**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ARMANDO SERRANO,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | No. |
| **REYNALDO GUEVARA,** ) | |
| **ERNEST HALVORSEN, EDWARD** ) | |
| **MINGEY, MATTHEW COGHLAN,** ) | |
| **JOHN DILLON, the CITY OF** ) | **JURY TRIAL DEMANDED** |
| **CHICAGO, and COOK COUNTY** ) | |
| ) | |
| Defendants. ) | |
| ) | |

## COMPLAINT

Plaintiff, ARMANDO SERRANO, by his undersigned attorney, for his complaint against

former Police Detectives, REYNALDO GUEVARA, ERNEST HALVORSEN, EDWARD

MINGEY, former Assistant State's Attorneys MATTHEW COGHLAN and JOHN DILLON, the

CITY OF CHICAGO, and COOK COUNTY.

## INTRODUCTION

1.      Plaintiff, Armando Serrano, spent 23 years incarcerated in the Illinois Department

of Corrections for the murder of Rodrigo Vargas, a crime he did not commit. In May and June of

1993, the Police Officer Defendants – Reynaldo Guevara, Ernest Halvorsen, and Edward Mingey

– conspired among themselves and with others, known and unknown, to prosecute Plaintiff for

Vargas's murder, while indifferent to the fact that he was innocent.

2.      Former Assistant Cook County State's Attorneys Matthew Coghlan and John

Dillon, while acting in an investigatory function and prior to Plaintiff's arrest, conspired among

themselves and with Detectives Guevara and Halvorsen to fabricate witness testimony from a notorious "snitch" witness to secure the unjust conviction of Plaintiff. Indeed, former Assistant State's Attorneys Coghlan and Dillon developed that same "snitch" witness to secure indictments against a total of five men, knowing full well that the men were innocent of the crimes for which they were accused.

3.      All of the Defendants concealed the fact that they had coerced, pressured, threatened, and induced the "snitch" witness to falsely implicate Plaintiff. There was no eyewitness or physical evidence connecting Plaintiff to the crime, thus without the Defendants' concealment of evidence, falsification of evidence, and manipulation of witness testimony, Plaintiff would never have been convicted.

4.      For two decades, Plaintiff fought to prove his innocence while the defendant officers continued to frame Latino men in the Humboldt Park area of Chicago until retiring with their full police pension.

5.      Defendant Guevara, known in the community as "the Hook-up Artist," routinely worked with other crooked officers, including disgraced Chicago police detective Joseph Miedzianowski and corrupt defense attorneys to allow select suspects to "buy" their way out of trouble while simultaneously framing innocent people.

6.      Following an evidentiary hearing, the Illinois Appellate Court issued a pair of scathing decisions acknowledging Guevara's pattern and practice of misconduct. *People v. Serrano*, 2016 IL App (1st) 133493 (June 7, 2016) & *People v. Montanez,* 2016 IL App (1st) 133726 (June 7, 2016). For his part, Guevara has consistently refused to answer questions under oath concerning his conduct in this case and numerous others, instead exercising his Fifth Amendment privilege to remain silent.

7.     On July 20, 2016, the office of the Cook County State's Attorney vacated Plaintiff's conviction and moved for an order to *nolle prosequi* the charges. That day, Plaintiff was released from custody. With no objection from the State, the Honorable Chief Judge of the Criminal Division, Leroy Martin, Jr., granted Plaintiff a Certificate of Innocence on November 2, 2016.

8.     Even before Plaintiff's formal exoneration, the City of Chicago retained former United State's Attorney Scott Lassar and his firm Sidley & Austin to conduct an independent investigation into Guevara's conduct in a number of Guevara-related murder investigations, including Plaintiff's. The City, through their attorneys, concluded that Plaintiff was probably innocent of the murder of Rodrigo Vargas.

9.     Just last week, the murder convictions and life sentences of Robert Almodovar and Willian Negron were vacated at the request of the office of the Cook County State's Attorney who acknowledged that new evidence of a "pattern and practice" of misconduct by Detective Guevara was of such a conclusive character that it would probably change the result on retrial. The State then moved to dismiss all charges against the men.

10.     Plaintiff now seeks compensation for the incalculable hardship and injury he suffered as a result of the Defendants' egregious misconduct.

## JURISDICTION AND VENUE

11.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiff's rights as secured by the United States Constitution as well as the deprivation of rights under Illinois state law.

12.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper under 28 U.S.C. §1391(b), because the parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district.

## PARTIES

13.     Plaintiff Armando Serrano, a 44-year-old Latino man, is a citizen of the United States and resides in the City of Chicago.

14.     Defendant City of Chicago is an Illinois Municipal Corporation, which employs or employed the Police Officer Defendants at the time of the events giving rise to this suit.

15.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office (hereinafter referred to as the "CCSAO") and the Cook County Board. At all times relevant to this action, Cook County and the CCSAO were responsible for the policies, practices, customs of the CCSAO and the prosecutors working therein. At certain times relevant to this action, Cook County and the Cook County State's Attorney's Office were employers of Defendants Coghlan and Dillon and are necessary parties to the lawsuit.

16.     At all relevant times hereto, Defendants Reynaldo Guevara (Star No. 16345) and Ernest Halvorsen (Star No. 20692) were members of the Chicago Police Department and assigned to the Gang Crimes Unit of Area Five also known as the 25th District. Each of these defendants conspired with one another and former Assistant Cook County State's Attorneys Matthew Coghlan and John Dillon and with other persons, known and unknown, to conceal and fabricate evidence, manipulate witness testimony, and maliciously prosecute Plaintiff for Rodrigo Vargas's murder.

17.     Defendant Sergeant Edward Mingey (Star No. 1731) was a member of the Chicago Police Department and assigned to Area Five's Violent Crimes Unit. Mingey was, at all relevant times, a supervisor of the Police Officer Defendants. He facilitated, condoned and approved the constitutional violations committed by the Police Officer Defendants.

18.     Defendants Matthew Coghlan and John Dillon, at all relevant times, were Assistant Cook County State's Attorneys assigned to the Gang Crimes Unit of the office of the Cook County State's Attorney. Prior to Plaintiff's arrest, Defendants Coghlan and Dillon directly participated in fabricating false witness statements from Francisco Vicente that were later introduced at trial and used to wrongfully convict Plaintiff.

19.     Each of the individual Chicago Police officer defendants are sued in his individual capacity, and each acted under color of state law and in the scope of his or her employment while engaging the actions alleged in this Complaint. Defendants Coghlan and Dillon are also sued in their individual capacities.

## FACTUAL ALLEGATIONS

20.     On February 5, 1993, at approximately 5:30 a.m., Rodrigo Vargas was shot to death in his van that was parked in front of his home located at 1838 N. Springfield Ave. Anna Velez, a neighbor, heard the gun shots but did not see anyone or any cars in the vicinity.

21.     Several hours later, Velez noticed that Vargas's van was still parked outside with the engine running. She went outside to investigate and discovered Vargas's body inside the van.

22.     Chicago Police officers and detectives arrived on the scene and observed Vargas inside his locked van. Vargas appeared to be holding a radio in his hand and his wallet containing $190 remained untouched in his pocket. Eight shell casings were recovered from the grass and sidewalk area near the van. There was no evidence of a struggle or close range fire.

23.     Wilda Vargas, the victim's widow, reported to Chicago Police detectives Jack and Schak that Vargas had no enemies and she could conceive of no reason why anyone would want to kill him. She further informed police that nothing appeared to have been taken from Vargas's van or from his person.

24.     Police also spoke to Gary Shoop, another neighbor who looked outside of his window after hearing gunshots. He told the detectives that he saw an older, light brown sedan, possibly a two-door vehicle, driving northbound on Springfield Ave.

25.     The crime went unsolved for four months until Detectives Reynaldo Guevara and Ernest Halvorsen took over the investigation.

**Arrest of Francisco Vicente and Plan to Cultivate Him as a "Witness"**

26.     On May 14, 1993, Francisco Vicente (a.k.a. "Chino") was arrested by 25th District (Area Five) Officers Lupa Pena and Luis Marron for three separate armed robberies. At the time of his arrest, Vicente was on bond for a simple robbery charge. Gang Detectives Guevara and Halvorsen knew Vicente from the streets as he was a member of the Imperial Gangsters street gang and had a significant criminal history. Vicente was a self-admitted heroin addict who robbed people to support his drug habit.

27.     The same day of Vicente's arrest, 16-year old Robert Bouto was arrested for the murder of Salvador Ruvalcaba and brought to the 25th District. Detectives Guevara and Halvorsen were assigned to the Ruvalcaba investigation and decided to procure Vicente's cooperation as a witness even though they knew he had no knowledge of the Ruvalcaba murder. Because Vicente was going through heroin withdrawal and was facing a significant prison sentence if convicted, Detectives Guevara and Halvorsen knew that he could be cultivated as a witness.

28.     Detectives Guevara and Halvorsen pulled Vicente out of the lock-up and told him that they wanted him to help them frame Robert Bouto for Ruvalcaba's murder. Initially, Vicente refused to cooperate but Detective Guevara smacked him around and told him that he didn't really have a choice in the matter. Guevara intimated that if he cooperated with the detectives they would help him out on his own cases, but that if he refused, his situation would get a lot worse.

29.      Detective Halvorsen played "good cop" to Guevara's "bad cop" and offered Vicente food and candy, knowing that Vicente was going through heroin withdrawal. Facing anywhere from nine to 97 years in prison if convicted and familiar with Guevara's pattern and practice of framing Latino men, Vicente reluctantly agreed to cooperate with Detectives Guevara and Halvorsen.

30.     Together, Detectives Guevara and Halvorsen contrived a "jailhouse" confession, fed that confession to Vicente, and directed him to falsely claim that Bouto made the confession to him in the lock-up. Vicente cooperated with the ploy and eventually signed a handwritten statement in the presence of an Assistant State's Attorney falsely claiming that Bouto had confessed to shooting Ruvalcaba while the two were in the lock-up. The detectives coached Vicente so that he could persuasively sell the story to the "rookie" Assistant State's Attorney. On May 19, 1993, Vicente appeared before the grand jury and repeated the false confession to secure a true bill of indictment against Bouto.[1]

---

[1] After conducting an independent investigation, the City of Chicago, through their counsel Sidley & Austin (led by former U.S. Attorney Scott Lassar) concluded that Robert Bouto was more likely than not innocent for the Ruvalcaba murder, a crime for which he spent over 20 years wrongly imprisoned. Bouto's Post-Conviction Petition alleging Actual Innocence is currently pending in the Circuit Court of Cook County.

### The Frame-Up of Plaintiff and his Co-Defendants

31.     With the Ruvalcaba murder cleared, Detectives Guevara and Halvorsen turned their attention to the unsolved murder of Rodrigo Vargas. The detectives re-interviewed Vargas's widow, Wilda Vargas, who again told them that her husband had no enemies and that she had no idea who would have murdered him. The detectives asked Wilda to recount in detail the day preceding her husband's murder. Wilda related that the night before Rodrigo's murder, they had gone to the bank and stopped at a gas station at North and Central Park Avenues. Rodrigo was carrying a roll of cash on him when he went into the cashier area to pay for his gas. Wilda recalled a minor incident at the gas station where Rodrigo honked at a tan-colored car that was blocking his way. The car was occupied by three Latino men. She did not think much of the incident.

32.     After speaking with Wilda, Detectives Guevara and Halvorsen decided (with no supporting evidence) that the motive for the Vargas murder was a robbery "gone bad" and that the three individuals in the car at the gas station were the offenders who had seen Vargas with a roll of cash. Consistent with a pattern of framing Latino men from the Humboldt Park area, detectives Guevara and Halvorsen decided to frame three Latino men who had previously been convicted of or accused of committing armed robberies. They settled on Plaintiff, Jose Montanez, and Jorge Pacheco.

33.     Even though no witness had suggested their involvement in the murder of Rodrigo Vargas, Detectives Guevara and/or Halvorsen inexplicably obtained the criminal histories of Plaintiff, Montanez, and Pacheco on May 25, 1993. They also secured photos of the three men. The only explanation for why the detectives ran the criminal histories of Plaintiff and

his co-defendants was to determine whether they could be framed (e.g., were any of them in custody at the time of the Vargas murder).

34.     Detective Guevara returned to Wilda Vargas's home to show her photos of Plaintiff, Montanez, and Pacheco. Guevara lied to Wilda and told her that the three men in the photos were the men that she saw in the tan car at the gas station.

35.     On or around June 6, 1993, Detectives Guevara and Halvorsen drove Vargas to Montanez's home to show her his car that was parked outside his home. Wilda was asked whether she recognized Montanez's car as the car she saw at the gas station the night before her husband's murder. Wilda stated only that the car was similar to the one she had seen at the gas station.

36.     Detective Guevara then told Wilda that the "bullet hole" on the passenger side of Montanez's car had been "matched" to ballistics evidence found at the scene of her husband's shooting. That statement was a lie.  No ballistics evidence connected Montanez's car to the crime scene.

37.     Guevara also falsely told Wilda that damage to the fender of Montanez's car was consistent with witness statements about the crime. Based on the false representations of detectives Guevara and Halvorsen, Wilda Vargas came to believe that the three men at the gas station were Plaintiff, Montanez, and Pacheco and that they were responsible for her husband's murder.

### Gang Crimes' Prosecutors Coghlan and Dillon Conspire with Detectives Guevara and Halvorsen to Use Vicente as a "Witness" in Three Separate Murder Prosecutions

38.     On June 2, 1993, Detectives Guevara and Halvorsen met with Assistant State's Attorneys Matthew Coghlan and John Dillon at the gang crimes division of the Cook County

State's Attorney's office to discuss the prosecution of Robert Bouto and the investigation of the Vargas murder.

39.    Detectives Guevara and Halvorsen told Coghlan and Dillon that the "street" was saying that Serrano, Montanez, and Pacheco were responsible for the Vargas murder and that they needed to develop some evidence to justify bringing Serrano (and his co-defendants) in for questioning. Guevara, Halvorsen, Coghlan, and Dillon agreed that they could get additional use out of Vicente.

40.    On June 2, 1993, ASAs Coghlan and Dillon arranged to have Vicente transported from Division 9 of the Cook County Jail to the gang crimes unit of the Cook County State's Attorney's office where they all met and discussed the plan to use Vicente as a witness in the Vargas murder and another gang case involving an Imperial Gangster named Geraldo Iglesias (a.k.a "Snake).

41.    Once at the Cook County State's Attorney's office, Detective Guevara told Vicente, in the presence of Halvorsen, Coghlan, and Dillon, that he wanted Vicente to say that he was present when Plaintiff, Montanez, and Pacheco attempted to rob Vargas. Vicente was instructed to look at the crime scene photos as Guevara fed him a narrative that involved naming Plaintiff, Montanez and Pacheco as the offenders. Vicente later stated that, "they [Guevara, Halvorsen, Coghlan, and Dillon] already knew who they wanted for the murder." Everyone in the room knew that Vicente was not actually present for the murder of Rodrigo Vargas.

42.    Vicente refused to go along with the plan that involved him admitting to being present for the murder, later explaining that he did not trust the detectives and the State's attorneys not to turn around and charge him with the murder. ASAs Coghlan and Dillon promised Vicente that he had nothing to worry about if he just cooperated and did what Guevara

and Halvorsen told him to do. However, Vicente insisted that he would not make himself an eyewitness to the crime.

43.    In what amounted to a brainstorming session, Detective Halvorsen proposed that Vicente implicate Plaintiff, Montanez, and Pacheco by falsely claiming that Montanez confessed their involvement in the crime to him. Again, ASAs Coghlan and Dillon promised Vicente that they would protect him by moving him to the State's Attorney Witness Quarters (a.k.a " the Q") where he would get special privileges. Coghlan and Dillon also promised that they would make sure he received a minimum sentence on his pending robbery cases and arrange for the sentences to run concurrently. In other words, they promised Vicente that they could secure him a minimum sentence of six years' imprisonment.

44.    Vicente was still reluctant but agreed to cooperate in exchange for the State's Attorney's protection and assistance. When all was said and done, Vicente became the State's key "snitch" witness in three murder prosecutions investigated by Detectives Guevara and Halvorsen: (1) the prosecution of Robert Bouto for the murder of Ruvelcaba; (2) the prosecutions of Serrano, Montanez, and Pacheco for the murder of Rodrigo Vargas; and (3) the prosecution of Geraldo Iglesias for the murder of Monica Roman.

45.    After the meeting with Vicente and ASAs Coghlan and Dillon, Detective Guevara and Halvorsen prepared a supplemental police report, falsely claiming that a confidential informant told them that Montanez admitted his involvement in the murder and further implicated Plaintiff and Pacheco.

46.    In truth, no confidential informant shared this information with the detectives. This story was completely fabricated by detectives Guevara and Halvorsen, ASA Coghlan, and

ASA Dillon who used it as a basis to arrest Plaintiff for questioning. The detectives and ASAs knew that they could later attribute the statement to Francisco Vicente.

**Plaintiff's First Arrest**

47.     On June 8, 1993, Plaintiff was arrested at his home and brought to Area Five for questioning. Detectives Guevara and Halvorsen planned to pressure Plaintiff to provide an inculpatory statement. Detectives Guevara and Halvorsen interrogated Plaintiff in a tag team fashion for roughly 24 hours with Guevara playing "bad cop" and Halvorsen playing "good cop," as was their routine.

48.     Detective Guevara yelled in Plaintiff's face, accusing him of killing Rodrigo Vargas while repeatedly slapping him in the face and the side of the head when Plaintiff denied having any knowledge or involvement in the crime. After physically assaulting Plaintiff, Guevara left the room and Halvorsen took over the interrogation, also attempting to elicit statements from Plaintiff albeit without physical abuse. Each time Guevara returned to the interrogation room, the physical abuse intensified. This back and forth continued until the following day (June 9, 1993) when Serrano was eventually released.

49.     Despite prolonged physical and psychological coercion, Plaintiff made no inculpatory statements and consistently denied any knowledge of the crime.

**Sergeant Mingey Helps Detectives Guevara and Halvorsen Fabricate False Testimony from his Informant, Timothy Rankins**

50.     On June 10, 1993, Timothy Rankins, a 19-year old member of the Spanish Cobras street gang, was arrested for committing a robbery along with his 15-year old accomplice named Demond Williams a.k.a "Shorty Folks."

51.     Rankins was a known snitch who worked closely with Sergeant Edward Mingey. In fact, Mingey describes Rankins as one of his best informants. In an interview with attorneys

from Sidley & Austin in 2014, Mingey declared, "I've never talked to a guy [Rankins] who was a better informant."

52.     Because of Sergeant Mingey's relationship with Rankins, Mingey agreed to assist Detectives Guevara and Halvorsen in obtaining Rankins' "cooperation" in the Vargas murder investigation. Sergeant Mingey and Detectives Guevara and Halvorsen knew that Rankins possessed no knowledge about the murder but, nonetheless, decided to use him to fabricate evidence against Serrano, Montanez, and Pacheco.

53.     Mingey, Guevara, and Halvorsen brought Rankins to an interrogation room at Area Five and told him that they wanted him to falsely state that he was present and witnessed the murder of Rodrigo Vargas. When Rankins resisted, he was physically assaulted by Detective Guevara. Guevara showed Rankins polaroid photos of Plaintiff, Montanez, and Pacheco and fed him a detailed narrative that was eventually reduced to writing.

54.     After being held overnight and repeatedly assaulted and threatened, Rankins eventually agreed to adopt a false witness statement contrived by Detectives Guevara and Halvorsen in which Rankins claims he was present (along with Demond Williams) when Plaintiff, Montanez, and Pacheco shot and killed Rodrigo Vargas.

55.     After obtaining Rankins' signed statement, Detectives Guevara and Halvorsen immediately returned to Plaintiff's home and arrested him a second time. Guevara told Plaintiff, "this time you aren't going home."

56.     A few days later, Rankins testified before the grand jury consistent with his statement. However, Rankins recanted his statement and testimony nine months later after resolution of his own pending case. Rankins refused to testify at Plaintiff's trial and left Chicago to avoid harassment from detectives Guevara and Halvorsen.

**Vicente Formalizes His Fabricated Witness Statement**

57.     On June 28, 1993, ASAs Coghlan and Dillon arranged to have Vicente brought to the gang crimes division of the Cook County State's Attorney office again to formalize the false witness statement that was constructed prior to Plaintiff's arrest.

58.     Detective Halvorsen wrote out Vicente's statement in which he claimed that he was hanging out at a "dope spot" at the corner of Hamlin and Altgeld on February 5, 1993 (the day of Vargas's murder) when Montanez drove up in a tan-colored Buick with Serrano and Pacheco. According to the fabricated statement, Montanez placed a large 9 mm semi-automatic pistol in one of the car's air vents and then confessed to Vicente that he, Plaintiff, and Pacheco had shot Rodrigo Vargas in a robbery "gone bad." According to the fabricated statement, Montanez told Vicente that they targeted a Mexican guy at a gas station after seeing him with a large amount of money and that during the robbery, Serrano "fucked up" and shot "the stud." Also according to the false statement, Montanez relayed that after the attempted robbery, Montanez smashed into a parked car as they drove off, causing damage to his left front fender.

59.     In the presence of an Assistant State's Attorney (who had not been present for and was not privy to the detectives and ASAs Coughlan and Dillon's prior conversations with Vicente), Vicente signed the handwritten statement that had been previously manufactured by Detectives Guevara, Detective Halvorsen, ASA Coghlan, and ASA Dillon.

60.     Four days later, on July 1, 1993, Vicente testified consistent with his written statement before a grand jury that returned true bills of indictment against Plaintiff, Montanez, and Pacheco.

61.     After testifying before the grand jury, Vicente was placed in the State's Attorney's witness quarters (a.k.a "the Q") where he spent the next three years, receiving a wide

array of benefits in exchange for his cooperation in three separate murder prosecutions, including approximately $2000 in cash, cigarettes, special food, access to drugs, and conjugal visits with both his wife and ex-wife. According to Vicente, he was transported back and forth between the Q and the Cook County State's Attorney's gang crimes office more times than he can count where he was prepped and coached by ASAs Coghlan and Dillon in preparation for his testimony in the Bouto, Serrano (and co-defendants), and Iglesias murder prosecutions.

### Plaintiff's Wrongful Conviction

62.     On March 3, 1995, following a bench trial in the Circuit Court of Cook County, Plaintiff was wrongly convicted of the murder of Rodrigo Vargas alongside his co-defendant Jose Montanez. Jorge Pacheco was acquitted. Pacheco's acquittal was curious since the State's evidence was identical as to all three co-defendants.

63.     Plaintiff was sentenced to a term of 55 years' imprisonment in the Illinois Department of Corrections. Defendants Guevara and Halvorsen both testified as prosecution witnesses at that trial and testified falsely in furtherance of the scheme to convict Plaintiff of murder without regard to his guilt or innocence.

64.     Vicente testified largely consistent with his false handwritten statement and prior grand jury testimony. The prosecutors knew Vicente's testimony was false as they had assisted in fabricating it along with Detectives Guevara and Halvorsen who targeted Plaintiff and his co-defendants for wrongful conviction. Because Wilda Vargas was unable to credibly identify the defendants in open- court as the men she saw at the gas station the night before her husband's murder, the trial court judge rejected her identification testimony. In sum, Plaintiff and his co-defendant were convicted solely on the "snitch" testimony of Francisco Vicente, testimony that was fabricated and induced by Defendants Guevara, Halvorsen, Coghlan and Dillon.

65.     At the time of Plaintiff's trial, neither Plaintiff nor his criminal defense attorney was aware of the concealment of evidence, fabrication of evidence, and manipulation of Wilda Vargas's testimony as set forth in this Complaint. Had these facts been disclosed, Plaintiff would not have been convicted.

66.     After Plaintiff, his co-defendants, and Bouto and Iglesias were all convicted, Vicente was finally sentenced on his own robbery cases. Although ASAs Coughlan and Dillon had originally promised Vicente that they would secure him a minimum six-year sentence, they overlooked that Vicente was on bond for his simple robbery case when he picked up the three additional armed robbery cases. This meant that his mandatory minimum sentence was nine years, not six years, because the sentence for simple robbery had to be served consecutive to the armed robbery offenses as a matter of law.

67.     To pacify their disgruntled star-witness, ASA Dillon promised Vicente (before he testified at Plaintiff's trial) that he would get him additional pre-trial custody credit so that he would not serve the entire nine-year sentence. ASA Dillon delivered on that promise when he drafted Vicente's sentencing order that reflected 1476 days of pre-trial custody credit when Vicente had only spent 1132 days in custody prior to sentencing. In sum, Vicente received 344 days of pre-trial credit to which he was not entitled. This benefit was never disclosed to Plaintiff.

**Plaintiff's Exoneration**

68.     Throughout his wrongful incarceration, Plaintiff tirelessly fought to prove that he was innocent and wrongfully convicted of the Vargas murder. His direct appeal and post-conviction petition were all denied. In 2005, the Northwestern Center on Wrongful Convictions filed a successor post-conviction petition on Plaintiff's behalf, alleging that Plaintiff was innocent of the murder. An evidentiary hearing was held on this petition during which Plaintiff

16

presented an affidavit of Francisco Vicente admitting that his testimony was false in its entirety. Now-retired, Reynaldo Guevara asserted his Fifth Amendment right to remain silent at Plaintiff's evidentiary hearing.

69.     Although the Circuit Court judge denied Plaintiff and Montanez relief at the close of the evidentiary hearing, the Illinois Appellate Court reversed that decision in a pair of scathing published decisions, *People v. Serrano*, 2016 IL App (1st) 133493 (June 7, 2016) *& People v. Montanez,* 2016 IL App (1st) 133726 (June 7, 2016).

70.     On remand, the office of the Cook County State's Attorney vacated Plaintiff's and Montanez's convictions and moved to *nolle prosequi* the murder charges.

71.     After spending 23 years in the Illinois Department of Corrections, Plaintiff was released from custody on July 20, 2016.

72.     With no objection from the State, the Honorable Leroy Martin, Jr. granted Plaintiff (and Jose Montanez) a Certificate of Innocence on November 2, 2016.

**Defendants Guevara and Halvorsen's History of Framing Innocent Persons**

73.     Tragically, Plaintiff's wrongful conviction at the hands of Detective Guevara and his accomplices, including Defendant Halvorsen, is not an isolated miscarriage of justice. Over the course of two decades, Guevara and Halvorsen framed literally dozens of other innocent men who have all lodged independent accusations of similar misconduct against him.[2]

74.     Guevara and Halvorsen are the subject of an ever-growing number of litigations both in criminal and civil courts. Detective Guevara is now refusing to testify about any of his activities as a Chicago police officer on grounds that truthful testimony would subject him to criminal liability.

---

[2] https://www.buzzfeed.com/melissasegura/detective-guevaras-witnesses?utm_term=.tymQzXk3Yn#.lhx2y8nblB

75.     Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including abusive tactics, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are dozens of identified cases in which Guevara has engaged in serious investigative misconduct, including many cases in which he has manipulated and coerced witnesses and fabricated and concealed evidence, as he did in this case.

76.     Given this extensive history, it is apparent that Guevara and Halvorsen engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline then for doing so.

77.     Regarding his role in framing Plaintiff, Defendant Guevara has asserted his Fifth Amendment right to silence when questioned about: whether he framed Plaintiff; whether he coerced Vicente to falsely implicate Plaintiff; whether he fed facts to Vicente; whether he coerced Rankins to falsely implicate Plaintiff; and whether he purposely misled Ms. Vargas into falsely identifying Plaintiff's car.

78.     Repeatedly, Defendant Guevara has also invoked his Fifth Amendment right not to answer any questions about allegations that he manipulated dozens of witnesses to provide false identifications because truthful responses could subject him to criminal liability, including every single instance of misconduct detailed below.

78.     Bill Dorsch is a former Chicago police detective. While serving with the Chicago police department, Dorsch was assigned to investigate a murder.  Several months after the murder occurred, Defendant Guevara brought two juveniles to the police station who purported to have witnessed a shooting and recorded the license place of the shooter.

80. Based on the information provided, Detective Dorsch created a photo array for the juveniles to attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "that's him." The juvenile then agreed with Guevara, saying that was the person who committed the shooting.

81. Dorsch then directed Defendant Guevara to leave the room and had the other juvenile view the same photo array, and he was unable to make any identification.

82. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles without Defendant Guevara being present. The juveniles admitted that they had been paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

83. Defendant Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago Police Officer Joseph Miedzianowski and his associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney [Richard Beuke] as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

84. In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara put Perez inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Juan Johnson to take the

19

blame for the murder. Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer.

85.    In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

86.    Juan Johnson was later exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

87.    In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz that if he did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

88.    In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not.

89.    In 1990, Defendant Guevara physically coerced Jose Maysonet into falsely confessing to the murders of Torrence and Kevin Wiley. Maysonet's convictions were reversed in 2016.

90.    In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the Grand Jury by threatening Rosario that if he did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

91.     In 1991, Defendant Guevara physically coerced sixteen year-old David Velazquez into making a false identification and giving false testimony by taking him to a rival gang's territory, beating him while chained to a wall at Area 5, and threatening to "get you for anything I can" if he did not talk. All of the false details of Velazquez's statement were provided by Guevara.

92.     In 1993, Defendant Guevara coerced an identification from Carl Richmond by threatening Richmond that he could make his life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

93.     In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained him to the wall of an interrogation room and told him that he was going to frame him for murder.  After Davila told Guevara that he did not do it, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite the fact that each of those witnesses had previously told the police that they had not been able to see the shooter.

94.     In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup.  As a result, these men falsely claimed that Colon had committed murder, but later came forward to bring Defendant Guevara's misconduct to light.

95.     In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

96.     In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

97.     In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight-hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand" saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

98.     In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragosa was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

99.     In 1995, Defendant Guevara engaged in misconduct when he told Jose Melendez to falsely identify Thomas Sierra as the shooter even though Melendez did not see the shooter. Melendez identified Sierra, but recanted his identification at trial.

100.     In 1996, Defendant Guevara coerced Maria Rivera into making a false identification of a man in a lineup by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution later abandoned murder charges against the individual whom Rivera falsely identified in the lineup.

101.     In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification. Guevara detained Ruiz repeatedly over the course of a ten-day period, locking him

22

in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew.

102.    In 1997, Defendant Guevara withheld physical evidence and failed to disclose the exculpatory statements of witness Ruth Atonetty to Ariel Gomez. Gomez was accused of firing multiple shots from a car into a crowd. Ruth Antonetty told Guevara that she heard multiple shots coming from within the crowd, not from Gomez's vehicle. Guevara continued to pressure her to change her account, and when she would not, he told her he "had other witnesses" and "didn't need her." As a result, Ariel Gomez did not have access to key *Brady* material at his trial.

103.    In 1998, Defendant Guevara used suggestive tactics to force twelve-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of murder. In 2011, Lopez testified at an evidentiary hearing that he had never been able to identify Rivera as the murderer. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges against Rivera.

104.    In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and observed the testimony of trial witnesses. She then conferred with Guevara, even though the Court had ordered all witnesses excluded from the courtroom to prevent collusion among the witnesses.

23

105.    In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus.  Guevara called her a "bitch" and pushed her out the back door of the bus.  He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke.  He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch."  Turner sought medical treatment and filed a complaint with the Office of Professional Standards.

106.    In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her  home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and two children, and left the home in shambles. Lloyd filed a complaint with the Office of Professional Standards the next day.

107.    In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed.  Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claim of a beating by the police. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action on Hunt's claim of excessive detention against the City of Chicago.

108.    In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year old sister Anna during a search of their home, during which the officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch" and

pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

109.     In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied knowing the people Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

110.     In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him and hit him in the head. Garcia filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS). Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as he was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

111.     In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights during an interrogation. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claim that he had been beaten while in police custody.

112.     In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses

confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with the Office of Professional Standards (OPS). OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

113.    In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime he knew nothing about.

114.    In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed he would serve seven years in prison whereas if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if he signed a statement, he could go home.

115.    In 1991, Defendant Guevara coerced a false confession from Daniel Rodriguez through the use of threats and intimidation. While en route to the police station, Guevara threatened to harm Rodriguez's family if he did not cooperate. Once at Area 5, Rodriguez was chained to a wall, denied food, water, and use of a restroom, and beaten by Guevara's partner, Defendant Halvorsen in the chest and torso. Guevara provided details of the crime to Rodriguez to include in Rodriguez's false confession.

116.    In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez (no relation to Plaintiff) without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, noting that "not only was defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

26

117.     In 1993, Defendant Guevara arrested fifteen year old Eliezar Cruzado and threatened him with life imprisonment if he did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

118.     In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of a two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room.  Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away.  Frias-Munoz, who did not speak English, agreed to give a statement to an assistant state's attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement he could not read.

119.     In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying and repeatedly said that he did not know what he had signed and had only signed the document so he could go home.  Duta complained to his father of being struck in the head and stomach by Guevara.

120.     In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the  11-hour interrogation, Guevara yelled at him,

slapped him numerous times on the side of his head, and told him that if he did not confess he would never see the light of day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores's statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of *Miranda*.

121. In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room. Dembski, a Polish National who did not speak English, was interrogated by Guevara without *Miranda* warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

122. In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Rosauro never confessed and was finally released after being held in custody for three days.

123. In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated.

124. In 1998, Defendant Guevara repeatedly threatened and beat Arturo Reyes in an attempt to unconstitutionally coerce Reyes into giving an incriminating statement. After two days of isolation and interrogation, Reyes provided a false statement.

125. In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

**Plaintiff's Damages**

126.     Plaintiff has suffered and continues to suffer enormous physical and psychological injury as a direct and proximate result of the Defendants' misconduct. Plaintiff spent 23 years of his life imprisoned for a crime that he did not commit. He woke up each day with this reality, not knowing whether he would ever succeed in proving the wrongfulness of his conviction and incarceration.

127.     Over the course of his 23 years of imprisonment, Plaintiff was separated from his wife and his two sons, one of whom was an infant when Plaintiff was incarcerated and the other who was not yet born. Plaintiff lost the chance to raise, care for, and mentor his children who were grown men by the time Plaintiff was released from prison.

128.     As a result of Defendants' actions, Plaintiff continues to experience physical and psychological pain and suffering, humiliation, constant fear and anxiety, deep depression, despair, rage, and other physical and psychological effects from his years of wrongful conviction.

**COUNT I**
**42 U.S.C. § 1983 – Due Process:  Fabrication of Evidence**

129.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

130.     As more fully described above, all of the individual Police Officer Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by fabricating Vicente and Rankins' statements and testimony as well as fabricating other evidence.

29

131. In the manner described more fully above, Defendants fabricated, coerced, manipulated and/or solicited false testimony from Vicente, Rankins, and Wilda Vargas implicating Plaintiff in the crimes that they knew he did not commit; falsified police reports; obtained Plaintiff's conviction using false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

132. Similarly, Defendants Coghlan and Dillon, acting individually, jointly, and in conspiracy with one another and the Police Officer Defendants, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments when they intentionally fabricated and solicited false statements and testimony from Vicente, statements they knew to be false.

133. Along with the defendant officers, Defendants Coghlan and Dillon knowing and intentionally fed false statements to Vicente prior to Plaintiff's arrest and subsequent charging.

134. The Police Officer Defendants and Defendants Coghlan and Dillon concealed and fabricated additional evidence that is not yet known to Plaintiff.

135. Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murder of Rodrigo Vargas. Thus, the Police Officer Defendants' misconduct and ASAs Coghlan and Dillon's' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

136. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

137. As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish,

humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

139. The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

### COUNT II
### 42 U.S.C. § 1983 – *Brady* Violations

140. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

141. As described in detail above, all of the individual Police Officer Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by withholding and suppressing exculpatory evidence from Plaintiff and the prosecution.

142. Defendants Coghlan and Dillon deliberately withheld exculpatory evidence from Plaintiff during the pendency of his criminal proceedings, up to and including the time of Plaintiff's conviction.

143. The Police Officer Defendants and Defendants Coghlan and Dillon also continued to suppress exculpatory evidence after Plaintiff's conviction. Had this exculpatory evidence been disclosed, Plaintiff would not have spent 23 years in prison for a crime he did not commit.

144. The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

145.     As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

146.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT III**
**42 U.S.C. § 1983 – Malicious Prosecution**

147.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

148.     In manner more fully described above, the Defendant officers and Defendants Coghlan and Dillon, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his Fourth and Fourteenth Amendment constitutional rights.

149.     The Defendant officers accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

150.     Defendants Coghlan and Dillon exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

151.    In so doing, the Defendant officers and Defendants Coghlan and Dillon caused Plaintiff to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and in all such proceedings were ultimately terminated in Plaintiff's favor indicative of his innocence.

152.    The Defendant officers and Defendants Coghlan and Dillon subjected Plaintiff to unauthorized and arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a  crime of which he was totally innocent, through the Defendant officers and Defendants Coghlan and Dillon's fabrication, suppression, and withholding of evidence.

153.    The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

154.    As a direct and proximate result of this deprivation of his constitutional right, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

155.    The misconduct described above in this Count by the Defendant officers and Defendants Coghlan and Dillon was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT IV
## 42 U.S.C. § 1983 – Conspiracy

156.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

157. All of the individual Police Officer Defendants along with Defendants Coghlan and Dillon and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to coerce, induce, and fabricate false evidence in the form of witness statements and testimony for the purpose of framing Plaintiff for a crime he did not commit.

158. All of the individual Police Officer Defendants along with Defendants Coghlan and Dillon and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to deprive Plaintiff of material exculpatory evidence and information to which he was lawfully entitled and to conceal their misconduct from Plaintiff, all in violation of Plaintiff's constitutional rights, as described above.

159. In this manner, the Police Officer Defendants and Defendants Coghlan and Dillon, acting in concert with other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

160. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant joint activity.

161. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

162. As a direct and proximate result of this of this illicit agreement referenced above, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

163.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT V
## 42 U.S.C. § 1983 – Failure to Intervene

164.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

165.     In the manner described above, one or more of the individual Police Officer Defendants and Defendants Coghlan and Dillon, and other unknown individuals, stood by without intervening to prevent the alleged constitutional violations, despite having an opportunity to do so.

166.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with willful indifference to Plaintiff's constitutional rights, and in total disregard of the truth and Plaintiff's innocence.

167.     As a direct and proximate result of this failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including, but not limited to, loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

168.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT VI
## 42 U.S.C. § 1983 – *Monell* Policy Claim

169.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully

set forth herein.

170.     The Chicago Police Department is responsible for scores of miscarriages of

justice. Since 1986, no fewer than 70 documented cases have come to light in which Chicago

Police Detectives amassed "evidence" against an innocent person for a serious crime that he did

not commit. There are undoubtedly many more such cases that have not yet been discovered.

171.     The false charges against innocent people include numerous cases in which

Chicago Police Officers used the very same tactics that Defendants Guevara, Halvorsen, and

Mingey employed against Plaintiff in this case, including: (1) procuring false witness testimony

from detainees and "jailhouse snitches;" (2) concealment of exculpatory evidence; (3)

manipulation of witnesses in order to obtain false identifications; (4) manipulation of witnesses

in order to influence their testimony; and (5) the use of other tactics to secure the arrest,

prosecution and conviction of a person without regard to his actual guilt or innocence of the

offense.

172.     At all times relevant hereto, members of the Chicago Police Department,

including but not limited to the Defendants in this action, routinely manufactured evidence

against innocent persons by coercing, manipulating, threatening, pressuring, and offering

inducements to detainees to make false witness statements implicating innocent persons,

knowing full well that those statements were false. As a matter of widespread custom and

practice, members of the Chicago Police Department, including but not limited to the Defendants

in this action, contrived false witness narratives that were fed to vulnerable "jailhouse snitches"

who then adopted those false witness narratives as their own for the purpose of wrongly

convicting an innocent person. Furthermore, Members of the Chicago Police Department systematically suppressed exculpatory and/or impeaching material by concealing evidence that a jailhouse witness was coerced, manipulated, threatened, pressured or offered inducements to make false statements.

173.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, procured false testimony from detainee witnesses knowing full well that their testimony was false and would lead to the wrongful conviction of Plaintiff. The tactics and inducements used to gain cooperation from these jailhouse witnesses was concealed from Plaintiff.

174.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as part of the official file.

175.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, concealed exculpatory evidence from Plaintiff.

176.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, routinely manipulated, tricked, lied to, and misled witnesses for the purpose of influencing their testimony to conform to a false

narrative contrived by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false identifications of suspects.

177. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, manipulated, tricked, and improperly influenced the testimony of the victim's widow, Wilda Vargas.

178. The City of Chicago and the Chicago Police Department has failed to investigate any of the cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

179. Prior to and during 1993, the year in which Plaintiff was falsely charged with the Vargas murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The Former Chicago Police Officer of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

180. As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

181. As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct,

failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens

182.     Defendants Guevara and Halvorsen have a long history of engaging in the kind of investigative misconduct that occurred in this case, including the manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are approximately 40 known cases in which Guevara and Halvorsen have engaged in serious investigative misconduct, including many cases in which they have manipulated and coerced witnesses and fabricated and concealed evidence, as he did in this case. Guevara engaged in such misconduct because he had no reason to fear that the City of Chicago and its Police Department would ever discipline him for doing so.

183.     The City of Chicago and its Police Department failed in 1993 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

> a.     The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

    b.       The need to refrain from manipulation or potentially coercive conduct in relation to witnesses.

    c.       The risks associated with relying on testimony from "jailhouse snitches."

    d.       The risks of wrongful conviction and the steps police officers should take to minimize risks.

    e.       The risks of engaging in tunnel vision during investigation.

    f.       The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

184.    The need for police officers to be trained in these areas was and remains obvious. The City of Chicago's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

185.    The City's failure to train supervise and discipline its officers, including repeat offenders such as Defendants Guevara and Halvorsen, effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

186.    The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

187.    The policies and practices described in the foregoing paragraphs were consciously approved by the City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

188.    The actions of all of the individual Police Officer Defendants were done pursuant to policies and practices of the Chicago Police Department were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included, among others:

a.    conducting physically and psychologically or otherwise illegal or improperly coercive interrogations of witnesses in order to obtain false statements and wrongful convictions.

b.    manufacturing and fabricating false witness statements, and manipulating and lying to witnesses to influence unreliable and inaccurate testimony.

c.    filing false reports and giving false statements and testimony about interrogations and witness interviews or constructing parts or all of witness statements; suppressing evidence concerning interrogations and/or witness interviews; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of fabricated witness statements, including those by "jailhouse snitches;" and otherwise covering up the true nature of those interviews and/or interrogations.

d.    failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of misconduct, on how to avoid false arrests, wrongful

imprisonments, malicious prosecutions, and wrongful convictions, and on the proper manner in which to conduct interrogations of witnesses and arrestees. Among those the City failed to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control were the repeat offenders Defendants Guevara and Halvorsen.

e.  perpetuating, encouraging and condoning the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above, whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to report. This code of silence caused police officers either to remain silent or give false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves or fellow officers from discipline, civil liability, or criminal charges. The code of silence also caused police officers to perjure themselves in criminal cases where they and their fellow officers have fabricated evidence or concealed exculpatory evidence.

189.   The policies and practices described in this Count and in the factual allegations section of this Complaint were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

190.   As a direct and proximate result of the City's actions, Plaintiff suffered injuries, including, but not limited to, emotion distress, as if more fully alleged above.

191.    The City of Chicago is therefore liable for the misconduct committed by the Police Officer Defendants.

## COUNT VII
## State Law Claim – Malicious Prosecution

192.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

193.    All of the individual Defendants and Defendants Coghlan and Dillon caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued with malice and resulted in the injury to Plaintiff. All such proceedings were ultimately terminated in Plaintiff's favor and in a manner indicative of innocence.

194.    The Defendants accused Plaintiff of murdering Rodrigo Vargas, knowing that he was innocent of the crime. All of the individual defendants fabricated evidence, manipulated witness testimony, and withheld exculpatory evidence. The individual Defendant officers knowingly made false statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings against Plaintiff.

195.    While acting in an investigatory function and prior to the arrest of Plaintiff, Defendants Coghlan and Dillon fabricated evidence from the State's snitch witness, Francisco Vicente with the intent of using that statement and his subsequent false testimony to institute and continue judicial proceedings against Plaintiff.

196.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

197.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT VIII
## State Law Claim – Civil Conspiracy

198.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

199.    As described more fully in the preceding paragraphs, the individual Defendant officers and Defendants Coghlan and Dillon acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means.

200.    In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willing participants in joint activity.

201.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

202.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT IX
## State Law Claim – Intentional Infliction of Emotional Distress

203.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

204.    The acts and conduct of the individual Defendants as set forth above were extreme and outrageous. The Defendants intended to cause, or were in reckless disregard of the probability that their conduct would cause sever, emotional distress to Plaintiff.

205.    The individual Defendants' actions and conduct directly and proximately caused severe emotional distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

198.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

199.    As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

### COUNT X
### State Law Claim – Respondeat Superior

200.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

201.    When they committed the acts alleged in this Complaint, the individual Defendant officers were members and agents of the Chicago Police Department, an agency of the City of Chicago, acting at all relevant times within the scope of their employment and under color of law.

202.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

203.    Similarly, when they committed the acts alleged in this Complaint, Defendants Coghlan and Dillon were members and agents of the Cook County State's Attorney's office, an agency of the County of Cook, Illinois, acting at all relevant times within the scope of their employment and under color of law.

204.    Defendant Cook County is therefore liable as principal for all torts committed by its agents, Defendants Coghlan and Dillon.

### COUNT XI
### State Law Claim – Indemnification

205.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

206.     Illinois law provides that public entities must pay any tort judgment for compensatory damages for which its employees are liable based on upon the employees' misconduct committed within the scope of their employment activities.

207.     The individual Defendant officers are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described herein.

208.     Defendants Coghlan and Dillon are or were employees of Cook County State's Attorney's office, an agency of Cook County, Illinois, who acted within the scope of their employment in committing the misconduct described herein.

**WHEREFORE**, Plaintiff Armando Serrano prays this Court enter judgment in his favor and against Defendants Reynaldo Guevara, Ernest Halvorsen, Edward Mingey, Matthew Coghlan, John Dillon, the City of Chicago, and Cook County awarding compensatory damages, costs and attorneys' fees against all Defendants, and punitive damages against each of the individual Defendants in their individual capacities; and for such further and additional relief as this Court may deem appropriate and just.

**JURY DEMAND**

Plaintiff demands trial by jury.


Respectfully Submitted,

**ARMANDO SERRANO**

By:     /s/JENNIFER BONJEAN
               *His Attorney*

Jennifer Bonjean
Bonjean Law Group, PLLC
1000 Dean St., Ste. 422
Brooklyn, New York  11238
718-875-1850