**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **ARMANDO SERRANO,** | |
| Plaintiff, | |
| v. | Case No. 17 CV 2869 |
| **REYNALDO GUEVARA, ERNEST HALVORSEN, EDWARD MINGEY, MATTHEW COGHLAN, JOHN DILLON; the CITY OF CHICAGO; and COOK COUNTY** | District Judge Manish S. Shah Magistrate Judge Jeffrey Cole  **JURY TRIAL DEMANDED** |
| Defendants. | |

**DEFENDANT MATTHEW COGHLAN'S ANSWER AND AFFIRMATIVE
DEFENSES TO PLAINTIFF'S FIRST AMENDED COMPLAINT**

Defendant, Matthew Coghlan ("Coghlan"), by his undersigned counsel, for his Answer

and Affirmative Defenses to Plaintiff's First Amended Complaint ("Amended Complaint"),

states as follows:[1]

1.     Plaintiff, Armando Serrano, spent 23 years incarcerated in the Illinois Department
of Corrections for the murder of Rodrigo Vargas, a crime he did not commit. In May and June of
1993, the Police Officer Defendants – Reynaldo Guevara, Ernest Halvorsen, and Edward Mingey
– conspired among themselves and with others, known and unknown, to prosecute Plaintiff for
Vargas's murder, while indifferent to the fact that he was innocent.

**ANSWER:**     Coghlan admits, on information and belief, that Plaintiff Armando Serrano

("Plaintiff") spent 23 years incarcerated in the Illinois Department of Corrections for the murder

of Rodrigo Vargas.  To the extent any of the remaining allegations in this paragraph are directed

to Coghlan, Coghlan denies all such allegations.

---

[1] Plaintiff's Amended Complaint includes a number of headings and subheadings.  To the extent
any such headings or subheadings could be construed as containing factual allegations to which an answer
is required, Coghlan denies all such allegations.

2.      Former Assistant Cook County State's Attorneys Matthew Coghlan and John Dillon, while acting in an investigatory function and prior to Plaintiff's arrest, conspired among themselves and with Detectives Guevara and Halvorsen to fabricate witness testimony from a notorious "snitch" witness to secure the unjust conviction of Plaintiff. Indeed, former Assistant State's Attorneys Coghlan and Dillon developed that same "snitch" witness to secure indictments against a total of five men, knowing full well that the men were innocent of the crimes for which they were accused.

**ANSWER:**      Coghlan denies the allegations in this paragraph.

3.      All of the Defendants concealed the fact that they had coerced, pressured, threatened, and induced the "snitch" witness to falsely implicate Plaintiff. There was no eyewitness or physical evidence connecting Plaintiff to the crime, thus without the Defendants' concealment of evidence, falsification of evidence, and manipulation of witness testimony, Plaintiff would never have been convicted.

**ANSWER:**      Coghlan denies the allegations in this paragraph.

4.      For two decades, Plaintiff fought to prove his innocence while the defendant officers continued to frame Latino men in the Humboldt Park area of Chicago until retiring with their full police pension.

**ANSWER:**      Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

5.      Defendant Guevara, known in the community as "the Hook-up Artist," routinely worked with other crooked officers, including disgraced Chicago police detective Joseph Miedzianowski and corrupt defense attorneys to allow select suspects to "buy" their way out of trouble while simultaneously framing innocent people.

**ANSWER:**      Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

6.      Following an evidentiary hearing, the Illinois Appellate Court issued a pair of scathing decisions acknowledging Guevara's pattern and practice of misconduct. *People v. Serrano*, 2016 IL App (1st) 133493 (June 7, 2016) *& People v. Montanez,* 2016 IL App (1st) 133726 (June 7, 2016). For his part, Guevara has consistently refused to answer questions under oath concerning his conduct in this case and numerous others, instead exercising his Fifth Amendment privilege to remain silent.

**ANSWER:**      Coghlan admits that, on June 7, 2016, the First District Appellate Court of Illinois

issued opinions in *People v. Serrano*, 2016 IL App (1st) 133493 (June 7, 2016) and *People v.*

*Montanez,* 2016 IL App (1st) 133726 (June 7, 2016).  Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

7.      On July 20, 2016, the office of the Cook County State's Attorney vacated Plaintiff's conviction and moved for an order to *nolle prosequi* the charges. That day, Plaintiff was released from custody. With no objection from the State, the Honorable Chief Judge of the Criminal Division, Leroy Martin, Jr., granted Plaintiff a Certificate of Innocence on November 2, 2016.

**ANSWER:**     Coghlan admits, based on court records, that the State moved to vacate Plaintiff's murder conviction and moved for an order to *nolle prosequi* the charges on July 20, 2016. Coghlan also admits, based on court records, that Judge Leroy Martin, Jr. granted Plaintiff a Certificate of Innocence on November 2, 2016.  Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

8.      Even before Plaintiff's formal exoneration, the City of Chicago retained former United State's Attorney Scott Lassar and his firm Sidley & Austin to conduct an independent investigation into Guevara's conduct in a number of Guevara-related murder investigations, including Plaintiff's. The City, through their attorneys, concluded that Plaintiff was probably innocent of the murder of Rodrigo Vargas.

**ANSWER:**     Coghlan admits, on information and belief, that the City of Chicago retained the law firm Sidley Austin to conduct an investigation into certain cases in which Guevara was involved, including Plaintiff's case, and that the report of the investigation of Plaintiff's case speaks for itself.  Coghlan denies any allegations concerning the contents, findings, or conclusions in the report that are inconsistent with that report.  Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

9.      Just last week, the murder convictions and life sentences of Robert Almodovar and Willian [*sic*] Negron were vacated at the request of the office of the Cook County State's

Attorney who acknowledged that new evidence of a "pattern and practice" of misconduct by Detective Guevara was of such a conclusive character that it would probably change the result on retrial. The State then moved to dismiss all charges against the men.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

10.     Plaintiff now seeks compensation for the incalculable hardship and injury he suffered as a result of the Defendants' egregious misconduct.

**ANSWER:**     Coghlan admits that Plaintiff is seeking damages for purported claims in his Amended Complaint, but denies that Plaintiff has suffered any hardship or injury, or is entitled to any damages, as a result of Coghlan's conduct, which was at all times proper.  Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

11.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiff's rights as secured by the United States Constitution as well as the deprivation of rights under Illinois state law.

**ANSWER:**     Coghlan admits that Plaintiff's Amended Complaint seeks damages for purported claims asserted pursuant to 42 U.S.C. § 1983 and Illinois state law, but Coghlan denies liability to Plaintiff for any and all claims asserted in the Amended Complaint.

12.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper under 28 U.S.C. §1391(b), because the parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district.

**ANSWER:**     Coghlan admits that venue is proper in this Court and that the alleged events that are the subject of Plaintiff's claims allegedly occurred in this judicial district.  Coghlan denies, however, the allegations and events asserted by Plaintiff insofar as they are directed to Coghlan and further denies liability to Plaintiff for any and all claims asserted in the Amended Complaint. Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

13.     Plaintiff Armando Serrano, a 44-year-old Latino man, is a citizen of the United States and resides in the City of Chicago.

**ANSWER:**     Coghlan admits, upon information and belief, that Plaintiff is a Latino man and was, at the time of the filing of the original Complaint, 44 years old.  Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

14.     Defendant City of Chicago is an Illinois Municipal Corporation, which employs or employed the Police Officer Defendants at the time of the events giving rise to this suit.

**ANSWER:**     Coghlan admits that the City of Chicago is an Illinois Municipal Corporation. Coghlan further admits that the named Police Officer Defendants were employed by the City of Chicago at various dates and times.  Coghlan denies the remaining allegations of this paragraph.

15.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office (hereinafter referred to as the "CCSAO") and the Cook County Board. At all times relevant to this action, Cook County and the CCSAO were responsible for the policies, practices, customs of the CCSAO and the prosecutors working therein. At certain times relevant to this action, Cook County and the Cook County State's Attorney's Office were employers of Defendants Coghlan and Dillon and are necessary parties to the lawsuit.

**ANSWER:**     Coghlan admits that Defendant Cook County is a governmental entity within the State of Illinois and that the Cook County State's Attorney's Office and the Cook County Board are located within Cook County.  Coghlan further admits that he was employed by the Cook County State's Attorney's Office from 1987 to 2000.  Coghlan denies the remaining allegations in this paragraph.

16.     At all relevant times hereto, Defendants Reynaldo Guevara (Star No. 16345) and Ernest Halvorsen (Star No. 20692) were members of the Chicago Police Department and assigned to the Gang Crimes Unit of Area Five also known as the 25th District. Each of these defendants conspired with one another and former Assistant Cook County State's Attorney's Matthew Coghlan and John Dillon and with other persons, known and unknown, to conceal and fabricate evidence, manipulate witness testimony, and maliciously prosecute Plaintiff for Rodrigo Vargas's murder.

**ANSWER:**     Coghlan admits that Defendants Guevara and Halvorsen were officers in the

Chicago Police Department's Gang Crimes Unit of Area 5, but lacks sufficient knowledge or

information to form a belief as to what periods of time they were so assigned and therefore

denies the same.  Coghlan denies the remaining allegations in this paragraph.

17.     Defendant Sergeant Edward Mingey (Star No. 1731) was a member of the
Chicago Police Department and assigned to Area Five's Violent Crimes Unit. Mingey was, at all
relevant times, a supervisor of the Police Officer Defendants. He facilitated, condoned and
approved the constitutional violations committed by the Police Officer Defendants.

**ANSWER:**     Coghlan admits, based on information and belief, that Defendant Mingey was an

officer in the Chicago Police Department's Gang Crimes Unit of Area 5, but lacks sufficient

knowledge or information to form a belief as to what periods of time he was so assigned and

therefore denies the same.  Coghlan lacks sufficient knowledge or information to form a belief as

to the truth of the remaining allegations in this paragraph and therefore denies them.

18.     Defendants Matthew Coghlan and John Dillon, at all relevant times, were
Assistant Cook County State's Attorneys assigned to the Gang Crimes Unit of the office of the
Cook County State's Attorney. Prior to Plaintiff's arrest, Defendants Coghlan and Dillon directly
participated in fabricating false witness statements from Francisco Vicente that were later
introduced at trial and used to wrongfully convict Plaintiff.

**ANSWER:**     Coghlan admits that he was an Assistant States Attorney and was assigned to the

Gang Crimes Unit of the Cook County State's Attorney's Office from 1992 to 1997.  Coghlan

further admits that John Dillon was an Assistant States Attorney and was assigned to the Gang

Crimes Unit of the Cook County State's Attorney's Office for some period of time, but lacks

sufficient knowledge or information to form a belief as to what periods of time Dillon was so

assigned and therefore denies the same.  Coghlan denies the remaining allegations in this

paragraph.

19.     Each of the individual Chicago Police officer defendants are sued in his individual
capacity, and each acted under color of state law and in the scope of his or her employment while

engaging the actions alleged in this Complaint. Defendants Coghlan and Dillon are also sued in their individual capacities.

**ANSWER:**   Coghlan admits that Plaintiff's Amended Complaint purports to sue each of the

individual defendants in his individual capacity.  Coghlan also admits that he was employed by,

and acted within the scope of his employment at, the Cook County State's Attorney's Office

during the State's prosecution of the Vargas murder.  Coghlan lacks sufficient knowledge or

information to form a belief as to the truth of the remaining allegations in this paragraph and

therefore denies them.

20.     On February 5, 1993, at approximately 5:30 a.m., Rodrigo Vargas was shot to death in his van that was parked in front of his home located at 1838 N. Springfield Ave. Anna Velez, a neighbor, heard the gun shots but did not see anyone or any cars in the vicinity.

**ANSWER:**   Based on records of the Chicago Police Department and the Cook County State's

Attorney's Office, including the transcript of Anna Velez's trial testimony, Coghlan admits the

allegations in this paragraph.

21.     Several hours later, Velez noticed that Vargas's van was still parked outside with the engine running. She went outside to investigate and discovered Vargas's body inside the van.

**ANSWER:**   Coghlan admits, based on records from the Chicago Police Department, that later

the same morning of February 5, 1993, Anna Velez noticed that Vargas's van was still parked

outside with the engine running.  Coghlan further admits, based on records from the Chicago

Police Department, that Anna Velez then went outside and observed Vargas's body inside the

van.  Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the

remaining allegations in this paragraph and therefore denies them.

22.     Chicago Police officers and detectives arrived on the scene and observed Vargas inside his locked van. Vargas appeared to be holding a radio in his hand and his wallet containing $190 remained untouched in his pocket. Eight shell casings were recovered from the grass and sidewalk area near the van. There was no evidence of a struggle or close range fire.

**ANSWER:**    Coghlan admits, based on records from the Chicago Police Department, that the

officers who arrived on the scene observed Vargas inside the van, holding a pull-out stereo unit.

Coghlan further admits, based on records from the Chicago Police Department, that Vargas's

personal belongings appeared to be intact.  Coghlan further admits, based on records from the

Chicago Police Department, that investigators recovered eight shell casings from the scene, one

near the curb, one closer to the sidewalk and six gathered on the parkway.  Coghlan lacks

sufficient knowledge or information to form a belief as to the truth of the remaining allegations

in this paragraph and therefore denies them.

23.    Wilda Vargas, the victim's widow, reported to Chicago Police detectives Jack and
Schak that Vargas had no enemies and she could conceive of no reason why anyone would want
to kill him. She further informed police that nothing appeared to have been taken from Vargas's
van or from his person.

**ANSWER:**    Coghlan admits, based on records from the Chicago Police Department, that

Wilda Vargas, the victim's widow, reported to officers at the scene that her husband had no

enemies.  Coghlan further admits, based on records from the Chicago Police Department, that

during her initial interview with officers, Wilda Vargas did not provide a reason for the shooting

to the officers on the scene and that the initial interview with her indicated that nothing appeared

to be missing.  Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the remaining allegations in this paragraph and therefore denies them.

24.    Police also spoke to Gary Shoop, another neighbor who looked outside of his
window after hearing gunshots. He told the detectives that he saw an older, light brown sedan,
possibly a two-door vehicle, driving northbound on Springfield Ave.

**ANSWER:**    Coghlan admits, based on records of the Chicago Police Department, that a

neighbor by the name of Gary Shoop, who lived at 1842 N. Springfield Avenue, Chicago,

Illinois told Chicago Police officers that he looked outside at around 5:35 a.m. on the morning of

the Vargas murder and saw a full size, possibly two-door, older light brown Chevrolet driving

north on Springfield. Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

25.     The crime went unsolved for four months until Detectives Reynaldo Guevara and Ernest Halvorsen took over the investigation.

**ANSWER:**     Coghlan admits, based on records from the Chicago Police Department, that the crime was not solved for four months after the murder, in that no charges had been filed against the perpetrators. Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

26.     On May 14, 1993, Francisco Vicente (a.k.a. "Chino") was arrested by 25th District (Area Five) Officers Lupa Pena and Luis Marron for three separate armed robberies. At the time of his arrest, Vicente was on bond for a simple robbery charge. Gang Detectives Guevara and Halvorsen knew Vicente from the streets as he was a member of the Imperial Gangsters street gang and had a significant criminal history. Vicente was a self-admitted heroin addict who robbed people to support his drug habit.

**ANSWER:**     Coghlan admits, based on records from the Chicago Police Department and the Cook County State's Attorney's Office, that Francisco Vicente was a member of the Imperial Gangsters street gang, is also known as "Chino," and was arrested for robbery on or around May 14, 1993. Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

27.     The same day of Vicente's arrest, 16-year old Robert Bouto was arrested for the murder of Salvador Ruvalcaba and brought to the 25th District. Detectives Guevara and Halvorsen were assigned to the Ruvalcaba investigation and decided to procure Vicente's cooperation as a witness even though they knew he had no knowledge of the Ruvalcaba murder. Because Vicente was going through heroin withdrawal and was facing a significant prison sentence if convicted, Detectives Guevara and Halvorsen knew that he could be cultivated as a witness.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

28.     Detectives Guevara and Halvorsen pulled Vicente out of the lock-up and told him that they wanted to help them frame Robert Bouto for Ruvalcaba's murder. Initially, Vicente

- 9 -

refused to cooperate but Detective Guevara smacked him around and told him that he didn't really have a choice in the matter. Guevara intimated that if he cooperated with the detectives they would help him out on his own cases, but that if he refused, his situation would get a lot worse.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

29.     Detective Halvorsen played "good cop" to Guevara's "bad cop" and offered Vicente food and candy, knowing that Vicente was going through heroin withdrawal. Facing anywhere from nine to 97 years in prison if convicted and familiar with Guevara's pattern and practice of framing Latino men, Vicente reluctantly agreed to cooperate with Detectives Guevara and Halvorsen.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

30.     Together, Detectives Guevara and Halvorsen contrived a "jailhouse" confession, fed that confession to Vicente, and directed him to falsely claim that Bouto made the confession to him in the lock-up. Vicente cooperated with the ploy and eventually signed a handwritten statement in the presence of an Assistant State's Attorney falsely claiming that Bouto had confessed to shooting Ruvalcaba while the two were in the lock-up. The detectives coached Vicente so that he could persuasively sell the story to the "rookie" Assistant State's Attorney. On May 19, 1993, Vicente appeared before the grand jury and repeated the false confession to secure a true bill of indictment against Bouto.[2]

**ANSWER:**     Coghlan denies that he was the Assistant State's Attorney referenced in this

paragraph.  Coghlan lacks sufficient knowledge or information to form a belief as to the truth of

the remaining allegations in this paragraph and the accompanying footnote and therefore denies

them.

31.     With the Ruvalcaba murder cleared, Detectives Guevara and Halvorsen turned their attention to the unsolved murder of Rodrigo Vargas. The detectives re-interviewed Vargas's widow, Wilda Vargas, who again told them that her husband had no enemies and that she had no idea who would have murdered him. The detectives asked Wilda to recount in detail the day

---

[2]     After conducting an independent investigation, the City of Chicago, through their counsel Sidley & Austin (led by former U.S. Attorney Scott Lassar) concluded that Robert Bouto was more likely than not innocent for the Ruvalcaba murder, a crime for which he spent over 20 years wrongly imprisoned. Bouto's Post-Conviction Petition alleging Actual Innocence is currently pending in the Circuit Court of Cook County.

preceding her husband's murder. Wilda related that the night before Rodrigo's murder, they had gone to the bank and stopped at a gas station at North and Central Park Avenues. Rodrigo was carrying a roll of cash on him when he went into the cashier area to pay for his gas. Wilda recalled a minor incident at the gas station where Rodrigo honked at a tan-colored car that was blocking his way. The car was occupied by three Latino men. She did not think much of the incident.

**ANSWER:**    Coghlan admits, based on records of the Chicago Police Department, that

Detective Guevara interviewed Wilda Vargas, who related that on February 4, 1993, she, her

husband, and children went to the bank; that on the way home they stopped at a gas station at

North Avenue and Central Park; that her husband had a roll of money with him when he went

into the station to make a purchase; that a tan car occupied by three Latino men parked directly

in front of the Vargas vehicle at the gas station; that the driver of the tan vehicle walked into the

station behind her husband; and that when she, her husband  and her children left the gas station,

the tan car began to follow them back to their house on Springfield.  Coghlan lacks sufficient

knowledge or information to form a belief as to the truth of the remaining allegations in this

paragraph and therefore denies them.

32.    After speaking with Wilda, Detectives Guevara and Halvorsen decided (with no supporting evidence) that the motive for the Vargas murder was a robbery "gone bad" and that the three individuals in the car at the gas station were the offenders who had seen Vargas with a roll of cash. Consistent with a pattern of framing Latino men from the Humboldt Park area, detectives Guevara and Halvorsen decided to frame three Latino men who had previously been convicted of or accused of committing armed robberies. They settled on Plaintiff, Jose Montanez, and Jorge Pacheco.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

33.    Even though no witness had suggested their involvement in the murder of Rodrigo Vargas, Detectives Guevara and/or Halvorsen inexplicably obtained the criminal histories of Plaintiff, Montanez, and Pacheco on May 25, 1993. They also secured photos of the three men. The only explanation for why the detectives ran the criminal histories of Plaintiff and his co-defendants was to determine whether they could be framed (e.g., were any of them in custody at the time of the Vargas murder).

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

34.     Detective Guevara returned to Wilda Vargas's home to show her photos of Plaintiff, Montanez, and Pacheco. Guevara lied to Wilda and told her that the three men in the photos were the men that she saw in the tan car at the gas station.

**ANSWER:**     Coghlan admits, based on records from the Chicago Police Department, that Detective Guevara showed Wilda Vargas a photo array that consisted of eight CPD black and white Identification Photos, wherein she identified Jose Montanez as the person who followed her husband into the gas station on February 4, 1993 and Armando Serrano as the person she saw seated in the front passenger seat of the tan car that followed her and her husband home from the gas station.  Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

35.     On or around June 6, 1993, Detectives Guevara and Halvorsen drove Vargas to Montanez's home to show her his car that was parked outside his home. Wilda was asked whether she recognized Montanez's car as the car she saw at the gas station the night before her husband's murder. Wilda stated only that the car was similar to the one she had seen at the gas station.

**ANSWER:**     Coghlan admits, based on records from the Chicago Police Department, that Detectives Guevara and Halvorsen drove Wilda Vargas around the neighborhood of the 3900 block of West Dickens and asked if she recognized the car that had followed her the day before her husband was murdered and she positively identified the 1984, two-door Buick Regal of Jose Montanez as the car that followed her and her husband from the gas station.  Coghlan lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

36.     Detective Guevara then told Wilda that the "bullet hole" on the passenger side of Montanez's car had been "matched" to ballistics evidence found at the scene of her husband's shooting. That statement was a lie.  No ballistics evidence connected Montanez's car to the crime scene.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

37.     Guevara also falsely told Wilda that damage to the fender of Montanez's car was consistent with witness statements about the crime. Based on the false representations of detectives Guevara and Halvorsen, Wilda Vargas came to believe that the three men at the gas station were Plaintiff, Montanez, and Pacheco and that they were responsible for her husband's murder.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

38.     On June 2, 1993, Detectives Guevara and Halvorsen met with Assistant State's Attorneys Matthew Coghlan and John Dillon at the gang crimes division of the Cook County State's Attorney's office to discuss the prosecution of Robert Bouto and the investigation of the Vargas murder.

**ANSWER:**     Coghlan denies that he was present for any meeting with John Dillon and

Detectives Guevara and Halvorsen on June 2, 1993 to discuss the prosecution of Robert Bouto or

the investigation of the Vargas murder and further denies that he had any knowledge of the

prosecution of Robert Bouto or of the Vargas murder or Plaintiff until after Plaintiff had already

been indicted for the Vargas murder.  Coghlan further denies all remaining allegations in this

paragraph.

39.     Detectives Guevara and Halvorsen told Coghlan and Dillon that the "street" was saying that Serrano, Montanez, and Pacheco were responsible for the Vargas murder and that they needed to develop some evidence to justify bringing Serrano (and his co-defendants) in for questioning. Guevara, Halvorsen, Coghlan, and Dillon agreed that they could get additional use out of Vicente.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

40.     On June 2, 1993, ASAs Coghlan and Dillon arranged to have Vicente transported from Division 9 of the Cook County Jail to the gang crimes unit of the Cook County State's Attorney's office where they all met and discussed the plan to use Vicente as a witness in the Vargas murder and another gang case involving an Imperial Gangster named Geraldo Iglesias (a.k.a "Snake") [*sic*].

**ANSWER:**     Coghlan denies the allegations in this paragraph.

41.     Once at the Cook County State's Attorney's office, Detective Guevara told Vicente, in the presence of Halvorsen, Coghlan, and Dillon, that he wanted Vicente to say that he was present when Plaintiff, Montanez, and Pacheco attempted to rob Vargas. Vicente was instructed to look at the crime scene photos as Guevara fed him a narrative that involved naming Plaintiff, Montanez and Pacheco as the offenders. Vicente later stated that, "they [Guevara, Halvorsen, Coghlan, and Dillon] already knew who they wanted for the murder." Everyone in the room knew that Vicente was not actually present for the murder of Rodrigo Vargas.

**ANSWER:**     Coghlan denies that he was present for any meeting with Vicente, John Dillon and

Detectives Guevara and Halvorsen on June 2, 1993 to discuss the Vargas murder and further

denies that he had any knowledge of the Vargas murder, Vicente, or Plaintiff until after Plaintiff

had already been indicted for the Vargas murder.  Coghlan further denies all remaining

allegations in this paragraph.

42.     Vicente refused to go along with the plan that involved him admitting to being present for the murder, later explaining that he did not trust the detectives and the State's attorneys not to turn around and charge him with the murder. ASAs Coghlan and Dillon promised Vicente that he had nothing to worry about if he just cooperated and did what Guevara and Halvorsen told him to do. However, Vicente insisted that he would not make himself an eyewitness to the crime.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

43.     In what amounted to a brainstorming session, Detective Halvorsen proposed that Vicente implicate Plaintiff, Montanez, and Pacheco by falsely claiming that Montanez confessed their involvement in the crime to him. Again, ASAs Coghlan and Dillon promised Vicente that they would protect him by moving him to the State's Attorney Witness Quarters (a.k.a " the Q") where he would get special privileges. Coghlan and Dillon also promised that they would make sure he received a minimum sentence on his pending robbery cases and arrange for the sentences to run concurrently. In other words, they promised Vicente that they could secure him a minimum sentence of six years' imprisonment.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

44.     Vicente was still reluctant but agreed to cooperate in exchange for the State's Attorney's protection and assistance. When all was said and done, Vicente became the State's key "snitch" witness in three murder prosecutions investigated by Detectives Guevara and Halvorsen: (1) the prosecution of Robert Bouto for the murder of Ruvelcaba [*sic*]; (2) the prosecutions of Serrano, Montanez, and Pacheco for the murder of Rodrigo Vargas; and (3) the prosecution of Geraldo Iglesias for the murder of Monica Roman.

**ANSWER:**     To the extent this paragraph refers to or relies upon allegations made in previous

paragraphs, Coghlan adopts and restates his prior answers and responses thereto.  Coghlan

admits that Vicente testified at trial in the State's prosecutions of Plaintiff, Montanez, and

Pacheco for the murder of Rodrigo Vargas.  Coghlan lacks sufficient knowledge or information

to form a belief as to whether Vicente served as a witness for the State in the Robert Bouto trial

or the Geraldo Iglesias trial and therefore denies the same.  Coghlan denies the remaining

allegations in this paragraph.

45.     After the meeting with Vicente and ASAs Coghlan and Dillon, Detective Guevara
and Halvorsen prepared a supplemental police report, falsely claiming that a confidential
informant told them that Montanez admitted his involvement in the murder and further
implicated Plaintiff and Pacheco.

**ANSWER:**     Coghlan denies that he was present for, or participated in any meeting(s) with,

Vicente, Dillon, Detective Guevara and Detective Halvorsen on June 2, 1993 regarding the

Vargas murder.  Coghlan lacks information lacks sufficient knowledge or information to form a

belief as to the remaining allegations in this paragraph and therefore denies them.

46.     In truth, no real confidential informant shared this information with the detectives.
This story was completely fabricated by detectives Guevara and Halvorsen, ASA Coghlan, and
ASA Dillon who used it as a basis to arrest Plaintiff for questioning. The detectives and ASAs
knew that they would later attribute the statement to Francisco Vicente.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

47.     As prosecutors, Defendants Coghlan and Dillon would not and could not have
acted independently to falsely implicate Plaintiff and his co-defendants in the murder of Rodrigo
Vargas.

**ANSWER:**     To the extent this paragraph refers to or relies upon allegations made in previous

paragraphs, Coghlan adopts and restates his prior answers and responses thereto.  Coghlan denies

falsely implicating Plaintiff and his co-defendants in the murder of Rodrigo Vargas.  Coghlan

lacks sufficient knowledge or information to form a belief as to the truth of the remaining

allegations in this paragraph and therefore denies them.

48.     The defendant prosecutors knew that in order to falsely charge Plaintiff and his co-defendants with murder, they would need the active participation of the Defendant Officers in securing false evidence against the Plaintiffs.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

49.     Put another way, the Defendant Prosecutors would not have filed false charges against Plaintiff without the Defendant Officers' willingness to fabricate evidence and absent their success in doing so. The Defendant Prosecutors would not have done the dirty work of beating Vicente or creating their own false police reports; but where the Defendant Officers were ready, willing, and able to both [*sic*], the Defendant Prosecutors were more than willing to play their part in the conspiracy.

**ANSWER:**     Coghlan denies that he filed "false charges" against the Plaintiff and denies

playing any part in any alleged conspiracy.  Coghlan lacks sufficient knowledge or information

to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies

them.

50.     At bottom, the Defendant Prosecutors would not have prosecuted Plaintiff but for the involvement and encouragement of Defendants Guevara, Halvorsen, and Mingey. Indeed, the Defendant Prosecutors would never have prosecuted the case without having at least one police officer available to document and testify to the version of events that led to the initiation of charges against the Plaintiffs.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

51.     The Defendant Prosecutors relied on Defendants Guevara, Halvorsen, and Mingey to write false reports and back up their fabricated charges against Plaintiffs. Without the involvement, agreement, and false reports of the Defendant Officers, the Defendant Prosecutors would never have initiated or continued the charges against Plaintiff.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

52.     On June 8, 1993, Plaintiff was arrested at his home and brought to Area Five for questioning. Detectives Guevara and Halvorsen planned to pressure Plaintiff to provide an inculpatory statement. Detectives Guevara and Halvorsen interrogated Plaintiff in a tag team fashion for roughly 24 hours with Guevara playing "bad cop" and Halvorsen playing "good cop," as was their routine.

**ANSWER:**    Coghlan admits, based on records from the Chicago Police Department, that

Plaintiff was brought to Area Five for questioning on June 8, 1993.  Coghlan lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in this

paragraph and therefore denies them.

53.    Detective Guevara yelled in Plaintiff's face, accusing him of killing Rodrigo
Vargas while repeatedly slapping him in the face and the side of the head when Plaintiff denied
having any knowledge or involvement in the crime. After physically assaulting Plaintiff,
Guevara left the room and Halvorsen took over the interrogation, also attempting to elicit
statements from Plaintiff albeit without physical abuse. Each time Guevara returned to the
interrogation room, the physical abuse intensified. This back and forth continued until the
following day (June 9, 1993) when Serrano was eventually released.

**ANSWER:**    Coghlan admits, based on records from the Chicago Police Department, that

Detectives Guevara and Halvorsen interviewed Plaintiff on June 8, 1993.  Coghlan lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

in paragraph and therefore denies them.

54.    Despite prolonged physical and psychological coercion, Plaintiff made no

inculpatory statements and consistently denied any knowledge of the crime.

**ANSWER:**    Coghlan lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

55.    On June 10, 1993, Timothy Rankins, a 19-year old member of the Spanish Cobras
street gang, was arrested for committing a robbery along with his 15-year old accomplice named
Demond Williams a.k.a "Shorty Folks."

**ANSWER:**    Coghlan admits, based on records from the Chicago Police Department, that on

June 10, 1993, Timothy Rankins was a member of the Spanish Cobras street gang, and was

arrested for an alleged robbery.  Coghlan lacks knowledge or information sufficient to form a

belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

56.    Rankins was a known snitch who worked closely with Sergeant Edward Mingey.
In fact, Mingey describes Rankins as one of his best informants. In an interview with attorneys

from Sidley & Austin in 2014, Mingey declared, "I've never talked to a guy [Rankins] who was a better informant."

**ANSWER:** Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

57. Because of Sergeant Mingey's relationship with Rankins, Mingey agreed to assist Detectives Guevara and Halvorsen in obtaining Rankins' "cooperation" in the Vargas murder investigation. Sergeant Mingey and Detectives Guevara and Halvorsen knew that Rankins possessed no knowledge about the murder but, nonetheless, decided to use him to fabricate evidence against Serrano, Montanez, and Pacheco.

**ANSWER:** Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

58. Mingey, Guevara, and Halvorsen brought Rankins to an interrogation room at Area Five and told him that they wanted him to falsely state that he was present and witnessed the murder of Rodrigo Vargas. When Rankins resisted, he was physically assaulted by Detective Guevara. Guevara showed Rankins polaroid photos of Plaintiff, Montanez, and Pacheco and fed him a detailed narrative that was eventually reduced to writing.

**ANSWER:** Coghlan admits, based on records from the Chicago Police Department, that on

June 11, 1993, Rankins was interviewed in an interview room at Area Five by Detectives

Guevara and Halvorsen, and that the detectives showed Rankins a photo array consisting of eight

Polaroid color photos to which Rankins positively identified Plaintiff, Montanez, and Pacheco.

Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the

remaining allegations in this paragraph and therefore denies them.

59. After being held overnight and repeatedly assaulted and threatened, Rankins eventually agreed to adopt a false witness statement contrived by Detectives Guevara and Halvorsen in which Rankins claims he was present (along with Demond Williams) when Plaintiff, Montanez, and Pacheco shot and killed Rodrigo Vargas.

**ANSWER:** Coghlan admits, based on records from the Chicago Police Department, that on

June 11, 1993, Rankins claimed he was present, along with an individual nicknamed "Shorty

Folks," when Plaintiff, Montanez and Pacheco shot and killed Rodrigo Vargas. Coghlan lacks

sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

60.     After obtaining Rankins' signed statement, Detectives Guevara and Halvorsen immediately returned to Plaintiff's home and arrested him a second time. Guevara told Plaintiff, "this time you aren't going home."

**ANSWER:**     Coghlan admits, based on records from the Chicago Police Department, that on June 11, 1993, Detectives Guevara and Halvorsen arrested Plaintiff at Plaintiff's home. Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

61.     Plaintiff remained incarcerated from the day of his arrest (the second time) on June 11, 1993, through his trial, and until his eventual exoneration.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

62.     A few days later, Rankins testified before the grand jury consistent with his statement. However, Rankins recanted his statement and testimony nine months later after resolution of his own pending case. Rankins refused to testify at Plaintiff's trial and left Chicago to avoid harassment from detectives Guevara and Halvorsen.

**ANSWER:**     Coghlan admits, based on records from the Cook County State's Attorney's Office, that Rankins testified before a grand jury on June 15, 1993 and identified photos of Plaintiff, Montanez, and Pacheco during his testimony. Coghlan further admits that Rankins did not testify at Plaintiff's criminal trial for the murder of Rodrigo Vargas. Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

63.     On June 28, 1993, ASAs Coghlan and Dillon arranged to have Vicente brought to the gang crimes division of the Cook County State's Attorney office again to formalize the false witness statement that was constructed prior to Plaintiff's arrest.

**ANSWER:** Coghlan admits, based on records from the Cook County State's Attorney's Office, that on June 28, 1993, Vicente was brought to the Cook County State's Attorneys, Gang Prosecution Unit, and that ASA Pandit interviewed and subsequently took a handwritten statement from Francisco Vicente. Coghlan denies that he arranged to have Vicente brought to the Cook County State's Attorneys, Gang Prosecution Unit on June 28, 1993 and further denies the remaining allegations in this paragraph.

64. Detective Halvorsen wrote out Vicente's statement in which he claimed that he was hanging out at a "dope spot" at the corner of Hamlin and Altgeld on February 5, 1993 (the day of Vargas's murder) when Montanez drove up in a tan-colored Buick with Serrano and Pacheco. According to the fabricated statement, Montanez placed a large 9 mm semi-automatic pistol in one of the car's air vents and then confessed to Vicente that he, Plaintiff, and Pacheco had shot Rodrigo Vargas in a robbery "gone bad." According to the fabricated statement, Montanez told Vicente that they targeted a Mexican guy at a gas station after seeing him with a large amount of money and that during the robbery, Serrano "fucked up" and shot "the stud." Also according to the false statement, Montanez relayed that after the attempted robbery, Montanez smashed into a parked car as they drove off, causing damage to his left front fender.

**ANSWER:** Coghlan admits, based on records from the Cook County State's Attorney's Office, that on June 28, 1993, a voluntary handwritten statement was taken of Vicente by ASA Pandit in which Vicente stated that on February 5, 1993, he was hanging out at a dope spot at the corner of Hamlin and Altgeld when Montanez (aka "Pistol Pete") drove up in a tan-colored Buick Regal with Serrano and Pacheco (aka "Mondo" and "Jordan," respectively), and that at one point Montanez placed a large 9mm semi-automatic pistol in one of the car's heating ducts in the dashboard, and during the conversation confessed to Vicente that he, Plaintiff, and Pacheco had shot Rodrigo Vargas in a robbery gone bad, that Montanez told Vicente that the trio targeted a Mexican guy after they seeing him with a large amount of money at a gas station and that during the robbery, Serrano (aka "Mondo") "fucked up" and shot "the stud," that Montanez informed Vicente that after the attempted robbery and murder, Montanez smashed into a parked car causing damage to the left front fender. Coghlan lacks sufficient knowledge or information

to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies

them.

65.     In the presence of an Assistant State's Attorney (who had not been present for and was not privy to the detectives and ASAs Coughlan [*sic*] and Dillon's prior conversations with Vicente), Vicente signed the handwritten statement that had been previously manufactured by Detectives Guevara, Detective Halvorsen, ASA Coghlan, and ASA Dillon.

**ANSWER:**     Coghlan admits, based on records from the Cook County State's Attorney's

Office, that on June 28, 1993, Vicente, Detective Halvorsen, and ASA Pandit all signed

Vicente's handwritten statement.  Coghlan denies the remaining allegations in this paragraph.

66.     Four days later, on July 1, 1993, Vicente testified consistent with his written statement before a grand jury that returned true bills of indictment against Plaintiff, Montanez, and Pacheco.

**ANSWER:**     Coghlan admits, based on records from the Cook County State's Attorney's

Office, that on July 1, 1993, Vicente testified before a grand jury in which he identified photos of

Serrano, Pacheco, and Montanez and testified consistent with the statement he gave on June 28,

1993.  Coghlan further admits, based on records from the Cook County State's Attorney's

Office, that a grand jury returned true bills of indictment against Plaintiff, Montanez, and

Pacheco in July 1993.  Coghlan lacks sufficient knowledge or information to form a belief as to

the truth of the remaining allegations in this paragraph and therefore denies them.

67.     After testifying before the grand jury, Vicente was placed in the State's Attorney's witness quarters (a.k.a "the Q") where he spent the next three years, receiving a wide array of benefits in exchange for his cooperation in three separate murder prosecutions, including approximately $2000 in cash, cigarettes, special food, access to drugs, and conjugal visits with both his wife and ex-wife. According to Vicente, he was transported back and forth between the Q and the Cook County State's Attorney's gang crimes office more times than he can count where he was prepped and coached by ASAs Coghlan and Dillon in preparation for his testimony in the Bouto, Serrano (and co-defendants), and Iglesias murder prosecutions.

**ANSWER:**     Coghlan admits that Vicente was placed in witness quarters for a period of time

after he testified before the grand jury.  Coghlan denies that he "prepped" or "coached" Vicente

"in preparation for his testimony in the Bouto, Serrano (and co-defendants), and Iglesias murder prosecutions." Coghlan further denies that he provided Vicente "$2000 in cash, cigarettes, special food, access to drugs, and conjugal visits with both his wife and ex-wife" in exchange for his cooperation in the Vargas murder prosecution or any other murder prosecution. Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

68. On March 3, 1995, following a bench trial in the Circuit Court of Cook County, Plaintiff was wrongly convicted of the murder of Rodrigo Vargas alongside his co-defendant Jose Montanez. Jorge Pacheco was acquitted. Pacheco's acquittal was curious since the State's evidence was identical as to all three co-defendants.

**ANSWER:** To the extent this paragraph contains legal conclusions, no response is required. To the extent an answer is required, Coghlan admits that Plaintiff and Montanez were convicted of the murder of Rodrigo Vargas following a bench trial and that Jorge Pacheco was ultimately acquitted of the charges in the case. Coghlan denies that the State's evidence was "identical" as to all three co-defendants. Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

69. Plaintiff was sentenced to a term of 55 years' imprisonment in the Illinois Department of Corrections. Defendants Guevara and Halvorsen both testified as prosecution witnesses at that trial and testified falsely in furtherance of the scheme to convict Plaintiff of murder without regard to his guilt or innocence.

**ANSWER:** To the extent this paragraph contains legal conclusions, no response is required. Coghlan admits that Plaintiff was sentenced to a term of 55 years' imprisonment in the custody of the Illinois Department of Corrections. Coghlan further admits that Defendants Guevara and Halvorsen testified at Plaintiff's trial. Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

70.     Vicente testified largely consistent with his false handwritten statement and prior grand jury testimony. The prosecutors knew Vicente's testimony was false as they had assisted in fabricating it along with Detectives Guevara and Halvorsen who targeted Plaintiff and his codefendants for wrongful conviction. Because Wilda Vargas was unable to credibly identify the defendants in open- court [*sic*] as the men she saw at the gas station the night before her husband's murder, the trial court judge rejected her identification testimony. In sum, Plaintiff and his codefendant were convicted solely on the "snitch" testimony of Francisco Vicente, testimony that was fabricated and induced by Defendants Guevara, Halvorsen, Coghlan and Dillon.

**ANSWER:**     To the extent this paragraph contains legal conclusions, no response is required.

Coghlan admits, based on records of the Cook County State's Attorney's Office, that Vicente

testified largely consistent with his handwritten statement and prior grand jury testimony.

Coghlan denies the remaining allegations in this paragraph.

71.     At the time of Plaintiff's trial, neither Plaintiff nor his criminal defense attorney was aware of the concealment of evidence, fabrication of evidence, and manipulation of Wilda Vargas's testimony as set forth in this Complaint. Had these facts been disclosed, Plaintiff would not have been convicted.

**ANSWER:**     To the extent this paragraph contains legal conclusions, no response is required.

To the extent this paragraph refers to or relies upon allegations made in previous paragraphs,

Coghlan adopts and restates his prior answers and responses thereto.  Coghlan lacks sufficient

knowledge or information to form a belief as to the truth of the remaining allegations in this

paragraph and therefore denies them.

72.     After Plaintiff, his co-defendants, and Bouto and Iglesias were all convicted, Vicente was finally sentenced on his own robbery cases. Although ASAs Coghlan [*sic*] and Dillon had originally promised Vicente that they would secure him a minimum six-year sentence, they overlooked that Vicente was on bond for his simple robbery case when he picked up the three additional armed robbery cases. This meant that his mandatory minimum sentence was nine years, not six years, because the sentence for simple robbery had to be served consecutive to the armed robbery offenses as a matter of law.

**ANSWER:**     To the extent this paragraph contains legal conclusions, no response is required.

Coghlan admits, based on court records, that Vicente was sentenced on his robbery cases on or

around September 23, 1996.  Coghlan denies he promised Vicente that he (Coghlan) or anyone

else would secure Vicente a minimum six-year sentence. Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

73. To pacify their disgruntled star-witness, ASA Dillon promised Vicente (before he testified at Plaintiff's trial) that he would get him additional pre-trial custody credit so that he would not serve the entire nine-year sentence. ASA Dillon delivered on that promise when he drafted Vicente's sentencing order that reflected 1476 days of pre-trial custody credit when Vicente had only spent 1132 days in custody prior to sentencing. In sum, Vicente received 344 days of pre-trial credit to which he was not entitled. This benefit was never disclosed to Plaintiff.

**ANSWER:** To the extent any allegations in this paragraph are directed to Coghlan, Coghlan denies all such allegations. To the extent the allegations in this paragraph are directed to ASA Dillon, Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the the allegations in this paragraph and therefore denies them.

74. Throughout his wrongful incarceration, Plaintiff tirelessly fought to prove that he was innocent and wrongfully convicted of the Vargas murder. His direct appeal and postconviction petition were all denied. In 2005, the Northwestern Center on Wrongful Convictions filed a successor post-conviction petition on Plaintiff's behalf, alleging that Plaintiff was innocent of the murder. An evidentiary hearing was held on this petition during which Plaintiff presented an affidavit of Francisco Vicente admitting that his testimony was false in its entirety. Now-retired, Reynaldo Guevara asserted his Fifth Amendment right to remain silent at Plaintiff's evidentiary hearing.

**ANSWER:** Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

75. Although the Circuit Court judge denied Plaintiff and Montanez relief at the close of the evidentiary hearing, the Illinois Appellate Court reversed that decision in a pair of scathing published decisions, *People v. Serrano*, 2016 IL App (1st) 133493 (June 7, 2016) *& People v. Montanez,* 2016 IL App (1st) 133726 (June 7, 2016).

**ANSWER:** Coghlan admits that the First District Appellate Court of Illinois issued an opinion reversing the Circuit Court's ruling in the published opinions entitled, *People v. Serrano*, 2016 IL App (1st) 133493 (June 7, 2016) and *People v. Montanez*, 2016 IL App (1st) 133726 (June 7,

2016). Coghlan lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in this paragraph and therefore denies them.

76. On remand, the office of the Cook County State's Attorney vacated Plaintiff's and Montanez's convictions and moved to *nolle prosequi* the murder charges.

**ANSWER:** Coghlan admits, based on court records, the allegations in this paragraph.

77. After spending 23 years in the Illinois Department of Corrections, Plaintiff was released from custody on July 20, 2016.

**ANSWER:** Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

78. With no objection from the State, the Honorable Leroy Martin, Jr. granted Plaintiff (and Jose Montanez) a Certificate of Innocence on November 2, 2016.

**ANSWER:** Coghlan admits, based on court records, that Judge Leroy Martin, Jr. granted

Plaintiff a Certificate of Innocence on November 2, 2016. Coghlan lacks sufficient knowledge

or information to form a belief as to the truth of the remaining allegations in this paragraph and

therefore denies them.

79. Tragically, Plaintiff's wrongful conviction at the hands of Detective Guevara and his accomplices, including Defendant Halvorsen, is not an isolated miscarriage of justice. Over the course of two decades, Guevara and Halvorsen framed literally dozens of other innocent men who have all lodged independent accusations of similar misconduct against him.[3]

**ANSWER:** Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and corresponding footnote and therefore denies them.

80. Guevara and Halvorsen are the subject of an ever-growing number of litigations both in criminal and civil courts. Detective Guevara is now refusing to testify about any of his activities as a Chicago police officer on grounds that truthful testimony would subject him to criminal liability.

---

[3] https://www.buzzfeed.com/melissasegura/detective-guevaras-witnesses?utm_term=.tymQzXk3Yn#.lhx2y8nblB

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

81.     Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including abusive tactics, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are dozens of identified cases in which Guevara has engaged in serious investigative misconduct, including many cases in which he has manipulated and coerced witnesses and fabricated and concealed evidence, as he did in this case.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

82.     Given this extensive history, it is apparent that Guevara and Halvorsen engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline then [*sic*] for doing so.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

83.     Regarding his role in framing Plaintiff, Defendant Guevara has asserted his Fifth Amendment right to silence when questioned about: whether he framed Plaintiff; whether he coerced Vicente to falsely implicate Plaintiff; whether he fed facts to Vicente; whether he coerced Rankins to falsely implicate Plaintiff; and whether he purposely misled Ms. Vargas into falsely identifying Plaintiff's car.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

84.     Repeatedly, Defendant Guevara has also invoked his Fifth Amendment right not to answer any questions about allegations that he manipulated dozens of witnesses to provide false identifications because truthful responses could subject him to criminal liability, including every single instance of misconduct detailed below.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

85.     Bill Dorsch is a former Chicago police detective. While serving with the Chicago police department, Dorsch was assigned to investigate a murder.  Several months after the murder occurred, Defendant Guevara brought two juveniles to the police station who purported to have witnessed a shooting and recorded the license place of the shooter.

**ANSWER:**    Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

86.    Based on the information provided, Detective Dorsch created a photo array for the
juveniles to attempt to identify the shooter.  While the first juvenile was viewing the photo array,
and before he identified any of the photographs, Defendant Guevara pointed to the suspect's
photo and told the juvenile "that's him."  The juvenile then agreed with Guevara, saying that was
the person who committed the shooting.

**ANSWER:**    Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

87.    Dorsch then directed Defendant Guevara to leave the room and had the other
juvenile view the same photo array, and he was unable to make any identification.

**ANSWER:**    Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

88.    Based on the first juvenile's identification, the suspect was charged with murder.
Subsequently, Dorsch spoke to the two juveniles without Defendant Guevara being present. The
juveniles admitted that they had been paid to falsely claim that the suspect was the person
responsible for the shooting.  After prosecutors spoke to the two juveniles, the suspect was
released.

**ANSWER:**    Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

89.    Defendant Guevara's activities have drawn the interest of federal law enforcement
officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago
Police Officer Joseph Miedzianowski and his associates, including Defendant Guevara. The
report details that Defendant Guevara, while acting in his capacity as a police officer, would
apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to
the report, Guevara also took bribes to alter both positive and negative lineups of murder
suspects. Finally, the report states that Guevara, using an attorney [Richard Beuke] as a conduit,
would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

**ANSWER:**    Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

90.     In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara put Perez inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Juan Johnson to take the blame for the murder. Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

91.     In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

92.     Juan Johnson was later exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

93.     In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz that if he did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

94.     In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

95.     In 1990, Defendant Guevara physically coerced Jose Maysonet into falsely confessing to the murders of Torrence and Kevin Wiley. Maysonet's convictions were reversed in 2016.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

96.     In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the Grand Jury by threatening Rosario that if he did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

97.     In 1991, Defendant Guevara physically coerced sixteen year-old David Velazquez into making a false identification and giving false testimony by taking him to a rival gang's territory, beating him while chained to a wall at Area 5, and threatening to "get you for anything I can" if he did not talk. All of the false details of Velazquez's statement were provided by Guevara.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

98.     In 1993, Defendant Guevara coerced an identification from Carl Richmond by threatening Richmond that he could make his life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

99.     In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained him to the wall of an interrogation room and told him that he was going to frame him for murder.  After Davila told Guevara that he did not do it, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite the fact that each of those witnesses had previously told the police that they had not been able to see the shooter.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

100.   In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup.  As a result, these men falsely claimed that Colon had committed murder, but later came forward to bring Defendant Guevara's misconduct to light.

**ANSWER:**   Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

101.   In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

**ANSWER:**   Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

102.   In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

**ANSWER:**   Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

103.   In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight-hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand" saying that he "felt like smacking" her.  Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

**ANSWER:**   Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

104.   In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragosa was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

**ANSWER:**   Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

105.    In 1995, Defendant Guevara engaged in misconduct when he told Jose Melendez to falsely identify Thomas Sierra as the shooter even though Melendez did not see the shooter. Melendez identified Sierra, but recanted his identification at trial.

**ANSWER:**    Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

106.    In 1996, Defendant Guevara coerced Maria Rivera into making a false identification of a man in a lineup by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution later abandoned murder charges against the individual whom Rivera falsely identified in the lineup.

**ANSWER:**    Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

107.    In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification.  Guevara detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew.

**ANSWER:**    Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

108.    In 1997, Defendant Guevara withheld physical evidence and failed to disclose the exculpatory statements of witness Ruth Atonetty [*sic*] to Ariel Gomez. Gomez was accused of firing multiple shots from a car into a crowd. Ruth Antonetty told Guevara that she heard multiple shots coming from within the crowd, not from Gomez's vehicle. Guevara continued to pressure her to change her account, and when she would not, he told her he "had other witnesses" and "didn't need her." As a result, Ariel Gomez did not have access to key *Brady* material at his trial.

**ANSWER:**    Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

109.    In 1998, Defendant Guevara used suggestive tactics to force twelve-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin.  As a

result, Rivera was convicted of murder. In 2011, Lopez testified at an evidentiary hearing that he had never been able to identify Rivera as the murderer. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges against Rivera.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

110.    In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and observed the testimony of trial witnesses. She then conferred with Guevara, even though the Court had ordered all witnesses excluded from the courtroom to prevent collusion among the witnesses.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

111.    In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Office of Professional Standards.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

112.    In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and two children, and left the home in shambles. Lloyd filed a complaint with the Office of Professional Standards the next day.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

113.    In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claim of a beating by the police. The criminal court judge suppressed Hunt's confession, and a jury returned

a favorable verdict in a related civil rights action on Hunt's claim of excessive detention against the City of Chicago.

**ANSWER:** Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

114. In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year old sister Anna during a search of their home, during which the officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch" and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

**ANSWER:** Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

115. In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied knowing the people Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

**ANSWER:** Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

116. In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him and hit him in the head. Garcia filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS). Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as he was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

**ANSWER:** Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

117. In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights during an interrogation. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claim that he had been beaten while in police custody.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

118.     In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with the Office of Professional Standards (OPS). OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

119.     In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime he knew nothing about.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

120.     In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed he would serve seven years in prison whereas if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if he signed a statement, he could go home.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

121.     In 1991, Defendant Guevara coerced a false confession from Daniel Rodriguez through the use of threats and intimidation. While en route to the police station, Guevara threatened to harm Rodriguez's family if he did not cooperate. Once at Area 5, Rodriguez was chained to a wall, denied food, water, and use of a restroom, and beaten by Guevara's partner, Defendant Halvorsen in the chest and torso. Guevara provided details of the crime to Rodriguez to include in Rodriguez's false confession.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

122. In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez (no relation to Plaintiff) without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, noting that "not only was defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

123. In 1993, Defendant Guevara arrested fifteen year old Eliezar Cruzado and threatened him with life imprisonment if he did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

124. In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of a two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room.  Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away.  Frias-Munoz, who did not speak English, agreed to give a statement to an assistant state's attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement he could not read.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

125. In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying and repeatedly said that he did not know what he had signed and had only signed the document so he could go home.  Duta complained to his father of being struck in the head and stomach by Guevara.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

126.     In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that if he did not confess he would never see the light of day.  Flores eventually gave a statement to the police indicating his involvement in the crime. Flores's statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of *Miranda*.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

127.     In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room. Dembski, a Polish National who did not speak English, was interrogated by Guevara without *Miranda* warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

128.     In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Rosauro never confessed and was finally released after being held in custody for three days.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

129.     In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

130.     In 1998, Defendant Guevara repeatedly threatened and beat Arturo Reyes in an attempt to unconstitutionally coerce Reyes into giving an incriminating statement.  After two days of isolation and interrogation, Reyes provided a false statement.

**ANSWER:**     Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

131.    In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room.  After 40 hours of interrogation, Solache gave a false statement so the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

**ANSWER:**    Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

132.    Plaintiff has suffered and continues to suffer enormous physical and psychological injury as a direct and proximate result of the Defendants' misconduct. Plaintiff spent 23 years of his life imprisoned for a crime that he did not commit. He woke up each day with this reality, not knowing whether he would ever succeed in proving the wrongfulness of his conviction and incarceration.

**ANSWER:**    Coghlan denies that Plaintiff has suffered any injury, physical or psychological as

a result of Coghlan's conduct, which was at all times proper.  Coghlan lacks sufficient

knowledge or information to form a belief as to the truth of the remaining allegations in this

paragraph and therefore denies them.

133.    Over the course of his 23 years of imprisonment, Plaintiff was separated from his wife and his two sons, one of whom was an infant when Plaintiff was incarcerated and the other who was not yet born. Plaintiff lost the chance to raise, care for, and mentor his children who were grown men by the time Plaintiff was released from prison.

**ANSWER:**    Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

134.    As a result of Defendants' actions, Plaintiff continues to experience physical and psychological pain and suffering, humiliation, constant fear and anxiety, deep depression, despair, rage, and other physical and psychological effects from his years of wrongful conviction.

**ANSWER:**    To the extent this paragraph refers to or relies upon allegations made in previous

paragraphs, Coghlan adopts and restates his prior answers and responses thereto.  Coghlan denies

that Plaintiff has suffered any injury, physical or psychological, as a result of Coghlan's actions,

which were at all times proper.  Coghlan lacks sufficient knowledge or information to form a

belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

## COUNT I

135.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**    Coghlan's responses to each of the above paragraphs are incorporated by

reference as if restated fully herein.

136.    As more fully described above, all of the individual Police Officer Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fourteenth Amendment by fabricating Vicente and Rankins' statements and testimony as well as fabricating other evidence.

**ANSWER:**    Coghlan lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in this paragraph and therefore denies them.

137.    In the manner described more fully above, Defendants fabricated, coerced, manipulated and/or solicited false testimony from Vicente, Rankins, and Wilda Vargas implicating Plaintiff in the crimes that they knew he did not commit; falsified police reports; obtained Plaintiff's conviction using false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

**ANSWER:**    To the extent this paragraph refers to or relies upon allegations made in previous

paragraphs, Coghlan adopts and restates his prior answers and responses thereto. To the extent

there are any additional allegations in this paragraph directed to Coghlan, Coghlan denies them.

138.    Similarly, Defendants Coghlan and Dillon, acting individually, jointly, and in conspiracy with one another and the Police Officer Defendants, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fourteenth Amendment when they intentionally fabricated and solicited false statements and testimony from Vicente, statements they knew to be false.

**ANSWER:**    Coghlan denies the allegations in this paragraph.

139.    Along with the defendant officers, Defendants Coghlan and Dillon knowing and intentionally fed false statements to Vicente prior to Plaintiff's arrest and subsequent charging.

**ANSWER:**    Coghlan denies the allegations in this paragraph.

140.    The Police Officer Defendants and Defendants Coghlan and Dillon concealed and fabricated additional evidence that is not yet known to Plaintiff.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

141.     Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murder of Rodrigo Vargas. Thus, the Police Officer Defendants' misconduct and ASAs Coghlan and Dillon's [*sic*] misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

142.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:**     To the extent this paragraph refers to or relies upon allegations made in previous paragraphs, Coghlan adopts and restates his prior answers and responses thereto. Coghlan otherwise denies the allegations in this paragraph.

143.     As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

144.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**ANSWER:**      Coghlan lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

## COUNT II

145.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**     Coghlan's responses to each of the above paragraphs are incorporated by reference as if restated fully herein.

146.     As described in detail above, all of the individual Police Officer Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of

their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fourteenth Amendment by withholding and suppressing exculpatory evidence from Plaintiff and the prosecution.

**ANSWER:**    Count II, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan. Count II has also been previously dismissed as to Coghlan, *see* Dkt. No. 88

at 13. Accordingly, Coghlan provides no answer to this paragraph.

147.    The Police Officer Defendants also continued to suppress exculpatory evidence after Plaintiff's conviction. Had this exculpatory evidence been disclosed, Plaintiff would not have spent 23 years in prison for a crime he did not commit.

**ANSWER:**    Count II, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan. Count II has also been previously dismissed as to Coghlan, *see* Dkt. No. 88

at 13. Accordingly, Coghlan provides no answer to this paragraph.

148.    The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:**    Count II, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan. Count II has also been previously dismissed as to Coghlan, *see* Dkt. No. 88

at 13. Accordingly, Coghlan provides no answer to this paragraph.

149.    As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:**    Count II, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan. Count II has also been previously dismissed as to Coghlan, *see* Dkt. No. 88

at 13. Accordingly, Coghlan provides no answer to this paragraph.

150.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**ANSWER:**    Count II, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan.  Count II has also been previously dismissed as to Coghlan, *see* Dkt. No. 88

at 13.  Accordingly, Coghlan provides no answer to this paragraph.

## COUNT III

151.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully
set forth herein.

**ANSWER:**    Coghlan's responses to each of the above paragraphs are incorporated by

reference as if restated fully herein.

152.    In manner more fully described above, the Defendant officers and Defendants
Coghlan and Dillon, acting individually, jointly, and in conspiracy, as well under color of law
and within the scope of their employment, deprived Plaintiff of his Fourth and Fourteenth
Amendment constitutional rights.

**ANSWER:**    To the extent this paragraph refers to or relies upon allegations made in previous

paragraphs, Coghlan adopts and restates his prior answers and responses thereto.  Coghlan

otherwise denies the allegations in this paragraph.

153.    The Defendant officers accused Plaintiff of criminal activity and exerted influence
to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable
cause for doing so, in violation of his rights secured by the Fourth Amendment and the
procedural and substantive due process components of the Fourteenth Amendment.

**ANSWER:**    Coghlan lacks sufficient information to form a belief as to the truth of the

allegations in this paragraph and therefore denies them.

154.    Defendants Coghlan and Dillon exerted influence to initiate, continue, and
perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in
violation of his rights secured by the Fourth Amendment and the procedural and substantive due
process components of the Fourteenth Amendment.

**ANSWER:**    Coghlan denies the allegations in this paragraph.

155.    In so doing, the Defendant officers and Defendants Coghlan and Dillon caused
Plaintiff to be unreasonably seized on June 11, 1993, improperly subjected to judicial
proceedings for which there was no probable cause, and held in custody continuously through his
trial until his eventual exoneration. These judicial proceedings were instituted and continued

maliciously, resulting in injury, and in all such proceedings were ultimately terminated in Plaintiff's favor indicative of his innocence.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

156.     The Defendant officers and Defendants Coghlan and Dillon subjected Plaintiff to unauthorized and arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a  crime of which he was totally innocent, through the Defendant officers and Defendants Coghlan and Dillon's fabrication, suppression, and withholding of evidence.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

157.     The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:**     To the extent this paragraph refers to or relies upon allegations made in previous

paragraphs, Coghlan adopts and restates his prior answers and responses thereto.  Coghlan

otherwise denies the allegations in this paragraph.

158.     As a direct and proximate result of this deprivation of his constitutional right, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:**     To the extent this paragraph refers to or relies upon allegations made in previous

paragraphs, Coghlan adopts and restates his prior answers and responses thereto.  Coghlan

otherwise denies the allegations in this paragraph.

159.     The misconduct described above in this Count by the Defendant officers and Defendants Coghlan and Dillon was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**ANSWER:**     To the extent this paragraph refers to or relies upon allegations made in previous

paragraphs, Coghlan adopts and restates his prior answers and responses thereto.  Coghlan

otherwise denies the allegations in this paragraph.

## COUNT IV

160.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**     Coghlan's responses to each of the above paragraphs are incorporated by

reference as if restated fully herein.

161.     All of the individual Police Officer Defendants along with Defendants Coghlan and Dillon and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to coerce, induce, and fabricate false evidence in the form of witness statements and testimony for the purpose of framing Plaintiff for a crime he did not commit.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

162.     All of the individual Police Officer Defendants along with Defendants Coghlan and Dillon and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to deprive Plaintiff of material exculpatory evidence and information to which he was lawfully entitled and to conceal their misconduct from Plaintiff, all in violation of Plaintiff's constitutional rights, as described above.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

163.     In this manner, the Police Officer Defendants and Defendants Coghlan and Dillon, acting in concert with other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

**ANSWER:**      Coghlan denies the allegations in this paragraph.

164.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant joint activity.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

165.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

166.     As a direct and proximate result of this of this illicit agreement referenced above, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

167.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

## COUNT V

168.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**     Coghlan's responses to each of the above paragraphs are incorporated by

reference as if restated fully herein.

169.     In the manner described above, one or more of the individual Police Officer Defendants and other unknown individuals, stood by without intervening to prevent the alleged constitutional violations, despite having an opportunity to do so.

**ANSWER:**     Count V, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan.  Count V has also been previously dismissed as to Coghlan, *see* Dkt. No. 88

at 17.  Accordingly, Coghlan provides no answer to this paragraph.

170.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with willful indifference to Plaintiff's constitutional rights, and in total disregard of the truth and Plaintiff's innocence.

**ANSWER:**     Count V, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan.  Count V has also been previously dismissed as to Coghlan, *see* Dkt. No. 88

at 17.  Accordingly, Coghlan provides no answer to this paragraph.

171.     As a direct and proximate result of this failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including, but not limited to, loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:**     Count V, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan.  Count V has also been previously dismissed as to Coghlan, *see* Dkt. No. 88

at 17.  Accordingly, Coghlan provides no answer to this paragraph.

172.     The misconduct described above in this Count by the Defendant officers was
undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner
more fully described below in Count VI.

**ANSWER:**     Count V, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan.  Count V has also been previously dismissed as to Coghlan, *see* Dkt. No. 88

at 17.  Accordingly, Coghlan provides no answer to this paragraph.

## COUNT VI

173.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully
set forth herein.

**ANSWER:**     Coghlan's responses to each of the above paragraphs are incorporated by

reference as if restated fully herein.

174.     The Chicago Police Department is responsible for scores of miscarriages of
justice. Since 1986, no fewer than 70 documented cases have come to light in which Chicago
Police Detectives amassed "evidence" against an innocent person for a serious crime that he did
not commit. There are undoubtedly many more such cases that have not yet been discovered.

**ANSWER:**     Count VI, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan.  Accordingly, Coghlan provides no answer to this paragraph.

175.     The false charges against innocent people include numerous cases in which
Chicago Police Officers used the very same tactics that Defendants Guevara, Halvorsen, and
Mingey employed against Plaintiff in this case, including: (1) procuring false witness testimony
from detainees and "jailhouse snitches;" (2) concealment of exculpatory evidence; (3)
manipulation of witnesses in order to obtain false identifications; (4) manipulation of witnesses
in order to influence their testimony; and (5) the use of other tactics to secure the arrest,
prosecution and conviction of a person without regard to his actual guilt or innocence of the
offense.

**ANSWER:**     Count VI, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan.  Accordingly, Coghlan provides no answer to this paragraph.

176.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, and offering inducements to detainees to make false witness statements implicating innocent persons, knowing full well that those statements were false. As a matter of widespread custom and practice, members of the Chicago Police Department, including but not limited to the Defendants in this action, contrived false witness narratives that were fed to vulnerable "jailhouse snitches" who then adopted those false witness narratives as their own for the purpose of wrongly convicting an innocent person. Furthermore, Members of the Chicago Police Department systematically suppressed exculpatory and/or impeaching material by concealing evidence that a jailhouse witness was coerced, manipulated, threatened, pressured or offered inducements to make false statements.

**ANSWER:**    Count VI, which includes this paragraph, is not directed at Coghlan and seeks no relief from Coghlan.  Accordingly, Coghlan provides no answer to this paragraph.

177.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, procured false testimony from detainee witnesses knowing full well that their testimony was false and would lead to the wrongful conviction of Plaintiff. The tactics and inducements used to gain cooperation from these jailhouse witnesses was concealed from Plaintiff.

**ANSWER:**    Count VI, which includes this paragraph, is not directed at Coghlan and seeks no relief from Coghlan.  Accordingly, Coghlan provides no answer to this paragraph.

178.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as part of the official file.

**ANSWER:**    Count VI, which includes this paragraph, is not directed at Coghlan and seeks no relief from Coghlan.  Accordingly, Coghlan provides no answer to this paragraph.

179.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, concealed exculpatory evidence from Plaintiff.

**ANSWER:** Count VI, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan. Accordingly, Coghlan provides no answer to this paragraph.

180. At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, routinely manipulated, tricked, lied to, and misled witnesses for the purpose of influencing their testimony to conform to a false narrative contrived by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false identifications of suspects.

**ANSWER:** Count VI, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan. Accordingly, Coghlan provides no answer to this paragraph.

181. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, manipulated, tricked, and improperly influenced the testimony of the victim's widow, Wilda Vargas.

**ANSWER:** Count VI, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan. Accordingly, Coghlan provides no answer to this paragraph.

182. The City of Chicago and the Chicago Police Department has failed to investigate any of the cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

**ANSWER:** Count VI, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan. Accordingly, Coghlan provides no answer to this paragraph.

183. Prior to and during 1993, the year in which Plaintiff was falsely charged with the Vargas murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The Former Chicago Police Officer of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

**ANSWER:** Count VI, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan. Accordingly, Coghlan provides no answer to this paragraph.

184. As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In

accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

**ANSWER:**     Count VI, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan.  Accordingly, Coghlan provides no answer to this paragraph.

185.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

**ANSWER:**     Count VI, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan.  Accordingly, Coghlan provides no answer to this paragraph.

186.     Defendants Guevara and Halvorsen have a long history of engaging in the kind of investigative misconduct that occurred in this case, including the manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are approximately 40 known cases in which Guevara and Halvorsen have engaged in serious investigative misconduct, including many cases in which they have manipulated and coerced witnesses and fabricated and concealed evidence, as he did in this case. Guevara engaged in such misconduct because he had no reason to fear that the City of Chicago and its Police Department would ever discipline him for doing so.

**ANSWER:**     Count VI, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan.  Accordingly, Coghlan provides no answer to this paragraph.

187.     The City of Chicago and its Police Department failed in 1993 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a.     The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

b.     The need to refrain from manipulation or potentially coercive conduct in relation to witnesses.

     c.     The risks associated with relying on testimony from "jailhouse snitches."

     d.     The risks of wrongful conviction and the steps police officers should take to minimize risks.

     e.     The risks of engaging in tunnel vision during investigation.

     f.     The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

**ANSWER:**    Count VI, which includes this paragraph, is not directed at Coghlan and seeks no relief from Coghlan. Accordingly, Coghlan provides no answer to this paragraph.

188. The need for police officers to be trained in these areas was and remains obvious. The City of Chicago's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

**ANSWER:**    Count VI, which includes this paragraph, is not directed at Coghlan and seeks no relief from Coghlan. Accordingly, Coghlan provides no answer to this paragraph.

189. The City's failure to train supervise and discipline its officers, including repeat offenders such as Defendants Guevara and Halvorsen, effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

**ANSWER:**    Count VI, which includes this paragraph, is not directed at Coghlan and seeks no relief from Coghlan. Accordingly, Coghlan provides no answer to this paragraph.

190. The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

**ANSWER:**    Count VI, which includes this paragraph, is not directed at Coghlan and seeks no relief from Coghlan. Accordingly, Coghlan provides no answer to this paragraph.

191.    The policies and practices described in the foregoing paragraphs were consciously approved by the City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

**ANSWER:**    Count VI, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan.  Accordingly, Coghlan provides no answer to this paragraph.

192.    The actions of all of the individual Police Officer Defendants were done pursuant to policies and practices of the Chicago Police Department were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included, among others:

a.    conducting physically and psychologically or otherwise illegal or improperly coercive interrogations of witnesses in order to obtain false statements and wrongful convictions.

b.    manufacturing and fabricating false witness statements, and manipulating and lying to witnesses to influence unreliable and inaccurate testimony.

c.    filing false reports and giving false statements and testimony about interrogations and witness interviews or constructing parts or all of witness statements; suppressing evidence concerning interrogations and/or witness interviews; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of fabricated witness statements, including those by "jailhouse snitches;" and otherwise covering up the true nature of those interviews and/or interrogations.

d.    failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of misconduct, on how to avoid false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions, and on the proper manner in which to conduct interrogations of witnesses and arrestees. Among those the City failed to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control were the repeat offenders Defendants Guevara and Halvorsen.

e.    perpetuating, encouraging and condoning the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above, whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to report. This code of silence caused police officers either to remain silent or give false and misleading information during official investigations and Grand Jury

proceedings in order to protect themselves or fellow officers from discipline, civil liability, or criminal charges. The code of silence also caused police officers to perjure themselves in criminal cases where they and their fellow officers have fabricated evidence or concealed exculpatory evidence.

**ANSWER:** Count VI, which includes this paragraph, is not directed at Coghlan and seeks no relief from Coghlan. Accordingly, Coghlan provides no answer to this paragraph.

193. The policies and practices described in this Count and in the factual allegations section of this Complaint were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

**ANSWER:** Count VI, which includes this paragraph, is not directed at Coghlan and seeks no relief from Coghlan. Accordingly, Coghlan provides no answer to this paragraph.

194. As a direct and proximate result of the City's actions, Plaintiff suffered injuries, including, but not limited to, emotion distress, as if more fully alleged above.

**ANSWER:** Count VI, which includes this paragraph, is not directed at Coghlan and seeks no relief from Coghlan. Accordingly, Coghlan provides no answer to this paragraph.

195. The City of Chicago is therefore liable for the misconduct committed by the Police Officer Defendants.

**ANSWER:** Count VI, which includes this paragraph, is not directed at Coghlan and seeks no relief from Coghlan. Accordingly, Coghlan provides no answer to this paragraph.

## COUNT VII

196. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:** Coghlan's responses to each of the above paragraphs are incorporated by reference as if restated fully herein.

197. All of the individual Defendant Officers caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued with malice and resulted in the injury to Plaintiff. All such proceedings were ultimately terminated in Plaintiff's favor and in a manner indicative of innocence.

**ANSWER:**     To the extent any allegations in this paragraph are directed at Coghlan, Coghlan

denies all such allegations.

198.    The Defendant Officers accused Plaintiff of murdering Rodrigo Vargas, knowing that he was innocent of the crime. All of the individual Defendant Officers fabricated evidence, manipulated witness testimony, and withheld exculpatory evidence. The individual Defendant Officers knowingly made false statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings against Plaintiff.

**ANSWER:**     To the extent any allegations in this paragraph are directed at Coghlan, Coghlan

denies all such allegations.

199.    As described more fully above, the Prosecutor Defendants (Coghlan and Dillon) would not have prosecuted Plaintiff and his co-defendants but for the involvement and encouragement of the Defendant Officers. The Defendant Officers could not have lodged false charges against the Plaintiffs and prosecuted the case without having at least one police officer willing and able to document and falsely testify to the version of events that led to the initiation of charges against the Plaintiffs.

**ANSWER:**     To the extent any allegations in this paragraph are directed at Coghlan, Coghlan

denies all such allegations.

200.    The Prosecutor Defendants needed Defendants Guevara, Halvorsen, and Mingey to write false reports and back up their fabricated charges against Plaintiff. Without the involvement, agreement, and false reports of the police officer Defendants, Defendant Dillon and Coghlan would never initiated or continued the false charges against Plaintiff.

**ANSWER:**     To the extent any allegations in this paragraph are directed at Coghlan, Coghlan

denies all such allegations.

201.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

**ANSWER:**     To the extent any allegations in this paragraph are directed at Coghlan, Coghlan

denies all such allegations.

202.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

**ANSWER:**     To the extent any allegations in this paragraph are directed at Coghlan, Coghlan

denies all such allegations.

## COUNT VIII

203.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully
set forth herein.

**ANSWER:**     Coghlan's responses to each of the above paragraphs are incorporated by

reference as if restated fully herein.

204.     As described more fully in the preceding paragraphs, the individual Defendant
officers and Defendants Coghlan and Dillon acting in concert with one another and other
coconspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful
means.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

205.     In furtherance of the conspiracy, the Defendants committed overt acts and were
otherwise willing participants in joint activity.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

206.     The misconduct described in this Count was undertaken with malice, willfulness
and reckless indifference to Plaintiff's rights.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

207.     As a direct and proximate result of this misconduct, Plaintiff suffered injuries,
including, but not limited to, emotional distress, as is more fully alleged above.

**ANSWER:**     Coghlan denies the allegations in this paragraph.

## COUNT IX

208.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully
set forth herein.

**ANSWER:**     Coghlan's responses to each of the above paragraphs are incorporated by

reference as if restated fully herein.

209. The acts and conduct of the individual Defendants as set forth above were extreme and outrageous. The Defendants intended to cause, or were in reckless disregard of the probability that their conduct would cause sever [*sic*], emotional distress to Plaintiff.

**ANSWER:** Coghlan denies the allegations in this paragraph.

210. The individual Defendants' actions and conduct directly and proximately caused severe emotional distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

**ANSWER:** Coghlan denies the allegations in this paragraph.

211. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

**ANSWER:** Coghlan denies the allegations in this paragraph.

212. As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

**ANSWER:** Coghlan denies the allegations in this paragraph.

## COUNT X

213. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:** Coghlan's responses to each of the above paragraphs are incorporated by reference as if restated fully herein.

214. When they committed the acts alleged in this Complaint, the individual Defendant officers were members and agents of the Chicago Police Department, an agency of the City of Chicago, acting at all relevant times within the scope of their employment and under color of law.

**ANSWER:** Count X, which includes this paragraph, is not directed at Coghlan and seeks no relief from Coghlan. Accordingly, Coghlan provides no answer to the allegations in this paragraph.

215. Defendant City of Chicago is liable as principal for all torts committed by its agents.

**ANSWER:**     Count X, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan.  Accordingly, Coghlan provides no answer to the allegations in this

paragraph.

216.     Similarly, when they committed the acts alleged in this Complaint, Defendants
Coghlan and Dillon were members and agents of the Cook County State's Attorney's office, an
agency of the County of Cook, Illinois, acting at all relevant times within the scope of their
employment and under color of law.

**ANSWER:**     Count X, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan.  In addition, the Court dismissed this Count as it pertains to Cook County,

*see* Dkt. No. 88 at 18-19.  Accordingly, Coghlan provides no answer to the allegations in this

paragraph.

217.     Defendant Cook County is therefore liable as principal for all torts committed by
its agents, Defendants Coghlan and Dillon.

**ANSWER:**     Count X, which includes this paragraph, is not directed at Coghlan and seeks no

relief from Coghlan.  In addition, the Court dismissed this Count as it pertains to Cook County,

*see* Dkt. No. 88 at 18-19.  Accordingly, Coghlan provides no answer to the allegations in this

paragraph.

### COUNT XI

218.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully
set forth herein.

**ANSWER:**     Count XI, which includes this paragraph, is not directed Coghlan and seeks no

relief from Coghlan.  Accordingly, Coghlan provides no answer to the allegations in this

paragraph.

219.     Illinois law provides that public entities must pay any tort judgment for
compensatory damages for which its employees are liable based on upon the employees'
misconduct committed within the scope of their employment activities.

**ANSWER:**    Count XI, which includes this paragraph, is not directed Coghlan and seeks no

relief from Coghlan.  Accordingly, Coghlan provides no answer to the allegations in this

paragraph.

220.    The individual Defendant officers are or were employees of the Chicago Police
Department, an agency of the City of Chicago, who acted within the scope of their employment
in committing the misconduct described herein.

**ANSWER:**    Count XI, which includes this paragraph, is not directed Coghlan and seeks no

relief from Coghlan.  Accordingly, Coghlan provides no answer to the allegations in this

paragraph.

221.    Defendants Coghlan and Dillon are or were employees of Cook County State's
Attorney's office, an agency of Cook County, Illinois, who acted within the scope of their
employment in committing the misconduct described herein.

**ANSWER:**    Count XI, which includes this paragraph, is not directed Coghlan and seeks no

relief from Coghlan.  Accordingly, no answer to the allegations in this paragraph is required.  To

the extent an answer is required, Coghlan admits only that he was employed by the Cook County

State's Attorney's Office from 1987 to 2000 and acted within the scope of his employment when

he prosecuted the Vargas murder on behalf of the State.  Except as specifically admitted,

Coghlan denies the allegations in this paragraph.

### AFFIRMATIVE DEFENSES

Defendant Matthew Coghlan's affirmative defenses are set forth below: Coghlan sets

forth these allegations and defenses, without prejudice to his responses to Plaintiff's allegations.

Further, in setting forth these Affirmative Defenses, Coghlan does not assume the burden of

proof on matters and issues other than those on which Coghlan has the burden of proof as a matter of law.

## FIRST AFFIRMATIVE DEFENSE
### Absolute Prosecutorial Immunity

At all times relevant to Plaintiff's Amended Complaint, Coghlan was an Assistant State's Attorney working for the Cook County State's Attorney's Office.  In this capacity, Coghlan took actions intimately associated with the judicial phase of the criminal process, including the preparation for and initiation of judicial proceedings and trial.  Because the conduct complained of on the part of Coghlan arises solely out of actions he allegedly took as a part of the initiation and presentation of the case against Plaintiff and his co-defendants, and thus within his role as an advocate for the State, Plaintiff's claims are barred on the basis of absolute prosecutorial immunity.

## SECOND AFFIRMATIVE DEFENSE
### Qualified Immunity

At all times relevant to Plaintiff's Amended Complaint, Coghlan was an Assistant State's Attorney working for the Cook County State's Attorney's Office.  To the extent Coghlan is not entitled to absolute immunity for some or all of his alleged conduct, he is nevertheless entitled to qualified immunity because the alleged conduct does not violate clearly established statutory or constitutional rights.

## THIRD AFFIRMATIVE DEFENSE
### Statute of Limitations – Federal Claims

To the extent that any of Plaintiff's claims pursuant to 42 U.S.C. § 1983 accrued more than two years prior to the filing of Plaintiff's Complaint, these claims are time barred.

## FOURTH AFFIRMATIVE DEFENSE
### Statute of Limitations – State Law Claims

To the extent any of Plaintiff's claims pursuant to Illinois State law accrued more than one year prior to the filing of Plaintiff's Complaint, these claims are time barred pursuant to 745 ILCS 10/8-101(a).

## FIFTH AFFIRMATIVE DEFENSE
### Local Governmental and Governmental Employees Tort Immunity – 745 ILCS 10/2-202

Because the acts or omissions Coghlan allegedly took would have been acts or omissions in his capacity as a public employee in the execution or enforcement of a law and because those acts or omissions did not constitute willful or wanton conduct, Coghlan is immune from suit pursuant to 745 ILCS 10/2-202.

## SIXTH AFFIRMATIVE DEFENSE
### Local Governmental and Governmental Employees Tort Immunity – 745 ILCS 10/2-204

Because Coghlan was, at all times relevant to Plaintiff's Amended Complaint, a public employee acting within the scope of his employment, he is immune from suit pursuant to 745 ILCS 10/2-204 for any injury caused by the act or omission of another person.

## SEVENTH AFFIRMATIVE DEFENSE
### Res Judicata and Collateral Estoppel

Plaintiff's claims in the Amended Complaint are barred by the doctrines of res judicata and collateral estoppel to the extent that they involve issues or claims that were, or could have been, resolved in the underlying criminal or post-conviction proceedings.

## EIGHTH AFFIRMATIVE DEFENSE
### Proximate Causation

To the extent any injuries or damages claims by Plaintiff were proximately caused, in whole or in part, by negligent, willful, wanton, and/or other wrongful conduct on the part of

Plaintiff as reflected in the public record, including but not limited to police reports and court records, any verdict or judgment obtained by Plaintiff must be reduced by an amount commensurate with the degree of fault attributed to Plaintiff by the jury in this case.

## NINTH AFFIRMATIVE DEFENSE
### Failure to Mitigate

To the extent Plaintiff failed to mitigate any of his claimed injuries or damages, any verdict or judgment obtained by Plaintiff must be reduced by application of the principle that a Plaintiff has a duty to mitigate his or her damages.

## **JURY DEMAND**

Coghlan respectfully requests a trial by jury.

Dated: July 10, 2018          Respectfully submitted,

/s/ Paula S. Quist
Paula S. Quist (IL 6278287)
pquist@jonesday.com
Morgan R. Hirst (IL 6275128)
mhirst@jonesday.com
Leigh A. Krahenbuhl (IL 6309479)
lkrahenbuhl@jonesday.com
Kristina K. Cercone (IL 6306298)
kcercone@jonesday.com
JONES DAY
77 West Wacker
Chicago, IL  60601.1692
Telephone:  (312) 782-3939

*Counsel for Defendant Matthew Coghlan*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 10th day of July, 2018, I filed the foregoing with the Clerk of the United States District Court for the Northern District of Illinois by using the CM/ECF system, which will send notification electronically to all counsel of record.

/s/ Paula S. Quist
*Counsel for Defendant Matthew Coghlan*