**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ARMANDO SERRANO | ) | |
| | ) | Case No. 17 CV 2869 |
| Plaintiff, | ) | |
| | ) | Hon. Manish S. Shah |
| vs. | ) | Magistrate Susan E. Cox |
| | ) | |
| REYNALDO GUEVARA, ERNEST | ) | |
| HALVORSEN, EDWARD MINGEY, | ) | |
| MATTHEW COGHLAN, JOHN DILLON, the | ) | |
| CITY OF CHICAGO, and COOK COUNTY | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**MEMORANDUM OF LAW IN SUPPORT OF SPOLIATION SANCTIONS**

James G. Sotos
Josh M. Engquist
David A. Brueggen
Jeffrey R. Kivetz
**THE SOTOS LAW FIRM, P.C.**
141 W. Jackson Blvd, Suite 1240 A
Chicago, IL 60604
(630)735-3300
jsotos@jsotoslaw.com

Eileen E. Rosen
Patrick Moran
Austin Gordon Rahe
Catherine Macneil Barber
Stacy Ann Benjamin
Theresa Berousek Carney
**ROCK FUSCO & CONNELLY, LLC**
Cook County State's Attorney's Office
321 N. Clark Street, Suite 2200
Chicago, IL 60654
(312) 474-1000
erosen@rfclaw.com

## TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................4

I.      Plaintiff Serrano Retains Protess And His Students ............................................4

II.     Medill's Work In General And On Plaintiff Serrano's Case ............................4

III.    The Destroyed/Missing Evidence ........................................................................6

       A.     Destroyed/Missing Evidence Relating To Vicente's Recantation.......................6

       B.     Destroyed/Missing Memorandum Of Plaintiffs' Interviews .............................11

       C.     Destroyed/Missing Memoranda From Medill Interviews With Emilio Montanez And Rankins...................................................................................12

       D.     Destroyed/Missing Videotaped Interview Of Michele Serrano, Pacheco's Girlfriend ...................................................................................14

IV.    Protess's Affirmative Directives To Destroy Medill Documents...................16

ARGUMENT ....................................................................................................................19

I.      Plaintiff Serrano's Agents At Medill And The CWC Had A Duty to Preserve ............20

       A.     Plaintiff Serrano And His Agents Controlled The Missing Evidence ...............20

       B.     The Missing Evidence Is Material ....................................................................21

       C.     The Present Litigation Was Foreseeable And Specifically Contemplated .........23

II.     The Duty to Preserve Evidence Was Breached In Bad Faith .........................23

III.    Defendants Have Been Severely Prejudiced.....................................................24

IV.    Dismissal Is Appropriate....................................................................................25

CONCLUSION....................................................................................................................26

## TABLE OF AUTHORITIES

<u>**Cases:**</u>                                                                 <u>**Page**</u>

*Allstate Ins. Co. v. Sunbeam Corp.*, 53 F.3d 804 (7th Cir. 1995) .................................................25

*Am. Fam. Mut. Ins. Co. v. Roth*, 2009 WL 982788 (N.D. Ill. Feb. 20, 2009) ..............................24

*Barnhill v. United States*, 11 F.3d 1360 (7th Cir. 1993) .................................................................19

*Below by Below v. Yokohama Tire Corp.*, 2017 WL 76824 (W.D. Wis. Feb. 27, 2017) .............20

*Bryant v. Gardner*, 587 F. Supp. 2d 951 (N.D. Ill. 2018).................................................................20

*Cahill v. Sheriff of Cook County Thomas Dart*, 2016 WL 7093434 (N.D. Ill., Mar. 4, 2016)......20

*Cohn v. Guaranteed Rate, Inc.*, 318 F.R.D. 350 (N.D. Ill. 2016).....................................................20

*Dexia Credit Local v. Rogan*, 231 F.R.D. 538 (N.D. Ill. 2004).......................................................21

*Faas v. Sears, Roebuck & Co.*, 532 F.3d 633 (7th Cir. 2008) .........................................................24

*Langley, et al. v. Union Electric Company,* 107 F.3d 510 (7th Cir. 1997)....................................19

*Larson v. Bank One Corp.*, 2005 WL 4652509 (N.D. Ill., Aug. 18, 2005) ................19, 24, 25, 26

*MacNeil Automotive Products, Ltd. v. Cannon Automotive Ltd.*, 2011 WL 812140
(N.D. Ill. Mar. 1, 2011)......................................................................................................................25

*Marrocco v. General Motors Corp.*, 966 F.2d 220 (7th Cir. 1992)...........................................19, 20

*Nat'l Hockey League v. Metro. Hockey Club, Inc.,* 427 U.S. 639 (1976) ......................................19

## INTRODUCTION

In 1993, Plaintiffs Armando Serrano and Jose Montanez, and Jorge Pacheco, were arrested for the murder of Rodrigo Vargas. At the time, all three men were members of the Imperial Gangsters, a gang then operating in Chicago. In 1995, Plaintiffs and Pacheco were convicted of the murder at a bench trial where witness Francisco Vicente, also an Imperial Gangster, testified that he was present when Plaintiffs and Pacheco discussed their just having murdered Vargas during a botched robbery.[1] After extensive communications with Plaintiff Serrano's agents as well as Plaintiff Montanez, Vicente later recanted his testimony.

Another witness, Timothy Rankins, told the police, and testified to a Grand Jury, that he actually saw Plaintiffs and Pacheco murder Vargas while on their way to pick up guns and drugs. But after speaking with Plaintiff Montanez in Cook County Jail, Rankins also recanted his testimony. Rankins provided a second recantation after being contacted by Julio Lebron, an investigator for the families of both Plaintiffs. Rankins's recantations occurred before Plaintiffs' criminal trial during which time he was hidden at Plaintiff Montanez's family residence in Puerto Rico in order to evade being called as a trial witness. Notably, Plaintiffs' gang had threatened to kill both Vicente and Rankins before they recanted.

In 2003, a decade after Plaintiffs' arrests, David Protess ("Protess"), who was then a professor of journalism at Northwestern University's Medill School of Journalism, his journalism students ("the students"), and their private investigator, Sergio Serrittella (sometimes collectively "Medill"), began investigating the case on behalf of Plaintiff Serrano. This was part of Medill's overall project directed to obtaining evidence to exculpate several individuals convicted of crimes throughout Illinois.

---

[1] Pacheco was initially convicted of the murders along with Plaintiffs, but was later acquitted by the trial court on post-trial motions.

Protess, Serrittella, and the students, self-described as "Team Serrano," offered Vicente hidden incentives in order to "extract" (their word) a recantation from Vicente and prove that, in their view, Plaintiff Serrano was innocent. They also created a slew of tapes and memos of interviews of key witnesses, including of Plaintiffs, Vincente, Rankins, and Pacheco's girlfriend, Michele Serrano, that they deliberately destroyed before the instant case was filed. Years later, Northwestern fired Protess for his obstruction of the efforts of the Cook County State's Attorney's office (CCSAO) and of Northwestern University itself to determine what Protess did with certain evidence created during Medill investigations.[2]

In 2004, long before Protess's improprieties came to light, Medill succeeded in extracting Vicente's recantation. That same year, at Protess's recommendation, Plaintiff Serrano retained attorneys from Northwestern University's Center on Wrongful Convictions ("CWC") to file a post-conviction petition on his behalf. Medill provided its Serrano file to the CWC. In 2013, Serrano retained his current counsel, Jennifer Bonjean, who was provided the CWC's file. Attorney Bonjean represented Serrano throughout the remainder of the post-conviction process (and now represents Serrano in this case). Both Plaintiffs' convictions were reversed in 2016, and thereafter, they filed these cases.

Vicente's and Rankins's recantations are at the heart of Plaintiff Serrano's Amended Complaint. Serrano alleges "Defendants concealed the fact that they had coerced, pressured, threatened, and induced the 'snitch' witness [Vicente] to falsely implicate Plaintiff." (Dkt. 90 at ¶ 3.) Serrano further alleges that he and Plaintiff Montanez "were convicted solely on the 'snitch' testimony of Francisco Vicente[.]" ( *Id.* at ¶ 70.) And, Serrano's claim for fabrication of evidence

---

[2] In the post-Protess era, Medill's focus has been on "teaching [students] to be investigative reporters," rather than "advocat[ing] for the release" of prisoners. (Ex. 11, Cary Spivak, *How the Medill Justice Project has thrived following controversy,* COLUMBIA JOURNALISM REVIEW, Sept. 7, 2011, p. 1; http://www.cjr.org/united_states_project/medill_justice_project.php).

alleges that Defendants "deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fourteenth Amendment by fabricating Vicente and Rankins' statements and testimony[.]" (*Id.* at ¶136).

During discovery in this case, Defendants sought all evidence gathered by Medill during its investigation. (Ex. 31, Subpoenas to Northwestern and related entities; Ex. 37, Plaintiff Serrano's Response to Request for Production, ¶¶ 3, 4, 19, 22-24, 31, 39, 51, 57, and 60). Such evidence would be critical to Plaintiffs' guilt, as it could shed light on *why* the key witnesses against Plaintiffs recanted their testimony and what improper incentives might have been used to extract those recantations. It could also reveal detailed witness testimony about the events at issue from a time period far closer to the original events than could be obtained through discovery, well over a decade later.

But the facts here show that Medill deliberately destroyed and/or suppressed inculpatory tapes, memos, and notes of several key witness interviews. These also would have fully revealed widespread investigative misconduct, as well as facilitated fruitful investigation into the Vargas murder and the accounts of witnesses, including Vicente, Rankins, and Pacheco. Indeed, Defendants have learned from emails and letters, and their own investigation, that Medill suppressed critical evidence that implicated both Plaintiffs in the Vargas murder. Medill further suppressed evidence which showed that, after the Imperial Gangsters threatened their lives, Vicente and Rankins were offered protection from assassination by Plaintiffs, and Vicente was offered money from this expected civil rights case, in return for their recantations.

Further, Plaintiffs' co-defendant Pacheco was murdered by Imperial Gangsters shortly after his girlfriend Michele Serrano told Medill, on videotape, that Pacheco told her he shot Vargas in the presence of both Plaintiffs. Medill destroyed the videotape of that critical

interview. Team Serrano's conduct has permanently impaired Defendants' ability to defend this case and requires corrective sanctions.

## BACKGROUND

### I.   Plaintiff Serrano Retains Protess And His Students.

In the early 2000s, Serrano asked Protess for post-conviction assistance. (Ex. 1, Serrano dep. at 179). In 2001, Protess's son, Ben, a high school student who later attended Northwestern, learned of Serrano's case through Serrano's brother, and began informally investigating with Protess's approval. (Ex. 1, Serrano dep. at 179; Ex. 2, 7/5/02 Protess email; Ex. 3, Protess dep. at 367).

In July 2002, long before Medill had even agreed to take on Serrano's case or had interviewed Vincente, Medill had prejudged the facts. Protess drafted a letter for Ben to send Serrano that stated, "It is evident that the key to your freedom is the recantation of Vicente." (Ex. 2, 7/5/02 Protess email; Ex. 3, Protess dep. at 63-64; Ex. 1, Serrano dep. at 177-78). At the same time, Sergio Serritella, an aide to an Illinois State Senator and also a private investigator, was independently investigating Serrano's case as part of a constituent services program. (Ex. 3, Protess dep. at 59). Serritella and Ben connected, and by the Fall of 2002, convinced Protess to review Serrano's case. (Ex. 3, Protess dep. at 59, 63-65, 84-85; Ex. 4, Serritella dep. at 73, 75).

### II.   Medill's Work In General And On Plaintiff Serrano's Case.

As part of his journalism class, Protess assigned his students to investigate crimes on behalf of individuals whom they perceived had been wrongfully incarcerated. (Ex. 3, Protess dep. at 39-40). Protess and his students compiled materials, information, memoranda, audiotapes, and videotapes during their investigation, storing them "in a box with the name of the case on it and then just added to [it] every quarter that the students continued the work." (*Id*. at 337-8).

4

Audio and video files of interviews were kept in the Serrano box, which was stored in the Medill Innocence Project office under lock and key. (*Id*. at 361-2). Serritella was hired to accompany students and a program assistant was hired to maintain files in the boxes and to maintain electronically stored documents. (*Id*. at 40-41, 355-356, 361). When a particular client's case proceeded to the stage of a post-conviction petition or appeal, this box of materials was to be provided directly to the CWC, which partnered with Protess and his students in pursuing reversals of convictions. (*Id*. at 338-339, 349-350).

In January 2003, Medill began formally investigating on behalf of Plaintiff Serrano. (Ex. 5, ███████████████). Medill representatives met with Serrano as well as his family and then began interviewing witnesses, including Plaintiff Montanez and his family. (Ex. 6, 1/20/03 Protess Email, p. 2; Ex. 7, 4/25/03 Medill email; Ex. 8, 4/24/03 Medill email; Ex. 9, May/April 2003 Medill email, p. 2). They took notes during these interviews from which they prepared memoranda summarizing the interviews. (Ex. 3, Protess dep. at 82-3, 305-6, 357-8; Ex. 36, ███████████████████). Medill acted as Serrano's agent, with Serrano's cooperation and participation, to generate evidence proving his innocence.

In January 2004, Protess gave CWC executive director Rob Warden an overview of the Serrano investigation and asked that the CWC represent Serrano. (Ex. 12, 1/8/04 Protess email, p. 2). The CWC assigned attorney and Professor Jeff Urdangen to the case, whom the students kept apprised of their investigation. (Ex. 13, 4/13/04 Medill email; Ex. 14, 4/30/04 Medill email; Ex. 15, ██████████████; Ex. 16, 5/24/04 Urdangen email, p.1). In 2005, the CWC filed Serrano's post-conviction petition and represented him until around 2013, when Serrano retained his current counsel, attorney Bonjean. On July 20, 2016 the CCSAO moved to vacate both

Plaintiffs' convictions, *nolle prossed* the criminal charges, and Plaintiffs were released later that same day. (Dkt. 90, ¶7).

### III.    The Destroyed/Missing Evidence.

During civil discovery, Northwestern University, Protess and his students, and the CWC produced thousands of pages of emails and documents relating to Serrano's case. Serrano himself produced over 10,000 pages of documents.[3] These documents reveal the one-time existence of critical evidence inculpating Plaintiffs that was apparently destroyed, and never produced in this case.

### A.    Destroyed/Missing Evidence Relating To Vicente's Recantation.

As already described, Vicente testified at Plaintiffs' original trial that Plaintiffs told him they shot Vargas during a botched robbery. After taking on the case, Protess left no doubt as to Medill's plan of attack:

> It's indisputable that Vicente is key to this case. If he formally recants there's a solid basis for obtaining post-conviction relief. [Without that] it's doubtful the courts will take the petition seriously unless we actually solve the crime.

(Ex. 27, 11/6/03 Protess email, p.1).

To that end, Medill first visited Vicente in June of 2003 during his incarceration at Big Muddy Correctional Center. This meeting occurred just a few months after Jorge Pacheco, who was charged along with Plaintiffs for the Vargas murder, had himself been murdered by the Imperial Gangsters (*see* Section III.D. below), the gang to which Pacheco, both Plaintiffs, and Vicente all belonged. Vicente told Medill's investigator that he feared for his life because the Imperial Gangsters had threatened and attempted to kill him several times, including because of

---

[3] In contrast to the missing inculpatory videotaped interview of Pacheco's girlfriend, described in Section III.D. below, Plaintiff Serrano did produce a videotape which it viewed as exculpatory, that being of Medill's interview of Wilda Vargas, the victim's widow.

his testimony against Plaintiffs. (Ex. 4, Serritella dep., at 123-24; Ex. 23, 6/19/03 Medill email,

p. 2; Ex. 24, Vicente dep. at 164, 222, 347, 369). The notes taken during this interview have

never been produced.

On October 21, 2003, four months after Vicente told the students of the Imperial

Gangster threats and attempts on his life, Plaintiff Montanez sent Vicente a letter with assurances

that he would protect him from attacks and also make him wealthy if he recanted:

> [C]an't you see that once this is over and the truth is told. [sic] We
> won't have to work again G. [sic] There's a lot of ching-ching for
> us when we sue everyone and there [sic] mamas for this. Have you
> ever been on the Oprha [sic] show or 20/20.  Well shit that what's
> next for us.

(Ex. 28, 10/31/03 Montanez letter, p. 3).

Shortly thereafter, in November 2003, Medill again interviewed Vicente, at least "partly

on audiotape." (Ex. 12, 1/8/04 Protess email, p. 1; Ex. 27, 11/6/03 Protess email, p. 2). In

preparation for that visit, Protess advised "Team Serrano" how to go about obtaining the much-

needed recantation:

> [I]t's obvious that [Vicente's] going to want something tangible in
> return before agreeing to sign an affidavit. After all, he's a con and
> a snitch, and I can't see him recanting as a matter of conscience....
> If any promises to obtain [Vicente's] recantation aren't handled
> artfully, there is a risk that his statement will be legally
> meaningless. . .  [so] the offer to help him should be discussed in
> terms that are as GENERAL as possible . . . We can arrange
> protective custody, transfer him to a better prison that's closer to
> home, etc. The bottom line is we can protect their safety and
> ensure their comfort. No FINANCIAL promises should be
> made…However, you can suggest that the Montanez and Serrano
> families would likely be very generous with him in the civil rights
> suits that definitely would follow their release. That also would
> give him an incentive to help set them free.

(Ex. 27, 11/6/03 Protess email, pp. 1-2, emphasis in original). Of course, Plaintiff Montanez had

already written that, in exchange for his recantation, Vicente would get "a lot of ching-ching"

from those same civil rights suits. Although this November 2003 interview covered the very issues in this case, and likely contained devastating impeachment material, both the notes taken during this interview, and the audiotape itself, have been destroyed or intentionally lost.

Medill also prepared a memorandum of the November 2003 audiotaped interview with Vicente that included information about unidentified "mistakes" that were made with Vicente, presumably in regard to Medill's failure to secure a recantation at that time. (Ex. 29, 11/21/03 Protess email, p. 1; Ex. 30, 11/24/03 Serritella email). As with the notes and the audiotape, this memorandum has also been destroyed or intentionally lost.

Protess advised the student how to get Vicente's recantation at the next interview:

> [W]e first need to wait for his transfer, which hopefully will occur soon. Then you can go back to him and demand that he fulfill his part of the deal . . . . You don't need to threaten him directly . . . The threat of a transfer to an even worse prison is IMPLICIT, plus he's still hoping that Michele [sic] [Vicente's wife] will receive help, which gives him further incentive to cooperate…. Meanwhile, Sergio [their investigator] will monitor the transfer process. . . . The less important he feels, the more he'll feel obliged to cooperate in order to get what he wants.

(Ex. 29, 11/21/03 Protess email, p. 1, emphasis in original). This is a blatant discussion of a *quid pro quo*: recantation for favors.

In further discussing how to extract the recantation, members of Team Serrano predicted Vicente would "give up this recantation" by way of a "one-two punch" strategy under which Medill would "prov[e] we have the resources to accommodate his wish list" and ensure that Vicente's wife would "softe[n] him up" during her next holiday visit. (Ex. 30, 11/24/03 Serritella email). But as Vicente continued to resist providing a recantation affidavit, Team Serrano continued to increase the incentives. In January 2004 Protess wrote that Serrittella's use of his position as an Illinois senatorial aide to grant Vicente's November 2003 request for a transfer to

a prison closer to his home appeared to have convinced Vicente to "cooperate fully with us." (Ex. 12, 1/8/04 Protess email, p. 1; Ex. 3, Protess dep. at 183-4). As already mentioned, the audiotape, original memo and notes of the November 2003 interview are missing.

After the transfer, Vicente remained frightened about rumors among the Imperial Gangsters that he was a snitch, rumors that Team Serrano credited. (Ex. 10, 12/6/03 Serritella email, p. 2; Ex. 1, Serrano dep. at 237-8; Ex. 25, 2/5/04 Serritella email). Vicente requested that both Plaintiffs write his cellmate, still another Imperial Gangster, to explain "that he is cool" and was now helping Plaintiffs with post-conviction matters. (Ex. 10, 12/6/03 Serritella email, p. 2).

To accommodate Vicente's request, Medill facilitated Plaintiffs' circumvention of IDOC rules prohibiting correspondence among inmates without permission, by coordinating, obtaining, and providing letters to Vicente's cellmate, Freddy "Flintstone" Ramos, and Thomas Sierra,[4] both Chicago Imperial Gangsters incarcerated at Danville. (Ex. 10, 12/6/03 Serritella email, pp. 1-2; Ex. 32, 12/11/03 Sierra letter; Ex. 33, 12/9/03 Medill email; Ex. 34, 12/12/03 Montanez letter; Ex. 1, Serrano dep. at 237, 241-2). Plaintiff Montanez's letter to Ramos stated that Vicente ("Chino") was helping Plaintiffs and that Ramos should remind Vicente about Montanez's "ching-ching" letter. (Ex. 34, 12/12/03 Montanez letter, p. 1). Plaintiff Serrano's letter to Sierra similarly noted that Vicente was helping him and asked that Sierra "look out for [Vicente] and make sure that nothing happens to him." (Ex. 32, 12/11/03 Sierra letter, p. 2; Ex. 1, Serrano dep. at 246).

In his deposition, Vicente confirmed his belief that the only reason the Imperial Gangsters did not kill him was because Plaintiffs needed him alive to testify. (Ex. 24, Vicente dep. at 371-2, 377). Vicente clearly believed that he owed his very life to the efforts of Plaintiffs

---

[4] Sierra's conviction for a drive-by murder has been reversed, and he has a pending §1983 lawsuit against some of the same CPD detectives involved in this suit. *See Sierra v. Guevara, et al.*, 18 cv 3029 (N.D. Ill).

and Team Serrano, the most powerful incentive to lie. Plaintiffs' promises to protect Vicente

from retaliatory violence at the hands of their gang, the Imperial Gangsters, were deliberately

undertaken in a quest for his recantation.

In April 2004, Medill visited Vicente twice more. (Ex. 35, 4/9/04 Medill memo; Ex. 36,

█████████████). The students advised Protess that they had prepared a memo

summarizing the first April meeting, which detailed what they themselves described as

Serritella's "questionable tactics." But they had also prepared a second "clean copy" of that

memo that purposely excluded the "questionable material." (Ex. 13, 4/13/04 Medill email). The

sanitized version of the memo — which we have[5] — reveals that the interview was audio

recorded. (Ex. 35, 4/9/04 Medill memo). Still again, the notes of that interview, along with the

audiotape and original memorandum detailing Serritella's "questionable" witness tactics, no

longer exist.

Following the second April 2004 meeting, Medill representatives again discarded their

handwritten notes, but provided a typed selection of their interview notes to the CWC so its post-

conviction attorneys could draft Vicente's recantation affidavit. (Ex. 38, 4/30/04 Medill email,

p.1; Ex. 16, 5/24/04 Urdangen email). Medill planned to present that affidavit to Vicente in a

way that deliberately masked Serritella's role, about which Medill shared concerns with the

CWC, in offering Vicente protection, deals, money, and favors for signing. In essence, Medill

contrived to obtain Vicente's signature on the affidavit without Serritella's technical presence[6],

and then had Serritella "speak with [Vicente] in private when we were finished." (Ex. 38,

4/30/04 Medill email, p. 2). The idea was to make the favors and the recantation look "as isolated

---

[5] The memorandum from the second April 2004 visit was not disclosed by Northwestern or Serrano, but instead by a former student who still had a copy in her emails.

[6] At this initial meeting, Medill also planned to bring Vicente a "treat" in the form of a former female student whose presence Vicente had been requesting. (Ex. 38, 4/30/04 Medill email, p.1).

from one another as possible." (*Id.*, p. 1). Of course, this disguised the *quid pro quo* nature of the recantation. Medill itself admitted that "[i]f any promises to obtain [Vicente's] recantation aren't handled artfully, there is a risk that his statement will be legally meaningless." (Ex. 27, 11/6/03 Protess email, p. 1).

Vicente finally signed the affidavit on May 26, 2004, more than 10 years after his initial inculpatory statements, and two years after Protess first declared that the recantation was the key to Plaintiff Serrano's release. (Ex. 39, Vicente affidavit; Ex. 16, 5/24/04 Urdangen email). Per Medill's plan, this was done immediately before Vicente met with Serritella privately. (Ex. 40, 5/27/04 Medill email). Of course, the notes of these meetings have been destroyed. The affidavit (Ex. 39) contains, among other things, this blatant lie:

> Neither these students nor their instructor, nor any lawyers or investigators connected to the defendants have tried to . . . suggest to me that I would have anything to gain as a result of the statement I am signing now.

From what we can tell, therefore, no less (and likely many more) than 8 sets of notes, several memos, and audiotapes of interviews of Vicente and his recantation—the key witness in this case—have been destroyed and/or intentionally lost. These materials would have yielded a wealth of substantive and impeachment material; the evolution of Vicente's story and recantation; and a host of factual details. This evidence was all known to Serrano and/or his agents but has been lost to Defendants forever.

**B.**    **Destroyed/Missing Memorandum Of Plaintiffs' Interviews.**

Medill also met separately with Plaintiffs in Fall 2003, prior to any attorney/client relationship between the CWC and Serrano, and prepared a single memorandum summarizing both meetings. (Ex. 41, 11/2/03 Medill email). That memorandum is missing, but a later memo revealed that at least one student who was present for those interviews had expressed her

11

surprise that Plaintiffs were in the same facility because of their mutual dislike for each other, her suspicions of Plaintiff Montanez's actual guilt, and her concern over Plaintiff Montanez's "descri[ption of] Serrano as 'trigger happy' and it being "possible that Serrano committed the crime." (Ex. 42, 10/17/03 Medill memo, p. 2). Montanez's descriptions of Plaintiff Serrano generally corroborated Vicente's and Rankins's original accounts that Serrano was the shooter. More specifically, they corroborated Vicente's testimony ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████ (Ex. 64, ████████████████████████████). But all the details, directly from Plaintiff Montanez, supporting and explaining those perceptions from Medill's notes and its memorandum of those interviews have been lost. And, as with every other substantive matter addressed to the students, the student who had expressed her skepticism and suspicion about Plaintiffs had no recollection of the issue.



### C. Destroyed/Missing Memoranda From Medill Interviews With Emilio Montanez And Rankins.

Medill interviewed Plaintiff Montanez's father, Emilio Montanez, and prepared a memo, also missing, summarizing the interview. (Ex. 43, 11/17/03 Medill email). Emilio Montanez hired Julio Lebron to investigate Vargas's murder after his son's arrest. (Ex. 44, 10/20/03 Serritella email; Ex. 9, May/April 2003 Medill email, p. 2). Lebron tracked down Timothy Rankins, who had told police, and testified to a Grand Jury, that he was present when Plaintiffs and Pacheco murdered Vargas. (Ex. 44, 10/20/03 Serritella email; Ex. 65, ████████████ ████████████████). Rankins had initially recanted after speaking with Montanez at Cook County Jail. After Rankins was released, Lebron obtained his handwritten recantation and then hid him from the authorities at a Montanez family residence in Puerto Rico. (*Id.; see also* Ex. 45,

3/4/04 Medill email, p. 1; Ex. 9, May/April 2003 Protess email, p. 2; Ex. 46, Carmen Montanez

dep. at 54-57; Ex. 47, Rankins dep. at 105, 108, 208-9).

Later, Rankins thanked Plaintiff Montanez in a letter for not killing him and for

protecting him from a planned Imperial Gangster assassination. (Ex. 48, Rankins letter, p. 1; Ex.

44, 10/20/03 Serritella email, p. 2).[7] This is yet another key witness — in addition to Vicente —

whose recantation was directly tied to Imperial Gangster threats on his life followed by

Plaintiffs' offers of protection from Imperial Gangster violence, certainly the most powerful

incentive to recant. Plaintiffs' actions beg the question: if Rankins and Vicente had not recanted,

would they still be alive today? [8]

From its notes, Medill created several memos of its investigation of Rankins as well as a

memo of its interview with Rankins during his incarceration in California in May 2004. (Ex. 26,

6/9/04 Medill email; Ex. 51, ███████████; Ex. 52, ███████████; Ex. 53,

███████). The memo of that interview was shared with the CWC. (Ex. 26, 6/9/04 Medill

email; Ex. 15, ███████████). That memo likely explained Medill's extremely suspicious

decision to forego having Rankins sign an affidavit because of its concerns that "Tim may be a

liability," in favor of having students sign second-hand affidavits. (Ex. 61, 12/15/04 Medill

email).Yet, neither the notes nor the memo of any Rankins interview have ever been disclosed.[9]

---

[7] Plaintiff Montanez's sister, Norma, acted as a go-between and edited Rankins's letter before giving it to her brother because the reference to Montanez not killing or having Rankins killed sounded inappropriate to her and potentially violated IDOC rules. (Ex. 44, 10/20/03 Serritella email, p. 2; Ex. 48, Rankins letter, p. 1; Ex. 49, N. Montanez dep. at 72-76).

[8] Consistent with that very theory, one student questioned whether "[Rankins's recantation] was because of police intimidation to say the statement to begin with or if it was out of fear from [Plaintiffs] and [P]acheco." (Ex. 50, 5/4/03Medill email).

[9] Serrano's agents also destroyed/lost an audio-tape and memo of an interview of Vicente's cellmate, Valentine "Tomato" Gomez, who purportedly told Medill that Vicente recanted to him. (Ex. 23, 6/19/03 Medill email, p. 1). They also destroyed/lost a memo of their Fall 2003 interview of Vicente's wife,

**D.      Destroyed/Missing Videotaped Interview Of Michele Serrano, Pacheco's Girlfriend.**

As described above, witness Timothy Rankins told police and testified to a Grand Jury that he saw Plaintiffs and Jorge Pacheco murder Vargas, but later recanted that testimony after speaking to Plaintiff Montanez and Montanez's father's investigator, and then was hidden from the authorities by Montanez's family. Vicente also implicated Plaintiffs and Pacheco in the Vargas murder before recanting well over a decade later. Clearly, evidence confirming Pacheco's participation in the murder with Plaintiffs would directly corroborate Vicente's original trial testimony and Rankins's original account implicating Plaintiffs and Pacheco in the Vargas murder, as well as undermine Plaintiffs' contention that police and prosecutors coerced false statements from Vicente and Rankins.

Such compelling corroboration once existed in the form of a videotaped statement of Pacheco's girlfriend, Michele Serrano, placing Pacheco and Plaintiffs at the murder scene. At the onset of Medill's investigation, on January 21, 2003, Ben Protess emailed his father asking what he should do with "the tape of the Michele Serrano interview" which "implicated Pacheco as the trigger man" in the Vargas murder. (Ex. 6, 1/20/03 Protess email, p. 1).[10] No response to this email was ever produced.  Aside from this, and one other email, all evidence surrounding this

_____

Michelle Vicente (Ex. 54, 10/17/03, Medill memo), who had created a "wish list" in return for her husband's recantation. (Ex. 62, 12/6/03 Serritella email). Protess admitted Medill had "already headed down the road with both Michelle and Vicente" and a student noted "Sergio has already come forward to Michelle regarding a federal job in return for her cooperation." (Ex. 55, 11/7/03 Medill email).

[10] In this email, Ben mistakenly assumed that Michele's description of Pacheco as the "trigger man" exculpated Serrano. As described below, that was definitely not the case, a fact of which Protess would have been well aware.

critical interview, including interview notes, interview memoranda, and most critically, the videotaped interview itself, are gone.[11]

Until recently, Defendants had been unable to identify or locate Michele Serrano. In a December 7, 2018 email, Serrano's counsel in this case stated that Michele was not a family member but provided no further information. (Ex. 17, 12/7/18 Bonjean email). Eventually, by reviewing police reports from Pacheco's murder, defense counsel discovered that Michele Serrano had been Pacheco's girlfriend.

Defense counsel then located, interviewed, and deposed Michele Serrano. She confirmed that she was in contact with Pacheco in January 2003 when the video interview occurred (at the very beginning of Medill's investigation). She further testified that she told Medill that Pacheco had told her he shot Vargas, and that the two other Imperial Gangsters who were with Pacheco at the time were "locked up" for the crime, clearly referencing Plaintiffs. (Ex. 18, Michele dep. at 46-47, 78-79; Ex. 19, Michele Declaration). Michele Serrano further acknowledged that, due to the passage of time, she could not recall all the details she provided to Medill during her videotaped interview, and that her memory of Pacheco's description of the murder was better in 2003 than it was at the time of her 2019 deposition. (Ex. 18, Michele dep. at 43-44). None of the Medill students who were deposed remember anything about Michele's video statement. Although Medill gave its entire file to CWC, and CWC gave its entire file to Bonjean, all evidence of this critical interview has been destroyed.

---

[11] Serritella testified that he last saw Michele's videotape when he gave it to Ben Protess. (Ex. 4, Serritella dep. at 81, 83-84). Protess testified he would have told Ben to put Michele's videotape in Medill's Serrano box. (Ex. 3, Protess dep. at 369-370). According to a February 10, 2003 email, a few days after Pacheco was murdered, Serritella shared Michele's video with the students and offered to arrange a follow up interview. (Ex. 22, 2/10/03 Serritella email). Protess testified he has no recollection of Michele Serrano (Ex. 3, Protess dep. at 368, 370), and Serritella said he had no memory of discussing her interview with anyone. (Ex. 4, Serritella dep. at 87).

By January 21, 2003, just after Michele Serrano's videotaped interview, Medill was actively looking for Pacheco. (Ex. 6, 1/21/03 Serritella email). But just over two weeks later, on ██████████████████ Pacheco was suspiciously murdered — ███████████ — reportedly by his own gang, the Imperial Gangsters. (Ex. 20, ████████████████; Ex. 21, ████████████████ ████████████; Ex. 18, Michele dep. at 49-50). The destruction of all evidence of the Michele Serrano interview, in conjunction with the murder of Pacheco, helped pave the way for Plaintiffs' release, and eliminated any hope of further developing that critical evidence regarding the Vargas murder, including evidence corroborating Vicente's and Rankins's pre-recantation inculpation of Plaintiffs.

## IV. Protess's Affirmative Directives To Destroy Medill Documents.

Medill's filing system required that all information obtained during the investigation be placed into the Serrano box. But around the time Medill transferred the Serrano box to the lawyers at the CWC, Protess had already directed his students to "delet[e] all of our old memos, etc. because the case was entering the legal stage." (Ex. 56, 4/8/06 Medill email, p. 2). This is direct evidence that Protess directed that evidence be destroyed from the Serrano investigation. █████████████████████████████████████████████. (Ex. 57, ███████ ██████████████████████).[12]

This policy was exposed during a separate post-conviction matter, *People v. Anthony McKinney*, Cook County Circuit Court, 78 CR 5267, which Medill investigated simultaneously with Serrano's case.  In April 2009, then-State's Attorney Anita Alvarez subpoenaed Medill materials including emails, notes, and memos, after information surfaced about Medill students

---

[12] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

flirting with and paying two witnesses for recantations, including disguising a payment to one as cab fare.[13]



(Ex. 57 ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

---

[13]  Tony Drakes contended that, in return for his recant, Serritella gave a cab driver $60 dollars for a $6 fare, and told the driver to give Drakes $40 dollars and to keep the rest, before driving to a nearby spot so Drakes could buy crack cocaine. After Medill denied Drakes's claim, the CCSAO obtained a taxicab company log on which the driver had documented the payment because he thought something untoward was occurring. Drakes later recanted his recant. (*See* Ex. 63*, Emma Fitzsimmons, Prosecutors Say Students Paid Witness to Aid Case*, N.Y. TIMES, Nov. 10, 1991, pp. 1-2; (https://www.nytimes.com/2009/11/11/us/11innocence.html); (Ex 60, Jason Meisner, *Judge rules Northwestern students must turn over emails in murder case*, CHICAGO TRIBUNE, Sept. 7, 2011, p. 1; (https://www.chicagotribune.com/news/ct-xpm-2011-09-07-chi-judge-rules-northwestern-students-must-turn-over-emails-in-murder-case-20110907-story.html).



(Ex. 58

(Ex. 58,

## ARGUMENT

The actions of Serrano's agents have irrevocably deprived Defendants of core evidence critical to their defense, including tapes, memos, and notes of interviews of Plaintiffs and their key witnesses, evidence from co-defendant Pacheco, and evidence of improprieties in extracting the recantations that are the basis of Plaintiffs' lawsuits. Plaintiffs themselves were directly involved in such improprieties, having promoted the recantations through offers of money *from this case*, as well as by offering to protect the recanting witnesses from assassination at the hands of their gang, the Imperial Gangsters. The loss of that evidence cannot be cured. Defendants should not bear the consequences of that loss.

This Court has inherent authority to "manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Barnhill v. United States*, 11 F.3d 1360, 1367 (7th Cir. 1993) (internal citations omitted). The Supreme Court has outlined three policies for sanctions: "1) eliminate the prejudice to an innocent party; 2) punish the offending party; and 3) to deter future misconduct." *See Larson v. Bank One Corp., 2005 WL 4652509, at * 8 (N.D. Ill. Aug. 18, 2005) (citing Nat'l Hockey League v. Metro. Hockey Club, Inc.,* 427 U.S. 639, 643 (1976)).

Further, sanctions may be imposed against parties for spoliation which occurs as a result of the actions of their agents. For instance, in *Marrocco v. General Motors Corp.,* 966 F.2d 220 (7th Cir. 1992), the Seventh Circuit dismissed a lawsuit as a sanction for a destruction of potentially valuable evidence that occurred after plaintiff's attorneys and his experts set up an inspection of a vehicle without notifying the defendant. *See also Langley, et al. v. Union Electric Company,* 107 F.3d 510, 514 (7th Cir. 1997) (affirming spoliation sanctions despite party's own

lack of personal involvement in loss of furnace); *Below by Below v. Yokohama Tire Corp.*, 2017 WL 76824 (W.D. Wis. Feb. 27, 2017) (sanctions imposed based on failure of plaintiff's agents to do enough to preserve truck that was later destroyed).

Here, Plaintiff Serrano's spoliation regarding the facts of this case is indisputable based on the entire circumstances presented herein. The elements of spoliation are a duty to preserve the specific evidence; breach of the duty; willfulness, bad faith or fault; prejudice; and availability of an appropriate sanction to try to ameliorate the breach. *Cahill v. Sheriff of Cook County Thomas Dart*, 2016 WL 7093434, *4 (N.D. Ill. Mar. 4, 2016). All elements are met here.

## I.      Plaintiff Serrano's Agents At Medill And The CWC Had A Duty To Preserve.

A party has a duty to preserve evidence that it controls and which it reasonably knows or can foresee would be material to a potential legal action. *Bryant v. Gardner*, 587 F. Supp. 2d 951, 967-68 (N.D. Ill. 2008). "Federal courts across the country have recognized that a 'plaintiff's duty to preserve is more often triggered before litigation commences, in large part because plaintiffs control the timing of litigation.'" *Cohn v. Guaranteed Rate, Inc.*, 318 F.R.D. 350, 354 (N.D. Ill. 2016) (internal citations omitted). The duty extends to a party's agents who cause loss or destruction of evidence. *See Marrocco*, 966 F.2d at 223 (extending duty to plaintiffs' attorneys and experts that caused destruction of evidence).

### A.      Plaintiff Serrano And His Agents Controlled The Missing Evidence.

Medill and the CWC—both agents of Serrano—indisputably controlled the destroyed/missing evidence. It was all generated by Medill and placed in the "Serrano box," which was then provided to the CWC legal team and then to Serrano's current attorney. (Ex. 59, Urdangen dep. at 30, 33-34; Ex. 3, Protess dep. at 337-9, 349- 350). The box at one time included memos, audio tapes, and videotapes of Plaintiffs and the key witnesses. The Medill

emails that survived indicate that those materials also undoubtedly evidenced efforts by Team Serrano to "extract" favorable testimony through promises of protection, money, favorable treatment in prison, prison transfers, and the like.

Whether Serrano himself actually possessed the evidence is irrelevant because he had a right to access the evidence his agents controlled. *Dexia Credit Local v. Rogan*, 231 F.R.D. 538, 542 (N.D. Ill. 2004) ("It is 'well-settled that a party need not have actual possession of the documents to be deemed in control of them;' rather the 'test is whether the party has a legal right to obtain them.'") (internal citations omitted). Serrano had access to the missing evidence from the time Medill created it to when the CWC provided his new counsel all the evidence it possessed. (Ex. 59, Urdangen dep. at 38-41; Ex. 3, Protess dep. at 337-9).

**B.     The Missing Evidence Is Material.**

The materiality of the evidence is clear, as already described above. For example, evidence bearing on the circumstances of Vicente's recantation, including his unwillingness to recant, his demands in exchange for recantation, and his expectation of receiving protection and money won in this very lawsuit directly from both Plaintiffs, is indisputably material. Vicente's testimony against Plaintiffs did not change for more than a decade. Only after Medill's multiple contacts with Vicente, which included promises of (among other things) riches from this very case, protection of his life, and a prison transfer, did Vicente recant. Yet the tapes, memos, and notes of Medill's interviews with Vicente — reflecting all of this — are gone. The same arguments exist regarding the circumstances of Rankins's recantation. While some details of those contacts have trickled out from emails and letters that Team Serrano did not manage to destroy, all of the missing evidence would have formed a far more robust picture destroying any

credibility behind the recantations that led to this case.[15] The missing material is core evidence: notes and statements from Plaintiffs and the key witnesses in this case.

As another example, the memo that described Plaintiff Montanez's statements that Plaintiff Serrano was "trigger happy" and that he might have murdered Vargas, is gone, as well as any and all specifics as to *why* Montanez suspected Serrano might have been the killer. In Vicente's original testimony, Montanez blamed Serrano for the murder; at a minimum, this memorandum could have corroborated Vicente's original testimony and likely provided even stronger evidence of Plaintiffs' guilt. At trial, of course, the two Plaintiffs will present a united front, and much of our ability to effectively impeach that front has been destroyed. That same missing memo also summarized Medill's interview with Plaintiff Serrano around 2004, just before his post-conviction matter was filed. In reversed conviction cases, prior statements from Plaintiffs are invaluable pieces of evidence, both substantively and for impeachment purposes.

Plaintiffs' claims that they were uninvolved in Vargas's murder; that Vicente fabricated his conversations with Plaintiffs and Pacheco; and that Rankins fabricated his eyewitness account against Plaintiffs and Pacheco, moreover, were squarely contradicted by the missing Michele Serrano video. The suppression of her thirty-minute recounting of Pacheco's description of the murder has stripped critical evidence from the defense. Its loss is a devastating blow to Defendants, who are now left without this powerful tool to illustrate Plaintiffs' participation in the murder and Vicente's related discussions with Plaintiffs.

Finally, the circumstances of the Imperial Gangster murder of Pacheco — Plaintiffs' co-defendant who implicated Plaintiffs to his girlfriend and who, having been acquitted, was shielded by double jeopardy — are highly suspicious. That is especially so in light of its timing

---

[15] All of the Medill students, Protess, and Serritella have testified generally to a lack of any recollection of their interactions with Vicente, Rankins, and others.

(just after Michele told Medill about Pacheco's admissions) *and* the fact that both (still living) recanting witnesses believe they only avoided Imperial Gangster assassination due to the protection provided by none other than . . . Plaintiffs Serrano and Montanez.

### C. The Present Litigation Was Foreseeable And Specifically Contemplated.

This lawsuit was not only foreseeable: it was foreseen by Medill back in 2003 and used to extract Vicente's recantation. Protess specifically authorized Medill to "suggest that the Montanez and Serrano families would likely be very generous with [Vicente] in the civil rights suits that definitely would follow their release." (Ex. 27, 11/6/03 Protess email, p. 2). And, shortly after meeting with Medill, Plaintiff Montanez sent the infamous "ching-ching" letter telling Vicente how, if he recanted, he would never again have to work again after getting paid from this lawsuit. (Ex. 28, 10/31/03 Montanez letter, p. 3).[16] A duty to preserve the evidence at issue here clearly existed at the time of destruction.

## II. The Duty To Preserve Evidence Was Breached In Bad Faith.

Well over a dozen, and likely many more, pieces of evidence (a videotape, two or three audiotapes, eight memoranda, and several sets of interview notes) central to the two key issues in this case — whether Plaintiffs participated in Vargas's murder and the reliability of the witness recantations — once existed. All of this evidence was requested during discovery; none was produced. In the specific circumstances present here, the only fair inference from these facts is that the evidence was destroyed or intentionally lost because it inculpated Plaintiffs.

---

[16] The CWC was also aware of potential civil litigation because it was handling Serrano's post-conviction petition which, if successful, would trigger a civil case. Urdangen taught at the law school and knew of the availability of civil damages. (Ex. 59, Urdangen dep. at 102-105). Indeed, the CWC has its own civil division that handles Section 1983 cases following reversed convictions. (*Id*. at 102-103). Serrano was represented by the CWC, communicated with Protess about his case, and knew of a potential lawsuit.

A document is destroyed in bad faith if done to hide adverse information. *Faas v. Sears,*
*Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008). 

(Ex. 57

(*Id.*).

(*See* Ex. 58

The circumstances in this case support the inference that materials to
which Defendants were absolutely entitled were destroyed because they helped Defendants' case
and hurt Plaintiffs' case.

## III. Defendants Have Been Severely Prejudiced.

As described above, all of the missing evidence likely contained powerful substantive
evidence on the core issue of who murdered Vargas, *and* impeachment material relevant to
Plaintiffs and their key witnesses. *Larson,* 2005 WL 4652509, at * 8 (destruction of "evidence
that is crucial to one side's chosen theory, but not to the other side's theory, is rife with material
prejudice."). "[T]he choice of sanctions is a function of the prejudice suffered." *Am. Fam. Mut.*
*Ins. Co. v. Roth*, 2009 WL 982788, at *14 (N.D. Ill. Feb. 20, 2009).

The loss of all this evidence has prevented Defendants from fully defending a case in
which each Plaintiff seeks tens of millions of dollars in damages. Evidence that Plaintiffs were
involved in the Vargas murder is critically important to defend against their claims that they
were "wrongfully incarcerated." Defendants have been deprived of the ability to develop and

present a wealth of such evidence, through the destruction/loss of the Vicente audiotapes; memos relating to Vicente, Rankins, Plaintiffs, Emilio Montanez, Valentine "Tomato" Gomez, and Michelle Vicente; and the Michele Serrano videotaped interview.

## IV. Dismissal Is Appropriate.

In sanctioning a spoliator, the Court must focus on releveling the playing field to minimize the effect of the lost evidence. *Larson*, 2005 WL 4652509, at *9 ("the Seventh Circuit has mandated that sanctions be proportionate with the circumstances surrounding the failure to comply with discovery orders."). A party, here Serrano, whose agents deliberately destroy evidence should not benefit from his side's own unclean hands.

This Court can and should dismiss Serrano's case to prevent him from further exploiting and capitalizing on the wide-ranging destruction/suppression of evidence which has occurred. *See e.g. Allstate Ins. Co. v. Sunbeam Corp.*, 53 F.3d 804, 807 (7th Cir. 1995) (determining defendant was so deprived of the ability to establish its case that prejudice necessitated dismissal). Indeed, only dismissal would remove the prejudice to Defendants, punish Plaintiff Serrano for his agents' actions, and discourage similar suppression efforts in the future.

While the evidence supporting dismissal is compelling, the Court should minimally impose significant evidentiary sanctions. In the absence of dismissal, those sanctions should include an Order barring:

- All recantation evidence regarding Vicente in light of the destruction/loss of the audiotapes and memoranda from the Vicente interviews and the Valentine "Tomato" Gomez interview. *See e.g. MacNeil Automotive Products, Ltd. v. Cannon Automotive Ltd.*, 2011 WL 812140, at *4 (N.D. Ill. Mar. 1, 2011) (spoliation precluded defendant from presenting evidence that its manufacturing process did not produce a high rate of defects and that produced mats in plaintiff's possession were different from the mats defendant had produced);

- All recantation evidence regarding Rankins in light of the destruction/loss of the notes and memoranda from Medill's investigation of Rankins, including its interview of

Rankins, and the loss/destruction of the notes and memoranda from Medill's interview with Emilio Montanez, which addressed the Montanez family's extraction of Rankins's recantation;

- Plaintiff Serrano from contesting that he shot Vargas in light of the destruction/loss of the notes and memoranda from Medill's interview of Plaintiff Montanez, which prevented Defendants from learning why Montanez described Plaintiff Serrano as "trigger happy" and that he suspected Serrano might have murdered Vargas;

- Plaintiff Serrano from contesting that he was present at the scene of the Vargas murder based on the destruction/loss of the videotape, notes, and memoranda from Medill's interview of Michele Serrano, during which she stated that Pacheco placed both Plaintiffs at the scene of the crime;

- Plaintiff Serrano from introducing evidence of his Certificate of Innocence since it was procured without the circuit court having an opportunity to examine a wealth of inculpatory and impeachment evidence, as well as all of the details presented herein;[17] and

- Plaintiff Serrano from contesting the admissibility of Pacheco's statements to Michele Serrano — as preserved in her deposition — and questioning their lack of detail, to ameliorate the destruction of the detailed videotape of her account.

Such evidentiary sanctions will not completely undo the substantial prejudice that Defendants have suffered, but would provide counterweight to the tying of Defendants' hands in attempting to defend this case. *Larson*, 2005 WL 4652509, at * 9 ("'Issue related' sanctions… promote the hearing of cases on the merits free from any prejudice resulting from pretrial conduct").

## CONCLUSION

The Court should grant the sanctions requested herein, reasonable attorneys' fees and costs associated with the filing of this motion, and for such further relief as this Court deems appropriate and necessary.

---

[17] There are a myriad of other evidentiary reasons why Certificates of Innocence are inadmissible, which are not the subject of this motion and will be presented in a motion *in limine*.

Date: August 9, 2019                                  Respectfully submitted,


/s/ James G. Sotos                                    /s/ Eileen E. Rosen
JAMES G. SOTOS, Atty. No. 6191975                     EILEEN E. ROSEN, Atty. No. 6217428
*One of the Attorneys for Defendants*                 *One of the Attorneys for*
*Ernest Halvorsen and Edward Mingey*                  *Defendant City of Chicago*

James. G. Sotos                                       Eileen E. Rosen
Jeffrey N. Given                                      Patrick Moran
Caroline P. Golden                                    Austin Gordon Rahe
Joseph M. Polick                                      Catherine Macneil Barber
Jeffrey R. Kivetz                                     Stacy Ann Benjamin
David A. Brueggen                                     Theresa Berousek Carney
Josh M. Engquist                                      **ROCK FUSCO & CONNELLY, LLC**
**THE SOTOS LAW FIRM, P.C.**                          321 N. Clark Street, Suite 2200
141 W. Jackson Blvd., #1240A                          Chicago, IL 60654
Chicago, IL 60604                                     (312) 474-1000
(630) 735-3300                                        erosen@rfclaw.com
jsotos@jsotoslaw.com

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that on August 12, 2019, I electronically filed the foregoing **Memorandum of Law in Support of Spoliation Sanctions** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants on the attached Service List.

/s/ James G. Sotos
JAMES G. SOTOS, Atty. No. 6191975
*One of the Attorneys for Defendants*
*Ernest Halvorsen and Edward Mingey*

**SERVICE LIST**
**Serrano v. Guevara, et al., Case No. 17 CV 02869**

***Attorneys for Armando Serrano***
Jennifer A Bonjean
Ashley Blair Cohen
Bonjean Law Group, PLLC
1000 Dean St., #422
Brooklyn, NY 11238
(718) 875-1850
jennifer@bonjeanlaw.com
Ashley@bonjeanlaw.com

***Attorneys for Defendant Guevara,***
***Halvorsen, Mingey:***
Thomas More Leinenweber
James Vincent Daffada
Kevin Edward Zibolski
Michael John Schalka
Leinenweber Barone & Daffada LLC
120 N. LaSalle St., Suite 2000
Chicago, IL 60602
(847) 251-4091
thomas@ilesq.com
jim@ilesq.com
kevin@ilesq.com
mjs@ilesq.com

***Attorney for Defendant Illinois Department***
***of Corrections:***
James Robinson
Office of the Illinois Attorney General
General Law Bureau
100 W. Randolph St.
13th Floor
Chicago, IL 60601
JRobinson@atg.state.il.us

***Attorneys for Defendant Coghlan:***
Paula Sue Quist
Kristina Katz Cercone
Leigh Ann Krahenbuhl
Morgan Reid Hirst
Jones Day
77 West Wacker Drive, Suite 3500
Chicago, IL 60601-1692
(312)782-3939
pquist@jonesday.com
kcercone@jonesday.com
lkrahenbuhl@jonesday.com
mhirst@jonesday.com

***Attorneys for Defendants Cook County and***
***Dillon:***
T. Andrew Horvat
Yulia Nikolaevskaya
Cook County State's Attorney's Office
Complex Litigation Unit
50 West Washington Street , 5th Floor
Chicago, IL 60601
312-603-3362
timothy.horvat@cookcounty.il.gov
yulia.nikolaevskaya@cookcountyil.gov

***Attorneys for Defendant City of Chicago:***
Eileen E. Rosen
Patrick Moran
Austin Gordon Rahe
Catherine Macneil Barber
Stacy Ann Benjamin
Theresa Berousek Carney
Rock Fusco & Connelly, LLC
Cook County State's Attorney's Office
321 N. Clark Street, Suite 2200
Chicago, IL 60654
erosen@rfclaw.com
pmoran@rfclaw.com
arahe@rfclaw.com
cbarber@rockfuscoconnelly.com
sbenjamin@rfclaw.com
tcarney@rfclaw.com