**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Jose Montanez, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17 cv 4560 |
| | ) | |
| v. | ) | The Honorable Manish S. Shah |
| | ) | Presiding Judge |
| Reynaldo Guevera, et al., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| Armando Serrano, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17 cv 2869 |
| | ) | |
| v. | ) | The Honorable Manish S. Shah |
| | ) | Presiding Judge |
| Reynaldo Guevera, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**JOHN DILLON AND COOK COUNTY'S MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT**

Defendant, former Assistant State's Attorney John Dillon ("Dillon") and Cook County, by their attorney, Kimberly M. Foxx, State's Attorney of Cook County, hereby submit their Memorandum in Support of their Motion for Summary Judgment.

**INTRODUCTION**

John Dillon did not prosecute the Plaintiffs for the murder of Rodrigo Vargas. He was not the felony review assistant state's attorney ("ASA") who evaluated the evidence, did not take any witness statements regarding the murder of Rodrigo Vargas, nor did he elicit or present any evidence used to arrest, indict or convict the Plaintiffs. Instead, swept up in the fervor created by

the alleged acts of Reynaldo Guevara, Dillon has been falsely alleged to be culpable for the purported misdeeds of others. The allegations against him are false and unsubstantiated.

The crux of Plaintiffs' allegations against Dillon center on a June 2, 1993 interview with witness Francisco Vicente ("Vicente"). Tellingly, however, Plaintiffs' allegations regarding this meeting have radically changed. Initially, Plaintiffs claimed that Dillon was present with the Defendant officers on June 2nd when the officers allegedly manufactured testimony from Vicente implicating Plaintiffs in the Vargas murder. *See, e.g.* Serrano's First Am. Comp. at ¶¶ 41-43, ECF No. 90. Based on Plaintiffs' allegations that Dillon, during this meeting, offered Vicente protections and rewards for Vicente's knowingly false testimony, *id.*, this Court denied Dillon's motion to dismiss. Mem. Op. and Order, ECF Nos. 86, 88. Ultimately, however, Vicente's own testimony has rendered this allegation patently false.

Contrary to Plaintiffs' allegations, the record establishes that Dillon never spoke about the Vargas murder with Vicente on June 2nd, was not in the room when the murder was discussed, and never offered any inducements for Vicente's statement that day. In recognition of their unquestionably false accusation, Plaintiffs have moved the goalposts. In the place of their debunked allegations, Plaintiffs now proffer a new theory of liability based on an allegedly hushed conversation occurring between the Defendants outside of Vicente's presence. Plaintiffs' second attempt to rope Dillon into their conspiracy fairs no better than their first. To be certain, despite Plaintiffs' shifting allegations, one fact has remained constant - John Dillon engaged in no wrongdoing. Because the record unequivocally establishes this fact, Dillon and Cook County are entitled to summary judgment.

## FACTS

Rodrigo Vargas was shot outside his home in the early morning hours of February 5, 1993. Cook County Defs.' Local Rule 56.1 Statement of Undisputed Material Facts ("SOF") at ¶ 19. The Chicago Police Department investigated the case for a number of months but, as of May 1993, no arrests had been made. *Id.* On May 14, 1993, Francisco Vicente was arrested. *Id.* at ¶ 20. At the time of his arrest, Vicente was facing numerous robbery charges - all unrelated to the Vargas murder. *Id.* at ¶ 20. At all relevant times, Vicente and the Plaintiffs were members of the Imperial Gangsters street gang. *Id.* at ¶¶ 20, 36.

On May 15, 1993, Vicente provided a handwritten statement to Felony Review ASA Kevin Hughes regarding a different murder - the May 1993 murder of Salvador Ruvalcaba. *Id.* at ¶ 21. In his statement, Vicente claimed that he was told by Robert Bouto that Bouto had killed Ruvalcaba. *Id.* On May 19, 1993, while questioned by ASA Mary Roberts, Vicente testified before a Grand Jury consistent with his statement to ASA Hughes. *Id.* at ¶ 22. Plaintiffs allege that this testimony was procured through physical and mental abuse at the hands of Defendants Halvorsen and Guevara. *See* Montanez' (Corrected) First Amend. Compl. at ¶¶ 26-29, ECF No. 89; Serrano's First Amend. Compl. at ¶¶ 26-30. At this point in time, Dillon had yet to learn of Vicente, much less meet with him regarding any case, including the Bouto prosecution. SOF at ¶¶ 23, 24.

John Dillon began his career with the Cook County State's Attorney's Office ("CCSAO") in 1984 and continued to serve until he retired from the CCSAO in December 2014. *Id.* at ¶ 5. In 1992, Dillon was assigned to the Gang Crimes Unit where he remained until April of 1994. *Id.* at ¶ 16. From 1992 through 1994, the Gang Crimes Unit of the CCSAO consisted of approximately twenty (20) ASAs who at any point in time handled hundreds of gang-related

cases, more often than not first degree murders. *Id*. at ¶¶ 14, 15. During this relevant time period, Dillon handled approximately 20-25 cases. *Id*. at ¶ 16.

During the relevant period, cases were assigned to ASAs in the Gang Crimes Unit only after charges had been approved by the Felony Review Unit and the case had gone to the Preliminary Hearing Unit. *Id*. at ¶ 17. ASAs within the Gang Crime Unit were scheduled to be "on call" for a week at a time. *Id*. at ¶ 18. During this time, the on-call ASA would go to Branch 66 of the Cook County Criminal Courts to see if there were any gang-related homicides that had been charged. *Id*. If they was, and their workload permitted it, the ASA would take the case. *Id*. Visiting Branch 66 was the primary way in which ASAs of the Gang Crimes Unit would obtain cases. *Id*. The first time Dillon ever heard of Vicente was when Dillon, while on-call at Branch 66, reviewed a felony review folder relating to the murder of Salvador Ruvalcaba. *Id*. at ¶ 23. At that time Dillon agreed to handle the prosecution of Bouto who had already been charged with Ruvalcaba's murder. *Id*.

On May 31, 1993, Bouto's criminal defense attorney visited Vicente in the Cook County jail. *Id*. at ¶ 25. During this visit, Bouto's attorney gave Vicente seventeen (17) dollars and offered to represent Vicente in his pending criminal matters if Vicente would recant his testimony against Bouto. *Id*. Upon learning from Vicente that Bouto's attorney had attempted to bribe Vicente, Chicago Police Detective Ernest Halvorsen contacted Dillon to inform him of the incident. *Id*. at ¶ 26. Dillon then arranged to have Vicente transported to the CCSAO on June 2 to meet with Dillon and Halvorsen regarding the attempted bribe. *Id*. at ¶ 27.

The June 2nd meeting took place in the Gang Crimes Unit at the CCSAO. *Id*. at ¶ 28. This was the first time Dillon met Vicente. *Id*. During the meeting, Dillon, Halvorsen, and Vicente discussed Bouto's confession to Vicente regarding the Ruvalcaba murder, as well as the

fact that Bouto's attorney had attempted to bribe Vicente. *Id*. at ¶ 29. At times Dillon would occasionally leave the conference room to attend to other matters before returning to speak with Vicente about Bouto's confession or the attempted bribe of Vicente. *Id*. at ¶¶ 29, 31. During the meeting with Halvorsen the Vargas murder was not discussed in the presence of Dillon. *Id*. at ¶ 35. When Dillon left the conference room to attend to other matters he left Halvorsen in the room with Vicente. *Id*. at ¶ 32. During the time he was not in the conference room Dillon was unable to hear any conversation coming from the room. *Id*. at ¶ 33.

At some point while Dillon was out of the room the Vargas murder was discussed. *Id*. at ¶¶ 35, 36, 43. During this time, Halvorsen asked Vicente if he knew who 'Pistol Pete' was as he was investigating 'Pistol Pete' for the Vargas homicide. *Id*. at ¶ 36. Vicente knew 'Pistol Pete' to be Jorge Pacheco, a fellow Imperial Gangster. *Id*. Sometime after Halvorsen spoke to Vicente about his knowledge of the Vargas murder, Halvorsen left the room and, while in the common area of the CCSAO, told Dillon "he just gave us another murder." *Id*. at ¶ 37. No further details about Vicente's statement were discussed between Dillon and Halvorsen at that time. *Id*.

According to Vicente[1], while Halvorsen and Guevara were alone with Vicente in the room they began to abuse him and coerced him into providing a fabricated statement about the Plaintiffs' involvement in the Vargas murder. *See* SOF, Ex. 5, Vicente Tr. at 60:3-14; 101:4-20; 203:13-19. According to Vicente, he was fed multiple scenarios by Halvorsen and Guevara regarding his knowledge of the Vargas murder, including a scenario in which the Plaintiffs confessed to Vicente regarding their involvement in the murder. *Id*. at 62:2-64:1. Sometime thereafter, after Guevara and Halvorsen left the room, Vicente claims that he could hear the Defendants "whispering, and talking, and trying to figure out different scenarios." *Id*. at 213:11-

---

[1] Vicente's allegations are false and are therefore denied. As such, these allegations have not been included in the Cook County Defendants' Local 56.1 Statement of Facts. Nevertheless, these contested allegations are the crux of the case against Dillon. As discussed below, they fail to create a triable issue of fact.

20. Vicente, in response to a request for further details, further elaborated; "Amongst them talking outside I can hear little talk about what I was saying, and what I wasn't going to say, and what they wanted me to say. And amongst Halvorsen and Guevara trying to get me to say, they kept going back and forth. That's all I can tell you. Okay?" *Id*. at 214:9-18.

On June 9, 1993, Dillon requested that Vicente be brought over to the Gang Crimes Unit a second time to discuss and document an additional allegation that an associate of Bouto's criminal defense lawyer had gone to the jail and had given Vicente a new pair of gym shoes with the attorney's card tucked inside the shoes. SOF at ¶ 47. Dillon wanted this incident documented for discovery purposes as he believed it could become an issue at trial and potentially disqualify Bouto's attorney. *Id*. at ¶ 48. As with the June 2nd meeting, there were no discussions during the June 9th meeting about the Vargas murder in the presence of Dillon. *Id*. at ¶ 49.

The June 2nd and June 9th meetings with Vicente were the only times Dillon spoke with Vicente before Vicente testified about the Vargas murder before the Grand Jury on July 1, 1993. *Id*. at ¶ 51. Dillon did not learn about Vicente's specific claims regarding the Vargas murder until late June or early July of 1993 when a Felony Review ASA took Vicente's handwritten statement regarding the Vargas murder. *Id*. at ¶ 52. Dillon was not present when Vicente gave this handwritten statement. *Id*. Although Dillon became aware while litigating the Bouto case that Vicente alleged he was a witness to confessions in other cases, Dillon was unaware of the specific facts of these other cases as Dillon did not prosecute those cases and never discussed with Vicente any confessions Vicente alleged he was privy to, including those of the Plaintiffs. *Id*. at ¶¶ 53, 54.

On June 11, 1993, another witness, Timothy Rankins ("Rankins"), implicated Plaintiffs and Jorge Pacheco in the Vargas murder. *Id*. at ¶ 56. That same day, Serrano was arrested and

the CCSAO Felony Review Unit was called to review the evidence against Serrano. *Id*. at ¶¶ 57, 58. Felony Review ASA Jon King ("King") was assigned to conduct the review and went to the Area Five police station late in the evening on June 11, 1993. *Id*. at ¶ 58. When King arrived at the Area Five police station, he met with Rankins who signed a handwritten statement alleging that he was present when Serrano, with the assistance of Montanez and Jorge Pacheco, shot and killed Vargas. *Id*. at ¶ 59. Rankins also identified Serrano in a line-up as the person Rankins saw kill Vargas. *Id*. That same day, Vargas' widow identified Serrano in a separate line-up as a passenger in a car that followed her and her husband home the day before her husband was murdered. *Id*. at ¶ 60. After finishing his review of the evidence that same evening, King approved murder charges against Serrano. *Id*. at ¶¶ 61, 62. On June 15, 1993, Rankins, in response to questioning from Preliminary Hearing ASA Dan Galivan, testified before the Grand Jury consistent with his statement given to ASA King. *Id*. at ¶ 65.

On June 28, 1993, Felony Review ASA Solita Pandit interviewed Vicente at which time Vicente signed a handwritten statement implicating the Plaintiffs in the Vargas murder. *Id*. at ¶ 67. Dillon was not present for this statement. *Id*. at ¶ 68. After Vicente gave his statement, Pandit approved a law enforcement request for the arrest warrants of Montanez and Jorge Pacheco. *Id*. at ¶ 72. On July 1, 1993, Vicente, under questioning from Preliminary Hearing ASA Galivan, testified before the Grand Jury that the Plaintiffs admitted to Vicente that they had murdered Vargas. *Id*. at ¶ 69. The Grand Jury subsequently returned a true bill of indictment against Serrano for the murder of Rodrigo Vargas. *Id*. at ¶ 73. Although Vicente met with a prosecutor before giving his Grand Jury testimony on July 1st, the prosecutor was not Dillon. *Id*. at ¶ 70. Dillon was not present when Vicente gave his handwritten statement and grand jury testimony

and had no involvement in either occurrence. *Id*. at ¶ 71. That same day a Cook County Criminal Court Judge issued arrest warrants for Pacheco and Montanez. *Id*. at ¶ 72.

A week later, on July 8, 1993, Montanez was arrested. *Id*. at ¶ 74. The next day, Felony Review ASA Lynn Weaver conducted the evidentiary review of Montanez and approved the initial filing of murder charges against him. *Id*. On July 29, 1993, the Grand Jury returned a true bill indicting Montanez and Pacheco for the murder, as well as a superseding true bill against Serrano. *Id*. at ¶ 76. Plaintiffs were eventually convicted after an October 1994 bench trial that was prosecuted by Defendant Coghlan. *Id*. at ¶ 80. Dillon was not involved in Plaintiffs' prosecution. *Id*. at ¶ 53.

On June 19, 2018, Plaintiffs filed there amended complaints ("complaints"). ECF Nos. 89, 90. Substantially similar in most respects, Plaintiffs bring the following federal claims pursuant to 42 U.S.C. § 1983: fabrication of evidence (Count I); *Brady* violations (Count II); unlawful pretrial detention (Count III); conspiracy (Count IV); failure to intervene (Count V); and a *Monell* claim against the City of Chicago (Count VI). Plaintiffs Montanez and Serrano also bring the following state law counts, respectively: intentional infliction of emotional distress (Count VII; Count IX); malicious prosecution (Count VIII; Count VII); *respondeat superior* (Count IX; Count X); civil conspiracy (Count X; VIII); and indemnification (Count XI).[2]

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To establish that a material fact is undisputed, a party must support the assertion by citing to materials in the record. Fed. R. Civ. P. 56(c)(l). All facts and reasonable inferences are

---

[2] Pursuant to this Court's May 29, 2018 order entered before Plaintiffs filed their amended complaints, the *Brady* claims, failure to intervene claims and the *respondeat superior* claims are no longer viable as they have been dismissed, with prejudice. Mem. Op. and Order, ECF Nos. 86, 88.

to be drawn in favor of the non-moving party in determining whether judgment is warranted. *Van den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011) (citation omitted). Although credibility issues are generally left to the trier of fact, testimony used to oppose summary judgment that is so implausible or otherwise fantastical may be disregarded. *See, e.g., In re Chavin*, 150 F.3d 726, 728-29 (7th Cir. 1998). Once the moving party demonstrates the absence of a disputed issue of material fact, the burden shifts to the non-moving party to provide facts creating a genuine dispute. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A genuine issue of material fact exists only if there is evidence to permit a reasonable jury to return a verdict for the non-moving party. *Egonmwan v. Cook County Sheriff s Dept.*, 602 F.3d 845, 849 (7th Cir. 2010).

## ARGUMENT

John Dillon and Cook County are entitled to summary judgment because: 1) Dillon is entitled to absolute immunity; 2) in the event absolute immunity is inapplicable, Plaintiffs have failed to establish Dillon engaged in any improper conduct; 3) Dillon is entitled to qualified immunity.

**1) John Dillon is entitled to Absolute Immunity.**

Prosecutors are absolutely immune from §1983 suits for damages relating to the initiation of a prosecution and the presentation of the state's case. *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976); *Hunt v. Jaglowski,* 926 F.2d 689, 692-93 (7th Cir. 1991). When presented with an immunity defense, a functional test is used to determine whether absolute or qualified immunity applies. In accordance with this test, "[t]he nature of the function performed, not the identity of the actor who performed it," determines which type of immunity controls. *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993). Generally speaking, if the prosecutor acted in the role of

advocate for the state, absolute immunity applies. If he instead acted in the role of an investigator, only qualified immunity applies. *Id.* Prosecutorial immunity is not limited only to the bringing of charges and the presentment of the state's case. Instead, immunized conduct includes "actions preliminary to the initiation of a prosecution" and comprises "[p]reparation, both for the initiation of the criminal process and for a trial, [and] may require the obtaining, reviewing, and evaluating of evidence." *Imbler*, 424 U.S. at 431 n.33; *see also Buckley*, 509 U.S. at 273 (part of a prosecutor's role as "advocate for the State involve[s] actions preliminary to the initiation of a prosecution" and "include[s] the professional evaluation of the evidence assembled by the police…."). Ultimately, the functional test "focuses on the conduct for which immunity is claimed, not on the harm that the conduct may have caused or the question of whether it was lawful." *Id.* at 271.

The record is clear that Dillon engaged in no investigative activities with relation to Plaintiffs' cases. Instead, Dillon had a conversation with Vicente about his role in the Bouto case and the efforts of Bouto's attorney to bribe Vicente. SOF at ¶¶ 29, 47. This incident was document by non-defendant employees of the Cook County Sheriff's Office, as well as Dillon's notes memorializing his conversation with Vicente. *Id.*, Ex. 8. To be certain, the one thing that is uncontested is that no prosecutors were in the room when Vicente spoke to Halvorsen about the Vargas murder. *Id.* at ¶¶ 35, 43. In fact, Dillon did not speak to Vicente at all that day regarding the Vargas murder; much less provide inducements for Vicente's testimony. *Id.*

Not only was there no discussion between Dillon and Vicente on June 2nd about the Vargas murder, there is no evidence that Dillon instructed the Defendants detectives to speak to Vicente about the Vargas murder. In fact, the latter would be impossible as there is no evidence that Dillon knew anything about the Vargas murder on June 2nd, a case he had no role in

prosecuting at any stage, *Id*. at ¶ 71, and a murder that had not yet been screened by Felony Review and wouldn't be formally charged for several weeks. *Id*. at ¶¶ 62, 72, 73-76. In fact, Dillon did not become aware of any ancillary murder whatsoever until subsequently informed by Halvorsen of Vicente's admission. *Id*. at 37. Yet, even in light of this fact, there is still no evidence to suggest Dillon had any notion of which murder Halvorsen was speaking of as Dillon did not discuss with Halvorsen the details of Vicente's statement upon learning of it. *Id*. Instead, all that Dillon is alleged to have done is to either engage in, or listen to, a conversation regarding what Vicente would admit to regarding this unknown murder. This was clearly a prosecutorial act. Indeed, whether done to evaluate Vicente as a witness in his own prosecution of Bouto, or to discuss a potential prosecution against Plaintiffs for an unknown murder, Dillon's function was clearly that of a prosecutor. To be sure, having a conversation about evidence is a function that is absolutely necessary in order to initiate a prosecution (or not) in the case of the Vargas murder, or to continue with the use of Vicente (or not) in the previously charged criminal prosecution of Bouto. In other words, the evaluation of evidence and the decision to prosecute cannot be separated - they are inextricably intertwined. To hold otherwise would result in the constitutionally bizarre result of immunizing the initiation of a prosecution while at the same time holding a prosecutor liable for evaluating the evidence underlying the decision to prosecute. Because the complained-of conduct was clearly a prosecutorial function, Dillon is entitled to absolute immunity.

In light of the aforementioned, it is worth noting how specious Plaintiffs' facts are in relation to other well-established law in this area, specifically the immunity afforded ASAs who take witness statements. Taking a suspect's statement following interrogation is considered part of a prosecutor's role in evaluating and preparing evidence. *Hunt v. Jaglowski*, 926 F.2d 689,

692-93 (7th Cir. 1991); *Andrews v. Burge*, 660 F. Supp. 2d 868, 878 (N.D. Ill. 2009). To that end, it is undisputed that interviewing witnesses and evaluating evidence to determine whether to file charges is "clearly part of prosecutor's role as advocate for the State." *See*, *e.g.*, *Patterson v. Former Chi. Jon Burge*, 03 C 4333, 2010 U.S. Dist. LEXIS 103966, at * 28 (N.D. Ill. Sep. 27, 2010). As such, when determining whether absolute or qualified immunity applies, courts have focused on whether the prosecutor participated only in the taking of the statement, or whether he actively participated in the interrogation leading to the statement. *Compare Hunt*, 926 F.2d at 692-94 (holding that prosecutor who was on notice of physically coerced and involuntary confession was immune as he took no part in the physical coercion), *with Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1045-46 (N.D. Ill. 2016) (rejecting absolute immunity argument predicated on *Hunt* as facts existed from which a jury could infer that the ASAs actively participated in coercive interrogations leading to the statement). As *Hunt* and its progeny direct, a prosecutor is entitled to absolute immunity for taking a suspect's statement even if he has knowledge that the statement is false or involuntary. Here there is no need to analyze whether Dillon actively participated in the interrogation or whether he took a statement after the fact. *He did neither*. The only function he is alleged to have undertaken is to listen to what others relayed to him about a discussion that occurred outside of his presence. Whatever the nefarious inference Plaintiffs attempt to draw from this function is irrelevant as Dillon's entitlement to absolute immunity is clear. Therefore, judgment in Dillon's favor must be granted for all claims made against him.[3]

---

[3] Plaintiffs' state law claims, which stem from the same alleged conduct, likewise fail as state law prosecutorial immunity is interpreted in lock-step with the federal doctrine. *See*, *e.g. Frank v. Garnati*, 989 N.E.2d 319, 322 (Ill. App. Ct. 2013) (holding that "the state and federal doctrines of prosecutorial immunity are coterminous"); *White v. City of Chicago*, 861 N.E.2d 1083 (Ill. App. Ct. 2006) (relying on *Imbler* and *Buckley* to hold a prosecutor absolutely immune from state law claims); *see also Hobbs v. Cappelluti*, 899 F. Supp. 2d 738 (N.D. Ill. 2012) (holding that state and federal law prosecutorial immunity are co-extensive).

**2) John Dillon is entitled to Judgment on all Claims.**

Even in the absence of absolute immunity, the undisputed record establishes that there is no evidence that could lead a reasonable juror to conclude that Dillon committed any wrongdoing. As such, John Dillon is entitled to judgment for all state and federal claims levied against him.

a. Fabrication of Evidence.

It is well-established that the Due Process Clause of the Fourteenth Amendment forbids the state from depriving a person of his liberty on the basis of falsified evidence. *Whitlock v. Brueggemann*, 682 F. 3d 567, 580 (7th Cir. 2012). To succeed with a fabrication claim, facts must be asserted that establish that the falsified evidence was used to deprive a plaintiff of his liberty. *Id.* ("We have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way."). In the context of witness or suspect statements, allegations of mere coercion will not suffice. *Whitlock*, 682 F. 3d at 584 ("Coercively interrogating witnesses, paying witnesses for testimony, and witness-shopping may be deplorable, and these tactics may contribute to wrongful convictions, but they do not necessarily add up to a constitutional violation even when their fruits are introduced at trial. Evidence collected with these kinds of suspect techniques, unlike falsified evidence and perjured testimony, may turn out to be true."). Ultimately, to survive summary judgment, a Plaintiff must point to some evidence that the defendant actually "manufactured" the statement and that the defendant knew, "with certainty," that the statement was false. *Coleman v. City of Peoria*, 925 F.3d 336, 344 (7th Cir. 2019). Evidence that merely impeaches aspects of the relevant statement or suggests that the defendant had reason to doubt the statement's veracity is insufficient. *Id.* at

345. As the Seventh Circuit has recently opined, "[t]his is a high bar to clear." *Coleman*, 925 F.3d at 344.

Plaintiffs' fabrication claim fails for multiple reasons. First, there is no evidence to suggest that Dillon "manufactured" Vicente's statement. As Plaintiffs must concede, Dillon did not speak to Vicente about the Vargas murder on June 2nd, *see* SOF at ¶¶ 35, 43, and there is no evidence to suggest that he instructed anyone to do so. In fact, the latter would be virtually impossible as Dillon didn't know anything about the Vargas murder on June 2, and certainly knew nothing of it at the time Halvorsen began speaking to Vicente about it outside of Dillon's presence. Furthermore, Dillon did not memorialize Vicente's handwritten statement. Instead, this was done weeks later by another ASA without Dillon taking any role in the process. *Id*. at ¶¶ 67, 71. Finally, contrary to Plaintiffs' fantastical and unsupported allegations, because Dillon was not even in the room when the statement was elicited, and never spoke to Vicente about the Vargas murder that day, he could not have possibly given inducements on June 2nd for Vicente's cooperation. *Id*. at ¶ 35.

In addition to lacking any evidence to establish Dillon manufactured the statement, there is likewise no evidence to suggest that Dillon knew, with certainty, that Vicente's testimony was false. In fact, it is entirely unclear from Vicente's testimony what exactly the statement was that Dillon allegedly became privy to. Nevertheless, whatever its substance, he could not have known it to be false as he was not in the room when the statement was taken and, pursuant to Vicente's disputed version of events, Dillon would not have been privy to the statement at all until informed of it by the detectives. In fact, it would be impossible for Dillon to know the statement given was false because he did not know the details of the Vargas homicide on June 2nd, did not discuss them with Halvorsen on June 2nd, *id*. at ¶ 37, and would therefore have no point of

reference by which to evaluate the statement's validity. In fact, Dillon *never* knew the details of the Vargas homicide as he had no role in the prosecution whatsoever. *Id*. at ¶¶ 52-53. While Plaintiffs will certainly argue that Dillon should've known coercive tactics were being used, there is still no evidence to suggest that Dillon knew the evidence was false, as opposed to being a product of permissibly coercing "a reluctant witness to say what may be true." *Whitlock*, 740 F.3d at 1112. Because Dillon knew nothing of the Vargas murder, did not question Vicente about the murder, provided no incentives for the statement, and had no role in prosecuting the case at any stage, there is simply no evidence to conclude that Dillon knew, *with certainty*, that the statement he allegedly became privy to on June 2nd was false. Because Plaintiffs have failed to clear the "high bar" necessary to proceed with their claim, Dillon is entitled to judgment on the fabrication of evidence claim.

      b.   <u>Pretrial Detention and Malicious Prosecution</u>.

For the same reasons Plaintiffs' fabrication of evidence claim fails, so too does their Fourth Amendment unlawful pretrial detention and malicious prosecution claims. In order to state a valid pretrial detention claim, Plaintiffs must show that Dillon had some role in securing their pretrial detention in the absence of probable cause. *Manuel v. City of Joliet*, 903 F.3d 667 (7th Cir. 2018). Similarly, in order to state a malicious prosecution claim, Plaintiffs must establish evidence that: 1) Dillon commenced criminal proceedings against the plaintiff; 2) the proceeding terminated in a manner favorable to Plaintiffs; 3) there was no probable cause for the proceedings; 4) Dillon acted with the malice; and 5) resulting damages. *Williams v. City of Chicago,* 733 F.3d 749, 759 (7th Cir. 2013). However, as with the fabrication claim, there is no evidence to establish that Dillon had any personal involvement in Plaintiffs' detention. *Palmer v. Marion City.*, 327 F.3d 588, 594 (7th Cir. 2003) (holding personal involvement a necessary

predicate for finding liability pursuant to § 1983). Again, Dillon was not the prosecutor assigned to Plaintiffs' cases. SOF at ¶ 53. He did not take any statements, did not manufacture or solicit any evidence, did not provide any inducements or benefits for the June 2nd statement and did not present any evidence that led to Plaintiffs' detention, prosecution or conviction. *Id*. at ¶ 71. In sum, he had absolutely nothing to do with Plaintiffs' arrest and prosecution.

In addition to Dillon's lack of involvement in Plaintiffs' detention, indictment and conviction, probable cause also serves to defeat Plaintiffs' Fourth Amendment and malicious prosecution claims. *Coleman*, 925 F.3d at 350. Both Plaintiffs were indicted, *see* SOF at ¶ 76, which is prima facie evidence of probable cause. *Coleman*, 925 F.3d at 350. While Plaintiffs will certainly claim that the presumption is overcome because the evidence supporting probable cause was allegedly manufactured, Plaintiffs must establish some evidence that Dillon was aware of this fact for the presumption to be rebutted. *Id*. (citing *Williamson v. Curran*, 714 F.3d 432, 444 (7th Cir. 2013). However, as discussed above, Dillon had no knowledge that Vicente's statement was false. As such, even if Dillon had a role in Plaintiffs' arrest and prosecution, because there is no evidence to suggest that Dillon did anything other than reasonably rely on other law enforcement officers, Dillon is entitled to summary judgment on the pretrial detention and malicious prosecution claims.

c. Federal and State Conspiracy Claims.

Similarly, Plaintiffs' conspiracy claims also fail. In order to establish a conspiracy under federal and state law, a plaintiff must demonstrate an express or implied agreement to deprive plaintiff of his or her rights, as well as an actual deprivation of those rights in the form of overt acts taken in furtherance of the agreement. *Scherer v. Balkema,* 840 F.2d 437, 442 (7th Cir.); *Redelmann v. Claire Sprayway, Inc*., 874 N.E.2d 230, 241 (Ill. App. Ct. 2007). To that end,

enough facts must be present "to permit a reasonable jury to conclude that a meeting of the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives." *Goldschmidt v. Patchett,* 686 F. 2d 582, 585 (7th Cir. 1982). As for the 'actual deprivation' element, § 1983 does not punish a conspiracy alone. Rather, a Plaintiff alleging a conspiracy pursuant to § 1983 must establish facts evidencing an underlying constitutional violation. *See*, *e.g.*, *Ingram v. Jones*, 1996 U.S. Dist. LEXIS 8854, at * 5 (N.D. Ill. June 20, 1996).

Entirely aside from the fact that Dillon committed no predicate constitutional violation himself, Plaintiffs have presented no evidence to establish a meeting of the minds between Dillon and anyone else to frame Plaintiffs for the murder of Rodrigo Vargas. Nor have Plaintiffs established that Dillon took any steps towards such a goal that would indicate such an agreement. Once again, Dillon was not the prosecutor assigned to the Vargas murders. He did not take any statements relevant to the murder, did not instruct anyone else to do so, did not provide any inducements to Vicente to give his statement on June 2nd, and never manufactured or presented any evidence that led to Plaintiffs' arrest, detention, indictment, conviction or incarceration. SOF at ¶¶ 35, 49, 52-53, 71. In fact, Dillon did not become aware of *any* additional murder until, at earliest, he was informed by Halvorsen that "[Vicente] just gave us another murder." *Id*. at ¶ 37. Pursuant to Plaintiffs' own allegations, this occurred after much of the complained-of (and contested) conduct attributed to the detectives had already occurred. *See, e.g*. Serrano's First Am. Comp. at ¶¶ 26-33. Furthermore, Dillon did not follow up with Halvorsen about Vicente's statement, SOF at ¶ 37, and was never privy to the specifics of Vargas murder and the prosecution of Plaintiffs for the crime. *Id*. at ¶¶ 52-54. As a result, because there is no evidence to suggest that Dillon ever entered a conspiracy, and there is likewise no evidence that he took

any affirmative acts that would evidence his intent to further the conspiracy, Dillon is entitled to summary judgment on Plaintiffs' conspiracy claims.

D. Intentional Infliction of Emotional Distress.

In order to establish a claim for intentional infliction of emotional distress under Illinois law, a plaintiff must show that: 1) the defendant's conduct was truly extreme and outrageous; 2) the defendant knew that there was a high probability that his or her conduct would cause severe emotional distress, or intended to cause severe emotional distress; and 3) the conduct in fact caused severe emotional distress. *Honaker v. Smith,* 256 F.3d 477, 490 (7th Cir. 2001) (citing *McGrath v. Fahey,* 533 N.E.2d 806, 809 (Ill. 1988)). Plaintiffs' IIED claims fails for the same reason his remaining claims fail – Dillon's utter lack of involvement in the arrest and prosecution of Plaintiffs. As discussed, the record establishes that Dillon engaged in no extreme and outrageous conduct, could not have known that the action he did undertake would have caused severe emotional distress, and did not in fact cause severe emotional distress. Because the record evidences an utter lack of evidence as to all three elements of Plaintiffs' IIED claim, Dillon is entitled to judgment.

**3) John Dillon is entitled to Qualified Immunity from all Federal Law Claims.**

As discussed above, Dillon did not violate the Plaintiffs' constitutional rights. Nevertheless, even if this Court were to hold that absolute immunity did not apply, and were to further hold that there exists some evidence that Dillon engaged in unconstitutional conduct, Dillon is still entitled to qualified immunity as the record establishes that he acted reasonably in light of the particular circumstances that he faced.

It is well settled that, pursuant to qualified immunity, public officials performing discretionary functions are shielded from liability for civil damages unless their conduct violates

a clearly established statutory or constitutional right. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Burns v. Reed,* 44 F.3d 524, 526 (7th Cir. 1995). The policy behind granting public officials qualified immunity from lawsuits is to protect them "from undue interference with their duties and from potentially disabling threats of liability." *Harlow,* 457 U.S. at 806. The qualified immunity doctrine also stems from the conclusion that few individuals will enter public service if such service entails the risk of personal liability for one's official decisions. *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir. 1994); *Cleveland-Perdue v. Brutsche,* 881 F.2d 427, 430 (7th Cir. 1989). The immunity grants ample room for mistaken judgments by protecting "all but the plainly incompetent or those who knowingly violated the law." *Malley v. Briggs,* 475 U.S. 335, 343 (1986).

Qualified immunity is a two-pronged analysis requiring the court to determine: 1) whether the record evidences a constitutional violation; and 2) if so, whether the right violated was clearly established at the time the violation occurred. *Saucier v. Katz,* 533 U.S. 194, 121 (2001). Regardless of which inquiry is undertaken first, the failure of Plaintiff to establish either is fatal to his claim. *Pearson v. Callahan*, 555 U.S. 223 (2009). To defeat qualified immunity, the burden is on Plaintiff to demonstrate that the alleged violation of his rights was 'clearly established' at the time of the alleged violation. *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017). To be clearly established, the right's contours must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right...." *Id*. (quoting *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015)). Although Plaintiff need not point to an identical case finding the alleged conduct unlawful, a plaintiff must point to precedent placing the "statutory or constitutional question beyond debate," *Mullenix*, 136 S.Ct. at 308, (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011)), or otherwise persuade the court that the conduct

is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully. *See*, *e.g*., *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008).

Before it can be determined that a law was clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). To that end, the Supreme Court has "repeatedly told courts ... not to define clearly established law at a high level of generality." *Al-Kidd*, 563 U.S. at 742. Instead, the clearly established law must be "particularized to the facts of the case." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987). ("[T]he test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted."). Ultimately, "the crucial question [is] whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014); *see also Saucier*, 533 U.S. at 205 ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct . . . .").

Even assuming, *arguendo*, that there is some evidence Dillon violated Plaintiffs' constitutional rights, there is no evidence that Dillon acted unreasonably in light of the facts then known to him. Adhering to the Supreme Court's admonition that the right must be "particularized to the facts of the case," *Anderson*, 483 U.S. at 640, the question is such: was it clearly established law in 1993 that a prosecutor, uninvolved in the prosecution of a defendant, violates the rights of that defendant when, without any personal involvement in taking the statement of a witness, he converses with those who did take the statement about what that witness is willing to testify to regarding the defendant's role in a homicide? The question begs

the answer as there is absolutely no precedent to establish that such conduct should have put Dillon on notice of wrongdoing; nor is the conduct so egregious that a reasonable officer should have known he was acting in an unconstitutional manner.  This is particularly true in light of the the Seventh Circuit's 1991 ruling that a prosecutor, so long as he did not personally take part in extracting the statement, can use a statement to institute criminal charges despite the fact that he knows the statement to be the product of a physical abuse. *Hunt,* 926 F.2d at 691-93. In light of this well-established law, any argument that discussing Vicente's statement is unreasonable under the circumstances must be rejected. Because Dillon acted reasonably in light of the facts then presented to him, he is entitled to qualified immunity from all of Plaintiffs' constitutional and federal law claims.

*Wherefore*, John Dillon and Cook County request that this Court grant their Motion for Summary Judgment, assess costs, and grant any further relief deemed just and equitable.

Respectfully submitted,

KIMBERLY M. FOXX
State's Attorney of Cook County

By: */s/ T. Andrew Horvat*
T. Andrew Horvat
Cook Co. Assistant State's Attorney
50 W. Washington, 5th Floor
Chicago, Illinois 60602
(312) 603-3362

*/s/ Yulia Nikolaevskaya*
Yulia Nikolaevskaya
Cook Co. Assistant State's Attorney
50 W. Washington, 5th Floor
Chicago, Illinois 60602
(312) 603-3469

# CERTIFICATE OF SERVICE

I, T. Andrew Horvat, hereby certify that on August 12, 2019, I have caused a true and correct copy of John Dillon and Cook County's Memorandum in Support of Summary Judgment to be sent via e filing to all counsel of record accordance with the rules regarding the electronic filing of documents.

*/s/ T. Andrew Horvat*
T. Andrew Horvat
Cook Co. Assistant State's Attorney
50 W. Washington, 5th Floor
Chicago, Illinois 60602
(312) 603-3362