# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ARMANDO SERRANO, <br><br> Plaintiff, <br><br> v. <br><br> REYNALDO GUEVARA, et al., <br><br> Defendants. | Case No. 1:17-cv-02869 <br><br> Hon. Manish S. Shah <br><br> Magistrate Judge Susan E. Cox |
| JOSE MONTANEZ, <br><br> Plaintiff, <br><br> v. <br><br> REYNALDO GUEVARA, et al., <br><br> Defendants. | Case No. 1:17-cv-04560 <br><br> Hon. Manish S. Shah <br><br> Magistrate Judge Susan E. Cox |

**COOK COUNTY DEFENDANTS' SEALED
<u>LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS</u>**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendants, former Assistant State's Attorney Matthew Coghlan ("Coghlan"), former Assistant State's Attorney John Dillon ("Dillon"), and Cook County (collectively the "Cook County Defendants") submit the following Statement of Material Facts as to Which There is No Genuine Issue:

**A.  The Parties, Jurisdiction and Venue.**

1.  Plaintiffs Armando Serrano and Jose Montanez are residents of the State of Illinois and reside in Cook County. (Ex. 38, Serrano Tr. at 10:5-8; Ex. 39, Montanez Tr. at 11:9-14.)

2. Cook County is a governmental entity within the State of Illinois. (Montanez ECF No. 92, Cook County's and Dillon's Answer to Plf's Corrected 1st Am. Compl., ¶ 20; Serrano ECF No. 93, Cook County's and Dillon's Answer to Plf's 1st Am. Compl., ¶ 15.)

3. Coghlan and Dillon were employed by the Cook County State's Attorney's Office ("CCSAO") during the time period when the alleged events giving rise to plaintiffs' purported claims occurred. (Montanez ECF No. 92, Cook County's and Dillon's Answer to Plf's Corrected 1st Am. Compl., ¶ 19; Serrano ECF No. 93, Cook County's and Dillon's Answer to Plf's 1st Am. Compl., ¶ 18; Montanez ECF No. 94, Coghlan's Answer to Plf's Corrected 1st Am. Compl., ¶ 19; Serrano ECF No. 95, Coghlan's Answer to Plf's 1st Am. Compl., ¶ 18.)

4. Coghlan began his career with the CCSAO in 1987 and continued to serve as an Assistant State's Attorney ("ASA") until 2000; he was assigned to the Gang Crimes Unit as a trial prosecutor from 1992 to 1997. (Ex. 1, Coghlan Tr. at 36:7-21, 39:20-40:4, 40:16-18.)

5. Dillon began his career with the CCSAO in 1984 and continued to serve until he retired from the CCSAO in December 2014; at that time, he was the supervisor of the Homicide/Sex Crimes Unit and the Preliminary Hearing Unit. (Ex. 2, Dillon Tr. at 32:3-12, 34:16-35:2.)

6. This Court has jurisdiction over plaintiffs' claims against the Cook County Defendants pursuant to 28 U.S.C. §§ 1331, 1367. (Montanez ECF No. 92, Cook County's and Dillon's Answer to Plf's Corrected 1st Am. Compl., ¶ 13; Serrano ECF No. 93, Cook County's and Dillon's Answer to Plf's 1st Am. Compl., ¶ 12; Montanez ECF No. 94, Coghlan's Answer to Plf's Corrected 1st Am. Compl., ¶ 13; Serrano ECF No. 95, Coghlan's Answer to Plf's 1st Am. Compl., ¶ 12.)

7. Venue is proper under 28 U.S.C. § 1391(b), because the alleged events giving rise to plaintiffs' purported claims against Defendants allegedly occurred in this judicial district. (Montanez ECF No. 92, Cook County's and Dillon's Answer to Plf's Corrected 1st Am. Compl., ¶ 14; Serrano ECF No. 93, Cook County's and Dillon's Answer to Plf's 1st Am. Compl., ¶ 12; Montanez ECF No. 94, Coghlan's Answer to Plf's Corrected 1st Am. Compl., ¶ 14; Serrano ECF No. 95, Coghlan's Answer to Plf's 1st Am. Compl., ¶ 12.)

**B.     Structure of the Cook County State's Attorney's Office.**

8. Between 1992 and 1994, ASAs assigned to the Criminal and Special Prosecutions Bureaus of the CCSAO did not prosecute a case from its inception through sentencing and appeal. Instead, different ASAs did different work on the case at different stages of a prosecution. (Ex. 3, Declaration of John Dillon ("Dillon Decl.") ¶ 3.)

9. In felony cases, ASAs in the Felony Review Unit of the CCSAO were the first link between law enforcement and Cook County's criminal justice system. Felony Review ASAs were responsible for, among other things, the review and evaluation of law enforcement personnel requests for search or arrest warrants and the review and evaluation of evidence gathered by law enforcement personnel to determine whether to approve the initial filing of criminal felony charges against a suspect. In some circumstances, that review included interviewing victims, witnesses, and/or suspects about the circumstances relating to the alleged crimes for which approval of charges were being sought. (Ex. 3, Dillon Decl. ¶ 4; Ex. 1, Coghlan Tr. at 41:16-42.8, 43:2-6, 45:24-46:3, 51:7-18.)

10. If felony charges were placed against a suspect in connection with a homicide or sex-related offense, the case was sent to a different ASA, or set of ASAs, in the Preliminary Hearing Unit to handle the bond hearing and preliminary hearings and/or Grand Jury proceedings. (Ex. 3, Dillon Decl. ¶ 5; Ex. 2, Dillon Tr. at 125:12-126:5.)

11. Homicides and sex-related offenses were sent to Branch 66 of the Cook County criminal courts for bond hearings and preliminary hearing/Grand Jury proceedings. (Ex. 3, Dillon Decl. ¶ 5; Ex. 2, Dillon Tr. at 125:12-126:5.)

12. After a bond hearing, either a judge (by way of a preliminary hearing) or a Grand Jury (by way of proceedings seeking an indictment) determined whether there was probable cause to warrant the defendant being tried in a felony trial courtroom. (Ex. 3, Dillon Decl. ¶ 6.)

13. Upon transfer to a felony trial courtroom, the case was then picked up by a third different ASA, or set of ASAs, to handle the pretrial and trial phases of the prosecution. (Ex. 3, Dillon Decl. ¶ 7.)

14. One of those trial units was the Gang Crimes Unit of the CCSAO, which, from 1992-1994 consisted of approximately twenty (20) ASAs who tried gang-related felonies. (Ex. 2, Dillon Tr. at 78:22-79:5.)

15. During the period of 1992-1994, the Gang Crimes Unit handled hundreds of gang-related cases at any given time, more often than not, cases involving first degree murders. (Ex. 2, Dillon Tr. at 78:22-79:5, 86:1-4.)

16. Dillon, for example, was in the Gang Crimes Unit from 1992 until April 1994, and during that time period, he regularly handled approximately 20-25 cases at a time, assigned to various criminal courtrooms throughout the Cook County Criminal Courts building. (Ex. 2, Dillon Tr. at 34:9-12, 85:19-24.)

17. Cases were picked up by ASAs in the Gang Crimes Unit after the charges had been initially approved by the Felony Review Unit and had come in to the Preliminary Hearing Unit. (Ex. 2, Dillon Tr. at 79:6-11.)

18.     The Gang Crime Unit prosecutors would be scheduled on call for a week at a time to monitor cases coming in to Branch 66 to see if there were any gang-related homicides that had been charged, and if there were, the on-call Gang Crimes Unit ASA would take the case if his/her workload permitted it.  This was the primary way in which ASAs of the Gang Crimes Unit would pick up cases.  The second way was through a typical assignment sometimes via a senior ASA. (Ex. 2, Dillon Tr. at 84:16-85:18.)

    **C.    The Vargas Murder, the Arrest of Francisco Vicente, and the Events Leading Up to the June 2, 1993 Meeting with Vicente.**

19.     Rodrigo Vargas was shot and killed outside his home in the early morning hours of February 5, 1993.  (Ex. 4 at RFC-Serr/Mont 000157.)  The Chicago Police Department investigated the case for a number of months, but as of May 1993, no arrests had been made. (Ex. 4 at RFC-Serr/Mont 000152-174.)

20.     Francisco Vicente was arrested on May 14, 1993, and at that time, was facing three armed robbery charges and one simple robbery charge—all unrelated to the Vargas shooting.  (Ex. 5, Vicente Tr. at 15:22-16:16.)  At the time of his arrest, Vicente was a member of the Imperial Gangsters street gang in Chicago.  (Ex. 5, Vicente Tr. at 87:21-88:3, 162:18-162:20.)

21.     On May 15, 1993, Vicente provided a handwritten statement to Felony Review ASA Kevin Hughes relating to a different murder—the May 1993 murder of Salvador Ruvalcaba—stating that he (Vicente) had been told by Robert Bouto that Bouto had killed Ruvalcaba.  (Ex. 6 at CCSAO 0004896-900.)

22.     On May 19, 1993, while questioned by ASA Mary Roberts, Vicente testified before a Grand Jury consistent with his statement to ASA Hughes, specifically testifying that Robert Bouto admitted to Vicente that he had killed Salvador Ruvalcaba.  (Ex. 7, CCSAO 0060396-418.)

23. The first time Dillon ever heard of Vicente was in late May 1993, when Dillon reviewed a felony review folder at Branch 66 relating to the Ruvalcaba murder as an on-call Gang Crimes Unit ASA. (Ex. 2, Dillon Tr. at 125:3-127:8.) At that time, Dillon agreed to handle the prosecution of Bouto, who, by this time, had already been charged for the murder of Ruvalcaba. (Ex. 2, Dillon Tr. at 125:7-126:20, 128:15-130:13.)

24. Dillon did not ever meet or speak with Vicente until after he had already provided a handwritten statement and testimony before the Grand Jury implicating Bouto in the Ruvalcaba murder. (Ex. 2, Dillon Tr. at 272:16-20.)

25. On May 31, 1993, Bouto's criminal defense attorney visited Vicente in the Cook County jail and Bouto's attorney gave Vicente seventeen (17) dollars and offered to represent Vicente in his pending criminal matters if Vicente would recant his previous testimony given against Bouto. (Ex. 2, Dillon Tr. at 150:14-151:1; Ex. 8 at SERRANO_LASSAR 24554-562.)

26. Upon learning from Vicente that Bouto's attorney had attempted to bribe Vicente, Chicago Police Detective Ernest Halvorsen contacted Dillon to inform him of the incident. (Ex. 9, Halverson Tr. at 151:12-153:11; Ex. 2, Dillon Tr. at 136:14-138:3.)

**D.     The June 2, 1993 Meeting with Vicente.**

27. Dillon arranged to have Vicente transported to the CCSAO on June 2, 1993 to meet with Dillon and Halvorsen and document the allegation that Bouto's lawyer had attempted to bribe Vicente into recanting his testimony against Bouto. (Ex. 2, Dillon Tr. at 131:3-11, 136:14-138:3, 150:14-151:1.)

28. Dillon met Vicente for the first time on June 2, 1993 in the Gang Crimes Unit at the CCSAO. (Ex. 2, Dillon Tr. at 130:15-131:2.)

29. During the June 2, 1993 meeting with Vicente, which took place in a conference room of the Gang Crimes Unit at the CCSAO, Dillon, Halvorsen, and Vicente discussed Bouto's

confession to Vicente regarding the Ruvalcaba murder, as well as the fact that Bouto's attorney had attempted to bribe Vicente. (Ex. 2, Dillon Tr. at 138:4-139:8, 139:20-140:8, 141:9-142:21, 150:14-151:1.)

30. Dillon took his own handwritten notes of the June 2, 1993 conversation with Vicente. (Ex. 2, Dillon Tr. at 182:7-21; Ex. 8 at SERRANO_LASSAR 24554-555.)

31. During the course of the June 2, 1993 meeting with Vicente, Dillon would occasionally need to leave the conference room to attend to other matters before returning to speak with Vicente about Bouto's confession to Vicente or Bouto's lawyer's attempt to bribe Vicente. (Ex. 2, Dillon Tr. at 198:24-199:24.)

32. When Dillon left the conference room to attend to other matters, he left Halvorsen in the room with Vicente. (Ex. 2, Dillon Tr. 193:9-194:6; Ex. 9, Halvorsen Tr. at 159:14-160:15.)

33. During the time he was not in the conference room where Vicente and Halvorsen were meeting, Dillon was unable to hear any conversation in the conference room, as his office was 15 to 20 yards away. (Ex. 2, Dillon Tr. at 298:14-21.)

34. While Dillon was in his office, he could not see who may have entered the conference room in his absence. (Ex. 2, Dillon Tr. at 299:14-17.)

35. During the June 2, 1993 meeting with Vicente, there was no discussion of the Vargas murder in the presence of Dillon. (Ex. 2, Dillon Tr. at 183:21-184:13, 217:12-16; Ex. 9, Halvorsen Tr. at 159:14-160:15.)

36. According to Detective Halvorsen, while he was alone in the room with Vicente, he (Halvorsen) asked Vicente if he knew anyone who went by the nickname "Pistol Pete" and explained that he was investigating a "Pistol Pete" for potential involvement in the Vargas murder. According to Halvorsen, Vicente responded, "that's Big Pistol Pete" and proceeded to give

Halvorsen a lengthy statement about his knowledge of the Vargas murder, implicating both plaintiffs and a third man, Jorge Pacheco, in the murder. (Ex. 9, Halvorsen Tr. at 160:21-161:16; Ex. 10 at RFC-Serr/Mont 000097-098.) At the time, Serrano, Montanez, and Vicente were all members of the same Imperial Gangsters street gang. (Ex. 5, Vicente Tr. at 87:21-88:3.)

37. At some point in time after Halverson spoke to Vicente about his knowledge of the Vargas murder, Halverson left the room and, while in the general open area of the CCSAO, told Dillon "he just gave us another murder." No details about the murder were discussed at that time between Dillon and Halverson. (Ex. 2, Dillon Tr. at 193:9-20, 196:6-197:9).

### E. Coghlan Had No Role In The June 2, 1993 Meeting.

38. Halvorsen, who was present for all the meetings between law enforcement authorities and Vicente on June 2, 1993, testified that Coghlan was not present at the June 2 meeting with Vicente and that he (Halvorsen) did not have any conversations or meetings with Coghlan about the Vargas case until after plaintiffs were indicted weeks later. (Ex. 9, Halvorsen Tr. at 160:2-7, 186:13-20, 365:24-367:14.)

39. Dillon testified that Coghlan was not present at the meeting with Vicente or conversation he later had with Halvorsen in the open area of the CCSAO on June 2, 1993, and Dillon had no reason to believe that Coghlan had any contact relating either to Vicente or the Vargas case until after Serrano and Montanez had been charged. (Ex. 2, Dillon Tr. at 138:13-16, 140:6-16, 196:20-198:5, 299:22-302:12.)

40. Coghlan testified he was not at the June 2, 1993 meeting with Vicente and was neither involved in, nor even aware of, the Vargas murder case or Francisco Vicente until more than six weeks later—in late July 1993, after Serrano had already been indicted and the Felony Review Unit had approved the filing of murder charges against Montanez. (Ex. 11 at 15-16; Ex.

12 at 11-12; Ex. 1, Coghlan Tr. at 20:20-23:20, 111:10-19, 153:15-154:17; Ex. 27 at CCSAO-Serr-Mont_00015797 (charges against Montanez approved on July 9, 1993).)

41. The police report memorializing the portion of the June 2, 1993 meeting during which the Bouto case was discussed states that Vicente was interviewed by "Det. E. HALVORSEN and A.S.A. John DILLON." The report makes no reference to Coghlan. (Ex. 13 at SERRANO_LASSAR 9063.)

42. The police report memorializing the portion of the June 2, 1993 meeting during which the Vargas murder was discussed states that the "R/Dets.," listed as Detectives Halvorsen and Guevara, had a meeting with a "circumstantial witness" on June 2, 1993, who was later identified as Vicente. The report makes no reference to Coghlan. (Ex. 10 at RFC-Serr/Mont 000096-097.)

43. No ASAs were in the room when detectives discussed the Vargas murder with Vicente at the CCSAO on June 2, 1993. (Ex. 5, Vicente Tr. at 203:13-19.)

44. When asked directly whether Vicente saw Coghlan on June 2, 1993, Vicente testified, "I'm not sure because I was dealing with so many people, and with all the chaos, I can't." (Ex. 5, Vicente Tr. at 250:1-11.)

45. When asked directly whether Coghlan was ever in the interview room on June 2, 1993 when Vicente was talking to the detectives about the Vargas murder, Vicente responded, "He could have been" but "I just don't remember." (Ex. 5, Vicente Tr. at 250:23-251:9.)

46. When asked directly whether he heard Coghlan's voice on June 2, 1993, Vicente responded, "I can't tell you if it was him or not." (Ex. 5, Vicente Tr. at 250:12-22.)

F. **Dillon's June 9, 1993 Meeting With Vicente.**

47. On June 9, 1993, Dillon requested that Vicente be brought to the Gang Crimes Unit a second time to discuss the allegation that an associate of Bouto's criminal defense lawyer had

gone to the jail and had given Vicente a new pair of gym shoes with the attorney's card tucked inside the shoes. (Ex. 2, Dillon Tr. at 185:24-186:11, 188:22-189:5.)

48. Dillon wanted this incident documented for discovery purposes as he believed it could become an issue at trial and potentially disqualify Bouto's attorney. (Ex. 2, Dillon Tr. at 202:8-19.)

49. During the June 9, 1993 meeting with Vicente, there were no discussions about the Vargas murder in the presence of Dillon. (Ex. 2, Dillon Tr. at 201:20-24, 217:9-16.)

50. As a result of the actions of Bouto's lawyer and his associate, Bouto's lawyer eventually withdrew as counsel of record for Bouto. (Ex. 2, Dillon Tr. at 189:6-13.)

51. The June 2, 1993 and June 9, 1993 meeting with Vicente were the only times Dillon spoke with Vicente before he testified about the Vargas murder to the Grand Jury on July 1, 1993. (Ex. 2, Dillon Tr. at 213:6-12.)

52. Dillon did not learn about Vicente's claims that plaintiffs confessed to him about the Vargas murder until late June or early July of 1993, when a Felony Review ASA, Solita Pandit, took Vicente's handwritten statement regarding the Vargas murder; Dillon was not present when Vicente gave this handwritten statement about the Vargas murder on June 28, 1993. (Ex. 2, Dillon Tr. at 213:13-214:1.)

53. Although Dillon became aware while litigating the Bouto case that Vicente alleged to have been a witness to confessions in Vargas and another murder case (apart from the Bouto case), Dillon was unaware of the specific facts of those cases or Vicente's specific allegations in these other cases, as Dillon was not involved in prosecuting those cases. (Ex. 2, Dillon Tr. at 207:9-23.)

54. Apart from Bouto's confession, Dillon never discussed with Vicente any confessions Vicente alleged he was privy to, including those of plaintiffs. (Ex. 2, Dillon Tr. at 215:11-216:22.)

55. The evidence against Bouto consisted of eyewitness identifications of Bouto as the offender as well as circumstantial identification witnesses who identified him by the clothing he was wearing. Dillon never called Vicente as a witness in the trial of Bouto because he believed that Vicente's testimony would distract from the eyewitnesses who had identified Bouto as the killer of Ruvalcaba. (Ex. 2, Dillon Tr. at 245:16-246:19.)

**G.  Timothy Rankins Separately Implicates Plaintiffs.**

56. On June 11, 1993, another witness—Timothy Rankins—separately implicated plaintiffs and Jorge Pacheco in the Vargas murder. (Ex. 14 at Plaintiff 000320-323.)

57. Plaintiff Serrano was arrested on June 11, 1993 and brought to the Area Five police station. (Ex. 14 at Plaintiff 000323.)

58. Detectives Halvorsen and Guevara then contacted the CCSAO Felony Review Unit to review and approve felony charges against plaintiff Serrano. Felony Review ASA Jon King was assigned to conduct the review and went to the Area Five police station late in the evening on June 11, 1993. (Ex. 14 at Plaintiff 000323.)

59. When ASA King arrived at the Area Five police station, he met with Rankins, who signed a handwritten statement alleging that he was present when Serrano, with the assistance of Montanez and Jorge Pacheco, shot and killed Vargas. (Ex. 14 at Plaintiff 000323; Ex. 15 at Plaintiff 000723-727.) Rankins also identified plaintiff Serrano in a line-up as the person Rankins saw shoot and kill Vargas. (Ex. 14 at Plaintiff 000322.)

60. On June 11, 1993, Wilda Vargas, Vargas's widow, identified Serrano in a separate line-up as one of the persons seated in a vehicle that was parked in front of her husband's vehicle

and followed them home from a gas station the day before Vargas was murdered. (Ex. 16 at RFC-Serr/Mont 000193-194.)

61. ASA King also reviewed the police reports, including the report referencing information obtained from Vicente on June 2, 1993, and attempted to interview Serrano. (Ex. 14 at Plaintiff 000323.)

62. After finishing his review of the evidence late in the evening of June 11 or in the early morning hours of June 12, ASA King approved murder charges against Serrano in connection with Vargas's shooting death. (Ex. 17, King Tr. at 152:12-153:18.)

63. ASA King did not have any contact with Coghlan concerning the Vargas murder prior to approving charges against Serrano, and to ASA King's knowledge, Coghlan did not have any connection to the Vargas case before charges against Serrano had been approved. (Ex. 17, King Tr. at 153:20-154:5.)

64. Rankins testified that he did not meet Coghlan until June 14, by which time Serrano had been arrested and ASA King had approved murder charges against him. (Ex. 18, Rankins Tr. at 223:22-224:7; Ex. 14 at Plaintiff 000323; Ex. 17, King Tr. at 134:7-13;153:14-18.)[1]

65. On June 15, 1993, Rankins testified under oath before a Grand Jury in response to questioning from Preliminary Hearing ASA Dan Galivan, stating that he (Rankins) was present when Serrano, with the assistance of Montanez and Jorge Pacheco, shot and killed Rodrigo Vargas. (Ex. 20 at SERRANO 8103.)

---

[1] Coghlan disputes Rankins testimony, and testified that he did not meet Rankins until September 1993. (Ex. 1, Coghlan Tr. at 161:14-163:7, Ex. 19 at CCSAO-Serr-Mont_00015783.) Regardless, there is no dispute that Coghlan and Rankins did not meet until after Rankins had given his statement to police and prosecutors implicating plaintiffs in the Vargas murder, and after Serrano had been arrested and charged.

66. The transcript of Rankins' testimony before the Grand Jury on June 15, 1993 indicates that only ASA Galivan was present for Rankins' Grand Jury testimony that day. (Ex. 20 at SERRANO 8103, 8115-117.)

**H. Vicente Gives A Handwritten Statement and Grand Jury Testimony Implicating Plaintiffs In The Vargas Murder.**

67. On June 28, 1993, Felony Review ASA Solita Pandit interviewed Vicente at the CCSAO, and during that interview, Vicente signed a handwritten statement alleging that he had been told by plaintiffs that plaintiffs had killed Vargas. (Ex. 21 at RFC-Serr/Mont 000060-065.)

68. Neither Coghlan nor Dillion were present during ASA Pandit's interview of Vicente on June 28, 1993. (Ex. 21 at RFC-Serr/Mont 000060.)

69. On July 1, 1993, Vicente was questioned by Preliminary Hearing ASA Galivan in front of a Grand Jury, where Vicente testified under oath that plaintiffs admitted to Vicente that they had murdered Vargas. (Ex. 5, Vicente Tr. at 261:21-262:8; Ex. 22 at Plaintiff 004406-420.)

70. Vicente met with a prosecutor before giving his Grand Jury testimony on July 1, 1993, but the prosecutor was not Dillon or Coghlan. (Ex. 5, Vicente Tr. at 263:8-22.)

71. Dillon was not present nor was he involved in any way in the taking of any written statement regarding the Vargas homicide, or any other homicide Francisco Vicente claimed to have knowledge of. Furthermore, Dillon was not present or involved in any way in the bond hearing or Grand Jury proceedings regarding plaintiffs' cases and the Vargas murder. (Ex. 3, Dillon Decl. ¶ 8.)

**I. Plaintiff Serrano Is Indicted and Plaintiff Montanez and Jorge Pachecho are Arrested for the Vargas Murder.**

72. On June 28, 1993, ASA Pandit approved law enforcement personnel's request to seek arrest warrants for Jorge Pacheco and Jose Montanez in connection with the shooting death of Vargas. (Ex. 23 at RFC-Serr/Mont 000187.) A Cook County Criminal Court Judge issued

arrest warrants for Pacheco and Montanez on July 2, 1993. (Ex. 24 at RFC-Serr/Mont 000048-52.)

73. On July 1, 1993, Serrano was indicted for the offenses of first degree murder and attempted armed robbery of Rodrigo Vargas, as well as the offense of unlawful use of a weapon by a felon. (Ex. 25 at CCSAO-Serr-Mont_00015570.)

74. A week later, on July 8, 1993, plaintiff Montanez was arrested. (Ex. 26 at RFC-Serr/Mont 000046.) The next day, Felony Review ASA Lynn Weaver conducted the felony review for Montanez and approved the filing of murder charges against Montanez. (Ex. 27 at CCSAO-Serr-Mont_00015797; Ex. 28 at RFC-Serr/Mont 000192.)

75. Jorge Pacheco was arrested on July 12, 1993. (Ex. 29 at CCSAO 0006303.) Felony Review ASA Kevin Hughes was assigned to conduct the felony review. (Ex. 30 at RFC-Serr/Mont 000196.) The Felony Review Unit approved murder charges against Pacheco on July 13, 1993. (Ex. 31 at CCSAO-Serr-Mont_00015806; *see also* Ex. 30 at RFC-Serr/Mont 000196.)

76. On July 29, 1993, Montanez, Serrano and Pacheco were indicted for the offenses of first degree murder and attempted armed robbery committed against Rodrigo Vargas. (Ex. 32 at CCSAO-Serr-Mont_00015554-556.) Serrano's original indictment was superseded by this later indictment. (*Id.* at CCSAO-Serr-Mont_00015554.)

**J. Coghlan Becomes Involved In The Vargas Case As Trial Counsel.**

77. In late July 1993, Coghlan was looking to increase his caseload. After being told about a case in which a witness recently came forward, Coghlan agreed to take the case, which turned out to be the Vargas case. Coghlan then went to Branch 66 and located the prosecution file. (Ex. 1, Coghlan Tr. at 20:20-23, 21:4-8, 22:15-20, 155:6-156:3)

78. This occurred somewhere between July 22 and 26, 1993, and was the first time Coghlan became aware of any criminal case involving plaintiffs. (Ex. 1, Coghlan Tr. at 23:10-20, 153:15-155:5.)

79. Coghlan's name does not appear on any contemporaneously-prepared police or CCSAO records relating to the Vargas murder or plaintiffs until late July 1993. (Ex. 1, Coghlan Tr. at 153:15-154:17; also *compare* Ex. 10 at RFC-Serr/Mont 000097 (6/2/1993 Supp. Report); Ex. 13 at SERRANO_LASSAR 9063 (6/8/1993 Supp. Report); Ex. 33 at RFC-Serr/Mont 000175-176 (6/11/1993 Rankins Line-Up Report); Ex. 16 at RFC-Serr/Mont 000193-194 (6/11/1993 Wilda Vargas Line-Up Report); Ex. 14 at Plaintiff 000319-323 (6/14/1993 Supp. Report); Ex. 34 at RFC-Serr/Mont 000183-184 (6/14/1993 Supp. Report); Ex. 23 at RFC-Serr/Mont 000185-187 (7/3/1993 Supp. Report); Ex. 28 at RFC-Serr/Mont 000191-192; Ex. 30 at RFC-Serr/Mont 000195-197 (7/13/1993 Supp. Report); Ex. 35 at CCSAO-Serr-Mont_00015792-795, 811-817 (Serrano Felony Review Folder); Ex. 27 at CCSAO-Serr-Mont_00015796-804 (Montanez Felony Review Folder); Ex. 31 at CCSAO-Serr-Mont_00015805-810 (Pacheco Felony Review Folder); Ex. 15 at Plaintiff 000723-727 (6/11/1993 Rankins Statement); Ex. 21 at RFC-Serr/Mont 000060-065 (6/28/1993 Vicente Statement); Ex. 22 at Plaintiff 004406-025 (Vicente Grand Jury Transcript); and Ex. 20 at SERRANO 8103-112 (Rankins Grand Jury Transcript) *with* Ex. 36 at CCSAO-Serr-Mont_00007341 (Rankins Blueback on 7/26/1993 notes that Rankins "is a witness in murder #93 CR 15871. See ASA Coghlan, gangs"); Ex. 25 at CCSAO-Serr-Mont_00015567 (Coghlan's handwriting appears on Serrano Blueback for the first time on 7/29/1993).)

80. In the months that followed, Coghlan prepared the criminal case against plaintiffs for trial and ultimately tried it in an October 1994 bench trial in which plaintiffs were convicted of

committing the Vargas murder. (Ex. 1, Coghlan Tr. at 127:14-16, 160:18-161:9, 173:5-14, 209:21-211:24).

**K.     Vicente's Guilty Plea, Sentencing and Credits For Time Served.**

81.     Vicente pleaded guilty to three armed robberies and one simple robbery and was sentenced for those crimes on September 23, 1996. (Ex. 37 at SERRANO_LASSAR 1783-786, 791.)

82.     The time spent in custody for which Vicente was given credit was provided to Dillon by Vicente's public defender. (Ex. 2, Dillon Tr. at 261:11-262:13.)

83.     In Dillon's 30-year plus time as a prosecutor, Dillon never calculated the time as the credit for time served was always calculated by the defense. (Ex. 2, Dillon Tr. at 264:4-18.)

84.     At Vicente's sentencing hearing, Vicente's public defender orally represented to the court the amount of time Vicente was to be credited with. (Ex. 2, Dillon Tr. at 262:4-9; Ex. 37 at SERRANO_LASSAR 1793.)

Dated: August 12, 2019                                            Respectfully submitted,


/s/ T. Andrew Horvat                                              /s/ Paula S. Quist
T. Andrew Horvat                                                  Paula S. Quist (IL 6278287)
(timothy.horvat@cookcountyil.gov)                                 (pquist@jonesday.com)
Yulia Nikolaevskaya                                               Morgan R. Hirst (IL 6275128)
(yulia.nikolaevskaya@cookcountyil.gov)                            mhirst@jonesday.com
Cook County State's Attorney's Office                             Leigh A. Krahenbuhl (IL 6309479)
50 W. Washington, 5th Floor                                       (lkrahenbuhl@jonesday.com)
Chicago, Illinois 60602                                           JONES DAY
Telephone;  (312) 603-3362                                        77 West Wacker
                                                                  Chicago, IL  60601.1692
                                                                  Telephone:  (312) 782-3939
*Counsel for Defendants John Dillon and
Cook County*
                                                                  *Counsel for Defendant Matthew
                                                                  Coghlan*

**CERTIFICATE OF SERVICE**

      I hereby certify that on the 12th day of August, 2019, I emailed the foregoing to all counsel of record in this matter.

      /s/ Paula S. Quist
*Counsel for Defendant Matthew Coghlan*