1    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF ILLINOIS
2          EASTERN DIVISION

3  ARMANDO SERRANO,                    )
                                       )
4            Plaintiff,                )
        vs.                            ) No. 17 C 2869
5                                      )
   REYNALDO GUEVARA, et al.,           )
6                                      )
             Defendants.               )
7  ----------------------------------- )
   JOSE MONTANEZ,                      )
8                                      )
             Plaintiff,                )
9        vs.                           ) No. 17 C 4560
                                       )
10 REYNALDO GUEVARA, et al.,           ) September 5, 2019
                                       ) Chicago, Illinois
11           Defendants.               ) 10:40 o'clock a.m.

12                 TRANSCRIPT OF PROCEEDINGS
13          BEFORE THE HONORABLE MANISH S. SHAH

14 APPEARANCES:

15 For Plaintiff Serrano:     BONJEAN LAW GROUP, P.L.L.C.
16                            BY:  MS. JENNIFER A. BONJEAN
                              1000 Dean Street, Suite 422
17                            Brooklyn, New York  11238
                              (718) 875-1850
18
   For Plaintiff Montanez:    LOEVY & LOEVY
19                            BY:  MR. RUSSELL R. AINSWORTH
                                   MS. RUTH Z. BROWN
20                            311 North Aberdeen Street, 3rd Floor
                              Chicago, Illinois  60607
21                            (312) 243-5900

22 For Defendant Guevara:     LEINENWEBER BARONI & DAFFADA, L.L.C.
                              BY:  MR. THOMAS M. LEINENWEBER
23                            120 North LaSalle Street, Suite 2000
                              Chicago, Illinois  60602
24                            (312) 663-3003

25

1    APPEARANCES (Continued):

2

3    For Defendants Mingey         THE SOTOS LAW FIRM, P.C.
     and Halvorsen:               BY:  MR. JAMES G. SOTOS
4                                       MR. JEFFREY R. KIVETZ
                                  141 West Jackson Boulevard, Ste. 1240A
5                                 Chicago, Illinois  60604
                                  (630) 735-3300
6
     For Defendant Coghlan:       JONES DAY
7                                 BY:  MR. MORGAN R. HIRST
                                       MS. PAULA S. QUIST
8                                 77 West Wacker Drive, Suite 3500
                                  Chicago, Illinois  60601-1692
9                                 (312) 782-3939

10   For Defendants Dillon        COOK COUNTY STATE'S ATTORNEY'S OFFICE
     and Cook County:             BY:  MR. T. ANDREW HORVAT
11                                50 West Washington Street, Suite 500
                                  Chicago, Illinois  60602
12                                (312) 603-3362

13   For Defendant City:          ROCK FUSCO & CONNELLY, L.L.C.
                                  BY:  MS. EILEEN E. ROSEN
14                                321 North Clark Street, Suite 2200
                                  Chicago, Illinois  60654
15                                (312) 474-1000

16   Also Present:                Mr. Matthew Coghlan, Defendant

17

18

19

20

21

22
                    COLLEEN M. CONWAY, CSR, RMR, CRR
23                      Official Court Reporter
                  219 South Dearborn Street, Room 1918
24                    Chicago, Illinois  60604
                         (312) 435-5594
25                 colleen_conway@ilnd.uscourts.gov

1          (Proceedings heard in open court:)

2          THE CLERK:  17 C 2869, Serrano versus Guevara; 17 C

3     4560, Montanez versus Guevara.

4          MR. AINSWORTH:  Good morning, Your Honor.  Russell

5     Ainsworth appearing on behalf of Plaintiff Montanez.

6          MS. BROWN:  Good morning, Your Honor.  Ruth Brown for

7     Plaintiff Montanez.

8          MS. BONJEAN:  Good morning, Your Honor.  Jennifer

9     Bonjean on behalf of Armando Serrano.

10          MR. SOTOS:  Good morning, Your Honor.  Jim Sotos on

11     behalf of Defendants Halvorsen and Mingey.

12          MR. KIVETZ:  Good morning, Your Honor.  Jeff Kivetz

13     also on behalf of Defendants Halvorsen and Mingey.

14          MS. ROSEN:  Good morning, Your Honor.  Eileen Rosen

15     on behalf of Defendant City of Chicago.

16          MR. HIRST:  Good morning, Judge.  Morgan Hirst and

17     Paula Quist on behalf of Matt Coghlan.

18          And, Your Honor, our client, Mr. Coghlan, is here as

19     well today.

20          MR. COGHLAN:  Good morning, Judge.

21          MR. LEINENWEBER:  Good morning, Judge.  Tom

22     Leinenweber on behalf of Defendant Guevara.

23          MR. HORVAT:  Finally, Your Honor -- good morning --

24     Andrew Horvat on behalf of John Dillon and Cook County.

25          THE COURT:  Good morning, everyone.  And people can

1    have a seat as well.  And thanks, everyone, for waiting.

2          What I wanted to do first is talk about the motion

3    for sanctions.  So to the extent people are not involved in

4    that, you can go ahead and have a seat.  Counsel that are

5    involved should stay at the lectern.

6          (Counsel retreat to counsel tables.)

7          THE COURT:  And so before I ask Ms. Bonjean for an

8    oral response, I wanted to ask a few questions just of defense

9    counsel.

10          What is your basis for articulating an agency

11   relationship between Medill and Mr. Serrano?  Where -- what's

12   the source of that principal agency relationship?

13          And just to follow through on my thought, if

14   Mr. Serrano had directed the Medill team to stop, were they

15   under any obligation to listen to him or follow his directions

16   in that regard?

17          MR. SOTOS:  They certainly were in terms of their

18   right to continue to do an investigation on his behalf.  And

19   that, I think, really is the heart of the issue.  It's were

20   they acting as investigators or did they act as something else.

21          It's actually the same issue that was addressed in an

22   identical context and before the Circuit Court of Cook County

23   when Circuit Court Judge Diane Cannon found specifically that

24   Medill acted as investigators, not as reporters; and as a

25   result, they were required to turn over all of the information.

1   All this ultimately led to David Protess' termination from
2   Northwestern.
3           THE COURT:  But that issue, I gather, was likely one
4   of a different substantive law that might have applied,
5   depending on how you categorize someone as a journalist or an
6   investigator.
7           My question is, what makes an agency relationship
8   exist between the Medill team and Mr. Serrano?
9           MR. SOTOS:  Well, Mr. Serrano reached out and asked
10  Medill to get involved in the case in the very early 2000s.
11          At that point, Sergio Serritella, who was a private
12  investigator -- and there is evidence in the record --
13  specifically was working as a private investigator for the
14  Serrano family.
15          When Medill became involved, they asked
16  Mr. Serritella to step back so the students could be upfront,
17  but then they used Mr. Serritella as their private
18  investigator, and he was involved with the investigation all
19  the way up through the completion of the investigation.
20          The CWC became involved in the case, at the very
21  latest, in January of 2004, which was before the essential work
22  was done in the case, which led to the recantation of Francisco
23  Vicente.
24          As the Court knows, this case is, in large part,
25  about Francisco Vicente, did he -- was he coerced to give false

1 | statements by the defendant police officers --

2 | THE COURT: I get that.

3 | MR. SOTOS: -- or was there coercion.

4 | THE COURT: Let's steer back to my question --

5 | MR. SOTOS: Sure.

6 | THE COURT: -- which is, what would I look to to be

7 | able to articulate the scope of a principal agent relationship

8 | between Mr. Serrano and the Medill team? And what is it that

9 | defines the scope?

10 | And I'll circle back to the question I asked at the

11 | beginning, which is if Mr. Serrano had ordered the Medill team,

12 | "Stop looking into my case," where would I find some principle

13 | or rule that says they had to listen to him? That -- because

14 | that might tell me he is a principal, they are his agent.

15 | Agents have to do what the principal directs.

16 | Where would I find that in what you've submitted to

17 | me?

18 | MR. SOTOS: I think in the facts, Judge. We didn't

19 | argue the -- we argued that the -- well, I think in the facts.

20 | Again, once the CWC became involved in January of

21 | 2004, they were Mr. Serrano's lawyers. This was all under the

22 | umbrella of Northwestern. So that's in January 2004 and that

23 | was at the behest of David Protess and Medill.

24 | So at that point, Medill functioned specifically like

25 | any private investigator that we are using in our case and

1   plaintiffs are using in their case. There's really no

2   difference at all.

3           And I don't think there's any real uncertainty in the

4   law as to whether or not a private investigator working on --

5   working with a law firm on a case is the agent minimally of

6   that law firm and, as a result, of that client.

7           So that was the situation all the way up from January

8   2004 through the completion of the investigation, through the

9   filing of the post-conviction petition, through the obtaining

10  of Francisco Vicente's affidavit. And so -- and during the

11  time at which the evidence that we've laid out in our brief was

12  destroyed, or lost, whatever happened to it.

13          So with respect to your question about whether he

14  would have had the right to control them, he would absolutely

15  have the right to control that relationship in the same way

16  that if, say, that a spouse hires a private investigator to

17  investigate because he suspects his wife of infidelity, and the

18  investigator investigates, and then the spouse says, "You know

19  what? We've reconciled. I don't want you to do this anymore,

20  so you're not working as our investigator anymore." If that

21  investigator decides he's interested in the case for

22  independent reasons, and he wants to go around and follow the

23  person around, he can physically do that, but he can't anymore

24  work as -- any longer work as that person's agent.

25          So we don't really see any difference between that

1    situation and what we have here, given the fact that we think

2    the facts make it acutely clear that there was no reporting of

3    any kind going on here. This was purely investigative work.

4              THE COURT: Is there anything in what you've

5    submitted that establishes the agency between the Center for

6    Wrongful Conviction and the Medill students as the

7    investigative arm of the lawyers?

8              I mean, obviously, there's the e-mail traffic and the

9    communications, but is there some moment when they say -- when

10   the lawyers say, "We're taking the case. Please keep digging

11   on our behalf"?

12             MR. SOTOS: So we don't have that specific e-mail.

13   We got pretty close it, though, from what we've been able to

14   get, that has been turned over.

15             We have Medill specifically reaching out to the

16   Center of Wrongful Convictions on January 9th, 2004, asking the

17   executive director, Rob Warden, to take the case. We've got

18   Mr. Serrano including Jeff Urdangan, the attorney from the CWC,

19   on his visiting list on January 2nd. And then we've got Medill

20   going to visit Francisco Vicente twice in April of 2004,

21   supplying their notes from that -- those meet -- that meeting,

22   the second meeting, to the CWC, which then drafted the

23   affidavit for Mr. Vicente to sign.

24             And there -- we also have -- and I don't believe it's

25   in what's been submitted so far, Your Honor. We didn't really

1    anticipate the agency issue.  But I will tell you, we do have

2    an affidavit -- the draft affidavit that the CWC prepared.  And

3    one of the paragraphs in that affidavit specifically said, "I,

4    Francisco Vicente, acknowledge that Medill is working solely on

5    behalf of Armando Serrano in this case."  And that line caused

6    some concern to Medill, and it was excluded from the final

7    draft of the affidavit.

8           So we don't anticipate having any difficulty

9    establishing the connection between CWC and Medill, the fact

10   that they were working hand on hand towards the obtaining of

11   this critical and ultimately dispositive affidavit.

12          THE COURT:  Let me ask a couple of other questions on

13   other topics and then I'll ask the plaintiff for a response.

14          If you had Michelle Serrano's videotaped statement,

15   do you think it would be admissible?  And under what theory?

16          And then my next question will lead us into talking

17   about the prejudice because you have other statements from

18   Michelle Serrano.  I am using that as an example to try and

19   explore what you think would be admissible if you had the

20   things that are lost.  And then in light of all the other

21   things you do have, that might very well amount to the same

22   kind of impeachment that you would get from some of these

23   materials.

24          And I appreciate that you might say, "Well, we don't

25   know what we don't have."  I get that.  But I want to explore a

1    little bit how material the materials are in light of what you

2    do know, and I want to -- just as an example.  Say you had the

3    Michelle Serrano videotaped statement.  What would you do with

4    it at trial?

5            MR. SOTOS:  So I think the statement could be

6    admitted as a declaration against Pachecco's interests under

7    hearsay exception.  I think it could be admitted under the

8    residual exception given the circumstances surrounding

9    Mr. Pachecco's demise.  I think all of that would make it

10   difficult for plaintiff to argue that that shouldn't come in at

11   the trial.

12           I think there was another hearsay exception that I

13   had thought of that's escaping me right now.

14           THE COURT:  And then you have a statement from her in

15   which she does report that he said he was the shooter.  So you

16   have that.  What do you think the videotaped statement would

17   add to your -- to the approach?

18           MR. SOTOS:  I think the answer to that question,

19   Judge, lies in the 16 years in between when she gave a

20   statement and when she gave her deposition.  Her details on the

21   two -- in 2019 were all over the place in terms of describing

22   what exactly Pachecco said to her.

23           Well, one thing that does come clear is she said that

24   Pachecco shot some people in front of Serrano and Montanez.

25   She describes it as a gang shooting.  There's a lot about it

1   that the plaintiffs will be able to aggressively attack and

2   say:  Oh, this is -- she's talking about something else.  She's

3   all over the place.  There's a lot of fodder for that.

4        A lot of that's attributable to the fact that 16

5   years have passed when she actually gave a statement.  And

6   without getting into all the specifics, she's had a difficult

7   life, and it's really unsurprising that she's not going to

8   remember a lot of the details.

9        But having that statement in its original form,

10  notwithstanding the fact that Pachecco was suspiciously

11  murdered a couple of weeks after it was given, would have given

12  -- likely provided the answer to a lot of the questions that

13  the plaintiffs are going to try to exploit in terms of what's

14  not in the deposition or the declaration, or what's different

15  from this specific case.

16       THE COURT:  And so then let me just ask more broadly

17  about prejudice here.

18       When you have -- from what you have been able to put

19  together, you have some sense of inconsistencies that have been

20  in statements over time.  You have some sense of how Medill

21  approached the gathering of information.  So you have some

22  fodder to impeach either declarants or impeach the process by

23  which declarants made various statements.  You don't have

24  some -- you don't have notes of some interviews.  You don't

25  have audiotapes of some interviews.  You have some summaries of

1    what happened during those interviews.  You don't have other

2    summaries because you don't have memos.  But it's not uncommon

3    for notes of interviews to no longer exist because the material

4    parts of the interviews get memorialized in either reports or

5    elsewhere.

6              So explain to me a little bit more about what the

7    prejudice is.  In light of what you do know, how much more

8    incremental value is in what's missing?

9              MR. SOTOS:  I think your question actually provides

10   the answer.  We have some information.  We have what we view to

11   be the tip of the iceberg.  We have references in e-mails to

12   things that occurred on the most critical aspect of the case.

13             Let's take, for example, the recantation of Vicente.

14   We know that there were efforts -- we know about what was done.

15   We know that there were efforts to convince him that they

16   wouldn't kill him, that they would make him rich through the

17   civil lawsuit that was going to be filed.  We know that those

18   efforts weren't successful when they provided him that

19   information in 2003; that they then were upping up -- upping

20   the incentives in 2004.  There were memos prepared that

21   specifically describe concerns about what Sergio Serritella was

22   doing.  And so then there was another memo prepared, an excise

23   -- which excised that information, which -- I mean, that's part

24   of it.

25             Everything that occurred up until Vicente's actual

1  recantation, we only know a little bit about it.  And this

2  isn't a situation, Judge, where it's like notes were missing.

3  We were familiar with that, where notes are missing, and then

4  the argument is:  Well, they're in the memos.  We don't have

5  the notes.  We don't have the memos.

6         And we also know from Protess in other cases,

7  including a reference to this case, that he specifically

8  ordered that the memos be destroyed.  And in relation to the

9  *McKinney* case, which I do think is instructive at least,

10 because we're only able to get so much information --

11        THE COURT:  I am going to hit pause for a moment.

12        Ms. Bonjean, why don't you take a seat with your

13 materials.

14        MS. BONJEAN:  Judge -- yes.  I --

15        THE COURT:  No.  I am just asking you to take a seat

16 and --

17        MS. BONJEAN:  Oh.  Sure.

18        THE COURT:  -- keep your materials over there --

19        MS. BONJEAN:  Okay.

20        THE COURT:  -- and I'll continue my colloquy with

21 Mr. Sotos.

22        MS. BONJEAN:  Sure.

23     (Counsel retreats to table.)

24        MR. SOTOS:  So what we have in this case is we know

25 that David Protess, in the *McKinney* case, which was being

1    investigated at the exact same time as the *Serrano* case,

2    specifically directed that memos be destroyed.  And the reason

3    for that is he told the CWC that they better be careful what

4    they ask for in terms of the memos because that may well

5    disclose information that could hinder Mr. McKinney's ability

6    to be free, that would impeach witnesses.

7            And according to Protess' memo, Karen Daniel from the

8    CWC told him she destroyed the memos and then broke her promise

9    by providing them to the judge.

10           So what we know is there was a specific effort to

11   destroy the evidence to prevent the prosecution at the time

12   from finding out what really was going on.  So it's not a

13   stretch to assume here where we know about -- in fact, we have

14   several memos in relation to this case where they're

15   specifically trying to disguise incentives that they're giving;

16   for instance, by way of illustration, David Protess saying, "We

17   can't make any specific monetary offers, but you can tell him

18   that Mr. Serrano and Mr. Montanez will likely be very generous

19   with the money that's going to flow from the civil rights case

20   that's going to be filed after he's released."  And then, of

21   course, Montanez sent a letter to Vicente telling him, "We'll

22   keep you alive, and we'll make you rich one day.  You'll never

23   have to work."

24           So there are several examples of that in the brief

25   where they're -- they -- critically, they attempted to disguise

1     the incentives that Sergio Serritella was offering Vicente at

2     the very last meeting, when he agreed to give the affidavit in

3     April of 2004, by saying they'll have the students, who we

4     think the evidence will show they used as a front for the real

5     work that was going on behind the scenes, so they'll have the

6     students get the affidavit and then have Serritella meet

7     separately with Vicente so he can deliver on whatever promises

8     he made.

9          And some of them are undisclosed.  We don't know what

10    they were.  We don't know what he actually promised them beyond

11    what we do know.

12         So there -- we believe there's a wealth of

13    information in those memos.  The information we do have

14    suggests that some of the students, when they first met with

15    Mr. Montanez and Mr. Serrano, that one of the students, at

16    least we know from an e-mail, talked about the fact that

17    Montanez said that he thought Serrano may have committed the

18    crime, that he was trigger-happy.  It was surprisingly candid

19    in the way she described that.

20         So any memos that came out of that meeting could have

21    been critical in explaining why that student felt that way.

22         THE COURT:  And my recollection is that that student

23    now no longer recalls Montanez making that statement.

24         MR. SOTOS:  That's correct, Judge.  And, actually,

25    none of the students really recall anything of -- I mean,

1 nobody recalls anything of substance.

2 We didn't attach all of the depositions where

3 everybody said they didn't recall. We can. But that's --

4 THE COURT: And do you --

5 MR. SOTOS: That's essentially the --

6 THE COURT: Do you think you would have a problem

7 admitting Mr. Montanez's statement to the student based on the

8 form you have it in now?

9 MR. SOTOS: I -- I mean, potentially, we would argue

10 it's a party admission. We would argue that. But, again, it's

11 only -- it's only a part of it.

12 Like, why does -- why did the student think that?

13 There were memos that were created after all of these

14 interviews -- and this was an interview of the plaintiffs in

15 the fall of 2003 in which one of the students who was there

16 expressed her doubts about the plaintiffs' guilt. So -- but

17 that's all we have. We don't know why.

18 And it's not a stretch to assume that that memo would

19 have described in detail what she felt. Now she doesn't

20 remember anything.

21 THE COURT: The loss of the information, whether it

22 was destroyed, lost, you attribute that to the Medill side or

23 are you saying that there were -- the materials did make its

24 way to the attorneys and then the attorneys, knowing that

25 litigation was likely, given their roles, the attorneys then

1   had an obligation to preserve what they received, and you have

2   some information to suggest that it was lost thereafter?

3           MR. SOTOS:  Well --

4           THE COURT:  So I would like to get a -- just pin you

5   down on the timeline and who you think is responsible as

6   directly as you know.

7           MR. SOTOS:  So the answer to that is both.

8           We know that David Protess said that all the

9   audiotapes, videotapes, everything that was put into some memos

10  were put into the Serrano box, and the complete file was given

11  to the CWC.

12          We also know that there's a lot of information in our

13  motion about the fact that Serrano had told people to destroy

14  memos.  So everything that was in that --

15          MS. ROSEN:  Protess.

16          MS. BONJEAN:  Protess.

17          MR. SOTOS:  Protess.  I'm sorry.  I misspoke.  Thank

18  you, both.

19          So we don't know what actually was in the box and

20  what the CWC had.

21          Now, we do know that the CWC had an important memo

22  that surrounded the interview of Timothy Rankins in California

23  in May 2004 which led the CWC to forgo an affidavit from

24  Rankins.  We don't know why except that they specifically said

25  he may be a liability.  So they decided to rely on secondhand

1   accounts from students.  That was a pretty significant

2   development.  Presumably, that memo explained why they felt Tim

3   Rankins was such a liability that they couldn't get an

4   affidavit from him.

5           Now, we know the CWC had that affidavit.  Excuse me,

6   that memo.  And it wasn't disclosed.  So that was missing.

7           We believe that there was information that --

8   provided to the CWC at the time of its -- Medill's interviews

9   with Francisco Vicente in April 2004 which were provided to the

10  CWC, which wasn't disclosed.  All we have is the affidavits

11  from Francisco Vicente.

12          And -- but in terms of the rest of the information

13  that's laid out in that brief, we can't tell whether it was

14  necessarily Medill or CWC.  We know it was Northwestern.  But

15  beyond that, that's the most we've been able to garner.

16          THE COURT:  Okay.  Let me ask Ms. Bonjean to step up

17  and if I can get a response from her.

18          And, defense counsel, you can go ahead and have a

19  seat.

20      (Counsel retreats to table.)

21          MS. BONJEAN:  I --

22          THE COURT:  So my -- just to keep us focused.

23          MS. BONJEAN:  Sure.

24          THE COURT:  You've heard my questions of defense

25  counsel.  So if you want to comment on those particular issues,

1 I'd welcome it.

2 And then the other question is why shouldn't we brief

3 this, which will lead us to the next topic on our agenda.

4 You had mentioned at our last session that you

5 thought it would take just a couple of seconds and I'd be

6 convinced and I don't need to think about this anymore. So

7 I'll give you that few seconds --

8 MS. BONJEAN: Sure.

9 THE COURT: -- to tell me what's on your mind.

10 MS. BONJEAN: Well, I think that even if Medill was a

11 party to this lawsuit, they lose on all the elements. But he's

12 not a party to this lawsuit.

13 And I found it kind of surprising that Mr. Sotos said

14 that he didn't anticipate the agency argument because I

15 actually wrote a letter, a Rule 11 letter; because I believe

16 that even on that one legal theory, it is, frankly, a

17 sanctionable pleading in and of itself under the agency

18 privilege.

19 There's no authority across the country in this

20 scenario where Mr. Serrano, who's sitting in prison, who

21 reaches out, like hundreds, maybe thousands of prisoners, to

22 Mr. Protess and Medill after -- in the wake of Anthony Porter's

23 exoneration, and the Ford Heights Four, and says, "Help me,

24 help me." And that's all he did. He said, "Help me." He

25 didn't have a lawyer.

1    And to suggest that he somehow directed or controlled

2    or had -- even the letter itself that initiated whatever

3    relationship you want to say started here from the students,

4    which you do not have -- you don't have a lot.  You have some

5    stuff attached, which is, frankly, quite cherry-picked.  But

6    the letter itself says, "Mr. Protess has decided to take your

7    case and look at it as part of our investigative journalism

8    class."  And all the letters from Mr. Serrano going to

9    Mr. Protess are, "Thank you for helping me."

10   And there is no even basis to believe that

11   Mr. Serrano ever saw, ever knew, ever had any understanding of

12   what these students were doing, their notes they were making.

13   He never saw a copy of their notes.  He certainly didn't have

14   access to the documents.  And he could not have, A, directed

15   the investigation.  He could not -- and he could not have

16   directed what happened to any of those source materials.

17   So I --

18   THE COURT:  What about when they do make their way

19   into his attorneys' hands?

20   MS. BONJEAN:  Well --

21   THE COURT:  Doesn't he have some control then at that

22   point?

23   MS. BONJEAN:  Let me say this, Judge.  They have no

24   evidentiary basis for this.  And this is -- first of all, if

25   you look at what they're saying was destroyed, all of it

1 predates January 2004 except notes that they believe were
2 created in connection with this affidavit-taking of Vicente.

3 Let me be clear about this. Eighty percent of what
4 they say has been destroyed, there's no evidence that it ever
5 existed. All of these students have said -- in fact, if you
6 look at even their own cites, it says, for instance -- at -- on
7 their paper at page 5: "They took notes during these
8 interviews from which they prepared memoranda summarizing the
9 interviews." I looked specifically at all of their pinpoint
10 cites, and there's nothing that supports the proposition that
11 they took notes at all of these interviews. I would suspect
12 that they did. But there is nothing that shows us that there
13 were specific notes that were destroyed.

14 And we do know, for instance, that when they went to
15 see Rankins, they weren't permitted in with paper and pen, and
16 they said that, "We couldn't take notes during that interview."

17 They've all been interviewed, and what they have --
18 they've been deposed. Six, seven students have all been
19 deposed for seven hours. And they all routinely said, "We went
20 back, we created these memos."

21 The only -- the defendants say that all these memos
22 are missing. I don't see it. I see one memo that they think
23 is missing, and this is the memo that they claim was created
24 after the students interviewed Mr. Montanez and Mr. Serrano.

25 In fact, some of the e-mails, if you look at, the

1  memos are attached to the e-mails.  How are they missing?  I
2  mean, it's in the ESI somewhere.  Some of the -- I mean, there
3  are memos attached to even some of their own exhibits, in the
4  e-mails that they claim are missing, when they're actual -- you
5  can see it with your own eyes.

6          So it's -- the idea that there's even stuff missing
7  is highly questionable.

8          I will say this.  Michelle Serrano's video is
9  apparently missing.  I've never seen it.  According to
10 Mr. Urdangan, who was deposed, and who was part of CWC, he
11 never saw it.

12         So they have no basis to believe everything made its
13 way to CWC.  And let me put this in context.  There's no reason
14 to believe it did.

15         Mr. Protess said they had a, quote, informal filing
16 system.  He also said it was the messy Medill student.  "We
17 threw things in a box.  That's what we did."  It wasn't a
18 formalized.  And that, "We did send the box over to the CWC
19 when they became involved in the case."  But there's nothing to
20 suggest that this was somehow some formalized filing system.

21         And, in fact, some of the students I believe
22 testified that some of their memos stayed on their computers.
23 It didn't go into the box.  They were -- and they all have
24 testified that they were never really given any protocol for
25 maintaining their materials.  And I think the belief being at

1    the time that they had no duty to disclose anything because

2    they had a reporter's privilege, a robust privilege, under

3    Illinois law.

4         Now, I understand defendants believe that they waived

5    that privilege by sharing things in some cases, and that is

6    what Judge Cannon ultimately found, that it was waived.

7         And in this particular case, which was pending sort

8    of around the same time as the *Serrano* case -- I handled it --

9    Mr. Protess just waived.  He said, "I'm not going to assert a

10   journalistic privilege to this."

11        So it's not like there was a finding in this case

12   that they didn't have a privilege in 2003 and 2004.  I think

13   they were very much operating under the assumption that they

14   did have a privilege.  Now, that doesn't mean --

15        THE COURT:  Let's -- just to be more specific about

16   materials --

17        MS. BONJEAN:  Yes.

18        THE COURT:  -- what's your response to the reference

19   that it does seem like the Center for Wrongful Conviction had

20   some memo about Mr. Rankins' statement that may have informed a

21   strategy about who to get affidavits from, but that memo that's

22   being referenced is --

23        MS. BONJEAN:  There were --

24        THE COURT:  -- not to be found according to the

25   defendants?

1          MS. BONJEAN:  There were many memos that were sent to

2    CWC.  It is, I believe, speculative that these other memos

3    existed.  Again, quite speculative.  They are deducing from

4    e-mails -- they weren't -- notably, they spent hours and hours

5    deposing everybody.  And I get that memories fade, but really

6    they're just going on nefarious inferences from e-mails which,

7    again, we just don't know that they existed in the first place.

8          We also don't know that they ever made its way to the

9    CWC.  Mr. Urdangan has said under oath -- and they do not have

10   any evidence to suggest that Urdangan destroyed anything.  He

11   said, "I didn't destroy anything.  I took what I got, and that

12   was it."  And there's -- and it may very well be that it was

13   incomplete.  It probably was incomplete.

14         You know what else is missing?  A video -- an

15   audiotape, apparently, of a witness who heard Vicente recant

16   when he first went to jail.  That would have been very helpful

17   to Mr. Serrano.  Frankly, a lot of this would have been helpful

18   to Mr. Serrano during the post-conviction proceeding.  So I'm

19   not sure that Mr. Serrano isn't more prejudiced by some of the

20   omissions here.

21         They want to make the connection between -- and I

22   understand, they want to put a drive on of their David Protess

23   defense, that he -- that they -- the Medill school weren't

24   operating as journalists.  And if they were, it was a very

25   biased investigation.  And they were doing some things or at

1    least discussing doing some things that could be construed as

2    inducing a recantation from Vicente.

3           Again, very little evidence, including from Vicente,

4    that that actually transpired.  There was some talking,

5    apparently, about it in e-mails, and I will -- but that's

6    really kind of different than, "We de" -- "We purposely

7    destroyed evidence to keep you from knowing about this."  And

8    they haven't demonstrated that.

9           I would also point out that, you know, we -- back to

10   the agency point.  You know, again, I raised it with Mr. Sotos.

11   I know Mr. Ainsworth asked Mr. Sotos, what's your authority on

12   the agency principle so we can be teed up today?  So to say

13   that he was surprised by this agency argument is just really, I

14   mean, a little surprising, because we did raise it.

15          And I spent a lot of time looking at scenarios where

16   third parties could be held culpable for spoliation.  And, as

17   the Court's already indicated, you know, this is analyzed under

18   traditional agency principles.  And there is no evidence

19   whatsoever that Mr. Serrano directed any of this.  And, in

20   fact, almost all of the evidence was prepared before CWC -- all

21   the evidence that they're complaining about missing was

22   prepared before CWC even got involved.

23          As an example, Michelle Serrano.  I mean, they say

24   they're prejudiced because Michelle Serrano doesn't remember

25   much.  Well, Michelle Serrano was deposed in this case.

1    And I think one of the reasons that she probably

2  doesn't remember very much is she said that she was high on

3  heroin with Mr. Pachecco when he made these statements to her.

4  She claimed she had a very bad relationship with Mr. Pachecco

5  and that they were actually using heroin at the time that he

6  made these statements.

7    So I think that might account for maybe her inability

8  to remember exactly.

9    THE COURT:  Well, but that really is neither here nor

10  there about the videotape, which is really what's at issue.

11  Not the weight to be given to any of this.

12    MS. BONJEAN:  Well --

13    THE COURT:  At least in terms of what I am concerned

14  about right now.

15    MS. BONJEAN:  I understand.

16    THE COURT:  And I've --

17    MS. BONJEAN:  But to the prejudice point.

18    THE COURT:  I've addressed the prejudice point with

19  counsel, so I understand why you're making it now.

20    What I'd like to do at this point is I am going to

21  take the motion under advisement.  I may direct the plaintiff

22  to file a response; I may not.

23    If I conclude that I know enough based on what's been

24  submitted to resolve the motion, I'll just resolve the motion.

25  If I have some lingering questions, I'll ask that it just get

1  fully briefed, and I'll hear everybody out, you know, in a

2  round of further briefs.  But I think we -- our time is better

3  spent this morning moving on to the next agenda item, but I'll

4  give you a minute to give me a reply of some kind.

5          MR. SOTOS:  I'm not -- no.  I understand that you're

6  not looking for that, Judge.  I just wanted to say, we really

7  didn't anticipate that the agency was going to be contested by

8  the plaintiff.  And so they did alert us to it after we filed

9  the brief, but that doesn't -- we didn't anticipate it at the

10 time we filed the brief.

11         But given the Court's questions, I would ask the

12 Court, would it be helpful if we submitted a supplemental

13 submission of two or three pages, laying out the law that we

14 believe supports us on agency and the --

15         THE COURT:  I'll give you --

16         MR. SOTOS:  The factors?

17         THE COURT:  I'll give you that opportunity.

18         And then once I see that, that might be the reason

19 why I ask for a response.  But I still might not need a

20 response even after I see their filing.  And, again, I'm

21 just -- I am trying to keep people's time and resources well

22 managed here.

23         So I'll give the defendant a week to file a

24 supplemental memo in support of the motion for sanctions,

25 limited to the issue of agency, and I'll give you five pages.

1          MR. SOTOS:  That's fine.  Thank you, Judge.

2          THE CLERK:  Counsel, that's going to be September

3     12th.

4          MR. SOTOS:  Pardon me?

5          THE CLERK:  September 12th for your memo.

6          MR. SOTOS:  Yes.

7          THE CLERK:  Thank you.

8          MR. SOTOS:  Thank you.

9          THE COURT:  And then after I see that, I'll enter an

10    order either directing more briefs or resolving the motion.

11         So why don't we turn to the motions for summary

12    judgment.  And on this front, I'll keep defense counsel at

13    their seats and ask Mr. Ainsworth to step up.

14         MR. AINSWORTH:  Yes, Judge.

15         THE COURT:  This was your idea.

16         MR. AINSWORTH:  It was.  I thought we could start

17    with the absolute immunity issue, Judge, if that's okay.

18         THE COURT:  Sure.  And one of my reactions to that

19    was that that would not be all that burdensome to brief.

20         MR. AINSWORTH:  Well --

21         THE COURT:  So, so --

22         MR. AINSWORTH:  But it comes --

23         THE COURT:  -- with that as my question, why would it

24    be so burdensome to brief the immunity -- the absolute immunity

25    issue?

1          I think it's pretty narrow.  It seems about who was

2     where and what role did they play and -- I gather from at least

3     the defense filings that we're focused on a particular moment

4     in time.

5          MR. AINSWORTH:  Exactly.  And the reason why I think

6     it's helpful to talk about it here is because there are some

7     facts that we are just at loggerheads on, both sides.  And we

8     are both looking at the same, you know, facts, and we're asking

9     the Court to make a decision.  And those facts not only pertain

10    to the absolute immunity, but they also go on to were -- are

11    the prosecutor defendants liable, you know, for the substantive

12    counts that we have made against them.

13          And to do this, what I wanted to do was just to show

14    the Court a few excerpts that I've made of the testimony that

15    actually exists and show the Court -- because what the

16    prosecutor defendants have set up is, "On June 2nd, we had no

17    idea about Vicente and him being manipulated or coerced into

18    saying anything about the Vargas homicide," and we say we have

19    evidence showing otherwise.  And the resolution of that factual

20    dispute will resolve summary judgment.

21          And so we think it's -- it really is that simple to

22    take a look at the testimony and just see what we have.  And

23    I'm not going to give you everything.  I'll only give you

24    enough that I think that you'll understand it.

25          And so with your permission, Your Honor, I'd like to

1    just display it on the court's equipment so defendants can also

2    see what the Court is seeing.

3            THE COURT:  I'll ask that we get the system up and

4    running.

5            THE CLERK:  Sure.  Bear with me one second here.

6            MR. AINSWORTH:  It's awaiting.

7            THE CLERK:  Okay.  Let's see.

8        (Court staff conferring.)

9            MR. AINSWORTH:  The first excerpt that I'm showing to

10   the Court is from Vicente's deposition.  So --

11           MR. HIRST:  And, Your Honor, I don't mean to

12   interrupt Mr. Ainsworth.  If you'd like the entire

13   transcript -- I think they're going to show you extensive

14   supposition transcript.  Sometimes context matters.

15           THE COURT:  Well, I mean --

16           MR. HIRST:  If you want it for the Court.

17           THE COURT:  -- the defendants have filed their --

18           MR. HIRST:  Yeah.

19           THE COURT:  -- 56.1 statements with the exhibits,

20   so -- and I don't recall off the top of my head whether you --

21           MR. HIRST:  We filed the whole thing.

22           THE COURT:  -- filed the whole deposition or just

23   excerpts.  So I have access to it.  I'll just let Mr. Ainsworth

24   point out what he wants to point out.

25           MR. AINSWORTH:  So this appears at page 212 of

1    Vicente's deposition.  And at the bottom where it's

2    highlighted, it reads -- this is Vicente testifying -- "They

3    knew what was going on," referring to the prosecutors.  "They

4    knew I was there.  They knew what was happening inside the

5    room.  They went from one story to three."

6              THE COURT:  So let me just hit pause there and ask

7    you, what's his competence or foundation to have admissible

8    testimony about what the prosecutors knew?

9              So why would I admit into evidence a statement from

10   Mr. Vicente that says the prosecutors knew what was happening?

11             MR. AINSWORTH:  And that's what we have to, you know,

12   view the transcript for.  That alone is not enough.  I agree

13   with the Court.

14             "Okay.  And do you say that they knew because they

15   would have been able to hear it from outside?

16             "Every time they went out, they knew what was being

17   talked about outside, and they were part of that conversation.

18   I was in the room.  I could hear them talking out there, just

19   like I can hear people outside the door.

20             "Okay.  So could you hear them talking outside the

21   door?

22             "Yes.  I could hear them whispering, and talking, and

23   trying to figure out different scenarios.

24             "Okay.  And who did you hear having conversations

25   outside the door when they left the room?

1          "Guevara, Halvorsen, and the state's attorneys that
2     were present there.
3          "Okay.  And do you remember who -- which state's
4     attorneys' voices you heard?
5          "Answer:  I know --
6          "And we're talking about -- I'm sorry; let me just --
7     I'm talking about this June 2nd meeting that we're -- the June
8     -- that June 2nd meeting, the first time you came upstairs that
9     you went back -- you already testified to, that meeting, the
10    first time the Vargas murders were brought up to you.
11         "At the State's Attorney's Office?
12         "At the State's Attorney's Office.
13         "Halvorsen, Dillon, Coghlan, and Guevara.
14         "Okay.  Could you hear any other voices outside
15    discussing the different versions of your -- what your
16    statement would be or anything else?
17         "Amongst them talking outside, I can hear little talk
18    about what I was saying, and what I wasn't going to say, and
19    what they wanted me to say, amongst Halvorsen and Guevara,
20    trying to get me to say, they kept going back and forth.
21    That's all I can tell you.  Okay?"
22         So we have testimony from Vicente saying that he
23    could hear them talking.  We have competing testimony that the
24    defendants have produced saying that Vicente, you know, later
25    in his deposition said, "I can't remember if I heard Coghlan's

1  voice at that time."

2  But we don't look at any one snippet in isolation.  I
3  agree with counsel.  I think the context does matter.

4  THE COURT:  And even from that excerpt of testimony,
5  your position would be a jury could reasonably infer that what
6  Halvorsen and Guevara were saying to the state's attorneys was,
7  "We are coercing this witness.  We are using abusive tactics to
8  try and get him.  He's not there yet."  That's the inference
9  you'd want to draw.  Because at most, he says, "I heard them
10  talking about what" --

11  MR. AINSWORTH:  "What I would say" --

12  THE COURT:  -- "I was saying."

13  MR. AINSWORTH:  "What I would say, what I wouldn't
14  say, and what they wanted me to say."

15  And I think it's very -- you know, context matters.
16  Because what Vicente says is -- first, they asked him to be
17  present for the homicide.  Then they asked him to receive the
18  murder weapon from the homicide.  And then -- and when he
19  refused to go along with either of those because of his fear of
20  personal responsibility, then they asked him to claim that the
21  men had confessed to him.

22  And so that's the evolving story that he's talking
23  about.  That's the different scenarios.  And that's when he
24  hears them saying what he was -- what he wasn't going to say
25  and what they wanted him to say and going through the evolving

1    stories.

2           THE COURT:  And you think a reasonable inference of

3    the statement what they want him to say is that they want him

4    to say something false as opposed to, "We want him to tell us

5    the truth about the Vargas murders.  He's not there yet.  He's

6    unwilling to come totally clean.  He's willing to say this

7    much.  He's not willing to say this much.  What we want him to

8    say is the truth of what happened"?

9           Your position would be maybe that's an inference, but

10   that's not the only inference that could be drawn.  And a

11   reasonable inference would be when they say "what we want him

12   to say," a jury could conclude that that statement is, "We want

13   him to say a false version," and the detectives are passing

14   that along to the state's attorneys to get them on board with

15   their approach?

16          Do I understand what your argument would be about

17   this piece of testimony?

18          MR. AINSWORTH:  That's correct.  When you have

19   testimony from somebody saying, "What I was saying, what I

20   wasn't going to say, and what they wanted me to say," and then

21   that testimony is linked to what was going on inside the room

22   when Vicente is being told.

23          And, you know -- and there is additional testimony

24   that gets at what was really going on here and why this is a

25   reasonable inference, and we don't have to show, as the Court

1  points out, that's the only inference.

2  We have testimony -- and this is at page 143 of the

3  same Vicente deposition. And I just want to point out that

4  this is from defense -- or the last transcript was from defense

5  questioning, you know, of Mr. Vicente.

6  And he's asked: "Okay. Now, Mr. Vicente, you also

7  said you were certain that the Cook County State's Attorney's

8  Office knew what was going on. When Guevara and Halverson were

9  interrogating you during this meeting at the Cook County

10  State's Attorney's Office, were they making noise?

11  "Answer: They had me in a room with a door slightly

12  ajarred. They would close it, open it, go out, talk, come

13  back, deal with me, try and get me -- get me and coerce me

14  more.

15  "And you also mentioned that Dillon and Coghlan would

16  sometimes stick their heads in the door?

17  "Yes."

18  And what Vicente has been describing is that he was

19  being beaten and he was beaten -- that it was loud, he was

20  being yelled at, he was yelling himself, he was being struck,

21  and that this was all taking place in the Cook County State's

22  Attorney's Office.

23  And for Defendant Coghlan, he says, "Judge, I wasn't

24  there." You know, "I had no involvement in this June 2nd

25  meeting."

But we also know from Vicente's testimony at the
trial for Serrano and Montanez -- and this is back, you know,
in 1994 at page 26 of his trial transcript.

He's asked: "And I'd like to direct your attention
to June 2nd of 1993. Were you in the State's Attorney's Office
on that day?

"Answer: Yes, sir.

"Why were you at the State's Attorney's Office?

"Answer: I was talking to a state's attorney.

"Question: Which state's attorney?

"Answer: I was talking to you."

And the "you" he's referring to is Matthew Coghlan,
who's the prosecutor who's presenting his testimony at that
time.

Now, Mr. Coghlan, you know, says, "Oh, well, he was
mistaken, and, you know, we clarified it, and" -- but we have
testimony saying that, you know, Coghlan's there. This is
something that additionally supports a reasonable inference.

We have Vicente, again, from his deposition. And
this is at page 68 of his deposition:

"How do you know that they knew what was going on?

"Answer: You can hear from outside the door. The
door is there; I'm in this room; they're right outside; they're
in and out. They knew what was going on."

And here, he's referring, again, to Coghlan and

1    Dillon.

2         We have Dillon's testimony from Dillon's deposition.

3    This is page 196 of Dillon's deposition where he says:

4         "I talked to Vicente on June 2nd, 1993, but then I

5    left and I didn't have any -- you know, no one -- nothing about

6    the Vargas murder came up."

7         And he's asked:  "Okay.  Where did the conversation

8    take place?

9         "Answer:  Where did what conversation take place?

10        "Question:  Where Detective Halvorsen tells you, 'He

11   gave us another murder.'"

12        Because in Dillon's story, he left the room and then

13   Halvorsen comes out and tells him that Vicente is now

14   confessing about a different murder.

15        Dillon says:  "On the 13th floor in the gang unit

16   outside of the conference room that Mr. Vicente was in.

17        "Question:  Okay.  In the hallway?  Somewhere else?

18        "Answer:  As I explained to you, there's that big

19   open area.

20        "Right.

21        "So if you step out of that conference room, you're

22   in the big open area of the gang unit.  That's where he told me

23   that."

24        And there is some synergy here between what Vicente

25   is saying, that Coghlan and Dillon were right outside the door

1  while he was being interrogated, and Dillon's saying that, "I

2  was" -- "When they stepped out the room and I was right" --

3  "and I was standing right there, and they told me about the

4  Vargas murder going on."  There are consistencies between the

5  two accounts.

6          We also have Dillon saying that he was going in and

7  out of the room, like Vicente testified to.  And this is,

8  again, from Dillon's deposition at page 199.

9          And he testifies that he would go into the interview

10  room, speak with Mr. Vicente regarding his knowledge of what

11  Mr. Bouto told him while he was in the lockup with him, and

12  also as to Mr. Garvin:  "In the course of either or between

13  those two statements or that, I left.

14          "So I didn't get up and leave in the middle of him

15  telling me something, but when there was a break, I left for

16  what else was calling my attention at the time."

17          And he would leave and he would return, and he

18  would -- he knew that Vicente was -- you know, how long he was

19  in the office.  He was monitoring what was going on.  He knew

20  that he was in the office for about an hour.

21          THE COURT:  Can I shift gears --

22          MR. AINSWORTH:  Yes.

23          THE COURT:  -- a bit to ask whether, in your view, it

24  is Dillon's and Coghlan's involvement in this statement that

25  also establishes their culpable personal involvement on the

1    prolonged detention claim?

2           MR. AINSWORTH:  Yes, buttressed by their involvement

3    in coercing Timothy Rankins, which is -- I think also cannot be

4    viewed in isolation.  Because we have Coghlan and Dillon

5    saying, "We weren't there whatsoever."  We have evidence

6    showing that they were there.  So why are they lying about

7    that?  You know, why are they trying to, you know, deny being

8    present?

9           We also have evidence from Timothy Rankins.  And what

10   I'm showing the Court now is from Timothy Rankins' deposition

11   at page 75.  And this is his testimony about Matt Coghlan

12   telling him to lie.

13          And the testimony reads:  "And did Matt Coghlan ask

14   you questions about what had happened?

15          "Answer:  No.  As soon as I seen him, they told me --

16   they identified themselves, and I told them, I said I was beat

17   in order to sign this statement.

18          "Okay.  So let me ask you this.  Did you tell Matt

19   Coghlan that you had been beaten?

20          "Answer:  Yes.

21          "Okay.  Did you tell them that they forced you to

22   sign a statement?

23          "Answer:  Yes.

24          "Did you tell Matt Coghlan that they forced you to

25   sign a statement that contained untruths?

1          "I told him that the statement they made me sign, I

2    knew nothing about the case, I was not at the scene of the

3    crime.  I had nothing to do with these dudes, I do not know

4    these dudes.

5          "Okay.

6          "And I told him, I said, all I want to do is tell the

7    truth.  The truth is I don't know these dudes, and they beat me

8    and made me sign the statement.

9          "And what did Matt Coghlan say in response when you

10   told him all of this?

11         "He said to me -- he said to me, he said, 'You're

12   going to do what they told you to do.  I don't want to hear it,

13   and that's what is going to happen.'"

14         And I think that this testimony is particularly

15   important because, in context, we have evidence that's, you

16   know, rebuttable for sure, but evidence that Coghlan is

17   intentionally trying to get other witnesses to lie about the

18   same case and the same murder and get -- in order to falsely

19   implicate Serrano and Montanez.

20         And further in Mr. Rankins' deposition testimony --

21   this is page 87 of his testimony -- he's asked:

22         "Which state's attorney came to the witness quarters?

23         "Matt Coghlan and Dillon.

24         "It was both of them?

25         "Yes.

1            "And did they have a conversation with you?

2            "They told me, they said, 'Look, we're going to put

3 you back in the county jail. Whatever happened to you in that

4 county jail, you need to think about testifying on these' --

5 'testifying on these people and telling them that you're

6 supposed' -- 'what you're supposed to do.'

7            "And I said I ain't supposed to do nothing because

8 I'm not going to lie. He said, 'Well, regardless of whether

9 you're lying or not, you're going to give this statement.

10 You're going to testify in court.'

11            "And did you tell the Assistant State's Attorney John

12 Dillon and Assistant State's Attorney Matt Coghlan that the

13 statement that they wanted you to testify to was a lie?"

14            And he answered: "Yes."

15            So we have testimony from Rankins saying that both

16 Coghlan and Dillon knew that his testimony was a fabrication

17 and that they were trying to get him to repeat that lie in

18 court in order to falsely implicate Serrano and Montanez.

19            And that evidence supports our interpretation of

20 Vicente's statements, where he's saying -- you know, he's

21 replete. You know, "They knew, they knew, they knew." And

22 when we -- when asked, "How do you know?" He said, "Well, I

23 heard them out in the hall. It was Guevara, Halvorsen, Dillon,

24 and Coghlan all talking about what I was going to say, what I

25 wasn't going to say, and what they wanted me to say. And the

1    door was open.  They were poking their heads in and out.  I was

2    getting beat.  I was getting hit.  It was loud.  And there's no

3    way that they wouldn't hear."  We have, you know --

4            THE COURT:  And is your position that the entirety of

5    probable cause dependent on Mr. Rankins' and Mr. Vicente's

6    statements being true?

7            That would be the only way there would have been

8    probable cause.  And if the prosecutors knew that those

9    statements were not true, then the prosecutors knew there

10   wasn't probable cause and their role in -- whatever their role

11   was in facilitating those statements would mean that they

12   participated in the pretrial detention without probable cause.

13           Am I tracking what I would anticipate your argument

14   would be?

15           MR. AINSWORTH:  Exactly right.

16           THE COURT:  Okay.

17           MR. AINSWORTH:  So --

18           THE COURT:  So let me then ask you, if what we are

19   talking about is these couple of moments in time when either

20   Mr. Vicente is being questioned or Mr. Rankins is being

21   questioned, and what the evidence is one way or the other of

22   the state's attorneys' participation and knowledge, why is that

23   so burdensome to brief as opposed to having me do it on the fly

24   right now?

25           MR. AINSWORTH:  Because we have a lot of issues

1  raised by -- you know, we've got three sets of briefing, and so

2  the plaintiffs are going to be filing responses to all three.

3  And just at the outset, there's a good, you know, 45, 50 pages

4  of briefing presented, each side presenting 120 -- and so if

5  there are issues that we can resolve at this point, I think we

6  should try to resolve them and narrow the issues that the Court

7  really needs briefing on.  Because the other aspect of it is

8  this is an issue that I think can be resolved.  And I think

9  there are some issues that we're going to have to brief.  I'm

10 not going to be here saying, Judge, you know, just deny it all,

11 you know, and have us walk out the door.

12         THE COURT:  Do you -- can we turn to the officer

13 defendants?

14         MR. AINSWORTH:  Yes.

15         THE COURT:  And what your proposal is --

16         MR. AINSWORTH:  Yes.

17         THE COURT:  -- on that.

18         MR. AINSWORTH:  So I think we need to brief the *Brady*

19 claims.  I think that the *Brady* claims need to be briefed.

20         I think that one issue that I think we can resolve,

21 because I think the defendants just missed the boat on it, and

22 that's their argument 1(B) about Wilda Vargas' statements were

23 not fabricated and did not otherwise cause a deprivation of

24 plaintiffs' due process rights.

25         The defendants say that Wilda Vargas on her own

1 identified Montanez's vehicle, and that it was only after she
2 made the identification that she was told that the ballistics
3 from the car matched, and from the scene, matched the murder
4 scene.

5 And I just wanted to -- I have one clip that I think
6 demonstrates that they just got it wrong. And this is from
7 Wilda Vargas' deposition, starting at page 230.

8 So, as I understand it, Detective Guevara -- and I
9 guess I should just preview the testimony. Here, she says,
10 "That's not what happened. What happened was first they told
11 me we were looking for an inoperable, abandoned, dumped car,"
12 without any explanation for why they knew that the suspect car
13 was inoperable and dumped. And it just so happens that
14 Plaintiff Montanez's car didn't have a license plate, had
15 bullet holes in it, and had damage to it and looked like an
16 abandoned car.

17 Then she said, "They did the real estate agent trick.
18 They didn't take me right to Montanez's car. First, they took
19 me to a truck." And she's like, "The only" -- "The only thing
20 I could describe the car I'm looking at for was it was a tan,
21 full-size car. And they took me to little Toyotas. They took
22 me to a truck. They took me to cars of all sorts of colors.
23 And then they brought me to Montanez's car," and she's like,
24 "Ah, that's it."

25 And so it's a very different scenario that we're

1  talking about when we're saying that Guevara and Halverson

2  manipulated and coerced -- or manipulated this identification,

3  not only the lie about matching of the ballistics.

4          And so here, she says:  "Did he say why he was going

5  to show you any particular area of the city to show you cars?

6          "Because he knew that in those areas, there were

7  dumped vehicles.  There was always reports of vehicles being

8  burned and they would always call.

9          "And did he explain to you why he thought the vehicle

10  that you saw at the gas station would have been dumped?

11          "No, I don't know.

12          "So he just randomly took you to abandoned cars?

13          "Yes.

14          "He didn't explain to you why he was bringing you to

15  abandoned cars; right?

16          "That's correct.

17          "The description that you had provided to Detective

18  Guevara about the car was a color of the car; right?

19          "Yes."

20          And she says in here she didn't know the make, she

21  didn't know the year.  She remembers it was a four-door.

22          "You testified earlier that you looked at -- you saw

23  five cars before?

24          "Yes.

25          "And how did -- how were you certain that those were

1     not the cars that were involved?

2            "Because the other ones were different.  They were

3     smaller, they were Toyotas.  You know, they were smaller, they

4     were little ones.  There were older cars.  There were different

5     cars and there were -- some were little trucks.

6            "So he showed you some trucks?

7            "Yes, yes, little trucks.

8            "And they were different colors, maybe?

9            "They were all different colors.

10           "And he showed you some very small cars?

11           "Smaller.

12           "Okay.  And none of those fit the -- fit the

13    description; right?

14           "No.

15           "But then he took you to a street that had a large --

16    larger four-door car?

17           "Yes.

18           "Now, was the car abandoned?

19           "Yes.  It was abandoned there.  It was dumped there.

20           "How do you know it was dumped?

21           "Because they said that the car had been there for

22    days and it was just, you know, dumped there.  That's what he

23    said.

24           "So Detective Guevara told you that the car had been

25    there for days?

1          "I don't know how many, but it had been dumped there

2    for days, because they would make reports for police to pick up

3    those vehicles.

4          "I see.

5          "So just -- just so I understand, Detective Guevara

6    told you that?

7          "Yes.

8          "And what did he tell you about the car that you

9    identified?

10         "I told him, 'Hey, stop,' because that vehicle looks

11   like the one I saw.  And then he said, 'Are you sure?'  And

12   then I got out of the car with him.  And then he said to me,

13   'Are you sure that's the car?'  And then I said, 'That looks

14   like the car that I saw at the gas station.'  And I asked him

15   why the vehicle was dented and damaged."

16         And then Guevara tells her, well, the bullet holes

17   match the bullet holes from the scene of the crime, and the car

18   was damaged when it sped off.

19         THE COURT:  Would you agree with the proposition that

20   an unduly suggestive identification is not necessarily a false

21   identification?

22         MR. AINSWORTH:  No, not in these situations.  Or,

23   sorry.  Yes, I do agree with that.  I do not agree with it here

24   under these facts.

25         THE COURT:  And your view would be that -- what

1  you've just pointed out -- and maybe there's more -- is enough

2  for a jury to conclude that the detectives knew that this was

3  not the car that she saw?

4          MR. AINSWORTH:  Yes.

5          THE COURT:  As opposed to them honestly and genuinely

6  believing that this was the car she saw and they set up a

7  process whereby they obtained evidence that they believed to be

8  truthful?

9          MR. AINSWORTH:  So a few days before this, Guevara

10  and Halverson had just beaten Vicente into providing a

11  statement and falsely implicating Montanez and Serrano and know

12  that it's a lie.  And then they create a fake police report

13  pretending that it was only through Vicente that they learned

14  about a gas station incident, where the victim's widow, Ms.

15  Vargas, whose testimony we're looking at here, testified that,

16  "I told them about that back in February.  And they're

17  investigating me, and they're trying to find out where I was.

18  And I told them everything that was going on the night before

19  my husband was killed at 5:30 in the morning.  Of course, I

20  did."

21          And so they have now concocted a scheme where they're

22  implicating Serrano and Montanez with Vicente's testimony and

23  then they get the victim's widow and they try and corroborate

24  that by telling her false information, that they're looking for

25  an abandoned car.  They drive her around, and they show her

1   first a red truck and a small Toyota and then, lo and behold,

2   they drive to an abandoned tan car and they're like, "Um" --

3   and she says, "Oh, that looks like it, but what's that damage

4   on there?" And it matched.

5         THE COURT: I'm sorry to interrupt.

6         MR. AINSWORTH: Yes.

7         THE COURT: But let me just shift gears to ask about

8   what your approach would be on Defendant Mingey's

9   participation.

10        So, for example, in this --

11        MR. AINSWORTH: I agree.

12        THE COURT: -- identification, Mr. Mingey says, well,

13   you know, he's not involved in this.

14        So tell me about what your approach is there. You

15   know, are you pursuing those claims?

16        MR. AINSWORTH: We will --

17        THE COURT: That theory against him?

18        MR. AINSWORTH: We will not pursue those claims

19   against Mingey, Plaintiff Montanez.

20        MS. BONJEAN: That's correct.

21        MR. AINSWORTH: Okay. And he --

22        MS. BONJEAN: That doesn't extend to the Rankins

23   claims. But as to this conduct.

24        THE COURT: Right. Well, Mr. Mingey is saying he's

25   not involved in the Vicente --

1          MS. BONJEAN:  Right.

2          MR. AINSWORTH:  Or the Wilda Vargas.

3          THE COURT:  Or the Wilda Vargas fabrication.

4          MR. AINSWORTH:  And we would agree to that, Judge.

5     See, look, we've made some progress.

6          THE COURT:  You've already said that you'd like to

7     brief the *Brady* issues, so I am not going to pin you down on

8     those this morning.

9          And on the accrual issue of the Fourth Amendment

10    claim, I suppose I'm -- I'll shift back to what I said earlier.

11    I'm not so sure that it's all that burdensome to brief it,

12    unless there was something that you wanted to say about that

13    that --

14          MR. AINSWORTH:  I mean --

15          THE COURT:  -- you think could convince me not to

16    brief it.

17          MR. AINSWORTH:  I think we're right, and I think

18    they're wrong, but I think that there's enough -- it's open

19    enough, you know, that I think that the Court's going to want

20    to have briefing on it.

21          By open, I mean, there's just -- no one has said

22    definitively.

23          THE COURT:  And at the time of the motion to dismiss,

24    my recollection is I didn't have the Seventh Circuit opinion on

25    remand in *Manuel*.

1          MR. AINSWORTH:  That's correct.

2          THE COURT:  Okay.  Is --

3          MR. AINSWORTH:  Can we talk about the breaking the

4     causal chain?

5          THE COURT:  Yes, sure.

6          MR. AINSWORTH:  And I think that that's a -- kind of

7     a ridiculous argument.  One, we have a factual problem for the

8     defendant officers because the prosecutors are saying, you

9     know, "We didn't know."  And the prosecutor defendants are

10    saying, "We didn't know."  And so I don't know how they get --

11    at summary judgment, how they get around that roadblock.

12          But -- because -- so --

13          THE COURT:  Well, whether the prosecutor defendants

14    knew or not, they pursued the prosecution.  So why isn't that

15    enough to break the chain of causation for the defendant

16    officers' culpability?

17          MR. AINSWORTH:  Because case after -- you know,

18    fundamental Seventh Circuit law is that if the evidence is

19    manufactured or exculpatory evidence is suppressed, and the

20    prosecutor doesn't know about that and then files charges based

21    on believing that there's a legitimate police investigation,

22    then you cannot hang your hat on the indictment in order to

23    break the causal chain.

24          And so here in a twist, the police officer defendants

25    are saying:  Well, you know, Dillon and Coghlan were in on it,

1 as you say, so you can't get summary judgment because they knew

2 about all this stuff and, thus, there's a break in the chain.

3 And so, first, for summary judgment purposes, the

4 defendants -- the defendant prosecutors are denying the fact

5 that they knew about this, and so they can't avail themselves

6 of that argument. But even if they could -- even if, you know,

7 it was undisputed that Dillon and Coghlan knew about all this

8 bad stuff, the problem for the defendants is -- and in --

9 *Whitlock* makes this clear -- if you tell prosecutors with whom

10 you are conspiring to, you know, maliciously prosecute

11 somebody, that is not the kind of independent decision-making

12 by a prosecutor that would break the chain of causation.

13 That's explicitly not what's allowed.

14 So they have a *Whitlock* problem. And *Whitlock*

15 addresses that specifically, where police officers and

16 prosecutors are all involved in the same investigation and

17 prosecution.

18 And then also they have a problem because the -- they

19 haven't been able to show that the decision-makers, the

20 prosecutors who decided to indict, were the ones who knew about

21 this false evidence. And so it is not the rule that you could

22 just tell any old prosecutor that you committed misconduct,

23 especially if you know that that person ain't gonna out you,

24 you know, isn't going to out you because they're your

25 co-conspirator and, thus, get yourself out from under the yoke

1  of having a malicious prosecution claim against you.

2     So that's what I would say about breaking the causal

3  chain.

4     THE COURT:  Okay.  Let me think about it.  I think it

5  likely that I'll say I want to brief it all.  It's been helpful

6  to have this conversation because I think there might be a few

7  things where we can say we don't need to brief this particular

8  issue, or I'm satisfied that there's a dispute, and the defense

9  has preserved their argument and their record that there is no

10 dispute.

11    I am a little concerned about accepting the factual

12 dispute as articulated here without having then a record of

13 what is it exactly that the plaintiffs are admitting and

14 denying to give the defense a fair sense of what is at issue or

15 not at issue, and to have a complete record so that if it's

16 reviewed at some point, that people know what was before me,

17 what wasn't before me.

18    So that's causing me some pause about endorsing fully

19 the plaintiffs' approach to this.

20    You know, the other issue would be is if I thought

21 that even taking what plaintiff has pointed out today about

22 Mr. Vicente's statements and testimony about the prosecutors'

23 involvement, if I were to think that accepting that as true,

24 that would not be enough to persuade a jury that they were

25 culpably involved.  That is the kind of thing that we'd

1   probably want a full record on and full briefing on so that I

2   don't say, well, I would direct a verdict if that's what the

3   argument was going to be, and then -- so we don't need a trial.

4   And I ought to give you a fair -- a more fulsome opportunity to

5   persuade me otherwise.

6           So that's, in part, why I -- my initial view after

7   reading the briefs, particularly because I -- as I came out

8   here, I said some of these issues are not all that complicated

9   legally.  It might be factually intense, but the legal issues

10  are not all that thorny.

11          So the plaintiffs' concern about the passage of time

12  and how long it's going to take are understandable.  And the

13  volume of briefing will likely to be -- likely be fairly

14  significant, and it's going to take me some time to read the

15  entire depositions and all of that.  So I am sensitive to all

16  of that.

17          The last thing I wanted to talk about, though, was,

18  are there any other ideas that plaintiffs had to streamline

19  this case, like any particular claims or defendants that you

20  are now in a position to say, "We're not going to pursue those,

21  and we will" -- that will streamline some things?

22          MR. AINSWORTH:  If we're -- well, the one other claim

23  that we, on Plaintiff Montanez's side, had considered

24  jettisoning was the failure to intervene claim against

25  Defendant Mingey and just go forward on conspiracy.  It seems

1  like that's a -- we think we certainly have the evidence, but I

2  don't think it gets us much further.

3              THE COURT:  Would Mr. Serrano --

4              MS. BONJEAN:  Yes.

5              THE COURT:  -- join in that?

6              MS. BONJEAN:  Yes, we do.

7              THE COURT:  Okay.  In light of my comments, is there

8  anything the defense wants to say this morning?

9              MR. HIRST:  On behalf of Coghlan, Your Honor, unless

10 you have specific questions for us, we don't need additional

11 briefing.

12             MR. SOTOS:  On behalf of the -- Halvorsen and Mingey,

13 I think we're just looking for a little clarification on what

14 has been dismissed.

15             We appreciate with respect to the failure to

16 intervene claim.  There was some reference about the

17 fabrication claim.  But I'm just not sure --

18             THE COURT:  Well, nothing has been dismissed, but the

19 plaintiffs have said they are not pursuing a -- the due process

20 fabrication claim based on Vicente's statements or Ms. Wilda

21 Vargas' statements against Mr. Mingey.

22             MS. BONJEAN:  That's correct.

23             THE COURT:  And they are not pursuing a failure to

24 intervene claim against Mr. Mingey at all.  I think that was --

25             MR. AINSWORTH:  That's it.

1      THE COURT:  -- it.  But, again, that's the kind of
2  thing that can be formalized if I ask for a brief.  Then they
3  can put that in writing, and there will be no confusion about
4  it.  But at least for your planning purposes, you know that
5  much of their approach.
6      Anything else the officer defendants would like to
7  say at this point?
8      MR. SOTOS:  No, Your Honor.  Thank you.
9      MR. LEINENWEBER:  No, Judge.
10     THE COURT:  Okay.  I will give it some thought and
11  enter an order on both pending motions directing whether I want
12  briefs.  If so, when.
13     It may make sense, if I decide to brief things, for
14  me to simply ask the courtroom deputy to reach out to the
15  parties and have you talk amongst yourselves and come up with a
16  briefing schedule before I just impose one on you, which you
17  won't agree is workable anyway and then you'll make the phone
18  call.  And so I'll at least let you know if I want briefs and
19  then we'll set a schedule after I consult with everybody.
20     Okay.  Anything else?  Then we will be adjourned.  I
21  appreciate the time everyone has taken in making the
22  presentation.  It's certainly helpful to me.  But I need a
23  little more time to think about how I think it makes sense to
24  move us forward.
25     (Proceedings concluded.)

1                    C E R T I F I C A T E

2

3

4

5              I, Colleen M. Conway, do hereby certify that the

6    foregoing is a complete, true, and accurate transcript of the

7    proceedings had in the above-entitled case before the

8    HONORABLE MANISH S. SHAH, one of the Judges of said Court, at

9    Chicago, Illinois, on September 5, 2019.

10

11

12         /s/ Colleen M. Conway, CSR, RMR, CRR      09/27/19

13              Official Court Reporter              Date
               United States District Court
14             Northern District of Illinois
                    Eastern Division

15

16

17

18

19

20

21

22

23

24

25