## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

ARMANDO SERRANO,

        Plaintiff,

v.

REYNALDO GUEVARA, et al.,

        Defendants.

Case No. 1:17-cv-02869

Hon. Manish S. Shah

Magistrate Judge Susan E. Cox

---

JOSE MONTANEZ,

        Plaintiff,

v.

REYNALDO GUEVARA, et al.,

        Defendants.

Case No. 1:17-cv-04560

Hon. Manish S. Shah

Magistrate Judge Susan E. Cox

## PLAINTIFFS' RESPONSE TO COOK COUNTY DEFENDANTS' REDACTED LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiffs Armando Serrano ("Serrano") and Jose Montanez ("Montanez") submit the following response to Defendants former Assistant State's Attorney Matthew Coghlan ("Coghlan"), former Assistant State's Attorney John Dillon ("Dillon"), and Cook County's (collectively the "Cook County Defendants"), Statement of Material Facts:

## A. The Parties, Jurisdiction and Venue.

1. Plaintiffs Armando Serrano and Jose Montanez are residents of the State of Illinois and reside in Cook County. (Ex. 38, Serrano Tr. at 10:5-8; Ex. 39, Montanez Tr. at 11:9-14.)

RESPONSE: Undisputed.

2. Cook County is a governmental entity within the State of Illinois. (Montanez ECF No. 92, Cook County's and Dillon's Answer to Plf's Corrected 1st Am. Compl., ¶ 20; Serrano ECF No. 93, Cook County's and Dillon's Answer to Plf's 1st Am. Compl., ¶ 15.)

RESPONSE: Undisputed.

3. Coghlan and Dillon were employed by the Cook County State's Attorney's Office ("CCSAO") during the time period when the alleged events giving rise to plaintiffs' purported claims occurred. (Montanez ECF No. 92, Cook County's and Dillon's Answer to Plf's Corrected 1st Am. Compl., ¶ 19; Serrano ECF No. 93, Cook County's and Dillon's Answer to Plf's 1st Am. Compl., ¶ 18; Montanez ECF No. 94, Coghlan's Answer to Plf's Corrected 1st Am. Compl., ¶ 19; Serrano ECF No. 95, Coghlan's Answer to Plf's 1st Am. Compl., ¶ 18.)

RESPONSE: Undisputed.

4. Coghlan began his career with the CCSAO in 1987 and continued to serve as an Assistant State's Attorney ("ASA") until 2000; he was assigned to the Gang Crimes Unit as a trial prosecutor from 1992 to 1997. (Ex. 1, Coghlan Tr. at 36:7-21, 39:20-40:4, 40:16-18.)

RESPONSE: Undisputed.

5. Dillon began his career with the CCSAO in 1984 and continued to serve until he retired from the CCSAO in December 2014; at that time, he was the supervisor of the Homicide/Sex Crimes Unit and the Preliminary Hearing Unit. (Ex. 2, Dillon Tr. at 32:3-12, 34:16- 35:2.)

RESPONSE: Disputed only to the extent that Dillon "was the supervisor of the Homicide/Sex Crimes Unit and the Preliminary Hearing Unit" when he retired in December 2014. Dillon was

the supervisor of Branch 66 which is the homicide section and the preliminary hearing unit until his retirement in December 2014. (PSOAF Ex. 32, 11/13/18 Dillon Deposition at 34:20-35:2).

6. This Court has jurisdiction over plaintiffs' claims against the Cook County Defendants pursuant to 28 U.S.C. §§ 1331, 1367. (Montanez ECF No. 92, Cook County's and Dillon's Answer to Plf's Corrected 1st Am. Compl., ¶ 13; Serrano ECF No. 93, Cook County's and Dillon's Answer to Plf's 1st Am. Compl., ¶ 12; Montanez ECF No. 94, Coghlan's Answer to Plf's Corrected 1st Am. Compl., ¶ 13; Serrano ECF No. 95, Coghlan's Answer to Plf's 1st Am. Compl., ¶ 12.)

RESPONSE: Undisputed.

7. Venue is proper under 28 U.S.C. § 1391(b), because the alleged events giving rise to plaintiffs' purported claims against Defendants allegedly occurred in this judicial district. (Montanez ECF No. 92, Cook County's and Dillon's Answer to Plf's Corrected 1st Am. Compl.,¶ 14; Serrano ECF No. 93, Cook County's and Dillon's Answer to Plf's 1st Am. Compl., ¶ 12; Montanez ECF No. 94, Coghlan's Answer to Plf's Corrected 1st Am. Compl., ¶ 14; Serrano ECF No. 95, Coghlan's Answer to Plf's 1st Am. Compl., ¶ 12.)

RESPONSE: Undisputed.

**B. Structure of the Cook County State's Attorney's Office.**

8. Between 1992 and 1994, ASAs assigned to the Criminal and Special Prosecutions Bureaus of the CCSAO did not prosecute a case from its inception through sentencing and appeal. Instead, different ASAs did different work on the case at different stages of a prosecution. (Ex. 3, Declaration of John Dillon ("Dillon Decl.") ¶ 3.)

RESPONSE: Disputed to the extent that Plaintiffs do not know what Defendant Dillon means by "inception" as used in his Declaration. (CC Ex. 3)

9. In felony cases, ASAs in the Felony Review Unit of the CCSAO were the first link between law enforcement and Cook County's criminal justice system. Felony Review ASAs were responsible for, among other things, the review and evaluation of law enforcement personnel requests for search or arrest warrants and the review and evaluation of evidence gathered by law enforcement personnel to determine whether to approve the initial filing of criminal felony charges against a suspect. In some circumstances, that review included interviewing victims, witnesses, and/or suspects about the circumstances relating to the alleged crimes for which approval of charges were being sought. (Ex. 3, Dillon Decl. ¶ 4; Ex. 1, Coghlan Tr. at 41:16-42.8, 43:2-6, 45:24-46:3, 51:7-18.)

RESPONSE: Disputed to the extent that Defendants contend that in *all* felony cases, ASAs in the Felony Review Unit of the CCSAO have the first contact with law enforcement and Cook County's criminal justice system. Defendant Dillon testified that felony review assistants in some cases sought assistance and/or direction from assistants assigned to the gang crimes unit simultaneous with their felony review process and before formal charging. (PSOAF Ex. 32, 11/13/18 Dillon Deposition at 79:19-80:16). By way of example, the first Cook County State's Attorney assistants to have contact with law enforcement investigating the Vargas murder were not felony review assistants but rather ASA Dillon and Coghlan. (CC Ex. 13 at SERRANO_LASSAR 9063.) Plaintiffs do not dispute Defendants' general description of felony review assistants' responsibilities.

10. If felony charges were placed against a suspect in connection with a homicide or sex-related offense, the case was sent to a different ASA, or set of ASAs, in the Preliminary Hearing Unit to handle the bond hearing and preliminary hearings and/or Grand Jury proceedings. (Ex. 3, Dillon Decl. ¶ 5; Ex. 2, Dillon Tr. at 125:12-126:5.)

RESPONSE: Disputed to the extent that Defendants contend that homicide cases always originated with felony review assistants and were then sent to a different set of ASAs in the Preliminary Hearing Unit to handle the bond hearing and preliminary hearings and/or Grand Jury proceedings. ASAs from the gang crimes unit would take turns being on call for a week at a time and would go down to Branch 66, the homicide section, and would take over gang-related cases. (PSOAF Ex. 32, 11/13/18 Dillon Deposition at 84:16-85:9)

11. Homicides and sex-related offenses were sent to Branch 66 of the Cook County criminal courts for bond hearings and preliminary hearing/Grand Jury proceedings. (Ex. 3, Dillon Decl. ¶

5; Ex. 2, Dillon Tr. at 125:12-126:5.)

RESPONSE: Undisputed.

12. After a bond hearing, either a judge (by way of a preliminary hearing) or a Grand Jury

(by way of proceedings seeking an indictment) determined whether there was probable cause to

warrant the defendant being tried in a felony trial courtroom. (Ex. 3, Dillon Decl. ¶ 6.)

RESPONSE: Undisputed.

13. Upon transfer to a felony trial courtroom, the case was then picked up by a third different

ASA, or set of ASAs, to handle the pretrial and trial phases of the prosecution. (Ex. 3, Dillon

Decl. ¶ 7.)

RESPONSE: Disputed to the extent the Defendants suggest that after formal charging in a homicide or sex-related offense a different ASA or set of ASA always take over the case. Defendant Dillon testified that gang crimes ASA "were to go down to Branch 66, the homicide section, and see if any new murders had come in that were gang-related. If they were and our case load was such that we could take, then we would take it." PSOAF Ex. 32, 11/13/18 Dillon Deposition at 84:16-85:6.

14. One of those trial units was the Gang Crimes Unit of the CCSAO, which, from 1992-

1994 consisted of approximately twenty (20) ASAs who tried gang-related felonies. (Ex. 2, Dillon

Tr. at 78:22-79:5.)

RESPONSE: Disputed to the extent that Defendants suggest that gang crimes ASAs were always assigned cases *after* the case was transferred to a felony-trial courtroom post-charging or post-indictment. As set out above, Defendants Dillon and Coghlan both testified that they would often pick up cases from Branch 66 before formal charging. PSOAF Ex. 32, 11/13/18 Dillon Deposition at 84:16-87:6; PSOAF Ex. 33, 11/15/18 Coghlan Deposition at 67:24-68:20. Both Defendant Dillon and Coghlan testified that another way they would get cases by taking over for a lawyer who had been transferred out of the unit. PSOAF Ex. 32, 11/13/18 Dillon Deposition at 84:16-24; PSOAF Ex. 33, 11/15/18 Coghlan Deposition at 67:24-68:12.

15. During the period of 1992-1994, the Gang Crimes Unit handled hundreds of gang-

related cases at any given time, more often than not, cases involving first degree murders. (Ex. 2,

Dillon Tr. at 78:22-79:5, 86:1-4.)

RESPONSE: Undisputed.

16. Dillon, for example, was in the Gang Crimes Unit from 1992 until April 1994, and during that time period, he regularly handled approximately 20-25 cases at a time, assigned to various criminal courtrooms throughout the Cook County Criminal Courts building. (Ex. 2, Dillon Tr. at 34:9-12, 85:19-24.)

RESPONSE: Undisputed.

17. Cases were picked up by ASAs in the Gang Crimes Unit after the charges had been initially approved by the Felony Review Unit and had come in to the Preliminary Hearing Unit. (Ex. 2, Dillon Tr. at 79:6-11.)

RESPONSE: Undisputed to the extent that ASAs sometimes picked up cases after they came into Branch 66 but disputed to the extent that Defendants suggests that ASAs from the gang crime unit never had any contact with a case prior to approval by the Felony Review Unit. Defendant Dillon admitted that sometimes felony review ASAs contacted ASAs from the gang crime unit for assistance and/or direction in gang-crimes cases before approval of charges. PSOAF Ex. 32, 11/13/18 Dillon Deposition at 79:19-80:16. And in this case, Defendants Dillon and Coghlan worked on the case before charges had been approved. PSOAF ¶¶ 14, 20-23, 56.

18. The Gang Crime Unit prosecutors would be scheduled on call for a week at a time to monitor cases coming in to Branch 66 to see if there were any gang-related homicides that had been charged, and if there were, the on-call Gang Crimes Unit ASA would take the case if his/her workload permitted it. This was the primary way in which ASAs of the Gang Crimes Unit would pick up cases. The second way was through a typical assignment sometimes via a senior ASA. (Ex. 2, Dillon Tr. at 84:16-85:18.)

RESPONSE: Undisputed that in *most* cases this was the manner in which ASAs were assigned to cases. But deny that ASAs were assigned to cases in this manner in all cases. *See* Response to Statement No. 17.

### C. The Vargas Murder, the Arrest of Francisco Vicente, and the Events Leading Up to the June 2, 1993 Meeting with Vicente.

19. Rodrigo Vargas was shot and killed outside his home in the early morning hours of February 5, 1993. (Ex. 4 at RFC-Serr/Mont 000157.) The Chicago Police Department investigated

the case for a number of months, but as of May 1993, no arrests had been made. (Ex. 4 at RFC-Serr/Mont 000152-174.)

RESPONSE: Undisputed.

20. Francisco Vicente was arrested on May 14, 1993, and at that time, was facing three armed robbery charges and one simple robbery charge—all unrelated to the Vargas shooting. (Ex. 5, Vicente Tr. at 15:22-16:16.) At the time of his arrest, Vicente was a member of the Imperial Gangsters street gang in Chicago. (Ex. 5, Vicente Tr. at 87:21-88:3, 162:18-162:20.)

RESPONSE: Undisputed.

21. On May 15, 1993, Vicente provided a handwritten statement to Felony Review ASA Kevin Hughes relating to a different murder—the May 1993 murder of Salvador Ruvalcaba—stating that he (Vicente) had been told by Robert Bouto that Bouto had killed Ruvalcaba. (Ex. 6 at CCSAO 0004896-900.)

RESPONSE: Disputed. On May 15, 1993, Vicente repeated a false statement to ASA Kevin Hughes that was coerced and fed to him by detectives Guevara and Halvorsen, falsely claiming that Robert Bouto confessed to killing Salvador Ruvalcaba. Vicente then signed a handwritten statement prepared by ASA Kevin Hughes based on Vicente's false story fed to him by detectives Guevara and Halvorsen. PSOAF Ex. 18, 11/19/18, Vicente Deposition at 12:10-13:3; 46:13-51:22; 73:7-15.

22. On May 19, 1993, while questioned by ASA Mary Roberts, Vicente testified before a Grand Jury consistent with his statement to ASA Hughes, specifically testifying that Robert Bouto admitted to Vicente that he had killed Salvador Ruvalcaba. (Ex. 7, CCSAO 0060396-418).

RESPONSE: Disputed. On May 19, 1993, Vicente testified before the grand jury consistent with his false statement to ASA Hughes that was coerced and fed to him by Defendants Guevara and Halvorsen. PSOAF Ex. 18, 11/19/18, Vicente Deposition at 12:10-13:3; 46:13-51:22; 73:7-15.

23. The first time Dillon ever heard of Vicente was in late May 1993, when Dillon reviewed a felony review folder at Branch 66 relating to the Ruvalcaba murder as an on-call Gang Crimes Unit ASA. (Ex. 2, Dillon Tr. at 125:3-127:8.) At that time, Dillon agreed to handle the prosecution of

Bouto, who, by this time, had already been charged for the murder of Ruvalcaba. (Ex. 2, Dillon Tr.

at 125:7-126:20, 128:15-130:13.)

RESPONSE:  Undisputed that the first time Dillon heard Vicente's name was in May 1993 when Dillon reviewed a felony review folder relating to the Ruvalcaba murder at Branch 66 after felony-review had approved murder charges for Robert Bouto. Disputed as to the date on which Dillon first reviewed the felony-review folder and to the extent the Defendants allege that Dillon first heard Vicente's name after Bouto was indicted for the murder. Defendants' record citation does not support these latter facts.

24.  Dillon did not ever meet or speak with Vicente until after he had already provided a

handwritten statement and testimony before the Grand Jury implicating Bouto in the Ruvalcaba

murder. (Ex. 2, Dillon Tr. at 272:16-20.)

RESPONSE:  Undisputed that Dillon did not speak with Vicente until after Vicente had signed a statement related to the Ruvalcaba murder; however, the Defendants' record citation does not support the claim that Dillon did not speak to Vicente prior to Vicente providing grand jury testimony.

25.  On May 31, 1993, Bouto's criminal defense attorney visited Vicente in the Cook County

jail and Bouto's attorney gave Vicente seventeen (17) dollars and offered to represent Vicente in his

pending criminal matters if Vicente would recant his previous testimony given against Bouto. (Ex. 2,

Dillon Tr. at 150:14-151:1; Ex. 8 at SERRANO_LASSAR 24554-562.)

RESPONSE:  Disputed. Vicente denies that Bouto's attorney ever attempted to bribe him or that he received any money from Mr. Bouto's attorney. PSOAF Ex. 18, 11/19/18 Vicente Dep. at 196:19-197:19. Rather, Vicente testified that after Bouto's attorney attempted to visit him, Defendants Guevara and Halvorsen devised a plot to falsely claim that Mr. Bouto's attorney had attempted to bribe him and that he was directed by Defendants Guevara, Halvorsen, Coghlan and Dillon not to speak to any defense attorneys on any of the cases for which he was providing testimony. *Id.* at 52:17-57:1; 196:7-197:15. In response to questions regarding whether Defendant Guevara invented a story about Mr. Bouto's attorney attempting to bribe Vicente, Defendant Guevara asserted his Fifth Amendment right to remain silent. PSOAF Ex. 11, 4/10/18, Guevara Deposition at 52:13-22.

26.  Upon learning from Vicente that Bouto's attorney had attempted to bribe Vicente,

Chicago Police Detective Ernest Halvorsen contacted Dillon to inform him of the incident. (Ex. 9,

Halverson Tr. at 151:12-153:11; Ex. 2, Dillon Tr. at 136:14-138:3.)

RESPONSE: Disputed. Vicente testified that he contacted Detective Guevara after Bouto's attorney came to see him. PSOAF Ex. 18, 11/19/18, Vicente Dep., at 55:2-12; 196:19-197:11. However, Vicente denies that he met with Mr. Bouto's attorney or that Mr. Bouto's attorney attempted to bribe Vicente. *Id.* at 52:17-57:1; 196:7-197:19. In response to questions regarding whether Defendant Guevara invented a story about Mr. Bouto's attorney attempting to bribe Vicente, Defendant Guevara asserted his Fifth Amendment right to remain silent. PSOAF Ex. 11, 4/10/18 Guevara Dep., at 52:13-22.

### D. The June 2, 1993 Meeting with Vicente.

27. Dillon arranged to have Vicente transported to the CCSAO on June 2, 1993 to meet with

Dillon and Halvorsen and document the allegation that Bouto's lawyer had attempted to bribe

Vicente into recanting his testimony against Bouto. (Ex. 2, Dillon Tr. at 131:3-11, 136:14-138:3,

150:14-151:1.)

RESPONSE: Undisputed that Defendant Dillon arranged to have Vicente transported to the gang crimes unit of the CCSAO on June 2, 1993. Disputed to the extent that Defendants suggest that Defendants Guevara and Coghlan were not present at the meeting, and dispute that the purpose of the meeting was to discuss a supposed bribe from Bouto's lawyer.

In two separate supplemental reports prepared by detectives Guevara and Halvorsen, it indicates that both Guevara and Halvorsen were present in the "gang crimes unit" of the CCSAO on June 2, 1993 when Vicente was interviewed. In a supplemental report dated June 2, 1993, it indicates that the "R/Dets." (plural) identified as Guevara and Halvorsen "had a meeting with a circumstantial witness" later identified as Vicente. PSOAF Ex. 1, Investigative File at 96-99. In a second supplemental report prepared in connection with the Ruvalcaba murder investigation and dated June 8, 1993, it indicates that the "R/Dets" (plural) "arranged to have Francisco Vicente brought from the Cook County Jail, to the State's Attorneys Gang Prosecution Unit." Cook County Ex. 13. According to the June 2, 1993 supplemental report, Vicente provided a statement implicating Plaintiffs in the Vargas murder for the first time on that date while in the "gang crimes unit" of the CCSAO. PSOAF Ex. 1, Investigative File at 96-99. Vicente testified that he was fed the statement by Guevara and Halvorsen and that Guevara showed him photos of Rodrigo Vargas's body and physically coerced him while in the CCSAO gang crimes unit on June 2, 1993. PSOAF Ex. 18, 11/19/18 Vicente Dep., at 61:17-64:18; 213:24-214:8; 202:6-23; 203:13-208:18. Guevara exercised his Fifth Amendment right to remain silent in response to questions about whether he was present during the June 2, 1993 meeting along with Halvorsen. PSOAF Ex. 11, 4/10/18, Guevara Deposition at 52:23-73:6; PSOAF Ex. 43, Vicente Affidavit dated 5/26/2004, at ¶¶ 5-7; PSOAF Ex. 18, 11/19/18 Vicente Dep. at 49:3-49:13, 50:7-50:15, 51:11-51:22, 62:19-63:12, 75:3-75:5, 93:10-93:14; 94:2-94:8; PSOAF Ex. 17, Vicente Affidavit dated 10/18/18. *See* PSOAF ¶¶ 32-35.

Vicente further testified that ASA Coghlan was present at the June 2, 1993 meeting in the "gang crimes unit" of the CCSAO. At Plaintiffs' criminal trial, Vicente testified to Coghlan's presence at the meeting on June 2, 1993 in the CCSAO. PSOAF Ex. 34, Vicente Trial Testimony dated 10/18/94 at 26:17-27:3. At his deposition Vicente further testified that Defendant Coghlan was

present. PSOAF Ex. 18, 11/19/18, Vicente Deposition at 64:19-65:2, 67:13-18; 74:17-77:20; 140:7-147:8. Vicente testified that Dillon and Coghlan were outside the conference room while Guevara and Halvorsen were coercing him to make a statement implicating Plaintiffs, and that he could hear the four of them "whispering, and talking, and trying to figure out different scenarios" and talking "about what [Vicente] was saying, what [he] wasn't going to say, and what they wanted [him] to say" about the Vargas homicide. PSOAF Ex. 18, 11/19/18 Vicente Dep. at 67:13-67:18, 213:3-214:17; PSOAF Ex. 11, 4/10/18 Guevara Dep. at 71:9-72:9. While discussing different scenarios that Vicente could use to implicate Plaintiffs in the Vargas homicide, Guevara and Halvorsen would leave the conference room for the open area right outside the door of the conference room, talk, and come back to try to coerce Vicente some more. PSOAF Ex. 18, 11/19/18 Vicente Dep., at 143:16-145:18, 208:10-209:2. When specifically asked by defense counsel who was present at the June 2, 1993 meeting at the CCSAO, Vicente replied "Halvorsen, Dillon, Coghlan, and Guevara." *Id.* at 213:24-214:8. Additionally, the City's own investigation found evidence back in 2013 that Dillon was present during Vargas homicide discussions with Vicente. PSOAF Ex. 48, 10/21/13 Halvorsen Interview Memo, at 6; PSOAF Ex. 47, Meeting Notes dated 8/27/13.

Dillon admits that he was in the open area outside the conference room when Vicente agreed to implicate Plaintiffs because he recalled at his deposition that "Detective Halvorsen came out and said, 'He just gave us another murder.'" PSOAF Ex. 32, 11/13/18 Dillon Dep. at 193:9-193:23. Even Defendant Halvorsen admitted that he believed during the conversations with Vicente on June 2, 1993, Vicente was not satisfied with the deal he was getting the CCSAO and may have told ASA Dillon directly, "what if I give you another murder case." PSOAF Ex. 47, Meeting Notes dated 8/27/13; PSOAF Ex. 48, 10/21/13 Halvorsen Interview Memo; PSOAF Ex. 18, 11/19/18 Vicente Dep. at 67:13-67:18; Dkt. 117, Halvorsen's Answer to Corrected 1AC at 3-4 ¶9; PSOAF Ex. 32, 11/13/18 Dillon Dep., at 193:9-193:23. See also Pls.' Resp. to CCSOF No. 33; PSOAF ¶¶ 5, 27-47.

28. Dillon met Vicente for the first time on June 2, 1993 in the Gang Crimes Unit at the

CCSAO. (Ex. 2, Dillon Tr. at 130:15-131:2.)

RESPONSE: Undisputed.

29. During the June 2, 1993 meeting with Vicente, which took place in a conference room

of the Gang Crimes Unit at the CCSAO, Dillon, Halvorsen, and Vicente discussed Bouto's

confession to Vicente regarding the Ruvalcaba murder, as well as the fact that Bouto's attorney

had attempted to bribe Vicente. (Ex. 2, Dillon Tr. at 138:4-139:8, 139:20-140:8, 141:9-142:21,

150:14-151:1.)

RESPONSE: Undisputed that Vicente met with Dillon and Halvorsen in a conference room of the gang crimes unit on June 2, 1993. Disputed to the extent that Defendants suggest that Defendants Guevara and Coghlan were not present for the June 2, 1993 "gang crimes unit" meeting. *See* Pls.' Resp. to CCSOF No. 27, above. Further disputed to the extent that the purposes of the meeting was to discuss Bouto's confession to Vicente and document allegations that Bouto's attorney had attempted to bribe Vicente. Vicente testified that the purpose of the meeting was to coerce a false

and fabricated statement from him implicating Plaintiffs in the murders of Rodrigo Vargas. (PSOAF Ex. 18, 11/19/18, Vicente Deposition at 61:17-64:18; 213:24-214:8; 202:6-23; 203:13-208:18.)

30. Dillon took his own handwritten notes of the June 2, 1993 conversation with Vicente.

(Ex. 2, Dillon Tr. at 182:7-21; Ex. 8 at SERRANO_LASSAR 24554-555.)

RESPONSE: Undisputed that the handwritten notes reflected at SERRANO_LASSAR 24554-24554 were prepared by Defendant Dillon. However, Defendants' record citation does not establish those notes reflect the entirety of the conversation with Vicente or that the notes are a truthful account of the interview. Furthermore, the citations provided do not establish the date on which those notes were prepared. The notes are undated and Defendant Dillon testified that he "believed" they were prepared during his June 2, 1993 meeting with Vicente in the gang crimes unit of the CCSAO. *See* Pls.' Resp. to CCSOF No. 27, above.

31. During the course of the June 2, 1993 meeting with Vicente, Dillon would occasionally

need to leave the conference room to attend to other matters before returning to speak with

Vicente about Bouto's confession to Vicente or Bouto's lawyer's attempt to bribe Vicente. (Ex. 2,

Dillon Tr. at 198:24-199:24.)

RESPONSE: Disputed to the extent that Defendants contend that Defendants Guevara and Coghlan were not present during any portion of the June 2, 1993 meeting and disputed to the extent that Defendants suggest that the Vargas murder was not a subject of conversation involving Dillon and Coghlan on June 2. *See* PSOAF ¶¶ 15-25; Pls.' Resp. to CCSOF No. 27. Undisputed that Defendant Dillon would periodically leave and return to the room where Vicente was being interrogated.

32. When Dillon left the conference room to attend to other matters, he left Halvorsen in the

room with Vicente. (Ex. 2, Dillon Tr. 193:9-194:6; Ex. 9, Halvorsen Tr. at 159:14-160:15.)

RESPONSE: Undisputed that ASA Dillon left the conference room periodically and returned during the June 2, 1993 meeting but disputed to the extent that the statement suggests Defendants Guevara and Coghlan were not present during the meeting. Both Dillon and Coghlan came in and out of the conference room while Guevara and Halvorsen discussed different possible scenarios for implicating Plaintiffs in the Vargas homicide on June 2, 1993. PSOAF Ex. 18, 11/19/18 Vicente Dep. at 67:13-68:22, 143:16-145:18; PSOAF Ex. 32, 11/13/18 Dillon Dep. at 298:7-299:13. Also disputed that to the extent that Defendants suggest that Defendants Dillon and Coghlan did not remain outside the conference room and were not actively participating in the interrogation via Halvorsen and Guevara. PSOAF ¶¶ 15-35. By coming in and out of the interrogation room and conferring with the detectives, Defendants Dillon and Coghlan were able to witness how Vicente's statements implicating Plaintiffs evolved. PSOAF Ex. 18, 11/19/18 Vicente Dep. at 67:13-67:18, 68:11-68:22, 70:14-71:10, 143:16-145:18; PSOAF Ex. 11, 4/10/18 Guevara Dep. at 71:9-72:9; PSOAF Ex. 19, 4/20/18 Halvorsen Dep. at 95:5-95:17. *See* Pls.' Resp. to CCSOF No. 27.

33. During the time he was not in the conference room where Vicente and Halvorsen were meeting, Dillon was unable to hear any conversation in the conference room, as his office was 15 to 20 yards away. (Ex. 2, Dillon Tr. at 298:14-21.)

RESPONSE: Disputed. Outside of the Gang Crimes Unit conference room in which Vicente was placed on June 2, 1993 was a small open area surrounded by offices. PSOAF Ex. 32, 11/13/18 Dillon Dep. at 83:2-84:15, 196:23-197:9; PSOAF Ex. 18, 11/19/18 Vicente Dep. at 140:13-141:7, 143:23-144:9, 203:13-204:9. Many of the offices outside the conference room, as well as the conference room itself, had glass along the side of the door so one could see inside. PSOAF Ex. 32, 11/13/18 Dillon Dep. at 83:23-84:11, 140:6-140:11. The door to the conference room was sometimes ajar when different possible scenarios for Vicente to implicate Plaintiffs were discussed, such that Dillon and Coghlan could hear the interactions between Vicente and Defendants Guevara and Halvorsen when they were not in the conference room. PSOAF Ex. 18, 11/19/18 Vicente Dep. at 67:13-70:13, 143:16-145:18, 203:13-204:9; PSOAF Ex. 11, 4/10/18 Guevara Dep. at 71:9-72:9. Vicente knew that Defendants Dillon and Coghlan could hear what was happening inside the conference room, because he could hear Dillon and Coghlan outside the conference room whispering and discussing different scenarios of the fabricated statement with Guevara and Halvorsen while Vicente was inside the conference room and Dillon and Coghlan were outside. PSOAF Ex. 18, 11/19/18, Vicente Deposition at 212:9-214:8; Pls.' Resp. to CCSOF No. 27. Moreover, when Vicente was in the Gang Crimes Unit conference room on June 2, 1993 meeting with Guevara and Halvorsen, Defendant Guevara raised his voice loudly at times and forcefully hit Vicente. PSOAF Ex. 18, 11/19/18 Vicente Dep. at 30:2-30:18, 64:2-64:18, 68:23-69:24, 204:22-206:1, 207:16-209:2. Defendants Dillon and Coghlan could hear Guevara yelling at and striking Vicente. PSOAF Ex. 18, 11/19/18 Vicente Dep. at 67:13-68:22, 143:16-145:18, 213:3-214:17.

34. While Dillon was in his office, he could not see who may have entered the conference room in his absence. (Ex. 2, Dillon Tr. at 299:14-17.)

RESPONSE: Undisputed, but dispute that Dillon was in his office while Vicente was interrogated. See Pls.' Resp. to CCSOF No. 27, above.

35. During the June 2, 1993 meeting with Vicente, there was no discussion of the Vargas murder in the presence of Dillon. (Ex. 2, Dillon Tr. at 183:21-184:13, 217:12-16; Ex. 9, Halvorsen Tr. at 159:14-160:15.)

RESPONSE: Disputed. *See* PSOAF ¶¶ 15-25; Pls.' Resp. to CCSOF Nos. 27 & 33.

36. According to Detective Halvorsen, while he was alone in the room with Vicente, he (Halvorsen) asked Vicente if he knew anyone who went by the nickname "Pistol Pete" and explained that he was investigating a "Pistol Pete" for potential involvement in the Vargas murder.

According to Halvorsen, Vicente responded, "that's Big Pistol Pete" and proceeded to giving

Halvorsen a lengthy statement about his knowledge of the Vargas murder, implicating both

plaintiffs and a third man, Jorge Pacheco, in the murder. (Ex. 9, Halvorsen Tr. at 160:21-161:16;

Ex. 10 at RFC-Serr/Mont 000097-098.) At the time, Serrano, Montanez, and Vicente were all

members of the same Imperial Gangsters street gang. (Ex. 5, Vicente Tr. at 87:21-88:3.)

RESPONSE:  Disputed. Vicente testified that his entire statement was concocted by Defendants
Guevara, Halvorsen, Coghlan and Dillon and that the Defendants first attempted to have him falsely
claim to be an eyewitness to the crime, and that when he refused to make himself a witness to the
crime, Defendant Guevara and Halvorsen attempted to get him to falsely claim that he was there
and was given the gun, and that eventually they settled in having Vicente falsely claim that Plaintiffs
confessed their involvement to him. PSOAF ¶¶ 15-25; PSOAF Ex. 18, 11/19/18, Vicente
Deposition at 142:4-147:8; 212:9-214:8; Pls.' Resp. to CCSOF No. 27. Undisputed that on June 2,
1993 Plaintiffs and Vicente were members of the Imperial Gangster street gang, but disputed that
they were members of the same faction of the Imperial Gangster street gang. PSOAF Ex. 7, Serrano
Dep., at 20-22; PSOAF Ex. 8, Montanez Dep., at 203.

37.  At some point in time after Halverson spoke to Vicente about his knowledge of the

Vargas murder, Halverson left the room and, while in the general open area of the CCSAO, told

Dillon "he just gave us another murder." No details about the murder were discussed at that time

between Dillon and Halverson. (Ex. 2, Dillon Tr. at 193:9-20, 196:6-197:9).

RESPONSE:  Disputed. Defendant Dillon was actively involved with the questioning of Vicente
that involved feeding him a false story and coercing him to adopt it. PSOAF ¶¶ 15-25; PSOAF Ex.
18, 11/19/18, Vicente Deposition, at 142:4-147:8; 212:9-214:8; Pls.' Resp. to CCSOF  No. 27.
Notably, Halvorsen even told attorneys for Sidley & Austin that Vicente may have told ASA Dillon
directly "what if I give you another murder?" at the June 2, 1993 meeting. PSOAF Ex. 32, 11/13/18
Dillon Dep. at 193:9-193:23.

### E.  Coghlan Had No Role In The June 2, 1993 Meeting.

38.  Halvorsen, who was present for all the meetings between law enforcement authorities

and Vicente on June 2, 1993, testified that Coghlan was not present at the June 2 meeting with

Vicente and that he (Halvorsen) did not have any conversations or meetings with Coghlan about

the Vargas case until after plaintiffs were indicted weeks later. (Ex. 9, Halvorsen Tr. at 160:2-7,

186:13-20, 365:24-367:14.)

<u>RESPONSE:</u>  Undisputed that Halvorsen testified to that at his second deposition, but disputed that Coghlan was not present. PSOAF ¶¶ 15-25. Vicente testified at his deposition *and* at Plaintiffs' criminal trial that Coghlan was present for the June 2, 1993 meeting in the "gang crimes unit" of the CCSAO. At Plaintiffs' criminal trial, Vicente testified to Coghlan's presence at the meeting on June 2, 1993 in the CCSAO. PSOAF Ex. 34, Vicente Trial Testimony dated 10/18/94 at 26:17-24. At his deposition Vicente further testified that Defendant Coghlan was present. PSOAF Ex. 18, 11/19/18, Vicente Deposition at 67:13-18; 74:17-77:20; 140:7-147:8. Vicente testified that Dillon and Coghlan were outside the conference room while Guevara and Halvorsen were coercing him to make a statement implicating Plaintiffs, and that he could hear the four of them "talking and trying to figure out different scenarios" that Vicente would falsely testify to. *Id.* at 212:9-214:8. When specifically asked by defense counsel who was present at the June 2, 1993 meeting at the CCSAO, Vicente replied "Halvorsen, Dillon, Coghlan, and Guevara." *Id.* at 213:24-214:8. Additionally, the City's own investigation found evidence back in 2013 that Coghlan was present during Vargas homicide discussions with Vicente. PSOAF Ex. 47, Meeting Notes dated 8/27/13. Defendant Halvorsen admitted that he believed during the conversations with Vicente on June 2, 1993, Vicente was not satisfied with the deal he was getting from the CCSAO and may have told ASA Dillon directly, "what if I give you another murder case." PSOAF Ex. 47, Meeting Notes dated 8/27/13; PSOAF Ex. 48, 10/21/13 Halvorsen Interview Memo; PSOAF Ex. 18, 11/19/18 Vicente Dep. at 67:13-67:18; Dkt. 117, Halvorsen's Answer to Corrected 1AC at 3-4 ¶9; PSOAF Ex. 32, 11/13/18 Dillon Dep. at 193:9-193:23; Pls.' Resp. to  CCSOF No. 27.

39. Dillon testified that Coghlan was not present at the meeting with Vicente or conversation he later had with Halvorsen in the open area of the CCSAO on June 2, 1993, and Dillon had no reason to believe that Coghlan had any contact relating either to Vicente or the Vargas case until after Serrano and Montanez had been charged. (Ex. 2, Dillon Tr. at 138:13-16, 140:6-16, 196:20-198:5, 299:22-302:12.)

<u>RESPONSE:</u>  Disputed. Dillon testified that he could not say whether Defendant Coghlan was in the gang crimes unit on June 2, 1993 when Vicente was there. PSOAF Ex. 32, 11/13/18 Dillon Deposition, at 197:21-128:5. Furthermore, Vicente testified that Defendant Coghlan was present for the June 2, 1993 meeting. PSOAF ¶¶ 16-25; Pls.' Resp. to CCSOF No. 38.

40. Coghlan testified he was not at the June 2, 1993 meeting with Vicente and was neither involved in, nor even aware of, the Vargas murder case or Francisco Vicente until more than six weeks later—in late July 1993, after Serrano had already been indicted and the Felony Review Unit had approved the filing of murder charges against Montanez. (Ex. 11 at 15-16; Ex. 12 at 11-12; Ex. 1, Coghlan Tr. at 20:20-23:20, 111:10-19, 153:15-154:17; Ex. 27 at CCSAO-Serr-Mont_00015797 (charges against Montanez approved on July 9, 1993).)

<u>RESPONSE:</u>  Disputed. Vicente testified at his deposition *and* at Plaintiffs' criminal trial that Coghlan was present for the June 2, 1993 meeting in the "gang crimes unit" of the CCSAO. PSOAF ¶¶ 16-25; Pls.' Resp. to CCSOF Nos. 27 & 38.

41.  The police report memorializing the portion of the June 2, 1993 meeting during which

the Bouto case was discussed states that Vicente was interviewed by "Det. E. HALVORSEN and

A.S.A. John DILLON." The report makes no reference to Coghlan. (Ex. 13 at

SERRANO_LASSAR 9063.)

<u>RESPONSE:</u>  Disputed that the police report dated June 2, 1993 accurately reflects all the parties present at June 2, 1993 meeting at the CCSAO. PSOAF ¶¶ 16-25; Pls.' Resp. to CCSOF Nos. 27 & 38.

42.  The police report memorializing the portion of the June 2, 1993 meeting during which

the Vargas murder was discussed states that the "R/Dets.," listed as Detectives Halvorsen and

Guevara, had a meeting with a "circumstantial witness" on June 2, 1993, who was later identified as

Vicente. The report makes no reference to Coghlan. (Ex. 10 at RFC-Serr/Mont 000096-097.)

<u>RESPONSE:</u>  Undisputed that both Defendants Guevara and Halvorsen were present for the June 2, 1993 meeting. But disputed that June 2, 1993 accurately reflects *all* the parties present at the June 2, 1993 meeting at the CCSAO. PSOAF ¶¶ 16-25; Pls.' Resp. to CCSOF Nos. 27 & 38.

43.  No ASAs were in the room when detectives discussed the Vargas murder with Vicente

at the CCSAO on June 2, 1993. (Ex. 5, Vicente Tr. at 203:13-19.)

<u>RESPONSE:</u>  Disputed. The cite on which Defendants rely does not show that Vicente testified that no ASAs were in the room when the detectives discussed the Vargas murder with Vicente. The cite referenced merely indicates that Vicente testified that when the issues of the Vargas murder "came up," Halvorsen and Guevara were in the room. Furthermore, Vicente testified that ASAs Dillon and Coghlan were directly outside the conference; the door was ajar; and that Dillon and Coghlan were talking with Guevara and Halvorsen about how to change the fabricated statement so that Vicente would agree to it. PSOAF ¶¶ 16-25; Pls.' Resp. to CCSOF Nos. 27 & 38.

44.  When asked directly whether Vicente saw Coghlan on June 2, 1993, Vicente testified,

"I'm not sure because I was dealing with so many people, and with all the chaos, I can't." (Ex. 5,

Vicente Tr. at 250:1-11.)

<u>RESPONSE:</u> Disputed. The portion of the testimony cited does not reference the June 2, 1993 meeting, and Vicente testified that he was brought up to the "gang crimes unit" of the CCSAO

between 30 and 40 times after the June 2, 1993 meeting where he routinely met with Defendants Halvorsen, Guevara, Dillon and Coghlan. PSOAF Ex. 18, 11/19/18 Vicente Dep. at 66:12-66:17, 215:5-215:18. Furthermore, Vicente testified that he could hear Coghlan, Dillon, Halvorsen and Guevara "trying to figure out different scenarios" by which Vicente would implicate Plaintiffs in the Vargas homicide and talking "about what [Vicente] was saying, what [he] wasn't going to say, and what they wanted [him] to say." PSOAF ¶¶ 16-25; Pls.' Resp. to CCSOF Nos. 27 & 38; PSOAF Ex. 18, 11/19/18 Vicente Dep. at 67:13-67:18, 213:3-214:17; PSOAF Ex. 11, 4/10/18 Guevara Dep. at 71:9-72:9.

45. When asked directly whether Coghlan was ever in the interview room on June 2, 1993 when Vicente was talking to the detectives about the Vargas murder, Vicente responded, "He could have been" but "I just don't remember." (Ex. 5, Vicente Tr. at 250:23-251:9.)

RESPONSE: Disputed. The portion of the testimony cited does not reference the June 2, 1993 meeting. Furthermore, dispute that Coghlan was not in the room and/or right outside the room during the interrogation of Vicente on June 2, 1993. PSOAF ¶¶ 16-25; Pls.' Resp. to CCSOF Nos. 27 & 38.

46. When asked directly whether he heard Coghlan's voice on June 2, 1993, Vicente responded, "I can't tell you if it was him or not." (Ex. 5, Vicente Tr. at 250:12-22.)

RESPONSE: Disputed. The portion of the testimony cited does not reference the June 2, 1993 meeting.  Furthermore, dispute that Vicente did not hear Coghlan's voice on June 2, 1993. PSOAF ¶¶ 16-25; Pls.' Resp. to CCSOF Nos. 27 & 38.

**F. Dillon's June 9, 1993 Meeting With Vicente.**

47. On June 9, 1993, Dillon requested that Vicente be brought to the Gang Crimes Unit a second time to discuss the allegation that an associate of Bouto's criminal defense lawyer had gone to the jail and had given Vicente a new pair of gym shoes with the attorney's card tucked inside the shoes. (Ex. 2, Dillon Tr. at 185:24-186:11, 188:22-189:5.)

RESPONSE: Undisputed that ASA Dillon arranged to have Vicente brought to the "gang crimes unit" of the CCSAO on June 9, 1993 prior to Plaintiff Serrano's June 11, 1993 arrest for the murder of Rodrigo Vargas. Disputed that the purpose of the interview was to discuss the allegations that Bouto's attorney had arranged to have Vicente given a pair of shoes with his business card tucked into them. Vicente testified that he never received any shoes. PSOAF Ex. 18, 11/19/18, Vicente Deposition at 197:12-19. Rather, Vicente testified that after Bouto's attorney attempted to visit him, Defendants Guevara and Halvorsen devised a plot to falsely claim that Mr. Bouto's attorney had attempted to bribe him and that he was directed by Defendants Guevara, Halvorsen, Coghlan and Dillon not to speak to any defense attorneys on any of the cases for which he was providing

testimony. *Id.* at 52:17-57:1; 196:7-197:15. In response to questions regarding whether Defendant Guevara invented a story about Mr. Bouto's attorney attempting to bribe Vicente, Defendant Guevara asserted his Fifth Amendment right to remain silent. PSOAF Ex. 11, 4/10/18, Guevara Deposition at 52:13-52:22.

48. Dillon wanted this incident documented for discovery purposes as he believed it could become an issue at trial and potentially disqualify Bouto's attorney. (Ex. 2, Dillon Tr. at 202:8-19.)

RESPONSE: Disputed. Vicente testified that the story regarding Mr. Bouto's attorney's attempt to "bribe" him was fabricated by Defendant Guevara for the purposes of preventing any of Plaintiffs' attorneys from attempting to interview him. *See* Response to Statement No. 47.

49. During the June 9, 1993 meeting with Vicente, there were no discussions about the Vargas murder in the presence of Dillon. (Ex. 2, Dillon Tr. at 201:20-24, 217:9-16.)

RESPONSE: Disputed. The cites provided by Defendants does not support the contention, and Vicente testified that he numerous conversations with Defendants Dillon and Coghlan about the Vargas murder. *See* PSOAF ¶ 27.

50. As a result of the actions of Bouto's lawyer and his associate, Bouto's lawyer eventually withdrew as counsel of record for Bouto. (Ex. 2, Dillon Tr. at 189:6-13.)

RESPONSE: Disputed. Neither the record nor Dillon's testimony demonstrates when or why Bouto's attorney withdrew.

51. The June 2, 1993 and June 9, 1993 meeting with Vicente were the only times Dillon spoke with Vicente before he testified about the Vargas murder to the Grand Jury on July 1, 1993 (Ex. 2, Dillon Tr. at 213:6-12.)

RESPONSE: Disputed. *See* PSOAF ¶ 27.

52. Dillon did not learn about Vicente's claims that plaintiffs confessed to him about the Vargas murder until late June or early July of 1993, when a Felony Review ASA, Solita Pandit, took Vicente's handwritten statement regarding the Vargas murder; Dillon was not present when Vicente gave this handwritten statement about the Vargas murder on June 28, 1993. (Ex. 2, Dillon Tr. at 213:13-214:1.)

RESPONSE: Disputed. Vicente testified that ASA Dillon was directly involved in crafting the fabricated statement implicating Plaintiffs in the Vargas murder on June 2, 1993. PSOAF ¶¶ 16-25; Pls.' Resp. to CCSOF Nos. 27 & 38. Moreover, Chicago Police Department Identification Section logs show that Dillon requested Vicente's criminal history just one day after the June 2, 1993 meeting. PSOAF ¶ 34 (citing PSOAF Ex. 54, Vicente Criminal History Requested by Dillon). Further disputed that Dillon's testimony establishes that he was not present when Vicente signed a statement on June 28, 1993. Dillon testified that he did not recall whether he was present in the gang crimes unit when Vicente signed the statement. PSOAF Ex. 32, 11/13/18 Dillon Deposition at 214:2-10.

53. Although Dillon became aware while litigating the Bouto case that Vicente alleged to have been a witness to confessions in Vargas and another murder case (apart from the Bouto case), Dillon was unaware of the specific facts of those cases or Vicente's specific allegations in these other cases, as Dillon was not involved in prosecuting those cases. (Ex. 2, Dillon Tr. at 207:9-23.)

RESPONSE: Disputed. Vicente testified that ASA Dillon was directly involved in crafting the fabricated statement implicating Plaintiffs in the Vargas murder on June 2, 1993. PSOAF ¶¶ 16-25; Pls.' Resp. to CCSOF Nos. 27 & 38.

54. Apart from Bouto's confession, Dillon never discussed with Vicente any confessions Vicente alleged he was privy to, including those of plaintiffs. (Ex. 2, Dillon Tr. at 215:11-216:22.)

RESPONSE: Disputed. Vicente testified that ASA Dillon was directly involved in crafting the fabricated statement implicating Plaintiffs in the Vargas murder on June 2, 1993. PSOAF ¶¶ 16-25; Pls.' Resp. to CCSOF Nos. 27 & 38.

55. The evidence against Bouto consisted of eyewitness identifications of Bouto as the offender as well as circumstantial identification witnesses who identified him by the clothing he was wearing. Dillon never called Vicente as a witness in the trial of Bouto because he believed that Vicente's testimony would distract from the eyewitnesses who had identified Bouto as the killer of Ruvalcaba. (Ex. 2, Dillon Tr. at 245:16-246:19.)

RESPONSE: Undisputed that Vicente was not called as a witness at Bouto's criminal trial. Although Dillon claimed Vicente accused Bouto of confessing, Vicente has recanted and alleged that he was coerced into falsely implicating Bouto as the offender. PSOAF ¶ 3. Like Plaintiffs here, Mr. Bouto has been declared innocent. *See* PSOAF Nos. 11, 1.

## G. Timothy Rankins Separately Implicates Plaintiffs.

56. On June 11, 1993, another witness—Timothy Rankins—separately implicated plaintiffs

and Jorge Pacheco in the Vargas murder. (Ex. 14 at Plaintiff 000320-323.)

RESPONSE: Disputed. On June 11, 1993, Timothy Rankins was arrested in connection with a
robbery case and was coerced by Defendants Guevara, Halvorsen, and Mingey to implicate
Plaintiffs in the Vargas murder. *See* PSOAF ¶¶ 41-44.

57. Plaintiff Serrano was arrested on June 11, 1993 and brought to the Area Five police

station. (Ex. 14 at Plaintiff 000323.)

RESPONSE: Undisputed that Plaintiff was arrested a second time on June 11, 1993.

58. Detectives Halvorsen and Guevara then contacted the CCSAO Felony Review Unit to

review and approve felony charges against plaintiff Serrano. Felony Review ASA Jon King was

assigned to conduct the review and went to the Area Five police station late in the evening on June

11, 1993. (Ex. 14 at Plaintiff 000323.)

RESPONSE: Undisputed that a supplemental police report dated June 14, 1993 reflects that a
felony review assistant ASA King was assigned to review charges against Plaintiff Serrano at Area
Five.

59. When ASA King arrived at the Area Five police station, he met with Rankins, who signed

a handwritten statement alleging that he was present when Serrano, with the assistance of

Montanez and Jorge Pacheco, shot and killed Vargas. (Ex. 14 at Plaintiff 000323; Ex. 15 at Plaintiff

000723-727.) Rankins also identified plaintiff Serrano in a line-up as the person Rankins saw shoot

and kill Vargas. (Ex. 14 at Plaintiff 000322.)

RESPONSE:      Undisputed that a supplemental police report dated June 14, 1993 reflects that
ASA King interviewed Rankins. Disputed to the extent that Defendants suggest that the
statement signed by Rankins contained information provided to Defendants by Rankins. Rather
the statements that were fabricated by Guevara, Halvorsen, and Mingey and fed to Rankins who
repeated them to ASA King. PSOAF ¶¶ 41-46, 50-58. Dispute that Rankins viewed a lineup
containing Mr. Serrano. Defendants fabricated documentation indicating that Rankins identified
Armando Serrano in a lineup, when in fact he had never viewed such a lineup or made such an
identification. PSOAF Ex. 1, Investigative File at 71 (Supp. Report dated 6/14/93); *Id.* at 78
(Supp. Report dated 6/11/93); PSOAF Ex. 63, Rankins 6/11/93 Statement at 5; PSOAF Ex. 53,

3/13/19 Rankins Dep. at 63:20-64:10; PSOAF Ex. 19, 4/20/18 Halvorsen Dep. at 169:6-169:14.

60. On June 11, 1993, Wilda Vargas, Vargas's widow, identified Serrano in a separate line-up as one of the persons seated in a vehicle that was parked in front of her husband's vehicle and followed them home from a gas station the day before Vargas was murdered. (Ex. 16 at RFC- Serr/Mont 000193-194.)

RESPONSE: Disputed that the people Wilda Vargas saw at the gas station followed the Vargas family home. PSOAF ¶ 65; Pls.' Resp. to Def. Officers' SOF, at ¶ 17. Also disputed that Wilda identified Mr. Serrano from a fair lineup. *See* PSOAF ¶ 69; Pls.' Resp. to Def. Officers' SOF, at ¶ 18.

61. ASA King also reviewed the police reports, including the report referencing information obtained from Vicente on June 2, 1993, and attempted to interview Serrano. (Ex. 14 at Plaintiff 000323.)

RESPONSE: Disputed. ASA King successfully interviewed Plaintiff Serrano but terminated the interview when Plaintiff Serrano told him, "I was innocent and I would prove it if it took my whole life in prison." PSOAF Ex. 3, 2/28/19 Serrano Dep., at 334:7-335:23.

62. After finishing his review of the evidence late in the evening of June 11 or in the early morning hours of June 12, ASA King approved murder charges against Serrano in connection with Vargas's shooting death. (Ex. 17, King Tr. at 152:12-153:18.)

RESPONSE: Undisputed that ASA King approved felony charges for murder against Plaintiff Serrano on June 12, 1993.

63. ASA King did not have any contact with Coghlan concerning the Vargas murder prior to approving charges against Serrano, and to ASA King's knowledge, Coghlan did not have any connection to the Vargas case before charges against Serrano had been approved. (Ex. 17, King Tr. at 153:20-154:5.)

RESPONSE: Undisputed that ASA King had no recollection of having contact with ASA Coghlan prior to approving charges against Plaintiff Serrano.

64. Rankins testified that he did not meet Coghlan until June 14, by which time Serrano had been arrested and ASA King had approved murder charges against him. (Ex. 18, Rankins Tr. at

223:22 224:7; Ex. 14 at Plaintiff 000323; Ex. 17, King Tr. at 134:7-13, 153:14-18.).[1]

RESPONSE:  Disputed. Rankins testified that he had a conversation with Coghlan shortly after arriving at Cook County Jail but could not recall the date. PSOAF Ex. 53, 3/13/19 Rankins Deposition at 73:3-11. Rankins did testify that he met with Coghlan prior to testifying before the grand jury on June 15, 1993. *Id.* at 74:15-75:6; PSOAF ¶ 50.

65.  On June 15, 1993, Rankins testified under oath before a Grand Jury in response to questioning from Preliminary Hearing ASA Dan Galivan, stating that he (Rankins) was present when Serrano, with the assistance of Montanez and Jorge Pacheco, shot and killed Rodrigo Vargas. (Ex. 20 at SERRANO 8103)

RESPONSE:  Undisputed that Rankins *falsely* testified before the grand jury implicating Plaintiffs in the Vargas murder. See PSOAF ¶¶ 50, 52, 55-56.

66.  The transcript of Rankins' testimony before the Grand Jury on June 15, 1993 indicates that only ASA Galivan was present for Rankins' Grand Jury testimony that day. (Ex. 20 at SERRANO 8103, 8115-117.)

RESPONSE: Disputed. The transcripts reflect that ASA Galivan was the only ASA who questioned Rankins. The transcript does not reflect who was present in the grand jury room or outside the grand jury room. Cook County Ex. 20 at SERRANO8103.

### H. Vicente Gives A Handwritten Statement and Grand Jury Testimony Implicating Plaintiffs In The Vargas Murder.

67.  On June 28, 1993, Felony Review ASA Solita Pandit interviewed Vicente at the CCSAO, and during that interview, Vicente signed a handwritten statement alleging that he had been told by plaintiffs that plaintiffs had killed Vargas. (Ex. 21 at RFC-Serr/Mont 000060-065.)

RESPONSE:      Undisputed that Vicente signed a handwritten statement implicating Plaintiffs on June 28, 1993. Defendants' record citation does not support the contention that ASA Pandit

---

[1] Coghlan disputes Rankins testimony, and testified that he did not meet Rankins until September 1993. (Ex. 1, Coghlan Tr. at 161:14-163:7, Ex. 19 at CCSAO-Serr-Mont_00015783.) Regardless, there is no dispute that Coghlan and Rankins did not meet until after Rankins had given his statement to police and prosecutors implicating plaintiffs in the Vargas murder, and after Serrano had been arrested and charged.

"interviewed" Vicente.

68. Neither Coghlan nor Dillion were present during ASA Pandit's interview of Vicente on June 28, 1993. (Ex. 21 at RFC-Serr/Mont 000060.)

RESPONSE: Disputed. Defendants' record citation does not demonstrate that Dillon and Coghlan were not present when Vicente signed the handwritten statement at the "gang crimes unit" on June 28, 1993.

69. On July 1, 1993, Vicente was questioned by Preliminary Hearing ASA Galivan in front of a Grand Jury, where Vicente testified under oath that plaintiffs admitted to Vicente that they had murdered Vargas. (Ex. 5, Vicente Tr. at 261:21-262:8; Ex. 22 at Plaintiff 004406-420)

RESPONSE: Undisputed that Vicente testified before the grand jury on July 1, 1993 to testimony that was false and fed to him by Defendants Guevara, Halvorsen, Coghlan, and Dillon. Pls.' Resp. to CCSOF No. 27.

70. Vicente met with a prosecutor before giving his Grand Jury testimony on July 1, 1993, but the prosecutor was not Dillon or Coghlan. (Ex. 5, Vicente Tr. at 263:8-22.)

RESPONSE: Undisputed that Vicente testified that on July 1, 1993 he spoke to a State's Attorney prior to giving his testimony to the grand jury and that he did not believe it was either Dillon or Coghlan.

71. Dillon was not present nor was he involved in any way in the taking of any written statement regarding the Vargas homicide, or any other homicide Francisco Vicente claimed to have knowledge of. Furthermore, Dillon was not present or involved in any way in the bond hearing or Grand Jury proceedings regarding plaintiffs' cases and the Vargas murder. (Ex. 3, Dillon Decl. ¶ 8.)

RESPONSE: Disputed. As set forth in PSOAF ¶¶ 16-25 and Pls.' Resp. to CCSOF No. 27, Dillon played a significant role in the written statement provided by Vicente in the Vargas murder case.

**I. Plaintiff Serrano Is Indicted and Plaintiff Montanez and Jorge Pachecho are Arrested for the Vargas Murder.**

72. On June 28, 1993, ASA Pandit approved law enforcement personnel's request to seek arrest warrants for Jorge Pacheco and Jose Montanez in connection with the shooting death of Vargas. (Ex. 23 at RFC-Serr/Mont 000187.) A Cook County Criminal Court Judge issued arrest warrants for Pacheco and Montanez on July 2, 1993. (Ex. 24 at RFC-Serr/Mont 000048-52.)

RESPONSE: Undisputed.

73. On July 1, 1993, Serrano was indicted for the offenses of first degree murder and attempted armed robbery of Rodrigo Vargas, as well as the offense of unlawful use of a weapon by a felon. (Ex. 25 at CCSAO-Serr-Mont_00015570.)

RESPONSE: Undisputed.

74. A week later, on July 8, 1993, plaintiff Montanez was arrested. (Ex. 26 at RFC- Serr/Mont 000046.) The next day, Felony Review ASA Lynn Weaver conducted the felony review for Montanez and approved the filing of murder charges against Montanez. (Ex. 27 at CCSAO- Serr-Mont_00015797; Ex. 28 at RFC-Serr/Mont 000192.)

RESPONSE: Undisputed that Montanez was arrested on July 8, 1993, and that ASA Weaver approved murder charges against Montanez.

75. Jorge Pacheco was arrested on July 12, 1993. (Ex. 29 at CCSAO 0006303.) Felony Review ASA Kevin Hughes was assigned to conduct the felony review. (Ex. 30 at RFC-Serr/Mont 000196.) The Felony Review Unit approved murder charges against Pacheco on July 13, 1993. (Ex. 31 at CCSAO-Serr-Mont_00015806; *see also* Ex. 30 at RFC-Serr/Mont 000196.)

RESPONSE: Undisputed that Pacheco was arrested on July 12, 1993 and that felony review approved murder charges on July 13, 1993.

76. On July 29, 1993, Montanez, Serrano and Pacheco were indicted for the offenses of first degree murder and attempted armed robbery committed against Rodrigo Vargas. (Ex. 32 at

CCSAO-Serr-Mont_00015554-556.) Serrano's original indictment was superseded by this later

indictment. (*Id.* at CCSAO-Serr-Mont_00015554.)

RESPONSE: Undisputed.

### J. Coghlan Becomes Involved In The Vargas Case As Trial Counsel.

77. In late July 1993, Coghlan was looking to increase his caseload. After being told about

a case in which a witness recently came forward, Coghlan agreed to take the case, which turned

out to be the Vargas case. Coghlan then went to Branch 66 and located the prosecution file. (Ex. 1,

Coghlan Tr. at 20:20-23, 21:4-8, 22:15-20, 155:6-156:3)

RESPONSE: Disputed. Coghlan first became involved in the Vargas murder investigation no later
than June 2, 1993. *See* PSOAF ¶¶ 16-25; Pls.' Resp. to CCSOF Nos. 27 & 38.

78. This occurred somewhere between July 22 and 26, 1993, and was the first time Coghlan

became aware of any criminal case involving plaintiffs. (Ex. 1, Coghlan Tr. at 23:10-20, 153:15-

155:5.)

RESPONSE: Disputed. Coghlan first became involved in the Vargas murder investigation no
later than June 2, 1993. PSOAF ¶¶ 16-25; Pls.' Resp. to CCSOF Nos. 27 & 38.

79. Coghlan's name does not appear on any contemporaneously prepared police or CCSAO

records relating to the Vargas murder or plaintiffs until late July 1993. (Ex. 1, Coghlan Tr. at

153:15-154:17; also *compare* Ex. 10 at RFC-Serr/Mont 000097 (6/2/1993 Supp. Report); Ex. 13 at

SERRANO_LASSAR 9063 (6/8/1993 Supp. Report); Ex. 33 at RFC-Serr/Mont 000175- 176

(6/11/1993 Rankins Line-Up Report); Ex. 16 at RFC-Serr/Mont 000193-194 (6/11/1993 Wilda

Vargas Line-Up Report); Ex. 14 at Plaintiff 000319-323 (6/14/1993 Supp. Report); Ex. 34 at

RFC-Serr/Mont 000183-184 (6/14/1993 Supp. Report); Ex. 23 at RFC-Serr/Mont 000185-187

(7/3/1993 Supp. Report); Ex. 28 at RFC-Serr/Mont 000191-192; Ex. 30 at RFC-Serr/Mont

000195-197 (7/13/1993 Supp. Report); Ex. 35 at CCSAO-Serr-Mont_00015792-795, 811-817

(Serrano Felony Review Folder); Ex. 27 at CCSAO-Serr-Mont_00015796-804 (Montanez Felony

Review Folder); Ex. 31 at CCSAO-Serr-Mont_00015805-810 (Pacheco Felony Review Folder);

Ex. 15 at Plaintiff 000723-727 (6/11/1993 Rankins Statement); Ex. 21 at RFC-Serr/Mont 000060-065 (6/28/1993 Vicente Statement); Ex. 22 at Plaintiff 004406-025 (Vicente Grand Jury

Transcript); and Ex. 20 at SERRANO 8103-112 (Rankins Grand Jury Transcript) *with* Ex. 36 at

CCSAO-Serr-Mont_00007341 (Rankins Blueback on 7/26/1993 notes that Rankins "is a witness

in murder #93 CR 15871. See ASA Coghlan, gangs"); Ex. 25 at CCSAO-Serr-Mont_00015567

(Coghlan's handwriting appears on Serrano Blueback for the first time on 7/29/1993).)

RESPONSE: Undisputed that Coghlan's name does not appear on Guevara and Halvorsen's supplemental reports.

80. In the months that followed, Coghlan prepared the criminal case against plaintiffs for

trial and ultimately tried it in an October 1994 bench trial in which plaintiffs were convicted

committing the Vargas murder. (Ex. 1, Coghlan Tr. at 127:14-16, 160:18-161:9, 173:5-14, 209:21-211:24).

RESPONSE: Undisputed that Coghlan tried the case against Plaintiffs.

**K.** Vicente's Guilty Plea, Sentencing and Credits For Time Served.

81. Vicente pleaded guilty to three armed robberies and one simple robbery and was

sentenced for those crimes on September 23, 1996. (Ex. 37 at SERRANO_LASSAR 1783-786, 791.)

RESPONSE: Undisputed.

82. The time spent in custody for which Vicente was given credit was provided to Dillon by

Vicente's public defender. (Ex. 2, Dillon Tr. at 261:11-262:13.)

RESPONSE: Disputed. Vicente's Sentencing Order that reflects his pre-trial custody time was prepared by ASA Dillon. Vicente testified that ASA Dillon gave him a "sweet deal" on his three armed robbery and one simply robbery cases consisting of six years on all three armed robbery cases and 3 years on the simple robbery case. PSOAF ¶ 33-36; PSOAF Ex. 18, 11/19/18 Vicente Dep., at 81:15-82:7. Vicente further testified that he thought the sentences would "run wild" (consecutive) but Dillon "did the calculation sheet, ran them together, and I ended up getting out a lot earlier than I was supposed to actually." PSOAF Ex. 18, 11/19/18 Vicente Dep., at 82:2-13. Vicente explained that it was Dillon who calculated the pre-trial custody because he was in the custody of the Cook County State's Attorney's Office not Cook County Jail on paper, and thus Dillon had to be the one

to do the calculation. *Id.* at 82:18-83-12. Judge Gregory Vasquez (Plaintiff Serrano's trial attorney) testified at his deposition that when a witness was in the "Q" (State's Attorney Witness Quarters) a prosecutor might calculate a defendants pre-trial custody because that information would be only available to the Cook County State's Attorney. PSOAF Ex. 56, Vasquez Dep., at 172:18-173:2; PSOAF ¶¶ 33, 35-38.

83. In Dillon's 30-year plus time as a prosecutor, Dillon never calculated the time as the

credit for time served was always calculated by the defense. (Ex. 2, Dillon Tr. at 264:4-18.)

RESPONSE: Disputed. Pls.' Resp. to CCSOF No. 82, above.

84. At Vicente's sentencing hearing, Vicente's public defender orally represented to the

court the amount of time Vicente was to be credited with. (Ex. 2, Dillon Tr. at 262:4-9; Ex. 37 at

SERRANO_LASSAR 1793.)

RESPONSE: Undisputed.

RESPECTFULLY SUBMITTED,

**JOSE MONTANEZ**

BY:   /s/ Ruth Brown _____
      *One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Russell Ainsworth
Ruth Brown
Rachel Brady
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900

**ARMANDO SERRANO**

BY:   /s/ Ashley Cohen _____
      *One of Plaintiff's Attorneys*

Jennifer Bonjean
Ashley Cohen
Bonjean Law Group, PLLC
467 St. Johns Place
Brooklyn, New York 11238
718-875-1850

## **CERTIFICATE OF SERVICE**

I, Ashley Cohen, an attorney, hereby certify that on January 8, 2020, I filed the foregoing PLAINTIFF'S RESPONSE TO COOK COUNTY DEFENDANTS' STATEMENT OF MATERIAL FACTS UNDER LR 56.1(b)(3)(B) using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Ashley Cohen
*One of Plaintiff's Attorneys*