IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| Jose Montanez, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | No. 17 CV 4560 |
| v. | ) | |
| | ) | Honorable Manish S. Shah |
| Reynaldo Guevara, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| Armando Serrano, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | No. 17 CV 2869 |
| v. | ) | |
| | ) | Honorable Manish S. Shah |
| Reynaldo Guevara, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' STATEMENT OF ADDITIONAL
## MATERIAL FACTS UNDER LR 56.1(b)(3)(C)

Plaintiffs Jose Montanez and Armando Serrano, by their attorneys, Loevy & Loevy and

Bonjean Law Group, hereby submit their Statement of Additional Material Facts under LR

56.1(b)(3)(C):

**Plaintiffs Are Innocent**

1.      Jose Montanez and Armando Serrano had no involvement in the murder of Rodrigo Vargas, a fact corroborated by the City of Chicago's own investigation. Ex. 2, 2/26/19 Montanez Dep. at 397:20-397:22; Ex. 3, 2/28/19 Serrano Dep. at 110:20-110:24, 170:14-170:17, 335:2- 335:6; Ex. 4, Order granting Montanez Certificate of Innocence dated 11/2/16; Ex. 5, Order granting Serrano Certificate of Innocence dated 11/2/16; Ex. 6, Lassar Report on Montanez/Serrano at 58.

2.      According to Defendants Guevara and Halvorsen, Vicente revealed that two additional people had also confessed murder to him, in two separate conversations involving two completely different murders: Robert Bouto supposedly confessed to him on May 14, 1993 to having murdered Salvadore Ruvalcaba, and Geraldo Iglesias supposedly confessed to him on July 16, 1993, to having murdered Monica Roman, and Vicente provided details about both murders. Ex. 12, Bouto Supp. Report dated 5/14/93 at 8-9; Ex. 13, Vicente Statement dated 5/15/93; Ex. 9, 2/6/19 Halvorsen Dep. at 132:9-132:23, 134:6-134:9; Ex. 14, Vicente Statement dated 7/16/93; Ex. 15, Vicente Testimony in *People v. Iglesias* dated 12/16/94 at V17:7-V22:12; Ex. 1, Investigative File at 68-72 (Supp. Report dated 6/14/93); Ex. 16, Iglesias Supp. Report dated 6/24/93; Ex. 12, Bouto Supp. Report dated 5/14/93; Ex. 9, 2/6/19 Halvorsen Dep. at 124:14-125:5, 230:8-230:13.

3.      Vicente has revealed that all inculpatory statements against Mr. Montanez, Mr. Serrano, Mr. Pacheco, Mr. Bouto, and Mr. Iglesias were false; they were manufactured and coerced by Defendants Guevara and Halvorsen through physical abuse and threats. Ex. 17, Vicente Affidavit dated 10/18/18; Ex. 18, 11/19/18 Vicente Dep. at 12:10-12:23, 26:15-26:22, 27:9-27:18,  47:6-47:12, 49:3-49:13, 50:7-50:15, 51:11-51:22 , 73:16-74:1, 72:2-72:12, 75:3-75:5, 88:14-90:5, 93:10-93:14, 102:5-103:4; Ex. 43, Vicente Affidavit, dated 5/26/04; Ex. 44, Vicente Affidavit Notes at 1-2; Ex. 11, Guevara Dep. at 15:10-15:19, 21:9-21:21, 22:8-23:6.

4.      Defendant Guevara has invoked his Fifth Amendment right against self-incrimination about his activities in the Vargas, Ruvalcaba, and Roman homicide investigations, including whether he conspired together with the other individual defendants to frame Plaintiffs, asserting his right to remain silent on grounds that truthful responses would subject him to criminal liability. Ex. 11, 4/10/18 Guevara Dep.; *see, e.g.*, *id.* at 87:22-88:4, 126:22-127:4, 127:12-128:3, 215-283, 289-362.

5.      In their first depositions in this case, Defendants Halvorsen and Mingey invoked their Fifth Amendment rights against self-incrimination, refusing to answer questions about their activities in the Vargas, Ruvalcaba, and Roman homicide investigations, including whether they conspired together with the other individual defendants to frame Plaintiffs. Ex. 19, 4/20/18 Halvorsen Dep.; *e.g.*, *id.* at 12:17-13:2, 13:11-14:24, 17:17-23, 22:11-22:21, 34:6-34:14, 290:4-290:8; Ex. 20, 4/26/18 Mingey Dep.; *e.g.*, *id.* at 10:8-10:14, 11:4-11:12, 12:17-12:24, 16:9-17:11, 26:9-26:14, 39:5-44:6. There was no change regarding any actual or potential criminal matter that prompted Defendants to change their minds and agree to give substantive testimony. Ex. 9, 2/6/19 Halvorsen Dep. at 111:4-112:2.

**The Vargas Homicide Is Unsolved Through May 1993**

6.      Rodrigo Vargas, a husband and father, was not a member of a gang, a user of narcotics, or someone with enemies. Ex. 1, Investigative File at 121-123, 125-126 (Supp. Report dated 2/6/93); Ex. 21, 12/12/18 Vargas Dep. at 33:6-33:12; Ex. 22, 10/30/18 Schak Dep. at 115:13-11:21; Ex. 23, Wilda Vargas Trial Testimony dated 10/19/94 at 33:21-34:4.

7.      After some initial investigative activity in the two days following the Vargas homicide (February 5 and 6, 1993), there was no documented activity regarding the Vargas homicide investigation from February 7, 1993 through June 1, 1993, with the following exceptions: the receipt of the victim's toxicology laboratory report (2/16/93); the conduct of a polygraph examination for

3

the victim's neighbor Ana Velez (3/11/1993); the receipt of a report on Ana Velez's polygraph results (3/17/93); and a ballistics laboratory report (dated 4/6/93). Ex. 1, Investigative file (e.g., *id.* at 115-126, 96-99); Ex. 24, Velez Polygraph Report; Ex. 25, Ballistics Report dated 4/6/93; Ex. 26, Toxicology Report dated 2/16/93; Ex. 6, Lassar report on Montanez/Serrano, at 4-6; Ex. 9, 2/6/19 Halvorsen Dep. at 255:16-256:11.

**Defendants Meet their Star Witness,
Heroin Addict and Felon Francisco Vicente**

8.      At the time of his May 14, 1993 arrest, Vicente was facing felony charges on four separate robberies: one simple robbery and three separate armed robberies. His potential exposure on the charges was 97 years of imprisonment, with a minimum 9-year prison sentence. Ex. 32, 11/13/18 Dillon Dep. at 221:7-223:5, 257:22-258:9;  Ex. 33, 11/15/18 Coghlan Dep. at 214:15-214:23; Ex. 34, Vicente Trial Testimony, dated 10/18/94 at 4:2-4:15; Ex. 35, Vicente Arrest Report; Ex. 36, Vicente criminal history report

9.      At the time Vicente was placed in the Area 5 lockup on May 14, 1993, he was experiencing heroin withdrawal. Ex. 18, 11/19/18 Vicente Dep. at 18:16-19:4; Ex. 11, 4/10/18 Guevara Dep. at 15:20-16:5.

**Defendants Use Vicente to Frame Robert Bouto**

10.      Salvador Ruvalcaba was fatally shot near Roosevelt High School in Chicago at approximately 3:05pm on May 14, 1993, shortly after school let out at 2:45pm. Ex. 12, Bouto Supp. Report dated 5/14/93 at 2; Ex. 9, 2/6/19 Halvorsen Dep. at 123:7-123:12; Ex. 38, Helen Kandah Testimony, dated 1/16/19, at 33:2-33:17.

11.      Robert Bouto had nothing to do with the murder of Salvadore Ruvalcaba, as he has maintained for decades, and he has since been granted a Certificate of Innocence by the Cook County Circuit Court for that wrongful conviction. Ex. 39, Testimony of Robert Bouto, dated 1/16/19 at 116:17-117:10; 174:3-174:7; Ex. 40, Bouto's Testimony before sentencing, dated

9/11/96 at 72:13-72:22, 73:7-73:9; Ex. 12, Bouto Supp. Report dated 5/14/93; Ex. 41, Order Granting Bouto Certificate of Innocence, dated 03/27/19; Ex. 42, Lassar Report on Bouto at 43.

12.     On May 15, 1993, Defendants Halvorsen and Guevara claimed that Vicente had informed another detective that Robert Bouto had confessed to the Ruvalcaba murder to Vicente while they were detained in the lockup together. Ex. 12, Bouto Supp. Report dated 5/14/93, at 8-9; Ex. 13, Vicente Statement dated 5/15/93; Ex. 9, 2/6/19 Halvorsen Dep. at 131:4-132:20. According to Halvorsen and Guevara's account, Vicente had learned details of the manner of the Ruvalcaba homicide and its aftermath from Bouto. Ex. 12, Bouto Supp. Report dated 5/14/93, at 8-9; Ex. 13, Vicente Statement dated 5/15/93; Ex. 9 2/6/19 Halvorsen Dep. at 132:2-132:23.

**Defendants Use Vicente to Frame Plaintiffs for the Vargas Homicide
in a Conference Room in the State's Attorney's Office on June 2, 1993**

13.     In 1993, when prosecutors in the Cook County State's Attorney's Office Gang Prosecution Unit wanted to interview a Cook County Jail prisoner, they could request that a State's Attorney's Office investigator transport the prisoner to the State's Attorney offices. Ex. 32, 11/13/18 Dillon Dep. at 95:23-96:18, 97:2-97:14, 97:19-98:9, 102:17-103:9, 104:2-104:11, 104:21-105:5.

14.     Defendant Dillon was the prosecutor for the Bouto prosecution, and Coghlan was the prosecutor for the Montanez, Serrano, and Pacheco case. Coghlan prosecuted Mr. Montanez and Mr. Serrano at Dillon's request, which was not the typical way cases were assigned. Ex. 32, 11/13/18 Dillon Dep. at 85:1-85:18, 138:19-138:23; Ex. 42, Lassar Report on Bouto at 33; Ex. 33, 11/15/18 Coghlan Dep. at 21:19-22:5; Ex. 45, Prosecution Opening Statement at 16:7-19:3.

15.     Outside of the State's Attorney's Office Gang Crimes Unit conference room in which Vicente was placed on June 2, 1993 was a small open area surrounded by offices. Ex. 32, 11/13/18 Dillon Dep. at 83:2-84:15, 196:23-197:9; Ex. 18, 11/19/18 Vicente Dep. at 140:13-141:7, 143:23-144:9, 203:13-204:9. Many of the offices outside the conference room, as well as the

conference room itself, had glass along the side of the door so one could see inside. Ex. 32, 11/13/18 Dillon Dep. at 83:23-84:11, 140:6-140:11.

16.     Defendants fed Vicente three different versions of the crime. Defendant Guevara first tried to get Vicente to admit to being a witness to the Vargas murder, as the driver of the supposed culprits' car, but Vicente refused to adopt a story that would admit his involvement during the crime. Ex. 18, 11/19/18 Vicente Dep. at 61:17-64:18, 94:9-94:24, 142:4-143:15, 145:19-146:10, 210:16-211:14; Ex. 43, Vicente Affidavit dated 5/26/04.

17.     Defendant Guevara then tried to get Vicente to claim that after the murder, Mr. Montanez, Serrano, and Pacheco gave him the murder weapon and told him about the crime, but Vicente refused to adopt a story that would admit his involvement after the crime. Ex. 43, Vicente Affidavit dated 5/26/04; Ex. 18, 11/19/18 Vicente Dep. at 61:17-64:18, 95:1-95:19, 145:19-146:10

18.     Finally, Defendant Guevara instructed Vicente to say that after the Vargas homicide, when he saw Mr. Montanez, Mr. Serrano, and Mr. Pacheco on the street, he got into their car and saw a  gun, and also heard the men arguing about how "Mondo fucked" up the robbery by coming at the victim wrong, thereby causing the events of Vargas's murder, and Vicente agreed to do so. Ex. 10, Vicente Statement dated 6/28/93; Ex. 43, Vicente Affidavit dated 5/26/04; Ex. 18, 11/19/18 Vicente Dep. at  61:17-64:18, 70:14-71:10, 95:20-96:12, 145:19-146:10, 210:16-211:14.

19.     While discussing different scenarios that Vicente could use to implicate Plaintiffs in the Vargas homicide, Guevara and Halvorsen would leave the conference room for the open area right outside the door of the conference room, talk, and come back to try to coerce Vicente some more. Ex. 18, 11/19/18 Vicente Dep. at 143:16-145:18, 208:10-209:2**.**

20.     Dillon and Coghlan were both present in the Gang Crimes Unit on June 2, 1993 at the same time as Vicente, and spoke with him there on that day. Ex. 34, Vicente Trial Testimony

dated 10/18/94 at pages 26:17-27:3; Ex. 18, 11/19/18 Vicente Dep. at 64:19-65:2, 67:13-67:18, 76:8-77:1; Ex. 32, 11/13/18 Dillon Dep. at 138:17-139:8).

21.     Vicente could hear Guevara, Halvorsen, Coghlan, and Dillon standing right outside the door of the conference room on June 2, 1993 "trying to figure out different scenarios" by which Vicente would implicate Plaintiffs in the Vargas homicide and talking "about what [he] was saying, what [he] wasn't going to say, and what they wanted [him] to say" about the Vargas homicide. Ex. 18, 11/19/18 Vicente Dep. at 67:13-67:18, 213:3-214:17**;** Ex. 11, 4/10/18 Guevara Dep. at 71:9-72:9.

22.     The door to the conference room was sometimes ajar when different possible scenarios for Vicente to implicate Plaintiffs were discussed, such that Dillon and Coghlan could monitor the interactions between Vicente and Defendants Guevara and Halvorsen when they were not in the conference room. Ex. 18, 11/19/18 Vicente Dep. at 67:13-70:13, 143:16-145:18, 203:13-204:9; Ex. 11, 4/10/18 Guevara Dep. at 71:9-72:9.

23.     Dillon and Coghlan came in and out of the conference room while Guevara and Halvorsen discussed different possible scenarios for implicating Plaintiffs in the Vargas homicide on June 2, 1993. Ex. 18, 11/19/18 Vicente Dep. at 67:13-68:22, 143:16-145:18; Ex. 32, 11/13/18 Dillon Dep. at 298:7-299:13. Defendant Dillon admits that he came in and out of the conference room that held Vicente on June 2, 1993. *Id.*

24.     When Vicente was in the Gang Crimes Unit conference room on June 2, 1993 meeting with Guevara and Halvorsen, Defendant Guevara raised his voice loudly at times and forcefully hit Vicente. Ex. 18, 11/19/18 Vicente Dep. at 30:2-30:18, 64:2-64:18, 68:23-69:24, 204:22-206:1, 207:16-209:2.

25.     Those persons in the conference area of the Gang Crimes Unit, such as defendants

Dillon and Coghlan, could hear Guevara yelling at and striking Vicente. Ex. 18, 11/19/18 Vicente

Dep. at 67:13-68:22, 143:16-145:18, 213:3-214:17.

26.     In February 1993, during the criminal trial of Daniel Rodriguez, Defendant Coghlan

was presented with sworn testimony by a witness named Daniel Velasquez stating that Defendants

Guevara and Halvorsen had used violence to fabricate his own statement. Velasquez testified to

Coghlan that Guevara and Halvorsen had hit him with a flashlight, threatened to implicate him in

murder, and fed him false facts to put into a false statement implicating Rodriguez. Ex. 33,

11/15/18 Coghlan Dep. at 263:3-16, 311:6-312:10; 312:6-10; Ex. 49, Velasquez Testimony in *People

v. Rodriguez*, dated 2/24/93, at B15:16-B16:4, B19:1-5, B21:2-24, B23:1-9.

### Defendants Exert Ongoing Pressure on Vicente
### To Maintain Their False Story

27.     After the June 2, 1993 meeting, Vicente was brought between 30 and 40 times to the

Cook County State's Attorney's office, where he routinely met with Defendants Halvorsen,

Guevara, Dillon and Coghlan. Ex. 18, 11/19/18 Vicente Dep. at 66:12-66:17, 215:5-215:18.

28.     Vicente told Coghlan and Dillon that he would not to testify to the false statements

at Plaintiffs' trial. In response, Coghlan and Dillon threatened to return Vicente to general

population (where he would be harmed as a snitch), if he recanted his false statements, a threat that

Guevara had also made to Vicente. Ex. 18, 11/19/18 Vicente Dep. at 81:5-82:1, 89:6-89:15, 204:22-

206:1, 207:16-208:18.

29.     Defendants Dillon, Coghlan, Halvorsen, and Guevara prevented Vicente from

speaking with defense attorneys so that Vicente would not recant before trial. Ex. 18, 11/19/18

Vicente Dep. at 55:4-56:23, 227:1-228:6.

30.     At Plaintiffs' trial, Vicente repeated the false story that Plaintiffs had confessed to the

Vargas homicide. Ex. 34, Vicente Trial Testimony dated 10/18/94 at 8:17-25:17; Ex. 18, 11/19/18

Vicente Dep. at 79:6-79:20. Vicente also claimed at trial that he had supposedly disclosed information about Plaintiffs' "confession" in response to questions about "Pistol Pete," which was false. Ex. 34, Vicente Trial Testimony dated 10/18/94, at 27:12-27:21, 30:1-30:4; Ex. 50, Halvorsen Trial Testimony dated 10/19/94 at 81:22-83:9; Ex. 18, 11/19/18 Vicente Dep. at 12:10-12:23, 26:15-26:22, 27:9-27:18, 47:6-47:12, 49:3-49:13, 50:7-50:15, 51:11-51:22 , 73:16-74:1, 72:2-72:12, 75:3-75:5, 88:14-90:5, 93:10-93:14, 102:5-103:4.

31. Neither the existence, extent of, nor the contents of the communications between Vicente and Defendants in Statement of Fact Nos. 27-29, above, were ever disclosed to Plaintiffs' defense. Ex. 1, Investigative File (e.g., at 96-99).

### Defendants Coghlan and Dillon Provide Undisclosed Benefits to Vicente in the State's Attorney's Office Witness Quarters

32. While Vicente was incarcerated in the State's Attorney's Office witness quarters and prior to his testimony in the Vargas murder prosecution, Vicente received perks including three cooked meals a day (such as steak and pork chops) and free phone calls for up to an hour each day. Ex. 18, 11/19/18 Vicente Dep. at 127:12-128:8, 132:1-134:9. In the witness quarters, Vicente also received jogging suits, jeans, shoes, other clothing, and walk-man radios from "[his] State's Attorneys"—Dillon and Coghlan. Ex. 18, 11/19/18 Vicente Dep. at 132:1-134:9; 317:5-318:1; Ex. 32, 11/13/18 Dillon Dep. at 235:14-236:9. Vicente was also able to access contraband drugs inside the State's Attorney's witness quarters. Ex. 18, 11/19/18 Vicente Dep.at 150:9-151:15, 152:7-152:18; Ex. 11, 4/10/18 Guevara Dep. at 52:4-52:12, 150:2-152:19. Defendants did not disclose to Plaintiffs' defense that Vicente was receiving these benefits in the State's Attorney's Office witness quarters prior to Plaintiffs' trial. Ex. 1, Investigative File.

### Defendants Make Undisclosed Promises of Leniency to Vicente

33. Around the time Vicente was booked in May 1993, Defendants Guevara and Halvorsen promised Vicente a deal on his robbery charges should he go along with their scheme to

implicate Bouto. Vicente cooperated with Defendants in framing Plaintiffs, as well, to secure the "sweet deal" that had been promised. Ex. 18, 11/19/18 Vicente Dep. at 99:2-100:22, 31:1-31:14, 82:2-83:12; Ex. 43, Vicente Affidavit dated 5/26/04 at 1-2; Ex. 53, 3/13/19 Rankins Dep. at 85:3-85:10; Ex. 11, 4/10/18 Guevara Dep. at 23:17-24:7; *id.* at 51:15-52:3, 105:23-111:1. The deal was undisclosed to Plaintiffs. Ex. 1, Investigative File.

34.  Chicago Police Department Identification Section logs show that Dillon requested Vicente's criminal history just one day after the June 2, 1993 meeting. Ex. 54, Vicente Criminal History Requested by Dillon.

35.  Because Vicente served nearly all of his pre-trial custody time in the care and control of the Cook County State's Attorney either in the witness quarters or in DuPage County, Defendant Dillon drafted Vicente's sentencing order and calculated his pre-trial custody time, when Vicente was eventually sentenced on his four armed robbery cases. Ex. 55, Order dated 9/23/96 Sentencing Vicente; Ex. 32, 11/13/18 Dillon Dep. at 261:9-261:15; Ex. 18, 11/19/18 Vicente Dep. at 82:2-83:12, 84:22-85:23; Ex. 56, 5/13/19 Vasquez Dep. at 172:18-173:2.

36.  Dillon ensured that Vicente would effectively get a 7-year sentence instead of a 9-year sentence by giving Vicente 1,476 days of pre-trial custody time even though Vicente had actually served only 1,320 days of pre-trial custody time, a benefit that was not disclosed to Plaintiffs' defense. Ex. 55, Order dated 9/23/96 Sentencing Vicente; Ex. 18, 11/19/18 Vicente Dep. at 82:2-83:12, 84:22-86:21; Ex. 33, 11/15/18 Coghlan Dep. at 220:18-221:2, 221:10-221:19; Ex. 32, 11/13/18 Dillon Dep. at 264:4-264:8; Ex. 1, Investigative File (e.g., *id.* at 97-98).

37.  Vicente served roughly three and a half years for his robbery charges, rather than the four and a half years he should have served on his nine-year sentence. Ex. 35, Vicente Arrest report dated 5/14/1993; Ex. 55, Order dated 9/23/96 (sentencing Vicente to nine years on all four

robbery cases); Ex. 57, IDOC Offender Tracking System (reflecting Vicente's parole date of 11/26/96).

38.     At the grand jury, Vicente testified that he had not been threatened to give his testimony and had not received any promises in exchange for his June 1993 inculpation of Plaintiffs. Ex. 51, Vicente Grand Jury Testimony at 16:3-16:15, 18:11-18:20. At trial, in testimony elicited by Defendant Coghlan, Vicente testified that in May and June 1993, he did not receive any promises in exchange for his inculpation of Plaintiffs and Robert Bouto in the Vargas and Ruvalcaba homicide investigations. Ex. 34, Vicente Trial Testimony dated 10/18/94 at 30:5-31:13.

### Serrano's June 8, 1993 Arrest and Subsequent Release from Custody

39.     Serrano was arrested on June 8, 1993, and placed in an interview room at Area Five, where Detective Guevara and Halvorsen played good-cop, bad-cop while interrogating Serrano. Guevara repeatedly slapped Serrano, punched him in the chest, accused him of lying, and told him falsely that Pacheco, who was also in custody, was telling officers that Serrano did it [the murder]. Halvorsen would attempt to soften Serrano up by urging him to cooperate with Guevara. Ex. 58, Affidavit of Armando Serrano dated 6/30/08; Ex. 3, 2/28/19 Serrano Dep. at 100:3-106:10.

40.     On June 9, 1993, the following day, Serrano was released from Area Five. Guevara opened the door to the room where Serrano was detained and said, "get the fuck out." Serrano made no statements implicating himself or anyone else in the Vargas murder despite the unlawful detention and physical abuse he suffered. Ex. 3, 2/28/19 Serrano Dep. at 112:15 – 113:23.

### Defendants Fabricate Timothy Rankins's Statements
### to Bolster Their False Case Against Plaintiffs

41.     On June 10, 1993, Timothy Rankins and Demond Williams (also known as "Shorty Folks") were arrested in connection with a robbery. Ex. 1, Investigative File at 86 (Rankins Arrest Report dated 6/10/93); Ex. 59, Williams 6/10/93 Arrest Report; Ex. 60, 2/8/19 Mingey Dep. at

204:9-204:13; Ex. 1, Investigative File at 69 (Supp. Report dated 6/14/93); Ex. 61, Rankins

Interview Memo at 1; Ex. 6, Lassar Report on Serrano/Montanez at 14.

42.     Rankins had no knowledge of involvement by Plaintiffs in the Vargas homicide, and

did not volunteer such information to Mingey, Guevara, or Halvorsen on or about June 10 and 11,

1993. Rather, Defendants Mingey, Guevara, and Halvorsen knowingly fabricated Rankins's June 11,

1993 signed statement, by feeding Rankins the narrative. Ex. 11, 4/10/18 Guevara Dep. at 91:02-

101:04; Ex. 20, 4/26/18 Mingey Dep. at 16:16-17:19, 56:6-56:11, 56:24-59:10, 59:24-60:3; Ex. 19,

4/20/18 Halvorsen Dep. at 22:11-21, 153:2-174:15; Ex. 53, 3/13/19 Rankins Dep. at 29:1-11, 30:3-

31:24, 32:25-33:9, 50:9-64:10, 160:13-18.

43.     Defendants Mingey, Guevara, and Halvorsen coerced Rankins using threats and

physical force to agree to sign his June 11, 1993 statement against Plaintiffs. Ex. 11, 4/10/18

Guevara Dep. at 91:02-101:04; Ex. 20, 4/26/18 Mingey Dep. at 16:16-17:19, 56:6-56:11, 56:24-

59:10, 59:24-60:3; Ex. 19, 4/20/18 Halvorsen Dep. at 22:11-21, 153:2-174:15; Ex. 53, 3/13/19

Rankins Dep. at 30:3-31:24, 38:1-17, 50:9-64:10.

44.     Rankins's first interaction with Area Five detectives after his June 10, 1993 arrest was

with Defendants Mingey, Guevara, and Halvorsen, together—not with Defendant Mingey alone.

Ex. 53, 3/13/19 Rankins Dep. at 25:21-27:1; Ex. 20, 4/26/18 Mingey Dep. at 69:4-69:11.

Defendants Mingey, Halvorsen, and Guevara claimed that Rankins was known to Defendant Mingey

prior to his arrest as a Spanish Cobra, and thus that when Rankins was arrested, Mingey interviewed

Rankins, alone, to see whether he had information about the murder of Monica Roman, which was

alleged to have been committed by members of the Spanish Cobra gang. Ex. 1, Investigative File at

69-72 (Supp. Report dated 6/14/93); Ex. 62, Rankins Grand Jury Testimony dated 6/15/93. Yet

this was false. Mingey did not know Rankins at all prior to Rankins's June 10, 1993 arrest, as a

Spanish Cobra or otherwise. Ex. 60, 2/8/19 Mingey Dep. at 53:14-17, 204:9-204:13, 205:4-205:15; Ex. 53, 3/13/19 Rankins Dep. at 27:2-27:6; Ex. 11, 4/10/18 Guevara Dep. at 103:23-104:10.

45.     Defendants Guevara, Halvorsen, Mingey, Coghlan, and Dillon also assisted in fabricating Rankins's false statement by bringing him to the scene of the Vargas murder shortly after his arrest, and during one of Rankins's first interactions with Coghlan and Dillon, to familiarize Rankins with the location of the murder scene so his grand jury testimony would appear more truthful. Ex. 64, Rankins 4/4/12 Sworn Statement at 22:4-22:17; Ex. 53, 3/13/19 Rankins Dep at 47:11-47:25, 158:13-158:17; 225:20-225:25; Ex. 65, 1/15/18 Coghlan Handwritten Notes (documenting June 11, 1993 visit to scene); Ex. 33, 11/15/18 Coghlan Dep. at 239:17-240:17.

46.     Defendants did not disclose to Plaintiffs' defense that they had fabricated Rankins's account implicating Plaintiffs in the Vargas homicide or that they had used physical force and threats to coerce Rankins to sign his June 11, 1993 statement. Ex. 1, Investigative File at 75-78 (Supp. Report dated 6/11/93).

47.     Serrano was arrested and brought to Grand and Central; as he was escorted past Defendant Mingey's office, Mingey looked at him and gave him a thumbs down signal. Serrano was placed in an interview room and Guevara showed him a photo of Timothy Rankins. Serrano told Guevara that he knew Rankins only because he had previously testified against Rankins' brother. Ex. 3, 2/28/19 Serrano Dep. at 117:19-118:6; 130:7-11.

48.     Serrano and Rankins were not friends and are not friends to this day because Serrano previously testified against Rankins' brother. Serrano and Rankins encountered each other a single time in the "bullpen" shortly after they were arrested. According to Rankins, the two did not converse and Rankins thought that Serrano "wanted to do something to him." The two men had no additional contact with one another ever again. Ex. 53, 3/13/19 Rankins Dep. at 213:15-215:11; Ex. 3, 2/28/19 Serrano Dep. at 86:2-91:1.

49. Defendants Guevara and Halvorsen obtained the identity of two individuals ("Shorty Folks" and Rankins' girlfriend "Sabrina") that Rankins falsely claimed had witnessed the Vargas murder alongside Rankins, but withheld that information from Plaintiffs' defense. Ex. 9, 2/6/19 Halvorsen Dep. at 301:2-301:13; 302:5-303:6, 306:4-306:19; Ex. 60, 2/8/19 Mingey Dep. at 271:1-273:1, 278:24-279:13; Ex. 20, 4/26/18 Mingey Dep. at 70:19-72:19; Ex. 11, 4/10/18 Guevara Dep. at 146:4-149:1; Ex. 53, 3/13/19 Rankins Dep. at 56:25-57:19, 67:9-67:22; Ex. 63, Rankins 6/11/93 Statement; Ex. 1, Investigative File.

50. Rankins told Defendants Coghlan, Dillon, Guevara, and Halvorsen, including on dates prior to his grand jury testimony, that his June 11, 1993 statement and inculpation of Plaintiffs was a lie, and that he had been beaten and forced to sign the statement inculpating Plaintiffs. Ex. 53, 3/13/19 Rankins Dep. at 74:25-76:19, 219:17-219:22, 225:20-225:25, 87:1-87:25, 91:1-91:23; Ex. 19, 4/20/18 Halvorsen Dep. at 171:15-171:21; Ex. 11, 4/10/18 Guevara Dep. at 104:11-104:22.

51. Defendants Coghlan and Dillon responded to Rankins's disclosures about the falsity of his inculpation of Plaintiffs in the Vargas homicide by instructing Rankins that, "regardless" of whether he was "lying or not," he was going to provide the testimony, or words to that effect. Ex. 53, 3/13/19 Rankins Dep. at 38:24-39:11, 75:2-76:19, 87:1-87:25, 91:1-91:2.

52. Rankins met with Defendant Dillon numerous times during the Vargas murder investigation, including at least two meetings prior to Rankins' grand jury testimony. Ex. 53, 3/13/19 Rankins Dep. at 45:23-47:21, 68:24-69:13, 69:19-70:21, 70:22-73:5, 296:21-306:25.

53. Defendants Guevara, Halvorsen, and Dillon offered to make Rankins's armed robbery charges disappear if Rankins provided testimony inculpating Plaintiffs in the Vargas homicide, but withheld those offers from Plaintiffs' defense. Ex. 53, 3/13/19 Rankins Dep. at 173:19-174:10, 217:8- 218:11; Ex. 1, Investigative File (e.g., *id.* at 68-72); Ex. 31, Rankins Recantation letter dated 3/29/94 at 2.

54.     Defendant Coghlan placed Rankins in the State's Attorney's Office witness quarters, where Rankins received perks such as home-cooked meals, radios, cigarettes, clothes, and contact visits, but Coghlan did not disclose those perks to Plaintiffs' defense. Ex. 33, 11/15/18 Coghlan Dep. at 164:2-164:23; Ex. 53, 3/13/19 Rankins Dep. at 81:23-83:23; Ex. 61, Rankins Interview Memo; Ex. 66, Rankins Complaint filed 3/31/14 at CCSAO 3305; Ex. 64, Rankins 4/4/12 Sworn Statement at 25-26; Ex. 1, Investigative File.

55.     When Rankins balked at lying before the grand jury, Defendants Dillon and Coghlan threatened him until he agreed to testify. Ex. 53, 3/13/19 Rankins Dep. at 161:4-162:1; Ex. 1, Investigative File at 54 (Supp. Report dated 7/3/93).

56.     Rankins's testimony was used at the grand jury to implicate Plaintiffs. Ex. 62, Rankins Grand Jury Testimony dated 6/15/93, at 4-16. Charges were not approved against Plaintiffs until Rankins falsely implicated them in the Vargas homicide. Ex. 63, Rankins Statement dated 6/11/93 at 4; Ex. 67, Charging Documents, dated July 1993.

57.     Rankins recanted before Plaintiffs' trial and refused to testify to the false story. Ex. 33, 11/15/18 Coghlan Dep. at 326:8-326:19; Ex. 31, Rankins Recantation letter dated 3/29/94 at 2.

58.     Defendant Coghlan thought that Rankins "was crazy" with "credibility problems" and admits that he questioned the veracity of Rankins's statements against Plaintiffs; he also saw Rankins's written recantation prior to trial. Ex. 33, 11/15/2018 Coghlan Dep. at 205:15-205:20, 207:18-207:20, 208:9-208:23, 326:8-326:19; Ex. 31, Rankins Recantation letter dated 3/29/94.

59.     False testimony regarding Rankins was introduced against Plaintiffs at Plaintiffs' trial through Defendant Halvorsen.  Defendant Coghlan elicited from Defendant Halvorsen that on June 11, 1993, Defendant Mingey informed Defendant Halvorsen that Timothy Rankins came forward stating that he was an eyewitness to the crime; that after Guevara and Halvorsen interviewed

Rankins they took Rankins in a car to the corner of North Avenue and Springfield; that Halvorsen told Rankins that he wanted to believe what Rankins was saying but Rankins would have to provide proof, or words to that effect; that Halvorsen told Rankins that he wanted to believe the information Rankins was providing him but that Rankins was going to have to demonstrate to Halvorsen that he actually had evidence, or words to that effect; that he would drive Rankins north on Springfield and he would have to identify the location where the murder took place; that as Rankins drove past 1838 North Springfield, Rankins pointed to a house and fence that Halvorsen recognized as being the home of Rodrigo Vargas; that Defendants then went to look for Mr. Serrano to place him in custody; that Mr. Serrano was placed in a line-up; that Rankins and Wilda Vargas viewed the line-up; and that a handwritten statement was taken from Rankins. Ex. 50, Halvorsen Trial Testimony dated 10/19/94 at 89:20-94:3, 95:13-96:17, 98:9-98:16. The trial judge ruled that the evidence was admissible to show the detectives' course of conduct in the investigation and also that it was relevant, overruling objections to the evidence, including as to its prejudicial effect. *Id.* at 89:20-94:3, 95:13-96:17.

60.     Defendant Coghlan also presented an investigator to testify at Plaintiffs' trial about the investigator's unsuccessful efforts to locate Timothy Rankins, at Coghlan's request, before trial. Ex. 68, Martinez Trial Testimony 10/19/94 at 32:1-34:2.

61.     After the investigator's testimony, Coghlan requested a "continuance at this time to make one last effort to locate Timothy Rankins," and the judge denied the request, stating "You've made serious efforts and you've had investigators and had the day off and there doesn't seem there's a fresh scent on the ground." Ex. 68, 10/19/94 Martinez Trial Testimony at 34:5-34:12.

### Defendants Fabricate Plaintiffs' Supposed Motive for the Crime: The "Gas Station Encounter"

62.     Defendants Guevara and Halvorsen claimed to have first heard from Vicente that Montanez, Serrano, and Pacheco had encountered Rodrigo Vargas at a gas station with his family

the night before the shooting, seen that he was carrying a lot of money, followed him home, and waited by his house until 5:00am ("the Gas Station Encounter"). Ex. 1, Investigative File at 97 (Supp. Report dated 6/2/93). This was false. Defendants Guevara and Halvorsen manufactured Vicente's statements about the Gas Station Encounter, knowing they were false, and the fabrication was used against Plaintiffs. Ex. 18, 11/19/18 Vicente Dep. at 95:20-96:12, 97:2-97:10; Ex. 43, Vicente Affidavit dated 5/26/04 at 2-4; Ex. 11, 4/10/18 Guevara Dep. at 63:18-64:14, 64:16-64:24; Ex. 20, 4/26/18 Mingey Dep. at 136:18-137:1; Ex. 19, 4/20/18 Halvorsen Dep. at 226:7-226:17; Ex. 10, Vicente Statement dated 6/28/93; Ex. 51, Vicente Grand Jury Testimony dated 7/1/93 at 4-20; Ex. 45, Prosecution Opening Statement dated 10/18/94 at 16:7-19:3.

63.     Defendants Guevara and Halvorsen reported that only after they learned of the Gas Station Encounter motive from Vincente did they obtain confirmation from the victim's widow, Wilda Vargas, that the Gas Station Encounter had taken place. Ex 1, Investigative File at 98 (Supp. Report dated 6/2/93); Ex. 11, 4/10/18 Guevara Dep. at 154:18-155:4; Ex. 34, Vicente Trial Testimony dated 10/18/94 at 16:8-18:24. This was false: Wilda Vargas told Defendant Guevara about the Gas Station Encounter months *before* Vicente's supposed June 2 inculpation of Plaintiffs, and it was thus known to Defendants Guevara and Halverson long before they talked to Vicente about the Vargas murder. In fact, Wilda Vargas was taken by a police officer to look for the car she saw at the gas station four days after her husband's murder. Ex. 21, 12/12/18 Vargas Dep. at 96:20-97:1, 97:14-97:23, 98:4-98:7, 100:3-100:13, 102:5-102:10; Ex. 48, 10/21/13 Halvorsen Interview Memo at 5; Ex. 11, 4/10/18 Guevara Dep. at 32:11-32:21, 32:23-33:10, 33:12-33:13; Ex. 19, 4/20/18 Halvorsen Dep. at 29:4-29:10; Ex. 20, 4/26/18 Mingey Dep. at 136:18-137:1; Ex. 23, Wilda Vargas Trial Testimony at 61:15-61:22.

64.     Fabricated evidence about the timeline by which Defendants learned of the Gas Station Encounter from Vicente and Wilda Vargas was used against Plaintiffs in the criminal

prosecution. Ex. 45, Prosecution Opening Statement dated 10/18/94 at 16:8-18:24; Ex. 23, Wilda

Vargas Trial Testimony dated 10/19/94 at 10:22-21:11; Ex. 34, Vicente Trial Testimony dated

10/18/94 at 16:8-18:24. Ex. 50, Halvorsen Trial Testimony dated 10/19/94 at 85:8-87:23.

65.     In Wilda's version of the Gas Station Encounter, it was a benign event: The night

before the shooting, her family had stopped at the gas station, after her husband had cashed a check

at the bank; an occupant from a car had entered the gas station, as Rodrigo Vargas was leaving;

because the car was blocking her family's van, they had to wait for the car to leave before they could

leave; and the car left the same way as the Vargas' van and drove behind them for a short while.

According to Wilda, there is no evidence that the three men from the gas station on the night before

the murder saw Vargas' money, followed the Vargas family home, or were responsible for the

murder. Ex. 23, Wilda Vargas Trial Testimony dated 10/19/94 at 11:12-20:20. However, when

Wilda Vargas's testimony on the Gas Station Encounter was coupled with Vicente's fabricated

account of the Gas Station Encounter, the prosecution was able to argue that the Gas Station

Encounter provided evidence of a motive for the Vargas homicide. *Id.*; Ex. 45, Prosecution Opening

Statement dated 10/18/94 at 16:8-18:24.

### Defendants Guevara and Halvorsen Withhold
### Wilda Vargas's Failure to Identify Plaintiffs Using Gang Books and
### Fabricate Her Identifications of Plaintiffs

66.     Defendants Guevara and Halvorsen claimed that following a June 2, 1993 interview

with Wilda Vargas, nearly four months after the Gas Station Encounter, Detective Guevara showed

Wilda Vargas a photo array that consisted of 8 photos, and that Wilda identified Montanez and

Serrano as two of the men in the car that she saw at the gas station on the night before her

husband's murder. Ex. 1, Investigative File at 99 (Supp. Report dated 6/2/93); Ex. 50, Halvorsen

Trial Testimony dated 10/19/94 at 85:8-86:1; Ex. 69, Guevara Trial Testimony dated 10/21/94 at

5:21-9:20.

67. The Gang Crimes North station of the Chicago Police Department had gang books consisting of photographs of known gang members that were used to assist in identifications. Identifications made through use of those gang books were to be documented in supplemental reports because they constituted evidence. Ex. 9, 2/6/19 Halvorsen Dep. at 101:14-102:6, 103:11-103:15. Even if a witness did not make an identification, some documentation was to be made of which gang books the witness had reviewed. *Id.* at 103:21-104:9. Defendants Guevara and Halvorsen were aware that they were supposed to document identifications made from gang books. *Id.* at 101:14-102:6, 103:11-103:15.

68. Prior to the June 2, 1993 photo array, Guevara showed Wilda Vargas gang photo books, and she made an identification of two people that she saw in the car at the gas station four months earlier on the night before Rodrigo's death. The identified photos were removed from the gang photo books, marked, and set aside, but never inventoried, preserved, or placed into evidence, and the identification was not disclosed to Plaintiffs' defense. Ex. 21, 12/12/18 Vargas Dep. at 102:11-115:15; Ex. 1, Investigative File (e.g., *id.* at 99 (Supp. Report dated 6/2/93)); Ex. 11, 4/10/18 Guevara Dep. at 121:11-123:21, 156:2-156:9; Ex. 19, 4/20/18 Halvorsen Dep. at 133:3-134:23, 255:2-2:58:3.

69. At the time Guevara questioned Wilda Vargas on June 2, 1993 about the appearance of the men involved in the Gas Station Encounter approximately four months earlier, Wilda Vargas was unable to provide any physical descriptions of the three men. Ex. 1, Investigative File at 99 (Supp. Report dated 6/2/93); Ex. 11, 4/20/18 Guevara Dep. at 176:18-177:5; Ex. 9, 2/6/19 Halvorsen Dep. at 70:16-71:6.

70. Evidence of Wilda Vargas's identifications was used against Plaintiffs to prosecute them for the Vargas homicide. Ex. 1, Investigative File at 99 (Supp. Report dated 6/2/93); Ex. 69, Guevara Trial Testimony dated 10/21/94 at 6:16-9:20; Ex. 50, Halvorsen Trial Testimony dated

10/19/94 at 85:12-87:23; Ex. 45, Prosecution Opening Statement dated 10/18/94 at 18:1-19:3; Ex. 70, Prosecution Closing Statement dated 10/21/94 at 107:22-108:7; Ex. 8, 10/21/94 Trial court findings at 118:19-119:9.

### Defendants Fabricate Ms. Vargas's Identification of Mr. Montanez's Car and Withheld Exculpatory Information Regarding the Identification

71. According to Defendants Guevara and Halvorsen, Wilda Vargas claimed that the car that blocked her family's car at the gas station the night before Rodrigo Vargas's death was tan-colored. Ex. 1, Investigative File at 98 (Supp. Report dated 6/2/93).

72. Defendant Guevara told Wilda Vargas that he would take her to see several cars that had been "abandoned" or "thrown away" in a neighborhood in which people commonly dumped cars. Ex. 21, 12/12/18 Vargas Dep. at 62:9-62:23, 117:23-118:2, 119:8-120:17, 230:22-232:21, 233:6-233:17. All of the cars that Detectives Guevara and Halvorsen showed Wilda Vargas appeared abandoned or had sustained some sort of serious damage. Ex. 21, 12/12/18 Vargas Dep. at 119:21-119:24, 118:11-118:21. However, no evidence in the investigation indicated, at the time Defendants Guevara and Halvorsen took Wilda Vargas to look at cars, that any car associated with Rodrigo Vargas's murder had sustained damage. Ex. 1, Investigative File.

73. Defendants Guevara and Halvorsen took Wilda Vargas to approximately five cars, pointing them out, before taking her to view Mr. Montanez's car. These five cars did not match the size or color of her description of the car she had seen at the gas station: a large brown car. Ex. 21, 12/12/18 Vargas Dep. at 235:2-235:23; Ex. 11, 4/20/18 Guevara Dep. at 76:3-78:16, 157:9-164:23.

74. When Defendants Guevara and Halvorsen took Wilda to Mr. Montanez's car, Defendant Guevara told Wilda that the car had been abandoned. Ex. 21, 12/12/18 Vargas Dep. at 235:21-236:18.

75. When Defendants Guevara and Halvorsen took Wilda to Mr. Montanez's vehicle, Wilda questioned why the condition of the car differed from the car she had seen at the gas station,

inquiring why it was "crashed" and had "a bullet in it," because the car she had seen at the gas station was not so damaged. Ex. 21, 12/12/18 Vargas Dep. at 65:13-65:23, 68:6-68:12. Defendant Guevara told Wilda that Mr. Montanez's car had sustained damage to its front as a result of Rodrigo's murder, Ex. 21, 12/12/18 Vargas Dep. at 121:15-121:21, and that ballistics evidence taken from Mr. Montanez's car forensically matched evidence from the scene of the crime, *id.* at 65:13-66:17, 123:13-124:3; Ex. 11, 4/20/19 Guevara Dep. at 76:13-77:2, 164:2-164:23; Ex. 19, 4/20/18 Halvorsen Dep. at 108:2-109:15. These representations lacked any support and were false. Ex. 1, Investigative File (e.g., *id.* at 99 (Supp. Report dated 6/2/93)).

76.    Defendants Guevara and Halvorsen withheld from Plaintiffs' defense information about the tactics they used to secure Wilda Vargas's identification of Mr. Montanez's car identified above in PSOAF Nos. 72-75, above. Ex. 1, Investigative File (e.g., *id.* at 99 (Supp. Report dated 6/2/93)).

77.    Defendants Guevara and Halvorsen's fabrication of Wilda's identification of Mr. Montanez's car was used in the prosecution of Plaintiffs. Ex 69, Guevara Trial Testimony dated 10/21/94 at 10:14-10:21; Ex. 50, Halvorsen Trial Testimony dated 10/19/94 at 87:8-87:23; Ex. 23, Wilda Vargas Trial Testimony dated 10/19/94 at 25:13-27:15, 61:13-63:14; Ex. 8, 10/21/94 Trial court findings at 118:07-118:18; 119:15-119:22.

### Defendants Guevara and Halvorsen Withhold Evidence of an Alternate Suspect

78.    Defendants Guevara and Halvorsen pursued at least one alternate suspect in the Vargas homicide investigation: Rodrigo Vargas's neighbor Frank Velez, who lived at 1832 N. Springfield, with his mother, Ana Velez. Ex. 73, 11/2/2019 Affidavit of Frank Velez at ¶¶1, 5-19.

79.    Frank Velez was questioned about the murder by two detectives, one of whom was a Hispanic man with dark hair and glasses, and ordered to come to the police station along with Ana Velez. Ex. 73, 11/2/19 Affidavit of Frank Velez ¶¶5-19.

80.     The Detectives accused Frank Velez of having committed the murder, and accused Ana Velez of having covering up her son's murder. Ex. 73, 11/2/19 Affidavit of Frank Velez ¶¶5-19.

81.     Defendants Guevara and Halvorsen did not disclose to Plaintiffs' defense that they considered Frank Velez as an alternate suspect or that they believed Ana Velez was guilty of covering up Frank's murder to protect her son. Ex. 1, Investigative File; *Id.* at 122 (Supp. Report dated 2/6/93); Ex. 24, Velez Polygraph Report.

82.     Had defense counsel at Plaintiffs' trial had access to the improperly withheld information, such as the tactics used to procedure Vicente's false statements and to secure Wilda Vargas' false identification of Mr. Montanez's car, defense counsel would have used that information at trial. Ex. 56, 5-13-09, Vasquez Dep at 154:23-169:5.

RESPECTFULLY SUBMITTED,

**JOSE MONTANEZ**

BY:    <u>/s/ Ruth Brown</u>
        *One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Russell Ainsworth
Ruth Brown
Rachel Brady
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900

**ARMANDO SERRANO**

BY:    <u>/s/ Ashley Cohen</u>
        *One of Plaintiff's Attorneys*

Jennifer Bonjean
Ashley Cohen
Bonjean Law Group, PLLC
467 St. Johns Place
Brooklyn, New York 11238
718-875-1850

## CERTIFICATE OF SERVICE

      I, Ashley Cohen, an attorney, hereby certify that on January 8, 2020, I filed the foregoing PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS UNDER LR 56.1(b)(3)(C) using the Court's CM/ECF system, which effected service on all counsel of record.

        <u>/s/ Ashley Cohen</u>
        *One of Plaintiff's Attorneys*