# Plaintiffs' Exhibit 6

## Lassar Report on Serrano/Montanez



# CONFIDENTIAL

## MEMORANDUM

TO:   File

FROM:  Daniel Greenfield and Jeff Carroll

RE:   Guevara – The Armando Serrano and Jose Montanez Case

DATE:  February 2, 2015

---

### I.  Introduction

  We investigated three cases in which defendants purportedly confessed to the same person: Francisco Vicente. The defendants in these cases are Robert Bouto, Armando Serrano and Jose Montanez, and a third defendant.

  Principally, the factual background relevant to claims of misconduct and actual innocence is as follows. On 5/14/93, Francisco Vicente, a member of the Imperial Gangsters street gang, was arrested in connection with three armed robberies and one simple robbery he was suspected of having committed over the prior ten months. Beginning the following morning and continuing for approximately six weeks, Dets. Rey Guevara and Ernest Halvorsen reported that Vicente had obtained confessions in three unrelated murder cases. In each case, the record indicates that Vicente's confession evidence was corroborated by a second informant—Edwin Maldonado in connection with the case against Bouto; Timothy Rankins in connection with the case against Montanez and Serrano; and a still-anonymous confidential informant in connection with the case against third defendant.[1] In two of the cases, Dets. Guevara and Halvorsen reported that Vicente first provided that evidence to someone other than them—in the Bouto case, the record indicates that Vicente first shared evidence against Bouto with Det. Maher or another detective or officer, who then alerted Det. Halvorsen; in the Montanez/Serrano case, the record indicates that Rankins first provided evidence against Montanez, Serrano, and Pacheco to Sgt. Ed Mingey, who then alerted Dets. Guevara and Halvorsen.

  Since Dets. Guevara and Halvorsen initially reported this information, it has been recanted by Rankins, Maldonado, and Vicente. First, beginning in 1994 and continuing to the present day, Rankins has recanted the evidence that he provided against Montanez and Serrano, alleging that it was coerced from him by a lengthy list of police and prosecution personnel, including Dets. Guevara and Halvorsen. Then, starting in 1996 and continuing to the present day,

---

[1] Bouto, Serrano, and Montanez remain incarcerated pursuant to these convictions, whereas the third defendant was released under supervision recently.



**CONFIDENTIAL**

Maldonado recanted the evidence that he provided against Bouto, alleging first that he was pressured to do so by Vicente but years later also claiming that police personnel coerced him. In 2003, Vicente told students investigating possible wrongful convictions that the confession evidence he provided in all three cases had been fabricated, alleging that he had been coerced by Dets. Guevara and Halvorsen. On later occasions he negotiated for various benefits in return for executing an affidavit and potentially providing testimony in connection with the Montanez/Serrano post-conviction matter. Other individuals who served time with Vicente—specifically, Lydell Williams and Valentine Gomez (aka "Tomato")—have also provided information potentially corroborating Vicente's recantations in the Bouto and Montanez/Serrano matters, respectively. Finally, some non-informant witnesses in the Bouto and Montanez/Serrano matters have described actions by Det. Guevara that, if accurate, could constitute misconduct.

For purposes of investigating these allegations, we analyzed the record and conducted interviews with individuals involved in these cases. In this report, we present a detailed statement of facts, our analyses and findings, and our conclusions regarding allegations of misconduct and claims of actual innocence in the Montanez/Serrano case. We were not able to make comprehensive conclusions in the third defendant's matter.

## II.  The Montanez/Serrano Case

### 1.  Introduction

To analyze the case against Serrano and Montanez for purposes of assessing claims of misconduct and, separately, their claims that they are actually innocent, we reviewed and analyzed the complete record in the matter. We also interviewed or met with sixteen people connected with the case, including the following:

- Det. Ernest Halvorsen (reporting detective)
- Sgt. Ed Mingey (interviewed purported eyewitness Tim Rankins)
- Capt. Lupe Pena (arrested Francisco Vicente and Jose Montanez)
- Jose Montanez (defendant)
- Armando Serrano (defendant)
- Tim Rankins (purported eyewitness)
- Demond Williams (aka "Shorty Folks") (purported eyewitness)

We note that we were unable to interview Det. Guevara or State's witnesses Francisco Vicente, Wilda Vargas, and Anna Velez, who also had significant roles in the matter. Specifically, Det. Guevara and Vicente have been advised by counsel not to consent to interviews with us. Wilda did not respond to multiple messages left by us at her home or the bar she co-owns, and appears to be avoiding us. Velez, we learned from our private investigator, is suffering from dementia, and had no relevant recall during a conversation with him.

First, we present the facts, and then our analysis. We begin our analysis by examining the confession evidence provided by Vicente and Rankins, including its recantation. We conclude our analysis by examining the evidence provided by sources other than Vicente and Rankins.

2



<span style="color:red">**CONFIDENTIAL**</span>

2.    **Statement of Facts**

a.    **The Shooting**

On 2/5/93, at approximately 5:32 a.m., Rodrigo Vargas was shot to death in his van in front of his home at 1838 N. Springfield Ave. (2/6/93 Supplemental Report ("Supp. R.").) The bullets that killed Vargas had been "fired into the vehicle from the driver's side door area," shattering the front driver's side window. (*Id.* at 7.) Springfield is a one-way street, and therefore the driver's door was adjacent to the curb. (*Id.*)

The shattering glass caused "numerous cuts on the face in an around the eyes" [sic] of Vargas. (*Id.* at 2; *also see* Photos in Evidence.) Vargas was shot five times. (*Id.* at 2.) One shot entered his "left upper arm" and exited "the inside of his left upper arm." (*Id.*) Two shots entered his lower back and two entered his upper back. (*Id.*) Two "essentially intact" bullets were "found in the front upper clothing of the victim[.]" (*Id.* at 7.) Vargas's "feet were to the front, under the dashboard" when found, and, combined with the abrasions on his face, police determined that "[i]t appeared that the victim was looking at the window at the time one of the shots was fired before he attempted to get to the rear of the vehicle." (*Id.*)

b.    **The Initial Investigation**

Chicago Police Department ("CPD") officers and detectives began arriving on the scene at 8:25 a.m. (2/5/93 General Offense Case Report.) Upon arriving, they found the van's engine running, its parking gear engaged, and its doors locked. (10/18/94 Trial Transcript, Vol. 1 at 64-65.) Vargas was holding a pull-out radio and lay atop a lunch bag. (2/6/93 Supp. R. at 7.) On Vargas's person was found $190 in cash (10/19/94 Trial Transcript, Vol. 3 at 10), and a receipt for $300 from an unidentified source. (2/5/93 General Progress Report.) After examining the scene and interviewing witnesses, Dets. N. Jack and R. Schak reported that "[t]he victim was shot several times as he sat in his vehicle preparing to go his place of employment." (2/6/93 Supp. R. at 3.) Vargas was still wearing his scarf and a cap. (Photos in Evidence.) There was no evidence of a struggle according to responding Officer Jeff Show. (10/18/94 Trial Transcript, Vol. 1 at 65.)

Police canvassed the neighborhood interviewing potential witnesses. (2/5/93 Supp. R.; 2/6/93 Supp. R. at 8-11.) Wilda Vargas, the victim's wife, informed CPD that her husband had "no enemies" and "no problems" and that she could think of no reason for his murder, noting only that her husband's van had been stolen a year earlier but recovered.[2] (2/6/93 Supp. R. at 8-9.) She further informed police that nothing appeared to have been taken from Vargas's van or his person. (*Id.* at 7.)

---

[2] For purposes of clarity, we henceforth refer to the victim as "Vargas" and his widow as "Wilda."

3



<span style="color:red">**CONFIDENTIAL**</span>

Anna Velez, Vargas's neighbor and friend, had discovered Vargas's body and called CPD. (2/6/93 Supp. R. at 8.) She stated to police on-scene that at 5:30 a.m. she looked out her window and noticed Vargas's van parked at the curb beneath with its engine running. (2/5/93 Supp. R. at 8.) Velez, who lived two houses south of the Vargas home, "sometimes" saw Vargas as he warmed up his van in the morning. (10/18/94 Trial Transcript, Vol. 1 at 32, 37). On the morning of the murder, she "saw the van was – he was heating up the van." (*Id.* at 38.) She could tell, she said, because of "the smoke that comes out through the back when you turn on the car." (*Id.*) Velez stated that two to three minutes later, while she was in the bathroom (*Id.* at 29), she heard gun shots and looked out the window, but "did not observe anyone, did not see any cars moving and did not notice anything unusual." (2/6/93 Supp. R. at 8.) Velez also specified she did not hear any yelling from outside. (10/18/94 Trial Transcript, Vol. 1 at 32, 37.) Later, after it became light out, she observed that Vargas's van remained parked at the curb, still running, at which time she discovered his body. (2/6/93 Supp. R. at 8.)

Police also spoke to Gary Shoop, another neighbor. (2/5/93 Supp. R. at 3.) He was awakened by gunshots and "peered out the window." (10/18/94 Trial Transcript, Vol. 1 at 44.) At that time, he saw an older, light brown sedan, possibly a two-door vehicle, driving northbound on Springfield Ave. (2/5/93 Supp. R. at 3.)

Judy Milinkovic, who was on her way to visit her mother-in-law two doors away from the Vargas home at about 5:30 a.m.—i.e., about two minutes prior to the shooting—as she did most mornings at that time, told CPD that she "believed" she saw Vargas as he was exiting his home. (2/6/93 Supp. R. at 9-10.) She reported that she did not see anyone on the street other than Vargas. (*Id.*) "A few moments later," after entering her mother-in-law's home, Milinkovic heard gun shots. (*Id.*) Milinkovic also saw the sedan that Shoop described. (*Id.*)

The day after the shooting, 2/6/93, Detectives N. Jack and R. Schak interviewed Benjamin Salazar because he and a friend, Antonio Rojo, had been victimized several weeks earlier during an incident characterized by police as "very similar." (2/6/93 Supp. R. at 11.) Although both Salazar and Rojo saw the African-American offenders, Rojo had a better vantage, and Dets. Jack and Schak reported plans to interview Rojo "as soon as possible."[3] (*Id.*) The investigative record went silent, however, on 2/6/93, and remained so until 3/11/93.[4]

---

[3] Neither Rojo nor Salazar participated in the line-up identifications of Montanez and Serrano (6/11/93 Supp. R. by G/H, Rankins Line-Up; 6/11/93 Supp. R. by G/H, Wilda Line-Up; 7/10/93 Supp. R. by G/H, Line-Up), which both took place before ballistics evidence was returned indicating that the same weapon was not used in the incident involving them and the murder of Vargas. (9/25/93 Ballistics Comparison.)

[4] Although Dets. Guevara and Halvorsen each testified that he began investigating the case on 2/6/93, the day after the murder (10/21/94 Trial Transcript at 4; 10/19/94 Trial Transcript, Vol. 3 at 108), the initial investigation reports were prepared by other personnel and do not reference the participation of either Det. Guevara or Halvorsen. Det. Halvorsen's name first appears in the record within the Supp. R. dated 6/2/93.

SERRANO_LASSAR 25078



# CONFIDENTIAL

On 3/11/93, at the request of Det. Guevara, Velez submitted to a polygraph examination. (3/17/93 Crime Lab Report.) Det. Guevara's request reflected the first time his name appeared in the Vargas investigative record. (*Id.*) The resulting report indicated that Velez "allegedly tells people [she] saw offenders," which she denied during the polygraph.[5] (*Id.*) Handwritten notes accompanying the polygraph report read: "Deception Indicated." (*Id.*) After Velez's polygraph results were reported on 3/17/93, the investigative file in the Montanez/Serrano case again goes silent through 6/2/93, but for a ballistics laboratory report and Vargas's toxicology laboratory report. (4/6/93 Ballistics Report; 2/16/93 Toxicology Report.)

### c.    Vicente is Arrested

On 5/14/93, Francisco Vicente, aka "Chino," a member of the Imperial Gangsters street gang, was arrested by Officers Lupe Pena and Luis Marron in connection with three armed robberies, all class X offenses, and one simple robbery he was suspected of having committed over the prior ten months. (5/14/93 Francisco Vicente Arrest Report; 9/23/96 Francisco Vicente Change of Plea Hearing.) A suspected accomplice of Vicente's, Kenneth Thrane, nicknamed "Kenny," was also arrested at about that time. (Vicente Armed Robbery File.) (Vicente, who admitted to having a "bad" heroin habit and who later acknowledged robbing people in order to support his habit, committed three of the robberies in order to steal his victim's gold jewelry, all of them at gun or knifepoint. (Vicente Armed Robbery File.)) In the other, he stole a bicycle from a school-age child. (9/23/96 Francisco Vicente Change of Plea Hearing.) Vicente also had an extensive prior criminal history. (*Id.*)

### d.    Unknown CPD or ASAs Request Criminal History of Defendants

Although not reported in the Vargas investigative file (i.e., the RD File), on 5/25/93 unknown police or prosecution personnel requested the criminal histories of Jose Montanez, Armando Serrano, and Jorge Pacheco.[6] (5/25/93 Criminal Histories.) There is no evidence that we are aware of that Montanez, Serrano, or Pacheco committed any criminal activity on or about that date.[7]

---

[5] Velez did not participate in the eventual police station line-up identifications of Montanez and Serrano. (6/11/93 Supp. R. by G/H, Rankins Line-Up; 6/11/93 Supp. R. by G/H, Wilda Line-Up; 7/10/93 Supp. R. by G/H, Line-Up.)

[6] We obtained this documentation from the City in July of 2014 in response to requesting from our client additional material concerning this and other cases we were asked to evaluate.

[7] Montanez's criminal history contains a 5/17/93 entry, reading "BFW No FOID," which means "Bond Forfeiture Warrant" related to a weapons charge. (5/25/93 Criminal Histories.) Serrano obtained some minor charges in late April, but none in May. (*Id.*) And Pacheco was not charged with anything in April or May of 1993. (*Id.*)

SERRANO_LASSAR 25079



<span style="color:red">**CONFIDENTIAL**</span>

e.   **The Evidence Reportedly Obtained From Vicente**

(i)   **Det. Halvorsen Decides to Question Vicente About the Vargas Murder**

One week later, in a Supp. R. dated 6/2/93, and approved 6/3/93, but reflecting evidence reported to have been gathered as late as 6/6/93, significant investigative activity is reported for the first time since Velez's polygraph. (6/2/93 Supp. R. by G/H.) Specifically, at time unknown on 6/2/93, a "circumstantial witness who for his own safety must remain anonymous" was reported to have informed both Dets. Guevara and Halvorsen that on 6/2/93, he had been present, four months earlier, when Montanez, Serrano, and Pacheco discussed having murdered Vargas.[8] (*Id.*) The anonymous circumstantial witness was described as a member of the Imperial Gangsters street gang, and he identified the defendants by street name, accurately, as Pistol Pete, Mando, and Jordan.[9] (*Id.*) More than three weeks later, the circumstantial witness was identified as Vicente.[10] (6/28/93 Vicente HW Statement by H.)

At trial, Det. Halvorsen described the circumstances of that meeting, explaining that he interviewed Vicente on 6/2/93 because he "had heard rumors on the street that a guy by the name of Pistol Pete was involved" in the Vargas murder.[11] (10/19/94 Trial Transcript, Vol. 3 at 82.) These rumors, according to Det. Halvorsen, were "unsubstantiated" and he "had no evidence to involve Pistol Pete in a crime whatsoever." (*Id.*) Moreover, there were "many Pistol Petes" in the "nickname file," a circumstance that he testified rendered the alias information "utterly useless" to him. (*Id.* at 116.) Det. Halvorsen had learned, however, during the course of "talk[ing] to [Vicente] about the Robert Bouto investigation" on "[t]he date Francisco Vicente was

---

[8] It is not clear to us whether Det. Guevara was in fact at the meeting with Vicente as it is reported in the Supp. R. dated 6/2/93. Although Vicente testified that Dets. Guevara and Halvorsen were both present (Trial Transcript, Vol. 2 at 98-99, 128), Det. Halvorsen testified that he interviewed Vicente without Det. Guevara present. (10/19/94 Trial Transcript, Vol. 3 at 81.) However, Det. Halvorsen told us that he and Det. Guevara were both present for the 6/2/93 meeting. (10/21/93 Interview with Ernest Halvorsen.)

[9] Montanez told us that his nicknames were "Gordo" and "Pistol Pete." (10/17/13 Interview with Jose Montanez.) The latter street name was a reference to basketball great Pistol Pete Maravich, and reflected Montanez's skill from the three-point line, Montanez told us. (*Id.*) On occasion, he noted, Pistol Pete was diminutized to "Pito." (*Id.*)

[10] Accordingly, we refer to the circumstantial witness as Vicente from this point forward for purposes of clarity. Similarly, although Vicente refers to the defendants by their street names, Pistol Pete, Mando, and Jordan, for purposes of clarity we primarily refer to them as Montanez, Serrano, and Pacheco, respectively.

[11] Those rumors are not reflected in the investigative record.

SERRANO_LASSAR 25080



<span style="color:red">**CONFIDENTIAL**</span>

arrested"—i.e., 5/14/93—that Vicente had been "arrested with a second offender who had a nickname of Pistol Pete," according to Det. Halvorsen.[12] (*Id.* at 114.) Thus, he was "curious whether or not [Vicente] might be able to assist" in the Vargas murder investigation. (*Id.* at 82.)

At that time, Det. Halvorsen testified, Vicente informed him he "had the right nickname but I had the wrong Pistol Pete, I wanted big Pistol Pete and not little Pistol Pete." (*Id.* at 83.) Vicente testified that he then told Det. Halvorsen, "I knew two Pistol Petes, the one that I had the armed robbery with" and Montanez.[13] (10/18/94 Trial Transcript, Vol. 2 at 28-29.) Then Vicente "supplied [Det. Halvorsen] the three nicknames of Pistol Pete, Mando and Jordan." (10/19/94 Trial Transcript, Vol. 3 at 83.) After talking to Vicente, Det. Halvorsen testified, "I checked my nickname files at my office and I saw that Pistol Pete was in fact Jose Montanez, Mando was Armando Serrano and Jordan was Jorge Pacheco." (*Id.*) Det. Halvorsen testified that he knew all three from prior investigations.[14] (*Id.*) Det. Halvorsen testified that he then "went and obtained black and white CPD identification photos of them ... and I showed these three photos to Francisco Vicente" who identified them "as being the individuals that he had given the statement regarding." (*Id.* at 84.)

---

[12] Vicente's arrest records for the four relevant robberies, which we obtained and examined, indicate that he was not arrested with (nor did he commit any of his robberies with) a Pistol Pete. (Vicente Armed Robbery File.) Rather, Vicente's only co-perpetrator on these robberies was Kenneth Thrane, nicknamed simply "Kenny," and the pair were not actually arrested together. (*Id.*) Notwithstanding this evidence, Vicente testified at trial that he had in fact been arrested with a Pistol Pete. (10/18/94 Trial Transcript, Vol. 2 at 28.) Vicente also testified at trial that he gave a statement against that other Pistol Pete—i.e., not Montanez—in connection with the robbery they allegedly committed together, another assertion we have been unable to confirm through our search of Vicente's criminal records. (*Id.* at 126-27, 129.)

[13] Captain Lupe Pena, Vicente's arresting officer on his armed robberies, told us that he knew of only two Pistol Petes in the neighborhood at that time, Montanez and another man named Jose Cotto. (7/17/14 Interview with Lupe Pena.) The "little Pistol Pete" referenced by Vicente and Halvorsen is Angel Sanchez, according to information obtained by student investigators from Montanez's family, whose brother Armando Quinones was nicknamed, like Armando Serrano, simply "Mando." (5/4/03 Email.) Quinones confirmed these nicknames in an interview with us. (Interview with Armando Quinones.) Both Sanchez and Quinones were members of the Imperial Gangsters (*id.*), and have extensive criminal histories, including for the following charges: armed robbery, burglary, narcotics possession, mob action, theft, receipt of stolen property, and receipt of stolen vehicle. (7/14/14 Armando Quinones Background; 12/13/94 Angel Sanchez Criminal History.)

[14] Halvorsen was the arresting officer of Montanez's co-defendant in a prior murder trial. (6/24/90 Jose Baez Arrest Report by H.) (Montanez was acquitted at trial in that case, and told us he had been innocent of the crime. (10/17/13 Interview with Jose Montanez.)

SERRANO_LASSAR 25081



# CONFIDENTIAL

(ii)     **The 2/5/93 Confession**

Regarding the details of the confession, Vicente was reported to have informed the "R/Dets." that he was hanging out at a "dope spot" at the corner of Hamlin and Altgeld on 2/5/93. (6/2/93 Supp. R. by G/H.) Vicente had spent the entire night on that corner and had used heroin at about 1:30 or 2 a.m.[15] (10/18/94 Trial Transcript, Vol. 2 at 88.) Then, between 8:30 and 9 a.m., when Vicente was "coming down off of" his heroin high, Montanez drove up in a tan-colored Buick. (*Id.* at 10-11.) Serrano and Pacheco, he said, were passengers.[16] (*Id.* at 89.) Although there is a large church and school complex on the corner of Hamlin and Altgeld, Vicente testified that he was not aware of the church or school, and did not see any other people during the time he spent on that corner with Montanez, Serrano, and Pacheco.[17] (*Id.* at 123, 130-31.)

Serrano and Pacheco exited the car and Montanez, who remained inside of it, placed a "large frame, 9 mm semi-automatic pistol" in one of the vehicle's air vents. (6/2/93 Supp. R. by G/H.) (At trial, in contrast, Vicente described for the first time Montanez hiding his weapon by "plac[ing] it outside somewhere." (10/19/94 Trial Transcript, Vol. 2 at 33.)) While parked on the corner, Montanez also "play[ed] with a bag of … dope," i.e. heroin. (6/2/93 Supp. R. by G/H; 10/18/94 Trial Transcript, Vol. 2 at 10-11.) Thereafter, in Vicente's presence, "[t]he three of them were talking about a robbery they had just done, that had gone bad" because Serrano "fucked up" and "went at the guy wrong." (6/2/93 Supp. R. by G/H.) Montanez continued, "we

---

[15] At trial, Vicente referred instead twice to a meeting at *Harding* and Altgeld. (10/18/94 Trial Transcript, Vol. 2 at 8, 116-17.) However, later in his testimony he again began referring to *Hamlin* and Altgeld as the site of the meeting with the defendants. (*Id.* at 130-131, 140.) At trial, ASA Coghlan referred to the streets only as Hamlin and Altgeld, with the references occurring after Vicente said Harding. (*Id.* at 130-31, 140.) Vicente referred to Hamlin once more, in a 5/26/04 affidavit he executed recanting his statements and testimony against Montanez, Serrano, and Pacheco. (5/26/04 Affidavit of Francisco Vicente.)

[16] Vicente told the grand jury that he had known Montanez for seven years prior to the corner meeting, that he had known Pacheco "nine or eight years" before the meeting, and that he had known Serrano for "about six years" before the meeting." (7/1/93 Grand Jury Testimony of Francisco Vicente.) Vicente and Serrano had been in a fight in July of 1992, after Vicente had informed someone that Serrano had broken into his car. (7/13/99 Affidavit of Felix Serrano.) In conversation with us, Serrano denied that he had broken into that car, but confirmed the fight. (10/17/13 Interview with Armando Serrano.) Vicente has not specifically discussed the fight, to our knowledge, but did tell student investigators that he "hated" Serrano. (6/19/03 Email.)

[17] Stephanie Turner, an investigator employed by the Cook County Public Defender's Office, testified that "[T]here's a big Catholic school there at the corner and the school is very large. It goes all the way around and all the way up to Ridgeland and all around. So it's a very large school." (10/21/94 Trial Transcript at 42-43.) We visited that location and confirmed the accuracy of her characterization.

SERRANO_LASSAR 25082



# CONFIDENTIAL

would have never did what we did if [Serrano] never fucked up." (*Id.*) At that time, Pacheco "stood around laughing as [Montanez] yelled at [Serrano]." (*Id.*) When Vicente asked for clarification, Montanez stated "we shot a stud" and "we hurt that stud bad." (*Id.*) Vicente and the occupants of the Buick conversed for three to four hours, at the corner of Hamlin and Altgeld, on Vicente's porch, and on the drive to Gold Busters, Vicente testified. (10/19/94 Trial Transcript, Vol. 2 at 12.)

Montanez continued: "the day before the three of them had spotted a victim with lots of money" at an undescribed location. (6/2/93 Supp. R. by G/H.) Specifically, "Pistol Pete was getting change for a dollar when the victim walked in and showed a lot of money."[18] (*Id.*) (At trial, Vicente stated for the first time that Pacheco also discussed with him the fact that they had spotted Vargas the night before they killed him. (10/18/94 Trial Transcript, Vol. 2 at 111.)) Then, Montanez, Serrano, and Pacheco followed him home, but held off robbing him because "he was with his lady and some kids." (6/2/93 Supp. R. by G/H.) (At trial, Vicente testified that Montanez, Serrano, and Pacheco held off on the robbery "because the guy's wife was aware that they were being followed." (10/18/94 Trial Transcript, Vol. 2 at 10-11.)) Instead, because they "knew this guy would be a sweet victim . . . they laid out for him." (6/2/93 Supp. R. by G/H.)

According to Vicente, Montanez stated that "they did not get money from the victim they popped, and needed to get some money to buy" heroin. (*Id.*) In fact, they did not take anything from Vargas, Vicente testified. (10/18/94 Trial Transcript, Vol. 2 at 19.) Accordingly, Montanez allegedly stated that "they robbed some kid on the street with his school bags." (6/2/93 Supp. R. by G/H.) Montanez continued, according to Vicente, stating "he took this victims [sic] three neck chains, and his bracelet." (*Id.*) Serrano allegedly stated that "he took the school ring off the victims [sic] finger." (*Id.*)

Vicente then reportedly accompanied Montanez, Serrano, and Pacheco to a store called "Gold Busters," where they fenced the gold chains and school ring "to get money to buy heroin." (*Id.*) Det. Halvorsen told us that he and Det. Guevara determined that Gold Busters did not exist. (10/21/13 Interview with Ernest Halvorsen.) Said Det. Halvorsen: "Gold Busters was bullshit." (*Id.*) We have independently determined, through a search of relevant public records, that no store called Gold Busters existed in Chicago at that time. (10/20/14 Public Records Search.)

### (iii) The 2/7/93 Confession

Vicente is also reported to have stated to the "R/Dets." on 6/2/93 that on 2/7/93, two days after the initial reported meeting, Montanez again drove up to Vicente. (6/2/93 Supp. R. by G/H.) That second visit, Vicente testified, was motivated by Montanez's need to repair his muffler, a job Vicente had agreed to do for Montanez. (10/18/94 Trial Transcript, Vol. 2 at 120-21.) When

---

[18] Vicente later expanded upon this in a handwritten statement (6/28/93 Vicente H/W Statement by H) and at trial, explaining that Montanez informed him that the "day before" Montanez had "seen this Mexican guy walk into the gas station." (10/18/94 Trial Transcript, Vol. 2 at 16.)

9



<span style="color:red">**CONFIDENTIAL**</span>

Montanez arrived, Vicente said, he first "noticed new damage to the left front fender" of Montanez's car.[19] (6/2/93 Supp. R. by G/H.)

Vicente asked "'Pistol Pete' what happened to his car," and Montanez reportedly informed Vicente that "after they popped" Vargas, "he was driving his car and smashed into a parked car as they drove off" from the scene. (*Id.*) Vicente then sought clarification, asking Montanez "what went wrong." (*Id.*) In response, Montanez stated:

> The victim who was a Mexican came out carrying a car radio. Mondo was supposed to grab the victim around the neck, so they could go into the victim's pockets. Mondo got greedy when he saw the radio and, instead of grabbing the victim he went for the radio. The victim started fighting, and got shot. Pistol Pete and Mondo jumped back into the car.[20]

(*Id.*)

At trial, Vicente stated for the first time that he was with a "friend" known to him only as "Rick" when Montanez described the Vargas murder on 2/7/93. (10/18/94 Trial Transcript, Vol. 2 at 22.) Vicente acknowledged that he had not, prior to trial, specifically discussed with anyone Rick's presence during the confession. (*Id.* at 112-13.) He stated, however, that he had previously informed ASA Coghlan that a "friend" was with him on 2/7/93. (*Id.*) (That prior disclosure is not reflected in the record.)

As reported by Dets. Guevara and Halvorsen, the "R/Dets. were familiar with the Imperial Gangsters Street Gang and had photos of Pistol Pete, Jordan and Mondo," which Vicente then identified as Montanez, Pacheco, and Serrano, respectively. (6/2/93 Supp. R. by G/H.)

Jose Garcia, a mechanic, later submitted an affidavit in which he noted that on 2/19/93, Montanez brought in his car for repair. (3/2/95 Affidavit of Jose Garcia.) Garcia stated that it was part of his standard practice to examine customer vehicles for damage, and that there was no damage on Montanez's vehicle. (*Id.*) Attached to the affidavit was a receipt for repair, dated 2/19/93. (*Id.*) Montanez told us that he damaged his car by hitting a parked vehicle when he was "high." (10/17/13 Interview with Jose Montanez.)

Det. Halvorsen did not take notes during the 6/2/93 interview with Vicente, he testified. (10/19/94 Trial Transcript, Vol. 3 at 111.)

---

[19] Vicente would later tell ASA Coghlan and testify at trial that he actually noticed the damage on 2/5/93, but did not disclose that fact to anyone. (9/21/94 Investigative Report; 10/18/94 Trial Transcript, Vol. 2 at 120.)

[20] During the 2/7/93 meeting between Montanez and Vicente, Montanez purportedly did not describe Pacheco's involvement in the robbery or shooting. (6/2/93 Supp. R. by G/H.)

SERRANO_LASSAR 25084



<span style="color:red">**CONFIDENTIAL**</span>

f.    **Dets. Guevara and Halvorsen Obtain Evidence From Wilda Vargas**

(i)    **Wilda Discusses the "Gas-Station Incident"**

Also, at time unknown on 6/2/93, Det. Guevara reportedly met alone with Wilda, Vargas's widow. (6/2/93 Supp. R. by G/H.) Det. Halvorsen testified that while he was "seated in the car on the street," Det. Guevara "went into the house." (10/19/94 Trial Transcript, Vol. 3 at 85.)

Wilda informed Det. Guevara that she, Vargas, and their children went to the bank on 2/4/93, and then, at some time between 6:40 and 7 p.m., "stopped at the gas station at North Ave. and Central Park." (10/19/94 Trial Transcript, Vol. 3 at 12; 6/2/93 Supp. R. by G/H.) At that point, a vehicle "pulled up and parked directly in front of them." (6/2/93 Supp. R. by G/H.) Although Dets. Guevara and Halvorsen reported that Wilda described that vehicle as a "tan car" (*Id.*), Det. Guevara later testified that Wilda did not describe to him the vehicle she saw at the gas station. (10/21/94 Trial Transcript at 25.)

Wilda could "see that there were three" male Latino occupants, a driver, a front passenger, and a rear passenger. (6/2/93 Supp. R. by G/H.) Wilda "looked at the man next to her husband" and the "man who was seated in the front passenger seat." (*Id.*) (At trial, Wilda testified, in contrast, that both passengers sat in the back seat. (10/19/94 Trial Transcript, Vol. 3 at 16.))

Wilda informed Det. Guevara that after "[h]er husband went into the station to make a purchase" the "driver of this car walked into the station behind her husband." (6/2/93 Supp. R. by G/H.) Her husband, Wilda reportedly stated, "had a roll of money, about $350" with him. (*Id.*) (At trial, however, Wilda testified several times that by the time the occupant of the tan sedan entered the cashier's station at the gas station, her husband had already exited the cashier's station and was either pumping gas or seated in their van.[21] (10/19/94 Trial Transcript, Vol. 3 at 13, 20, 69.)) Wilda and her family and the occupants of the tan car were at the gas station together for three minutes, she testified. (10/19/94 Trial Transcript, Vol. 3 at 71.)

At the expiration of this time, the "people in the tan car began to follow them, all the way back to her house on Springfield." (6/2/93 Supp. R. by G/H.) (At trial, in contrast, Wilda testified several times that she did not know whether the vehicle she saw at the gas station followed her all the way home.[22])

---

[21] On one occasion, on cross examination, Wilda she testified that Vargas was still in the cashier's station when the occupant of the tan sedan entered. (10/19/94 Trial Transcript, Vol. 3 at 70.)

[22] Specifically, Wilda testified that although she and Rodrigo believed that the car followed them directly out of the gas station, they were not sure whether it followed them after they made their

11



<span style="color:red">**CONFIDENTIAL**</span>

Det. Guevara then showed Wilda eight black and white CPD identification photos—specifically, Montanez, Serrano, and Pacheco plus five fillers.[23] (*Id.*) Wilda identified Montanez as the person who "followed her husband into the gas station" and Serrano as the person she "saw seated in the front passenger seat." (*Id.*) She could not, however, "see the man in the back seat clearly." (*Id.*) According to Vicente, that would have been Pacheco. (*Id.*)

After Wilda identified Serrano and Montanez, Det. Guevara "asked her to go with us and show us the route that they took that night at the gas station going home." (10/21/94 Trial Transcript at 10.) Det. Guevara and Wilda then exited her home, and all three drove to the gas station at the corner of Central Park and North Avenue. (*Id.*) There, Det. Halvorsen "watched as Wilda Vargas explained in Spanish to Detective Guevara the events that had taken place in that gas station the day before her husband was murdered." (10/19/94 Trial Transcript, Vol. 3 at 85.) (Det. Halvorsen told us that he did not speak Spanish. (10/21/13 Interview with Ernest Halvorsen.))

(ii) <b>Wilda Identifies Montanez's Car</b>

As also reported in the Supp. R. dated 6/2/93, at time and date unknown, the "R/Dets. gained information" regarding the location of Montanez's car, a "tan colored, 1984, 2Dr, Buick Regal" with "damage to the left front fender" and a "bullet hole in the trunk and in the left passenger door." (6/2/93 Supp. R. by G/H.)

Then, Wilda, in the presence only of Det. Guevara, reportedly drove around. (*Id.*) At that time, Wilda "was asked if she recognized the car that had followed her the day before her husband was killed."[24] (*Id.*) As reported, Wilda "positively identified the 1984 2Dr. Buick Regal

---

first of several turns. (10/19/94 Trial Transcript, Vol. 3 at 53-55, 57-60, 76.) On 5/23/06, however, in connection with a student investigation of potential wrongful convictions, Wilda executed an affidavit in which she asserted that she *did* notice that the men drove behind the van until the Vargases reached their home, but that they then "continued driving without pausing or slowing," and that "[i]t did not appear to me that we were being 'followed' by these men," and that Rodrigo Vargas also did not indicate that he thought they had been followed. (5/23/06 Affidavit of Wilda Vargas.)

[23] We have not been able to locate this photo array among the Impounded Evidence, although a 3/8/95 Impounding Order confirms that the array was impounded, and the trial transcript indicates that Wilda was shown the photo array photos at trial. (10/19/94 Trial Transcript, Vol. 3 at 21-23.)

[24] Dets. Guevara and Halvorsen both testified that they did not look for Montanez's car with Wilda on 6/2/93, but rather on 6/6/93. (10/21/94 Trial Transcript at 10; 10/19/94 Trial Transcript, Vol. 3 at 86-87.) As reported in the Supp. R. dated 6/2/93, it was not until "6 June 93 [that] the R/Dets. took photos of this 1984 Buick Regal." (6/2/93 Supp. R. by G/H.) A 6/6/93 Crime Scene Processing Report confirms this. (6/6/93 Crime Scene Processing Report by H.)

12



<span style="color:red; font-weight:bold">CONFIDENTIAL</span>

of Jose Montanez as the car that followed her from the gas station." (*Id.*) (In actuality, the car was a four-door. (Photos in Evidence.))

However, prior to the 2013 post-conviction proceedings in this matter, Wilda allegedly told Russell Ainsworth and Jennifer Bonjean, post-conviction counsel to Montanez and Serrano, respectively, that Det. Guevara had pointed out Montanez's car to her, and asked if it was the vehicle that had followed her home. (5/15/13 Hearing Transcript at 194-98.) Specifically, she allegedly stated that Dets. Guevara and Halvorsen drove her around looking for the car that blocked Vargas's van at the gas station on the eve of his murder. (*Id.*) She allegedly stated that she was not able to identify the car that she saw at that gas station. (*Id.*) She stated, allegedly, that Det. Guevara than brought her to a car and identified it to Wilda as the car that had been driven by the offenders. (*Id.*) Upon being pointed out the car by Det. Guevara, Wilda purportedly said only that the vehicle was "similar," at which time Det. Guevara responded that the bullet holes in Montanez's car matched the ballistics evidence from the crime scene and that the fender damage on Montanez's car "matched the accounts of the crime." (*Id.*) There is no evidence to support Det. Guevara's alleged statement regarding the ballistics match or fender damage. In fact, the bullet damage to Montanez's car was to a passenger side door and the trunk, neither of which would have been exposed to gunfire emanating from the driver's side sidewalk on a one-way street. (Photos in Evidence.) Wilda, allegedly, was prepared to testify to this event at the post-conviction hearing, according to an offer of proof, but was barred from testifying by the post-conviction court. (5/15/13 Hearing Transcript at 194-198.)

### g. Sequencing of Vicente's and Wilda's Evidence

At trial, Dets. Guevara and Halvorsen testified to the sequencing of these events. Upon concluding his meeting with Vicente, Det. Halvorsen testified that he "informed [his] partner Detective Reynaldo Guevara of the statement that I had gotten from Francisco Vicente." (10/19/94 Trial Transcript, Vol. 3 at 85.) After receiving this information from Det. Halvorsen, Det. Guevara testified that he "immediately" called Wilda, with whom he had been "keeping constant contact" since the "day after" the murder, and "asked her if anything unusual happened the night before the murder." (10/21/94 Trial Transcript at 4-5.) In response, Wilda said, "yes." but did not elaborate and, accordingly, Det. Guevara drove to her house with Det. Halvorsen to elicit additional information, he testified. (*Id.* at 6-7.) After Det. Guevara had a conversation with Wilda at her home, she accompanied Dets. Guevara and Halvorsen to the gas station where she described the incident that occurred. (10/19/94 Trial Transcript, Vol. 3 at 85.)

Wilda also testified to the sequencing of these events, stating several times, however, that she, rather than Det. Guevara, first introduced the incident that took place on the eve of her husband's murder.[25] (*Id.* at 10-11, 36-39.) Like Det. Guevara, Wilda testified that she and Det.

---

[25] Wilda stated three times at trial that she volunteered the 2/4/93 incident to Det. Guevara. On direct, she said that Det. Guevara asked her if she had been to the bank the night before the murder, at which time she told him "[t]hat we went to the gas station to pay gas for the van." (10/19/94 Trial Transcript, Vol. 3 at 10-11.) Asked whether "the detective asked you if you had been at the gas station," she responded, "No, I told him that we went to the gas station." (*Id.* at

13



<span style="color:red">**CONFIDENTIAL**</span>

Guevara had been in contact in the months after the murder, stating: "I used to get in touch with him." (*Id.* at 38.) Wilda testified inconsistently regarding when she and the detectives visited the gas station and surrounding streets in an effort to locate the car she saw at the gas station, describing it variously as 2/8/93 and June of 1993. (*Id.* at 61-62, 23-25.) (Det. Halvorsen testified that "nobody showed her any cars" on 2/8/93. (*Id.* at 104.))

We also asked Det. Halvorsen about the sequencing of these events. Det. Halvorsen told us that when he was working on the Supp. R. in which this evidence was reported—i.e., the Supp. R. dated 6/2/93—"Rey [Guevara] came into the office and told" him "by the way" at some point prior to 6/2/93, Wilda had informed him that she "remembered something happened the night before [the murder] at a gas station." (10/21/13 Interview with Ernest Halvorsen.) Det. Halvorsen recalled exclaiming at the time, "You're just telling me about this now?" (*Id.*) When we asked Det. Halvorsen whether Vicente instead might have introduced that incident into the case, Det. Halvorsen said, "no," explaining that Vicente "had no knowledge of that." (*Id.*)

   h.  **Serrano and Pacheco are Detained for Questioning**

On 6/8/93, Serrano was brought into Area 5 Violent Crimes for questioning. (6/14/93 Supp. R. I by G/H.) At that time, he "denied having any knowledge" of the incident, and requested a polygraph. (*Id.*) At the conclusion of the polygraph, he was "informed that he had failed the test and that he had knowledge or participated in the incident." (*Id.*) A report accompanying the test reads, in part, "Deception Indicated." (6/8/93 Crime Lab Report.)

The following day, Pacheco was brought into Area 5 VC to be interviewed. (6/14/93 Supp. R. by G/H II.) Pacheco, like Serrano, "denied having any knowledge of the incident and also requested to be taken for a polygraph test." (*Id.*) Pacheco was also "told that he failed the test" but he "kept on denying any knowledge of the incident." (*Id.*) A report accompanying his test reads, also, in part, "Deception Indicated." (6/9/93 Crime Lab Report.)

   i.  **Tim Rankins Claims to Have Witnessed Shooting**

    (i)  **Rankins Meets with Sgt. Mingey**

On 6/10/93, at approximately 11 p.m., Timothy Rankins (aka "Loco"), 19, a member of the Spanish Cobras street gang, was arrested moments after allegedly committing a robbery. (6/10/93 Timothy Rankins Arrest Report.) At 1:05 a.m., Demond Williams (aka "Shorty Folks"), 15, a member of the Gangster Disciples street gang, was arrested in connection with the same robbery, and described as Rankins's co-perpetrator. (6/11/93 Demond Williams Arrest Report.)

---

36-37.) She then verified that sequence when asked a clarifying question. (*Id.* at 38.) In a later interview with student investigators, Wilda said that she told police investigators about the gas-station incident on the day that Rodrigo was shot and killed. (4/24/06 Interview with Student Investigators at 6.)

14



<span style="color:red">**CONFIDENTIAL**</span>

After Rankins was brought in, Sgt. Ed Mingey decided to interview him because, as reported by Dets. Guevara and Halvorsen, "preliminary information . . . indicated" that a victim in another case had been murdered by a Spanish Cobra. (6/14/93 Supp. R. II by G/H.) (The defendant in that case, an Imperial Gangster, was later convicted of that murder, in part, on his alleged confession to Vicente. As noted in the introduction to this report, we investigated his case, as well, but were unable to make a final finding regarding innocence.[26]) Rankins was reported to have revealed to Sgt. Mingey at that time that "he was a witness to a murder that occurred in Feb. 93," which Sgt. Mingey recognized as a reference to the Vargas murder. (*Id.*) Mingey knew that Dets. Guevara and Halvorsen "had previously gained information as to suspects" in that case, and thus contacted them for purposes of requesting that they take a statement from Rankins. (*Id.*) Specifically, Sgt. Mingey told us, "[t]he lead they were working on was this Vicente guy . . . who was Halvorsen's snitch on other cases." (4/7/14 Interview with Ed Mingey.) There are no notes in the record from Sgt. Mingey memorializing his interview with Rankins, although he told us that he did take brief notes of the conversation, containing only Rankins's nicknames for the assailants—Barrel Belly, Stripes, and Joker—which he then turned over to Dets. Guevara and Halvorsen.[27] (*Id.*)

Sgt. Mingey told us that Rankins was "the best witness I ever had." (*Id.*) Mingey said that Rankins "was extremely cooperative and easy to talk to," and that it was "obvious" after talking to Rankins "that one, he was the offender or, two, he actually witnessed it." (*Id.*) Sgt. Mingey continued:

> When I talked to this guy, I never talked to anyone who gave me more info and it turned out to be totally legit. . . . I've never talked to a guy who was a better informant. He spewed out all this information. It seems strange, but that's exactly what happened.

(*Id.*)[28]

---

[26] The reporting in the third defendant's case indicates that the preliminary information pointed at the Imperial Gangsters rather than the Spanish Cobras, as Sgt. Mingey was reported by Dets. Guevara and Halvorsen to have believed. (6/24/93 Supp. R. by G/H.) Moreover, Sgt. Mingey told us that he did not, in fact, participate in that murder investigation. (4/7/14 Interview with Ed Mingey.)

[27] Serrano told us that Joker and Stripes were well-known gang members in the neighborhood. (10/17/13 Interview with Armando Serrano.) Stripes, according to Serrano, lived near Monticello Park. (*Id.*) Another Imperial Gangster, Armando Quinones (aka "Mondo") told us in an interview on 8/9/14, too, that Stripes and Joker were well-known Imperial Gangsters. (2014 Interview with Armando Quinones.)

[28] Mingey currently serves as the Director of Security for the Illinois Racing Board. (4/7/14 Interview with Ed Mingey.)

15



**CONFIDENTIAL**

(ii)   **Rankins Meets with Dets. Guevara and Halvorsen and Gives a Handwritten Statement**

At 2 p.m. on 6/11/93, Dets. Guevara and Halvorsen interviewed Rankins. (6/14/93 Supp. R. II by G/H.) At 11:35 p.m., he met with ASA Jon King and Det. Halvorsen and gave a handwritten statement.[29] (6/11/93 Timothy Rankins H/W Statement by H.) Rankins stated that on 2/4/93 he was standing on the corner of Spaulding and Armitage, "a hangout for the Imperial Gangsters Street Gang." (*Id.*) Rankins noted that at that time, "his gang was friendly with the Imperial Gangsters Street Gang" because they were "part of the 'Folk Nation.'" (*Id.*) At about 9 p.m. (*Id.*), a "tan colored Buick Regal" drove up. (6/14/93 Supp. R. II by G/H.) That car, according to Rankins, was driven by an Imperial Gangster "he knows as Moses" or "Barrel Belly" (Montanez), the latter nickname a reference to his "large stomach." (*Id.*) An Imperial Gangster "he knows as Joker" (Serrano) was also in the car.[30] (*Id.*) Serrano exited the car and said, "I want you to go with us tonight to go pick up some guns and drugs." (*Id.*) According to Rankins, he had done so with Serrano, Montanez, and other Imperial Gangsters on two prior occasions because he is fast runner and could outrun the police if stopped with contraband. (*Id.*)

As planned, Rankins arrived at Monticello Park at 4:30 a.m. (*Id.*) There, he found Serrano and Montanez and another Imperial Gangster "he knows as 'Stripes'" (Pacheco). (*Id.*) Rankins's girlfriend "Sabrina" and "a guy he knows as Shorty Folks" (Demond Williams) were also in the park with Serrano, Montanez, and Pacheco. (*Id.*) Then, according to Rankins, he talked to his girlfriend while Montanez, Serrano, and Pacheco had a conversation by themselves.[31] (*Id.*) Rankins "could not hear what they were saying." (*Id.*) After a time, Serrano approached Rankins and said, "Come on now, we're going to do this." (*Id.*) Then, Serrano and Montanez got into the "same tan Buick that they had been riding in earlier." (*Id.*) Williams and Pacheco got into a "red van with white stripes on the bottom."[32] (*Id.*) That van, according to Rankins, had been borrowed from another Imperial Gangster, but he did not know from whom specifically. (*Id.*)

Upon departing Monticello Park, Rankins, Williams, and Pacheco drove down Springfield and then "parked their van at the corner of Springfield and Cortland." (*Id.*) Pacheco

---

[29] The content of that handwritten statement is almost identical to the content of the 6/14/93 Supp. R. memorializing Dets. Guevara and Halvorsen's 2 p.m. meeting with Rankins.

[30] For purposes of clarity, we primarily refer to the defendants as Montanez, Serrano, and Pacheco under circumstances where Rankins referred to them by purported nicknames.

[31] In the handwritten statement, in contrast, Rankins indicated that Williams also took part in this conversation with the defendants. (6/11/93 Timothy Rankins Handwritten Statement by H.)

[32] An Imperial Gangster commonly known as Joker (i.e., not Serrano), in fact, owned the red and white van that Rankins described, according to Serrano. (10/17/13 Interview with Armando Serrano.)

16



<span style="color:red">**CONFIDENTIAL**</span>

exited the red and white striped van and met Montanez and Serrano near another "van that was parked on Springfield"—i.e., Vargas's van. (*Id.*) Pacheco, Serrano, and Montanez were standing on the sidewalk "about seven or eight houses away from where Rankins was watching." (*Id.*) A "couple of minutes" later, a man exited a "gate" and was stopped by Serrano, Montanez, and Pacheco. (*Id.*) Although Serrano, Montanez, and Pacheco "said something to this man," Rankins "could not make out the words." (*Id.*) Rankins noticed that the man was carrying a "Snatch Out Radio." (*Id.*) Then the "man ran to a blue and grey van that was parked on Springfield." (*Id.*) As he ran, Pacheco "was yelling out, 'DO HIM, DO HIM.'" (*Id.*) When the man jumped inside the van, Montanez "yelled out, 'GO AHEAD, GO AHEAD.'" (*Id.*) Then Serrano "pulled out a large semi-automatic pistol" and started "firing into the van." (*Id.*) Rankins could "hear the glass on the drivers side window shatter." (*Id.*) After Serrano fired into the van "6-9 times," he and Montanez "ran back to the tan Buick and drove off." (*Id.*) Pacheco then got back into the van, at which point he stated to Rankins and Williams, "If you tell anyone what you saw, we'll kill you too." (*Id.*)

Rankins told Dets. Guevara and Halvorsen that as he was "afraid he would be killed," he had not talked to anyone about the shooting. (6/11/93 Timothy Rankins Handwritten Statement by H.) However, when Rankins was locked up for a robbery on 6/11/93, "he asked to speak with Sgt. Eddie Mingey who Timothy knows and trusts."[33] (*Id.*). Rankins noted that "is scared of being killed by the Imperial Gangsters but came forward to Sgt. Mingey anyway." (*Id.*)

After Rankins shared this information, Dets. Guevara and Halvorsen "asked Timothy Rankins to verify the information he was providing, by showing the R/Dets. the exact location where the man was shot." (6/14/93 Supp. R. II by G/H.) Det. Halvorsen testified that he said the following to Rankins at the conclusion of the interview: "I wanted to believe the information he was providing me but he is going to have to demonstrate to me that he actually had evidence of this." (10/19/94 Trial Transcript, Vol. 3 at 93.) Det. Halvorsen testified he then informed Rankins "that they were going to drive North on Springfield, and that Timothy Rankins should indicate the location where the victim was shot." (*Id.* at 93.) Rankins "instructed the R/Dets. to stop in front of 1838 N. Springfield" (i.e., the Vargas home) and "pointed out the gate that the Victim walked out of, and pointed to the spot on the street where the victim['] van was parked." (6/14/93 Supp. R. II by G/H.) After Rankins viewed the crime scene, he was "returned to Area Five VC" where he viewed a photo array consisting of eight color photos, and identified Stripes as Pacheco, Joker as Serrano, and Barrel Belly as Montanez. (*Id.*) He also stated that he had known Montanez, Serrano, and Pacheco for about "seven years." (6/11/93 Timothy Rankins Handwritten Statement by H.)

On 6/15/93, Rankins appeared before a grand jury, and provided testimony largely consistent with his prior statements. (6/15/93 Grand Jury Transcript.) At that time, he also stated the following for the first time: (1) He knew Jorge Pacheco by the nickname "Jordan" in addition

---

[33] Sgt. Mingey told us that he "may have" known Rankins previously, but "I really don't know." (4/7/14 Interview with Ed Mingey.) He continued: "Something tells me I may have known this guy from some place. If he was arrested previously and it was a robbery case, I could have been involved in arresting him previously." (*Id.*)

17



**CONFIDENTIAL**

to the nickname "Stripes"; and (2) He knew Montanez by the nickname "Pistol Pete," in addition to the nicknames "Moses" and "Barrel Belly." He also, at this time, did not describe his girlfriend as having been at the Monticello Park. (*Id.*)

Det. Guevara testified before a grand jury on 7/29/93, at which time he related the evidence provided by Rankins. (7/29/93 Grand Jury Transcript.)

We discussed with Det. Halvorsen his attempt to corroborate Rankins's evidence. (7/1/14 Interview with Ernest Halvorsen.) Said Det. Halvorsen: "I just remember this black guy that was as crazy as crazy could be. He was just making up stories. This guy was way off his bean. He didn't have any of the facts of the case, to me." (*Id.*) We asked Det. Halvorsen directly if he recalled driving Rankins to the scene of Vargas's murder. (*Id.*) He said: "I don't remember if we did or not, but I remember the guy didn't have any of the facts. He was sitting up in the office and Mingey sent us to go talk to him. Mingey said, 'Go talk to this guy, Rankins.' Why he was up there in the first place, I don't know. . . . He had no information. Everything he had was goofy, talking to him. I imagine I told Eddie, 'This guy's nuts.'" (*Id.*)

We also interviewed Williams, identified in the record as "Shorty Folks." (5/1/14 Interview with Demond Williams.) As an initial matter, it appeared that he learned both of the Vargas murder and his reported connection to it from us. (*Id.*) Williams credibly appeared baffled when we explained to him why we were interested in speaking with him and denied any knowledge of the crime. (*Id.*) He claimed also not to know Montanez, Serrano, or Pacheco. (*Id.*) Nor did he have any knowledge of Dets. Guevara or Halvorsen or Sgt. Mingey. (*Id.*) He stated, further, he did not associate with Imperial Gangsters. (*Id.*) As he said, "I would never fuck with those guys, I would never hang with [them]. I got nothing to do with those IGs." (*Id.*) He did, however, vividly recall Tim Rankins, and informed us that Rankins falsely implicated him in a robbery in June of 1993 for which he served four years in jail, and for which he maintained his innocence. (*Id.*) Said Williams: "Rankins lied on and said me and him did a robbery in 1993. I was fifteen years old…. I will never forget his name." (*Id.*) At the conclusion of the interview, he said of Rankins's allegedly false statements regarding his role in the Vargas murder, "If I ever see Tim Rankins again, I'll kill him." (*Id.*)

### j.   Serrano Is Arrested

One hour after Dets. Guevara and Halvorsen first met with Rankins, they arrested Serrano. (6/11/93 Serrano Arrest Report.) Serrano's arrest was approved by ASA King. (*Id.*) The arrest report indicated that Serrano was "identified by an eyewitness [i.e., Rankins], and a circumstantial witness [i.e., Vicente] as the person who shot to death, Rodrigo Vargas." (*Id.*) Later that evening, at 6:45 p.m., Rankins identified Serrano in a lineup in the presence of Dets. Guevara and Halvorsen. (6/11/93 Supp. R. by G/H, Rankins Line-Up.)

Also at 6:45 p.m. on 6/11/93, Wilda, in the presence of Dets. Guevara and Halvorsen, identified Serrano as the front-seat passenger of the vehicle that was parked in front of her husband's van at the gas station on the evening of 2/4/93. (6/11/93 Supp. R. by G/H, Wilda Line-Up.)

SERRANO_LASSAR 25092



<span style="color:red">CONFIDENTIAL</span>

Serrano had several prior arrests, including arrests for possession of marijuana, armed robbery, battery, obstructing traffic, disorderly conduct, and assault. (5/25/93 Criminal Histories.) Serrano told us that he also stole cars and car radios on a regular basis. (8/22/13 Interview with Armando Serrano.) His primary income, however, came from selling drugs, he told us. (*Id.*) Typically, he sold crack, cocaine, and marijuana, he said. (*Id.*) Serrano claimed not to carry a gun, and he described himself as a low-volume, "street-level" dealer. (*Id.*) Finally, Serrano described himself to us as a "punk" and a "typical gang banger." (*Id.*) He insisted, however, that he "never shot anyone, never killed anyone, never owned a gun." (*Id.*)

### k. Vicente Is Identified as Confidential Informant

Several weeks later, on 6/28/93, Vicente signed a hand-written statement, which was prepared by Det. Halvorsen and ASA Solita Pandit. Therein he was first identified as the previously "anonymous" witness who reportedly gave evidence against Montanez, Serrano, and Pacheco on 6/2/93. (*Id.*) But for some minor additions and differences, described as follows, his hand-written statement was consistent with the evidence reflected in the Supp. R. dated 6/2/93: (1) Vicente specifically identified the place where Montanez saw Vargas with money as a gas station for the first time; and (2) During their second meeting, Vicente said, Montanez asked Vicente to repair his muffler, Vicente stated for the first time. (*Id.*) After Vicente executed the statement, ASA Pandit approved arrest warrants for Montanez and Pacheco. (7/3/93 Supp. R. by G/H.)

### l. Dets. Guevara and Halvorsen Appear Before Grand Jury, Montanez and Pacheco Are Arrested, and Vicente and Rankins Are Placed in Witness Quarters

On 7/1/93, Det. Halvorsen appeared before the grand jury. (7/1/93 Grand Jury Transcript.) His testimony was consistent with the evidence provided exclusively by Rankins. (*Id.*) Specifically, Det. Halvorsen testified that after evading Montanez, Serrano, and Pacheco, Vargas "was able to run and get in his van." (*Id.*) Then, according to Det. Halvorsen, "[h]e closed the van door and locked it" and "Serrano ran up to the van, shot through the window." (*Id.*)

Vicente also appeared before the grand jury on 7/1/93. (*Id.*) His testimony was consistent with his statement as reported by Dets. Guevara and Halvorsen in the Supp. R. dated 6/2/93. On 7/7/93, Vicente was moved to the Witness Quarters, also known as the "Q," at the Office of the State's Attorney. (6/19/12 Subpoena Attachment 1.)

The following day, 7/8/93, Montanez was arrested for the Vargas murder by Officers Lupe Pena, Luis Marron, J. Silva, and R. Rodriguez. (7/8/93 Montanez Arrest Report.) We discussed the Montanez arrest with now-Capt. Lupe Pena. (7/7/14 Interview with Lupe Pena.) Capt. Pena said that he had gone to high school with Montanez, recalling him as a "funny guy" and "very personable." (*Id.*) He recalled, however, that Montanez later developed a heroin habit. (*Id.*) On the day of the arrest, he said, he went to Montanez's girlfriend's house, having been informed that Montanez's car was parked there. (*Id.*) Capt. Pena said that after Montanez's girlfriend's father let him into the home, Montanez emerged from a hiding spot behind the door

19



<span style="color:red">**CONFIDENTIAL**</span>

of a bedroom. (*Id.*) Capt. Pena said that Montanez appeared shocked to learn that there was a warrant for his arrest for murder, and would not believe it until Pena "ran a name check over the wire in front of him." (*Id.*) However, Capt. Pena said that Montanez "didn't go crazy after learning it." (*Id.*)

Prior to 7/8/93, Montanez had an extensive criminal history, including charges for armed and simple robbery and first-degree murder (of which he was acquitted in a 1991 trial.[34]) (5/25/93 Criminal Histories.) Regarding the robberies, Montanez told us that he had been involved in "more than ten stick ups." (10/17/13 Interview with Jose Montanez.) Typically, he "stuck up drug dealers" for their "dope and money," he explained. (*Id.*) Although he had "access to guns" and had "handled guns," he claimed that he had not directly used one in a crime. (*Id.*) Primarily, he explained, "back then, we fought with our hands." (*Id.*) He conceded, however, that on "one or two" occasions, his co-conspirators had been armed with a gun during the course of a stick-up. (*Id.*)

Thereafter, Dets. Guevara and Halvorsen were notified of the arrest. (7/10/93 Supp. R. by G/H.) Montanez was identified in a lineup by Wilda "as the person she saw the night before in the gas station staring at the Victim and his money." (7/10/93 Supp. R. by G/H, Line-Up Report.) Det. Guevara testified at trial that he was with Wilda when she identified Montanez, (10/21/94 Trial Transcript at 11), whereas the 7/10/13 Supp. R. Line-Up Report indicates that Dets. Guevara and Halvorsen were both present.[35] (7/10/93 Supp. R. by G/H, Line-Up Report.) At the time of the lineup, Montanez was wearing a jacket with his first name, Jose, appliquéd to the front of the jacket. (Photos in Evidence.)

On 7/12/93, Pacheco was arrested by Officers Pena and Marron. (7/12/93 Pacheco Arrest Report.) Thereafter, Dets. Guevara and Halvorsen were notified of the arrest and Det. Guevara alone interviewed him. (7/13/93 Supp. R. by G/H.) Det. Guevara asked whether Pacheco would talk about "the incident" to which Pacheco responded, he "would think about it." (*Id.*) Although the impounded evidence in this case contains line-up photos with Pacheco (Photos in Evidence), and the 7/13/93 Supp. R. notes that line-up photos were taken, no line-up involving Pacheco is reported in the record.

Pacheco had prior arrests for possession of marijuana (multiple times), trespass of a vehicle, discharging a weapon within city limits, and mob action. (5/25/93 Criminal Histories.) On 11/14/90, he was arrested for first-degree murder and armed robbery, but was released the following day without being charged. (*Id.*)

On 7/30/93, Rankins was also placed into the Q. (3/6/12 Rankins Disposition Sheet.) There, Vicente and Rankins appear to have met for the first time, as there is no evidence that we

---

[34] As noted above, Det. Halvorsen was involved in that case peripherally, as an arresting officer of Montanez's co-defendant. (6/24/90 Jose Baez Arrest Report by H.)

[35] Montanez told us that he knew Det. Guevara but not Det. Halvorsen prior to his arrest. (10/17/13 Interview with Jose Montanez.)

SERRANO_LASSAR 25094



<span style="color:red">CONFIDENTIAL</span>

are aware of that Vicente and Rankins knew each other prior to their time in the Q. In a sworn statement given to Serrano's post-conviction counsel, Jennifer Bonjean, Rankins said that after meeting Vicente in the Q, Vicente told him that Det. Guevara wanted them to coordinate their statements and instructed Vicente "to go over my statement with me." (4/4/12 Rankins Sworn Statement at 28.) Rankins then told Vicente that he would not "get on the stand and testify against an innocent person." (*Id.* at 28.) Thereafter, according to Rankins, Vicente began to pressure Rankins to cooperate. (*Id.* at 28-29.) That pressure, according to Rankins, caused Rankins to attack Vicente with a pool stick. (*Id.*) Rankins told us he was removed from the Q after the incident (3/2/14 Interview with Timothy Rankins), and the record confirms that he was placed back in the Cook County jail and, on 10/18/93, under house arrest. (3/6/12 Rankins Disposition Sheet.) In a discussion with student investigators, Vicente partially corroborated Rankins's story regarding the altercation, though he claimed to be the aggressor rather than Rankins. Vicente said that he "chased this guy with a stick and beat this black guy in the Q so I could get out of there." (Francisco Vicente Affidavit Notes.)

### m.   Montanez's Parents Reportedly Attempt to Bribe Wilda

As documented in an unattributed handwritten General Progress Report ("GPR"), dated 8/2/93, Montanez's parents reportedly offered Wilda "a couple thousand dollars to come to the pre-hearing of their son (Jose Montanez) and say that it was someone [else] and not thier [sic] son that killed her husband." (8/2/93 GPR.) In response, Wilda reportedly stated "she would not do such thing [sic]." (*Id.*) At that point, Montanez's parents reportedly "got very upset and left." (*Id.*) Reportedly, the conversation was also witnessed by James Montalbano, for whom a phone number was provided. (*Id.*) Our private investigator attempted to locate Montalbano, but no one by that name could be connected to the phone number listed on the report.

We discussed this incident with Montanez. (2013 Interview with Jose Montanez.) He told us that his parents had in fact met with Wilda, but had not offered her any money. (*Id.*) Instead, he said, his parents "wanted to know why she" had implicated him. (*Id.*) His parents, he said, were "just trying to help him out." (*Id.*) Montanez did not instruct them to meet with her, he said. (*Id.*)

### n.   Rankins Recants

On 3/29/94, Rankins recanted his statement and grand jury testimony implicating Montanez, Serrano, and Pacheco in the Vargas murder.[36] (3/29/94 Rankins Recantation.) In the handwritten statement, Rankins alleged that after he was arrested on an armed robbery charge, two unnamed "police" stated that they would have the charge "drop" in exchange for "testifie on a murder case for us." [sic] (*Id.*) Allegedly, when Rankins protested, "I know noting about the murder case so how is Im going to testiefie to something I know nothing about [sic]," the police

---

[36] Rankins's handwritten statement was purportedly obtained from Montanez's family by undergraduate students investigating potential wrongful convictions. (5/4/03 Email.) The circumstances of the execution of this recantation are unknown to us.

SERRANO_LASSAR 25095



<span style="color:red">CONFIDENTIAL</span>

stated, "your testifie cause if not were charge you with this fucking murder." (*Id.*) Then, according to Rankins, the police "start telling me what to say" to the "state attorney [sic]." (*Id.*) Rankins continued, the "reason why I sign the statement for the State Attorney cause the police threat me with case and that the State maid me a offer I couldn't refuse [sic]." (*Id.*) Rankins noted that he is certain of Montanez, Serrano, and Pacheco's innocence because "sergeant Eddie Mingy told me the reason why they gat these guys is cause he couldn't catch them up on any case but he knew that they sailing drugs [sic]." (*Id.*) Finally, Rankins alleged that he was in Gary, Indiana, on the day of the Vargas murder, and that his mother, Ella Rankins, and his girlfriend, Janet Clark, could corroborate that.[37] (*Id.*) For each, he provided a phone number. (*Id.*) Rankins claimed to have "writ[ten] th[e] statement on my own behalf[,] no deal or threats has been made[.]" (*Id.*)

In 1999, 2012, and 2014, Rankins provided additional recantation evidence. Those recantations are detailed below.

### o. Vicente Provides New Evidence to ASA Coghlan

On 9/21/94, Vicente met with ASA Coghlan and State's Attorney Investigator Jose Martinez for purposes of preparing for trial, at which time Vicente modified his statements and grand jury testimony implicating Montanez, Serrano, and Pacheco in the Vargas murder. (9/21/94 Investigative Report.) Specifically, upon being asked to review Dets. Guevara and Halvorsen's Supp. R. dated 6/2/93, in which the substance of Vicente's evidence was first reported, Vicente stated that the report is "basically correct" but offered several modifications. (*Id.*)

First, Vicente stated that "when [Montanez] was yelling at [Serrano], [Serrano] responded by saying that [Montanez] should have 'ganked' the victim himself so that [Serrano] could have gone through the victim's pockets."[38] (*Id.*) Vicente continued, "[Pacheco] took [Serrano's] side during the conversation and told [Montanez] that 'yeah, you're bigger than us, you should have ganked him from behind.'" (*Id.*) (Prior to this time, only Rankins had attributed inculpatory statements to Serrano and Pacheco.) Second, Vicente stated that Montanez, Serrano, and Pacheco were arguing about the robbery—Montanez "was angry because the victim had a lot of money and the robbery had gone bad" because they did not obtain anything from Vargas. (*Id.*) In response, according to Vicente, Serrano said, "'well, we can always do another one,'" meaning to commit another robbery.(*Id.*) Third, Vicente stated that on 2/7/93, "Montanez had said that [Pacheco], not [Montanez], was driving the car as the defendants fled the murder

---

[37] We obtained Indiana medical records for Rankins from February of 1993, confirming his hospital admission, but they were for several days after the Vargas murder, not the day of, as he alleged. (2/17/93 Rankins Medical Records.)

[38] Ganking, Vicente explained, is a "street saying meaning to grab someone by the neck in a choke hold." (9/21/94 Investigative Report.)

SERRANO_LASSAR 25096



CONFIDENTIAL

scene."[39] (*Id.*) Fourth, Vicente stated that he had actually "noticed the bullet holes and damage to Montanez's car" the first time he saw Montanez, Serrano, and Pacheco—i.e., on the morning of 2/5/93—although that fact had not been reported in Dets. Guevara or Halvorsen's report or in his handwritten statement, which both indicated that he did not notice the damage until 2/7/93. (*Id.*)

Vicente later testified that prior to meeting with ASA Coghlan on 9/21/94, he had had six or seven meetings with him. (10/18/94 Trial Transcript, Vol. 2 at 126.) He testified, too, that he had not previously provided to CPD, or shared with the Grand Jury, any of the information shared with ASA Coghlan on 9/21/94. (*Id.* at 124-26, 138-39.) Vicente responded affirmatively when ASA Coghlan questioned whether Vicente was "recovering from [his] heroin addiction" on 6/2/93—when he initially gave a statement against Montanez, Serrano, and Pacheco—and, accordingly, whether his "recollection of those events bec[a]me clearer as [Vicente] recovered more and more from [his] addiction to heroin"—i.e., by 9/21/94. (*Id.* at 139-40.)

p.     **Alibi Evidence**

Montanez and Pacheco offered some alibi evidence prior to, during, and after trial. Serrano did not.

Regarding Montanez, before the commencement of the trial, Montanez filed an Amended Answer to Discovery and noted that he would assert an alibi defense. (10/11/94 Montanez Answer to Discovery.) Specifically, he stated that he was with his parents during the time of the offense. (*Id.*) He did not assert such a defense at trial, however. On 3/15/95, Montanez's girlfriend, Jacqueline Pacheco (no relation to Jorge), submitted an affidavit in which she stated that Montanez was with her from 5 p.m. on 2/4/93 until 8:30 a.m. on 2/5/93. (3/15/94 Affidavit of Jacqueline Pacheco.) She noted further that Montanez's defense counsel was aware of this alibi prior to trial but considered it unlikely to sway the finder of fact given that she was Montanez's girlfriend. (*Id.*) Pacheco stated further that Montanez's car was damaged on 3/13/93. (*Id.*) This assertion would later be corroborated by Montanez's mechanic, as explained above. (3/2/95 Affidavit of Jose Garcia.)

Regarding Jorge Pacheco, on 7/13/93, in the presence of ASA Kevin Hughes and possibly Det. Guevara, Pacheco provided a partial alibi, stating that he was with his girlfriend, Michelle Zaleske, "on the date in question." (7/13/93 Supp. R. by G/H.) On 7/13/93, Zaleske gave a statement to Det. Guevara and ASA Hughes in which she provided a partial alibi for Pacheco. (7/13/93 Zaleske H/W Statement by G.) Specifically, Zaleske stated that she was with Pacheco at her Des Plaines, Illinois, home until 3 p.m. on 2/4/93, the day before the Vargas murder. (*Id.*) Zaleske stated further that Pacheco returned to her home in Des Plaines at 7:30 p.m. on 2/4/93, where he remained until 9 p.m. (*Id.*) The evidence indicates further that Zaleske stated that she did not see Pacheco from 9 p.m. on 2/4/93 until 7 p.m. on 2/5/93. (*Id.*) At trial, Zaleske testified consistent with this information. (10/21/94 Trial Transcript at 62.) A diary that she

---

[39] At trial, Vicente would elaborate, confirming that the fact that Pacheco was driving also meant that Pacheco "had smashed the car" when he fled the scene. (10/18/94 Trial Transcript, Vol. 2 at 23.)

SERRANO_LASSAR 25097



CONFIDENTIAL

claimed corroborated this account was offered into evidence, but not admitted. (*Id.* at 66.) Also, on 9/30/94, State's Attorney Investigators Martinez and Thomas Finnelly interviewed Felix Rodriguez, the ex-husband of Jorge Pacheco's sister. (9/30/94 Investigative Report.) Rodriguez stated he was "home all day" with Pacheco on 2/5/93, the date that Vargas was murdered and, thus, "knows that Jorge didn't do this shooting." (*Id.*) He reportedly qualified the alibi defense, however, by noting that "he was drinking most of" the relevant day and, thus, "doesn't remember what time he went to bed or if Jorge went to bed before him or if Jorge even went to sleep." (*Id.*) Reportedly, he noted that if contacted by defense counsel he would testify on Pacheco's behalf "because he has had trouble with the Police and States Attorney before" and "wouldn't help them." (*Id.*) He reportedly stated further that "he likes Jorge Pacheco very much" and "wants to see Jorge get out of jail." (*Id.*)

Serrano told us that he would be "lying" if he said he knew where he was the night before the Vargas murder. He speculated that he was "running the streets" as he "didn't have a job" at that point. (10/17/13 Interview with Armando Serrano.) He said that he was usually at home with his parents and now ex-wife at 5:30 a.m., but said that he has attempted to come up with a verifiable alibi for years for the relevant dates, and has been unable to do so. (*Id.*) Serrano told us that he considered Vicente's and Rankins's evidence incredible, among other reasons, because Vargas's car radio was playing when his body was discovered. (8/22/14 Interview with Armando Serrano.) That evidence, according to Serrano, indicated that Vargas was in his car, warming up the engine, and listening to the radio, when he was shot. However, Serrano is mistaken. As discussed above, Vargas's radio was not on when Vargas was murdered—in fact, Vargas's body was discovered atop his radio. Serrano received his information while later researching the case, he said, from a Chicago Tribune article in which the fact was erroneously reported. (*Id.*)

### q. The Trial

On 10/18/94, the trial of Montanez, Serrano, and Pacheco began. Vicente, Wilda, Velez, Shoop, Dets. Guevara and Halvorsen, Investigator Martinez, and Officer Show testified for the State. For Pacheco, alibi witness Zaleske testified. Office of Public Defender Investigator Stephanie Turner testified for Serrano. Montanez did not put on any witnesses.

### (i) Francisco Vicente

Vicente responded affirmatively to ASA Coghlan's question of whether "in return for your testimony in this case and other cases I have indicated to you that I would recommend a total of nine years … on your cases." (10/18/94 Trial Transcript, Vol. 2 at 4.) On cross, Vicente acknowledged that each of his three pending Class X charges for armed robbery carry sentences of between six and thirty years and his single simple robbery charge carries a sentence of three to seven years. (*Id.* at 72, 76.) On cross, Vicente also described his living arrangements in the Witness Protection Quarters, and stated that CPD bought him a Walkman, Nike track suits, and cigarettes, and allowed him "home-cooked meals," visits with friends, and visits with his girlfriend. (*Id.* at 79-80.)

Vicente correctly identified each of the three defendants in court. (*Id.* at 5-6.)

24



<span style="color:red">**CONFIDENTIAL**</span>

### (ii)     Wilda Vargas

Upon being asked to perform an in-court identification of the man who entered the cashier's station, the vehicle's driver, she chose Serrano initially, an action attributed in the record to Montanez. (10/19/94 Trial Transcript, Vol. 3 at 17-18.) (After ASA Coghlan asked the defendants to stand up, however, Wilda correctly identified Montanez. (*Id.* at 18-19.)) On being asked to perform an in-court identification of one of the passengers (described in the Supp. R. dated 6/2/93 as a front-seat passenger), she chose Pacheco twice, although at the line-up Vargas identified Serrano as the only passenger she saw. (10/19/94 Trial Transcript, Vol. 3 at 19, 23.) (She was reported to have stated at the time that she was not able to see the rear seat passenger— i.e., Pacheco—clearly. (6/2/93 Supp. R. by G/H.))

### (iii)     Gary Shoop

Vargas's neighbor, Shoop, testified that he was unable to definitely state that Montanez's car was the car he saw after hearing gunshots, although he said that it was "similar" to the car he saw and answered affirmatively when asked if it "appear[ed] to be the same car." (10/18/94 Trial Transcript, Vol. 1 at 47.) On cross, Shoop testified that he told CPD that the vehicle was "possibly a two door" and had not told CPD that the car was two-toned with a vinyl top. (*Id.* at 54.) He testified, however, that he believed his original description consistent with Montanez's car. (*Id.* at 47.) Shoop testified further that as the auto drove away, he heard its "tires squealing" as it rounded several corners. (*Id.* at 44.) He did not, however, hear a subsequent car crash. (*Id.* at 44, 53.) He also testified on cross that he did not see any passengers in the car. (*Id.* at 52.)

### (iv)     Investigator Jose Martinez

State's Attorney Investigator Martinez testified that he tried, but failed, to locate Rankins.[40] (10/21/94 Trial Transcript at 32-33.) His efforts, Martinez testified, included contacting "a girlfriend by the name of Janet Clark in Gary, Indiana," a name that appears within Rankins's 3/29/94, handwritten recantation, but nowhere else in the record. (*Id.* at 33.) Martinez testified further that Clark "said she hasn't seen Rankins for about a year and couldn't give me any other information on Rankins at all." (*Id.*) At the conclusion of Martinez's testimony, ASA Coghlan requested a continuance "to make one last effort to locate Timothy Rankins." (*Id.* at 34.) The Court denied the request, explaining that the State had already devoted a day to the task without success. (*Id.*)

### (v)     Det. Halvorsen

---

[40] Although not in the record, Rankins was arrested on a domestic violence charge along with a Sabrina Hernandez less than a month before trial, but failed to appear for a scheduled hearing days before the commencement of the Montanez/Serrano trial. (9/15/94 Rankins Domestic Documents.) We consider it likely, but cannot assert definitively, that this is the same Sabrina referenced in the statements against Montanez, Serrano, and Pacheco.

SERRANO_LASSAR 25099



<span style="color:red">**CONFIDENTIAL**</span>

Det. Halvorsen testified to the genesis of and content of Rankins's evidence. (10/19/94 Trial Transcript, Vol. 3 at 89-93.) Det. Halvorsen also testified that he did not discuss with the State's Attorney possibly charging Rankins with murder. (*Id.* at 106.)

### (vi)    Verdict and Findings

At the conclusion of the bench trial, the court found all three defendants guilty. (10/21/94 Trial Transcript at 119.) Thereafter, Serrano, Montanez, and Pacheco each moved for a new trial. (1/10/95 Hearing.) The court granted Pacheco's motion, acquitting him, but denied Montanez's and Serrano's motions. (*Id.* at 30-31.) Montanez and Serrano were later sentenced to fifty-five years. (3/3/95 Hearing at 97.)

### r.    Vicente is Sentenced

As explained above in the Bouto section, on 9/23/96, approximately two months after the last of the three cases in which Vicente provided evidence concluded with a guilty verdict, Vicente was sentenced on his three armed robberies and one simple robbery. (9/23/96 Francisco Vicente Change of Plea Hearing.) ASA Dillon represented the State at that hearing and recommended a sentence of nine years. (*Id.*) Vicente was sentenced in accordance with the State's request. (*Id.*) Before the sentencing judge was also a letter from Lt. Earl F. Tucker, a Division Nine Shift Commander. (9/22/96 Letter from L.T. Tucker.) In that letter, Lt. Tucker described Vicente's assistance in procuring for him photos of a corrections officer "standing in the cell with his arm around several inmates and money on the bed." (*Id.*) As a result of that assistance, Lt. Tucker noted that "[i]t has been brought to my attention that his life, along with his families (sic) has been threatened after he gets out …. [and] states attorney John Dillon is aware of the danger his family is in." (*Id.*) Tucker noted further that "the service that he gave us is extraordinary." (*Id.*) He concluded with "any consideration that you deem fit may or may not have any influence on future actions." (*Id.*)

### s.    Rankins Recants Again

As noted above, Rankins recanted several more times in the years after the trial, specifically in 1999, 2012, and 2014. Although Rankins continued to maintain that his evidence against Montanez, Serrano, and Pacheco had been fabricated, he alleged different misconduct and perpetrators within each iteration.

### (i)    1999

On 4/30/99, Rankins, incarcerated in California, petitioned, pro se, for relief under Section 1983, naming ASA Coghlan as defendant. (4/30/99 Timothy Rankins §1983 Claim.) As additional defendants, he named "John Doe 1-3 … Detectives at Grand and Central Police Station," Cook County State's Attorney Jack O'Malley, and ASA Jack Hines. (*Id.*) Rankins alleged therein that in 1993, "Doe # 1-3 beat and force" him to "sign a statement" under threat of being "beat and charge[d] with murder." (*Id.*) Rankins alleged further that ASAs Coghlan and Hines and State's Attorney O'Malley physically abused him and threatened that he would "go down for the crime" if he didn't testify against "George Pacheco and two more people." (*Id.*)

26



<span style="color:red">CONFIDENTIAL</span>

Then, according to Rankins, he was "charge[d] with arm robbery and placed in jail and then in the witness program were another witness on the case was hired by the defendant to teach plaintiff what to say." (*Id.*) When he got out of jail, Rankins was told by State's Attorney O'Malley that "if he came to court against the state" he would be charged with murder and "his family will be killed." (*Id.*)

Rankins then fled to Puerto Rico to evade "being harassed." (*Id.*) Rankins has discussed his Puerto Rico trip on several subsequent occasions, including in a 6/23/99 letter to Montanez (6/23/99 Rankins Letter) and in a 3/2/14 interview with us. In the letter to Montanez, Rankins said that he asked Montanez's father and his private investigator Julio Lebron to take him to Puerto Rico, and that Montanez's family were exceedingly gracious to him during that time. (6/23/99 Rankins Letter.) Rankins also wrote in the letter that he slept at Montanez's sister's house in Chicago and Puerto Rico, slept at Montanez's grand parents's house "for two days," and "ate your families table with all this you showed me much love even though I sign a statement against you by force." (*Id.*) Rankins was paroled out of custody on 7/28/94 (8/26/14 Rankins Custody Record) and was arrested and charged with battery in Chicago on 9/19/94 (3/14/14 Rankins Background), and his trip to Puerto Rico likely occurred some time between those two dates.

### (ii)   2012

On 4/4/12, Rankins, incarcerated at a federal prison in West Virginia, provided a sworn statement to Bonjean, Serrano's current post-conviction counsel. (4/4/12 Rankins Sworn Statement.) According to Rankins, Det. Guevara informed him that Montanez, Serrano, and Pacheco had previously provided evidence against Rankins's brother.[41] (*Id.* at 10.)

Then, according to Rankins, Dets. Halvorsen and Guevara and Sgt. Mingey gave him a prepared statement against Montanez, Serrano, and Pacheco. (*Id.* at 12.) Det. Guevara "threw his statement on the floor with three pictures in front of me and he said, these are the guys who did the murder." (*Id.*) Rankins said that Dets. Guevara and Halvorsen and Sgt. Mingey provided Rankins with nicknames—Barrel Belly, Stripes, and Joker—but not birth names for the men depicted in the photos. (*Id.* at 17-18.) Det. Guevara informed Rankins "you need to study that statement … and you're going to sign it." (*Id.* at 12.) Rankins stated that Dets. Guevara and Halvorsen and Sgt. Mingey also brought him to the murder scene. (*Id.* at 22.)

When Rankins refused to cooperate, Det. Guevara kicked him out of a chair, he alleged. (*Id.* at 11.) Det. Guevara assaulted him further, kicking him, beating him with a phone book and a flash light, and choking him, Rankins claimed. (*Id.* at 12-13, 18.) Although Det. Guevara doled out most of the physical abuse, Rankins alleged that Det. Halvorsen and Sgt. Mingey participated, too. (*Id.* at 13.)

---

[41] In our interview with him, Serrano confirmed this fact. (8/22/14 Interview with Armando Serrano.) He said that he had been the target of a murder attempt by Rankins's brother and, that being the case, later testified at his sentencing hearing. (*Id.*)

SERRANO_LASSAR 25101



<span style="color:red">**CONFIDENTIAL**</span>

He was "assaulted until [he] signed the statement," Rankins said. (*Id.* at 19.) Rankins alleged that he later informed ASA Coghlan that his statement implicating Serrano, Montanez, and Pacheco was fabricated and coerced. (*Id.* at 21.) According to Rankins, ASA Coghlan responded: "I don't care what you're saying, you're going to get on the stand and you're going to tell me what this statement said." (*Id.* at 21-22.)

Rankins stated that he was housed in the State's Attorney Witness Quarters. (*Id.* at 23.) While in the Witness Quarters, Rankins stated that he met on multiple occasions with Det. Guevara and ASA Coghlan. (*Id.* at 25.) While in the Witness Quarters, Rankins also alleged that he received "shoes, jumpsuits, cigarettes, special visits, [and] phone calls." (*Id.*) He continued: "[y]our girlfriend or your family could come down and they could sit with you and watch a movie and they can cook food in the kitchen[.]" (*Id.* at 26.) Rankins stated that conjugal visits were possible, but that he did not have any. (*Id.* at 26-27.) Det. Guevara, according to Rankins, also provided him with cash in the Witness Quarters, on occasion. (*Id.* at 26.)

Vicente was also in the Witness Quarters at that time, Rankins stated and the record evidence confirms. (*Id.* at 24; 6/19/12 Subpoena Attachment.) Allegedly, Vicente informed Rankins that Det. Guevara had instructed that they were to "go over our statements with each other[], so that he could know what I'd say in Court and I could know what he had to say in Court." (4/4/12 Rankins Sworn Statement at 28.) Vicente also informed Rankins that he had been abused by Det. Guevara. (*Id.* at 27-28.) When Rankins told Vicente that he would not "get on the stand and testify against an innocent person," Vicente raised his own "armed robbery cases." (*Id.* at 28.) Vicente explained, according to Rankins, that "[t]here's some cases that he himself was going to get off on that was promised him." (*Id.* at 28-29.) When Vicente persisted, Rankins stated that he beat Vicente with a broomstick. (*Id.*) (Vicente has related a similar account, although he said that he was the one who hit Rankins with the stick. (Francisco Vicente Affidavit Notes.)) That fight, according to Rankins, resulted in his transfer out of the Witness Quarters. (4/4/12 Rankins Sworn Statement at 29.) Dets. Guevara and Halvorsen and ASA Coghlan approached him after and stated, "I should have just cooperated and stayed inside the witness quarter protection program and that everything would have been alright." (*Id.*)

### (iii)    2014

#### (a)    Interview

We interviewed Rankins on 3/2/14. (3/2/14 Interview with Timothy Rankins.) Rankins said that he was shown three Polaroid photos of the three defendants by Dets. Guevara and Halvorsen and Sgt. Mingey, and told that the man wearing a striped shirt (Jorge Pacheco) would be known as "Stripes" in his statement, that the man with "a big stomach" (Jose Montanez) would be known as "Barrel Belly," and that the man smiling (Armando Serrano) would be known as "Joker." (*Id.*) Rankins said: "There was no line-up and there was no photo array. There were three photos and they came and told me, 'This is who killed this man, this is what you're gonna say.'" (*Id.*)

After being told what they wanted him to attest to, Rankins said, Rankins was shepherded by the detectives to the office of ASA Coghlan, in whose presence Rankins said he was beaten

SERRANO_LASSAR 25102



<span style="color:red">**CONFIDENTIAL**</span>

by Dets. Guevara and Halvorsen: "I was punched in my private, I was hit in my mouth, punched in my stomach, given water. Every time I drank water, I'd get punched." (*Id.*) Rankins said that Sgt. Mingey was present for much of this exchange, but would occasionally leave the room. (*Id.*)

Rankins said that he explained to ASA Coghlan that "if they put me on the stand to say anything, I'm gonna tell the truth. I'm gonna tell how they beat me up." (*Id.*) Rankins said that ASA Coghlan then took him to a judge's chambers, where Rankins told the judge, "I wasn't there, I wasn't there. This is a lie." (*Id.*) The judge responded: "You signed it, this is what you're gonna testify to, and we're gonna get this case over with." (*Id.*) Rankins stated that he visited the judge's chambers "six to eight times." (*Id.*) According to Rankins, at some point, Det. Guevara and ASA Coghlan told him, "If you back out on us, we could just kill you." (*Id.*)

In order to assist him in committing to memory the details of the story they wanted him to tell, Rankins said that he was taken to the scene four times. (*Id.*) Rankins said that Dets. Guevara and Halvorsen took him to the scene the first time, that ASA King took him the second time, that ASAs King and Coghlan took him the third time, and that the fourth and final time he was taken by ASA Coghlan, Dets. Guevara and Halvorsen, and Sgt. Mingey.[42] (*Id.*) He said that he was taken to the scene, specifically, "to memorize how we got there, where the people were standing, and what took place." (*Id.*)

Rankins said that he was eventually placed on house arrest, ending his incarceration for the armed robbery (*id.*), which is corroborated by a 10/18/93 court order. (3/6/12 Rankins Disposition Sheet.) He said that during the course of his house arrest, he was visited frequently by Det. Halvorsen. (3/2/14 Interview with Timothy Rankins.) Rankins said that Det. Halvorsen would supply him with money - $15,000 overall - and remind him that he was expected to testify as a "key witness" in the Montanez/Serrano/Pacheco trial. (*Id.*) Rankins said he continually told Det. Halvorsen that he was going to decline to go through with his testimony. (*Id.*) Rankins said that Det. Halvorsen's steady supply of cash was not unusual, particularly in this case. (*Id.*) He said, "I used to get called by these guys, and if I was with a girl and she needed anything or I needed money to do anything, I got it from them. It wasn't a problem. This was how bad they wanted this case." (*Id.*)

Rankins also said that during that time, "Halvorsen, Mingey, Guevara and these other dirty detectives were grabbing us and putting guns on us." (*Id.*) Rankins said that he remembered the names of fellow gang members who could corroborate this aspect of his story, but declined to share their names during the interview, allegedly for fear of retaliation. (*Id.*) Rankins said that Dets. Halvorsen and Guevara had been running a drug trade in the neighborhood they patrolled, and he speculated that Montanez, Serrano, and Pacheco had declined to participate with them, and perhaps being charged with the Vargas murder served as retaliation by the detectives. (*Id.*)

---

[42] Other than reflected in Rankins's recantation, there is no evidence that any ASAs accompanied Rankins on a site visit. Moreover, Sgt. Mingey told us that he did not accompany Dets. Guevara and Halvorsen when they went along with Rankins to the scene for purposes of verifying his evidence. (4/7/14 Interview with Ed Mingey.)

SERRANO_LASSAR 25103



<span style="color:red">**CONFIDENTIAL**</span>

Rankins said that he returned to the continental United States from Puerto Rico before the commencement of the Montanez/Serrano/Pacheco trial. (*Id.*) Some time after his return, Rankins said, he was arrested, and approached again about testifying at trial against the three defendants in the Vargas trial. (*Id.*) He said: "I said if you put me on the stand, I'm gonna tell you the truth. That's when the judge and the state's attorney and Halvorsen and Mingey (said), 'Look, we're gonna say we just can't find you.'" (*Id.*) According to Rankins, the judge said that the prosecution could "always use Vicente" instead as a witness "to seal the deal.'" (*Id.*) Rankins said that the judge in this incident was a different judge than the one he had met with several times in the months prior. (*Id.*) He did not know the judge's name. (*Id.*)

(b)      **The Second Section 1983 Claim**

On 3/31/14 Rankins once again filed a law suit under Section 1983, naming as defendants Dets. Guevara and Halvorsen, Sgt. Mingey, Judge Coghlan, Area 5 Chicago Police Department, the Rochelle and Elgin, Illinois, police departments, John Doe correctional officer, John Doe police officer, State's Attorney John Doe 1, State's Attorney John Doe 2, the Chicago division of the Office of State's Attorney, the Illinois Department of Corrections, the Illinois Department of Justice, the cities of Chicago, Elgin, Rochelle, Pasadena, and Oregon [sic], the California Department of Justice, the Pasadena State's Attorney's Office, the Oregon State's Attorney's Office, the Rochelle Public Defender's Office, Judge John Payne, Mr. F.N.U Miller, Corporal F.N.U. Hilliard, and the Ramada Inn and Suites. (3/31/14 Timothy Rankins §1983 Claim.)

According to Rankins, in approximately June of 1993, Dets. Guevara and Halvorsen and Sgt. Mingey approached Rankins. (*Id.* at 5.) Det. Guevara told him "they need me to do them a favor." (*Id.*) Although Rankins "knew these detective's to make people sale drugs for them when they is caught or do some dirty works agust other people [sic]" Rankins told them "I ain't doing anything." (*Id.*) Det. Halvorsen responded, "yes you is" and Rankins was placed in a car with Dets. Guevara and Halvorsen and Sgt. Mingey. (*Id.*) Det. Guevara said, "Loco you going to put three guys away for us" who "don't want to do what we tell them." (*Id.*) Det. Guevara continued: "they have to go[,] these are our streets." (*Id.*) When Rankins refused again, Det. Guevara "smack[ed]" him with the back of his hand. (*Id.*) Sgt. Mingey then explained that failure to cooperate would lead to an armed robbery charge, which would entail a six- to thirty-year sentence. (*Id.*)

Rankins was taken to the Grand and Central police station and placed in an interview room with Dets. Guevara and Halvorsen and Sgt. Mingey, he said. (*Id.*) When Rankins refused to cooperate once again, Det. Halvorsen "jump up and smack me out the chair [sic]" and "punch me in the stomack [sic]" and "slam my face on the table while I was cuff from behind [sic]." (*Id.* at 5-6.) Sgt. Mingey told Rankins that Rankins had the ability to "make this stop." (*Id.* at 6.) After Rankins refused again, Sgt. Mingey placed him in a "choke hold" while Det. Halvorsen continued to punch him. (*Id.*) At that point, Rankins said, he agreed to cooperate. (*Id.*)

After further resistance, Rankins said, he signed an already prepared statement. (*Id.*) Rankins was then instructed "to say everything on the statement to the state's attorney John Doe # 1 who came and seen us." (*Id.*) Rankins told him that the "police beat me and made me sign that statement." (*Id.*) ASA John Doe # 1 stated, allegedly, "I don't care what happen to you[,] I

SERRANO_LASSAR 25104



# CONFIDENTIAL

just care about getting promoted [sic]." (*Id.*) Several days later, Rankins was taken before ASA Coghlan. (*Id.*) He told ASA Coghlan that he was "beat and made to sign a statement and it was a lie." (*Id.*) ASA Coghlan responded, "I don't care what happen to you or anyone else[,] Pacho[,] Montanez[,] and Surrano is going down for this murder [sic]." (*Id.*)

Rankins was "taken before the Grand Jury and I told them I was beaten." (*Id.*) At that point, Rankins was removed from the grand jury room and "told by Judge John Doe # 1, I'm crazy[,] I was facing 30 years[,] and if I don't go and say what I stated on the statement[,] I'll be gone for a long time." (*Id.* at 6-7.) Rankins relented then, and "told the Grand Jury what the statement said." (*Id.* at 7.)

Later, Rankins entered the Witness Protection Program, where he met "witness John Doe # 1[,] a witness" against "Surrano, Pacheco and Montanez [sic]." (*Id.*) That witness informed Rankins that he was "getting paid by the State's Attorney Office and all his cases would be drop or he would be given liss time for all his crimes [sic]." (*Id.*) Several weeks later, Rankins "beat witness John Doe # 1 with a pool stick." (*Id.*) ASA Coghlan then asked Rankins if he wanted to "play Hard Ball?" (*Id.*) When Rankins reiterated that he would not give false testimony at trial, ASA Coghlan removed him from the witness quarters and placed him in the "county jail very late at night" in a "cell with Montanez[,] the defendant in the murder." (*Id.*)

Montanez, according to Rankins, said "a few guys wanted to kill" Rankins, but he instructed them not to because doing so would "fuck my case up" and "start another gang war." (*Id.* at 8.) Then Montanez presented Rankins and a corrections officer with "a copy of the statement I sign[ed] by force." (*Id.*) Recognizing that Rankins was "the key witness" in the case against Montanez, the corrections officer assigned Rankins to a different cell. (*Id.*)

Later, after being placed on home monitoring, Rankins met with a lawyer who reviewed Rankins's statement against Montanez, Serrano, and Pacheco. (*Id.*) The lawyer said "he didn't want anything to do with the case" because Rankins "implicated myself in a murder" but "was not charge with the murder [sic]." (*Id.*) The lawyer thought that indicated "something was very wrong." (*Id.*)

While on home monitoring, Rankins said he was "bother twice a week by Halvorsen showing up at my house letting me know they keeping a eye on me." (*Id.*) Det. Guevara also came by on occasion and gave Rankins money, "telling me to take it, or they know I turn on them [and] will kill me." (*Id.*) Later, Rankins was "caught at gun point by Guevara" and instructed to "keep quiet about things cause people will lose they jobs family and they life [sic]." (*Id.* at 9.) Before that would happen, Det. Guevara stated, Rankins "will [lose those things.]" (*Id.*)

In 1997, after Rankins was charged in Ogle County, Illinois, he contacted ASA Coghlan and threatened to meet with CBS and WGN reporters regarding the Montanez, Serrano, and Pacheco matter unless the Ogle County charges were dropped. (*Id.*) ASA Coghlan contacted Judge John Payne and several unnamed Ogle County State's Attorneys, Rankins said. (*Id.*) The Ogle County personnel "beat and sexually assaulted" Rankins. (*Id.*) Rankins was then told to

SERRANO_LASSAR 25105



<span style="color:red">CONFIDENTIAL</span>

"keep my mouth close[d]" about "Montanez and Surrano [sic]" unless he wanted to serve a longer sentence or "be killed." (*Id.* at 9-10.)

In 1998, Rankins said he was "contacted by Couglin [sic] and Guevara" who stated that "Surrano was appealing his case and I'll have to testify and keep him in prison [sic]." (*Id.* at 10.) Rankins was given $10,000 to "travel to California and Vegas." (*Id.*) In Pasadena, Rankins and several friends rented a room at the Ramada Inn. (*Id.*) After Rankins and his friends participated in an "orgy" with several prostitutes, Rankins received a phone call from Det. Guevara and ASA Coghlan. (*Id.* at 10-11.) Det. Guevara stated, according to Rankins, "see no matter were you go we are" there. (*Id.* at 11.) ASA Coghlan told Rankins the "fun" he just had would "cost" him if he did not keep "quiet." (*Id.*) Later that evening, Rankins was arrested for raping one of the prostitutes. (*Id.*) Several weeks later, Rankins was informed by Pasadena prosecution personnel that ASA Coghlan "asks us to work with you" and "want you to keep your mouth closed on the Surrano case [sic]." (*Id.*)

In 2013, after speaking with Bonjean "a few times," Rankins was "threatened" by "lawyers" and an "investigator" who "said they work for Coughlin and Gueverra [sic]." (*Id.* at 12.) Later that year, Rankins was contacted by telephone and informed that he was a "walking dead man." (*Id.*)

t. **Vicente Recants**

On 6/19/03 Vicente told students investigating possible wrongful convictions that the confession evidence he shared against Montanez, Serrano, and Pacheco (and against Bouto and the third defendant, too[43]) had been fabricated, after he had allegedly been "coerced" and "beat" by Dets. Guevara and Halvorsen. (6/19/03 Email.) Serrano, who he "hated," and Montanez were innocent, he stated. (*Id.*) On later occasions he negotiated for various benefits in return for executing an affidavit and his potential testimony in connection with the Montanez/Serrano post-conviction matter.

On 8/24/04 and 9/16/05, respectively, Montanez and Serrano moved for post-conviction relief, primarily relying on Vicente's allegations.[44] (8/24/04 Montanez Postconviction Petition;

---

[43] Det. Halvorsen told us that he did not remember that Vicente had also received a confession in the third defendant's matter, stating: "That's news to me." (7/1/14 Interview with Ernest Halvorsen.) When we asked him to examine the Supp. R. attributed to him and Det. Guevara reporting Vicente's information, Det. Halvorsen expressed surprise, stating: "He got another one? In the Cook County jail?" (*Id.*) Det. Halvorsen then stated of Vicente, "This guy's a roving confession elicitator" [sic]. (*Id.*)

[44] Previously, on 8/9/99, Serrano had petitioned pro se for post-conviction relief under the Illinois Post-Conviction Act, but his petition was dismissed as untimely. (Serrano Postconviction Petition at 2.) On 10/27/00, Serrano petitioned, pro se, for federal habeas relief, alleging, among other things, that "[t]he State knowingly used the perjured testimony of Francisco Vicente who was a professional snitch who had already testified in two other cases...." (10/27/00 Serrano

SERRANO_LASSAR 25106



<span style="color:red">**CONFIDENTIAL**</span>

Serrano Postconviction Petition at 2.) At a hearing, both Det. Guevara and Vicente appeared, but invoked their Fifth Amendment rights. (7/22/13 Hearing.)

On 5/16/13, during the pendency of the Montanez/Serrano post-conviction matter, a former inmate, Valentine Gomez (aka "Tomato"), testified that in 1995 or 1996 Vicente told him then that "he had caught a case and in order for him to cut a deal with some officer, he "lied on" Montanez, Serrano, and Pacheco and "pointed the finger" at them. (5/16/93 Hearing at 108-09.) Vicente also told Gomez that his trial testimony "was a lie." (*Id.* at 109.) Gomez testified further that he had not seen Serrano or Montanez for nearly twenty years and that he had not spoken to them about their case or Vicente's statements to him. (*Id.* at 111.) On cross exam, Gomez testified that although he was acquainted with both Montanez and Serrano he did not know them to be friends and had never seen them together. (*Id.* at 119-20.)

     3.    **Analysis**

First we analyze the evidence obtained from Vicente and Rankins. Then we analyze the evidence obtained from other sources.

     a.    **The Evidence Provided by Vicente and Rankins**

As was also the case in the Bouto and third defendant matters, the informants—here, Vicente and Rankins—knew details about the murder that they could only have learned through participating in or witnessing the murder, by learning about it from the participants after its commission, or by learning of it from another party knowledgeable about it, a category that includes the police investigating it or verifiable eyewitnesses to it. Rankins, in particular, provided detailed information about the murder, including regarding its location, Vargas's van, the radio, and that the gunfire shattered the passenger window. First we consider Vicente's evidence, then we consider Rankins's evidence.

     (i)    **Vicente's Evidence**

To determine whether it is more likely that Vicente obtained the evidence from Montanez, Serrano, and Pacheco or from one or more of the other categories of possible sources identified above, we analyze that evidence as it relates to the following: (1) whether it includes verifiable information not previously obtained from other sources; (2) the introduction of the evidence regarding a 2/4/93 incident with the victim; (3) its possible corroboration by Wilda and other sources; (4) its consistency (or lack thereof); (5) the purported circumstances of its receipt; and (6) its recantation.

     (a)    **Inclusion of Verifiable Information Not Previously Obtained from Other Sources**

---

Habeas Petition.) His federal habeas petition was dismissed as untimely on 7/24/01. (7/24/01 Serrano Habeas Dismissal.)

SERRANO_LASSAR 25107



<span style="color:red">CONFIDENTIAL</span>

For purposes of assessing whether Montanez, Serrano, and Pacheco confessed to Vicente, or whether Vicente instead became knowledgeable about the crime through other sources, it is useful to consider whether Vicente provided any verifiable information that had not been reported to police prior to Vicente's statement.

We begin with Vicente's description of the genesis of the crime. According to Vicente, Montanez, Serrano, and Pacheco decided to rob Vargas because they spotted him displaying a significant amount of cash. At least as early as the first day of the investigation, a General Progress Report noted that a receipt for $300 was found on the person of Vargas. Moreover, Vargas was discovered with $190 in cash in his wallet. Relatedly, as we explain below, the 2/4/93 incident with Latino men was likelier than not known to police before Vicente reportedly discussed it with Dets. Guevara and Halvorsen.

Second, Vargas's pull-out car radio played a significant role in Vicente's story. Vargas was found holding such a radio, as reported in a Supp. R. which issued the day after the murder.

Third, Vicente stated that Montanez, Serrano, and Pacheco were in Montanez's car when they spotted the victim and, the following morning, committed the crime. As early as 2/5/93, the day of the shooting, it was reported in a GPR and a Supp. R. that several of Vargas's neighbors, including State's witness Gary Shoop, saw a brown or light brown car driving north on Springfield after the shots were fired.

Fourth, Vicente described the victim, Vargas, as a "Mexican." On 2/6/93, the day after Vargas was murdered, Dets. Schak and Jack reported that Vargas had been born in Mexico. Moreover, it is not clear how Montanez, Serrano, or Pacheco would know the victim's country of origin.

To summarize, we find that all of the verifiable information that Vicente allegedly provided had been previously mentioned in some form in the investigation record, and that Vicente did not introduce any new, verifiable information.

### (b) The Introduction of Evidence Regarding a 2/4/93 Incident Involving Latino Men and the Victim

Making some determination of whether Vicente first introduced evidence regarding an incident on the eve of Vargas's murder involving several Latino men and the victim is instructive. If Vicente first introduced into the case that evidence—i.e., no one else knew about it, and Wilda subsequently confirmed that information—it would be meaningful evidence that Montanez, Serrano, and Pacheco confessed to him. If, however, Wilda first introduced that information, then Vicente's knowledge of it would not establish that Montanez, Serrano, and Pacheco confessed to him, for Vicente could have learned the information from another source, including police who may have previously received that information from Wilda.

34

SERRANO_LASSAR 25108



<span style="color:red;">**CONFIDENTIAL**</span>

We first consider evidence suggesting that Wilda merely confirmed information first introduced into the case by Vicente. We then examine evidence suggesting that Wilda introduced into the case the evidence prior to its alleged reporting by Vicente.

First, as detailed above, at trial Det. Guevara testified that he contacted Wilda after speaking with Vicente on 6/2/93, asking her "if anything unusual happened the night before the murder." Det. Guevara was suggesting, we believe, that Vicente introduced the incident, and that Wilda then confirmed it. Second, there is no mention of the incident in the record until Dets. Guevara and Halvorsen filed the Supp. R. dated 6/2/93. Although the Supp. R. dated 6/2/93 does not reference the sequence of evidence-gathering, the introduction of the incident in that report would tend to suggest that the incident had not been discussed by Wilda prior to the meeting she had with Dets. Guevara and Halvorsen as reflected in that report.

Regarding the evidence that Wilda first introduced evidence about a 2/4/93 confrontation into the case, we consider the following. First, Wilda stated at trial on several occasions that she introduced the incident into the evidence. That is, Wilda testified that she volunteered the evidence to them. Related to this point, Det. Guevara and Wilda both testified that they were in frequent contact, commencing the day after Vargas was murdered. It is unlikely that Wilda would not have shared this detail during one of those conversations. Second, Det. Halvorsen told us that Wilda, not Vicente, first introduced into the case the evidence of a 2/4/93 confrontation. (10/21/13 Interview with Ernest Halvorsen.) Of course, in connection with this point, we do not overlook the fact that Det. Halvorsen was speaking to us about an event that occurred more than twenty years ago. Still, Det. Halvorsen's statement to us is consistent with Wilda's testimony.

Third, the important Supp. R. dated 6/2/93, which memorialized Dets. Guevara and Halvorsen's meetings with Vicente and Wilda, did not itself indicate that Wilda corroborated evidence first provided by Vicente. With regard to Vicente and timing, the Supp. R. reads, "On 2 June 93, the R/Dets. had a meeting with a circumstantial witness who for his own safety must remain anonymous at this time." With regard to Wilda and timing, the Supp. R. reads, "On 2 June 93, Det. R. Guevara interviewed Wilda Vargas, the victims [sic] wife." Although Vicente's evidence precedes Vargas's evidence within the report, there is no indication within this or other Supp. R.'s that we reviewed that this is a meaningful distinction. This is particularly so where, as Det. Halvorsen explained to us, the report was prepared on word processing software.[45] (10/21/13 Interview with Ernest Halvorsen.) Moreover, there is no statement of sequencing within the report. For instance, the report does not state that Dets. Guevara and Halvorsen (or anyone else) met with Vicente and then met with Wilda, or that Wilda confirmed evidence previously provided by Vicente. The document asserts only that Dets. Guevara and Halvorsen spoke to Vargas and Vicente on the same day, but does not indicate at which time or in what order they spoke.

---

[45] That the Supp. R. dated 6/2/93 is backdated, i.e. it reports activity occurring on 6/6/93, four days later, is another reason that the report itself is an unreliable metric of sequencing in connection with the gas station evidence.

SERRANO_LASSAR 25109



<span style="color:red">**CONFIDENTIAL**</span>

(c)    **Corroboration of Evidence Provided by Vicente**

For purposes of assessing the veracity of Vicente's purported receipt of confession evidence, it is also useful to consider whether Vicente's evidence is corroborated by other sources and evidence. First, we consider whether Wilda did or did not corroborate aspects of Vicente's evidence. Then we consider whether other witnesses or evidence did or did not corroborate Vicente's evidence.

(1)    **Corroboration by Wilda**

Here we consider evidence that Wilda did and did not corroborate other evidence reportedly disclosed to Vicente by Montanez, Serrano, and Pacheco. We begin with the ways in which she corroborated evidence.

To begin, the record evidence indicates that Wilda identified Montanez and Serrano at Area 5 station line-ups conducted by Dets. Guevara and Halvorsen as the men she saw at a gas station the night before her husband's murder. If reliable, these line-up identifications would tend to corroborate Vicente's evidence that Montanez and Serrano spotted Vargas the day before he was murdered.

Second, the Supp. R. dated 6/2/93 indicates that Wilda identified Montanez's car in the presence of Dets. Guevara and Halvorsen as the car she saw at the gas station. If reliable, this is meaningful corroboration, as well, of Vicente's evidence.

We now consider ways in which Wilda did not corroborate evidence reportedly disclosed to Vicente by Montanez, Serrano, and Pacheco.

First, while it is important to Vicente's evidence regarding motive that Montanez saw Vargas, with his money visible, Wilda testified in answer to three separate questions at trial that her husband was already out of the store and back to the family van by the time that Montanez entered the store. (However, she stated otherwise on one occasion at trial, at the conclusion of her testimony, on cross examination.) If Wilda's first three responses are accurate—i.e., that Vargas was out of the gas station store by the time the driver of the tan car entered the cashier's line—there would no longer exist an incentive for the defendants to target Vargas as a potential robbery victim; the driver of the tan vehicle would not have seen his money.

Second, Wilda failed several times at trial to accurately identify Montanez and Serrano, which may raise questions regarding the reliability of her reported photo array and lineup identifications.

Third, Wilda testified in response to multiple questions at trial that she did not see the car follow her husband home, although she acknowledged that Det. Guevara reported differently in the Supp. R. dated 6/2/93. (10/19/94 Trial Transcript, Vol. 3 at 55-56.) Absent following the Vargases home, the Latino men spotted at the gas station would have no way of knowing where they lived. (As noted above, years later,  however, in an affidavit executed on 5/23/06 in

36



<span style="color:red">**CONFIDENTIAL**</span>

conjunction with a student investigation of potential wrongful convictions, Wilda did state that the vehicle from the gas station was still behind her when she and Vargas arrived at home, although she did not believe they were being "followed.")

Fourth, although Dets. Guevara and Halvorsen reported and testified that Wilda was riding with them when she spontaneously identified Montanez's car outside his girlfriend's house as the car that she saw at the gas station, Wilda herself has allegedly since said that she did not, according to Montanez's and Serrano's post conviction attorneys. Specifically, she reportedly stated that Det. Guevara pointed out the car to her, at which point she conceded only that it was similar to the car she saw at the gas station. Relatedly, Det. Guevara testified that Wilda did not describe to him the car she spotted at the gas station (10/21/94 Trial Transcript at 25), which may suggest that she could not have identified Montanez's car without assistance.

(2)     **Corroboration of Vicente's Evidence by Other Sources or Evidence**

We also consider whether Vicente's evidence is corroborated by other witnesses or evidence. First, we examine Vicente's linking of the Vargas murder to a botched robbery. Second, we examine Vicente's linking of Montanez's car to the Vargas murder. Third, we examine Vicente's trial testimony concerning "Rick" and a purported trip to "Gold Busters" with Montanez, Serrano, and Pacheco.

i)     **Regarding a Purported Connection Between the Vargas Murder and an Attempted Robbery**

A significant component of the evidence provided by Vicente is his statement and testimony that Montanez, Serrano, and Pacheco killed Vargas after attempting to rob him. We consider here evidence that Vargas's murder did and did not arise from a failed robbery.

We begin with the latter. There is no significant evidence that Vargas had any meaningful enemies and, accordingly, would have been the subject of a targeted and planned crime, rather than the victim of a robbery perpetrated by strangers, such as Montanez, Serrano, and Pacheco. First, while students investigating the case spoke with Vargas's brother Ramiro Vargas, who told the students that Vargas's family had speculated that the killing had been related to the drug trade, we are aware of no evidence supporting Ramiro's speculation. (3/7/03 Email.) Second, although some of his co-workers told police that Vargas's employers had been "grouchy" about his continuation of a worker's compensation lawsuit (2/5/93 General Progress Report at 11), there is no follow-up indicating that this was examined further or considered to be a credible lead. Moreover, such a lawsuit does not seem likely to motivate a planned killing. Third, while Vargas's family members reportedly told students investigating the case that an ex-girlfriend "stalker" might have been upset that Vargas's first wedding anniversary with Wilda was nearing, we are aware of no evidence supporting this theory. (5/4/03 Email.)

37



<span style="color:red">**CONFIDENTIAL**</span>

Regarding the possibility that Vargas's murder did not result from Montanez, Serrano, and Pacheco's failed attempt to rob Vargas, we consider the following. First, the story of a sidewalk confrontation between the defendants and Vargas and a botched "ganking" while struggling over a car radio is not corroborated by the eye and ear witnesses to Vargas's murder. Both Anna Velez and Judy Milinkovic likely would have seen Montanez, Serrano, and Pacheco on the sidewalk beside Vargas's home waiting for him to exit the gate, but did not. Indeed, Velez provided evidence tending to indicate that Vargas was sitting in his car, warming the engine, at the time of the confrontation that resulted in his death. Moreover, witnesses Hector and Iris Melendez, who were near enough to the crime scene to have reported hearing footsteps, did not report hearing a mugging (or the shouts described by Rankins). (2/5/93 GPR at 8.)

Second, the physical evidence at the scene is examined for consistency with the tale of a failed robbery. As an initial matter, it is unlikely that the defendants would shoot to death their target, but then not steal the goods that they were after, particularly under circumstances where those items were accessible. Having shot out a portion of the window, the assailants need only have reached into the van, unlocked the door, and taken Vargas's money and radio. (Photos in Evidence.) Relevant to this point, Vicente described Montanez, Serrano, and Pacheco as sufficiently in need of cash to procure drugs that they then committed a second robbery, this time in broad daylight. Under such circumstances, it is not clear why the perpetrators would not take the extra few seconds to obtain Vargas's cash or his radio. At 5:32 a.m., the extra risk from that action may have been marginal.

Relatedly, Vargas was discovered lying face down between the front seats of his van, positioned in a fashion indicating that he was, according to CPD, shot "as he sat in his vehicle preparing to go to his place of employment." He was holding his radio, his lunch bag was underneath his body, and his scarf, hood, and baseball cap were not disturbed. (Photos in Evidence.) It is unlikely that Vargas, after being confronted on the sidewalk by three assailants, would have held onto both a radio and a plastic lunch bag while running to his van, locking the doors behind him, starting the vehicle, and positioning himself to drive away. Indeed, on-scene investigators determined that there was no evidence of a struggle, and the medical examiner determined that Vargas had no defensive wounds. (2/6/93 Supp. R. at 7.)

    ii)    **Regarding Possible Connections Between Montanez's Car and the Shooting**

Another important component of Vicente's evidence is the link between Montanez's car and the Vargas murder. We consider here evidence that Montanez's car was connected to the Vargas murder. We then consider evidence that Montanez's car was not connected to the Vargas murder.

Regarding the former, we consider the following. First, Vargas's neighbor, Gary Shoop, testified that the car he saw fleeing the crime scene was similar to Montanez's car. The evidence indicates that Montanez purchased his car on 1/4/93—i.e., before the murder. (6/6/93 Montanez Vehicle History.) It is at least possible, then, that the car that Shoop viewed was Montanez's.

SERRANO_LASSAR 25112



<span style="color:red">CONFIDENTIAL</span>

Second, Dets. Guevara and Halvorsen reported, in the Supp. R. dated 6/2/93, that Wilda identified Montanez's car. Assuming the reliability of that identification, that is meaningful evidence that Montanez's vehicle was involved in the murder.

Regarding the possibility that Montanez's car was not connected to the Vargas murder, we now consider the following.

First, as detailed above, Det. Guevara testified that Wilda did not describe to him in advance the car she later purportedly positively identified, which may diminish the importance of the identification because it suggests she did not recall the car with particularity. Moreover, Wilda allegedly informed post-conviction counsel to Montanez and Serrano that Det. Guevara engaged in misconduct in connection with her identification of that car, which, if true, further calls into question the reliability of that identification. Furthermore, it is unlikely that she would remember the car after four months when she did not mention the incident the day of the murder.

Second, although Vicente purportedly asserted that Montanez explained to him that there was damage to his front fender because he crashed his car "into a parked car as they drove off," there is no reference in the investigation record of such a car crash in the vicinity of the crime. Indeed, although ten ear and eyewitnesses described hearing the shooting, and Shoop described hearing the tires squeal as it rounded corners several blocks away, none described hearing a car crash. (2/5/93 Supp. R.; 2/6/93 Supp. R.)

Third, Montanez's mechanic attested in an affidavit that Montanez brought the car into his shop for repair well after the shooting, and it did not have any damage. Relatedly, Montanez's former girlfriend executed an affidavit attesting similarly. (Montanez informed us that he crashed his car in March of 1993 when he was under the influence of narcotics. (10/17/13 Interview with Jose Montanez.)

Fourth, Montanez's car was a distinctive, two-toned vehicle—its body was light tan and its vinyl top was dark brown, which Shoop did not reference prior to trial. Milinkovic also described viewing a brown car driving away from the scene, and did not describe it as two-toned or reference the vinyl top. Such distinguishing details are the sort that we expect Shoop would have shared with on-scene personnel given the specificity of his description on scene.[46] Relatedly, Montanez's car was a four-door sedan, whereas Shoop told police the car he saw may have been a two-door.

---

[46] As we noted in our discussion of the Robert Bouto case, in "Eyewitness Testimony" psychology and law professor Elizabeth F. Loftus terms such details that are noted by many witnesses "salient details," which have a "high probability of being spontaneously mentioned by individuals who witness a particular event." A two-toned color scheme on a vehicle could qualify as such a detail, meaning it would be unlikely that multiple witnesses viewing the car would fail to note that aspect of its appearance.

39

SERRANO_LASSAR 25113



<span style="color:red">**CONFIDENTIAL**</span>

Finally, tan was a popular color for cars produced in the 1980s and early 1990s[47], and Montanez drove a sedan, a very popular body style. Considering the size and population density of the city of Chicago, a description of a tan or brown sedan may not have meaningfully limited the universe of possible vehicles used in commission of the crime.

        iii)    **Regarding "Rick" and "Gold Busters"**

We consider here two additional pieces of evidence that Vicente provided against Montanez and Serrano. First, we consider Vicente's testimony that the second time that Montanez confessed to him, Vicente was with his friend "Rick." Second, we consider Vicente's statement and testimony regarding a trip to "Gold Busters" with Montanez, Serrano, and Pacheco to fence gold.

We begin with Rick. Vicente's trial testimony stands as the only reference to Rick in the record, and nothing in the record corroborates Vicente's testimony regarding him. Although Vicente testified at trial that he informed ASA Coghlan on 9/21/94 that he was with a friend when Montanez confessed on 2/7/93, (10/18/94 Trial Transcript, Vol. 2 at 112-113), that purported statement is not reflected in the record, and we consider it unlikely that both ASA Coghlan and Investigator Martinez would have failed to note such a detail if provided to them. We note, too, that Montanez may have been unlikely to have confessed to murder in front of a stranger, and Vicente did not allege that Rick and Montanez were acquainted.

Second, we examine Vicente's statements and testimony regarding Gold Busters. While Dets. Halvorsen and Guevara both included the Gold Busters evidence in the Supp. R. dated 6/2/93, and Vicente testified to it at trial, Det. Halvorsen told us, as noted above, that he and Det. Guevara investigated that portion of Vicente's story and determined that Gold Busters did not exist. Also as noted above, we have independently determined that no store called Gold Busters existed in Chicago at that time.

        (d)    **Consistency of Vicente's Evidence**

We consider here internal consistencies and inconsistencies in connection with evidence provided by Vicente, parameters also useful for assessing credibility.

First, we describe the internal consistencies in connection with evidence provided by Vicente. Prior to his recantation in 2003, Vicente spoke on the record five times about the confession he allegedly received from Montanez, Serrano, and Pacheco: (1) As an unidentified confidential informant, as documented in a Supp. R. prepared by Dets. Guevara and Halvorsen dated 6/2/93; (2) In a handwritten statement memorialized by ASA Solita Pandit and Det.

---

[47] *See* Kelly, John. "Today's Popular Car Colors Rev No Engines," *Washington Post*, 4/23/12. (noting that brown and beige were among the most popular car colors during the relevant time period).

SERRANO_LASSAR 25114



<span style="color:red">**CONFIDENTIAL**</span>

Halvorsen on 6/28/93; (3) Before the grand jury on 7/1/93; (4) To ASA Coghlan and Investigator Martinez on 9/21/94; and (5) At trial on 10/18/94.

In all but the 9/21/94 statement, which is limited to new or altered information, Vicente related a complete telling or retelling of the confession. In each instance, he was standing near an intersection, when Montanez pulled up in his car, with Serrano and Pacheco. Consistently, Montanez explained to Vicente that the three men saw Vargas with money out the night before, and followed him to his home because of it, electing to hold off on robbing him then because his wife and children were present. Also in each instance, Vicente said that Montanez told him that Vargas was shot after Serrano attempted unsuccessfully to steal his pull-out radio. He also consistently told of a second meeting, with Montanez, that occurred two days later, and at which Montanez explained further the events of that morning.

Now, we examine the internal inconsistencies in connection with Vicente's evidence. We begin by examining the additions and alterations Vicente made to his evidence on 9/21/94 in a meeting with ASA Coghlan and Investigator Martinez. Then we examine inconsistencies that arose at trial.

In Vicente's original statements, Pacheco and Serrano had not spoken in front of him about their role in the murder. In the 9/21/94 update, however, Vicente said that Serrano and Pacheco made inculpatory statements. It may be notable that prior to Rankins's recantation, which predated the 9/21/94 meeting, Rankins's alleged eyewitness account was the only evidence that attributed comments specifically to Serrano and Pacheco admitting involvement in the shooting.

Second, while Vicente, in his initial statements to police, said that the defendants had indicated that Montanez was the getaway driver after the Vargas shooting, in the 9/21/94 report and at trial, Vicente described Pacheco as the driver instead. Recall that in Rankins's statement, Pacheco drove the striped van while Montanez drove his own sedan.

Third, as reported in the Supp. R. dated 6/2/93, and also in the hand-written statement executed a few weeks later, Vicente reportedly stated that he first noticed damage to Montanez's car on 2/7/93, two days after he initially spoke to the defendants about the Vargas murder. On 9/21/94, however, he stated that he "had noticed the bullet holes and damage to Montanez's car when he first talked to the defendants on 2/5/93—i.e., during the first purported conversation with defendants.

Regarding trial inconsistencies, first, as reported in the Supp. R. dated 6/2/93, and also in the hand-written statement executed a few weeks later, Vicente reportedly stated that he spoke with the three defendants outside, on the corner, and during a trip to Gold Busters. At trial, however, Vicente said that the conversation with the defendants took place in considerable part on his porch.

SERRANO_LASSAR 25115



<span style="color:red">**CONFIDENTIAL**</span>

Second, Vicente introduced for the first time at trial the assertion that Montanez disposed of the murder weapon, his 9 mm gun, somewhere outside the vehicle before driving to Gold Busters. Previously, he had only said that Montanez hid the gun in the car's heating vent.

Finally, at trial, as discussed above, Vicente for the first time introduced a new witness to the confession—Rick.

          (e)     **The Circumstances of the Confession's Purported Receipt by Vicente**

We consider here the circumstances of the purported receipt by Vicente of confession evidence.

The record indicates and Vicente testified that he received the confession from the defendants after meeting with them at 8:30 or 9 a.m. on 2/5/93 at the corner of Hamlin and Altgeld streets. We consider first ways in which the circumstances of the receipt of the purported confession contribute to its reliability. Then we consider ways in which the circumstances of its receipt detract from its reliability.

Regarding the former, we note, first, that this was, we have verified, the neighborhood that Vicente lived in at the time. It would, therefore, make some sense that Vicente would have been spending time at that location. Second, Vicente knew Montanez and Serrano, and possibly Pacheco and, accordingly, may have had reason to converse upon seeing each other. Specifically, Montanez told us that he had recruited Vicente into the Imperial Gangsters well before the Vargas murder, although he said that they did not have contact after that. (10/17/13 Interview with Jose Montanez.) Vicente later referred to Montanez as a "friend" in conversation with students investigating the case. Regarding Serrano, Vicente and Serrano had a prior altercation, discussed above. In fact, Vicente told students investigating the case that he "hated Serrano." At trial, Vicente stated that he had known Pacheco for "nine, eight years," although he does not elsewhere discuss a prior relationship with Pacheco, and we have not been unable to locate any corroborating evidence from Pacheco.

Third, Montanez, Serrano, and Pacheco were at least acquainted with each other and, thus, it is at least plausible that they would have committed a crime together. Specifically, Serrano told us that he was "aware of" Montanez and Pacheco, but "didn't really hang" with either regularly. (10/17/13 Interview with Armando Serrano.) Serrano also said that he had smoked marijuana with Pacheco a few times, and knew his girlfriend or sister, but that he had not socialized with Montanez. (*Id.*) Montanez said he knew Serrano, but did not socialize with him due to their differences in ages. (10/17/13 Interview with Jose Montanez.) Montanez said that he knew Pacheco better, and had "partied" with him on several occasions, but had not participated in criminal activity with either man. (*Id.*)

We consider now the ways in which the circumstances of its purported receipt detract from its reliability.

42



<span style="color:red">**CONFIDENTIAL**</span>

First, Vicente testified that he was not aware of the fact that Our Lady of Grace Catholic church and school are situated at Hamlin and Altgeld, notwithstanding the fact that the complex dominates several blocks there. Relatedly, Vicente testified that he did not see anyone other than the defendants during the hours he spent at the corner, notwithstanding the fact that on the morning of 2/5/93 (a non-holiday weekday), clergy, church employees, children, their parents, teachers, and other staff would likely have been arriving for the start of the work and school day.

Second, recall that Vicente discussed Montanez, Serrano, and Pacheco "yelling" at each other about how they had just killed someone. During that conversation, they were also purportedly using heroin. But for the church and school complex, this was not an otherwise vacant neighborhood. On the corners not dominated by the church and school, four- and five-story brick homes and apartment complexes stand. It may have been unlikely that Montanez, Serrano, and Pacheco would have handled a firearm, used heroin, and shouted about a murder next to a church and school in a crowded neighborhood. Moreover, no one reported overhearing their argument about a murder or witnessing them use drugs.

Third, according to our research, the outside temperature was in the high 20s and low 30s Fahrenheit, during that time period, which may have made it difficult to spend the entire evening and morning outside.

Fourth, the relationship between Serrano on one hand and Vicente on the other hand, may not have been such that he would have been likely to have confessed to him. It is also possible that Pacheco did not know Vicente, a circumstance which would also tend to make Pacheco unlikely to confess murder to Vicente.

Fifth, the relationship among the individual defendants may not have been such that they were likely to commit a crime together. In fact, there is no evidence that we are aware of indicating that any defendant had committed a crime with any other prior to their reported involvement in the Vargas murder.

(f)     **Vicente's Recantation**

(1)     **Consistency or Inconsistency**

Vicente has stated on several occasions that he fabricated the evidence he provided against Montanez, Serrano, and Pacheco, although he has provided inconsistent reasons for having done so. We examine here the ways in which those recantations are consistent and the ways in which they are inconsistent.

Some time prior to 2003, undergraduate students investigating potential wrongful convictions were informed that Vicente had told his co-defendant in another case, Valentine Gomez, aka "Tomato," that he had "admitted to falsely testifying against" Montanez and Serrano. (5/21/03 Email.) There is no evidence that Vicente told Tomato that he had been coerced to do so. Instead, Vicente apparently informed Tomato that he had been motivated by the promise of sentencing leniency.

43



# CONFIDENTIAL

On 6/19/03 Vicente told students investigating possible wrongful convictions that the confession evidence he shared against Montanez, Serrano, and Pacheco was fabricated, but this time alleging that he was "coerced" and "beat" by Dets. Guevara and Halvorsen. (6/19/03 Email.)

(2) **Potential Incentives for Providing False Evidence or Falsely Recanting**

We detailed Vicente's sentencing benefits for providing evidence above, in our discussion of the Robert Bouto case. To summarize, Vicente was facing a possible lengthy sentence for his armed robberies. In exchange for his cooperation as an informant in the three murder cases, Vicente was sentenced instead to nine years and served only three. He also received at least standard witness quarters benefits at Cook County Jail, such as better meals and more comfortable surroundings, and "contact visits" with family members.

Regarding other incentives to provide false evidence against the defendants, we note that Vicente allegedly had a pre-existing bad relationship with Serrano, as detailed above.

Regarding incentives to falsely recant, we note that Vicente informally recanted on 6/19/03 and only later negotiated for incentives in exchange for possibly executing a recantation affidavit and testifying at the Montanez/Serrano post-conviction matter. Similarly, we are not aware of any evidence that Montanez or Serrano coerced Vicente to recant prior to 6/19/03.

(ii) **Rankins's Evidence**

To determine whether it is more likely that Rankins witnessed the murder or instead learned details of the crime from one or more of the other categories of sources identified above, we analyze that evidence as it relates to the following: (1) its inclusion of verifiable information not previously obtained from other sources; (2) its corroboration; (3) the circumstances of its receipt; and (4) its recantation.

(a) **Inclusion of Verifiable Information Not Previously Obtained from Other Sources**

For purposes of assessing whether Rankins witnessed the murder or instead became knowledgeable about the crime through other sources, it is useful to consider whether Rankins provided any verifiable information on 6/11/93 that had not been reported to police previously.

First, Rankins stated that Vargas was confronted over a pull-out radio. As we noted above, that Vargas was found with a pull-out radio was a detail included in the Supp. R. filed the day after the murder, and Vicente reportedly provided this information, too. Second, Rankins stated that Vargas was shot to death while inside a blue-gray van parked in front of his home, a fact reported early in the police investigation. Third, Rankins allegedly accurately identified the make and model of Montanez's car four and a half months after he allegedly witnessed the shooting. (6/11/93 General Progress Report.) By the time that Dets. Guevara and Halvorsen

44



<span style="color:red">**CONFIDENTIAL**</span>

spoke to Rankins, they had already purportedly identified Montanez's Buick Regal as the vehicle involved in the shooting, based in part on Vicente's evidence.

We are aware of no verifiable information obtained from Rankins that had not already been obtained from other sources, including Vicente.

### (b)    Corroboration of Rankins's Evidence

For purposes of assessing the veracity of Rankins's evidence, it is also useful to consider whether the evidence not previously known to police prior his statement to ASA King and Det. Halvorsen on 6/11/93 can be corroborated by other sources and evidence. First, we consider whether it is corroborated by ear and eyewitnesses to the crime or by any other verifiable evidence. Second, we consider whether Demond Williams (aka "Shorty Folks") and Sabrina corroborated Rankins's evidence. Third, we compare Rankins's evidence to Vicente's evidence.

### (1)    Corroborating Rankins's Evidence with Ear and Eyewitness Evidence and Other Verifiable Evidence

First, Rankins described the three defendants waiting on the sidewalk in front of Vargas's home, then surrounding Vargas when he exited his gate, and finally Montanez and Pacheco yelling out encouragement to Serrano to shoot Vargas. Among the many eyewitnesses interviewed on 2/5 and 2/6/93, not one saw the defendants waiting on the sidewalk or surrounding Vargas. Nor did any ear or eyewitness hear the purported exhortations (or, indeed, any voices at all issuing from outside during the relevant time frame that might have represented what Rankins described). However, a number of ear and/or eyewitnesses would have had an opportunity to see three assailants on the street and/or hear these shouts, including at the very least, Velez, Milinkovic, and Melendez.

Related to the above evidence, Rankins stated several times that he was parked, inside the van, seven or eight houses away from the Vargas home. This would have been well over two-hundred feet from where Vargas was walking when he was purportedly apprehended by Montanez, Serrano, and Pacheco, while it was dark out.[48] We have confirmed, by visiting the site after sundown, that at the distance described by Rankins it likely would have been impossible to determine that Vargas was carrying a radio. Not only that, but it likely would have been impossible to clearly see Vargas, the assailants, and Vargas's van, at all. It likely would have been impossible to see Vargas exit his gate. Finally, it likely would have been impossible to hear the encouragements—"Do him! Do him!" and "Go ahead! Go ahead!" attributed to Pacheco and Montanez, respectively—at all, let alone to be able to attribute them, from that distance, to individual assailants.

---

[48] The sun rose at 6:58 a.m. on 2/5/93, nearly an hour and a half after the shots that killed Vargas. (http://www.wunderground.com/history/airport/KMDW/1993/2/5/DailyHistory.html?req_city=N A&req_state=NA&req_statename=NA)

SERRANO_LASSAR 25119



<span style="color:red">**CONFIDENTIAL**</span>

Second, the nicknames Rankins assigned to the assailants do not match the known nicknames of the three defendants. In the course of our investigation, we have not uncovered any evidence that linked any of the three defendants to any of the nicknames appearing in Rankins's statement. In an interview with us, Rankins offered an explanation: He was shown photos of the three defendants, one showing an overweight Montanez (hence, Barrel Belly), one showing Pacheco dressed in a striped shirt (hence, Stripes), and one showing Serrano smiling (hence, Joker). (3/2/14 Interview with Timothy Rankins.) From those photos, Rankins said, the detectives invented the nicknames assigned to the defendants in his statement. (*Id.*) We have identified in the record and examined what we presume are these photos, and note that the defendants' appearance therein is consistent with Rankins's characterization. (Photos in Evidence.) Also regarding nicknames, Serrano told us during his interview with us that upon arresting him, Guevara kept referring to him as "Joker" in front of groups of other police officers, which he said he did not understand. (8/22/14 Interview with Armando Serrano.)

Third, Rankins also described a second get-away vehicle, a van with distinctive stripes. There is no other evidence in the record regarding such a vehicle.

> **(2)  Corroborating Rankins's Evidence with Demond Williams and Sabrina**

Rankins's evidence is also not corroborated by the two additional participants—Demond Williams (aka "Shorty Folks") and Sabrina—he introduces into the story of the Vargas shooting. There is no evidence in the record that police sought to confirm Rankins's account with Williams even though Williams was in custody on the charge that brought Rankins into custody and remained there until the completion of his four-year sentence, well after the trial of Montanez, Serrano, and Pacheco. As noted above, we spoke to Williams, who credibly professed no knowledge of the Vargas murder, and thus could not corroborate Rankins's account.

Finally, the record reflects—and there is no allegation in the record—that Dets. Guevara or Halvorsen were able to corroborate Rankins's evidence with Rankins's alleged girlfriend, Sabrina. We believe she was arrested alongside Rankins prior to the start of Montanez, Serrano, and Pacheco's trial, thus potentially affording the opportunity to do so.

> **(3)  Corroborating Rankins's Evidence with Vicente's Evidence**

Rankins's evidence corroborates Vicente's evidence in some instances, and in other instances it adds additional details that cannot be reconciled with the account allegedly tendered by Vicente.

Regarding the ways in which Rankins's evidence corroborates Vicente's, we first note that in both informants' stories, the three defendants all approached Vargas on the sidewalk outside his home. Also according to both, Serrano then attempted to steal the victim's pull-out radio. Then, according to both Rankins and Vicente, Vargas was shot after fleeing to his van.

46



<span style="color:red">**CONFIDENTIAL**</span>

The evidence provided by Rankins, however, also differs from Vicente's in several significant ways. According to Rankins, there was not one vehicle, Montanez's car, but two, including a van driven by Pacheco, at the scene of the Vargas murder. There were also two additional people present in Rankins's telling of the story, Rankins and Williams. Additionally, in Rankins's story, Montanez and Pacheco loudly encouraged Serrano to shoot Vargas after he escaped the robbery attempt. Vicente did not relate this exchange, and did not identify a shooter in any of his five statements. It is also notable that in Vicente's telling, all three defendants arrived in one car, that driven and owned by Montanez.

(c)      **Rankins's Recantation**

Rankins has stated on multiple occasions that he fabricated the evidence he provided against Montanez, Serrano, and Pacheco. We examine here the ways in which those recantations are consistent and the ways in which they are inconsistent. We also examine potential benefits that may have tainted either his initial statements against the defendants or the subsequent series of recantations.

(1)      **Consistency or Inconsistency**

We begin with consistency. Rankins is consistent in one of his core assertions, that he did not witness Montanez, Serrano, and Pacheco murder Vargas. He has consistently alleged that he was provided the story by police and prosecution personnel—but by an inconsistent cast of characters. In each instance, official personnel offered to dispense with his armed robbery charge in exchange for cooperating, and threatened him with malicious prosecution for the Vargas murder should he not cooperate. But for his initial recantation, Rankins has also consistently stated since then that he was taken to the scene of the Vargas murder and provided the salient details of the murder, although by an inconsistent cast of characters.

Regarding inconsistencies, we continue with Rankins's allegations regarding physical abuse. Notably, there is no such allegation in his 1994 recantation, and the allegations instead first arise five years later, beginning in his first §1983 claim. While it is true that Rankins has alleged abuse in every instance since then, the actual abuse alleged has varied considerably since that time. Similarly, Rankins's recantations implicate a tremendously varied and continuously expanding cast of characters. Notably, he did not name Dets. Guevara and Halvorsen in any of his recantations until speaking with Jennifer Bonjean, Serrano's post conviction counsel, in 2012. Prior to that time, with one exception, he referenced police personnel only anonymously, by the designation "John Doe Detectives 1-3" and "police."[49]

(2)      **Potential Benefits for Providing False Evidence or Falsely Recanting**

---

[49] Within the 3/29/94 recantation, Rankins referred to Sgt. Mingey by name. (3/29/94 Rankins Recantation.)

47



<span style="color:red">**CONFIDENTIAL**</span>

Rankins did not allege specific sentencing benefits discussed with him for cooperating in the investigation, and since he ended his cooperation before the Montanez/Serrano trial and did not testify, unlike in Vicente's case there is no confirmed record of benefits received. He has said, rather, more generally, that CPD and State's Attorney's Office personnel would ensure that he would be provided benefits in connection with his armed robbery charge if he were to cooperate. For instance, in his 3/29/94 recantation, Rankins said that two unnamed officers told him that "you have an arm robbery and we can get it drop," and that "the state maid me an offer I couldn't refuse." Moreover, he spent at least a portion of his pre-trial incarceration in comparative comfort—first in the Witness Protection Quarters known as the "Q," and later at home on electronic monitoring.

Rankins told us that he did not recall the circumstances under which he drafted and executed his initial hand-written recantation. However, student investigators said in emails related to their investigation of Serrano's case that Rankins executed the recantation at the behest of private investigator Julio Lebron, who was at the time working for the Montanez family. (10/20/03 Email; 12/19/03 Email; 5/4/03 Email.) Perhaps bolstering the theory that Montanez's family was involved in procuring Rankins's initial recantation, Rankins wrote a letter to Montanez, which the Montanez family forwarded to the student investigators, indicating that Montanez's father arranged his trip to Puerto Rico, where he stayed at times with Montanez family members.

Regarding financial benefits, Rankins's 1999 § 1983 claim included a prayer for relief of "22.80 billion dollars." In his 2014 §1983 claim, Rankins requests relief in the amount of $3.780 million, with $4.280 million of that [sic] to be given to the Chicago Public Schools, and also makes several non-monetary requests for relief, such as an exemption from registering as a sex offender.

   (iii)  **Findings on Vicente and Rankins's Evidence**

We begin with Vicente's evidence. We find it more likely than not that Vicente fabricated the confession he purportedly obtained from Montanez, Serrano, and Pacheco.

First, Vicente did not provide to police verifiable information that had not already been obtained from other sources. Had Montanez, Serrano, and Pacheco confessed to him, we would expect that he would know some accurate information that was unknown to police prior to the reporting of his evidence in the Supp. R. dated 6/2/93.

Second, we find it more likely than not that Wilda, rather than Vicente, introduced the evidence regarding an incident involving several Latino men and the victim on the eve of his murder, thus indicating that Vicente did not have independent knowledge of this critical fact.

Third, the remainder of Vicente's evidence lacks meaningful corroboration. We begin with Wilda. As an initial matter, Vicente described Montanez spotting Vargas's money, but Wilda testified, primarily, that Rodrigo had returned to the van prior to the arrival of the relevant vehicle, thus negating motive. Related to that point, Vicente described Montanez following home the Vargas family but Wilda testified, primarily, that the vehicle did not follow them home, thus

48



<span style="color:red">**CONFIDENTIAL**</span>

negating opportunity. Wilda also struggled to identify Montanez and Serrano at trial, suggesting that her photo array and lineup identifications of them lack reliability. Finally, Det. Guevara testified and Wilda reportedly has since provided evidence casting doubt on the reliability of her purported identification of Montanez's car.

Vicente's evidence is also difficult to reconcile with the State's theory of the case—i.e., that Vargas was murdered during the course of an attempted robbery. As an initial matter, Vicente described an attempted mugging, but no ear or eyewitness reported hearing such a struggle, although several were in a position to do so. Related to that point, Vicente described the defendants as requiring money in order to procure drugs, but Vargas was discovered with nearly $200 on his person. Also, Velez's evidence, and the analysis of on-scene CPD personnel who reported no evidence of a struggle, suggests that Vargas was warming up his car when he was shot, a detail that is incompatible with the State's theory. Related to that point, we consider it unlikely that Vargas would have evaded his attackers while maintaining control of both a sandwich bag and his radio, all while keeping his scarf and cap in place.

Vicente's evidence regarding Montanez's car's involvement in the murder also lacks meaningful corroboration for reasons beyond the potential misconduct connected with Wilda's reported identification. As an initial matter, although Vicente stated that Montanez crashed his car while fleeing the scene, no witnesses reporting hearing a crash, and Montanez submitted evidence that, if accurate, would tend to indicate that his car was undamaged in mid-February. Additionally, Shoop and other eyewitnesses did not provide a description of the suspected get-away car that is consistent with Montanez's car in any but the most superficial manner.

Fourth, Vicente's evidence regarding Gold Busters and Rick also cannot be corroborated. Regarding the latter, we emphasize here the implausibility that Vicente, as he testified, mentioned Rick to ASA Coghlan during their 9/21/94 meeting, which was attended not only by ASA Coghlan, but also by Investigator Martinez. After the meeting, Investigator Martinez prepared an Investigative Report documenting it, and describing the new evidence that Vicente provided. Investigator Martinez's report did not reference Rick. Since Rick would be another witness to the confession, one would expect the presence of Rick to be mentioned in the report if it were related by Vicente.

Fifth, Vicente provided a significantly altered account of the confession nearly eighteen months after he purportedly received it, which further undermines his credibility. Several of those altered details apportioned blame to Serrano and Pacheco in ways that only Rankins's account had before. Related to this point, Rankins allegedly told Vicente while they were in the witness quarters that he did not plan to cooperate in the matter, which may have provided Vicente the motive and information required to modify his account.

Sixth, the reported circumstances of the receipt of the confession call into question the veracity of Vicente's evidence.

Seventh, if Vicente had this information, it is likely he would have raised it with the police at the same time that he related the Bouto confession since he was trying to get a lower sentence for his armed robberies.

49



<span style="color:red">**CONFIDENTIAL**</span>

Eighth, Vicente had a meaningful incentive to provide false evidence. In contrast, he recanted to Tomato without incentive and to students investigating potential wrongful convictions prior to negotiating for benefits for future testimony. Regarding his recantation, Vicente's belated claim of abuse in this and the Bouto and third defendant cases is incredible. Vicente has demonstrated—more than amply—that sentencing benefits were more than sufficient motivation.

We also give some weight both to the fact that we consider it unlikely that Vicente would have obtained three separate confessions to three unrelated crimes and that we have independently determined that Vicente likely fabricated those other confessions, too.[50]

For all of these reasons, we find that it is likely that Vicente fabricated the evidence he provided against Montanez, Serrano, and Pacheco. The most likely scenario, we find, is that Wilda at some point related the evidence regarding the 2/4/93 incident to Det. Guevara, as Det. Halvorsen told us and as she testified, and perhaps even to other CPD personnel or non-State personnel such as friends or neighbors. Then that aspect of the case was for some reason and by some unknown means related to Vicente during the course of the investigation.

We also find it more likely than not that Rankins fabricated the evidence that he witnessed the Vargas murder.

First, Rankins, like Vicente, did not provide any verifiable evidence that had not already been reported by other sources.

Second, Rankins's account of the Vargas murder is not corroborated. As an initial matter, Rankins's evidence regarding an attempted mugging and exhortations to murder cannot be reconciled with ear and eyewitness accounts of the Vargas murder. Related to that proposition, Rankins's own account of witnessing the murder is not credible, because he described himself—consistently— having witnessed the crime from a vantage point from which he could not have seen or heard what he described. Additionally, Rankins attributed to the defendants nicknames that likely were not associated with them, a mistake he would not have made had he participated with the defendants in a robbery scheme and witnessed the conversations he claimed to have witnessed. Finally, Williams repudiated Rankins's evidence and there is no evidence that police were able to corroborate it with Sabrina.

Third, Rankins had incentives to provide false evidence against Montanez, Serrano, and Pacheco, including the fact that had, like Vicente had, an adversarial history with Serrano, and so a reason to implicate him, given the chance.

---

[50] In the third defendant's case, we did not find that it was more likely than not that the defendant was actually innocent or that there was misconduct by Guevara. However, we did for several reasons determine that the confession to Vicente in that matter, purportedly occurring in the "Bullpen" waiting room at the Cook County Jail while the two were surrounded by several other people, was fabricated.

SERRANO_LASSAR 25124



<span style="color:red">CONFIDENTIAL</span>

For these reasons, we find it more likely than not that Rankins's evidence was fabricated. As with Vicente, we find that the most likely scenario is that Rankins learned the facts of the case from some unknown person or persons during the course of the investigation.

Although not dispositive, we also give some weight to the fact that Rankins has consistently recanted the evidence he provided against Montanez, Serrano, and Pacheco. (We note that if Rankins's evidence regarding his temporary incarceration with Montanez is accurate, it is conceivable that Montanez coerced Rankins into recanting. Assuming such a factor motivated his initial recantation, we consider it somewhat unlikely that Rankins would continue to recant to this day. Moreover, any such coercion would not negate the other defects with Rankins's evidence identified above).

Regarding the abuse alleged by Rankins, however, we cannot credit at all his sprawling and lurid tale of a vast conspiracy involving extreme physical coercion at the hands of dozens of police and prosecution personnel from this and several out-of-state jurisdictions. Det. Halvorsen described Rankins to us as "crazy," and we suspect that his assessment is correct.

### b. The Case Without Vicente's and Rankins's Evidence

Having found it more likely than not that the evidence provided by Vicente and Rankins was fabricated, we turn to the question of what the identification evidence, standing alone, nonetheless may indicate. We begin our analysis with the evidence provided by Wilda. Second, we examine the evidence provided by Shoop.

### (i) The Evidence Provided By Wilda

First we discuss reasons that Wilda's evidence might tend to indicate that the defendants are guilty. Second, we discuss reasons that Wilda's evidence may not tend to bolster a theory that the defendants committed the murder.

Regarding the former, Dets. Guevara and Halvorsen's Supp. R. dated 6/2/93 indicated that she identified Montanez and Serrano from a black-and-white photo array during a meeting with Det. Guevara at her home on 6/2/93, although we have been unable to locate those photos, which renders us unable to evaluate the photo array. The investigation record also indicates that Wilda identified Serrano and Montanez from lineups in the presence of Dets. Guevara and Halvorsen. Dets. Guevara and Halvorsen's Supp. R. dated 6/2/93 indicated that Wilda identified Montanez's car as the vehicle she saw at the gas station the night before the murder. Finally, an unattributed GPR indicated that Wilda refused Montanez's parents offer to implicate someone other than their son in Vargas's murder, although we have not been able to corroborate the content of that meeting. (As noted above, Montanez confirmed to us that her parents had, in fact, met with Wilda, but stated they did not attempt to bribe her, but merely wanted to know why she had identified their son. (10/17/13 Interview with Jose Montanez.)) Such a refusal would, of course, suggest that Wilda strongly believed Montanez, at least, was guilty.

We now discuss reasons that Wilda's evidence may not indicate guilt, beginning with her identifications of Montanez and Serrano. As an initial matter, as detailed above, Wilda was

51



<span style="color:red">CONFIDENTIAL</span>

unable to credibly identify Montanez and Serrano at trial. Although this does not necessarily mean that her prior identifications were unreliable, her trial performance does increase the likelihood that her prior identifications lacked reliability. Moreover, Wilda, by her own account, only saw the Latino men at the gas station for approximately three minutes. Related to that point, she did not apparently consider them a sufficiently obvious threat to cause her to focus intently on them, as she initially told investigators that her husband had "no enemies" and she could think of "no reason" for the murder. Additionally, Wilda allegedly first identified Montanez and Serrano from an array of black and white photographs during a private meeting with Det. Guevara four months after the purported gas station sighting. The lineup identifications occurred beginning several days after that, on 6/11/93 for Serrano and 7/10/93 for Montanez—i.e., more than five months after the brief eve-of-murder incident. Recall that Montanez was wearing a jacket with his name emblazoned on the front during the line-up. Also, for reasons we discussed in our analysis of the evidence provided by Vicente and Rankins, Wilda's line-up and photo-array identifications are not bolstered by Vicente's and Rankins's evidence, which we conclude was more likely than not fabricated.

There are also reasons to doubt the reliability of Wilda's identification of Montanez's car, reportedly in June of 1993. First, this identification suffers from one of the same problems that casts her identifications of the defendants themselves into doubt: The length of time (approximately four months) between the gas station incident and the identification of Montanez's car may have made an accurate identification nearly impossible. As well, as detailed above, Wilda allegedly told post conviction counsel for Montanez and Serrano that Det. Guevara pointed Montanez's car out to her, told her that it was the get-away car, and that she then merely told him it was "similar" to the car she recalled from the gas station incident.

Additionally, as noted above, Wilda's evidence suggests that the Latino men she saw at the gas station had neither motive nor opportunity to target Vargas. That is, there is some reason to doubt that the men she saw at the gas station were connected in any way to the murder of her husband.

(ii)     **The Evidence Provided by Shoop**

First we discuss reasons that Shoop's evidence might tend to indicate that the defendants are guilty. Second, we discuss reasons that Shoop's evidence may not suggest that the defendants committed the murder. Regarding the former, Shoop told police in the hours after the shooting that he saw an older, light brown sedan, possibly a two-door vehicle, pulling out of the neighborhood, giving a description of a vehicle style (common at the time) that had some similarities with Montanez's car.

Regarding the latter, as discussed above, Montanez's car was actually a two-toned (brown and tan) four-door sedan with a vinyl roof top, distinctive features that Shoop did not describe in the aftermath of the shooting, and which he may have been unlikely to have omitted had he seen Montanez's car. We note, however, that Shoop testified at trial that Montanez's car was "similar" to the vehicle he saw departing the scene, notwithstanding these differences.

SERRANO_LASSAR 25126



<span style="color:red">**CONFIDENTIAL**</span>

### (iii) Finding Regarding the Case Without Vicente's and Rankins's Evidence

For the reasons detailed above, we find that the identification evidence provided by Wilda and Shoop is, standing alone, unreliable and insignificant. In summary, Wilda's identifications of both the defendants and Montanez's car, for the reasons describe above, are unreliable. Moreover, there is some evidence suggesting that her identification of Montanez's car was improperly suggested by Det. Guevara. As noted above, Wilda reportedly stated that Det. Guevara pointed out the car to her and then provided false evidence regarding bullet holes and body damage linking it to Vargas's murder. Thus, we find it more likely than not that Wilda did not see Montanez or Serrano at the gas station. Related to this finding, we also find it more likely than not that the incident Wilda witnessed on the evening of 2/4/93 was wholly unrelated to Vargas's murder for the reasons explained above regarding lack of motive and lack of opportunity.

As well, neighbor Shoop tendered a very general description of a common style of car during the time period, but did not describe the distinctive features of Montanez's car. Thus, we find it more likely than not that Shoop saw a car other than Montanez's departing the scene of Vargas's murder.

### 4. Conclusion

#### a. Regarding Allegations of Misconduct

##### (i) Vicente's and Rankins's Evidence

Both Vicente and Rankins had knowledge of the crime that someone told them. It was either the perpetrators, the police, someone else, or some combination. It is also possible that the police provided the evidence wittingly, unwittingly, or through some combination. It is also possible that the police provided information to only one of them.

We first turn to facts that make misconduct less likely than it otherwise would be. First, the two informants, Vicente and Rankins, told two stories that contained material differences. First, as discussed above, there is no evidence we are aware of that the three defendants were ever known by the nicknames Rankins provided. If Dets. Guevara and Halvorsen were working in concert to set up these defendants, it is inconceivable that they would supply a completely different set of nicknames to Vicente and Rankins, let alone the wrong ones. Second, Rankins placed two extra people at the scene: Himself and Demond Williams, aka Shorty Folks. Third, Rankins placed an extra vehicle at the scene, a car driven by Pacheco, whereas in Vicente's telling all three defendants traveled in Montanez's vehicle. Fourth, in Rankins's story, Pacheco and Montanez shouted encouragement to Serrano, the shooter. (A shooter was never identified by Vicente.)

Second, as in the Bouto case, where Vicente reportedly first provided confession evidence to someone other than Dets. Guevara or Halvorsen, an informant here made first contact regarding the case with someone other than Dets. Guevara and Halvorsen. Here, the

SERRANO_LASSAR 25127



<span style="color:red">**CONFIDENTIAL**</span>

record indicates that Rankins first related the confession to Sgt. Mingey, who then called Dets. Guevara and Halvorsen. Thus according to Sgt. Mingey, Rankins came up with the confession before speaking with Dets. Guevara and Halvorsen.

Third, we note that accusations by the informants of physical coercion by Dets. Guevara and Halvorsen changed over time. In particular, Rankins at first did not allege physical coercion in his first recantation in 1994, but in later recantations included extensive allegations of physical abuse. Upon first telling co-defendant Valentine Gomez about his involvement in the Montanez/Serrano case, Vicente first allegedly only revealed that he participated in exchange for sentencing benefits. Like Rankins, it was only in later iterations that Vicente alleged physical coercion by the detectives. The changing nature of the allegations of misconduct against Dets. Guevara and Halvorsen make misconduct less likely than it otherwise would be—it also makes allegations of misconduct related to physical abuse unlikelier than it otherwise would be.

We next turn to facts that make misconduct more likely. First, on 5/25/93, just one week before the Vicente evidence purportedly broke the case, unknown CPD personnel requested criminal histories of Montanez, Serrano, and Pacheco notwithstanding the fact that they had no contemporary criminal history. Under the circumstances, the most likely reason that this occurred is that the three men had already been targeted as suspects in the Vargas murder. We cannot reconcile this event with Det. Halvorsen's later explanation that he was acting upon a rumor that an unknown "Pistol Pete" had committed the crime, information he considered "useless" until he approached Vicente for information about the murder, reportedly on 6/2/93. In fact, as discussed above, Vicente was not arrested with someone nicknamed "Pistol Pete." We find it a strong possibility that rather than being a cold case at the time of Vicente's initial involvement, Dets. Guevara and Halvorsen had already zeroed in on the defendants as primary suspects.

Related to this point, we also note that it may be significant that in the neighborhood at the time of the Vargas murder lived two brothers, both well-known members of the Imperial Gangsters, named Angel Sanchez and Armando Quinones. The pair were nicknamed "Pistol Pete" and "Mando," respectively. Because the two men share nicknames with Montanez and Serrano, but actually have a substantial connection to one another, unlike Serrano and Montanez, we consider it possible that Dets. Guevara, Halvorsen, or both may have suspected, for some unknown reason, that "Pistol Pete" was involved with the Vargas crime, but then, for another unknown reason, focused their investigation upon the wrong Pistol Pete and, later, the wrong Mando.

Second, although they provided different nicknames of the defendants and Rankins included several extra facts, discussed above, the core narratives of Vicente and Rankins share most of the same key characteristics. That these characteristics, describing an armed robbery, do not align with the untainted evidence, as discussed above, make it more likely than not that the evidence provided by Vicente and Rankins was provided to them. As discussed above, there is no evidence or allegation that Vicente and Rankins knew one another prior to meeting in the witness quarters, after they had already provided evidence in the case. Thus, it is most likely that

SERRANO_LASSAR 25128



<span style="color:red">CONFIDENTIAL</span>

the facts were provided to Vicente and Rankins, intentionally or not, by one or both of the detectives.

Third, there are two instances in which Det. Halvorsen has admitted to us that portions of the informants' story that became key components of the narrative told at trial were fabricated or otherwise not true. Det. Halvorsen told us that he and Det. Guevara knew that Gold Busters did not exist, which we confirmed. Nonetheless, Dets. Guevara and Halvorsen reported it as fact and Vicente testified to its existence. Second, Det. Halvorsen informed us that Rankins did not have "any of the facts" correct. Nonetheless, Det. Halvorsen himself testified at trial to the evidence provided by Rankins, and Det. Guevara did so before the grand jury.

Fourth, it is notable that this is the second of three cases from the summer of 1993 in which Vicente provided confession evidence against defendants in murder cases. Although we above found it more likely than not that Vicente fabricated the Bouto confession on his own, without willful police misconduct, that does not mean that that is the case in this instance, as well. It is unlikely that Vicente would have obtained multiple murder confessions in three cases investigated in the same year by the same two detectives. Also, unlike in Bouto, where Vicente had verified access to the defendant because the two were jailed in the same cell block, here no such verifiable meeting occurred. In fact, we find it unlikely that Vicente would have elected to provide evidence against Bouto immediately upon being incarcerated but withheld the evidence of Montanez and Serrano's guilt for weeks, given that he was incentivized to provide as much evidence as possible to secure sentencing benefits.

Fifth, we find it improbable that Det. Halvorsen did not take notes during his meeting with Vicente, as he testified at trial. Vicente's story about the purported confession was lengthy, taking place over multiple days and multiple locations and involving three defendants and the victim. It seems difficult to believe that he would have been able to accurately transfer the telling of such a story to a report by memory, unless he had a role in developing it.

Sixth, police did not charge Rankins as an accomplice to the Vargas murder, despite his alleged proximity to it and purported confession to agreeing to accompany the men on a drug and gun run. Perhaps even more tellingly, they did not charge or even attempt to discuss the crime with Williams, aka Shorty Folks, who was at the scene according to Rankins's statement, and available to provide evidence because he was incarcerated for the entire relevant period. That Dets. Guevara and Halvorsen did not attempt to speak with Williams makes it possible that they did not believe Rankin's story, but were willing to use it at trial.

Seventh, also related to Rankins's role, we find the one-hour time span reported between Dets. Guevara and Halvorsen's initial meeting with Rankins and the arrest of Serrano to be improbably short, raising the possibility that Rankins's evidence did not actually motivate the arrest of Serrano, contrary to reports in the record. This is particularly true because Dets. Guevara and Halvorsen allegedly drove Rankins to the scene of the shooting in that time frame, as well, to test Rankins's knowledge of the crime. Relatedly, inconsistencies regarding the reported genesis of Rankins's involvement with the case seem to weigh in favor of misconduct. While Dets. Guevara and Halvorsen wrote in their 6/14/93 Supp. R. that Rankins was questioned

SERRANO_LASSAR 25129



<span style="color:red; font-weight:bold; font-size:2em;">CONFIDENTIAL</span>

by Sgt. Mingey regarding an unrelated murder when Rankins revealed his knowledge about the Vargas murder, in an interview with us Sgt. Mingey said he did not investigate the other crime.

Eighth, and again related to Rankins, Rankins's later statements that he was taken to the scene and Det. Halvorsen's corroboration of that fact, would have offered an easy opportunity to provide Rankins with the facts of the case.

Finally, related to both informants, we find it important that neither provided verifiable information about the crime that was not previously known. Between two informants relating detailed accounts, we would expect that verifiable details would have emerged that were previously unknown about the crime scene. As discussed above in detail, none did, thus making it more likely than it would otherwise be that the facts of the case were shared with the informants by CPD personnel.

Looking at all the facts known to us, we cannot conclude whether or not there was misconduct by the police regarding the alleged confessions. There are too many possibilities, too many inconsistent facts, and a lack of credible witnesses.

Due to inconsistencies in the portion of Vicente's and Rankins's allegations of abuse, we find it more likely than not that neither Dets. Guevara nor Halvorsen engaged in physical abuse of the two informants.

### (ii) Wilda Vargas's Evidence

We next turn to possible misconduct related to the participation of Wilda in the investigation. First, we discuss reasons that make it less likely that Dets. Guevara, Halvorsen, or both committed misconduct in their contact with Wilda. Next, we discuss reasons that make it more likely that Dets. Guevara, Halvorsen, or both participated in misconduct in their contact with Wilda.

Regarding the facts that make misconduct more likely, we recall that Wilda told post-conviction counsel for Montanez that she did not independently identify Montanez's vehicle to Det. Guevara, as was argued at trial, but rather that he pointed the car out to her as they drove past it. Relatedly, Wilda allegedly revealed that Det. Guevara told her that the bullet holes in Montanez's car matched ballistics tests from the crime scene, which was not true and was never argued by the State. However, we were not able to interview Wilda for purposes of examining the validity of these allegations.

Regarding facts that make it less likely that Dets. Guevara, Halvorsen, or both committed misconduct related to their contact with Wilda, we first note that Wilda did not allege misconduct at trial, in particular when she was asked about her identifications of a photo array including the defendants, line-ups including Montanez and Serrano, and the identification of Montanez's vehicle.

56



<span style="color:red">**CONFIDENTIAL**</span>

To conclude, we are unable, based upon the available evidence, to determine whether or not Det. Guevara, Det. Halvorsen, or both, committed misconduct regarding Wilda's identification of Montanez's car.

> b.   **Regarding Claims of Actual Innocence**

First, for the reasons detailed above, the evidence Vicente and Rankins provided against the defendants is not credible. To recapitulate briefly, neither Vicente nor Rankins provided to police any verifiable information that had not already been obtained from other sources, a circumstance that both undermines the value of their evidence and raises the possibility of official misconduct. In contrast, that evidence which is original to Vicente or Rankins cannot be corroborated by untainted sources or evidence; if Vicente or Rankins possessed legitimate evidence, this would not likely be the case. Vicente and Rankins also had significant incentives to fabricate evidence, but recanted—at least initially—without obvious incentive. Causing us to additionally doubt Vicente's credibility, after Rankins ceased cooperating, Vicente provided to ASA Coghlan a significantly altered account—more than eighteen months after he began to provide evidence against the defendants. Finally, although not dispositive, we give some weight to our finding that the confession evidence Vicente provided against Bouto and the third defendant was also more likely than not fabricated.

Second, as explained above, the identification evidence provided by Wilda and Shoop, considered in isolation from the informant evidence, is neither meaningful nor persuasive. We begin with Wilda. In summary, Wilda's identification of the defendants is unreliable, her identification of Montanez's car not only unreliable but perhaps also predicated on official misconduct. Shoop's evidence is even less consequential. Recall that he merely provided a description of a common vehicle, and that description can be meaningfully distinguished from Montanez's two-toned car.

Third, the remaining evidence is inconsistent with the State's theory of the case. As an initial matter, if Wilda's trial testimony was accurate, the Latino men she spotted at a gas station on the eve of her husband's murder lacked both motive and opportunity to commit the crime because, according to that testimony, the men could not have seen Montanez's money and did not follow them all the way home. Moreover, there is no reason to believe that even if those men had spotted Vargas's money and knew where he lived, they would have known that he departed for work at 5:30 a.m., an unusual hour at which to depart for work. Also, several witnesses had reason to see and/or hear three assailants attempting to mug Vargas, but none did. Indeed, Velez's evidence suggests that Vargas was likely murdered as he sat in his car, warming the engine, a finding consistent with CPD's initial analysis. Finally, had the crime been motivated by the defendants' need to obtain money to procure heroin, the failure to take anything from Vargas—whether the nearly $200 cash or radio on him—despite the opportunity to do so, is illogical.

Moreover, there is also some affirmative evidence of innocence, which we do not consider dispositive, but do take into account.

SERRANO_LASSAR 25131



<span style="color:red">**CONFIDENTIAL**</span>

We begin with Serrano. First, in conversation with us, Serrano misstated an important fact regarding the crime scene, an error the perpetrator would not likely have made. Specifically, as detailed above, Serrano told us that Vargas's car radio was playing when his body was discovered. Second, other than common gang membership, there is no significant link between Serrano on the one hand and Pacheco and Montanez on the other hand. Third, Det. Halvorsen's testimony regarding the genesis of his solving the case, implicated Montanez not Serrano. Finally, we found credible Serrano's protestation of innocence when we met with him.

Regarding Montanez, first, Montanez has presented some evidence that his car was not damaged until well after Vargas's murder. Second, Capt. Pena told us that Montanez seemed genuinely shocked when he was arrested for Vargas's murder. Third, we also found credible Montanez's protestation of innocence when we met with him.

There is also some additional affirmative evidence of innocence. First, Vicente and Rankins both maintain that Montanez and Serrano are actually innocent. Second, CPD reported that the Vargas murder appeared to be similar to the crime perpetrated against Rojo and Salazar, and that crime was committed by African-American men. Third, no physical evidence links the defendants to the crime: (1) no weapon was recovered; (2) Montanez's car either tested negative for gun shot residue or was not tested for it; (3) the radio either tested negative for Serrano's fingerprints or it was not tested for them; and (4) the medical examiner did not report defensive wounds that might point to an attempted mugging. Fourth, the untainted physical evidence suggests that Vargas was murdered in a planned "hit" by someone familiar with his unusual work schedule, and there is no evidence linking Montanez or Serrano to a crime-for-hire scheme.

Having considered these flaws, we conclude that the only remaining potential evidence of guilt is as follows: (1) Montanez and Serrano were members of the Imperial Gangsters street gang, and knew each other; (2) Montanez and Serrano committed crimes, although there is no evidence that they committed crimes together; (3) Montanez and Serrano both committed armed robberies and, indeed, Montanez committed them with some frequency; (4) Montanez and Serrano used drugs and, in fact, Montanez sometimes committed robberies for the purpose of obtaining money to buy heroin; and (5) Serrano stole car radios with some frequency. That evidence, however, may not make Montanez or Serrano meaningfully more likely to have committed this crime than many other members of a Chicago street gang in 1993.

Looking at all the evidence, we conclude that Montanez and Serrano are more likely than not actually innocent.

58

SERRANO_LASSAR 25132