# Plaintiffs' Exhibit 32

## 11/13/18 Dillon Deposition

Transcript of John Dillon
Conducted on November 13, 2018

1 (1 to 4)

**Page 1**

```
 1        UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF ILLINOIS
 3              EASTERN DIVISION
 4    ----------------------------x
 5    JOSE MONTANEZ,          :
 6            Plaintiff,      :
 7       v.          : Case No. 17 CV 4560
 8    REYNALDO GUEVARA, et al.,  :
 9            Defendants.     :
10    ------------------------   :
11    ARMANDO SERRANO,         :
12            Plaintiff,      :
13       v.          : Case No. 17 CV 2869
14    REYNALDO GUEVARA, et al.,  :
15            Defendants.     :
16    ----------------------------x
17       Videotaped Deposition of JOHN DILLON
18              Chicago, Illinois
19         Tuesday, November 13, 2018
20              10:13 a.m.
21
22    Job No.:  216030
23    Pages:  1 - 304
24    Reported by:  Paula M. Quetsch, CSR, RPR
```

**Page 2**

```
 1       Videotaped deposition of JOHN DILLON, held at
 2    the location of:
 3
 4            LOEVY & LOEVY
 5            311 North Aberdeen Street
 6            3rd Floor
 7            Chicago, Illinois 60607
 8            (312) 243-5900
 9
10
11
12       Pursuant to notice before Paula M. Quetsch, a
13    Certified Shorthand Reporter, Registered Professional
14    Reporter, and a Notary Public in and for the State
15    of Illinois.
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1         A P P E A R A N C E S
 2    ON BEHALF OF PLAINTIFF JOSE MONTANEZ:
 3        RACHEL BRADY, ESQUIRE
 4        LOEVY & LOEVY
 5        311 North Aberdeen Street
 6        3rd Floor
 7        Chicago, Illinois 60607
 8        (312) 243-5900
 9
10    ON BEHALF OF PLAINTIFF ARMANDO SERRANO:
11        JENNIFER BONJEAN, ESQUIRE
12        ASHLEY COHEN, ESQUIRE
13        BONJEAN LAW GROUP, PLLC
14        1000 Dean Street
15        Suite 345
16        Brooklyn, New York 11238
17        (718) 875-1850
18
19    ON BEHALF OF DEFENDANT MATTHEW COGHLAN:
20        MORGAN R. HIRST, ESQUIRE
21        JONES DAY
22        77 West Wacker Drive
23        Chicago, Illinois 60601
24        (312) 782-3939
```

**Page 4**

```
 1     A P P E A R A N C E S   C O N T I N U E D
 2
 3    ON BEHALF OF DEFENDANTS ERNEST HALVORSEN AND
 4    EDWARD MINGEY:
 5        JOSH M. ENGQUIST, ESQUIRE
 6        THE SOTOS LAW FIRM, PC
 7        550 East Devon
 8        Suite 150
 9        Itasca, Illinois  60143
10        (630) 735-3300
11
12    ON BEHALF OF DEFENDANT CITY OF CHICAGO:
13        THERESA BEROUSEK CARNEY, ESQUIRE
14        EILEEN ROSEN, ESQUIRE
15        ROCK FUSCO & CONNELLY, LLC
16        321 North Clark Street
17        Suite 2200
18        Chicago, Illinois 60654
19        (312) 494-1000
20
21
22
23
24
```

Transcript of John Dillon
Conducted on November 13, 2018

2 (5 to 8)

---

**5**

```
1    A P P E A R A N C E S   C O N T I N U E D
2
3  ON BEHALF OF DEFENDANTS COOK COUNTY AND
4  JOHN DILLON
5      CHRISTINA CHOJNACKI, ESQUIRE
6      JULIE NIKOLAEVSKAYA, ESQUIRE
7      OFFICE OF THE COOK COUNTY STATE'S ATTORNEY
8      500 Richard Daley Center
9      Chicago, Illinois 60602
10     (312) 603-3473
11
12 ON BEHALF OF DEFENDANT JOHN DILLON:
13     T. ANDREW HORVAT, ESQUIRE
14     ILLINOIS ATTORNEY GENERAL'S OFFICE
15     100 West Randolph Street
16     13th Floor
17     Chicago, Illinois 60601
18     (312) 814-5484
19
20 ALSO PRESENT:
21     RYAN GRZELAK, Videographer
22     JOSE MONTANEZ
23     ARMANDO SERRANO
24
```

**7**

```
1  Exhibit 13 Bond Slip                      254
2  Exhibit 14 Certified Statement of         256
3             Conviction
4  Exhibit 15 Vicente Arrest Report          257
5  Exhibit 16 SERRANO_LASSAR 1779 through    258
6             1794, Transcript
7  Exhibit 17 SERRANO_LASSAR 1795,           261
8             Court Order
9  Exhibit 18 Police Report                  268
10 Exhibit 19 SERRANO_LASSAR 24100 through   273
11            24102, Handwritten Letter
12 Exhibit 20 SERRANO 7692 through 7700,     283
13            Memo
14
15
16
17
18
19
20
21
22
23
24
```

**6**

```
1          C O N T E N T S
2  EXAMINATION OF JOHN DILLON         PAGE
3      By Ms. Bonjean                    9
4      By Mr. Hirst                    300
5      By Ms. Bonjean                  302
6
7          E X H I B I T S
8      (Attached to transcript.)
9
10 DILLON DEPOSITION EXHIBITS         PAGE
11
12 Exhibit 1   5/16/93 Supplemental Report   169
13 Exhibit 2   6/8/93 Supplemental Report    184
14 Exhibit 3   Vicente Handwritten Statement 153
15 Exhibit 5   Case Fact Sheet               127
16 Exhibit 6   6/2/93 Supplemental Report    182
17 Exhibit 7   SERRANO_LASSAR 1295,          175
18             Transcript Page
19 Exhibit 8   SERRANO-LASSAR 862 through 864, 177
20             Affidavit
21 Exhibit 9   6/2/93 Supplemental Report    192
22 Exhibit 10 RFC-SERR/MONT 000589-000594    203
23 Exhibit 11 7/7/93 Court Order             212
24 Exhibit 12 Court Order                    253
```

**8**

```
1          P R O C E E D I N G S
2      THE VIDEOGRAPHER: Here begins Disk 1 in the
3  videotaped deposition of John Dillon in the matter
4  of Montanez v. Guevara, et al., Case No. 17 C 4560,
5  and Serrano v. Guevara, et al., Case No. 17 C 2869,
6  in the United States District Court, Northern
7  District of Illinois, Eastern Division.  Today's
8  date is November 13th, 2018, and the time on the
9  video monitor is 10:13 a.m.  The videographer
10 today is Ryan Grzelak representing Planet Depos.
11 This video deposition is taking place at 311 North
12 Aberdeen Street, 3rd Floor, Chicago, Illinois 60607.
13     Would counsel please voice identify
14 themselves and state whom they represent.
15     MS. BONJEAN:  Good afternoon -- or good
16 morning.  Jennifer Bonjean, B-o-n-j-e-a-n.  I
17 represent the plaintiff, Armando Serrano.
18     MS. COHEN:  Good morning.  Ashley Cohen,
19 C-o-h-e-n.  I also represent the plaintiff,
20 Armando Serrano.
21     MS. BRADY:  Good morning.  Rachel Brady,
22 B-r-a-d-y.  I represent the plaintiff José Montanez.
23     MR. HIRST:  We'll start back here.  Good
24 morning.  Morgan Hirst representing Matthew Coghlan.
```

Transcript of John Dillon
Conducted on November 13, 2018

---

**9**

1    MR. ENGQUIST: Josh Engquist,
2    E-n-g-q-u-i-s-t, on behalf of Defendants Mingey
3    and Halvorsen.
4        MS. CARNEY: Theresa Carney on behalf of
5    the City of Chicago.
6        MS. ROSEN: Eileen Rosen on behalf of the
7    City of Chicago.
8        MS. NIKOLAEVSKAYA: Julie Nikolaevskaya on
9    behalf of John Dillon.
10       MS. CHOJNACKI: Assistant State's Attorney
11   Christina Chojnacki on behalf of Cook County and
12   John Dillon.
13       MR. HORVAT: And Andrew Horvat, H-o-r-v,
14   as in "Victor," -a-t, on behalf of John Dillon.
15       THE VIDEOGRAPHER: The court reporter
16   today is Paula Quetsch, representing Planet Depos.
17       Will the reporter please swear in the
18   witness.
19       (Witness sworn.)
20           JOHN DILLON,
21   having been duly sworn, testified as follows:
22   EXAMINATION BY COUNSEL FOR PLAINTIFF ARMANDO SERRANO
23   BY MS. BONJEAN:
24   Q  Good morning, Mr. Dillon.

---

**10**

1    A  Good morning.
2    Q  My name is Jennifer Bonjean.  I represent
3    the Plaintiff Armando Serrano in this lawsuit in
4    which you are a named defendant.
5        Before we get started today, I would like
6    to ask whether you've ever had your deposition
7    taken before.
8    A  I have.
9    Q  How many times?
10   A  Once.
11   Q  How long ago was that?
12   A  About five months ago.
13   Q  And in what matter was your deposition taken?
14   A  It was in connection with a felony review
15   matter that I handled back in 1988.
16   Q  Was that a lawsuit?
17   A  I think it was under the -- I'm trying to
18   think of what they referred to it as, the group
19   that -- the Burge torture commission, it was
20   something in connection with that.
21   Q  So the TIRC or the torture commission?
22   A  Yes.
23   Q  And do you know whether your deposition
24   was taken in connection with an ongoing criminal

---

**11**

1    matter, or is it something other than a criminal
2    matter?
3    A  My understanding was it was a possible
4    relitigation of a motion to suppress statements
5    that had been taken back in 1988.
6    Q  And what is the name of the convicted or
7    the individual who's alleging that he was tortured?
8    A  I don't recall.
9    Q  You don't know the name of the person --
10   let me back up a second.
11       You were involved in felony review at
12   the time?
13   A  Yes.
14   Q  Did you take the statement?
15   A  I did.
16   Q  And you don't know the name of the person
17   whose statement you took?
18   A  No, I don't.  I don't recall it.
19   Q  Okay.  As you sit here today, you took a
20   deposition in a case five months ago, and you
21   don't remember the name of the person's whose
22   statement you took?
23   A  That's correct.
24   Q  Okay.  How long was that deposition?

---

**12**

1    A  Maybe a couple hours.
2    Q  Did they reference his name during those a
3    couple hours?
4    A  I'm sure they did.
5    Q  And as you sit here today, you cannot
6    recall that name?
7        MS. ROSEN: Objection; asked and answered.
8    A  I don't recall the name.
9    Q  Okay.  And who represented you in that
10   litigation?
11   A  John Carroll.
12   Q  Do you know the name of the person who was
13   there on behalf of the accused or the convicted?
14   A  No, I don't recall the name.
15   Q  Okay.  Where did that deposition take place?
16   A  At the offices of the law firm representing
17   the accused.
18   Q  Okay.  Do you remember where that was?
19   A  Just downtown Chicago.  I don't recall the
20   address, no.
21   Q  Do you know what street it was on?
22   A  No.
23   Q  Well, seeing as though you just had your
24   deposition taken five months ago, you probably are

Transcript of John Dillon
Conducted on November 13, 2018

4 (13 to 16)

---

**13**

1 familiar with how this goes, but I'm going to go
2 over some ground rules just so that we're on the
3 same page. Is that okay?
4    **A  Yes.**
5    Q  You understand, sir, that you're under
6 oath here today?
7    **A  Yes.**
8    Q  Okay. And you understand that's the same
9 oath that you take in a court of law?
10    **A  Yes.**
11    Q  And did you take a oath when you were
12 deposed in the felony review matter?
13    **A  Yes.**
14    Q  And you've testified under oath before;
15 right?
16    **A  Yes.**
17    Q  Probably many times. Correct?
18    **A  Yes.**
19    Q  And you understand by taking the oath that
20 you're swearing your testimony is truthful to the
21 best of your ability; correct?
22    **A  Correct.**
23    Q  You understand that if you make any
24 willfully false statements here today that you

---

**14**

1 could be subjected to penalties of perjury?
2        MR. HORVAT:  I'm going to object that
3 that mischaracterizes the law. If you understand,
4 the question, you can answer.
5    **A  Yes, I understand that.**
6    Q  Okay. I'm looking for full and complete
7 responses to my questions, and with that in mind,
8 if you do not understand one of my questions, will
9 you let me know so that I can rephrase it?
10    **A  Yes.**
11    Q  If you do not understand a question --
12 strike that.
13        If you do understand a question, or if you
14 answer a question -- let me start over.
15        If you do answer my question, I'm going
16 to -- I'm going to assume that you understood the
17 question. Does that make sense?
18    **A  Yes.**
19    Q  Okay. Now, if you recollect a piece of
20 information or a fact that was responsive to an
21 earlier question, I'm going to ask that you let me
22 know so that you can go back and modify your
23 answer or amend or supplement your answer so that
24 it's full and complete. Okay?

---

**15**

1    **A  All right.**
2    Q  If at any point you realize that one of
3 your prior responses is less than accurate or
4 complete, will you let me know?
5    **A  Yes.**
6    Q  And I will let you go back and change or
7 modify your answer to your liking. Okay?
8    **A  All right.**
9    Q  Obviously, the court reporter cannot
10 transcribe us both speaking at the same time, so I
11 would ask that you wait until I complete my
12 question before you answer it. Okay?
13    **A  All right.**
14    Q  And I will certainly do my best not to
15 step on any of your answers.
16        If you need a break, let us know. You're
17 at liberty to take one. I just ask if there is a
18 question pending that you answer it before we
19 break. Do you understand?
20    **A  Yes.**
21    Q  Okay. And before we get started, is there
22 any reason why you cannot give truthful and
23 complete testimony here today?
24    **A  No.**

---

**16**

1    Q  Can you please state your full name for
2 the record.
3    **A  My John is John Dillon. My last name is**
4 **spelled D-i-l-l-o-n.**
5    Q  What did you do to prepare for your
6 deposition here today?
7    **A  I reviewed police reports that were supplied**
8 **to me by the Cook County State's Attorney's Office.**
9    Q  And what police reports did you review?
10    **A  I reviewed police reports relative to the**
11 **Robert Bouto case; I reviewed police reports**
12 **relative to the Serrano and Montanez case, and I**
13 **reviewed police reports as to the Iglesias case.**
14    Q  Apart from reviewing police reports in
15 connection with those three prosecutions, did you
16 review any other documents?
17    **A  I believe I reviewed some felony review**
18 **folders.**
19    Q  What is a felony review folder?
20    **A  A Felony review folder is a folder that's**
21 **prepared by an assistant State's attorney when**
22 **they go out to a police station or speak with a**
23 **police officer over the phone and are asked to**
24 **either provide advice, or they're seeking the**

Transcript of John Dillon
Conducted on November 13, 2018

5 (17 to 20)

---

17

1 issuance of an arrest warrant, or they're looking
2 for charges to be placed against an individual.
3    Q  And is a felony review file maintained in
4 any particular place?
5    A  I believe the Cook County State's
6 Attorney's Office maintains them.  Where inside
7 their office, that I don't know.
8    Q  Let me ask it this way:  Are they maintained
9 by the felony review unit or separate and apart
10 from the prosecution file?
11    A  No.
12    Q  Is it all part of the same file ultimately?
13    A  Yes.
14    Q  What else did you do to prepare for your
15 deposition?
16    A  That's all.
17    Q  Okay.  Did you meet with your attorneys
18 at all?
19    A  Yes.
20    Q  How many times did you meet with your
21 attorneys prior to your deposition here today?
22    A  Twice.
23    Q  And where did you meet with them?
24    A  At their offices.

---

18

1    Q  Do you know where their offices are?
2    A  The Daley Center.
3    Q  I'm sorry?
4    A  The Daley Center on the 5th floor.
5    Q  How long did those meetings last
6 respectively?
7    A  I think the first meeting lasted about
8 3 hours, 4 hours, and then the second meeting
9 lasted about 2 hours, 2 1/2 hours.
10    Q  And let's talk about the first meeting.
11 Do you remember what month that meeting took
12 place in?
13    A  November of this year.
14    Q  Who was present without telling me
15 anything that was said?
16    A  Myself, Ms. Chojnacki was present, and
17 Mr. Horvat was present.
18    Q  Anyone else?
19    A  No.
20    Q  And that second meeting also in November?
21    A  The second meeting was also in November,
22 and, again, it was Mr. Horvat -- I take that back.
23 It was with just Ms. Chojnacki.  For a period of
24 time Ms. Nikolaevskaya was present.

---

19

1    Q  When was the last time you communicated
2 with Matt Coghlan in any form or fashion?
3    A  About two weeks ago.
4    Q  And how did that communication take place?
5 Was it by phone, by text?
6    A  It was in person.
7    Q  It was in person?  And where did it take
8 place?
9    A  It took place at a funeral home on the
10 south side of Chicago.
11    Q  Were you both in attendance at a funeral?
12    A  At a wake.
13    Q  At a wake?
14    A  Yes.
15    Q  Who died?
16    A  Thomas Sheehan, Jr.
17    Q  And your conversation with Mr. Coghlan, can
18 you estimate how long it took, how long it lasted?
19    A  A couple minutes.
20    Q  And what did he say to you, and what did
21 you say to him?
22    A  He said hello to me; I said hello to him.
23    Q  Anything else?
24    A  Small talk.  Nothing relative to this

---

20

1 lawsuit.
2    Q  So during the conversation at the funeral
3 home, it's your testimony that there was no mention
4 whatsoever about this lawsuit?
5    A  That's correct.
6    Q  Okay.  Prior to seeing each other at the
7 funeral, when was the last time you spoke to
8 Mr. Coghlan prior to that or communicated with him?
9    A  The only other time I communicated with him
10 was at 26th and California, and that was probably
11 sometime in the summer or early fall of 2017.
12    Q  Okay.  And where did that conversation
13 take place?
14    A  I saw him in a hallway in the criminal
15 courts building.
16    Q  Okay.  Did you speak to each other in the
17 hallway?
18    A  Yes.
19    Q  And how long did the conversation last?
20    A  A couple minutes.
21    Q  Okay.  And you said this was in summer or
22 fall of 2017?
23    A  That's correct.
24    Q  And what did he say to you and what did

---

Transcript of John Dillon
Conducted on November 13, 2018

---

21

1  you say to him?
2      **A  I just said to him that I can't believe**
3  **that we're getting sued over a case that I had**
4  **nothing to do with.**
5      Q  Okay.
6      **A  And he said something along the same lines**
7  **of, "You're right.  We didn't do anything wrong."**
8  **And I said, "Well, I guess we'll just have to see**
9  **how this plays out."  Something along those lines.**
10     Q  All right.  And that was an in-person
11  conversation?
12     **A  Yes.**
13     Q  Okay.  Did you speak with Mr. Coghlan by
14  telephone at any point let's say in the last
15  two years?
16     **A  No.**
17     Q  What about have you had any text
18  conversations, texting with Mr. Coghlan in the
19  past two years?
20     **A  No.**
21     Q  So -- and then prior to summer or fall of
22  2017, do you have a recollection of speaking with
23  Mr. Coghlan under any other circumstances?
24        MR. HORVAT:  Just so your question is clear,

---

22

1  relative to this case or about anything?
2        MS. BONJEAN:  About anything.
3      **A  Other than to see him in a hallway at**
4  **26th Street, no.**
5      Q  So I guess what I'm getting at is,
6  Mr. Coghlan is -- would you characterize him as
7  someone that you maintained contact with prior to
8  this lawsuit?
9        MS. ROSEN:  Objection to the form.
10     **A  No.**
11     Q  Other than running into him at 26th Street
12  or at a funeral on the south side, did you ever
13  have an opportunity to speak with him by telephone
14  or in any other fashion?
15     **A  No.**
16     Q  So -- and just to be clear, prior to summer
17  or fall of 2017, you don't have a recollection of
18  having any specific conversation with Mr. Coghlan
19  other than possibly running into him in the
20  hallways at 26th Street?
21     **A  That's correct.**
22     Q  Okay.  And then have you had any other
23  conversations at any point about anything related
24  to the Serrano/Montanez case other than the ones

---

23

1  you've already mentioned that took place in summer
2  of 2017 or fall?
3      **A  No.**
4        MS. ROSEN:  Object to the form.
5        MR. HIRST:  Just for all time in the
6  history of the world?
7        MS. BONJEAN:  Well, let me -- when I said
8  case, I meant the civil case but I'll clarify.
9      Q  Did you have any -- have you ever had any
10  conversations about the civil suit that's been
11  brought by Mr. Serrano and Mr. Montanez other than
12  what you've already testified to in the summer of
13  2017 or fall of 2017 with Mr. Coghlan?
14     **A  No.**
15     Q  You have the ability to reach Mr. Coghlan
16  by cell phone if you wanted to?
17     **A  No.**
18     Q  You don't have his cell phone in your --
19     **A  I don't.**
20     Q  Okay.  So if you pulled out your phone
21  right now, or if I asked you to pull out your
22  phone, you would not have Matt Coghlan's phone
23  number in your cell phone?
24     **A  I would not.**

---

24

1      Q  And have you ever texted Mr. Coghlan?
2      **A  No.**
3      Q  When did you -- when was the first time you
4  ever met Matt Coghlan?  Do you remember?
5      **A  Back in either 1992 or 1993.**
6      Q  And where did you meet him?
7      **A  At the Cook County State's Attorney's Office.**
8      Q  Were you a State's attorney?
9      **A  Yes, I was.**
10     Q  And was he a State's attorney?
11     **A  He was.**
12     Q  So is it fair to say that you did not know
13  Matt Coghlan prior to joining the Cook County
14  State's Attorney's Office?
15     **A  That's correct.**
16     Q  Mr. Dillon, how old are you?
17     **A  60.**
18     Q  And what's your date of birth?
19     **A ████████, 1958.**
20     Q  And where do you live generally?
21     **A  Glenview, Illinois.**
22     Q  Do you live with your family?
23     **A  Yes.**
24     Q  Do you have grown children?

---

Transcript of John Dillon
Conducted on November 13, 2018

25

1    A  I do.
2    Q  How many?
3    A  Three.
4    Q  Do any live with you presently?
5    A  No.
6    Q  Are any of your children either in the
7  legal field or law enforcement?
8    A  No.
9    Q  Do they all live in the Chicago area?
10    A  Yes.
11    Q  Have you ever been arrested?
12    A  No.
13    Q  Have you ever been charged with an offense
14 other than traffic violations regardless of whether
15 you were physically detained, arrested, and
16 regardless of the outcome of the case?
17    A  No.
18    Q  Have you ever been sued?
19    MR. HORVAT:  Other than what's going on
20 right now?
21    MS. BONJEAN:  Correct.
22    A  No.
23    Q  So apart from this civil suit, you've never
24 been named as a party in any other civil action?

26

1    A  That's correct.
2    Q  Are you currently employed?
3    A  Yes.
4    Q  By whom?
5    A  The Prisoner Review Board, State of
6  Illinois.
7    Q  And where do you physically work?
8    A  I go to either St. Charles at the juvenile
9  detention facility located there or the juvenile
10 detention facility located in Warrenville, Illinois.
11    Q  And can you describe for me what your role
12 or responsibilities are in connection with your
13 work at the PRB?
14    A  Yes.  As a result of litigation, juvenile
15 detainees who are seeking to have their parole
16 revoked by the State of Illinois are entitled to a
17 probable cause hearing for purposes of determining
18 whether or not there's sufficient probable cause
19 to continue to detain them and to have them go
20 before the board for a determination of whether
21 their parole was violated.  I am the hearing
22 officer.
23    So there's a preliminary hearing that takes
24 place.  The lawyers from the Department of

27

1  Juvenile Justice represent the State of Illinois'
2  interests in the hearing.  The juvenile arrestee
3  who they're seeking to have their parole revoked
4  is represented by private counsel.
5    They present evidence to me, and I make a
6  determination as to whether or not I believe
7  probable cause is established for them to go before
8  the Prisoner Review Board for a final determination
9  of whether or not they're in violation of their
10 parole.
11    Q  Okay.  As a hearing officer, that's just
12 you making the decision of whether they go in
13 front of the panel or the board; is that right?
14    A  That's correct.
15    Q  And you said that the juveniles are
16 represented by private counsel?
17    A  The Cabrini Green Legal Clinic has been
18 retained by the State to provide representation
19 for them.  Also, a private attorney by the name of
20 Darren O'Brien is also retained to represent the
21 youth.
22    Q  Okay.  And how long have you held this
23 position?
24    A  Since January of 2015.

28

1    Q  And is it the State of Illinois that signs
2  your checks?
3    A  Yes.
4    Q  And how did you get that position?  Did
5  you apply for it?
6    A  I applied for the position.
7    Q  Okay.  I want to move backwards a little
8  bit.  Can you just tell me what year it is you
9  graduated from high school?
10    A  1976.
11    Q  And where did you attend high school?
12    A  Well, I attended first at Loyola Academy
13 from 19 -- I went there the first two years, my
14 freshman and sophomore years, and I transferred to
15 Evanston Township High School, which is where I
16 graduated from in 1976.
17    Q  And in 1976 upon graduation of high
18 school, what did you do by way of education, or
19 employment, or both?
20    A  I went to college.
21    Q  Where did you attend college?
22    A  For the first two years of college I
23 attended DePaul University.
24    Q  All right.  And then?

Transcript of John Dillon
Conducted on November 13, 2018

---

29

```
1      A  Then I transferred to the University of
2   Notre Dame, and I received my undergraduate degree
3   in 1980.
4      Q  What did you study?
5      A  History.
6      Q  Did you work through college?
7      A  No.
8      Q  Now, after you received your degree in
9   history from Notre Dame, what did you do, again,
10  either by way of employment or further education?
11     A  I went to law school.
12     Q  Where did you attend law school?
13     A  Loyola University of Chicago.
14     Q  And what year did you graduate?
15     A  1983.
16        MS. BONJEAN:  This is a point -- I'm sorry --
17  I have to take a quick break.  I apologize.
18        THE VIDEOGRAPHER:  We are going off the
19  record.  The time is 10:33 a.m.
20        (Recess taken, 10:33 a.m. to 10:47 a.m.)
21        THE VIDEOGRAPHER:  We are going back on
22  the record.  The time is 10:47 a.m.
23  BY MS. BONJEAN:
24     Q  Mr. Dillon --
```

---

30

```
1         MR. HORVAT:  I'm sorry; before we start,
2   can you identify the new individual that came into
3   the room?
4         MS. BONJEAN:  Sure.  Present also is my
5   client, Mr. Armando Serrano.
6         MR. HORVAT:  Thank you.
7   BY MS. BONJEAN:
8      Q  Mr. Dillon, before we broke I had asked
9   you about your law school I think experience.  You
10  said you went to University of Chicago --
11  University of Loyola Chicago School of Law?
12     A  Loyola University of Chicago School of
13  Law, yes.
14     Q  And you graduated in what year?
15     A  1983.
16     Q  Did you work when you were in law school?
17     A  No.
18     Q  And after you graduated from law school,
19  can you tell me what your first job was?
20     A  I worked as an associate for approximately
21  six months in a law firm Concannon, Dillon, Snook
22  & Morton.
23     Q  Concannon --
24     A  -- Dillon, Snook & Morton.
```

---

31

```
1      Q  Is the Dillon someone related to you?
2      A  My grandfather along with another
3   individual that founded that law firm, and at the time
4   I worked there my father worked there, as well as
5   two of my uncles.
6      Q  Okay.  So your father was a lawyer, your
7   grandfather was a lawyer, and two uncles were
8   lawyers?
9      A  My great-grandfather was also a lawyer.
10        MS. ROSEN:  Can we have for the record the
11  individual that just walked in?
12        MS. BONJEAN:  Yes.  Also present is
13  Plaintiff Jose Montanez.
14  BY MS. BONJEAN:
15     Q  Did either your father, your grandfather,
16  your great-grandfather, any of your uncles work
17  for the Cook County State's Attorney's Office?
18     A  No.
19     Q  So upon graduation from law school, you
20  worked in the private sector for about six months;
21  is that fair to say?
22     A  About six months, yes.
23     Q  And then where did you go?
24     A  The Cook County State's Attorney's Office.
```

---

32

```
1      Q  And that would have been in 1984?
2      A  June 1st of 1984 is when I started.
3      Q  All right.  I'm going to ask you at this
4   point if you could to the best of your ability
5   take us through your assignments in the Cook
6   County State's Attorney's Office generally.  Okay?
7      A  Sure.
8      Q  I know this -- we're talking a couple
9   decades here.
10     A  June 1st of 1984 I started in the 4D unit,
11  which is the child support enforcement division,
12  and I did that up until sometime in 1986.
13        In 1986 I then went to the juvenile division,
14  1100 South Hamilton, and I was there for about a
15  year.  And then they had a program where they took
16  one assistant from juvenile and one assistant from
17  the First Municipal Division and had them serve as
18  a fourth chair, for lack of a better word, trial
19  assistant at 26th and California.  So I went there
20  for four months.  I was in front of Judge Karnezis,
21  Themis Karnezis.
22        Then I came back to juvenile maybe another
23  five or six months, and then I transferred -- I
24  believe it was 1987 or 1988 to the felony review
```

---

Transcript of John Dillon
Conducted on November 13, 2018

33

1  unit.  I was in felony review for approximately
2  six or seven months.
3        Then in 1988 I went to the preliminary
4  hearing unit, and I was in the preliminary hearing
5  unit I believe until November of 1988.
6        From the preliminary hearing unit I then
7  went -- I was assigned as a third chair in a
8  felony trial courtroom at 26th Street, Judge John
9  Morrison's courtroom.  I was there for I think a
10 little under a year.
11       Then from there I went to Judge Christy
12 Berkos' courtroom as a third chair, and I was
13 there approximately a year.
14       From there I was promoted to second chair
15 in a felony trial courtroom.
16    Q  Can I ask what year we're at when you were
17 promoted to second chair, roughly, if you recall?
18    A  I would say 1990 -- '89, '90.  I was assigned
19 to Judge Fiala's courtroom for I think eight months.
20 Again, this would be around '89, '90.
21       Then I went to Judge Thomas Head's
22 courtroom as a second chair at 26th and
23 California.
24       Then from Judge Head's courtroom I was

34

1  promoted to first chair, but first -- my first
2  assignment as a first chair was to the night
3  narcotics unit, and this is probably in 1991.
4  That was a four-month assignment, and then from
5  there I went to Judge Vincent Gaughan's courtroom
6  as first chair, and I was assigned to Judge
7  Gaughan's courtroom until '92 I'd say, sometime
8  in 1992.
9        In 1992 I went to the gang crimes unit,
10 and I was assigned there until April of 1994, and
11 I was promoted as a deputy supervisor of the
12 felony review unit.  I was there until sometime in
13 1997.  In 1997 I was assigned as the supervisor of
14 the Third Municipal District in Rolling Meadows.
15 I was there until approximately 2000.
16       In 2000 I came back as a felony trial
17 supervisor at 26th and California, and I remained
18 a felony trial supervisor until 2007 or 2008,
19 whenever State's Attorney Alvarez became State's
20 Attorney, and then they moved me to -- they
21 combined two positions, the head of Branch 66,
22 which is the homicide section, and the preliminary
23 hearing unit.
24       So I was the supervisor of both of those

35

1  units, and I remained there until my retirement,
2  which was December 31st of 2014.
3     Q  And then in 2015 is when you began working
4  for the --
5     A  January of 2015, yes.
6     Q  Okay.
7     A  And by the way, I do remember the name of
8  the person that I gave a deposition on earlier
9  now.  His name is James Marshall.
10    Q  James Marshall is the individual who --
11    A  He was the individual who was charged with
12 a crime that I took the statement from.
13    Q  Okay.  And this is a matter that TIRC is
14 handling?
15    A  I believe it's not pending anymore.
16 That's my understanding but I'm not entirely sure
17 about that.
18    Q  Okay.  I would like to first focus in on
19 your felony review days, if I could.
20    A  As an assistant going through felony
21 review or as a deputy supervisor?
22    Q  First, we'll start as an assistant, and I
23 know you were a supervisor in felony review, I
24 think you said from April of '94 to '97.

36

1     A  Sometime in 1997, yes.
2     Q  Okay.  Let's first talk about as an
3  assistant for felony review.  What generally were
4  your responsibilities when you were assigned to
5  felony review as an assistant?
6     A  My responsibilities were if I was assigned
7  to a case that would be called in by the Chicago
8  Police Department where they were either seeking
9  an arrest warrant or they were seeking charges
10 against an individual, we would be assigned to go
11 out on those cases.  The police would call into a
12 dispatcher, and the dispatcher would then assign
13 the cases.
14    Q  And were you assigned to a particular area
15 or was it citywide?
16    A  Technically it was an area, but depending
17 on how many cases there were in a given shift you
18 could be sent anywhere.
19    Q  Okay.  And when you were assigned to felony
20 review as an assistant, how many, approximately,
21 lawyers were assigned to that unit?
22    A  Approximately 26 to 28 State's attorneys.
23    Q  Okay.  And you said generally you were
24 assigned to an area, but you could be called

Transcript of John Dillon
Conducted on November 13, 2018

10 (37 to 40)

---

37

1 anywhere; is that fair to say?
2    **A Correct. When I did that, there were**
3 **six areas in the Chicago Police Department, and**
4 **they were six State's attorneys working during a**
5 **12-hour shift.**
6    Q Okay. And did the areas correspond to the
7 violent crimes areas that the --
8    **A That's correct.**
9    Q And what area were you assigned to?
10    **A All of them.**
11    Q Okay. Was there one that you were
12 focused on?
13    **A No, I didn't have any real say in it. It's**
14 **where whoever made up the schedule assigned me.**
15    Q Okay. Just so I understand, for every
16 shift you could be assigned to any one of the six;
17 is that fair to say?
18    **A That's correct.**
19    Q It wasn't like you were given an assignment
20 for the entire six or seven months that you were
21 in felony review; right?
22    **A That's correct.**
23    Q And when you were an assistant assigned to
24 felony review, did you have the opportunity to

---

38

1 respond to Area 5?
2    **A Yes.**
3    Q And were there certain violent crime areas
4 or areas that had more activity than others?
5    **A Yes.**
6    Q And can you to the best of your ability
7 tell me which areas were the most active, if you
8 could, during the time period that you were
9 assistant -- an assistant in the felony review
10 division?
11    **A I would say it was primarily Area 3 and**
12 **Area 4.**
13    Q And was one of your responsibilities when
14 you were an assistant there to take statements of
15 witnesses?
16    **A Yes.**
17    Q Okay. Now, you said someone would call or
18 the police department would call a dispatcher; is
19 that right?
20    **A That's correct.**
21    Q And then the dispatcher would essentially
22 send you out to wherever the call came from; right?
23    **A Depending on whether it was a case that**
24 **required me to go to an area or whether it was**

---

39

1    **something I could handle over the telephone.**
2    Q Okay. So sometimes you could call in and
3 take care of whatever needs the police officers
4 had; correct?
5    **A Correct.**
6    Q Did you receive any specific type of
7 training when -- before you became assigned to
8 felony review?
9    **A Just as to, you know, the information that**
10 **had to be filled out and made part of the felony**
11 **review folder, you know, making sure we understood**
12 **what the Miranda warnings were if we had to advise**
13 **them of the Miranda warnings, make sure that we'd**
14 **be alone with the person in custody they were**
15 **seeking charges against for a period of time.**
16    Q Did you receive a formalized training, or
17 was this sort of on-the-job mentoring by another
18 associate -- another assistant?
19    **A Well, each felony review team, as I told**
20 **you, had six assistants.**
21    Q Okay.
22    **A One of those six assistants was a trial**
23 **assistant at 26th and California who would spend a**
24 **four-month shift. So that would be a person that**

---

40

1 **you could seek advice from or who could, for lack**
2 **of a better word, show you the ropes.**
3    Q Okay. But was there any type of formalized
4 training? Like if you're a new assistant coming
5 into felony review, you have to participate in
6 this training on this date at this time?
7    **A No.**
8    Q Was there any kind of classroom setting or
9 classroom discussion related to the topics that
10 you've mentioned?
11    **A No.**
12    Q Were there any simulations or let's role
13 play a particular situation that you might
14 encounter when you go to respond to a call from
15 one of these areas?
16    **A No.**
17    Q And do you recall who your supervisor was
18 when you were an assistant?
19    **A Yes.**
20    Q Who was it?
21    **A Lynne Kawamoto.**
22    Q Now, did you ever overlap in felony review
23 with Matt Coghlan?
24    **A No.**

Transcript of John Dillon
Conducted on November 13, 2018

41

1    Q  Okay.  Was Matt Coghlan more senior to you
2  or junior to you?
3    **A  I don't know.**
4    Q  I mean, do you know if you started in the
5  office around the same time?
6    **A  I don't know.**
7    Q  Was he already in the office when you
8  started or you don't remember?
9    **A  I don't know.**
10    Q  Okay.  Well, you obviously worked together
11  in the gang crimes unit; right?
12    **A  Correct.**
13    Q  Do you have a recollection of ever working
14  together in any other division prior to the gang
15  crimes assignment in '92?
16    **A  No.**
17    Q  Okay.  So you said there were some subject
18  matters that you learned, it sounds like informally,
19  from other people who might have been either more
20  senior or supervisors in the felony review division.
21  Is that fair to say?
22    **A  That's fair.**
23    Q  Okay.  But this was not a formalized type
24  of instruction?  This is a more of a

42

1  show-you-the-ropes type of instruction; right?
2    MS. ROSEN:  Objection; asked and answered.
3    **A  Yes.**
4    Q  And one of the subject matters you
5  mentioned was understanding Miranda; right?
6    **A  Yes.**
7    Q  Did you -- how did you learn how to take
8  the statements of witnesses?
9    MS. ROSEN:  Object to the form.
10    **A  By asking them questions, and if they were**
11  **willing to make a statement to me, writing a**
12  **summary of what it is they told me.**
13    Q  Well, were you taught or did you learn in
14  any way any guidelines for how to conduct an
15  interview of a -- of a witness in a serious crime?
16    **A  No.**
17    Q  What about taking statements from
18  suspects?
19    **A  That was part of my responsibilities.**
20    Q  Right.  And did you receive any specific
21  training on how to conduct an interview of a
22  suspect?
23    **A  No.**
24    MS. ROSEN:  Object to the form.

43

1    Q  Well, how -- for your own purposes, how
2  did you figure out how to take the statement of a
3  suspect?
4    MS. ROSEN:  Object to the form.
5    MR. HORVAT:  Object to the form.
6    You can answer.
7    **A  It was no different than taking a**
8  **statement from a witness.**
9    Q  Okay.  And what are the guiding principles
10  in your mind of what you need to be thinking about
11  when you're taking a statement of either a witness
12  or a suspect?
13    MR. HORVAT:  Object to the form of the
14  question.
15    You can answer if you understand, John.
16    **A  Just getting to the truth.**
17    Q  Okay.  Well, can you beat the crap out of
18  somebody?
19    MS. ROSEN:  Object to the form.
20    **A  Are you asking did I ever do something**
21  **like that?**
22    Q  No.  I said, can you?
23    **A  No.**
24    Q  Okay.  So that -- that's one factor that

44

1  you would want to stay away from, right, actually
2  using physical force against a detainee, or a
3  suspect, or witness; right?
4    **A  Yes.**
5    MS. ROSEN:  Object to the form.
6    Q  Any other guidelines that were either
7  taught -- self-taught or taught to you by another
8  individual about how to conduct the interview or
9  interrogation of a suspect?
10    MS. ROSEN:  Object to the form.
11    **A  No.**
12    Q  Was there any type of protocol that you
13  can point me to on how you went into an interview
14  with a suspect?
15    MR. HORVAT:  I'm going to object.  It's
16  asked and answered at this point.
17    You can answer again.
18    **A  There was no protocol.  I would go in and**
19  **I would introduce myself to the person.  I'd**
20  **advise them that I was an assistant State's**
21  **attorney, that I was a lawyer, that I was a**
22  **prosecutor, that I wasn't their lawyer, and I**
23  **asked them if they understood who I was.**
24    Q  Okay.

Transcript of John Dillon
Conducted on November 13, 2018

---

45

1    A  If they answered that they did understand,
2  then I proceeded and told them that I'd like to
3  speak with them regarding this incident that I had
4  been called out on.
5    Q  Well, those introductory remarks, did you
6  get taught that by somebody, or did you make that
7  up on your own?
8    MS. ROSEN:  Object to the form.
9    A  I didn't make it up on my own.  I think it
10  was, again, through mentoring.  It was something
11  you learned how to introduce yourself, and you
12  wanted to make sure that the person that you were
13  interviewing understood who you were and what your
14  role was.
15    Q  So you were -- you think that's one of
16  those things that maybe a mentor taught you how to
17  do or something to say before you --
18    A  Well, and also common sense.  I mean, I
19  think obviously if I go to interview someone, I'm
20  going to introduce myself and let them know who
21  I am.
22    Q  Okay.  Was one of your goals in felony
23  review to ensure that probable cause existed to
24  justify proposed charges?

46

1    A  No.
2    Q  What was your goal as an assistant in
3  felony review then?
4    A  My goal was to get to the truth of whatever
5  the police were seeking charges on.  If they're
6  seeking charges against someone, I wanted to get
7  to the truth as to the witnesses I interviewed and
8  what information they had relative to the case
9  that I had been called out on.
10    Q  So your job was to get to the truth when
11  you were in felony review?
12    A  That's what I understood, yes.  That was
13  part of my responsibility.
14    Q  Were there times when a suspect told you
15  that they had an alibi, for instance?
16    A  Yes.
17    Q  Okay.  Did you go out and interview alibi
18  witnesses then possibly?
19    A  I would make the request of the police to
20  go and find the alibi witnesses so they could be
21  interviewed, yes.
22    Q  Okay.  So ultimately, who made a decision
23  about whether or not someone was going to be
24  charged with a crime?  Was it felony review or the

47

1  police?
2    A  It was felony review, State's Attorney's
3  Office.
4    Q  Okay.  So you would agree that one of your
5  roles was to approve charges; right?
6    MS. ROSEN:  Object to the form.
7    A  As well as reject charges, that's correct.
8    Q  Okay.  And were you trained in how to
9  determine when you should approve charges or
10  reject charges?
11    A  No.
12    Q  Was that just a discretionary issue, or
13  were there any guidelines that you followed in
14  determining whether or not you should approve or
15  reject charges?
16    A  Yes, the law that existed in the state of
17  Illinois.
18    Q  I'm sorry?
19    A  The law that existed in the state of
20  Illinois.  So if they were seeking an armed robbery
21  charge, then I had to satisfy myself that there
22  was sufficient evidence to potentially prove a
23  case beyond a reasonable doubt that somebody was
24  armed with a dangerous weapon and took property by

48

1  the use or threatening the imminent use of force.
2  That was the standard that I would apply in
3  reviewing a request for armed robbery charges.
4    Q  So you were applying a reasonable doubt
5  standard when you approved charges?
6    A  Yes, because that's what would have to be
7  proven in a court of law.
8    Q  Okay.  So every -- just so I understand,
9  in every case when you approved felony charges,
10  you felt confident that it could be proved beyond
11  a reasonable doubt?
12    A  Yes.
13    Q  And what if you didn't think that a case
14  could be proved beyond a reasonable doubt?  What
15  was your recourse or how did you respond?
16    A  Then I would reject felony charges, the
17  police request for felony charges.
18    Q  Okay.  And was there a mechanism by which
19  the police could overrule that?
20    A  There was for all crimes except first-
21  degree murder is my recollection.
22    Q  All right.
23    A  If we rejected those charges, then they
24  had no recourse.

Page 49

1    Q  Now, during this six- to seven-month period
2  that you were an assistant assigned to felony
3  review, do you know how many times a week you
4  responded to a police station?  And I would say in
5  person.  We'll say it that way.  You can give me a
6  range if that's helpful.
7    A  You know, it really fluctuated quite a bit.
8  The summers typically tended to be more busy, but
9  it was a steady stream.  I think that probably I
10  would have to go out five, six times a shift not
11  counting telephone calls where I would have to
12  speak with the police over the phone where they
13  were seeking charges.
14    Q  Okay.  So five to six times per shift, and
15  then also fielding telephone calls; is that fair,
16  roughly?
17    A  Yes.
18    Q  Do you have a sense of how many times you
19  approved felony charges during your time in felony
20  review for murder?
21    A  I don't recall.
22    Q  Can you estimate how many times you rejected
23  felony review -- strike that.
24      Can you estimate how many times you rejected

Page 50

1  murder charges when you were an assistant in
2  felony review?
3    A  Again, I don't recall.
4    Q  As you sit here today, can you remember a
5  single time that you rejected?
6    A  Yes.
7    Q  Okay.  Can you tell me about that time?
8    A  Sure.  There was a case that I got called
9  out; it was to Area 5, and it was an individual
10  who had Tourette Syndrome, and he got into an
11  argument with his father or brother.  And the
12  argument became physical, and he punched his
13  father in the stomach, and unbeknownst to him he
14  had an aneurysm in his stomach, and it ruptured
15  and he bled to death.  So the police sought felony
16  charges of first-degree murder against the son who
17  punched his father in the stomach and I rejected
18  those charges.
19    Q  Do you remember who the detectives were on
20  that case?
21    A  I don't.
22    Q  Any other cases that come to mind in which
23  you rejected murder charges?
24    A  Well, this was at a different time in my

Page 51

1  career but at one --
2      MR. HORVAT:  John, let me interject for a
3  second.
4      You can go ahead and testify to the facts.
5  I don't want you testifying to any mental
6  impressions you had or why you did not make the
7  determination.
8      With that said, go ahead.
9    A  The police in Palatine sought first-degree
10  murder charges against two individuals for the
11  Brown's Chicken murders and I rejected those charges.
12    Q  Simonek?
13    A  Yes.  John Simonek, yes.
14    Q  Were you on the special task force as it
15  related to the Brown's Chicken?
16    A  I was not on the special task force.  I was
17  the head of the Third Municipal District at the
18  time they sought those charges.
19    Q  When you were an assistant in felony review,
20  did you have the opportunity to get trained on or
21  learn about lineups?
22    A  No.
23    Q  Okay.  Did you have any training as it
24  relates to conducting lineups?

Page 52

1    A  No.
2    Q  And I'm talking either before you were
3  assigned -- before you were assigned to felony
4  review or even after.
5    A  No, because I was -- I wasn't present when
6  lineups were conducted.
7    Q  Okay.  You certainly, though, litigate
8  issues related to suggestibility in lineups; right?
9      MR. HORVAT:  Object to the form of the
10  question.
11      Do you understand the question?
12    A  As a -- as a trial attorney --
13    Q  Right.
14    A  -- yes.
15    Q  So as a trial attorney you were called
16  upon --
17    A  To litigate motions --
18    Q  Right.  Motions to suppress IDs?
19    A  To suppress identification, yes.
20    Q  So during the course of your career, was
21  it important to understand what constituted a
22  sound lineup versus suggestive lineup?
23      MS. ROSEN:  Object to the form.
24      MR. HORVAT:  You can answer if you

Transcript of John Dillon
Conducted on November 13, 2018

---

**53**

1  understand.

2  **A  I don't really understand.**

3  Q  Do you know what a suggestive lineup is?

4  **A  I could come up with factual scenarios that**

5  **would be a suggestive lineup.**

6  Q  Okay.  Well, generally, would you agree that

7  suggestive lineups are lineups that are arguably

8  constituted in a way where the person viewing the

9  lineup might be inclined or suggested to pick one --

10  pick a particular person out?

11  MS. ROSEN:  Object to the form.

12  MR. HORVAT:  You can answer if you

13  understand.

14  **A  Depending upon the particular circumstances.**

15  Q  Okay.  Are you telling me you don't

16  understand the concept of a suggestive lineup?

17  MS. ROSEN:  Object to the form and to the

18  argument in your voice.

19  MR. HORVAT:  He answered your question.

20  You don't have to be argumentative.

21  MS. BONJEAN:  I'm not being argumentative.

22  I'm asking a question.

23  Q  Do you understand the concept of a

24  suggestive lineup?

---

**54**

1  MR. HORVAT:  That's the question.  You may

2  answer.

3  **A  I believe I do.**

4  Q  Okay.  What do you understand that to mean?

5  **A  It's where there's some type of inappropriate**

6  **conduct on the police in the conducting of a**

7  **lineup so that it's not -- allows the witness who**

8  **is observing the lineup to view it, you know, with**

9  **an open mind without being influenced in any way,**

10  **shape, or form.**

11  Q  It doesn't have to involve maliciousness

12  on the part of a detective, though; right?  It

13  could be an error; right?

14  MR. HORVAT:  Object to the form of the

15  question.

16  **A  Again, that's subjective.  One person may**

17  **look at something and think it's suggestive, and**

18  **another person may look at it and say it's not**

19  **suggestive.  So I can't speculate as to a general**

20  **black-and-white rule along those lines.**

21  Q  You just testified that a suggestive

22  lineup involved misconduct by a police officer.

23  **A  Yes.**

24  Q  Okay.  It doesn't always involve misconduct

---

**55**

1  by a police officer; right?  You could have a

2  suggestive lineup without misconduct; right?

3  MS. ROSEN:  Objection to form.

4  MR. HORVAT:  You can answer if you

5  understand.

6  **A  No, I don't agree with that.**

7  Q  Okay.  So your position is that if there

8  is a suggestive lineup that's put together, it

9  would always involve some maliciousness or

10  purposeful conduct on the part of the police

11  officers?

12  **A  I would --**

13  MS. ROSEN:  Object to the form --

14  MR. HORVAT:  And object, misstates his

15  testimony.

16  MS. ROSEN:  -- compound.

17  Q  You can clarify for me?

18  **A  I don't know if it's malicious --**

19  MS. ROSEN:  It's not up to the witness to

20  clarify if he doesn't understand the question.

21  MS. BONJEAN:  You can answer the question.

22  **A  I don't know if it's malicious or**

23  **purposeful.**

24  Q  Okay.  What I'm asking is, does a suggestive

---

**56**

1  lineup turn on the misconduct of a police officer,

2  or could you have a suggestive lineup that does

3  not involve misconduct?

4  MS. ROSEN:  Object to the form.

5  MR. HORVAT:  Object to the form of the

6  question, again, "misconduct."

7  John, you can answer if you understand.

8  **A  I don't really understand what you're**

9  **trying to get at; I'm sorry.**

10  Q  I'm not trying to get at anything.  I'm

11  just asking a question.  You don't understand the

12  question?

13  **A  No.**

14  Q  Okay.  What about photo arrays?  Were you

15  ever trained on how to -- how police officers

16  should conduct a photo array?

17  **A  No.**

18  MS. ROSEN:  Object to the form.

19  Q  Would you agree that during your lengthy

20  career as a litigator in the Cook County State's

21  Attorney's Office from time to time defense

22  attorneys might challenge a photo array?

23  **A  Yes, there were instances where they**

24  **challenged photo arrays.**

Transcript of John Dillon
Conducted on November 13, 2018

15 (57 to 60)

57

1    Q  And were you called upon to defend a
2  particular photo array?
3       MS. ROSEN:  Object to the form.
4    A  Yes.
5    Q  And do you have any understanding about
6  what are the best practices for conducting photo
7  arrays?
8       MS. ROSEN:  Object to the form.  At what
9  point in time over his lengthy career since best
10  practices change over time?
11      MS. BONJEAN:  That's true.  I'll lay some
12  better foundation.
13    Q  What I'm trying to understand is at any
14  point during your career did you get -- how did
15  you learn about whether or not a particular photo
16  array was, again, done in accordance with generally
17  accepted standards in the law enforcement
18  community?
19    A  I wasn't familiar with what generally
20  accepted practices were within the law enforcement
21  community because I wasn't part of law enforcement.
22    Q  Okay.  But would you agree that throughout
23  your career you were at times called upon to defend
24  whether or not a particular photo array was proper?

58

1    A  There were motions that were filed by
2  attorneys representing people charged with crimes
3  who would file a motion to suppress an
4  identification.  They would argue that the way the
5  photo array was presented wasn't, you know,
6  accurate in terms of, you know, one person stood
7  out more than the other four or five photos that
8  were in there.  Things like that, yeah, I saw
9  motions along those lines.
10    Q  Okay.  And did you have any training in
11  determining whether or not there was any validity
12  to these arguments?
13    A  No, I had no training in that.  I looked
14  at case law because obviously case law you would
15  see examples of what constitutes suggestive photo
16  arrays and instances where allegations were made,
17  and motions were denied, and courts affirmed the
18  denial of those motions.  So I would look at
19  examples in previous cases that had been litigated.
20    Q  Okay.  So you look at case law regarding
21  that, but what about, for instance -- whether or
22  not, for instance, photo arrays should be conducted
23  one picture at a time or in six-packs?
24       MS. ROSEN:  Object to the form --

59

1    A  I was never instructed on that, no.
2       MS. ROSEN:  -- there's no foundation as
3  to time.
4    Q  I'm talking throughout your career.  Were
5  you ever trained on any of these concepts?  That's
6  all I'm asking.
7    A  No.
8    Q  Okay.  And with the live lineup situation,
9  as well, you were never trained on what constituted
10  a sound or constitutionally sound live lineup; right?
11    A  No.  I was never at a live lineup.
12    Q  When you were in felony review, was it your
13  practice to interview witnesses in the presence of
14  a detective?
15    A  No.  I would not interview witnesses in
16  the presence of a detective.
17    Q  Okay.  And when you were memorializing a
18  witness' statement to paper, did you do that -- or
19  was it your practice to do that in the presence of
20  a detective?
21    A  Yes.
22    Q  And what about with respect to suspects?
23  When you were in felony review, was it your
24  practice to interview suspects in the presence of

60

1  a detective?
2    A  Typically no.
3    Q  Okay.  When you -- if you -- when you were
4  in a position where you wanted to memorialize a
5  suspect's statement to paper, did you do that in
6  the presence of a detective?
7    A  Yes.
8    Q  How did you determine -- well, strike that.
9       Would you agree that as a felony review
10  assistant, you wanted to ensure that a suspect had
11  been treated fairly and professionally by the
12  police?
13       MR. HORVAT:  I'm going to object to the
14  form of the question.
15       You can answer it if you understand.
16       Are you asking before his arrival or while
17  he's present?
18       MS. BONJEAN:  I mean, the question speaks
19  for itself.  If he doesn't answer then I'll -- or
20  doesn't understand it --
21       MS. ROSEN:  Object to the form.
22    A  I wanted to ensure that they were treated
23  fairly.
24    Q  Okay.  So when you arrived at a particular

Transcript of John Dillon
Conducted on November 13, 2018

16 (61 to 64)

61

1 police department, one of your goals or
2 responsibilities in your mind was to ensure that a
3 particular suspect that you might be interviewing
4 was, in fact, not mistreated by a police officer;
5 right?
6 **A Yes.**
7 Q Okay. And would that be true of witnesses,
8 as well?
9 **A Yes.**
10 Q And how did you go about determining whether
11 a witness or a suspect had been treated
12 professionally by the police officers who had
13 interacted with him or her prior to your arrival?
14 **A I would speak with them alone typically in**
15 **the interview room. I'd close the door, and I'd**
16 **ask them if they had any compliant about their**
17 **treatment since they'd been at the police station.**
18 Q Okay. Can you -- can you recollect any
19 time when you were assigned as an assistant to the
20 felony review unit where a suspect told you that
21 they had been mistreated by a police officer?
22 **A No, I don't recall an instance.**
23 Q So in your time in felony review, you
24 can't recall a single instance where a suspect told

62

1 you, "I was mistreated by a police officer prior
2 to you arriving, Mr. Dillon"?
3 MR. HORVAT: Objection; asked and
4 answered.
5 **A That's correct.**
6 Q Okay. And I'll ask the same question with
7 respect to a witness. Can you recall a single
8 incident in your time in felony review where a
9 witness told you, "Prior to your arrival, I was
10 not treated fairly" or "professionally," or
11 something along those lines by the Chicago police
12 officers?
13 **A I don't recall that.**
14 Q Can you identify a single time where you
15 declined to take a statement from a suspect because
16 you were not convinced that that suspect had been
17 treated fairly, and appropriately, and professionally
18 by the Chicago police officers prior to your
19 arrival?
20 **A I don't recall an instance.**
21 Q And can you recall a single instance where
22 you declined to take a witness statement, a
23 handwritten witness statement because you were not
24 convinced that that witness had been treated

63

1 professionally, appropriately by the Chicago
2 police officers?
3 **A No, but, again, I would only take a**
4 **statement from either a witness or defendant if**
5 **they agreed to give one. So if they said they**
6 **weren't going to give a statement, then I didn't**
7 **take a statement from them.**
8 Q Okay. So as long as a suspect or a witness
9 told you in that moment that they were willing to
10 give it, you were willing to take it; is that fair?
11 **A If they agreed that they would give a**
12 **statement, then yes, I would take it.**
13 Q Did you ever have -- did you ever have an
14 occasion where you were concerned that they might
15 only be agreeing because they were fearful of
16 police officers?
17 **A No.**
18 Q Okay. You've certainly heard of -- well,
19 strike that.
20 You're aware that in your course of
21 litigating cases and murder cases that there are
22 times when an accused will allege that, you know,
23 they gave a statement to the State's Attorney
24 because they were fearful about the consequences

64

1 of not doing so; correct?
2 **A That's pretty true in every single murder**
3 **case where a defendant makes a statement that they**
4 **allege some type of police misconduct. That's**
5 **what my experience has shown me.**
6 Q So your experience is that in nearly all
7 of the murder cases you've prosecuted a suspect
8 alleges police misconduct in -- strike that. Let
9 me back up.
10 Your testimony is that in your career as a
11 prosecutor, in nearly all cases where an
12 individual, an accused makes a confession or an
13 inculpatory statement, they generally accuse the
14 police of misconduct?
15 **A That's correct.**
16 Q Can you estimate how many times in the
17 course of your career you've prosecuted a case
18 where a defendant has made an inculpatory
19 statement?
20 **A Hundreds.**
21 Q And what percentage of those hundreds would
22 you say they made an allegation of police
23 misconduct? Are we in the 90s? 95, 99?
24 **A Well, it would depend because of all the**

Transcript of John Dillon
Conducted on November 13, 2018

65

1 cases I tried there weren't always confessions.
2    Q  I'm talking about those where there were
3 inculpatory statements.
4    A  If there's an inculpatory statement and
5 they gave a confession, in almost all instances
6 they would allege some type of police misconduct.
7    Q  Okay.  So you don't give a lot of -- you
8 didn't give a lot of weight to someone just
9 alleging that they had -- that there was police
10 misconduct since you saw it pretty routinely; right?
11    A  That's --
12    MR. HORVAT:  I'm going to object --
13    A  -- not true.
14    MR. HORVAT:  -- to the form of the question.
15    Q  Okay.  Well, when -- in what circumstances --
16 well, let's back up a second.  I want to go back
17 to felony -- your felony review days for a moment.
18 Okay?  Did you see your role in felony review to
19 ensure that the statement that you were taking was
20 voluntarily, and intelligently, and knowingly being
21 given to you?
22    A  If the person was agreeing to give a
23 statement, yes.
24    Q  Okay.  In your mind, again, if someone was

66

1 agreeing, did that automatically mean the
2 statement was voluntary?
3    MR. HORVAT:  Object to the form of the
4 question.
5    You can answer if you understand.
6    A  I'd ask them, "Are you willing to give me
7 a memorialized statement," and explain to them the
8 differences.  If their answer was, "Yes, I am,"
9 then I would take the statement.
10    Q  And that's my question.  If they agreed to
11 give you a statement, in your mind, that meant the
12 statement was voluntary?
13    A  Yes, because they told me they would give it.
14    Q  Okay.  As long as they told you that they
15 would give a statement, in your mind that made it
16 a voluntary statement?
17    MS. ROSEN:  Objection; asked and answered.
18    A  Yes.  In addition to if I was satisfied
19 that, in fact, it was being voluntary.
20    Q  That's the part that -- how else
21 would you ensure in your mind that the statement
22 was, in fact, voluntary?
23    A  If I saw any injuries on the person, if I
24 saw any blood on their clothing, if I saw any

67

1 clothing was torn or ripped, those would set off
2 bells and whistles in my mind that something
3 probably inappropriate was going on.
4    Q  Okay.  And in your entire time in felony
5 review as an assistant you never saw that, though;
6 right?
7    A  In my time in felony review I did not.
8    Q  And you can't identify for me a single
9 time where you decided, "I'm not comfortable
10 taking this statement because I'm not convinced
11 it's a voluntarily giving a statement"; right?
12    MR. HORVAT:  Objection; asked and
13 answered.
14    You can answer one more time.
15    A  No, I did not see an instance of that.
16    Q  All right.  Can you identify for me any
17 time where you called a supervisor to express any
18 concern that perhaps a suspect had been mistreated
19 by the police?
20    A  There were none.
21    Q  I'm sorry?
22    A  There were none.
23    Q  And what about with respect to witnesses?
24 Can you -- can you recollect a single time where

68

1 you had to call a supervisor to let the supervisor
2 know that it was your concern that a witness had
3 been mistreated by the police?
4    A  I don't recall that but I wouldn't need a
5 supervisor to tell me whether or not I should take
6 it.  If I'm satisfied that there was something
7 inappropriate, then I wouldn't take the statement.
8    Q  In your career do you know how many
9 statements you've taken from suspects in murder
10 cases?  I'm going outside now the felony review
11 days, but do you have an idea of how many
12 statements you've taken?
13    A  Well, the only statements I would have
14 taken would have been in an assignment of felony
15 review.
16    Q  Okay.
17    A  I don't recall.
18    Q  Is it dozens or hundreds?
19    MR. HORVAT:  Objection; speculation.
20    You can answer if you know.
21    A  I don't think it would be hundreds.  Dozens
22 maybe.
23    Q  Okay.  And when you were called upon to
24 take the statement of a suspect as a felony review

Transcript of John Dillon
Conducted on November 13, 2018

**69**

1  assistant, were there occasions where you were
2  permitted to offer some type of benefit to a
3  suspect?
4      MS. ROSEN: Object to the form.
5      MR. HORVAT: Object to the form of the
6  question.
7      You can answer if you understand.
8  **A No.**
9      Q There were not occasions where you were
10 authorized to do so, or you don't remember ever
11 having done that?
12 **A I never did that.**
13     Q Okay. You know what I mean by "benefits";
14 right?
15 **A Yes.**
16     Q And by "benefit," I mean any -- any
17 benefit that might be appealing to a suspect or a
18 witness. Okay?
19     MS. ROSEN: Object to the form.
20     Q Anything from sentencing leniency to -- I
21 don't know; it could be any number of things. Okay?
22 But as you sit here today, you can't remember a
23 time when you ever offered benefit to a witness or
24 a suspect; correct?

**70**

1  **A I'm telling you --**
2      MS. ROSEN: Object to the form.
3  **A -- there never was a time.**
4      Q Okay. As a matter of discretion, were you
5  permitted to do so if you wanted to?
6  **A No.**
7      Q Okay. So if you -- if you -- for instance,
8  if there was an individual you were interviewing
9  who was -- could be a witness or, you know,
10 theoretically could have been charged, were you
11 able to make those types of decisions about
12 whether you were going to use them as a witness or
13 use them as -- or charge them?
14     MS. ROSEN: Object to the form.
15     MR. HORVAT: Object to the form.
16     You can answer if you understand.
17 **A No.**
18     Q Do you understand what I mean?
19 **A I believe I do.**
20     Q Okay. The attorneys seem confused. Let
21 me back up.
22     There are times when you're interviewing
23 witnesses at the police station that have some
24 involvement in a crime, and you may be called upon

**71**

1  to determine whether they are truly a witness or
2  whether they're actually involved in a crime; right?
3  **A No.**
4      Q No what? That didn't happen?
5  **A No, that's not correct.**
6      Q Okay. Would you agree that sometimes it's
7  not always clear whether someone is a witness or
8  should be charged?
9      MS. ROSEN: Object to the form.
10     MR. HORVAT: Object to the form,
11 foundation.
12 **A The police would contact us seeking felony**
13 **charges against an individual.**
14     Q Okay.
15 **A My responsibilities were not to go out and**
16 **to decide for the police who they should or should**
17 **not be seeking charges on.**
18     Q Okay. So you didn't respond to the police
19 station unless a police officer said, "We want
20 felony charges on this person"?
21 **A Or if they wanted us to come out and take**
22 **a statement from a witness.**
23     Q Okay. So the police were determining
24 whether or not this guy is getting charged, this

**72**

1  guy is a witness? That was decided before you
2  came in and took statements, is that what you're
3  saying?
4      MR. HORVAT: Objection.
5      MS. ROSEN: Object to the form.
6      MR. HORVAT: Objection to form; incomplete
7  hypothetical.
8      John, you can answer if you understand.
9  **A I don't understand your question.**
10     Q Okay. Can you remember a single occasion
11 where you were asked to respond to one of the
12 areas to take statements from both suspects and
13 witnesses or a suspect and witnesses?
14 **A From witnesses, yes. From suspects, no.**
15     Q And if a case called for a suspect's
16 statement to be memorialized and witnesses'
17 statements to be memorialized, would that be two
18 separate felony review assistants, or could one
19 felony review assistant handle that?
20 **A Yes.**
21     Q So that was possible?
22 **A Well, again, if the police were seeking**
23 **charges against someone, then I would go out and**
24 **introduce myself to the person, advise them**

Transcript of John Dillon
Conducted on November 13, 2018

19 (73 to 76)

73

1  of their rights, and see if they were willing to
2  speak with me.  So for the police -- I never ran
3  across an instance where the police called and I
4  got assigned a case with the instructions, "Come
5  out and take a memorialized statement from a
6  person in custody."  That never happened.
7       With witnesses, however, there were instances
8  where, for example, a suspect may not be in custody,
9  where there's a witness to a crime who has spoken
10 with the police, and the police would like to have
11 that person's statement memorialized.  I would go
12 out, and same thing, I'd interview that person,
13 and if I felt that was something that should be
14 memorialized, and that person was agreeing to have
15 their statement memorialized, then I would take a
16 statement in that instance.
17    Q  And, again, in your career as a felony
18 review assistant, you yourself never offered a
19 witness or told a witness that if they provided a
20 statement implicating somebody else they could
21 avoid culpability themselves?
22      MR. HORVAT:  Objection, asked and answered.
23    A  Absolutely not.
24    Q  In your career as a prosecutor and

74

1  assigned to the felony review -- strike that.
2       In your assignment as a felony review
3  assistant, did you ever witness a police officer
4  tell a witness that if they cooperated with a
5  particular investigation and inculpated somebody
6  else that they could avoid the culpability?
7    A  Never saw that happen, no.
8    Q  Did you ever witness officers using any
9  type of trickery in the process of their
10 interrogations of witnesses or suspects?
11      MS. ROSEN:  Object to the form.
12      MR. HORVAT:  Object to the form of the
13 question, vague.
14    A  I have no knowledge because I wasn't with
15 them when they're interrogating someone.  So that's
16 beyond the scope of the knowledge I would have.
17    Q  So anytime you were with a suspect at
18 felony review you were handling the questioning;
19 is that right?
20    A  Yes.
21    Q  Okay.  And you were not present to observe
22 a police officer handle the questioning of a
23 witness?
24    A  That's correct.

75

1    Q  Did you yourself ever use any form of
2  trickery or manipulation to induce a statement
3  from a witness?
4       MR. HORVAT:  Objection to the form of the
5  question.
6       MS. ROSEN:  Object to the form.
7       MR. HORVAT:  You can answer.
8    A  No, ma'am.
9    Q  And what about as it relates to suspects?
10 Did you ever use any type of trickery or
11 manipulation in order to secure and inculpatory
12 statement from a suspect?
13      MR. HORVAT:  Same objection.
14    A  No, ma'am.
15    Q  Now, as a felony review prosecutor, did
16 you ever have an occasion to respond to Area 5?
17    A  Yes.
18    Q  How often?
19    A  No more than any of the other areas with
20 the exception, again, of Area 3 and Area 4 which
21 tended when I went through felony review to be the
22 more busy of the other areas.
23    Q  Do you think you went there once a week,
24 twice a week?  Area 5 I'm talking about.

76

1    A  Sometimes I'd go there no times a week;
2  sometimes I might end up being there five or
3  six times a week.  It just depends on the
4  assignment that I was assigned and what each area
5  had by way of cases when I was assigned duties.
6    Q  Okay.  So there was a range.  Some weeks
7  zero; could be as many as six times a week?
8    A  Could be, yes.
9    Q  And whether you're responding to Area 3,
10 or 4, or 5, did you eventually become familiar with
11 the detectives assigned to those particular areas?
12    A  Some of them over time as I got,
13 you know, to know people from my time as a State's
14 Attorney, yes.
15    Q  Okay.  For instance, if you responded to
16 Area 5, you might see some of the same detective
17 faces over the course of your six to seven months
18 you were there; right?
19    A  Yes.
20    Q  Okay.  I want to ask you about --
21 specifically about Detective Reynaldo Guevara.
22 Do you know when you first met Detective
23 Reynaldo Guevara?
24    A  I don't recall.

Transcript of John Dillon
Conducted on November 13, 2018

20 (77 to 80)

---

77

1    Q  Were you an assistant in the felony review
2 division when you first met him?
3    A  I don't recall.
4    Q  Okay.  It's possible, though; right?
5       MS. ROSEN:  Object to the form.
6    A  It is possible.
7    Q  What about Ernie Halvorsen?  Do you remember
8 when you first met Ernie Halvorsen?
9    A  I don't recall.
10    Q  Possible that you met him when you were an
11 assistant assigned to the felony review division?
12       MS. ROSEN:  Objection to form.
13       MR. HORVAT:  Object to the form.
14       You can answer.
15    A  That's possible, yes.
16    Q  As you sit here today, you don't have a
17 clear memory of either one of those detectives
18 during your days as a felony review assistant?
19    A  No.
20    Q  What about Sergeant Mingey?
21    A  I don't think I've ever met a Sergeant
22 Mingey.
23    Q  Okay.  So Sergeant Mingey isn't a name
24 that stands out in your head right now as you

---

78

1 sit here?
2    A  No.  Because the detectives would be the
3 ones that would contact felony review.  The
4 detectives were the ones that we would go out and
5 meet that were investigating a case.  I never
6 reviewed a case where a sergeant was involved in
7 either conducting phone review or conducting
8 investigation.
9    Q  All right.  Now, eventually I think -- I
10 think you said after felony review you became part
11 of the trial division of the Cook County State's
12 Attorney's Office.  Right?
13    A  Well, after I went through the preliminary
14 hearing unit first.
15    Q  Right.  And you worked your way up, and
16 then in 1992 you went to gang crimes; right?
17    A  Yes.
18    Q  Okay.  And that was '92 to '94?  April of
19 '94 did you say?
20    A  April of '94, yes.  I'm not sure when in
21 1992, but yes, I believe that's the year I started.
22    Q  And then what was the gang crimes unit of
23 the Cook County State's Attorney's Office?
24    A  It was a unit -- I would say there were

---

79

1 probably 20 assistant State's attorneys assigned
2 to it, and our responsibilities were to handle
3 gang-related crimes that were committed by gang
4 members.  More often than not they were charged
5 with first-degree murder.
6    Q  Okay.  And when you say "handled," what do
7 you mean "handled"?
8    A  Once a case had been charged by felony
9 review, and once a case had come into the
10 preliminary hearing unit, then we could get
11 assigned the case.
12    Q  Okay.  Did you have any -- any involvement
13 in cases that involved gang crimes prior to the
14 case coming into prelims?
15    A  As a felony review assistant, I did.
16    Q  And when you were in gang crimes?
17       MS. ROSEN:  Object to the form.
18    A  I don't understand the question.
19    Q  Okay.  Sure.  When you were assigned to
20 gang crimes -- okay? -- what involvement did you
21 have in a case prior to the case being indicted or
22 formal charges being brought against an accused?
23    A  Before formal charges were brought, the
24 felony review assistant could contact an assistant

---

80

1 assigned to the gang crimes unit for any type of
2 direction or assistance they need.  And after
3 indictment, no, because you would handle the case
4 yourself.
5    Q  And from your experience, what type of
6 things or matters did attorneys from the felony
7 review unit call on attorneys from the gang crimes
8 unit to help with?
9    A  They might want to know, for example, what
10 nation a gang was affiliated with, what a gang's
11 colors were, how gangs, you know, represent
12 themselves.
13       So they may be interviewing a witness, and
14 they -- those questions may arise, and they may
15 call us to see if we can offer any assistance
16 to them.
17    Q  And did you have a particular expertise as
18 a gang crimes prosecutor on the ins and outs of
19 street gangs?
20    A  I wouldn't go so far as to say I have an
21 expertise, but, obviously, the more you did it,
22 the more you became aware of certain things.
23    Q  Okay.  Such as affiliations?
24    A  Nations, colors, violations, yeah, things

---

**81**

1 like that.
2 Q When you were in the unit, the gang crimes
3 unit, who was your supervisor?
4 **A The supervisor of the unit was Jack Hines,**
5 **and the deputy supervisor was Thomas Henley.**
6 Q Okay. So can you just tell me how it was
7 structured? There were -- you said there were
8 about 20 -- 20 assistant State's attorneys
9 assigned?
10 **A Approximately.**
11 Q There was a deputy supervisor?
12 **A Correct.**
13 Q And then a supervisor?
14 **A Correct.**
15 Q And who did the supervisor report to?
16 **A The chief of the special prosecutions**
17 **bureau.**
18 Q Okay. And under what State's Attorney in
19 '92 and '94 were you?
20 **A I believe it was -- could be Cecil Partee**
21 **or possibly Jack O'Malley.**
22 Q Now, when you were in the gang crimes unit,
23 Matt Coghlan was in the gang crimes unit; right?
24 **A For a period of time that I was there, yes.**

**82**

1 Q Okay. Do you know whether he was already
2 there when you got there or were you there first?
3 **A I believe I was there first.**
4 Q And then he came in and was he there when
5 you left?
6 **A Yes.**
7 Q Did you ever work with Nick Ford in the
8 gang crimes unit?
9 **A No.**
10 Q What about -- well, Tom Henley was your
11 supervisor?
12 **A Yes.**
13 Q What about Tony Calabrese?
14 **A Tony Calabrese was not in the gang unit**
15 **when I was in the gang unit.**
16 Q Before you, right?
17 **A I believe so.**
18 Q What about Rick Boykin, was he in the
19 gang unit?
20 **A Again, before I was.**
21 Q Randy Rueckert?
22 **A I believe he was. But, again, it was**
23 **before my time there.**
24 Q Was Chuck Burn in the gang unit?

**83**

1 **A I don't remember whether he was or not.**
2 Q Okay. Where was the gang crimes unit
3 located specifically?
4 **A On the 13th floor at 26th and California.**
5 **Part of the 13th floor, not the entire floor.**
6 Q Okay. And can you describe it physically
7 for me?
8 **A The main part of the gang unit -- picture**
9 **like a square.**
10 Q Okay.
11 **A And then on the perimeter of the squares**
12 **were offices. So there might be like office,**
13 **office, conference room, office, copier room. And**
14 **then off of that main square there was another**
15 **little office that I believe three people were in.**
16 **Then it was office; then it was windows looking**
17 **out to the west, I believe. And then it was the**
18 **supervisor's office, then the deputy supervisor's**
19 **office, and I shared an office with Tom Henley,**
20 **and then outside of that main room you made a right,**
21 **and there was another office that two assistants**
22 **were in.**
23 Q And these offices, they were contained,
24 meaning you could close the door and be separated

**84**

1 from the rest of the general area?
2 **A Well, you could close the door, but a lot**
3 **of them as I recall had like the little glass**
4 **along the side of the door. So you could like see**
5 **into the offices.**
6 Q Okay. So there was -- but these were not
7 like cubicles? These were actually spaces that
8 could be closed off completely except perhaps if
9 there was a glass that you could look through?
10 **A That you could close the door and then the**
11 **glass, yes.**
12 Q And you said there was a conference room,
13 as well?
14 **A I believe there were one or two conference**
15 **rooms, and I believe there was also a copier room.**
16 Q And how exactly did you get assigned to a
17 case when you were in the gang crimes unit?
18 **A Well, this is typically how we would get**
19 **cases. First of all, when you'd first come to the**
20 **gang unit, it was kind of tradition that the**
21 **assistants who were currently in the gang unit**
22 **would give you one of their cases. Typically they**
23 **were probably not the best cases that you'd want**
24 **to try from a prosecution standpoint.**

Transcript of John Dillon
Conducted on November 13, 2018

---

Page 85

1      Then we would take turns being on call for
2 a week at a time, and we were to go down to
3 Branch 66, the homicide section, and see if any
4 new murders had come in that were gang-related.
5 If they were and our case load was such that we
6 could take it, then we would take it.
7    Q  So were you actually assigned by your
8 supervisor, or did you sort of pick up cases?
9    A  You picked up cases.
10   Q  Okay.  So you had some discretion to pick
11 and choose cases?
12   A  To a certain extent, yes.  But, you know,
13 there were also instances where you were told you
14 were assigned a case.
15   Q  Okay.  So you could get assigned to a case
16 in a number of ways it sounds like.
17   A  Well, I would say the primary way is you
18 would pick the case up yourself.
19   Q  And how many cases did you handle at any
20 particular time?
21   A  Typically 20 to 25.
22   Q  And this would be in different courtrooms,
23 not specific --
24   A  This would be all over the building, yes.

Page 86

1    Q  Okay.  And it sounds like at any given
2 time the gang crimes unit would be handling
3 hundreds of cases.  Is that fair?
4    A  That's fair.
5    Q  And was there more than one prosecutor
6 assigned to a particular case?
7    A  No.
8    Q  Okay.  By the time the case went to trial,
9 there might be another prosecutor that was going
10 to try the case with you; would that be fair to say?
11   A  You would typically ask someone in the
12 courtroom where the case was going to go to trial
13 to try it with you.
14   Q  Okay.  But before the case is sort of set
15 for trial, one prosecutor, one case; is that right?
16   A  Yes.
17   Q  As a prosecutor in the gang crimes unit,
18 did you ever issue a subpoena to a witness that
19 directed the witness to appear at your offices
20 rather than a courtroom?
21   A  Yes.
22   Q  Okay.  Was that something that was regularly
23 or routinely done in 1992 to 1994?
24   A  No.  I don't think so.

Page 87

1    Q  And what gave you authority to do that?
2    A  Well, we would issue a subpoena to the
3 courtroom, and we'd ask -- and the subpoena would
4 ask the witness to contact the person sending the
5 subpoena.  Typically they would and we'd ask them
6 if they'd be willing to come to our office and
7 meet with us.
8    Q  Okay.  So there were occasions where you
9 issued a subpoena to a witness to appear in the
10 courtroom but then ask them to come up to the
11 State's Attorney's Office?
12   A  Correct.
13   Q  Okay.  Was there ever an occasion where
14 you actually directed a witness to appear to the
15 Cook County State's Attorney's Office rather than
16 the courtroom?
17   A  No.
18   Q  Did you ever issue subpoenas to witnesses
19 for nonhearing dates?
20   A  No.
21   Q  So anytime that you issued a subpoena to a
22 witness it was on a date in which the case was up
23 in court?
24   A  Typically.  Except, you know, once I might

Page 88

1 have met someone and had spoken with them
2 previously, I might have contacted them on the
3 phone and asked them if they could come in to
4 speak with me.
5    Q  Okay.  Let me ask it this way:  Was there
6 ever an occasion where you issued a subpoena to a
7 witness to appear on a date where you were not
8 expecting to take their testimony?
9    A  No.
10   Q  So anytime you would have issued a subpoena
11 it would be because that witness was there to
12 testify?
13   A  It was because the case was up in court.
14   Q  Okay.  But sometimes you just get a
15 continuance, right, in court?
16   A  Sometimes.
17   Q  You wouldn't -- that's what I'm asking.
18 Let me ask it this way:  Did you ever subpoena a
19 witness to appear in court on a date where there
20 was no hearing scheduled?  And when I mean hearing,
21 I mean somebody hitting the stand.
22   A  I don't --
23      MS. ROSEN:  Object to the form of the
24 question.

Transcript of John Dillon
Conducted on November 13, 2018

23 (89 to 92)

89

1    A -- recall.
2    Q  I'm sorry?
3    A  I don't recall.
4    Q  Okay.  Did you believe that you had the
5  discretion to subpoena witnesses to appear in
6  court on days when there was no hearing set?
7        MS. ROSEN:  Object to the form.  What do
8  you mean by "hearing"?
9    A  I don't understand your question.
10   Q  Okay.  Let me -- let me be clear.
11       Did you ever issue a subpoena to a witness
12 to appear in court on a date when their testimony
13 was not expected to be given in that courtroom?
14   A  No.
15   Q  Okay.  So every single time you issued a
16 subpoena to a witness was when that witness was
17 being called to testify at a hearing or some other
18 type of trial or something like that?
19   A  Expected --
20       MS. ROSEN:  Object to the form.
21   A  -- yes.
22   Q  I understand sometimes that didn't happen.
23   A  Right.
24   Q  But anytime you issued a subpoena, it

90

1  would have been for a date on which they would
2  testify?
3        MS. ROSEN:  Object to the --
4    A  That I was expecting, yes.
5        MS. ROSEN:  -- form.
6        MS. BONJEAN:  He still answered, so. . .
7        MS. ROSEN:  I'm still making my
8  objection so. . .
9        MS. BONJEAN:  You are at liberty to do so.
10   Q  Did you ever try any cases with Matt Coghlan?
11   A  No.
12   Q  In your days as a gang crimes prosecutor,
13 can you recollect any occasion where you offered a
14 benefit to a witness in exchange for his testimony?
15       MS. ROSEN:  Object to the form.
16   A  No.
17   Q  And by "benefit," I mean anything such as
18 sentencing leniency or some type of perk in the
19 jail if you had the ability to give that.
20       MS. ROSEN:  Object to the form.
21   A  Yes.  I remember an instance.
22   Q  Okay.  Tell me about that instance.
23   A  That would be with Francisco Vicente.
24   Q  Okay.  We'll get to Francisco Vicente.

91

1  But apart from Francisco Vicente, were there any
2  other occasions in your time as a gang crimes
3  prosecutor where you offered any type of benefit
4  to a witness in exchange for his or her testimony?
5    A  No.
6    Q  Do you know how many cases you tried as a
7  gang crimes prosecutor?  You must have some idea.
8        MS. ROSEN:  Object to the form.
9    A  Maybe 20, 30.
10   Q  And do you know how many cases you handled
11 as a gang crimes prosecutor?
12   A  I don't recall.
13       MS. ROSEN:  Object to the form.
14   Q  And when I say "handled," I mean not just
15 tried but maybe --
16   A  I understand.
17   Q  -- resolved by way of guilty plea or
18 something of that nature.
19   A  I don't recall.
20   Q  Now, did your office provide any training
21 or guidance on what was expected of you if you
22 were to offer a benefit to a witness in exchange
23 for his or her testimony?
24       MS. ROSEN:  Object to the form.

92

1    A  No.
2    Q  For instance, were you required or
3  obligated in any way to memorialize that benefit
4  on a report, or a memo, or something of that nature?
5    A  No.
6        MS. ROSEN:  Object to the form.
7    Q  How did you decide whether or not you were
8  going to -- well, strike that.
9        Let me ask it this way:  Did you have
10 discretion to decide whether or not you were going
11 to offer a witness a benefit in exchange for his
12 or her testimony?
13       MS. ROSEN:  Object to the form.
14   A  Given that it only happened once, no.
15   Q  Okay.  So you didn't have -- did you have
16 to go to your supervisor to get approval or anything
17 of that nature?
18   A  Not that I recall.
19   Q  What is a case fact sheet?
20   A  A case fact sheet is a summary of the
21 facts as written by an assistant in the felony
22 review unit.
23   Q  It's something that's written by the
24 felony review?

Transcript of John Dillon
Conducted on November 13, 2018

24 (93 to 96)

93

1    A    Right.  In your folder you would write a
2  summary of what the facts were involving a
3  particular case.
4    Q    Okay.
5    A    Those subsequently were typed by
6  secretaries, and that was the case fact sheet.
7    Q    Okay.  Tell me all the documents that went
8  into a felony review file.
9    A    Well, the only document was the felony
10  review folder, and then if the police provided any
11  reports or anything along those lines, statements
12  while you were at the station reviewing the case,
13  you would attach those and make those part of the
14  felony review folder.
15    Q    Okay.  And this case fact sheet, was the
16  handwritten summary included in the felony review
17  folder?
18    A    The handwritten --
19      MS. ROSEN:  Object to the form.
20    A    -- summary was in the felony review folder.
21    Q    Okay.
22    A    And the case fact sheet was generated after
23  the summary was made by the assistant in felony
24  review.

94

1    Q    Okay.  Just so I understand, in the felony
2  review folder you would have any police reports
3  that were generated provided by the police; correct?
4    A    Correct.
5    Q    Any handwritten statements or any
6  statements that were made and memorialized by the
7  prosecutor?
8    A    That's correct.
9      MS. ROSEN:  Object to the form.
10    Q    Any notes or summaries that the prosecutor
11  might make would go in that file?
12    A    Again, the summary, if you look at a blank
13  felony review folder, it lists incident, and you
14  have to write down the date of the incident, the
15  time that it occurred, the location, and then you
16  write a summary of what the facts were of that case.
17    Q    All right.  So this folder, it sounds
18  like -- it's preprinted?
19    A    Certain aspects of it are preprinted, yes.
20    Q    Okay.  And is it actually a folder?
21    A    Yes.
22    Q    Okay.  And so you would fill it in on the
23  folder itself; right?
24    A    Correct.

95

1    Q    All right.  That's what I'm asking.  And
2  then from that support staff would --
3    A    Yeah.  There's basically -- inside the
4  felony review folder there's a white sheet and a
5  yellow sheet.  It's like carbon paper.
6    Q    Okay.
7    A    So you would write on that white sheet, and
8  it would also go on the yellow sheet underneath
9  it, and it would also go on the folder underneath it.
10      When you were done with your shift, you
11  would separate the white portion of the file, and
12  you'd stick it in for the receptionist, and they
13  would type that information into a computer system.
14      The actual file itself was used because on
15  the other side of it you would put the entries
16  when you were in the preliminary hearing courtroom.
17    Q    Okay.  And then eventually, when it came
18  to -- if it was a gang case, eventually it -- the
19  gang crimes prosecutor would get all of this
20  information; right?
21    A    Any assistant getting the case would get
22  that information.
23    Q    Okay.  I want to specifically hone in on
24  the early '90s between, I guess '90 to '94, '92 is

96

1  when you were in the gang crimes unit.  As a
2  prosecutor, did occasions ever arise where you
3  wanted to interview a detainee?  And when I say
4  "detainee," I mean someone who is being detained
5  in the Cook County Department of Corrections.
6    A    Yes.
7    Q    Okay.  And if you wanted to interview a
8  detainee, how would you make that happen?
9    A    If it was someone in Cook County jail,
10  there would be an investigator request slip, and
11  you would fill that out, and you would make the
12  request to arrange to have them be able to be
13  interviewed.
14    Q    I'm sorry; what was the name of that form
15  that you --
16    A    An investigator request slip.
17    Q    An investigator request slip?
18    A    Yes.
19    Q    Okay.  And what information went on an
20  investigator request slip?
21    A    The name of the person, their IR number,
22  their CID number.  You would then provide
23  information, their race, their sex, their date of
24  birth, any features identifying that person,

97

1  including their Cook County jail number.
2      Q  Okay.  And once you completed the
3  investigator request slip, what about you do
4  with it?
5      A  I believe it was served on the jail, and
6  then the jail would make the person available to
7  be transported to be interviewed.
8      Q  Did you as the prosecutor serve it on the
9  jail, or did you actually have an investigator do
10 that?  Is that why it's called an investigator
11 request slip?
12     A  An investigator request slip is for anything
13 you request an investigator to do.
14     Q  Okay.
15     A  And in other instances we would issue a
16 writ to have them brought to a courtroom, and then
17 we'd attempt to interview them in the jury room of
18 the courtroom.
19     Q  Okay.  So when it came to investigator
20 request slips, did you have to get any approvals
21 in order to request or arrange for the transport
22 of a detainee to be interviewed?
23     A  No.  Because they were typically already
24 witnesses on a case that we were handling.

98

1      Q  Well, that may -- that's fine.  But I'm
2  just asking, generally speaking, you could fill
3  out an investigator request slip; that slip would
4  go to the jail, and then the jail would make
5  someone available to you; is that right?
6      A  Yes.
7      Q  Okay.  You didn't have to go to a judge and
8  get approval for an investigator request slip; right?
9      A  That's correct.
10     Q  Okay.  And then another way in which you
11 could arrange for the movement of a body was
12 through a writ; right?
13     A  Correct.
14     Q  Okay.  And that is -- and how did that --
15 tell me how that worked.
16     A  That was just you would call a department
17 in the State's Attorney's Office, you'd tell them
18 where the person was housed, and you would give
19 them, again, identifying information about the
20 person, and you would ask that they be writted to
21 a courtroom on a particular date, and you'd
22 provide them with the case name, the case number,
23 and your own name, and where you were assigned
24 within the office.

99

1      Q  And did that generate paper, as well?
2      A  I don't know the answer to that question.
3      Q  Well, was the writ an actual order?
4      A  I mean, I'm assuming someone in our office
5  generated something and sent it to the jail --
6      Q  Okay.
7      A  -- to bring the person over to the
8  courtroom.
9      Q  And how did you decide whether you were
10 going to -- strike that.
11         On the occasions when you wanted to interview
12 a detainee, how did you decide whether you were
13 going to issue a writ or fill out an investigator
14 request slip?
15     A  Primarily, it was by writ.
16     Q  And did you follow any protocol in --
17 well, strike that.
18         When you wanted to speak with a detainee,
19 did you also ensure that their attorney, whether
20 it was a public defender or a private attorney,
21 was informed?
22     A  No.
23     Q  Why not?
24     A  Because if they requested to have an

100

1  attorney, we would contact them, but if they didn't
2  request them, and they agreed to be interviewed,
3  then we would interview them.
4      Q  Okay.
5      A  I mean, they weren't being interviewed on
6  their cases that they were being detained on; they
7  were being interviewed relative to information as
8  a witness on an investigation or a case that I was
9  entrusted with handling.
10     Q  Okay.  But you would agree that if you're
11 seeking to interview a detainee, there's a good
12 chance that detainee is represented by a lawyer on
13 some matter?
14     A  I would agree with that.
15     Q  Okay.  And what I'm asking is, did you as
16 a matter of policy, or habit, or custom ensure that
17 their attorney was informed regardless of whether
18 it was the same matter or a different matter that
19 you were seeking to interview the detainee?
20     A  If it was a nonrelated matter, they would
21 not be notified.
22     Q  Okay.  So just so the record is clear,
23 you're testifying that you would not have sought
24 to speak to a detainee on a matter that he was

Transcript of John Dillon
Conducted on November 13, 2018

26 (101 to 104)

---

101

1 facing charges on; right?
2    **A  Correct.**
3    Q  Okay. But if you wanted to speak to a
4 detainee on an unrelated matter --
5    **A  Unrelated to his charges?**
6    Q  Correct. If you wanted to speak to a
7 detainee on an matter unrelated to his charges,
8 you would not as a matter of custom reach out to
9 his or her attorney just to ensure that they were
10 aware that you were trying to speak to them; right?
11    **A  That's correct.**
12    Q  Did you ever yourself personally go to the
13 jail to interview detainees?
14    **A  Never.**
15    Q  Did you ever in your career step foot in
16 Cook County jail?
17    **A  As an assistant State's Attorney assigned**
18 **to felony review, yes.**
19    Q  Okay. Would that be to interview witnesses
20 or how did that -- under what circumstances would
21 you go into the jail?
22    **A  I had to go into the jail on one occasion**
23 **where the police were seeking official misconduct**
24 **charges against a Cook County corrections officer**

---

102

1 **for sexually assaulting a person who had a pending**
2 **matter at 26th Street.**
3     **So as a result of that, I had to go into**
4 **the jail to interview the alleged victim, and I**
5 **had to go into the jail to interview the alleged**
6 **offender.**
7    Q  Okay. So apart from that one incident --
8    **A  I've never been in Cook County jail**
9 **outside of that incident.**
10    Q  Did you ever interview detainees in
11 judges' courtrooms like in the jury room? I think
12 you said you did.
13    **A  Yes.**
14    Q  Okay. What about the lockup? Did you
15 ever go into the lockup?
16    **A  No.**
17    Q  Now, if you wanted to speak to a detainee
18 in your office, the gang crimes office, how would
19 you make that happen? Was that through the
20 investigator request slip mostly?
21    **A  Yeah, I believe so. I think we authored**
22 **letters that were sent to the jail asking if we'd**
23 **be allowed to interview them, and they would be**
24 **transported from the jail to our office.**

---

103

1    Q  These are so-called jail letters; right?
2    MS. ROSEN: Object to the form.
3    **A  I don't know that there's a term for them,**
4 **but in effect that's what they were.**
5    Q  Okay. And you would as a prosecutor draft
6 a letter that let the Cook County Department of
7 Corrections know that you wanted to speak to a
8 detainee; right?
9    **A  Correct.**
10    Q  What other -- what other information went
11 into these letters?
12    **A  I think it was just the date that you**
13 **wanted to interview them, their identifying**
14 **information, which, again, would be their Cook**
15 **County jail identification number and the name of**
16 **the person.**
17    Q  Okay. And how would that get sent to the
18 jail? Was it like --
19    **A  I think it was just sent interoffice mail,**
20 **something like that.**
21    Q  All right. And do you know, did it go
22 specifically to a supervisor, or was there a
23 department that handled it?
24    **A  It was usually directed to like a**

---

104

1 **superintendent or deputy superintendent of the jail.**
2    Q  Okay. And after you sent that, how did
3 you determine whether or not, A, the detainee was
4 going to be produced and when he or she was going
5 to be produced?
6    **A  I waited to see if they were produced.**
7    Q  That's what I'm -- was it arranged or did
8 they just show up? I mean, how did it work after --
9    **A  They'd just show up. I mean, a deputy**
10 **would typically bring them over and would show up**
11 **in our offices with the detainee.**
12    Q  Okay. So how much time would elapse from
13 the time that you submitted the jail letter?
14    **A  I would -- I would typically try and do it**
15 **two, three weeks, four weeks in advance.**
16    Q  Would you ask for a specific date and time?
17    **A  Yes.**
18    Q  Okay. And then you would wait and see if
19 that person showed up; right?
20    **A  Yes.**
21    Q  And how did -- how did that detainee get
22 to you?
23    **A  It would depend. There were some instances**
24 **where a detainee would end up with me because a**

Transcript of John Dillon
Conducted on November 13, 2018

---

105

1  jail, Cook County Department of Corrections person
2  would bring him over.  There were instances where
3  an investigator from -- assigned to our unit would
4  bring them over.  And then in Mr. Vicente's case a
5  detective brought him over.
6      Q  So when you say "brought them over," do
7  you know what route they took or how they got to
8  you specifically if they were coming from the Cook
9  County jail?
10     MR. HORVAT:  Objection; speculation.
11     A  I don't know.
12     Q  Do you know whether they were brought in
13 the public elevator banks, or were they brought
14 some back way?
15     MR. HORVAT:  Same objection.
16     You can answer if you understand.
17     A  I don't know other than I've seen inmates
18 get on the regular elevators that other people get
19 on, but they would typically ask the people not to
20 get on the elevator with them.
21     Q  Does the Cook County State's Attorney's
22 Office have elevators -- an elevator bank that is
23 not accessible to the general public?
24     A  No.

---

106

1      Q  So if an inmate was coming from the Cook
2  County jail to the 13th floor of the gang crimes
3  unit, he or she would have to take one of the
4  public elevators?
5      A  It's my understanding, yes.
6      Q  And I think you testified that an actual
7  Cook County correctional officer could -- might
8  bring the detainee to you under these circumstances,
9  or it's possible that your investigator -- an
10 investigator from the Cook County State's Attorney's
11 Office would retrieve the detainee and bring him
12 or her.
13     A  Yes.
14     Q  Now, another way you could speak to a
15 detainee is if he or she had a court appearance.
16 Would you say that?  Would you agree you could go
17 to a courtroom and speak to him or her?
18     A  You could but ideally you wouldn't want to
19 do that.
20     Q  Okay.  Is there a reason why?
21     A  Yeah, because typically they're testifying
22 against someone who is charged with a crime, and
23 typically the people that are in the lockup don't
24 look favorably on people that do that kind of

---

107

1  thing.  So if the people that are in the lockup
2  know that they're cooperating with the State's
3  Attorney's Office, that may cause problems for
4  that inmate.
5      Q  Well, isn't that the case when you writ
6  someone in and talk to them in a jury room?
7      A  Well, first of all, we would writ them
8  into typically a different courtroom than the
9  courtroom in which the matter was pending, and
10 that's, again, in many instances why we try and
11 bring them to our office so the other inmates
12 wouldn't be aware of those things.
13     Q  And do you have to get court approval to
14 issue a writ or no?
15     A  No.  At least at that time you did not.
16     Q  So theoretically you could writ a detainee
17 into a courtroom without even letting the judge
18 know that the detainee was being writted into his
19 courtroom; right?
20     A  Typically we would let someone know in the
21 courtroom that they were doing that.  Because
22 obviously if someone came into their lockup, and
23 they weren't on their call, they wanted to know
24 who is this person, why are they here.

---

108

1      Q  Okay.  That was more of an informal --
2      A  More of a courtesy thing, yes.
3      Q  Now, let's -- you mentioned another way in
4  which a detainee could get to you is a Chicago
5  police detective could bring him or her to your
6  offices; is that right?
7      A  That happened on the one occasion, yes.
8      Q  Did you ever see that happen on any other
9  occasions?
10     A  I'm sure I did.
11     Q  And how -- how did it work where a Chicago
12 police detective could -- how did -- let me back
13 up a second.
14     If a Chicago police detective was going to
15 bring a detainee to your offices, did you have to
16 put the request in as the prosecutor?
17     A  No.  The detectives could make a request
18 to writ a person out of the jail, as well.
19     Q  Okay.  And to whom did the Chicago police
20 officers, detectives request a writ from?  Where
21 did they -- where did they enter these requests?
22     MS. NIKOLAEVSKAYA:  Objection; basis of
23 knowledge.
24     A  At that time I don't know.

---

Transcript of John Dillon
Conducted on November 13, 2018

28 (109 to 112)

109

1    Q  Okay.  So let me first ask you, between
2  1990 and 1994, as you sit here today you don't
3  know how a Chicago police officer could get a body
4  out of the Cook County jail?
5    A  In 1994 when I was a deputy supervisor in
6  felony review, part of my responsibilities were if
7  detectives would come up and seek a writ to take
8  someone out of the jail.  So I knew from my time
9  as the deputy supervisor in felony review that
10 that was taking place.  Those -- that was happening,
11 however, after I had obviously left the gang unit.
12 So I don't know if that was the procedure that was
13 in effect then.
14   Q  Okay.  Do you have any reason to believe
15 that wasn't the procedure in effect prior to 1994?
16   A  No.
17   Q  Okay.  And so, again, assuming it was the
18 same procedure that you were familiar with from
19 your time as a supervisor, if a Chicago police
20 detective wanted to secure a person from the
21 Cook County jail, to whom would they direct that
22 writ or that request?
23   A  To one of the supervisors in the felony
24 review unit.

110

1    Q  Okay.  And would it be fair to say that if
2  a Chicago police detective made a request to the
3  felony review unit for a writ, it would be similar
4  in information than if you requested a writ for an
5  inmate?
6      MS. CHOJNACKI:  Objection; form.
7      MR. HORVAT:  Objection; speculation.
8    A  I don't know.
9    Q  Okay.  So you could request a writ for an
10 detainee; right?
11   A  Yes.
12   Q  And you described how you would do that;
13 right?
14   A  Correct.
15   Q  You would make a request and would provide
16 information; right?
17   A  Correct.
18   Q  Okay.  Did that request go to the same
19 place or a different place as it would if a
20 Chicago police officer was making a request for
21 the writ?
22     MR. HORVAT:  Objection; speculation.
23     You can answer if you know.
24   A  If a police officer was requesting a writ,

111

1  they would have to go to one of the supervisors in
2  felony review.
3    Q  Okay.  And then the supervisor in the
4  felony review unit would make the request?
5    A  Would either grant that request or deny
6  that request.
7    Q  Okay.  And if they granted that request,
8  they would call this department that would --
9    A  I believe the detective would take the
10 form --
11   Q  Okay.
12   A  -- and take it and drop it off somewhere
13 at the jail.  Where inside the jail they dropped
14 that off, I don't know.
15   Q  Okay.  And this form that you're referencing,
16 is this the jail letter?  Is it the investigative
17 request slip or a writ?
18   A  It's just a -- it's just a letter requesting
19 that an inmate be released to the custody of a
20 police officer --
21   Q  Okay.  And it had to be --
22   A  -- on a given date or time, and it had to
23 have been approved by one of the supervisors in
24 felony review.

112

1    Q  Okay.  That's what I was asking.  As far
2  as you know, a police officer could not approve
3  his own request?
4    A  That's correct.
5    Q  Okay.
6    A  As far as I know, that's correct.
7      MR. HORVAT:  We've been going for about
8  two hours.
9      MS. BONJEAN:  Sure.
10     THE VIDEOGRAPHER:  We are going off the
11 record.  The time is 12:14 p.m.
12     (A recess was taken from 12:14 p.m. to
13 12:23 p.m.)
14     THE VIDEOGRAPHER:  We are back on the
15 record.  The time is 12:23 p.m.
16 BY MS. BONJEAN:
17   Q  Mr. Dillon, I just have a couple questions
18 that I wanted to follow up on this line that we've
19 been talking about.
20     As I understand your testimony, you could
21 not just call up the Cook County jail and say,
22 "Send someone over"; right?
23   A  That's correct.
24   Q  Okay.  There had to be some paper generated

Transcript of John Dillon
Conducted on November 13, 2018

29 (113 to 116)

---

113

1  at some point to formally request that a detainee
2  be brought over to the Cook County State's Attorney's
3  Office for an interview; right?
4  **A  Correct.**
5  Q  Now, do you know as you sit here today where
6  that paper was maintained or if it was maintained?
7  **A  I have no knowledge of that.**
8  Q  When you put in a request for a detainee
9  in your time as a prosecutor, after you filled out
10 the form or wrote the letter, do you know what
11 happened to it?
12     MR. HORVAT:  Object to speculation.
13     You can answer if you know.
14 **A  I don't.**
15 Q  In other words, did you maintain a copy of
16 it for yourself after you wrote a letter?
17 **A  I think if I wrote a letter sending it to**
18 **the jail asking that somebody be brought over, I**
19 **kept that in my file.**
20 Q  So you could -- you would keep it in your
21 personal file, is that your --
22 **A  In my trial file.**
23 Q  In your trial file?
24 **A  Yes.**

---

114

1  Q  Do you -- when you submitted a letter to --
2  strike that.
3     I just want to make sure I understand.
4  When you did prepare this letter, did you give it
5  to felony review to execute, or was there another
6  department that you would give it to, or did you
7  contact the jail directly yourself?
8  **A  I think I sent it interoffice mail to the**
9  **person that the letter was directed to.**
10 Q  Okay.  So there was no intermediary between
11 yourself and the Cook County jail when you requested
12 that a detainee be brought over for the most part?
13 **A  Correct.**
14 Q  And you're saying that you believe it was
15 your habit that if you were making this request,
16 you would have kept a copy of the request in your
17 trial file?
18 **A  While I was assigned to the felony review**
19 **unit -- I'm sorry -- while I was assigned to the**
20 **gang crimes unit, yes.**
21 Q  Okay.  And you have no idea what the
22 Cook County jail did with your letter once they
23 received it; is that fair to say?
24 **A  That's fair to say.**

---

115

1  Q  Okay.  And can you think of any other place
2  in the Cook County State's Attorney's Office that
3  might have a record of the times in which you
4  requested that a detainee be brought over for
5  questioning?
6     MR. HORVAT:  Objection; speculation.
7     You can answer, if you know.
8  **A  No, I don't.**
9  Q  You would agree, though, that if you were
10 going to have a detainee writted over, you would
11 ask a different department to do that; right?
12 **A  I could do that.**
13 Q  You could do that yourself?
14 **A  Yes.**
15 Q  Okay.  And how did you do that yourself?
16 **A  There was a writ department in the**
17 **Cook County State's Attorney's Office.  You would**
18 **contact them over the phone, and you would provide**
19 **them with the information of the detainee that you**
20 **wanted to see.  They would then in turn give you a**
21 **writ number, and you would write that writ number**
22 **on the blue back of your trial file.**
23 Q  Okay.  Then my question may not have been a
24 good one, but that's what I was wondering.  There's

---

116

1  an actual writ department that you yourself
2  contacted in the Cook County State's Attorney's
3  Office that would execute this writ and arrange
4  for a detainee to be brought over; right?
5  **A  Again, while I was in the gang crimes unit.**
6  **For the police it was different.  They had to go**
7  **to felony review to make a request.**
8  Q  Right.  I think I have it clear now.
9  Thank you.
10     Now, I want to ask you about the Cook
11 County -- oh, strike that.
12     Before we get there, in the gang crimes
13 unit, did you have photographs on the walls of
14 suspects or accused?
15 **A  I didn't but there were photographs on**
16 **the walls.**
17 Q  Okay.  And was there a tradition where
18 when someone was convicted the photographs would
19 be turned upside down?
20 **A  No.**
21 Q  Okay.  Was there a tradition in any way in
22 which the Cook County prosecutor would indicate
23 whether they were able to secure a conviction
24 against an accused to display it in some way?

---

Transcript of John Dillon
Conducted on November 13, 2018

30 (117 to 120)

---

117

1     MR. HORVAT:  Objection; form and foundation.
2 What time are we talking about?
3     MS. BONJEAN:  When he was -- let me back up.
4     Q  I'm talking about your days in the gang
5 crimes unit, which is why I referenced the gang
6 crimes unit in case there was any confusion about
7 that.  When you were in the gang crimes unit you
8 admit that some prosecutors displayed photographs
9 of defendants; right?
10     MS. ROSEN:  Object to the form.
11     MR. HORVAT:  Object to the form.
12     **A  I wouldn't agree with that.  A State's**
13 **attorney would try a case.  If they got a**
14 **conviction, from time to time some of the support**
15 **staff would order an enlarged CD photograph or**
16 **arrest report, and they would put it on the**
17 **backing, and that would go on the wall.**
18     Q  So it would just be a photograph of the
19 defendant on the wall?
20     **A  And then --**
21     Q  Go ahead.
22     **A  And underneath it would be what they were**
23 **convicted of, the case number, and the sentence**
24 **that they received.**

---

118

1     Q  Okay.  And that photograph that was placed
2 on the wall was not in any way marked?  Like there
3 wasn't a marker across it, or turned upside down,
4 or anything of that nature?
5     **A  No.**
6     Q  Okay.  And it's your testimony that this
7 was something support staff did but that
8 prosecutors didn't do?
9     **A  That's correct.**
10     Q  Okay.  And did you also sometimes display
11 your cut ties on the walls?
12     **A  That was only when you won your first jury**
13 **trial, and nobody's first assignment is the gang**
14 **unit, so that didn't happen.**
15     Q  So that wasn't something that was displayed
16 in the gang unit?  It might be displayed elsewhere
17 but not in the gang unit?
18     **A  Correct.**
19     MS. ROSEN:  Object to the form.
20     Q  Did the Cook County State's Attorney's
21 Office have a witness protection program?
22     **A  No.**
23     Q  Did it maintain witness quarters?
24     **A  No.**

---

119

1     Q  Okay.  Was there any area in the Cook County
2 jail that housed witnesses who were going to testify
3 on behalf of the Cook County State's Attorney's
4 Office?
5     **A  Yes.**
6     Q  Okay.  And what was that called?
7     **A  The witness quarters.**
8     Q  Okay.  All right.  The witness quarters was
9 maintained by whom?
10     **A  I believe the Cook County jail.**
11     Q  So the Cook County jail maintained the
12 witness quarters.  And how did someone get
13 designated to the witness quarters?
14     **A  The State's Attorney would have to make a**
15 **request to their supervisor and basically give**
16 **reasons why you believed a person belonged in the**
17 **witness quarters.**
18     Q  Okay.  And was that done in written form?
19     **A  I believe so.**
20     Q  So there would be a written request to your
21 supervisor saying, "I believe this witness should
22 be housed in the witness quarters and here is
23 why"; is that fair?
24     **A  Yes.  It would be basically what their**

---

120

1     **contribution to a case was and why you believed it**
2     **was essential for their own safety that they be**
3     **placed in the witness quarters.**
4     Q  And what were the reasons that a witness
5 would be placed in the witness quarters?
6     **A  Because there was a fear that they may be**
7     **harmed or killed in the general population of the**
8     **jail because of the evidence that they were**
9     **providing on a prosecution.**
10     Q  So it was primarily for safety reasons; is
11 that fair to say?
12     **A  Yes.**
13     Q  Were there any other reasons why a witness
14 might be designated to the witness quarters that
15 you can think of?
16     **A  No.**
17     Q  And where physically were the witness
18 quarters located?
19     **A  They're in the basement of one of the**
20     **divisions at Cook County jail.**
21     Q  Have you ever stepped foot in the witness
22 quarters?
23     **A  Never.**
24     Q  And the witness quarters themselves are

---

Transcript of John Dillon
Conducted on November 13, 2018

31 (121 to 124)

121

1 housed in the Cook County jail. Were they staffed
2 by Cook County personnel?
3    **A My understanding was yes, they were.**
4    Q All right. And this -- is it your
5 understanding that the correctional officers were
6 the same types of correctional officers that were
7 assigned to other parts of Cook County jail?
8    MR. HORVAT: Objection; foundation,
9 speculation.
10    You can answer.
11    **A That was my understanding.**
12    Q So do you have any firsthand knowledge of
13 what these witness quarters look like?
14    MS. ROSEN: Objection.
15    **A No.**
16    Q So as you sit here today, you couldn't
17 describe them to me; right?
18    **A No.**
19    Q Do you know how many inmates or detainees
20 the witness quarters could accommodate?
21    **A It was small. Maybe 20. It was small.**
22    Q Do you know what benefits or perks, if there
23 were any, that a detainee housed in the witness
24 quarters might enjoy?

122

1    MR. HORVAT: Objection; foundation,
2 speculation.
3    MS. ROSEN: Object to the form.
4    MR. HORVAT: You can answer, if you know.
5    **A None other than something that they may**
6 **request a State's Attorney to provide them.**
7    Q Okay. And in your career what types of
8 requests did you get?
9    **A I only had one witness in the witness**
10 **quarters in my career.**
11    Q And let me guess, that's Francisco Vicente?
12    MS. ROSEN: I'm going to object to the
13 form of that question.
14    **A That's correct.**
15    Q Okay. And do you remember as you sit here
16 today what type of requests Frankie Vicente made
17 to you?
18    **A Yes.**
19    Q What were they?
20    **A He asked for a Walkman, which is, you know,**
21 **like a radio with ear phones. He asked for some**
22 **clothing, and I believe we got him a couple of**
23 **sweat suits, underwear, and socks.**
24    Q Anything else?

123

1    **A That's it.**
2    Q And how do you remember that those were
3 the four requests that Frankie Vicente made?
4    **A Because in my review of some of the**
5 **documents that were provided to me after this**
6 **litigation commenced, in the Iglesias case it was**
7 **disclosed to the defense that he received a**
8 **Walkman, two sweat suits, socks, and underwear.**
9    Q And when you say "documents," can you be
10 more specific? What documents are --
11    **A I believe it was in response to a request**
12 **by Mr. Iglesias' attorney, and the State wrote --**
13 **typed that down, and it was tendered as a response**
14 **to that request.**
15    Q Okay. So there's an actual document that --
16 that you're recollecting or that you reviewed that
17 identified these four benefits that were given to
18 Mr. Vicente; right?
19    **A That's correct.**
20    MS. ROSEN: Object to the form.
21    Q And how did these items, the Walkman, the
22 clothing, the underwear, and the socks get paid for?
23    **A Out of the State's Attorney's petty**
24 **cash fund.**

124

1    Q Now, when you were using State's Attorney's
2 petty cash fund to purchase items for a witness,
3 did you have to memorialize that?
4    **A I didn't purchase those items.**
5    Q Okay. Well, how did -- tell me the
6 mechanics. How did it happen where Vicente got
7 these items? Who made the purchases and how did
8 they get memorialized, if you know?
9    MR. HORVAT: Objection; speculation --
10    MS. ROSEN: Object to the form.
11    MR. HORVAT: -- foundation. You can
12 answer if you know.
13    **A The inmate, here Vicente, would make the**
14 **request. If it was something that I deemed was**
15 **okay, then I would fill out an investigator request**
16 **slip and ask them to please go and purchase these**
17 **items.**
18    Q Okay. And do you have a recollection of
19 ever filling out an investigator request slip for
20 these four items that Mr. Vicente asked you to
21 provide to him?
22    **A I can only answer that as I believe I did.**
23    Q Would there have been any other way for
24 you to secure these items for Mr. Vicente other

Transcript of John Dillon
Conducted on November 13, 2018

125

1 than filling out an investigator request slip?
2  A  No.
3  Q  When was the first time you heard the name
4 Francisco or Frankie Vicente or Carlos Morales?
5  A  The first time I heard that is when I read
6 it in police reports in the felony review folder.
7  Q  Okay.  And do you remember where you were
8 when you first read this felony review file that
9 contained the name Frankie Vicente or
10 Carlos Morales?
11  A  I believe it was in Branch 66.
12  Q  And tell me again what Branch 66 is or
13 what it does?
14  A  Branch 66 is the homicide section.  So
15 anybody who's charged with first-degree murder,
16 voluntary manslaughter, reckless homicide, or a
17 sex-related offense, their case first goes to
18 Branch 66.
19      The bond hearings are conducted by the
20 assistants there.  They're held in Courtroom 101 at
21 26th and California at 12:00 -- or at least they
22 were when I left.  And the assistants that were
23 assigned to Branch 66 were typically five assistants
24 and a supervisor, and that's where the felony

126

1 review file would first go, and those would be the
2 assistants that would handle those cases.  If in
3 custody, they had 30-day terms unless occasioned
4 by the defendant or 60-day terms if they were
5 on bond.
6  Q  Okay.  And this is where you said earlier
7 you would go to pick up cases sometimes as a
8 prosecutor in the gang crimes unit?
9  A  When I was on call on a particular week, I
10 would stick my head in there to see if any new
11 cases came in that had a gang motivation to the
12 crime.
13  Q  And would it be fair to say that that was
14 the circumstance under which you first learned of
15 Mr. Vicente is when you were apprised of the
16 Ruvalcaba murder in Branch 66?
17      MR. HORVAT:  Objection to speculation,
18 foundation.
19      You can answer if you know.
20  A  That's my recollection, yes.
21  Q  Okay.  So tell me what -- you tell me what
22 you recollect about learning about Frankie Vicente
23 when you were at Branch 66.
24  A  My recollection is that I was on call the

127

1 week that that case came in, that I went down to
2 Branch 66 and asked, "Are there any new gang-related
3 murders," and that case was brought to my attention.
4      I would have reviewed the felony review
5 folder, and I believe Mr. Vicente's name was in
6 there as a witness, and I familiarized myself with
7 a short summary that the felony review assistant
8 had written when they reviewed the case.
9  Q  And were there supplemental police reports
10 in the felony review file at that point?
11  A  I don't have an independent recollection
12 of that.
13      MS. BONJEAN:  I'm going to hand you what's
14 been -- what's been previously marked as -- did
15 you mark it Coghlan or exhibit --
16      THE COURT REPORTER:  Dillon.
17      MS. BONJEAN:  I'm sorry; Dillon.
18      (Dillon Deposition Exhibit 5 marked for
19 identification and attached to the transcript.)
20  Q  Do you recognize this document?
21  A  Yes.
22  Q  And what is it?
23  A  This is the case fact sheet.  And, again,
24 the summary that you see here on the first page,

128

1 that was written -- all the information in here
2 was written by the assistant State's Attorney that
3 reviewed the case.
4  Q  And when you say "reviewed the case," you
5 mean the felony review assistant?
6  A  Yes.
7  Q  Okay.  And would this document have been
8 in the felony trial folder when you went in to
9 Branch 66 to inquire about gang-related murders
10 coming in?
11  A  There was no trial file at that point.  I
12 would have drafted the trial file.
13  Q  Okay.  Let me back up.  That was me.  I
14 misspoke; I apologize.
15      Would this case fact sheet have been in
16 the felony review file when you stuck your head
17 into Branch 66 to determine whether or not there
18 were any gang-related crimes that had come in there?
19  A  No.
20      MR. HORVAT:  Objection; speculation.
21  Q  It would not have?
22  A  These facts were contained in the felony
23 review folder.
24  Q  Okay.

Transcript of John Dillon
Conducted on November 13, 2018

129

1    **A  This sheet is generated from the information**
2  **in the felony review folder.  So this particular**
3  **sheet was not in the folder, but the folder with**
4  **this information was available to me.**
5    Q  Okay.  Very good.  So the substance of
6  what is here would have been contained in the
7  felony review folder when you had an opportunity
8  to review it at Branch 66; is that fair to say?
9    **A  Yes.**
10   Q  Okay.  Now, after you read the felony review
11 folder in Branch 66, what, if anything, did you do
12 with respect to the Ruvalcaba case or the Bouto case?
13   **A  I told the assistant who was handling it**
14 **in the preliminary hearing courtroom, Branch 66,**
15 **that I was intending on picking up this case.**
16   Q  All right.  Now, would it be fair to say
17 that that communication that you made to the
18 assistant would have been made in the same week
19 that Mr. Bouto was arrested for this crime?
20   MR. HORVAT: Objection; foundation,
21 speculation.
22     You can answer if you recall.
23   **A  It would have been after Mr. Bouto was**
24 **charged with first-degree murder for the murder of**

130

1  Salvador Ruvalcaba.
2    Q  Okay.  Well, maybe I'm confused.  Is it --
3  I thought you testified that -- well, Branch 66 is
4  where the bond hearing would take place; right?
5    **A  That's one of their responsibilities, yes.**
6    Q  And you're not suggesting that you
7  necessarily would show up for bond hearings?  It
8  would be only after charges were formally placed
9  against an accused?
10   MR. HORVAT: Objection; misstates his
11 testimony.
12     You can answer if you understand.
13   **A  That's correct.**
14   Q  All right.  Well, we'll get back to that.
15     When did you first meet Francisco Vicente?
16   **A  On June 2nd of 1993.**
17   MR. ENGQUIST: I'm sorry.  I didn't
18 hear that.
19   THE WITNESS: June 2nd of 1993.
20   Q  And where did you meet Mr. Vicente on
21 June 2nd, 1993?
22   **A  In the gang unit on the 13th floor of the**
23 **Cook County State's Attorney's Office.**
24   Q  And where was Mr. Vicente living at the time

131

1  that you met him in the gang unit on June 2nd, 1993?
2    **A  He was an inmate at the Cook County jail.**
3    Q  And do you know how it was that Mr. Vicente
4  came -- or found himself in the gang crimes unit
5  of the Cook County State's Attorney's Office on
6  June 2nd, 1993?
7    **A  Yes.**
8    Q  How?
9    **A  I had requested Detective Halvorsen to**
10 **bring him over to the 13th floor so that I could**
11 **interview him.**
12   Q  Okay.  And how was it that you requested
13 Detective Halvorsen to bring him over to the gang
14 crimes unit?
15   **A  I contacted him by phone.**
16   Q  You requested -- strike that.
17     You called Detective Halvorsen by phone?
18   **A  It's either I contacted him or he contacted**
19 **me.  I don't recall which of the two it was.**
20   Q  And do you recall how it was that you
21 arranged for Cook County jail to release him to
22 Detective Halvorsen to bring him over to you?
23   **A  No, I don't.**
24   Q  Would you have written one of these jail

132

1  letters or --
2    MR. HORVAT: Objection; speculation,
3  foundation.
4    You can answer if you know.
5    **A  No.**
6    Q  No what?
7    **A  No, I was not involved in obtaining**
8  **whatever document to bring him over the first time.**
9    Q  Well, we've established that somebody in
10 the Cook County State's Attorney's Office would
11 have had to authorize Mr. Vicente's movement to
12 the Cook County State's Attorney's Office; right?
13 Is that correct?
14   **A  That's correct.**
15   Q  And as you sit here today, you're saying
16 that person was not you; is that right?
17   **A  Yes.  That's correct.**
18   Q  Do you know what the other possibilities
19 are of who it might have been?
20   **A  The detective could have gone to felony**
21 **review and requested that a writ be obtained to**
22 **release Mr. Vicente to the detective.**
23   Q  Okay.  So one possibility is that
24 Detective Halvorsen himself could have gone to

Transcript of John Dillon
Conducted on November 13, 2018

133

1  felony review to get a writ to authorize him to
2  bring Mr. Vicente over to the State's Attorney's
3  Office; right?
4      A  Correct.
5      Q  But you're confident it wasn't you who
6  made that request; is that fair to say?
7      **A  I don't recall making that request.**
8      Q  Okay.
9      **A  That's fair to say.**
10     Q  You don't recall making it, or you have a
11 specific recollection that you did not make it?
12        MR. HORVAT:  Object to the form.  I think
13 they're one in the same.
14        But you can answer if you understand.
15     Q  Are they one in the same?
16     **A  I don't believe that I made the**
17 **arrangements to bring him over because I had never**
18 **met the person before.**
19     Q  But you had familiarized yourself with him
20 by virtue of reviewing the felony review folder
21 that you obtained in Branch 66; right?
22        MR. HORVAT:  Object to the form of the
23 question.
24        You can answer.

135

1  fact sheet that Mr. Bouto made a statement against
2  his interest to Frankie Vicente while he was locked
3  up at Area 5; right?
4      **A  Yes.**
5      Q  And, in fact, it also indicated that an
6  Edwin Maldonado was detained in Area 5 lockup at
7  the same time, as well; correct?
8      **A  That's correct.**
9      Q  And at least the felony review person
10 seemed to suggest that Edwin Maldonado needs to be
11 writted out of Cook County jail on May 17th to see
12 if he will give a statement regarding what Bouto
13 told Vicente; right?
14     **A  That's what the case fact sheet suggests.**
15     Q  Okay.  And so you were familiar with these
16 facts prior to June 2nd of 1993?
17     **A  Yes.**
18     Q  And as you sit here today, you don't know
19 exactly how Mr. Vicente got to the Cook County
20 State's Attorney's Office; is that fair to say?
21     **A  No, that's not fair to say.**
22     Q  Well, you don't -- let me put it this way:
23 As you sit here today, you can't say who authorized
24 Mr. Vicente's movement from the Cook County jail

134

1      **A  It lists his name, his address, his race,**
2  **whether he's a male or female, his date of birth,**
3  **his IR number.  So no, I didn't really familiarize**
4  **myself with him, but I read what his involvement**
5  **was allegedly in this case based on the information**
6  **contained in this document.**
7      Q  Right.  And you also said there might --
8  there were typically police reports in the felony
9  review folder, as well; right?
10     **A  There were some police reports.**
11     Q  Right.
12     **A  Because keep in mind that a lot of those**
13 **police reports aren't drafted until sometime after**
14 **a person has been charged with a crime.  So I**
15 **believe the Ruvalcaba murder was within a couple**
16 **weeks of these events taking place, so the vast**
17 **majority of these police reports hadn't been**
18 **authored or documented at that point.**
19     Q  Okay.  But you agree that at least the
20 substance of this case fact sheet was known to you
21 prior to Mr. Vicente coming to your offices on
22 June 2nd, 1993; right?
23     **A  That's correct.**
24     Q  And one of -- it's reflected in the case

136

1  to the Cook County State's Attorney's Office?
2      **A  That's correct.**
3      Q  And you don't know how his movement was
4  authorized; right?
5      **A  That's correct.  I don't recall.**
6      Q  You don't recall.  But it could have
7  been you?
8         MR. HORVAT:  Object to speculation,
9  foundation.
10        You can answer.
11     **A  I don't believe so.**
12     Q  And what makes you -- what makes you think
13 it wouldn't have been you?
14     **A  Because I remember having a conversation**
15 **with Detective Halvorsen, and in that conversation**
16 **Detective Halvorsen related to me what had**
17 **transpired with Mr. Vicente and Mr. Bouto's lawyer.**
18 **And it was a result of that contact that I**
19 **requested Detective Halvorsen to bring Mr. Vicente**
20 **to our office for us to interview him because I**
21 **felt it was essential that that be documented what**
22 **had transpired allegedly between Mr. Bouto's**
23 **lawyer and Mr. Vicente.**
24     Q  Okay.  So your recollection is that what

Transcript of John Dillon
Conducted on November 13, 2018

35 (137 to 140)

137

1 prompted Vicente coming to your office was the
2 report from Detective Halvorsen that there had
3 been some -- we'll call it a conversation at this
4 point; we'll get into that -- with Bouto's lawyer
5 at the Cook County jail; right?
6 **A That was what Mr. Vicente related to the**
7 **detectives who in turn related the information**
8 **to me.**
9 Q Got you. And do you know how it was that
10 Mr. Vicente reached out to Detective Halvorsen to
11 report some incident with Bouto's attorney?
12 **A My understanding it was through a phone call.**
13 Q Okay. And do you know whether the phone
14 call was placed to Detective Halvorsen's office
15 phone? Do you -- do you know any specifics
16 about this?
17 **A No.**
18 Q Okay. And it's your testimony that
19 Halvorsen then contacted you and said this
20 happened and you decided --
21 **A They wanted to make me aware of it, and I**
22 **felt it was essential that that information be**
23 **documented.**
24 Q Okay.

138

1 **A So I wanted to interview him to find out**
2 **if what the detective was representing to me had,**
3 **in fact, happened.**
4 Q Okay. And do you -- so you remember Frankie
5 showing up to the State's Attorney's Office gang
6 crimes unit?
7 **A Yes.**
8 Q Was he handcuffed?
9 **A I believe he was until he arrived at our**
10 **office.**
11 Q Okay. Was he dressed in Cook County garb?
12 **A I believe so.**
13 Q And who was he accompanied by?
14 **A Detective Halvorsen.**
15 Q Anyone else?
16 **A No.**
17 Q And when Detective Halvorsen and Mr. Vicente
18 arrived in the gang crimes unit, what happened next?
19 **A I introduced myself to Mr. Vicente, told him**
20 **my name is John Dillon, that I was an assistant**
21 **State's Attorney, that I was a lawyer, and I was**
22 **prosecuting the case of Robert Bouto for the**
23 **murder of Salvador Ruvalcaba.**
24 **And, "It's my understanding from looking**

139

1 **at some documents that they, meaning Mr. Bouto**
2 **made some statements to you while you were at**
3 **Area 5 in the lockup. Are you willing to talk**
4 **with me about that?"**
5 **He told me that he was, and I had a**
6 **conversation with him about what allegedly**
7 **transpired by Mr. Bouto, and Mr. Vicente, and**
8 **Mr. Maldonado.**
9 Q Now, you knew, of course, that Mr. Vicente
10 was charged with a range of robbery offenses at
11 the time that you met him?
12 **A Yes.**
13 Q And because you were not questioning
14 Mr. Vicente about the nature of those robbery
15 offenses, you did not reach out to his public
16 defender to either ask permission or even to
17 inform him that you were going to speak with
18 Mr. Vicente; is that fair to say?
19 **A That's correct.**
20 Q Now, did you have this conversation in the
21 general area? Did you go to a conference room, an
22 office? Where was this conversation taking place?
23 **A In a conference room on the 13th floor.**
24 Q In the gang crimes unit?

140

1 **A It's in that area that I told you about**
2 **where the office is, and there's a conference room**
3 **there.**
4 Q And did you sit at a table?
5 **A Yeah, there's a table with chairs.**
6 Q And who was in the conference room when
7 this conversation took place?
8 **A Myself, Mr. Vicente, and Detective Halvorsen.**
9 Q Okay. And is this one of those doors that
10 had the glass on the side?
11 **A I believe so.**
12 Q And was Assistant State's Attorney Coghlan
13 in the gang crimes unit at the time?
14 **A I don't know.**
15 Q Did he join you in the conference room?
16 **A No.**
17 Q And when you sat down with Mr. Vicente and
18 Detective Halvorsen, you said you uncuffed him;
19 right?
20 **A I didn't uncuff him.**
21 Q Strike that. Halvorsen uncuffed him?
22 **A I believe he handcuffed one of his hands**
23 **to the chair.**
24 Q Okay. Now, you said you introduced yourself,

Transcript of John Dillon
Conducted on November 13, 2018

141

1 and you said you're going to be the prosecutor on
2 the Ruvalcaba murder?
3    A  Yes.
4    Q  And you asked him if he was willing to
5 speak with you; is that fair?
6    A  Yes.
7    Q  And what did he say?
8    A  He agreed.
9    Q  And -- and after he agreed to speak with
10 you, what, if anything, did you ask him, and how
11 did he respond?
12    A  I asked him if he could tell me -- recount
13 for me what happened in the lockup at the police
14 station in Area 5 while he was there with Edwin
15 Maldonado and Robert Bouto and what it is
16 Mr. Bouto said to him.
17    Q  Okay.  And did he -- what did he tell you?
18    A  He told me that he was talking to
19 Mr. Maldonado, and at some point Mr. Bouto joined
20 the conversation.  He said he asked Mr. Bouto what
21 he was about, and I believe he indicated that he
22 did that because he wanted to see what gang he was
23 affiliated with.  And he told him that he was a
24 PR Stone, Puerto Rican Stone.

142

1      Mr. Vicente related to me that he told him
2 that he was an All Mighty, and he explained to me
3 that an All Mighty in most instances means Latin
4 King, which is aligned or affiliated gang of the
5 Puerto Rican Stones.  But in reality he was an
6 All Mighty Imperial Gangster, which is a gang
7 affiliated with the folks nation, which is
8 actually an enemy gang.
9      And Mr. Bouto related to him that he was
10 in custody for murder.  Mr. Vicente asked him,
11 "Did you do it?"  He said yes.  And he said there
12 were, I believe he referred to three studs who
13 picked him out in a lineup, and what was going to,
14 you know, happen to him, how much time did Vicente
15 think he would get.
16    Q  Anything else?
17    A  That's what he related to me.
18    Q  Okay.  And what did you say in response
19 when Mr. Vicente told you this?
20    A  I then asked him if he would talk to me about
21 what he had alleged Mr. Bouto's attorney did.
22    Q  Okay.  Did you ask Mr. Vicente anything
23 about his own robbery cases?
24    A  No.

143

1    Q  Did he indicate to you that he was hoping
2 or expected some leniency in his robbery cases?
3    A  No, he never said that.
4    Q  Did you ever raise the possibility that in
5 exchange for his cooperation in your prosecution
6 of Robert Bouto that you would be willing to
7 discuss leniency in his pending cases?
8    A  I didn't need his cooperation because he
9 had already provided a statement under oath before
10 the grand jury involving this incident, and he had
11 already given a handwritten statement detailing
12 his involvement in this incident.
13    Q  Okay.  Well, when you say you didn't need
14 his cooperation, you mean because you could get
15 his prior statements in substantively, and that
16 was good enough for you?
17    A  Yes.
18    Q  You didn't have an interest in finding out
19 whether he was going to adhere to his prior
20 statements?
21    A  At that time, no.
22    Q  Uh-huh.
23    A  I mean, I didn't even have a trial file
24 yet at that point.  So we're talking something that

144

1 by my experience was probably years off.
2    Q  Well, you said you didn't need his
3 cooperation, but typically you don't want
4 witnesses flipping; right?
5    A  Sometimes that's a good thing.
6    Q  Is that -- and why is that?
7    A  It's because it's I think a pretty easy
8 sell to a jury to understand why a gang member
9 would flip, not want to testify against another
10 gang member.  And when they do that, that's,
11 again, I think for most people common sense tells
12 them that that's what they're going to do.
13    Q  Right.  So you can argue to the jury that
14 they're afraid of the gang member; right?
15    A  Or that they don't want to be involved in
16 this prosecution.
17    Q  Okay.  Because they're not afraid of the
18 gang member when they're in the confines of the
19 police department, but they are later on when they
20 have testify, is that the theory?
21      MR. HORVAT:  Objection; speculation,
22 foundation.
23      You can answer if you understand.
24    A  Well, the theory is that a lot of times

Transcript of John Dillon
Conducted on November 13, 2018

---

145

1  they don't want to testify in trial in open court
2  and identify someone as being involved in a crime,
3  a fellow gang member.
4      Q  And why would they want to give a statement
5  against a fellow gang member in the first place?
6      MR. HORVAT:  Objection; speculation --
7      MS. ROSEN:  Objection.
8      MR. HORVAT:  -- foundation.
9      A  I have no idea why.
10     Q  Well, you have a theory why they wouldn't
11 want to --
12     A  No, I have a -- what I have is I was made
13 aware of the fact that Mr. Vicente brought that to
14 the attention of the detectives on his robbery
15 case.  So why Mr. Vicente brought that to those
16 detectives' attention is a question that's
17 probably better posed to Mr. Vicente than me.  I
18 have no idea why he did that.
19     Q  Well, Mr. Vicente does not say that now.
20 You realize that; right?
21     MR. HORVAT:  Objection; it's argumentative.
22 You don't have to answer that question.
23     MS. BONJEAN:  No, he does.
24     MR. HORVAT:  Well, there wasn't a question

146

1  pending.  Do you have a question?
2      MS. BONJEAN:  I do.
3      Q  You realize that Mr. Vicente denies that
4  he brought this information to Detectives Guevara
5  and Halvorsen.  You're aware of that; right?
6      MS. ROSEN:  Objection; foundation.
7      A  As of today, yes, I'm aware of that.
8      Q  You realize -- or maybe you don't.  Let me
9  ask you, are you aware that Frankie Vicente has
10 alleged that he was coerced into providing these
11 statements against Mr. Serrano and Mr. Montanez by
12 Detectives Guevara and -- strike that.
13     Let's start with Bouto.  Are you aware that
14 Frankie Vicente has alleged that he was coerced
15 into providing statements against Robert Bouto
16 while he was at Area 5?
17     A  I'm aware that he said that 10 years after
18 those events occurred, yes.
19     Q  Okay.  And you are -- so as you sit here
20 today, it's your opinion that that is a -- that
21 that's unreliable?  His belated recantation is
22 unreliable; is that fair?
23     MR. HORVAT:  Object to the form, foundation.
24     If you understand it, you can answer if

147

1  you understand it.
2      A  Yes, I believe that's very unreliable.
3      Q  Okay.  Now, did you ask Frankie Vicente when
4  he sat down with you whether or not Robert Bouto
5  had -- whether he knew Robert Bouto previously?
6      A  I'm sorry; could you repeat the question?
7      Q  Yeah.  Did you ask Frankie Vicente when
8  you interviewed him whether he had any prior
9  relationship with Robert Bouto?
10     A  I don't have an independent recollection
11 of that.
12     Q  Okay.  And did you find it at all odd that
13 Robert Bouto would confess to just random people
14 in a lockup for first-degree murder?
15     MR. HORVAT:  Object to the form of the
16 question.
17     You can answer if you understand.
18     A  No.
19     Q  Why not?
20     A  Because gang members often brag about the
21 crimes they commit.
22     Q  And where do you get that information from?
23     A  I get that information from being a
24 prosecutor for almost 31 years and trying thousands

148

1  of cases where I've seen instances where that's
2  happened in other cases besides this case.
3      Q  Uh-huh.  So but you didn't -- when you
4  interviewed Mr. Vicente, you didn't ask him whether
5  he was looking for any benefits; is that right?
6      A  That's correct.
7      Q  How did you -- how did you determine whether
8  or not his statements about what Bouto told him
9  were reliable?
10     A  I assumed that they were reliable.
11     Q  Why?
12     A  Because that's what he told the police,
13 and that's what he told me.
14     Q  He's a gang banger.
15     MR. HORVAT:  Wait, wait.
16     MS. ROSEN:  Can you not interrupt the
17 witness?  He was talking.  You interrupted him.
18     MS. BONJEAN:  Yes.  And that happens
19 sometimes and we've talked over each other a
20 couple of times, and we'll work it out.  It's all
21 right.  It's not purposeful.
22     MS. ROSEN:  So I'm just saying, could you
23 let him finish --
24     MS. BONJEAN:  Of course.

Transcript of John Dillon
Conducted on November 13, 2018

38 (149 to 152)

149

1    MS. ROSEN: My statement was, let him
2  finish.
3    MS. BONJEAN: Go ahead.
4    MR. HORVAT: Wait. My objection is just
5  please just ask him the question. You and I have
6  a clean slate; we haven't gone through this before.
7    MS. BONJEAN: I don't know what your
8  point is.
9    MR. HORVAT: Just ask the question.
10   Q Do you know what my question is, or do you
11 need to have it read back to you?
12   **A I thought I answered it.**
13   Q Okay. Let -- let me back up then. What
14 did you do to test the reliability of Vicente's
15 statements to you about what Bouto allegedly
16 told him?
17   MR. HORVAT: Objection to the form of the
18 question.
19   You can answer that, John.
20   **A I looked at the fact that another person**
21 **in lockup, Edwin Maldonado, said that that happened,**
22 **and Mr. Bouto's attorney obviously was very concerned**
23 **about it because he was over talking to Francisco**
24 **Vicente in the jail about it less than two weeks**

150

1  after it happened.
2    Q And --
3    **A So, obviously, I'm inferring from that**
4  **that Mr. Garvin must have placed a fair amount of**
5  **reliability on it to go over to the jail to talk**
6  **with him about it.**
7    Q Is it possible that Mr. Garvin just wanted
8  to find out why a witness would be making
9  statements against his client?
10   MR. HORVAT: Objection; speculation --
11   MS. ROSEN: Objection; foundation.
12   MR. HORVAT: -- foundation.
13   You can answer if you know.
14   **A Based on what Mr. Vicente related to me,**
15 **Mr. Garvin was trying to bribe him into telling**
16 **the police that that didn't happen.**
17   Q Tried to bribe him for $17; right?
18   **A That's what happened, yes.**
19   Q Okay. And you believed that?
20   **A That was documented by the Cook County**
21 **Sheriff's Department. Mr. Garvin admitted to**
22 **giving him $17, and Mr. Garvin had provided him**
23 **with a letter offering free representation to him**
24 **on his cases. So based on those things, yes, I**

151

1  believe that.
2    Q Okay. And apart from your inferences
3  about Mr. Garvin's sketchy behavior, what else did
4  you do to test the reliability of Mr. Vicente's
5  statements to you?
6    MR. HORVAT: Objection; form.
7    Go ahead.
8    **A I was satisfied with the reliability based**
9  **on the reasons I just gave you.**
10   Q Well, you know -- well, hold on a second.
11   So nothing else? You didn't do anything
12 else to test reliability of it?
13   **A No.**
14   Q It didn't give you concern that he was a
15 gang banger himself?
16   MR. HORVAT: Objection to form.
17   Do you understand the question?
18   THE WITNESS: Yes, I understand.
19   **A Unfortunately, as I would tell many juries**
20 **in my closing arguments that I'd love to have a**
21 **priest, a rabbi, or minister present when these**
22 **crimes took place, but, unfortunately, the**
23 **Francisco Vicentes of the world are the people who**
24 **are witnesses to these types of crimes.**

152

1    Q All right. And how do you determine which
2  ones are telling the truth and which ones aren't?
3    MS. ROSEN: Object to form.
4    **A Based on what they represented to you.**
5    Q Okay.
6    **A But that's true of any witness whether**
7  **they're a gang member or not. It depends on whether**
8  **they're being truthful in what they represented.**
9  **It's not peculiar to a gang member. That's if you**
10 **were to go into court and give testimony. There's**
11 **nothing that I can test your reliability any more**
12 **than I could Francisco Vicente's.**
13   Q Well, did you test his statement against --
14   **A It appeared to be --**
15   Q I'm going to ask you that you let me finish
16 my question, also. It goes both ways. Okay?
17   **A Sure.**
18   Q You could test a statement against
19 undisputed facts to determine whether it matches
20 up; right?
21   MR. HORVAT: Object; it's an incomplete
22 hypothetical and form.
23   You can answer.
24   MS. BONJEAN: Uh-huh.

Transcript of John Dillon
Conducted on November 13, 2018

153

1      MS. ROSEN:  Oh, I am sorry, that is the
2 most unprofessional thing.  You are just like
3 chalking it up there with your unprofessional
4 behavior.
5      MS. BONJEAN:  Thank you for your --
6      MS. ROSEN:  You're welcome.
7      MS. BONJEAN:  -- your commentary.
8      MS. ROSEN:  You're welcome.  I'm glad that
9 all of your unprofessional behavior is not directed
10 at female attorneys.
11      MS. BONJEAN:  Now, why would that be
12 the case?
13      MS. ROSEN:  I don't know.
14      MS. BONJEAN:  I love females.  What are
15 you talking about?
16      MS. ROSEN:  I don't know.
17      MS. BONJEAN:  Maybe it's just personal.
18      MS. ROSEN:  Maybe.  We have no history at
19 all, so it's personal.
20      MS. BONJEAN:  Okay.  Let's look -- I'm
21 going to have you look at Exhibit 3.  Okay?
22      (Dillon Deposition Exhibit 3 marked for
23 identification and attached to the transcript.)
24      MS. BONJEAN:  Let me know when you're ready.

154

1      THE WITNESS:  Okay.  Thank you.
2      Okay.
3 BY MS. BONJEAN:
4      Q  What do you recognize this exhibit to be?
5      A  This is the handwritten statement that
6 Francisco Vicente gave regarding the shooting
7 death of Salvador Ruvalcaba.
8      Q  When you interviewed Frankie Vicente about
9 the statements that he provided to the detectives
10 at Area 5, did you ask him about his heroin problem?
11      A  No.
12      Q  Were you aware of his heroin problem?
13      A  No.
14      Q  Did his drug addiction in any way color
15 your determination about the reliability of his
16 statements?
17      A  No.
18      Q  Were you aware that he was going through
19 heroin withdrawal at the time he made the
20 statement?
21      A  No.
22      Q  Would that have featured into your thinking
23 at all about whether the statement was reliable?
24      MS. ROSEN:  Object to the form.

155

1      A  I -- I didn't see any type of evidence
2 that he was going through some type of withdrawal.
3 So I suspected there was nothing wrong.
4      Q  And he didn't tell you he was going through
5 any withdrawal; is that your testimony?
6      A  That's my testimony.
7      Q  And Detective Halvorsen didn't tell you he
8 was going through any type of withdrawal at the
9 Area 5 when he made these statements?
10      A  No, he didn't.
11      Q  And did you ever learn that he was going
12 through heroin withdrawal?
13      A  I'm sure at some point I did.  I don't
14 recall when.
15      Q  It's not something that came up, though,
16 when you were interviewing him on June 2nd, 1993?
17      A  No, ma'am.
18      Q  And in 1993 did you have any general concern
19 about the reliability of jailhouse snitches or
20 jailhouse confessions?
21      MR. HORVAT:  Object to the form.
22      You can answer.
23      A  I always look at those things as somewhat
24 suspect.

156

1      Q  Okay.  So would it be fair to say that you
2 looked at Vicente's statements initially with
3 some -- some reservations or some extra caution
4 maybe?
5      A  I think that's fair.
6      Q  Okay.  And would it be fair to say that
7 often jailhouse snitches at least in your
8 experience want something in return for their
9 statements against witnesses?
10      MR. HORVAT:  Objection to form, foundation,
11 speculation.
12      You can answer, if you know.
13      A  This is really the only case that I had a
14 situation like that.  So I can't really speak as
15 to other people and what their instances were.  I
16 can only speak as to this case.
17      Q  Okay.  So in your entire career as a
18 prosecutor you only used a cooperating witness --
19 well, let me back up.
20      In your entire career as a prosecutor you
21 only used a jailhouse snitch on this one occasion;
22 is that fair?
23      MR. HORVAT:  I'm going to object to the
24 form of the question to specifically "used."

Transcript of John Dillon

40 (157 to 160)

Conducted on November 13, 2018

---

**157**

1    You can answer if you understand.
2    **A   I didn't use him on this case.**
3    Q   Well, you didn't -- no.  I know you didn't
4  end up calling him as a witness, but you used him
5  to get charges brought; right?
6       MR. HORVAT:  Is there a question?
7       MS. BONJEAN:  Yeah.
8    Q   You used him to get charges brought; right?
9    **A   No, that's not right.**
10   Q   He didn't testify before the grand jury?
11   **A   Did who testify before the grand jury?**
12   Q   Vicente.
13   **A   On which case?**
14   Q   On the Bouto case.
15   **A   Yes, he testified before the grand jury.**
16   Q   Okay.  Well, isn't the grand jury the
17 vehicle by which somebody is formally charged with
18 a crime.
19   **A   Or a preliminary hearing.**
20   Q   Right.  And in this case Mr. Bouto was
21 indicted, wasn't he?
22   **A   Yes.**
23   Q   Okay.  And that indictment was secured in
24 part through testimony of Francisco Vicente;

---

**158**

1  correct?
2    **A   I can't speak to that.  I have no knowledge**
3  **of that.**
4    Q   Did he testify before the grand jury?
5    **A   Yes.**
6    Q   Okay.  So --
7    **A   Do I know what the grand jurors considered**
8  **as important evidence in making their decision to**
9  **return a true bill, no, I can't answer that.**
10   Q   You think that's what I'm asking you, what
11 was in the minds of the grand jurors?
12      MR. HORVAT:  Objection.  You don't have to
13 be argumentative with my client.  You can follow
14 up with your question.
15      MS. BONJEAN:  I'm not being argumentative.
16      MR. HORVAT:  You asked Mr. Dillon if he
17 used Francisco Vicente.  He told you he didn't use
18 him.  If you want to follow up on that question,
19 go right head.
20      MS. BONJEAN:  We're so well past those
21 questions.  What's your name again?
22      MS. ROSEN:  Oh, my God.
23      MS. BONJEAN:  No, I'm serious.  I've never
24 met him.  How would I know his name?  I know it's

---

**159**

1  Mr. Horvat but --
2       MR. HORVAT:  There you go.
3    Q   Mr. Vicente testified before the grand
4  jury; right?
5    **A   Yes.**
6    Q   Okay.  He was evidence -- he provided
7  testimony on which the State's Attorney presented
8  to the grand jury; correct?
9    **A   Yes.**
10   Q   And that grand jury returned a true bill
11 of indictment; right?
12   **A   Correct.**
13   Q   Okay.  So the State's Attorney's Office
14 did, in fact, rely on testimony from Mr. Vicente
15 that resulted in charges being brought against
16 Mr. Bouto; right?
17   **A   An indictment being returned against**
18 **Mr. Bouto, yes.**
19   Q   The indictment being brought, which is the
20 formal charging mechanism or one way to formally
21 charge; right?
22   **A   Correct.**
23   Q   Okay.  And, in fact, as of the start of
24 trial you weren't -- you were still at least

---

**160**

1  holding out the possibility that you might present
2  Mr. Bouto's testimony; correct?
3       MS. ROSEN:  Object to the form.
4    **A   I'm sorry?**
5    Q   Even after you picked a jury --
6    **A   I can't call Mr. Bouto as a witness.**
7    Q   No, I misspoke.  Even as you started the
8  prosecution and picked a jury in the Bouto case,
9  you indicated that you might still call
10 Mr. Vicente as a witness; right?
11   **A   No.**
12   Q   No?
13   **A   No.**
14   Q   When did you decide not to use Mr. Vicente
15 as a witness in the Bouto case?
16   **A   When I interviewed him probably a couple**
17 **weeks before the trial took place, maybe a month**
18 **before the trial took place.**
19   Q   Okay.  And did you -- and when did you let
20 defense counsel know that you weren't going to
21 call him?
22   **A   I don't have to let defense counsel know**
23 **who I'm going to call or who I'm not going to call.**
24   Q   I didn't suggest you did.

Transcript of John Dillon
Conducted on November 13, 2018

41 (161 to 164)

161

1    A  Well, then I didn't tell them.
2    Q  In fact, you told defense counsel you might
3  still call him?
4    A  He was listed as a witness on my answer to
5  discovery, yes.
6    Q  Okay.  And so you indicated to the Court
7  and to defense counsel even after the start of
8  trial that you might still call him; right?
9    A  I don't recall that, no.
10   Q  Okay.  But it's possible?  If I showed you
11 the transcript, would that -- it wouldn't surprise
12 you; right?
13   A  You can show me --
14     MS. ROSEN:  Object to the form.
15   A  -- the transcript.
16   Q  Okay.  Well, I will pull it out in a
17 minute.  But your testimony is at least in your
18 mind you had decided you weren't going to call
19 Mr. Bouto -- strike that -- Mr. Vicente as a
20 witness?
21   A  That's correct.
22   Q  Okay.  Now, you knew when Mr. Vicente came
23 to visit you that he was looking at a significant
24 amount of time in the penitentiary in excess of

162

1  double digits; correct?
2      MR. HORVAT:  Object to foundation.  Which
3  visit are we talking about?
4      MS. BONJEAN:  On June 2nd, 1993.
5    A  I believe I did but I don't have an
6  independent recollection of that.
7    Q  Well, you would agree that the potential
8  of spending the rest of your life in prison or
9  something tantamount to that would be a strong
10 motivator potentially in giving a statement that
11 you think could get you leniency possibly; right?
12     MR. HORVAT:  Objection to form and
13 foundation.
14     You can answer.
15   A  I suppose.
16   Q  And is that something that crossed your
17 mind when you were determining whether or not
18 Mr. Vicente's statements were reliable?
19   A  No.
20   Q  It didn't cross your mind?
21   A  Not after reading Mr. Maldonado's
22 statements as well as Mr. Garvin's actions, no.
23   Q  So Mr. Garvin's actions made you feel
24 comfortable that what Mr. Vicente was saying was

163

1  truthful?
2    A  Yes.
3    Q  Okay.  Now, you actually went and pulled
4  Mr. Vicente's criminal history on June 3rd, '93;
5  right?
6    A  Well, I spoke with him again on June 2nd,
7  not June 3rd.
8    Q  Correct.
9    A  And I don't recall whether I pulled his
10 criminal history or not.  That really didn't have
11 anything to do with my conversation with him.
12   Q  Okay.  Let's get back to that conversation.
13 I'm going to ask you to look at this exhibit which
14 I think we've marked as 3.
15   A  Okay.
16   Q  If you could look at the third page of it.
17   A  All right.
18   Q  And starting at the second sentence it
19 says, "Francisco Vicente states that the PR Stone
20 told him that he had just picked up his lady at
21 Roosevelt High School and was walking with her by
22 Roosevelt High School when he heard some shots.
23 Francisco Vicente states that the PR Stone then
24 told him that his stone brothers, the shorties

164

1  came up to him and his lady and told him that the
2  Cobras had popped at them."  Did you see that?
3    A  Yes.
4    Q  What did you -- did you do anything to
5  confirm that, in fact, there had been a shooting
6  that precipitated the Ruvalcaba murder?
7    A  No.
8    Q  Okay.  Do you know -- were you able to
9  verify through any other witnesses, for instance,
10 that there was actually a shooting that
11 precipitated or occurred immediately or relatively
12 close in time to when the Ruvalcaba murder took
13 place?
14   A  No.
15   Q  Did you do anything to confirm that fact
16 that is contained in Vicente's statement here?
17     MR. HORVAT:  Objection; asked and
18 answered.
19     You can answer again.
20   A  Well, again, it's not confirmed as a fact
21 to me.  This is what Mr. Vicente is saying
22 Mr. Bouto said.
23   Q  Right.
24   A  So Mr. Bouto injecting that maybe somebody

Transcript of John Dillon
Conducted on November 13, 2018

42 (165 to 168)

165

1  was shooting at them and putting elements of
2  self-defense into his statement doesn't surprise
3  me at all.
4      Q  Well, what did you do to try to figure
5  it out?
6      MS. ROSEN:  Objection to the form.
7      MR. HORVAT:  Objection to the form.
8      A  I spoke to Mr. Vicente.
9      Q  And Vicente alone was enough?  You didn't
10 do anything to verify whether that, in fact,
11 happened or not?
12     A  Again, along with what Mr. Maldonado said
13 Mr. Bouto said and again based on Mr. Garvin's
14 actions.
15     Q  Okay.  Now, you realize that the other
16 witnesses in the case, including the friends of
17 Mr. Ruvalcaba, did not make any mention of a prior
18 shooting; right?
19     A  I don't know whether they were asked if
20 there was a prior shooting that took place.
21     Q  Okay.  Well, that's fine.  But you are
22 not -- are you familiar with any statements by the
23 actual eyewitnesses or occurrence witnesses who
24 were there that were friends with Mr. Ruvalcaba

166

1  that there had -- that there had been some prior
2  shooting by Cobras?
3      A  Not to my knowledge.
4      Q  And did that give you any pause or concern
5  that maybe that's, you know, something inaccurate
6  or made up here?
7      A  No.
8      Q  You assumed that it must have been Bouto
9  telling Mr. Vicente --
10     A  Well, I assumed that a shooting between
11 the gangs had shot at the rival gang members
12 earlier.  I didn't presume that it happened within
13 seconds of this murder happening.
14     Q  Did you do any --
15     A  So the fact that those witnesses may not
16 have heard those things doesn't mean that it
17 didn't happen.
18     Q  Okay.  Well, do you have any evidence that
19 it did happen apart from Mr. Vicente saying it
20 happened?
21     A  Mr. Bouto saying that it happened.
22     Q  Mr. Bouto said that there was a prior
23 shooting?
24     A  According to Mr. Vicente, yes.

167

1      Q  Okay.
2      A  And according to Mr. Maldonado.
3      Q  Did Mr. Maldonado say that that happened?
4      A  That was contained in his handwritten
5  statement, I believe, but I would have to look at
6  it to refresh my recollection.
7      Q  Okay.  Have you looked -- have you seen a
8  handwritten statement by Mr. Maldonado recently?
9      A  I'm guessing that I probably did.
10     Q  Okay.  You don't --
11     A  I don't have an independent recollection, no.
12     Q  All right.  Okay.  So apart from maybe it
13 was in Mr. Maldonado's handwritten statement that
14 I would love to have if somebody has it because I
15 don't --
16     MS. BONJEAN:  Has anyone seen a handwritten
17 statement by Mr. Maldonado?
18     A  I've -- you know what?  I'm sorry; I take
19 that back.  I don't believe there was a
20 handwritten statement, just his grand jury
21 testimony.  I'm sorry.
22     MS. BONJEAN:  Do you know if you provided
23 the grand jury testimony for Mr. Maldonado?
24     MS. CHOJNACKI:  Yes, we did.

168

1      MS. BONJEAN:  Okay.  Can you provide the
2  exam?  Because we had trouble finding it and I
3  don't know --
4      MS. CHOJNACKI:  Okay.  It's attached to
5  Francisco Vicente's testimony.
6      MS. BONJEAN:  It actually cuts off right
7  when it starts based on what was presented to me.
8  So if you could double-check, I'd appreciate it.
9      MS. ROSEN:  Okay.
10     Q  Okay.  So apart from possibly Mr. Maldonado's
11 grand jury testimony, you were not able to confirm
12 that there was a shooting shortly before the
13 Ruvalcaba shooting other than through Mr. Vicente
14 and Mr. Maldonado; right?
15     A  Correct.
16     Q  And what about -- I'm going to ask you to
17 look at -- were you able to track down or did you
18 attempt to track down any of these shorties that
19 were referenced in this Vicente statement
20 allegedly of what Bouto said?
21     A  There were no names provided.  So how was
22 I able to try and track them down?
23     Q  Okay.  Did -- I don't know.  Did you attempt
24 to ask any witnesses other than Mr. Vicente about

Transcript of John Dillon
Conducted on November 13, 2018

169

1  who these shorties might be?
2  **A The shorties were fellow gang members of**
3  **Mr. Bouto who was represented by counsel. I**
4  **couldn't talk to Mr. Bouto.**
5  Q No. But did you -- do you know whether
6  you asked any of the rival gang members whether
7  they recognized any of or knew who these shorties
8  might be?
9  **A No.**
10  Q Was it your understanding that Bouto told
11  Vicente that a shorty drove up in a car and handed
12  him a gun?
13  **A According to what Mr. Vicente related**
14  **Mr. Bouto told him, yes.**
15  MS. BONJEAN: Okay. I'm going to have you
16  look at what's been previously marked Exhibit 1.
17  (Dillon Deposition Exhibit 1 marked for
18  identification and attached to the transcript.)
19  MS. BONJEAN: Let me know when you're ready.
20  THE WITNESS: Thank you.
21  Q I want to draw your attention to page 6 at
22  the top.
23  **A Okay.**
24  Q And Frank Escobar was one of the occurrence

170

1  witnesses; right?
2  **A Yes.**
3  Q Okay. And he reported that he -- in the
4  middle of the paragraph looked across Kimball and
5  observed a male known to him as Mario riding a bike
6  and hand a gun to the offender. Do you see that?
7  **A Yes.**
8  Q Were you able to reconcile why
9  Frank Escobar said that the offender retrieved a
10  gun from a guy named Mario riding a bike versus
11  someone else driving up and handing Mr. Bouto
12  the gun?
13  **A No.**
14  Q Did it -- did that factual difference
15  concern you?
16  MR. HORVAT: I'm going to object --
17  MS. ROSEN: Object to the form.
18  MR. HORVAT: -- at this point in time.
19  Certainly, his decision on how to use
20  Mr. Vicente and ultimately not using him is at
21  issue in this case, and I've allowed you to go
22  into that. But when you ask him to opine on other
23  witnesses and his theory of the prosecution
24  outside Vicente, you're going into unrelated

171

1  matters in this case. And what you're asking my
2  client to do is to give his mental impressions,
3  his mental processes in his decisions for making
4  these nonrelated Vicente matters decisions. So to
5  that extent that you're asking that question
6  you're asking for my client's internal thoughts.
7  John, I'm going to direct you not to
8  answer the question.
9  MS. BONJEAN: I'm going to clarify that I
10  am trying to probe what he did to determine the
11  reliability of Vicente's statements.
12  MR. HORVAT: That's not what you asked him.
13  Q Well, let me make it more clear. One
14  witness says a guy named Mario brought the gun to --
15  well, brought the gun to the offender via a bike;
16  right?
17  **A That's what the report says.**
18  Q That's what Mr. Escobar says according to
19  this report; right?
20  **A Correct.**
21  Q And Mr. Vicente says something a little
22  different -- a lot different; correct?
23  **A Mr. Vicente relates what Mr. Bouto told him.**
24  Q Okay. And you feel that because -- I

172

1  don't -- let me back up and ask it this way:
2  Is it your testimony that you didn't have
3  a concern or an interest in determining whether or
4  not what Mr. Bouto told Mr. Vicente was, in fact,
5  accurate?
6  MR. HORVAT: Object to the form of the
7  question; misstates the testimony.
8  If you understand, you can answer.
9  **A Obviously, I'm concerned with its accuracy,**
10  **but in my 30-plus years of being a trial lawyer,**
11  **10 witnesses can observe the same thing, and**
12  **10 witnesses can give 10 different versions of**
13  **what happened. So the fact that one person was**
14  **saying somebody came up on a bike and handed him a**
15  **gun, and another person said he came up in a car**
16  **and handed him the gun, that was not a concern of**
17  **mine, no.**
18  Q So it was not of interest to you to ask
19  Mr. Vicente, "Another witness said it was a guy
20  named Mario on a bike. Didn't Bouto mention
21  anything about that?" Did you question Vicente at
22  all about this discrepancy?
23  MS. ROSEN: Object to the form.
24  **A No, because Mr. Vicente wasn't aware of a**

Transcript of John Dillon
Conducted on November 13, 2018

44 (173 to 176)

173

1  discrepancy.  He was only aware of what Mr. Bouto
2  related to him.
3      Q  Okay.  But you were aware of a
4  discrepancy, no?
5      A  At the time I spoke to him on June 2nd, I
6  don't know that I was.  Because I believe this
7  report is dated May 16th, and I don't believe I
8  had this report with me when I interviewed him.
9  Because, again, I think if you look, the case was
10 probably not indicted at that point.  So I didn't
11 have a trial file at that point.
12     Q  Okay.  So let me ask it this way then:
13         Was there any point at which you questioned
14 the reliability of the statement itself that
15 Vicente provided to you?
16         MR. HORVAT:  Objection; asked and
17 answered.
18         You can answer again.
19     A  Yes.
20     Q  Okay.  At what point would that have been?
21         MR. HORVAT:  Same objection.
22     A  Probably prior to my getting ready to try
23 this case.
24     Q  Okay.  And did you ask him whether he could

174

1  resolve any of the discrepancies that existed in
2  his statements that, again, he says Bouto made to
3  him versus the statements that were made by other
4  witnesses?
5         MS. ROSEN:  Object to the form.
6         MR. HORVAT:  Object to foundation.  You're
7  talking about the last --
8      A  No, because it's impossible for Vicente
9  to -- to reconcile discrepancies that he didn't
10 create.  How can he reconcile a statement someone
11 else gave to him?  That doesn't make any sense to
12 me; I'm sorry.
13     Q  At any point did it occur to you that
14 maybe Bouto didn't make the statement to Vicente?
15     A  Again, as I told you because of the fact
16 that Mr. Maldonado said he said these things, and
17 because of Mr. Garvin's actions, I believed that
18 what they represented to me, Mr. Vicente and
19 Mr. Maldonado, was the truth.
20     Q  But Mr. Maldonado recanted those statements
21 before trial, didn't he?
22     A  Yes, he did.
23     Q  He accused you of wrongdoing, didn't he?
24     A  He did.

175

1      Q  He said you tried to bribe him; correct?
2      A  No, he did not.  He testified under oath
3  that I did no such things.
4      Q  Okay.
5      A  And there's a transcript of that.
6      Q  Right.  But he did accuse of you -- in
7  fact, before trial started you -- you actually did
8  some type of motion in limine to try to prevent
9  the defense from in any way suggesting that
10 Mr. Maldonado had accused you of attempting to pay
11 witnesses off.  Do you remember that?
12     A  If the transcript says that, yes.
13         MS. BONJEAN:  Can you mark that for me?
14         THE WITNESS:  But, again, what does that
15 have to do with --
16         MR. HORVAT:  John, just yes or no.
17         MS. BONJEAN:  You can mark that, please.
18         (Dillon Deposition Exhibit 7 marked for
19 identification and attached to the transcript.)
20         MS. ROSEN:  Is this just one page of a
21 transcript?
22         MS. BONJEAN:  Yes.
23         MS. ROSEN:  Can you tell us from what date
24 the transcript is?

176

1         MS. BONJEAN:  It's from the Bouto trial.
2  It was from the first day of trial.  I'll have to
3  get the exact date.  It's just to refresh his
4  recollection.
5  BY MS. BONJEAN:
6      Q  So at least according to you, at the Bouto
7  trial Mr. Maldonado had at some point attempted --
8  accused you of attempting to pay witnesses off;
9  correct?
10     A  There was an affidavit that was generated
11 that he signed.
12     Q  Right.
13     A  And that affidavit had allegations in it
14 that resulted in a hearing before Judge Simmons,
15 and in his hearing before Judge Simmons
16 Mr. Maldonado said I did nothing wrong.
17         MS. ROSEN:  For the record, the date of
18 the hearing is July 31st, 1996.
19     Q  The point, though -- really what I'm trying
20 to get back at is that before trial Mr. Maldonado
21 had recanted his statements -- or his grand jury
22 system; isn't that right?
23     A  That's correct.
24     Q  Okay.  And when Mr. Maldonado said, "You

Transcript of John Dillon
Conducted on November 13, 2018

45 (177 to 180)

177

1 know what? I never heard these confessions or
2 anything of that nature" -- okay? -- did it prompt
3 you to reconsider the reliability of Vicente's
4 testimony?
5    **A Not really.**
6    Q Because you've said up to this point that
7 it was one of the reasons you were confident in
8 the reliability of Vicente's statements and that
9 Bouto made these statements to him was because it
10 was corroborated by Maldonado; right?
11    **A Correct.**
12    Q Okay. And then Maldonado, though, at some
13 point recanted those statements; right?
14    **A Correct.**
15    Q And said that they were false; correct?
16    **A Correct.**
17    Q And your testimony is, though, that that
18 didn't alter your thinking of the reliability of
19 the Vicente statements; right?
20    **A No.**
21    MS. BONJEAN: I'm going to ask you to mark
22 that, please.
23    (Dillon Deposition Exhibit 8 marked for
24 identification and attached to the transcript.)

178

1    MS. ROSEN: What number is this one?
2    THE COURT REPORTER: 8.
3    MS. ROSEN: Thank you.
4    THE WITNESS: Okay.
5 BY MS. BONJEAN:
6    Q Is this the affidavit you referenced earlier
7 by Mr. Maldonado?
8    **A Yes.**
9    Q Okay. And this is an affidavit where he
10 states that he actually never did hear Mr. Bouto
11 confess to the murder of Salvador Ruvalcaba; right?
12    **A That's correct.**
13    Q If you go to the second page, he
14 references when he was brought upstairs to the
15 criminal courts building section. Do you see that?
16    **A Yes.**
17    Q Do you remember when Mr. Maldonado was
18 brought up to the Cook County State's Attorney's
19 Office at any point?
20    **A Well, at some time he was brought up and I
21 interviewed him.**
22    Q Uh-huh.
23    **A I believe what's being referenced here is
24 when he was brought up before he went to go before**

179

1 the grand jury. So I don't think that's
2 referencing contact with me.
3    Q Okay. Did you, in fact, interview
4 Mr. Maldonado in the offices -- in your offices?
5    **A Yes.**
6    Q Okay. And do you know when that interview
7 took place?
8    **A I don't. But Point 12 I believe is what
9 is referring to me.**
10    Q Uh-huh.
11    **A In 1995, so I don't why - I can't -- I
12 don't have a recollection that it was in 1995, but
13 I did interview him prior to the trial.**
14    Q Did you interview him prior to him going
15 before the grand jury?
16    **A No.**
17    Q Okay. And did you have any contact with
18 him whatsoever prior to him testifying before the
19 grand jury?
20    **A No.**
21    Q Okay. Now, at some point he indicates
22 that he met with an assistant State's Attorney.
23 That's correct; right?
24    **A Correct.**

180

1    Q And you were the assistant State's
2 Attorney handling the case, so that would have
3 been most likely; correct?
4    MR. HORVAT: Objection; speculation.
5    **A No, that's not correct.**
6    Q Okay.
7    **A Because there's a State's Attorney who
8 handled it on review; there's a State's Attorney,
9 different State's Attorney who handled it in the
10 grand jury that wasn't me, and then there was me.**
11    Q All right. Did you have any contact with
12 Mr. Maldonado prior to the indictment returning a
13 true bill against Mr. Bouto?
14    MR. HORVAT: Objection; asked and answered.
15    You can answer.
16    **A No.**
17    Q Now, in No. 12 Mr. Maldonado references,
18 "In 1995 the assistant State's Attorney in
19 Robert Bouto's trial subpoenaed me and prepared me
20 for the trial by reviewing the false statement I
21 gave to the grand jury and the Chicago Police
22 Department"; correct?
23    **A That's what the affidavit states.**
24    Q And did you, in fact, review Mr. Maldonado's

Transcript of John Dillon
Conducted on November 13, 2018

46 (181 to 184)

181

1  prior grand jury testimony with him prior to
2  Mr. Bouto's trial?
3  **A I'm sure when I sat down with him I**
4  **reviewed the grand jury testimony.**
5     Q  Okay.  And would that have been before he
6  executed this affidavit?
7  **A I believe so.**
8     Q  Do you remember speaking to him after he
9  executed the affidavit?
10  **A No, I did not because I believe an attorney**
11  **sent me a letter claiming to represent him, said**
12  **if I wanted to have any contact with him to contact**
13  **the attorney.  So I don't believe I had any contact**
14  **with him after this affidavit was drafted.**
15     Q  Okay.  And this affidavit didn't change your
16  view of whether or not Mr. Bouto actually
17  confessed to Mr. Vicente in the presence of
18  Mr. Maldonado; is that fair?
19  **A That's fair.**
20     Q  Now, when you met with Mr. Vicente on
21  June 2nd, 1993, did you make any determinations
22  about whether or not he would be housed in the
23  witness quarters?
24  **A There were no determinations made at that**

182

1  point.
2     Q  Was it discussed?
3  **A No.**
4     Q  What else was discussed an aside from what
5  he told you about the Bouto case?
6  **A Mr. Garvin's visit to him at the jail.**
7        MS. BONJEAN:  Okay.  So let's talk about
8  that real quick.  I'm going to ask that this be
9  marked.
10        (An off-the-record discussion was held.)
11        (Dillon Deposition Exhibit 6 marked for
12  identification and attached to the transcript.)
13  BY MS. BONJEAN:
14     Q  The first two pages are some handwritten
15  notes.  Are those your handwritten notes,
16  Mr. Dillon?
17  **A Those are my handwritten notes.**
18     Q  Okay.  And were these notes that you took
19  during your interview with Mr. Vicente on
20  June 2nd, 1993?
21  **A I believe so.**
22     Q  All right.  Now there's some disciplinary
23  report findings of fact on page 3.  Do you know
24  when you obtained this report?

183

1  **A It would have been after my interview with**
2  **Mr. Vicente.**
3     Q  Okay.  And the same would be true of this
4  letter that was sent to Mr. Vicente?
5  **A That's correct.**
6     Q  Is that something he provided on June 2nd,
7  or did you get that at a later date?
8  **A I got that at a later date.**
9     Q  What about the log?
10  **A Got that at a later date.**
11     Q  And would that be true, also, of the last
12  two -- well, the next two pages are Part 1,
13  disciplinary report.  Do you see that?
14  **A Yes.**
15     Q  Is that something you got at a later date?
16  **A Yes.  All the rest of those documents I**
17  **got at a later date.**
18     Q  And during this -- and also the memorandum
19  at the back; is that right?
20  **A Yes.**
21     Q  And apart from the conversations about
22  Mr. Garvin on June 2nd, 1993, what else did you
23  discuss with Mr. Vicente?
24  **A Nothing.**

184

1     Q  Okay.  So you discussed his -- the Bouto --
2  his recollection of what Mr. Bouto told him,
3  right, at Area 5?
4  **A That's correct.**
5     Q  And then the incident with Mr. Bouto's
6  attorney; correct?
7  **A Correct.**
8     Q  And what was it?
9  **A That was it.**
10     Q  Is it your testimony that there was never
11  any discussion in your presence about the Vargas
12  murder?
13  **A That's correct.**
14        MS. BONJEAN:  I'm going to hand you what's
15  been marked Exhibit 2 already.
16        (Dillon Deposition Exhibit 2 marked for
17  identification and attached to the transcript.)
18        MS. BONJEAN:  Let me know when you're
19  finished.
20        THE WITNESS:  Okay.
21  BY MS. BONJEAN:
22     Q  This is a -- I'm going to represent
23  it's a supplemental police report that's dated
24  June 8th, 1993, do you see there at the bottom?

185

1    A  Yes.
2    Q  And it is a report that was prepared by
3  Detective Ernest Halvorsen and Detective Reynaldo
4  Guevara.  Do you see that?
5    A  Yes.
6    Q  And then on the second page in the
7  narrative of the report it mentions that on
8  June 2nd, 1993, the reporting detectives arranged
9  to have Mr. Vicente brought from the Cook County
10 jail to the State's Attorney gang prosecution
11 unit.  Do you see that?
12   A  Yes.
13   Q  And is that the events you recollect and
14 we have been discussing about -- discussing up
15 until this point when you met with Mr. Vicente?
16   A  Yes.
17   Q  Now, he uses the plural "reporting
18 detectives."  Do you have any recollection of
19 Mr. Guevara being there at any point?
20   A  No.
21   Q  Okay.  Do you have a specific memory of
22 Mr. Guevara not being there?
23   A  Yes.
24   Q  Okay.  Now, if you look at the very last

186

1  paragraph of this report --
2    A  Yes.
3    Q  -- it references another meeting between
4  yourself and Mr. Vicente on June 9th?
5    A  Yes.
6    Q  Do you remember that meeting?
7    A  Yes.
8    Q  Okay.  How did Mr. Vicente get to your
9  offices on June 9th?
10   A  Same way.  I made a request to the
11 detectives to bring him over.
12   Q  Okay.  And do you know how the detectives
13 arranged for him to be brought?
14     MR. HORVAT:  Objection; speculation,
15 foundation.
16     You can answer if you know.
17   A  I don't have personal knowledge of that.
18 I assume that they went to felony review and got
19 a writ.
20   Q  I'm confused about something.  If you
21 wanted him brought, why didn't you just issue a
22 letter, or a writ, or put in a request to have him
23 brought over?
24   A  Because these were kind of a fluid

187

1  situation.  I mean, typically, you know, this
2  isn't something I put off for 30 days.  So I was
3  trying to get him over fast.  But I mean, these
4  aren't things that like I anticipated were going
5  to happen, so like I had scheduled to do these
6  things, if that makes any sense to you.
7    Q  It doesn't.  Because if you were trying to
8  get him over, wouldn't it have been quicker for
9  you to just take care of it as opposed to having
10 the officers go an extra step to do --
11   A  Not really because I had other
12 responsibilities going on.  I had, you know,
13 25 other murders going on.  So this is something
14 that just -- you know, he contacted the
15 detectives, "Hey, some woman just came over, gave
16 me a pair of gym shoes, and inside the gym shoes
17 was Richard Garvin's card," and then they
18 contacted me.  "Detectives, can you make
19 arrangements to bring him over?"  That's what
20 happened.
21   Q  Okay.  And you specifically remember that
22 that is how Mr. Vicente got to your offices, that
23 you told Halvorsen or --
24   A  I made the request for them to get

188

1  him, yes.
2    Q  Okay.  And do you remember him actually
3  being brought over on June 9th, 1993?
4    A  Yes.
5    Q  And who brought him over?
6    A  I believe it was Detective Halvorsen.
7    Q  But you're not certain?
8    A  I'm not certain.
9    Q  Are you able to point to any paperwork that
10 would confirm who came over to the office with
11 Mr. Vicente on June 9th, 1993, other than what
12 I've just --
13   A  No.
14   Q  Do you know whether you took any notes on
15 that day regarding your interactions with
16 Mr. Vicente?
17   A  I don't believe I did.
18   Q  Okay.  And do you have independent
19 recollection of what was discussed?
20   A  Other than my reviewing of this report
21 after litigation was commenced, no.
22   Q  Okay.  And based on what you see in this
23 report, what is it that was discussed to the best
24 of your knowledge?

Transcript of John Dillon
Conducted on November 13, 2018

48 (189 to 192)

---

189

1    A  It was discussed that a woman associated
2  with Mr. Garvin had come over to the jail and had
3  given Mr. Vicente a brand-new pair of gym shoes,
4  and inside the shoes was the business card of
5  Mr. Garvin.
6    Q  Did you ever interview Mr. Garvin?
7    A  No.  He was the opposing counsel representing
8  Mr. Bouto.
9    Q  Well, he eventually actually withdrew;
10 right?
11   A  He withdrew because I had to bring to the
12 Judge's attention that he was a potential witness
13 and couldn't continue to serve as his attorney.
14   Q  Right.  And once -- whether or not he was
15 representing Mr. Bouto or not, did you make any
16 efforts to ask Mr. Garvin about his conduct in
17 this case?
18   A  No.
19   Q  I mean, it's -- it's a crime to try to
20 bribe a witness; right?
21   A  Yes.
22   Q  Okay.  That's why you were -- one of the
23 reasons you were looking into it; right?
24   A  I was looking into it as it related to my

---

190

1  case, the prosecution of Robert Bouto.  I wasn't
2  assigned to felony review.  The detectives weren't
3  asking or seeking any type of charges against
4  Mr. Garvin to my knowledge, and if they did,
5  they'd direct that to felony review, not to me.
6    Q  Did you try to determine who this woman
7  was that allegedly showed up at Cook County with
8  these items for --
9    A  Other than --
10   Q  Hold on -- with the items for Mr. Vicente?
11   A  Other than interviewing Mr. Vicente, no.
12   Q  And you didn't corroborate that either;
13 right?
14   A  I'm sorry?
15     MS. ROSEN:  Object to the form.
16   Q  You didn't corroborate his statement that
17 this woman showed up with these items; right?
18   A  It was my understanding that he had shown
19 a new pair of gym shoes to the detectives.
20   Q  Okay.
21   A  Or was wearing new gym shoes when he came
22 there, and he said that's where he got them from.
23   Q  Again, he was wearing new gym shoes, but
24 you can't point me to anything to show that you

---

191

1  corroborated that it was Garvin's associate that
2  brought these gym shoes to him; right?
3    A  Mr. Vicente told me that that would be the
4  corroboration of it.
5    Q  No, that's Mr. Vicente's statement.  Was
6  there any corroboration of his statement?
7    A  And his statement is corroboration of that.
8  The gym shoes he's wearing is a corroboration of
9  that statement.
10   Q  It's the corroboration that he had gym
11 shoes.  It's not corroboration that Mr. Garvin's
12 assistant brought him gym shoes; right?
13   A  I would disagree with that.
14   Q  Okay.  Well, his wife could have brought
15 his gym shoes; right?
16   A  Anything is possible.
17   Q  Again, did you do anything other than talk
18 to Mr. Vicente to confirm that it was actually
19 Mr. Garvin's assistant that brought him these gym
20 shoes?
21   A  Other than talking to Mr. Vicente and
22 looking at the new pair of gym shoes, no.
23     MS. BONJEAN:  I want to now show you --
24 can you mark this one, please?

---

192

1      (Dillon Deposition Exhibit 9 marked for
2  identification and attached to the transcript.)
3      MS. BONJEAN:  Let me know when you're
4  finished reviewing this document, please.
5      THE WITNESS:  Okay.
6  BY MS. BONJEAN:
7    Q  Are you familiar with this police report
8  that's been marked Exhibit 9?
9    A  I was -- I familiarized myself with it
10 after this litigation commenced.
11   Q  I'd like to draw your attention to page 2
12 of Exhibit -- well, let's first identify what it
13 is.  This is a supplemental report regarding the
14 murder of Rodrigo Vargas.  Would you agree
15 with that?
16   A  I would agree with that.
17   Q  Okay.  And it reflects that it was
18 submitted on June 2nd, 1993; correct?
19   A  That's what it states.
20   Q  And it purports to be prepared by Detective
21 Ernest Halvorsen and Detective Guevara; correct?
22   A  Correct.
23   Q  Now, in the second page of the narrative
24 it references, "On June 2nd, 1993, reporting

---

Transcript of John Dillon
Conducted on November 13, 2018

193

1  detectives had a meeting with a circumstantial
2  witness who for his own safety must remain
3  anonymous at this time." Do you see that?
4      **A  Yes.**
5      Q  Okay.  Would you agree that that -- we now
6  know that that circumstantial witness later turned
7  out to be Francisco Vicente?
8      **A  Yes, I would agree with that.**
9      Q  Okay.  And reporting detectives indicate
10 that they interviewed Mr. Vicente on June 2nd, 1993,
11 in connection with his knowledge about the Vargas
12 murder; correct?
13     **A  That's what the report indicates.**
14     Q  Okay.  And do you know where that meeting
15 took place?
16     **A  I believe it took place in the gang unit.**
17     Q  Okay.  And what makes you think that?
18     **A  Because while I was out of the interview**
19 **room, at some point Detective Halvorsen came out**
20 **and said, "He just gave us another murder."**
21         THE COURT REPORTER:  I'm sorry.  What?
22         THE WITNESS:  "He just gave us another
23 murder."
24     Q  Okay.  So there was a point at which you

194

1  left the interview room and left Mr. Vicente and
2  Mr. Halvorsen alone together?
3      **A  I was in and out of the interview room a**
4  **fair amount, actually.**
5      Q  All right.  So you were coming in and out?
6      **A  Yes.**
7      Q  Okay.  And why was that?
8      **A  Because I had other responsibilities.**
9      Q  Okay.  And once you were able to confirm
10 the statement that Mr. Vicente gave regarding the
11 Ruvalcaba murder and this matter with Mr. Garvin,
12 why did they stick around?
13         MR. HORVAT:  Objection; foundation,
14 speculation.
15         You can answer if you know.
16     **A  I don't know that they did stick around.**
17     Q  Okay.  Well, they stuck around long enough
18 for him to give up another murder; right?
19     **A  Yes.**
20     Q  Okay.  And after Mr. Halvorsen -- or
21 Detective Halvorsen told you he just gave another
22 murder, what did you do?
23     **A  I didn't do anything.**
24     Q  What did you say?

195

1      **A  Okay.  I didn't say anything.  I mean,**
2  **what was there for me to say?**
3      Q  Oh, I don't know.  You're a prosecutor in
4  a gang crimes unit, and a lead detective tells you
5  that Mr. Vicente just told you about another
6  murder.  I don't know, I'm like --
7          MS. ROSEN:  Is there a question?  I don't
8  know.
9          MS. BONJEAN:  I'm getting there; I'm
10 getting there, but if you want to voice an
11 objection before I get there, go right ahead.
12         MS. ROSEN:  Go ahead.  You sounded like --
13 you just kept saying "I don't know, I don't know,"
14 and I interpreted that as being the end of your
15 question.
16     Q  Well, I'm just wondering, is it your
17 testimony you said absolutely nothing in response
18 to that?
19     **A  Yes.**
20     Q  Did you say, "Hey, what was this -- what's
21 the murder?"
22     **A  No.**
23     Q  So Detective Halvorsen tells you, "He just
24 gave us another murder," and you just sit there in

196

1  silence?
2      **A  There's nothing to respond to that.  I'm**
3  **not involved in that case.**
4      Q  Well, why did he tell you then?  Do you know?
5      **A  I have no idea why he told me that.**
6      Q  So Detective Halvorsen tells you that
7  Frankie Vicente just told you -- told him about
8  another murder.  Detective Halvorsen then tells
9  you that, "He gave us another murder," and your
10 response is complete silence?
11         MR. HORVAT:  Objection.  That --
12     Q  Is that fair?
13         MR. HORVAT:  -- misstates his testimony.
14         You can answer if you know.
15     **A  I don't know if it was complete silence,**
16 **but I didn't ask him for any of the details.**
17     Q  Did you ask him anything?
18     **A  About what this other murder was, no, I**
19 **did not.**
20     Q  Okay.  Where did the conversation take
21 place?
22     **A  Where did what conversation take place?**
23     Q  Where Detective Halvorsen tells you, "He
24 gave us another murder."

Transcript of John Dillon
Conducted on November 13, 2018

50 (197 to 200)

---

197

1    A  On the 13th floor in the gang unit outside
2  of the conference room that Mr. Vicente was in.
3    Q  Okay.  In the hallway, somewhere else?
4    A  As I explained to you, there's that big
5  open area.
6    Q  Right.
7    A  So if you step out of that conference
8  room, you're in the big open area of the gang
9  unit.  That's where he told me that.
10   Q  So Detective Halvorsen steps out of the
11 conference room and says, "Assistant State's
12 Attorney Dillon" --
13   A  He said, "He just gave us another murder."
14 Those were the exact words.
15   Q  And you -- and you didn't respond in any
16 way, shape, or form?
17   MR. HORVAT:  Objection --
18   MS. ROSEN:  Asked and answered.
19   MR. HORVAT:  -- asked and answered.
20   A  No.
21   Q  Where was Matt Coghlan?
22   A  I don't know.
23   Q  Did you see him at all on June 2, 1993?
24   A  I can't recall.

---

198

1    Q  But you don't -- you can't say whether he
2  was there or not there?
3    A  I didn't have personal contact with him.
4  So no, I can't tell you whether he was or was not
5  there.  I don't know.
6    Q  Okay.  He worked in that unit, though; right?
7    A  He did.
8    Q  Where was his office in relationship to
9  your office?
10   A  My office was on the south wall, and his
11 office was on the east wall.  So kitty-corner.
12   Q  Okay.  And did you work every day from
13 your office?
14   A  When I wasn't in court, yes.
15   Q  And do you know if Mr. Coghlan worked
16 every day from the office?
17   MR. HORVAT:  Objection --
18   A  I can't --
19   MR. HORVAT:  -- speculation, foundation.
20   A  I can't speak as to what Mr. Coghlan did.
21   Q  Okay.  Did you see him in the office?
22   A  I'm sure I did.
23   Q  All right.  Now, after -- strike that.
24     When you were coming in and out of the

---

199

1  conference room, what were you doing?
2    A  I was working on other matters.  Because I
3  believe, as I previously said, this incident with
4  Mr. Garvin took place on May 31st.  So this was
5  June 2nd.  So my schedule is such that I had other
6  responsibilities that day.  So I was, for lack of
7  a better word, squeezing in this interview
8  concerning the Bouto case on very short notice.
9  So I was trying to juggle more than just that.
10   Q  Okay.  And when you were coming in and out
11 of the room, were you listening?  Did you come in
12 and interject, or were you just checking in?  I
13 don't know what your purpose was in coming in and
14 out.  Can you explain that more?
15   A  I would go into the interview room, speak
16 with Mr. Vicente regarding his knowledge of what
17 Mr. Bouto told him while he was in the lockup with
18 him and also as to Mr. Garvin.  In the course of
19 either between those two statements or that, I
20 left.
21     So I didn't get up and leave in the middle
22 of him telling me something, but when there was a
23 break, I left for whatever else was calling my
24 attention at that time.

---

200

1    Q  Okay.  And how long was Mr. Vicente in
2  your offices on June 2nd, 1993?
3    A  I don't think real long.  Maybe an hour.
4  I'm just guessing.
5    Q  All right.  And did he make any statements
6  about any other people confessing murder to him
7  while he was there, as far as you know?
8    A  As far as I know, no.
9    Q  Do you know whether he mentioned anything
10 about the Iglesias murder?
11   A  I didn't know he had mentioned anything
12 about the Serrano/Montanez murder.  Like I said,
13 Detective Halvorsen said, "He just gave us another
14 murder."  That was the extent of what was said
15 to me.
16   Q  Now, we know that -- all right.  So we
17 know Mr. Vicente came up to your offices on
18 June 2nd, 1993, and you also agree that he came up
19 again on --
20   A  June 9th.
21   Q  -- June 9th; right?
22   A  Yes.
23   Q  On June 9th, 1993, did you discuss his
24 housing situation or where he would be housed?

Transcript of John Dillon
Conducted on November 13, 2018

201

1   A   No.
2   Q   Apart from discussing the mystery woman
3   who dropped off a bag of items to him, what other
4   things did you discuss on June 9th, 1993?
5   A   Nothing that I recall other than I believe
6   the detectives had mentioned to me that he was --
7   or had run into Bouto in the jail and that they
8   felt he should be moved to a different part of
9   the jail.
10  Q   Okay.  So who mentioned that to you?
11  A   One of the detectives.
12  Q   Was it Guevara or Halvorsen?
13  A   I believe it was Halvorsen.
14  Q   Okay.  But it could have been Detective
15  Guevara?
16  A   On June the 2nd, no.  On June 9th I don't
17  have an independent recollection as to whether or
18  not they were both there.  I believe it was just
19  Detective Halvorsen.
20  Q   Now, on June 9th, 1993, was there any
21  mention by any of the parties, whether it was
22  Mr. Vicente, Mr. Halvorsen, or Mr. Guevara about
23  the Serrano/Montanez case?
24  A   Not in my presence.

202

1   Q   Do you know whether there was any mention
2   about that case in front of your colleague,
3   Mr. Coghlan?
4   A   Not to my knowledge.
5   Q   Well, you don't know one way or the other;
6   right?
7   A   No.
8   Q   What else was discussed?  Anything else on
9   June 9th, 1993?
10  A   No.
11  Q   Why bring him over for this discussion?
12  A   Because I wanted this documented in the
13  police reports because I foresaw that this was a
14  potential issue that was going to arise if this
15  case went to trial.  And it would arise to the
16  extent that I believed it disqualified Mr. Garvin
17  from continuing his representation of Mr. Bouto,
18  so I wanted it documented in a police report that
19  was going to be tendered in discovery to Mr. Garvin.
20  Q   Okay.  And it was documented -- you didn't
21  make any separate documentation of the conversation;
22  correct?
23  A   Correct.
24  Q   Now, Mr. Vicente appeared in court shortly

203

1   thereafter, is that --  on his own robbery cases;
2   right?
3   A   I don't know.
4   Q   Well, you did look up his -- his criminal
5   background; right?
6   A   I'm sure at some point I was aware of it.
7   Q   On actually June 3rd, 1993, does that
8   sound right?
9   A   No, it doesn't sound right.
10      (Dillon Deposition Exhibit 10 marked for
11  identification and attached to the transcript.)
12      MS. BONJEAN:  Let me know when you're
13  finished perusing this exhibit.
14      THE WITNESS:  Okay.
15  BY MS. BONJEAN:
16  Q   Okay.  Can you tell me what Frankie
17  Vicente's IR number is?
18  A   Based on this -- what you've tendered
19  to me?
20  Q   Well, yes, based on what I've tendered
21  to you.
22  A   His IR number is 858827.
23  Q   Okay.  And if you could look at the last
24  page, could you tell me what the IR number is in

204

1   the right-hand corner?
2   A   858827.
3   Q   All right.  And I'd ask that you look sort
4   of midway down in that bold where it reflects --
5   it says ASA Dillon.  Do you see that?
6   A   Yes.
7   Q   Okay.  And would you agree that this
8   reflects that you were requesting the criminal
9   history of Mr. Vicente?
10  A   No.
11  Q   Oh, what does this reflect then?
12  A   It's a record that's maintained by the
13  Chicago Police Department.  So I had nothing to do
14  with the preparation of it, and I don't have any
15  recollection of asking for his criminal history to
16  a police officer.  If I wanted to, I could call
17  down to our LEADS department and get that myself.
18  Q   Okay.  So your -- you think someone just
19  filled this in without --
20  A   I think someone said -- someone put my
21  name down as requesting this criminal history,
22  yes, that's exactly what I believe.
23  Q   Why would they do that?  Do you have any
24  thoughts?

205

1      MR. HORVAT:  Objection; speculation.
2    **A   No idea.**
3    Q   It's not at all possible that you had
4  asked for it?
5    **A   If I had asked for it, I would have**
6  **contacted our LEADS department.  It's located on**
7  **the first floor of the criminal courts building.**
8  **That's where we get all our criminal histories.**
9  **All I have to do is pick up the phone and make a**
10 **phone call, and they'll fax it to my office.  So**
11 **yeah, I'm positive --**
12   Q   Okay.
13   **A   -- that this isn't me.**
14   Q   So someone represented you or represented
15 that they were acting on your behalf you think?
16     MR. HORVAT:  Objection; speculation.
17     MS. ROSEN:  Object to the form, calls for
18 speculation.
19   **A   It appears that someone used my name to**
20 **request his criminal history.  That's what this**
21 **document appears to tell me.**
22   Q   All right.  Fine.  Now, at some point it
23 was decided that Mr. Vicente would go into witness
24 quarters.  Do you remember when that happened?

206

1    **A   Yes.**
2    Q   Okay.  When?
3    **A   It was July 7th that he went into the**
4  **witness quarters of 1993, but it was within a few**
5  **days before that.  The detectives requested that**
6  **he be placed in the witness quarters because he**
7  **was in the same division as Gerardo Iglesias, and**
8  **according to Mr. Vicente, Mr. Iglesias confessed**
9  **his involvement in the murder to him.**
10     **So the detectives said to me that if**
11 **Mr. Iglesias eventually got wind of the fact based**
12 **on reports that were being generated that**
13 **Mr. Vicente had snitched on him that his life**
14 **would be in jeopardy, and he needed to be moved.**
15 **So based on that representation, I then took the**
16 **steps to seek to have him placed in witness**
17 **quarters.**
18   Q   You actually took steps to have him placed
19 in the same cell as Mr. Iglesias, didn't you?
20   **A   No, that's not true.  I have no control**
21 **over where the jail puts people.**
22   Q   Well, you do have control over how someone
23 gets moved into one place or another if you want;
24 right?

207

1    **A   No.**
2    Q   Okay.  You became aware that Mr. Iglesias
3  also confessed to Mr. Vicente at some point;
4  correct?
5    **A   After the advent of this litigation, yes --**
6  **well, I take that back.  When the detectives**
7  **approached me and said that he did, yes, but I**
8  **wasn't given any of the details.**
9    Q   Okay.  So -- and, in fact, you were aware
10 certainly at the time that you were litigating
11 this case that he had purportedly heard
12 confessions from five different people; right?
13   **A   Yes.**
14   Q   And that he was not actually an eyewitness
15 to any of the crimes but that in three separate
16 cases a total of five defendants had confessed to
17 him; right?
18   **A   I was aware of the fact that five defendants**
19 **had confessed to him.  I was not aware of the facts**
20 **of either of the other two cases besides Bouto**
21 **because I wasn't involved in any way, shape, or**
22 **form in the prosecution or investigation of those**
23 **cases.**
24   Q   Well, you're familiar with something

208

1  called Brady v. Maryland; right?
2    **A   Yes.**
3    Q   Okay.  And would you agree that in your
4  handling of the Bouto case you had an obligation
5  to let defense counsel know about Mr. Vicente's
6  involvement in other cases?
7    **A   If I called him as a witness, yes.**
8    Q   Well, not just if you call him as a
9  witness; right?
10   **A   No.  If I call him as a witness.**
11   Q   So it's your testimony that you have no
12 Brady obligation until you decide to call Mr. Bouto
13 as a witness?
14   **A   As it relates to two other cases that**
15 **aren't in the courtroom, yes, that's exactly what**
16 **I'm saying.**
17   Q   Well, doesn't Brady just stand for the
18 proposition that you have an obligation to
19 disclose --
20   **A   Tender discovery on a matter that I'm**
21 **litigating and that's what I said.**
22   Q   I'm going to ask you to let me finish my
23 question.  Doesn't Brady just stand for the
24 proposition that you have an obligation to disclose

Transcript of John Dillon
Conducted on November 13, 2018

53 (209 to 212)

209

1 exculpatory evidence?

2 **A Yes.**

3 Q Okay. And exculpatory evidence can also

4 be matters that relate to credibility or impeachmet;

5 right?

6 **A Exculpatory evidence is evidence which**

7 **negates guilt. So I don't know how him getting a**

8 **confession on four other people negates**

9 **Mr. Bouto's guilt.**

10 Q That's not my question. My question is,

11 would you agree that under your Brady obligations

12 you have an obligation to also disclose to

13 opposing counsel matters that relate to a witness'

14 credibility or matters that relate to potential

15 impeachment of that witness?

16 MR. HORVAT: Object to form.

17 Do you understand the question?

18 **A I don't understand your question.**

19 Q Are you familiar with a U.S. Supreme Court

20 case called Kyles v. Whitley?

21 **A Not off the top of my head.**

22 Q Okay. So what do you understand your

23 Brady obligations to encompass?

24 MR. HORVAT: Objection; asked and answered.

210

1 **A That I have to tender any discovery that**

2 **exists on my case, including evidence which is**

3 **exculpatory in nature.**

4 Q Okay. And --

5 **A And I don't believe that the Iglesias case**

6 **file or the Serrano/Montenez/Pacheco case file was**

7 **exculpatory as it relates to Mr. Bouto which I had**

8 **the discovery obligation to provide discovery on.**

9 Q Well, doesn't it relate to Mr. Vicente's

10 credibility?

11 **A No, I don't believe it does.**

12 Q So the fact that Mr. Vicente claims that

13 five different defendants confessed murder to him,

14 and it was the same officers involved in all

15 three cases didn't at all lead you to believe that

16 that was something that needed to be disclosed to

17 opposing counsel?

18 MR. HORVAT: Objection; asked and

19 answered.

20 **A That's correct.**

21 Q Under your Brady obligations?

22 **A That's correct.**

23 Q Did it just personally give you pause that an

24 awful lot of people are confessing to Mr. Vicente?

211

1 **A If you can explain to me what you mean by**

2 **"pause."**

3 Q Well, did it concern you that there were

4 five different people who claimed to have confessed

5 to someone that they didn't know?

6 **A The only thing I was concerned about --**

7 MS. ROSEN: Objection; misstates the

8 record.

9 **A (Continuing.) The only thing I was**

10 **concerned about was the Bouto case and my**

11 **obligations under that because that's the only**

12 **case I was involved in the prosecution of.**

13 Q And your testimony here today is that in

14 your capacity as a prosecutor in the Bouto

15 prosecution, you did not see it as part of your

16 Brady obligations to disclose any information to

17 Mr. Bouto's counsel regarding Vicente's statements

18 in the Serrano, Montanez, Pacheco litigation

19 and/or the Geraldo Iglesias litigation?

20 **A That's correct.**

21 MS. BONJEAN: I'm going to ask that you

22 mark this, please. I'm sorry; I didn't mean to

23 throw it at you.

24 THE COURT REPORTER: Exhibit 11.

212

1 (Dillon Deposition Exhibit 11 marked for

2 identification and attached to the transcript.)

3 Q I'm going to ask you what's been marked

4 Exhibit 11. Do you recognize this?

5 **A Yes.**

6 Q What is it?

7 **A This is an order from Judge Suria releasing**

8 **Mr. Vicente to go to the witness quarters.**

9 Q Why was Mr. Vicente released on an I bond

10 to go to witness quarters?

11 **A Because that's the procedure, the mechanism**

12 **for them to be released under a D bond because**

13 **when under a D bond they have to be housed in the**

14 **main part of the jail. That's my understanding.**

15 Q I thought the witness quarters was part of

16 the Cook County jail, though.

17 **A I believe it was.**

18 Q All right. But why then -- again, you may

19 not know the answer. I'm just trying to understand

20 why he would have had to have been released on an

21 I bond to go to the witness quarters.

22 **A That's the way it was explained to me.**

23 **That's the mechanism that had to happen for him to**

24 **be placed in the witness quarters.**

Transcript of John Dillon
Conducted on November 13, 2018

54 (213 to 216)

**213**

1    Q  Okay.  And would this -- this seems to
2  corroborate your testimony that it's your belief
3  that July 7th is when he went into the witness
4  quarters?
5    **A  That's correct.**
6    Q  Do you remember speaking with Mr. Vicente
7  before he testified before the grand jury in the
8  Serrano/Montanez case?
9    **A  The only time that I spoke with Mr. Vicente**
10 **prior to his grand jury appearance in that case**
11 **was on June 2nd and on June 9th that we've**
12 **discussed already.**
13   Q  When did you find out that Mr. Vicente had
14 alleged that Serrano, Montanez, and Pacheco had
15 confessed to the murder of Rodrigo Vargas to him?
16   **A  Probably sometime in late June or early**
17 **July of 1993.**
18   Q  And how did you find out?
19   **A  Because I recall that felony review was**
20 **contacted and came down to the gang crimes unit**
21 **and took a handwritten statement from Francisco**
22 **Vicente regarding that investigation.**
23   Q  Okay.  And were you present when that
24 handwritten statement was taken?

**214**

1    **A  No.**
2    Q  Did you see Mr. Vicente in the gang crimes
3  unit when he was giving a handwritten statement in
4  the Serrano/Montanez case?
5    **A  I don't recall.  I mean, I know I wasn't**
6  **present because I would have been listed as a**
7  **witness to the statement.**
8    Q  Right.  But, again, did you see him in the
9  gang crimes unit?
10   **A  I don't recall.**
11   Q  Do you remember speaking to him in the gang
12 crimes unit on the date that he was back up there
13 making a statement in the Serrano/Montanez case?
14     MR. HORVAT:  Objection; asked and answered.
15   **A  No, I would have avoided having any contact**
16 **with him.**
17   Q  Why is that?
18   **A  Because I didn't want to inject myself in**
19 **any way, shape, or form as a witness to any of the**
20 **prosecutions.**
21   Q  As a witness?
22   **A  Yes.**
23   Q  Why would you be a witness?
24   **A  Because if I went to Mr. Vicente, and**

**215**

1    **Mr. Vicente started telling me about other people**
2    **confessing a murder to him, then as far as I'm**
3    **concerned I'm a witness to that statement, and**
4    **that makes me a witness in that prosecution.**
5    Q  Well, not -- I mean, if you have someone
6  else present, it wouldn't; right?
7    **A  No --**
8      MR. HORVAT:  Objection; argumentative.
9    **A  -- somebody can call me as a witness,**
10 **absolutely.**
11   Q  Well, you interviewed Mr. Vicente as part
12 of the Bouto prosecution.
13   **A  Yes.  But I was trying that case.**
14   Q  Okay.  So --
15   **A  I wasn't involved in the prosecution of**
16 **Serrano and Montanez.**
17   Q  You were a member of the Cook County
18 State's Attorney's Office; right?
19   **A  Yes.**
20   Q  Okay.  Now, is it your testimony that you
21 didn't have any information about the Serrano/
22 Montanez prosecution other than just generally
23 Mr. Vicente had provided statements in that case?
24   **A  At what point in time?**

**216**

1    Q  In late June.
2    **A  That's correct.**
3    Q  Okay.  Did you ever speak with Mr. Vicente
4  at any point about -- about the statements that he
5  claims that Mr. Serrano and Mr. Montanez made in
6  the Vargas matter?
7    **A  No.**
8    Q  Never asked him about it?
9    **A  Never asked him about it.**
10   Q  Did you ever ask him about the statements
11 that Iglesias purportedly made to him?
12   **A  Never asked him about it.**
13   Q  Didn't ask how those came to be or anything
14 of that nature?
15   **A  No.**
16   Q  And the fact that Mr. Vicente had claimed
17 all these people confessed to him was not something
18 that concerned you because you were just focused
19 on the Bouto matter; is that fair?
20     MR. HORVAT:  Objection; asked and
21 answered.
22   **A  That's fair.**
23     THE VIDEOGRAPHER:  We are going off the
24 record.  The time is 2:23 p.m.

Transcript of John Dillon
Conducted on November 13, 2018

55 (217 to 220)

217

1      (Recess taken, 2:23 p.m. to 2:38 p.m.)
2      THE VIDEOGRAPHER: We are back on the
3 record. The time is 2:38 p.m.
4 BY MS. BONJEAN:
5      Q Mr. Dillon, so you have testified that you
6 have a specific recollection of the June 2nd, 1993,
7 meeting with Mr. Vicente; right?
8      A Correct.
9      Q And you've also specifically recalled a
10 meeting on June 9th, 1993; right?
11      A Correct.
12      Q And it's your testimony that in neither of
13 those meetings did Mr. Vicente mention his
14 knowledge in these other murders, the ones of
15 Rodrigo Vargas and Monica Roman; right?
16      A In my presence, that's correct.
17      Q When was the next time that you saw
18 Mr. Vicente, if you have a recollection of doing so?
19      A Could you clarify --
20      Q Sure.
21      A -- that question for me, please?
22      Q So we know that on June 9th, 1993, you
23 remember him being there in the offices, and we
24 know on July 7th we've have established is when he

218

1 went into the witness quarters. Do you have a
2 recollection of speaking with him in between those
3 two dates?
4      A I'm sorry. From --
5      Q From June 9th to July 7th.
6      A No, I didn't speak with him between those
7 dates.
8      Q And how do you know that?
9      A Because I know what my involvement was in
10 speaking with him was the Bouto case, and those
11 were the two instances that I spoke with him on
12 the Bouto case up until that point in time.
13      Q Okay. And what information, if any, did
14 you receive about the Roman murder and/or the
15 Vargas murder between the dates of June 9th and
16 July 7th, if anything?
17      A The only information that I recall receiving
18 was a detective saying to me that Mr. Vicente was
19 in the same division of the jail and in close
20 proximity to Mr. Iglesias, and because of that he
21 needed to be moved.
22      Q Did the detective mention to you that
23 Mr. Iglesias had purportedly confessed or made
24 inculpatory statements to Mr. Vicente?

219

1      A Not to my recollection, no.
2      Q Do you remember when you first learned
3 that Mr. Iglesias had also made statements to
4 Mr. Vicente?
5      A No, not really.
6      Q Okay. So now, at what point did you discuss
7 with Mr. Vicente the fact that the State's Attorney's
8 Office was going to recommend a mandatory minimum
9 sentence for him in exchange for his testimony in
10 three murder cases?
11      A That would have been with his public
12 defender.
13      Q And who was his public defender?
14      A I believe it was Bob Cavanaugh.
15      Q So did you ever have any conversations
16 with Mr. Vicente directly about the fact that your
17 office was willing to recommend a mandatory minimum
18 sentence for all four robbery cases, three of
19 which were armed robberies?
20      A I had those conversations with his lawyer.
21      Q You didn't have those conversations with
22 him at all?
23      A Correct.
24      Q Never discussed it with him in the presence

220

1 of Detective Halvorsen and/or Guevara?
2      A Correct.
3      Q Did you ever discuss it with Matt Coghlan?
4      A No.
5      Q Well, who was it that decided that he
6 should be given this benefit?
7      A My recollection is his attorney came to
8 us -- me, and asked for consideration for his
9 testimony in these cases.
10      Q Okay. And when did Mr. Cavanaugh come to
11 you to ask for consideration in these cases on
12 behalf of his client?
13      A Well, it would have been sometime after
14 the three cases were charged, but as a specific
15 date, I don't think it was long after that.
16      Q Did you memorialize these conversations or
17 the fact that his attorney was looking for
18 consideration?
19      A No.
20      Q What did you do when Mr. Cavanaugh
21 suggested that your office provide Mr. Vicente
22 consideration in these cases?
23      A Well, again, he was under oath in a grand
24 jury and giving testimony, and I didn't really

Transcript of John Dillon
Conducted on November 13, 2018

56 (221 to 224)

---

221

1   need to make a deal for him, but his public defender
2   was on me because he had given us three murders, and
3   he wanted some type of consideration. And I told
4   him that I couldn't give him anything less than what
5   the legal sentence would be, which was nine years in
6   the Illinois Department of Corrections.
7       Q   Well, he had a simple robbery; right?
8       A   Correct.
9       Q   And what was he facing on that charge?
10      A   Three to seven years in the Illinois
11  Department of Corrections.
12      Q   Okay. And then he had three separate
13  armed robberies; right?
14      A   Correct.
15      Q   He was facing 6 to 30 on each of those;
16  right?
17      A   Correct.
18      Q   And the sentences -- at least -- at least
19  the simple robbery had to run consecutive to the
20  armed robberies because he was out on bond when he
21  picked up the armed robberies; right?
22      A   That's correct.
23      Q   And the armed robberies could be run
24  concurrent, or they could have been run

222

1   consecutive; right?
2       A   There was no mandated consecutive
3   sentencing, no.
4       Q   It wasn't mandated but a judge could have
5   ordered the three armed robberies to run
6   consecutive theoretically; right?
7       A   A judge -- yes, a judge could have.
8       Q   Okay. I'm talking about his exposure.
9       A   Yes.
10      Q   So at a minimum, the minimum sentence,
11  legal sentence he could get would be nine years;
12  right?
13      A   Correct.
14      Q   Three on the simple, six on the -- well,
15  the armed robberies all to run concurrent; right?
16      A   Correct.
17      Q   And theoretically the maximum he could
18  have gotten would be seven on the simple robbery;
19  right?
20      A   Correct.
21      Q   And then to run consecutive to three separate
22  armed robbery convictions; right?
23      A   Correct.
24      Q   And the maximum sentence on those was

223

1   30 apiece; right?
2       A   Correct.
3       Q   So I guess theoretically the maximum
4   sentence Mr. Vicente faced was 97 years. Right?
5       A   Correct.
6       Q   And did you ever ask Detective Guevara
7   whether or not he had offered any leniency to
8   Mr. Vicente in exchange for his cooperation in the
9   Bouto cases and the other cases?
10      A   No.
11      Q   Why not?
12      A   There was no reason for me to assume that
13  he offered him anything.
14      Q   Well, did Mr. Vicente ever tell you that
15  he expected some leniency?
16      A   No.
17      Q   Never?
18      A   Never.
19      Q   And did you ever ask Mr. Halvorsen whether
20  or not they had -- he or anyone with him had offered
21  any type of leniency to Mr. Vicente in exchange
22  for his cooperation in these murder cases?
23      A   No. And they weren't in a position to
24  offer him leniency.

224

1       Q   So is it your position that Mr. Vicente just
2   offered to help the Cook County State's Attorney's
3   Office out of goodness of his heart?
4           MR. HORVAT: Objection; foundation,
5   speculation.
6           You can answer if you know.
7       A   I don't know what his motivations were
8   but yes.
9       Q   Did you consider what his motivation might
10  be to offer up testimony in three separate murder
11  prosecutions?
12      A   Well, the only one that I have independent
13  knowledge of is the Bouto case, and he told me
14  that that was a rival gang member killing an
15  affiliated gang member, and I believe his words
16  were something along the lines of he wanted to see
17  the guy get what was due coming to him. That was
18  my recollection as to the Bouto case.
19      Q   Okay. So your understanding is that
20  Mr. Vicente wanted to help the Cook County State's
21  Attorney's Office to get justice against a rival
22  gang member?
23      A   My understanding is Mr. Vicente wanted to see
24  this person pay for what he did to Mr. Ruvalcaba.

Transcript of John Dillon
Conducted on November 13, 2018

225

1  That was my understanding, not that he was out to
2  help the State's Attorney's Office.
3      Q  Well, he wasn't friends with Mr. Ruvalcaba;
4  right?
5      A  He wasn't friends with the State's Attorney's
6  Office, either.
7      Q  Right.  Well, he -- you're suggesting that
8  merely because Mr. Bouto was in a rival gang that
9  that was the motivating factor to assist you in
10 getting a conviction on Mr. Bouto; right?
11         MR. HORVAT:  Objection; form and
12 foundation.
13         You can answer the question if you
14 understand.
15     A  I believe Mr. Vicente believed the victim
16 to be an affiliated gang member of the Imperial
17 Gangsters, his own gang.
18     Q  Well, the victim was not an Imperial
19 Gangster; right?
20     A  To my knowledge, he wasn't in a gang at all.
21     Q  Okay.
22     A  But I can't control what Mr. Vicente
23 perceives.
24     Q  But, again, Mr. Vicente's motivation was

226

1  something that you considered; right?
2      A  What do you mean by "motivation"?
3      Q  Well, it's not every day that gang bangers
4  want to come give testimony in murder prosecutions
5  against other gang members, is it?
6      A  For the last seven years of my being a
7  State's Attorney I was the head of the homicide
8  section, on a day-in-day-out basis typically on
9  average you'd have two or three witnesses who you
10 would have testify under oath in a grand jury
11 testifying against fellow gang members.  It
12 happened all the time.
13         So based on my 31 years of experience,
14 along with my seven years as head of the homicide
15 section, that happened all the time.
16     Q  Okay.  Well, you know Mr. Vicente later
17 accused the officers of coercing those statements;
18 correct?
19     A  I've been made aware of that, but he never
20 made that aware to me.
21     Q  Okay.  So my question is, you did not
22 consider -- and just yes or no, did you consider
23 his motivation in wanting to give testimony
24 against Mr. Bouto in a murder prosecution?

227

1      A  No.
2      Q  And you would agree that that put his life
3  in jeopardy; right?
4      A  Yes.
5      Q  That's the reason you moved him to the
6  witness quarters in part; correct?
7      A  Correct.
8      Q  Okay.  And it's your testimony that not
9  once did he tell you that he wanted anything in
10 exchange for his assistance in the Bouto
11 prosecution; right?
12     A  He never told me that, and if I recall
13 correctly, he testified to all that in the grand
14 jury before I had contact with him on the Bouto case.
15     Q  Okay.  Well --
16     A  And in his handwritten statement.
17     Q  All right.  And that's why I asked, did
18 you ever ask whether or not the prosecutors --
19 strike that -- whether or not the police officers
20 had made any promises to him.
21         MR. HORVAT:  Objection; asked and
22 answered.
23         You can answer one more time.
24     A  I assumed that if had been the case that

228

1  would not -- he would not have signed a handwritten
2  statement saying that nobody threatened or promised
3  him anything in his handwritten statement to the
4  assistant State's Attorney who took it or in his
5  testimony before the grand jury when he said that
6  no one threatened or promised him anything in
7  exchange for his testimony before the grand jury.
8  So I took it at its word.
9      Q  Okay.  And when he gave a statement
10 suggesting that fellow gang members, Mr. Serrano,
11 Mr. Montanez, Mr. Pacheco, or at least Mr. Serrano,
12 fellow gang member, had confessed murder to him,
13 did you question him about what his motivation was
14 for giving up fellow gang members?
15         MR. HORVAT:  Objection; foundation.
16         You can answer.
17     A  No, I didn't.
18     Q  Did it concern you at all or make you
19 question whether or not he was being truthful?
20     A  It did not.
21     Q  And when he gave a statement to Detective
22 Halvorsen and Detective Guevara and to prosecutors
23 that Iglesias had confessed to him, also a fellow
24 gang member, when that happened, did you decide --

Transcript of John Dillon
Conducted on November 13, 2018

58 (229 to 232)

229

1 or did it occur to you maybe this is a little odd
2 that he's getting all these murder confessions?
3    **A No, it didn't.**
4    Q Okay. So you testified that at some point
5 Mr. Vicente's public defender approached you about
6 getting a deal in these cases that he was assisting
7 the State's Attorney's Office in; right?
8    **A Correct.**
9    Q And you didn't need to make a deal with
10 Mr. Vicente, right, because he's already on paper,
11 and you didn't really need to do that; correct?
12   **A That's correct.**
13   Q But you wanted to make sure that he got
14 the mandatory minimum on three armed robberies and
15 robbery why?
16   **A I didn't say that that's what I wanted. I**
17 **said that that's what I agreed to based on my**
18 **conversations with his public defender.**
19   Q Well, what did his public defender say to
20 you that led you to agree to that?
21   **A That, "He gave you information on**
22 **three separate homicide cases," that "That's a lot**
23 **of information that he provided, and he should be**
24 **getting major information consideration for**

230

1 **doing so."**
2    Q And that persuaded you to --
3    **A I told him that he could get no consideration**
4 **of anything under what a legal sentence would be.**
5    Q You didn't authorize an unlawful sentence?
6    MR. HORVAT: Object to form.
7    **A I had the authority, for example, to reduce**
8 **one of those armed robberies to a robbery. Okay?**
9 **I had the authority to dismiss two of the armed**
10 **robberies and have him plead to one of the armed**
11 **robberies. But I didn't. I told him I wasn't**
12 **going to dismiss any charges against him, and he**
13 **had to do the minimum time on each one of those**
14 **cases, and that's what the agreement was.**
15   Q Okay. And you agreed to that even though
16 you didn't have to; right?
17   **A Correct.**
18   Q And according to you, at that point you
19 didn't need Vicente to cooperate in your prosecution
20 because you already had him committed to grand
21 jury testimony and/or handwritten statements; right?
22   **A The only thing I needed for his cooperation**
23 **was to come out and get on the witness stand and**
24 **not remain mute. If he remained mute and wouldn't**

231

1 **answer questions, then those statements would not**
2 **come in as 115-10.1 evidence --**
3    Q Right.
4    **A -- as substantive evidence. So I did need**
5 **him to get on the witness stand, and I did need**
6 **him to testify out loud.**
7    Q He would have been held in contempt if he
8 refused to speak, though, typically; right?
9    **A Well, given that he was potentially facing**
10 **97 years or, as you said, life in prison, probably**
11 **wouldn't have mattered much.**
12   Q Well, he ended up getting only nine years,
13 right --
14   **A That was --**
15   Q Well, less than nine years; right?
16   **A He -- the sentence was nine years.**
17   Q But he did less than even 4 1/2 years;
18 right?
19   **A He did what the Illinois Department of**
20 **Corrections gave him by way of day-of-day credit**
21 **off his sentence, which I have no control over.**
22   Q We'll get to that in a second.
23     So tell me every conversation that you can
24 recall about Vicente's statements about the

232

1 Serrano/Montanez confessions, if will you.
2     MR. HORVAT: I'm going to object to the
3 form of the question; object that it asks for a
4 narrative answer.
5     You can answer if you understand.
6    **A I didn't have any conversations about the**
7 **substance of those cases.**
8    Q Well, let me ask you this: Did you read
9 the statement that Vicente provided?
10   **A Since the advent of this litigation**
11 **against me, yes.**
12   Q Okay.
13   **A Prior to that, no.**
14   Q So prior to prosecuting the Bouto case,
15 you never even read the statement that was
16 provided by Mr. Vicente in the Serrano/Montanez/
17 Pacheco litigation?
18   **A There's no reason for me to.**
19   Q Okay. Did you read the statement that
20 Mr. Vicente provided in the Geraldo Iglesias
21 prosecution?
22   **A No.**
23   Q So you have no idea whether those statements
24 appeared to be reliable statements; right?

Transcript of John Dillon
Conducted on November 13, 2018

59 (233 to 236)

233

1    A   That wasn't a concern of mine.
2    Q   Right.  You didn't -- you were not concerned
3   about whether Mr. Vicente gave reliable statements
4   in the Vargas prosecution; right?
5    A   I was only concerned with the Bouto case.
6    Q   Right.  Just answer my question, please.
7        You were not concerned about the
8   reliability of Mr. Vicente's statements in the
9   Serrano, Montanez, and Pacheco litigation; right?
10       MR. HORVAT:  Objection; asked and answered.
11   A   Correct.
12   Q   Okay.  And you were not concerned about
13  the reliability of Vicente's statement in the
14  Geraldo Iglesias prosecution; correct?
15       MR. HORVAT:  Same objection.
16   A   Correct.
17   Q   Those could have been bold-faced lies, and
18  you would not have known one way or another; correct?
19       MR. HORVAT:  Objection; speculation
20  foundation.
21       You can answer if you understand the
22  question.
23   A   Correct.
24   Q   And it was of no concern to you in any

234

1   event; correct?
2        MR. HORVAT:  Objection; asked and answered.
3    A   Correct.
4    Q   And it was no concern to you whether he
5   lied in the Geraldo Iglesias statement; correct?
6        MR. HORVAT:  Objection; asked and answered.
7    A   Obviously, I don't want witnesses to be
8   lying in cases.  Okay?  But when they're not my
9   cases, and I'm not involved in the prosecution of
10  them, and I don't speak with witnesses on other
11  cases being prosecuted, then it's not my place to
12  go around to every State's Attorney on every case
13  that they have asking the veracity or trying to
14  determine the veracity of their witnesses.
15   Q   But Mr. Vicente was your witness, too.
16   A   He was my witness only on the
17  Robert Bouto case.
18   Q   Right.
19   A   And I trusted that the assistant State's
20  Attorneys prosecuting those cases, if they felt
21  that was an issue that they would have addressed it.
22   Q   And I'm just clearly -- I'm just asking for
23  clarification that you did not concern yourself
24  with the veracity of Mr. Vicente's statements in

235

1   either the Serrano/Montanez case or the Geraldo
2   Iglesias case; correct?
3    A   I've answered that before and it's still
4   the same answer, that is correct.
5    Q   Did you speak with Matt Coghlan about this
6   deal that you were going to offer Mr. Vicente
7   through his attorney?
8    A   I don't recall.  It would be dependent upon
9   when Mr. Coghlan came on the case and when I had
10  those conversations with Mr. Cavanaugh.
11   Q   Well, do you remember any conversations with
12  Mr. Coghlan about Frankie Vicente?
13   A   Yes.
14   Q   Okay.  Tell me those.  What do you remember?
15   A   Just that the guy was an annoyance because
16  he would call over from the witness quarters and,
17  "Can you get me a Walkman?  Can you get me
18  underwear?  Can you get me shoes?"  For a State's
19  Attorney putting somebody in the witness quarters
20  is a nuisance because they're constantly asking
21  you for things.
22   Q   They want stuff; right?
23   A   Yes.
24   Q   They want -- they want benefits that they

236

1   wouldn't otherwise get in the regular Cook County
2   jail, and they have a direct line to you to ask
3   for that; right?
4    A   They don't have a direct line to me.  They
5   have a direct line to the gang prosecutions unit,
6   who will then tell me Francisco Vicente is on the
7   phone, whether I choose to answer it or not.  But
8   yes, he would ask for, and the things that I've
9   told you he was given.
10   Q   And you talked about Frankie being a
11  nuisance or an annoyance with Mr. Coghlan.  Did
12  you talk about whether or not Frankie's statements
13  were believable?
14   A   No.
15   Q   Didn't have that conversation with
16  Mr. Coghlan at any point?
17   A   At any point.
18   Q   It was just presumed that they were
19  reliable and credible; is that right?
20       MR. HORVAT:  Objection; asked and answered.
21   A   I didn't really know of the statements or
22  the facts of the case, so for me to be able to
23  determine whether they were reliable or not, I had
24  no source of information to make that determination.

Transcript of John Dillon
Conducted on November 13, 2018

60 (237 to 240)

---

237

1    Q  And you never spoke with Mr. Coghlan about
2  the fact that Mr. Vicente -- Mr. Vicente's
3  motivation for making these statements in these
4  three different murder prosecutions; is that fair
5  to say?
6    **A  That's fair to say.**
7    Q  And Mr. Coghlan never told you that he was
8  concerned about Mr. Vicente's motivations for
9  testifying against all of these individuals in
10 these three separate murder prosecutions; correct?
11   **A  Correct.**
12   Q  Now, would you agree that if Detective
13 Guevara and Detective Halvorsen told the witnesses
14 in the Bouto case who to pick out, that would mean
15 that those identifications are not reliable?
16      MR. HORVAT:  Object to the form of the
17 question.
18      You can answer.
19   **A  I can't answer that question.  It would**
20 **depend on the circumstances of what they said**
21 **to them.**
22   Q  There is some circumstance where a detective
23 could tell a witness who to pick out?
24   **A  If the witness had an independent basis**

---

238

1  **for identifying that witness, then yes, that would**
2  **affect the weight to be given to the identification.**
3      **So, in other words, if a witness observed**
4  **a crime and said, "That's the person I saw commit**
5  **the crime; oh, and by the way, the detective told**
6  **me who to pick out," then that would be something**
7  **that would go towards the weight of that**
8  **identification.**
9    Q  Okay.  What if the witness picks out an
10 offender based entirely on what the detective
11 tells him to do?
12   **A  That's improper.**
13   Q  Okay.  And are you aware of Detective
14 Guevara having done that in any case?
15   **A  No, I am not.**
16   Q  What about Detective Halvorsen?
17   **A  I am not aware of that happening.**
18   Q  And in the Bouto case, if Detective Halvorsen
19 or Detective Guevara had told Karl Richmond or
20 Ray Lozado who to pick out, you would agree that
21 that would be improper; right?
22      MR. HORVAT:  Objection; form of the question,
23 incomplete hypothetical.
24      You can answer if you understand.

---

239

1    **A  Yes, that would be improper.**
2    Q  Okay.  And it would also mean that your
3  evidence really didn't point to Mr. Bouto as the
4  person who did it; correct?
5      MR. HORVAT:  Objection; argumentative.
6  Objection to the form of the question.
7      You can answer if you understand.
8    **A  Again, I wouldn't agree with that statement.**
9  **Because when I interviewed witnesses prior to**
10 **trial, I asked them the circumstances surrounding**
11 **their lineup identifications, photo arrays,**
12 **whatever, because that's something they're going**
13 **to testify to.**
14      **So in my preparation for the Bouto case, no**
15 **witness ever expressed that to me when I interviewed**
16 **them prior to their testimony, and when they**
17 **testified at the trial under oath, that was never**
18 **testified to in the Bouto trial.  So I had no**
19 **evidence to suggest that something like that took**
20 **place.**
21   Q  I understand.  But you do know that
22 Mr. Bouto's convictions were reversed; right?
23   **A  No.  I -- my understanding is that they were**
24 **nolle prossed by the State's Attorney's Office.**

---

240

1    Q  Well, Mr. Bouto received an evidentiary
2  hearing into his claims of actual innocence; right?
3    **A  I -- I don't know.  I haven't been in the**
4  **office since 2014.**
5    Q  Okay.  But you're aware that the Cook County
6  State's Attorney's Office vacated the charges
7  against --
8    **A  I was aware of that when I saw that in the**
9  **newspaper.**
10   Q  Right?
11   **A  Nobody from the Cook County State's**
12 **Attorney's office bothered to pick up the phone to**
13 **either, A, discuss with me my involvement in the**
14 **Bouto case or that they were dismissing the charges**
15 **against Mr. Bouto.  They apparently didn't feel**
16 **that was necessary.**
17   Q  Right.  Just the way you didn't find it
18 necessary to talk to any --
19      MR. HORVAT:  Objection; argumentative.
20   Q  -- other State's attorneys on the other
21 cases that Mr. Vicente was involved in; right?
22      MR. HORVAT:  Objection; argumentative.
23   **A  I wasn't involved in those prosecutions.**
24 **I was involved in the Bouto prosecution.**

---

Transcript of John Dillon
Conducted on November 13, 2018

241

1    Q  But were you aware that Mr. Guevara has been
2  pleading the Fifth Amendment in response to
3  questions about his involvement in both the Bouto
4  prosecution --
5       MR. HORVAT:  I'm going to object -- sorry;
6  I didn't mean to point.  I'm going to object to
7  the extent that your answer requires you go into
8  any conversations you had with us and instruct you
9  not to do that.
10      Outside of any conversations you had with
11 your attorneys, you can answer the question.
12   **A  Other than what I've read in the newspaper.**
13   Q  Well, you've read it in the newspaper; right?
14   **A  Yes.**
15   Q  Do you know how many cases have been vacated
16 in which Detective Guevara and Detective Halvorsen
17 were involved in?
18   **A  I do not.**
19   Q  Okay.  Do you know how many Federal juries
20 have returned civil verdicts against Detective
21 Guevara?
22   **A  I do not.**
23   Q  Were you aware that the City of Chicago
24 conducted its own investigation and concluded that

242

1  there were individuals who were probably innocent
2  that -- in cases that were investigated by
3  Detective Guevara, including Robert Bouto?
4       MS. CARNEY:  Objection; form.
5    **A  A, I was not aware of that, and nobody**
6  **bothered to contact the person who actually tried**
7  **the case for some insight on the Bouto case.**
8    Q  So is it your -- is it your testimony that
9  Sidley & Austin never contacted you, or
10 interviewed you, or attempted to interview you?
11   **A  They never interviewed me; they never**
12 **contacted me; to my knowledge, they never**
13 **attempted to interview me.**
14   Q  Okay.  And did you ever read the report
15 that was prepared by Sidley & Austin in connection
16 with the Bouto case?
17   **A  I did not.**
18   Q  So you don't know what their investigation
19 revealed; right?
20   **A  I do not.**
21      MS. CARNEY:  Objection; form.
22   Q  Were you aware that Mr. Serrano and
23 Mr. Montanez received certificates of innocence?
24   **A  I was made aware of that.  I read that in**

243

1  the newspaper.
2    Q  And were you aware that an individual by
3  the name of Jacques Rivera received a certificate
4  of innocence?
5    **A  I don't know who Jacques Rivera is.**
6    Q  What about Juan Johnson?
7    **A  I don't know who Juan Johnson is.**
8    Q  If you had learned during your time preparing
9  the Bouto prosecution that dozens of individuals
10 had claimed that Mr. Guevara had suggested to them,
11 or told them, or coerced them into identifying
12 certain individuals, would that have changed your
13 strategy or tactics when it comes to the case?
14 Excuse me.
15      MR. HORVAT:  Objection to the form.
16 Objection to speculation.  Objection to the
17 incomplete hypothetical.
18      John, you can answer if you know.
19   **A  Yes.  I would probably have asked questions**
20 **of the witnesses if anything like that took place**
21 **in a case that I was prosecuting.**
22   Q  Okay.  Now, at some point you prosecuted
23 the Bouto -- Robert Bouto; right?
24   **A  Correct.**

244

1    Q  And you made a decision not to call
2  Mr. Maldonado or Mr. Vicente as a witness; right?
3    **A  Correct.**
4    Q  And you said you made that decision at
5  least a few weeks before the case went to trial;
6  is that fair?
7    **A  That's fair.**
8    Q  And did you have conversations with
9  Mr. Vicente before the case went to trial?
10   **A  Yes.**
11   Q  Did you know how the cases in which he had
12 previously had testified had gone or how they had
13 shook out?
14   **A  If I did, I don't -- I don't recall that**
15 **I did.**
16   Q  Do you remember that he had testified in
17 the Serrano, Montanez, and Pacheco case and the
18 Iglesias case prior to the Bouto case?
19   **A  No.  Because in April of '94 I went up to**
20 **felony review.  So I wasn't in the gang unit any**
21 **longer, and I wasn't aware of the day-to-day**
22 **goings on in the gang unit, the trials that were**
23 **tried or anything else.**
24   Q  So when you sat down with Mr. Vicente

Transcript of John Dillon
Conducted on November 13, 2018

62 (245 to 248)

245

1  prior to your prosecution of Robert Bouto, it was
2  not something that you discussed at all about his
3  prior testimony in these other cases?
4      A  No.
5      Q  Did you talk to Matt Coghlan about how
6  Vicente did or how the cases went when he
7  testified in the Serrano/Montanez case?
8      A  No.
9      Q  Did you speak with, I think ASA -- what's
10 his name?  Do you know who prosecuted the Iglesias
11 case?  Mr. Studenroth?
12     A  I know I never spoke with Mr. Studenroth.
13     Q  And you didn't speak with him about
14 Vicente's testimony in the Iglesias prosecution?
15     A  No.
16     Q  And you decided not to present Vicente's
17 testimony; correct?
18     A  That's correct.
19     Q  And is that because he recanted to you?
20     A  He didn't recant to me.
21     Q  Why didn't you use him?
22     A  Because I had eyewitness identifications of
23 Mr. Bouto as the offender, and I had circumstantial
24 witnesses who identified the offender by the

246

1  clothing that he wore, and injecting into trial
2  Mr. Maldonado, who had given an affidavit
3  recanting that this statement took place, I
4  thought it would detract from my evidence.  I made
5  the decision that there was no reason to do that
6  given the strength of the remaining evidence I
7  had, and that's why I made that decision.
8      Q  It wasn't because you doubted Mr. Vicente's
9  statements at that point?
10     A  No.
11     Q  But you thought that maybe the defense
12 could get some hits on Vicente that would hurt
13 your case; is that why you didn't call him?
14     A  No, I was concerned that the jury's focus
15 would be drawn away as to whether or not the
16 statement took place versus, again, the direct
17 evidence, the eyewitness testimony of people that
18 came into court and pointed out Mr. Bouto as the
19 person who called Mr. Ruvalcaba.
20     Q  And those people did not come forward and
21 identify Mr. Bouto as the offender until after
22 Mr. Vicente gave his handwritten statement; would
23 you agree with that?
24     A  No, I wouldn't agree with that.

247

1      Q  So your testimony is that those people
2  made -- they made identifications from a lineup
3  prior to Mr. Vicente giving that handwritten
4  statement?
5      A  I believe so.  And I also believe that
6  there were identifications made at the scene prior
7  to -- after Mr. Bouto's detention by the police.
8      Q  And where -- and where do you remember
9  seeing that?
10     A  I remember seeing it and I remember
11 presenting that evidence in the trial.
12     Q  Identifications were made or a description
13 was provided?
14     A  A description was provided.  My understanding
15 is Mr. Bouto was detained and brought back to the
16 scene of the murder.  There were some witnesses
17 there, eyewitnesses who identified him to the
18 police officers as the person who shot Mr. Ruvalcaba.
19     Q  And in your estimation this was all before
20 Mr. Vicente had agreed to --
21     A  My understanding is Mr. Vicente was in
22 custody when the Ruvalcaba murder happened.
23     Q  Right.
24     A  So he would have no independent knowledge

248

1  of that crime taking place.
2      Q  Right.
3      A  The witnesses who were out there, they did
4  have an independent knowledge of the incident that
5  took place because they witnessed it.
6      Q  You're aware that Mr. Maldonado claims that
7  Guevara told him who to pick out; right?
8      A  No, I'm not aware of that.
9      Q  Okay.  Well, Mr. Maldonado made that
10 statement to attorneys for Sidley & Austin.  And
11 what say you to that?
12     MS. CARNEY:  Objection; foundation.
13     MR. HORVAT:  Object to the form.
14     Do you understand the question?
15     THE WITNESS:  Yeah, I understand the
16 question.
17     A  I believe he doesn't want to be involved,
18 and I believe he lied to Sidley & Austin.  That's
19 what I believe.
20     Q  Okay.  So -- and he lied back '96, too;
21 right?
22     A  When he gave his --
23     Q  Affidavit, right?
24     A  -- affidavit?  Yes, I believe so.

Transcript of John Dillon
Conducted on November 13, 2018

63 (249 to 252)

249

1    Q  But he didn't lie when he first went before
2  the grand jury, that's your --
3    **A  I don't believe so.**
4    Q  Okay.  Now, you eventually attended this
5  change of plea hearing, sentencing hearing for
6  Mr. Vicente; right?
7    **A  Correct.**
8    Q  And this was after there had been
9  convictions in all three cases -- I guess there
10 was one acquittal.  Mr. Pacheco was ultimately
11 acquitted, but apart from Mr. Pacheco, there had
12 been convictions in all three murder prosecutions,
13 and now Mr. Vicente was no longer needed as a
14 State's Attorney witness; right?
15   **A  That's correct.**
16   Q  And he went before Judge Suria for sentencing
17 on his four pending cases; right?
18   **A  Well, he went before him to enter a plea**
19 **of guilty to the charges against him.**
20   Q  Right.  And to be sentenced?
21   **A  And then to be sentenced.**
22   Q  Let me ask you this:  Before Vicente
23 testified in the Serrano/Montanez case, he was
24 moved to DuPage County.  Do you remember that?

250

1    **A  Yes.**
2    Q  Why?
3    **A  My understanding was because he could no**
4  **longer stay in the witness quarters because he had**
5  **caused some type of a problem.**
6    Q  Do you remember what type of problem that
7  was it?
8    **A  I don't have any independent recollection**
9  **of that.  I believe I've come to understand he got**
10 **into a fight with an individual named Rankins.**
11   Q  Do you know who Timothy Rankins is?
12   **A  I did not until after this litigation was**
13 **instituted against me.**
14   Q  Did you ever hear the name Timothy Rankins
15 prior to 2017?
16   **A  No.**
17   Q  And you have no idea what Mr. Rankins' role
18 was in any of these murder prosecutions, if any;
19 correct?
20   **A  No.**
21   Q  And who transported Mr. Vicente back and
22 forth from DuPage County to 26th Street when he
23 was giving testimony in the Iglesias and the
24 Serrano and Montanez case?  Do you know?

251

1    **A  The Cook County State's Attorney's Office**
2  **investigators.**
3    Q  And why was that?
4    **A  Because that was I believe, if I recall**
5  **correctly, the Judge's order.**
6    Q  Is that something that the State's
7  Attorney's Office asked for?
8    **A  I don't believe so.**
9    Q  Okay.  Who asked that he be remanded to
10 DuPage County --
11       MR. HORVAT:  Objection; foundation.
12   Q  -- if you know?
13       MR. HORVAT:  You can answer if you know.
14   **A  I -- I believe it was me.**
15   Q  Okay.  And why DuPage County versus
16 anywhere else?
17   **A  No particular reason at the time because**
18 **he couldn't stay in the witness quarters, he'd be**
19 **looking at going to the general population.  If he**
20 **went into general population, the cases against**
21 **which he had provided information on were still**
22 **pending.  So those people were in the jail, so it**
23 **was potentially life threatening to him to be**
24 **placed in general population, so we had to find**

252

1  **another place to house him, and we were able to**
2  **find that in DuPage County.**
3    Q  Did Mr. Vicente cause any other trouble in
4  the witness quarters apart from getting in a fight
5  with Tim Rankins?
6    **A  Not to my knowledge.**
7    Q  Do you know whether he was doing narcotics
8  in the witness quarters?
9    **A  I don't have personal knowledge, but they**
10 **can't have narcotics in the witness quarters.**
11   Q  Do you know whether State's witnesses ever
12 did have narcotics in the witness quarters?
13   **A  I don't believe they did.**
14   Q  Have you ever heard of an occasion where
15 they did have narcotics in the witness quarters?
16   **A  No.**
17   Q  Did you ever hear, even if it was a rumor,
18 that Vicente had narcotics in the witness quarters?
19   **A  I never heard that Vicente had drugs in**
20 **the witness quarters or rumor to the effect that**
21 **Vicente had drugs in the witness quarters.**
22   Q  Okay.  And what about conjugal visits?
23 Are they permitted conjugal visits in the witness
24 quarters?

Transcript of John Dillon
Conducted on November 13, 2018

64 (253 to 256)

253

1    A  No.
2    Q  They are permitted contact visits, though;
3  right?
4    A  **They're permitted whatever the Cook County**
5  **Sheriff's Office allows them to do.**
6    Q  To the best of your knowledge, when a
7  witness is detained in the witness quarters at the
8  Cook County State's Attorney's Office, they are
9  permitted contact visits, though; right?
10   A  **I don't know that to be the case, no.**
11   Q  Have you ever read the testimony from the
12  Serrano/Montanez trial or the Geraldo Iglesias
13  trial, Vicente's testimony?
14   A  **I believe I read it in the Serrano/**
15  **Montanez case.**
16   Q  Okay.  And you would agree that he testified
17  about having contact visits in the witness
18  quarters; right?
19   A  **I don't recall but if that's what it says,**
20  **that's what it says.**
21      MS. BONJEAN:  Fair enough.
22      Could you mark this, please?
23      (Dillon Deposition Exhibit 12 marked for
24  identification and attached to the transcript.)

254

1    Q  Do you know who Carlos Morales is?
2    A  **Yes.**
3    Q  And is that Frankie Vicente?
4    A  **Francisco Vicente.**
5    Q  Okay.  Francisco Vicente.  And do you know
6  what this arrest report refers to?
7    A  **It says it's for the offense of robbery,**
8  **and he was arrested on what appears to be**
9  **July 25th of 1992.**
10   Q  Okay.  So that's July 25th, 19 --
11  July 25th, 1992?
12   A  **The date of the arrest, yes.**
13   Q  And are you aware of whether Mr. Vicente
14  made bond on this case?
15   A  **If this was the case that he pled guilty**
16  **to when I was involved in the plea, he did make**
17  **bond in that case.**
18   Q  Okay.  And do you remember the date on
19  which he made bond?
20   A  **I don't.**
21      (Dillon Deposition Exhibit 13 marked for
22  identification and attached to the transcript.)
23   Q  Do you remember that Mr. Vicente had the
24  '92 case which was the robbery and the three armed

255

1  robberies from '93, or do you need something to
2  refresh your recollection on that?
3    A  **No, I believe that was the case.**
4    Q  Okay.  So do you see what this document --
5  can you identify this document for me?
6    A  **It appears to be a bond slip.**
7    Q  And what is the date on that?
8    A  **October 23rd of 1992.**
9    Q  And it reflects that that is when Mr. Vicente
10  made bond on the '92 robbery case; correct?
11   A  **I don't know if that's what that denotes.**
12   Q  Well, how about I have you look at the
13  certified statement of conviction.  Would that help?
14   A  **Yeah.  I see the date and I see that the**
15  **bond was set.  I don't see that it's an I bond or**
16  **a D bond, so I don't see where it tells me that he**
17  **made bond.**
18   Q  Okay.  Well --
19   A  **Well, actually, this is a D bond.  So he**
20  **would have had to come up with $100 to make bond.**
21   Q  Right.
22   A  **So if, in fact, he posted the bond, I'll**
23  **accept your representations, but this doesn't tell**
24  **me that he posted the bond.**

256

1      MS. BONJEAN:  All right.  I'm going to
2  have you mark that if you would, please.
3      THE COURT REPORTER:  14.
4      (Dillon Deposition Exhibit 14 marked for
5  identification and attached to the transcript.)
6    Q  Is it your experience that people sign
7  bond slips when they don't make bond?
8    A  **To be honest with you, I've never**
9  **represented someone as a defense attorney.  So I'm**
10  **not familiar with the whole bond process, to be**
11  **quite honest with you.**
12   Q  You've actually never represented -- other
13  than your first six months in the private sector,
14  you've never represented an individual; right?
15   A  **Correct.**
16   Q  I'm sorry; what did we mark this as?
17   A  **This is 14.**
18   Q  Okay.  I'm going to draw your attention --
19      MS. NIKOLAEVSKAYA:  Can we have copies?
20      MS. BONJEAN:  Oh, I'm sorry.
21   Q  And you've had a chance to look at the
22  second page -- the second line.  Can you tell me
23  what that reflects?
24   A  **Second line says, "Defendant on bond."**

Transcript of John Dillon

65 (257 to 260)

Conducted on November 13, 2018

257

1   Q  Would you agree that that would suggest
2  that he was on bond as of 10/23/92?
3     **A  Yes, I'd say that's what that appears to be.**
4     Q  And it tends to correspond to the bond
5  slip which also says 10/23/92, right, in the
6  left-hand corner?
7     **A  Yes.**
8     Q  Okay.  And then Mr. Vicente was arrested
9  on the date that he was in custody at Area 5 on
10 the same day as the Ruvalcaba murder; is that fair
11 to say?
12    **A  I don't know what date he went into custody.**
13    MS. BONJEAN:  Will you mark that, please?
14    (Dillon Deposition Exhibit 15 marked for
15 identification and attached to the transcript.)
16    Q  I'm handing you what's been marked
17 Exhibit 15.  Would you agree that this is an
18 arrest report for Francisco Vicente?
19    **A  Yes.**
20    Q  And it reflects that he was represented on
21 what date?
22    **A  It indicates he was arrested on May 14th,**
23 **1993, at 1:45 in the afternoon.**
24    Q  And it reflects he was arrested for

258

1  three separate armed robberies; right?
2     **A  Yes.**
3     Q  That was on May 14th, 1992; right?
4     **A  1993.**
5     Q  I mean '93.  Correct?
6     **A  Yes, correct.**
7     Q  And do you know whether Mr. Vicente made
8  bail after he was arrested on May 14th, 1993?
9     **A  To my knowledge, he did not.**
10    Q  Okay.  And he was -- do you remember what
11 date he was sentenced on?
12    **A  Without looking at either some type of**
13 **document or transcript of the proceedings, no.**
14    MS. BONJEAN:  Okay.  I'll get you that.
15    (Dillon Deposition Exhibit 16 marked for
16 identification and attached to the transcript.)
17    Q  When you've had a chance to thumb through
18 that, let me know.  Okay?
19    **A  Sure.  All right.**
20    Q  Would you agree that these transcripts
21 reflect the change of plea hearing that took place
22 in front of Judge Suria?
23    **A  Yes.**
24    Q  And as well as his sentencing?

259

1     **A  Yes.**
2     Q  And you stood up on that on behalf of the
3  State; correct?
4     **A  Correct.**
5     Q  Why did you stand up on it versus another
6  prosecutor?
7     **A  Because I was the first one who had contact**
8  **with Mr. Vicente; I was the person that had the**
9  **conversations with Mr. Vicente's attorney, so**
10 **that's why I was present.  I didn't, you know,**
11 **dump it off on somebody else to do.**
12    Q  Okay.  And this was -- this plea -- this
13 plea agreement that was entered into, that was a
14 negotiated plea; correct?
15    **A  Yes.**
16    Q  It was negotiated between yourself,
17 Mr. Vicente through his counsel with the Court's
18 approval; right?
19    **A  It wasn't with the Court's approval.  It**
20 **was with -- we would make these recommendations to**
21 **the Court.**
22    Q  Okay.  Well, if you look at page 13, it --
23    **A  Okay.**
24    Q  The Court says, "Pursuant to the agreement

260

1  between the State the defense in the pretrial
2  conference -- at the pretrial conference" or I
3  think it said "and the pretrial conference."
4     **A  Okay.**
5     Q  Do you see that?
6     **A  Yes.**
7     Q  The Court indicates that this was an
8  agreement between the State and the defense; right?
9     **A  On that date, yes.**
10    Q  It wasn't just a recommendation.  It was
11 pursuant to an agreement; right?
12    **A  Again, my understanding of reading this is**
13 **there was an agreement between State's Attorney's**
14 **Office and Mr. Vicente through his attorney.**
15    Q  Right.
16    **A  A pretrial conference took place prior to**
17 **the plea on September 23rd of 1996.  So up until**
18 **that date the Judge was not necessarily in**
19 **agreement with what the disposition was going to**
20 **be.  That didn't take place until we had that**
21 **pretrial conference prior to the plea.**
22    Q  Right.  The only point I'm trying to make,
23 though, and correct me if I'm wrong, is that this
24 sentencing arrangement was pursuant to an agreement

Transcript of John Dillon
Conducted on November 13, 2018

261

1  between the parties; right?

2  **A  Yes.**

3  Q  Okay.  And you also prepared the sentencing

4  order in the case; correct?

5  **A  Correct.**

6  MS. BONJEAN:  If you could mark that.

7  (Dillon Deposition Exhibit 17 marked for

8  identification and attached to the transcript.)

9  Q  I've handed you what is marked Exhibit 17.

10 What is this document?

11 **A  This is an order signed by Judge Suria**

12 **which reflects the sentence that the Court imposed**

13 **on Mr. Vicente, also known as Carlos Morales.**

14 Q  And this is your handwriting; correct?

15 **A  It is.**

16 Q  And your name is reflected in the bottom

17 there?

18 **A  Yes.  I drafted the order.**

19 Q  And you drafted the order --

20 **A  Correct.**

21 Q  -- based on the sentencing agreement that

22 had been entered into by the parties; correct?

23 **A  Correct.**

24 Q  And, also, you referenced this earlier,

262

1  you indicated that the defendant is credited for

2  1,476 days of time considered served?

3  **A  Correct.**

4  Q  Okay.  And how did you reach that number?

5  **A  That's what his public defender told me.**

6  Q  So his public defender just told you

7  that date?

8  **A  It's reflected in the transcript at the**

9  **top of page 15.**

10 Q  Okay.  Again, are you telling me that you

11 included this in the order based solely on the

12 representation of Mr. Vicente's defense attorney?

13 **A  Absolutely.**

14 Q  Okay.  You didn't double-check it?

15 **A  I never double-checked.  I take people's**

16 **representations as attorneys as the truth, and I**

17 **had no reason to question that.**

18 Q  Is it -- is it common for you to draft --

19 as a prosecutor to draft the sentencing order?

20 **A  No.  The Judge asked me to and I don't --**

21 **I can't really explain to you why, but the Judge**

22 **asked me to.**

23 Q  How many times have you drafted the

24 sentencing order in a case?

263

1  **A  Other than the times the Judge asked me,**

2  **maybe two or three.  But I can't speak as to why**

3  **Judge Suria asked me to, but he did, and I**

4  **followed his order.**

5  Q  Okay.  He asked you specifically to draft

6  the order?

7  **A  He said, "State, will you draft the**

8  **order?"  Because I felt Mr. Vicente was my**

9  **responsibility, I drafted that order.**

10 Q  And you remember Judge Suria asking you to

11 draft the order?

12 **A  Yeah.  The Judge -- you know, the Judge**

13 **just wouldn't accept me throwing something up**

14 **to him.**

15 Q  Well, the defense could have drafted the

16 order; correct?

17 **A  The Judge asked the State to draft the**

18 **order.  I did what the Judge asked me to do.**

19 Q  And that's what I'm asking.  You have an

20 independent recollection of Judge Suria asking you

21 to do it; correct?

22 **A  Yes.**

23 Q  And when he asked you to do it, you

24 reflected this 1,476 days of custody -- of pretrial

264

1  custody time based solely on the representation of

2  his attorney?

3  **A  That's correct.**

4  Q  And you know now, of course, that that is

5  approximately -- let's see -- 156 days more than

6  Mr. Vicente was entitled to; right?

7  **A  I don't know that.  I haven't done those**

8  **calculations.  I'll accept your representation.**

9  **But in my 30-plus years of being a prosecutor,**

10 **that's how time credit was always given, by asking**

11 **the defense how much time do they have.  I did**

12 **that in every single prosecution I ever handled.**

13 Q  Okay.  So --

14 **A  I never sat down and figured out how much**

15 **time, number one, because I knew that the Illinois**

16 **Department of Corrections reviews the amount of**

17 **credit a person gets, and if it's off, they send**

18 **requests back to have the minimus changed.**

19 Q  Well, in a case like this it's a little

20 unusual because Mr. Vicente was released on an

21 I bond.  At least that's what it would reflect;

22 right?

23 MR. HORVAT:  Objection to form of the

24 question.

265

1     A   When you say "released on I bond," on
2  which case?  He was released on an I bond in his
3  '92 armed robbery before these events took place.
4     Q   That was a D bond.
5     A   He was released on an I bond when he was
6  put in the witness quarters --
7     Q   Right?
8     A   -- and that was per the Judge's order and
9  the practice.  That's the only time he was
10 released on an I bond to my knowledge.
11    Q   Right.  And that's what I'm suggesting.
12 If someone is released on an I bond, is it fair to
13 say that he -- the calculation of how long he
14 spent in custody might not be accurately reflected?
15 I mean, how does that work?
16       MR. HORVAT:  Objection; speculation.
17       You can answer, if you know.
18    A   I'm not sure I understand your question.
19 If you're asking do they get credit for the time
20 while they're out on bond, the answer is no.
21    Q   No, what I'm asking is that, there's an
22 order that released Mr. Vicente on an I bond, but,
23 in fact, he went to the witness quarters.
24    A   Correct.

266

1     Q   In the main system of the Cook County
2  Department of Corrections, do you know whether it
3  reflects whether or not he's actually in custody
4  or whether he's actually out on this I bond?  Do
5  you have a way of determining -- do you know
6  whether that --
7     A   I don't know how the jail figures those
8  things out.
9     Q   Okay.  So do you want -- do you want to go
10 through the math here about whether or not he
11 received 156 days extra?
12    A   I mean, the math is the math.
13    Q   Uh-huh, right.
14    A   So if you're telling me that's what it is,
15 then I have no reason to question that you're not
16 being forthcoming in telling me that's what it is.
17    Q   Okay.  I'm not great at math, but I did
18 check that multiple times today even and that's my
19 calculation.  But you're right; it does speak for
20 itself.
21       But it's not your position that apart from
22 what we've just gone through that he had any
23 additional time in custody; right?
24    A   No.

267

1     Q   So just to recap, we established he was
2  arrested on July 25th, '92, on the robbery; right?
3     A   Correct.
4     Q   We've established that he was released on
5  bond on October 23, '92, at least according to the
6  bond slip and the certified statement of conviction;
7  right?
8     A   Okay.
9     Q   And according to the other arrest report
10 we looked at, he was back in custody as of
11 May 14th, '93; right?
12    A   Correct.
13    Q   And then as far as you know, and you have
14 no reason to doubt my representation that he wasn't
15 released at any point prior to his sentencing on
16 September 23rd, 1996; right?
17    A   That's correct.
18    Q   Okay.  So from that the math is the math.
19       Now, do you have any idea why the defense
20 attorney in this case would have added 156 days to
21 Mr. Vicente's pretrial custody time?
22       MR. HORVAT:  Objection; speculation,
23 foundation.
24       You can answer if you know.

268

1     A   I would assume he made an honest mistake.
2     Q   So it's your position that 156 days was
3  just an oversight or a mistake on the part of
4  defense counsel?
5     A   That's my belief.
6     Q   Have you ever asked him?
7     A   There was no reason for me to ask him.
8     Q   If Mr. Vicente were to come in here and
9  testify that actually that was something that was
10 worked out in advance to try to get him some
11 additional time on the back end, that would be a
12 false statement?
13       MR. HORVAT:  Objection to form.
14    A   That would be a lie.
15    Q   Do you know when Mr. Vicente was out of
16 custody again after his sentencing in
17 September of '96?
18    A   I don't recall, no.
19       MS. BONJEAN:  Can you mark this, please?
20       (Dillon Deposition Exhibit 18 marked for
21 identification and attached to the transcript.)
22    Q   Mr. Dillon, do you see the police report
23 that's before you marked as Exhibit 18?
24    A   Yes, I do.

269

1    Q  And does it reflect an arrest report for
2  Frankie Vicente again?
3    **A  It represents a person by the name of**
4  **Francisco Vicente.  It is an arrest report, and**
5  **the date of the arrest is February 26th of 1997.**
6    Q  Right.  And that you would agree was
7  approximately five months after he was sentenced?
8    **A  It's about five months, yes.**
9    Q  So he had already gone down to the
10 Department of Corrections and come back out and
11 picked up another bunch of armed robberies; right?
12   **A  Correct.**
13   Q  Do you remember when Mr. Vicente -- do you
14 have an independent recollection of Mr. Vicente
15 picking up these armed robberies in February of '97.
16   **A  I have an independent recollection of him**
17 **picking up the armed robberies.  I don't recall**
18 **the dates however.**
19   Q  Do you have an independent recollection of
20 him reaching out to you looking for some type of
21 leniency, or help, or anything along those lines
22 in connection with these robberies?
23   **A  He spoke to an assistant from the felony**
24 **review unit who went out to review these armed**

270

1  robberies.  My understanding is when the assistant
2  **apprised him of his rights and said, "You have a**
3  **right to an attorney," he said, "I want to talk to**
4  **my attorney John Dillon."  At least that's what**
5  **was represented to me when I got called in the**
6  **middle of the night regarding this.**
7     **Basically, he was looking for consideration**
8  **on these cases, and I explained to the assistant**
9  **State's Attorney that I sat down with him at the**
10 **time of his plea and told him that we had lived up**
11 **to the terms of the agreement; he got his nine**
12 **years in Illinois Department of Corrections, that**
13 **if he picked up any cases in the future, he was on**
14 **his own, and we weren't going to give him any**
15 **consideration.**
16   **So I told that assistant State's Attorney**
17 **to tell him -- remind him of that conversation,**
18 **and he gets no consideration.**
19   Q  So when he picks up these armed robberies,
20 he wants consideration; right?
21   **A  Apparently.  I didn't -- I never spoke to**
22 **him directly.  I'm just -- this is what -- it**
23 **wasn't related to me that he was looking for**
24 **consideration.  It was he's asking for me.**

271

1    Q  Okay.  So he gets arrested and the first
2  thing he does is ask for his Attorney John Dillon,
3  that being you?
4    **A  That's what was -- he was Mirandized.**
5  **That's what the assistant State's Attorney from**
6  **felony review related to me.  He said, "I want my**
7  **lawyer John Dillon."**
8    Q  Do you have any idea why he thought you
9  were his lawyer?
10     MR. HORVAT:  Objection; speculation,
11 foundation.
12     You can answer if you know.
13   **A  I'm assuming because he was looking for**
14 **some -- for me to try and help him out.**
15   Q  And as you sit here today, do you think
16 maybe he was looking for assistance when he was
17 picked up on four robberies back in '93 --
18 '92 and '93?
19   **A  No.**
20   Q  Why?  What would be different in your mind?
21   **A  Well, again, as I told you on the Bouto**
22 **case he explained that the reason he was providing**
23 **that information to the police was because someone**
24 **who he believed to be an aligned gang member of**

272

1  his was murdered by an opposing rival gang, and he
2  **wanted to see that person get what's coming to**
3  **him.  That's what he represented; that's what I**
4  **believed.**
5    Q  And someone with the character of Vicente
6  might not also simultaneously want to get some
7  leverage and get some benefit from his pending
8  cases that might send him to prison for the rest
9  of his life?
10     MR. HORVAT:  Objection to form.  Objection;
11 asked and answered, form.
12     Counsel, how many more times are you going
13 to ask this question?
14   **A  I don't know.  I can't speak for what his**
15 **intentions were.**
16   Q  And it's not something, though, that you
17 believe was part of his intentions?
18   **A  Again, as I told you, he testified under**
19 **oath before the grand jury; he gave a handwritten**
20 **statement before he talked to me on my case.  So I**
21 **didn't need to give him any consideration in order**
22 **to get his cooperation on the case because I**
23 **already had it when he testified under oath in the**
24 **grand jury.**

Transcript of John Dillon
Conducted on November 13, 2018

273

1    Q  But when he came in in February of '97, he
2  definitely wanted some consideration; right?
3    **A  He was looking --**
4        MR. HORVAT:  Objection; speculation,
5  foundation -- wait a minute, John.
6        Go ahead.  You can answer if you know.
7    **A  I believe that's what he was, but, again,**
8  **I only spoke with the assistant State's Attorney**
9  **from felony review.**
10    Q  Did the assistant State's Attorney from
11  felony review indicate that Vicente was able to
12  give up three or four more murders for your office?
13    **A  They didn't indicate that to me.**
14    Q  And, in fact, isn't it true that Vicente's
15  wife even wrote to the office looking for help at
16  a later point?
17    **A  Looking for some type of consideration --**
18    Q  Yes.
19    **A  -- I believe so.**
20        MS. BONJEAN:  Can you mark this, please?
21        (Dillon Deposition Exhibit 19 marked for
22  identification and attached to the transcript.)
23    Q  Are you familiar with -- have you seen
24  this letter before?

274

1    **A  Since the advent of this litigation, yes.**
2    Q  Okay.  You didn't see this letter prior to
3  the advent of this litigation?
4    **A  Correct.**
5    Q  Okay.  Do you know who Michelle Danno is?
6    **A  I assume she's an administrative assistant**
7  **to Mr. Divine, who was the State's Attorney at the**
8  **time these events took place.**
9    Q  Oh, well, I'm sorry, Michelle --
10    **A  I'm sorry.  It appears to be -- that**
11  **appears to be his significant other or something**
12  **along those lines, yes.**
13    Q  She says "my fiancé."
14    **A  Okay.**
15    Q  But did you have any interactions with her?
16    **A  No.**
17    Q  Okay.  And you'd agree that she represents
18  here that Mr. Vicente, her fiancé had "dealt with
19  a man by the name of John Dillon.  Mr. Dillon
20  helped Francisco get into the penitentiary called
21  Illinois River Correctional Center in Canton,
22  Illinois, which is a special unit called SMU"?
23    **A  That's what it says in the letter.**
24    Q  And did you help Mr. Vicente get into the

275

1  SMU unit of the Illinois River Correctional Center?
2    **A  Not my recollection, no.**
3    Q  Okay.  Did anyone contact you about
4  Ms. Danno's request?
5    **A  I'm assuming given that it's written in**
6  **the top right-hand corner, "No consideration per**
7  **John Dillon, 8/28/1997" I assume somebody contacted**
8  **me from Mr. Divine's office regarding Mr. Vicente,**
9  **and I told that person the same thing I told the**
10  **assistant in felony review, that we had lived up**
11  **to the terms of our agreement, that he fully was**
12  **made aware of the fact that if he picked up any**
13  **other crimes, he was on his own.  And that's what**
14  **this reflects.**
15    Q  Were you concerned about his safety after
16  Ms. Danno sent this letter saying that she wanted
17  help to get him back into the SMU unit?
18    **A  I didn't want to see anything bad happen**
19  **to him, but I wasn't going to help him because**
20  **that would have been additional consideration for**
21  **the cases that we had tried, and that was never**
22  **part of the agreement.  As a matter of fact, like**
23  **I said, I sat down and explained it to him, "We've**
24  **lived up to our terms of the bargain; you've**

276

1  **gotten your 9 years in the Illinois Department of**
2  **Corrections; you've lived up to your terms of the**
3  **bargain; it's over now today when you go, and if**
4  **you pick up any other cases, you're on your own."**
5  **And that was -- couldn't have been made more clear**
6  **to him.**
7    Q  Now, are you familiar with the allegations
8  that Mr. Vicente has made against -- specifically
9  against you and Mr. Coghlan?
10    **A  I have not been made aware of any**
11  **allegations against me.**
12    Q  Okay.  Are you aware of that Mr. Vicente
13  has alleged that you fed him or assisted in feeding
14  him the story surrounding Serrano and Montanez'
15  involvement in the Vargas murder?
16    **A  I have not seen any document where**
17  **Mr. Vicente has stated that I did that.**
18    Q  Okay.  Have you looked at any -- well,
19  strike that.
20        If, in fact -- if I were to show you a
21  document where he had made this allegation, would
22  that -- would you say that that would be a false
23  statement on his part?
24    **A  A bold-faced lie is what I would tell you.**

Transcript of John Dillon
Conducted on November 13, 2018

70 (277 to 280)

277

1    Q  And if Mr. Vicente had made the allegation
2  that you were also involved directly in helping
3  feed the story to him regarding Geraldo Iglesias'
4  involvement in the Roman murder, would that also
5  be a lie on his part or false statement on his part?
6    **A  That would be a bold-faced lie, yes.**
7    Q  And if Mr. Vicente alleged that you or
8  members of your office actively arranged for him
9  to be put in proximity to Mr. Iglesias so that he
10 could later plausibly claim that Mr. Iglesias made
11 certain statements to him, would that also be a
12 false statement or a lie on his part?
13   **A  It would be a bold-faced lie, yes, it would.**
14     MS. BONJEAN:  And if you could give me one
15 second, I just want to make sure that I've gotten
16 through these documents.
17   Q  Do you have any thoughts about why
18 Mr. Vicente would now be making these statements?
19     MR. HORVAT:  Objection to form,
20 foundation, speculation.
21     You can answer if you know.
22   **A  I assume he's angry with me because I**
23 **wouldn't help him out when he got his armed**
24 **robberies in 1997 and got sentenced to a significant**

278

1  **term in the penitentiary.  My recollection is the**
2  **State's Attorney from felony review said that he**
3  **was making allegations of somebody is going to pay**
4  **for this.**
5    Q  Mr. Vicente is the type of guy then, you
6  would agree at least at this juncture, that would
7  lie when it suited him; right?
8      MR. HORVAT:  Object to speculation,
9  foundation, form.
10     You can answer if you understand.
11   **A  I can only speak as to if he's making these**
12 **types of allegations against me, they're a lie.**
13   Q  He's lied on you; right?  He's lied
14 against you; correct?
15   **A  If what you've represented to me is what**
16 **he's saying, then yes, I agree.**
17     MS. BONJEAN:  Hold on one second.
18   Q  Mr. Dillon, didn't Vicente make an ARDC
19 complaint against you at one point?
20   **A  He did.**
21   Q  Do you know what the allegation was?
22   **A  I don't.**
23   Q  Do you know when he made the ARDC complaint
24 against you?

279

1    **A  Shortly after he picked up these armed**
2  **robberies and had the felony review assistant**
3  **contact me.**
4      MS. BONJEAN:  All right.  I don't have
5  copies of this.  It was produced.  I don't know if
6  you want to make copies -- oh, you have a copy there.
7      (An off-the-record discussion was held.)
8    Q  Okay.  Have you seen a recent affidavit
9  from Mr. Vicente?
10   **A  Yes.**
11   Q  And in that affidavit would you agree that
12 he alleges that the statements that he made in
13 connection with the Montanez, Serrano, Pacheco,
14 Bouto, and Iglesias murders were false and that
15 they were concocted by Guevara, Halvorsen, and
16 State's Attorneys Coghlan and Dillon?
17   **A  25 years after the fact, yes.**
18   Q  Well, he made those statements long before
19 that, too?
20   **A  25 years after the fact.  I've seen no**
21 **sworn statement of Mr. Vicente prior to this that**
22 **alleges that I did those things, none.**
23   Q  You're aware that he made statements to
24 certain students at Northwestern Medill School of

280

1  Journalism back in -- I don't remember exactly what
2  year it was but it was well before?
3    **A  Again, no sworn statement under oath**
4  **saying that I did those things until 25 years**
5  **after the fact.**
6    Q  Okay.  But you're aware that he made those
7  statements prior to -- at least there's -- you
8  know there's someone that's going to say that he
9  made those statements?
10     MR. HORVAT:  I'm going to object to the
11 microtomization of what's in that affidavit or in
12 those notes.
13     But if you understand, go ahead.
14   **A  No, I don't agree with that.**
15   Q  Well, are you familiar with -- did you see
16 any affidavit, notes, or memorandums that were
17 prepared by students of the Medill School of
18 Journalism?
19   **A  I have seen pages but I have not had the**
20 **opportunity to review all of them because they**
21 **were given to me recently.**
22   Q  Okay.  But you know what I'm referring to;
23 right?
24   **A  I think those were 10 years after his**

Transcript of John Dillon
Conducted on November 13, 2018

71 (281 to 284)

281

1  testimony.

2      Q  That might be fair.  You've seen them,

3  that's my question, though.  Right?

4      A  I've seen documents, yes.

5      Q  And the -- there were individuals who

6  prepared those documents, who at least those

7  documents reflect statements by Francisco Vicente,

8  correct, that include allegations against you;

9  right?

10      MR. HORVAT:  Objection; misstates what

11  those documents state.

12      But if you understand the question, go

13  ahead.

14      A  I saw an affidavit 10 years after the

15  incident took place where he directs wrongdoing on

16  the part of Detectives Guevara and Halvorsen under

17  oath.  That's what I've seen.

18      Q  All right.

19      A  There's no mention of my name in that

20  affidavit --

21      Q  You're making --

22      A  -- if I recall correctly.

23      Q  Sorry; I don't mean to interrupt.  You're

24  making a distinction between sworn statements and

282

1  hearsay statements that have been reflected in a

2  memo; right?

3      A  They're not prepared by Mr. Vicente.

4  They're not sworn to or agreed by Mr. Vicente, so

5  yes, I am.

6      Q  Okay.  And that's fine.  But I'm simply

7  trying to get to -- because you're getting way

8  ahead of me -- have you seen those documents that

9  were prepared by the students?

10      A  I told you I've seen some emails that I

11  have not had the opportunity to review because I

12  believe it's like over 400 pages of them, and I

13  have seen the affidavit that was prepared by those

14  students back in, I think it was 2003.

15      Q  That's correct.

16      A  So the affidavit I did see and I did read.

17      Q  And prior to the preparation of that

18  affidavit, there are memorandums and/or affidavit

19  notes that reflect allegations by Mr. Vicente

20  directed at you and Mr. Coghlan.  Have you seen

21  those?

22      MR. HORVAT:  Object to the

23  mischaracterization.

24      You can answer the question.

283

1      MS. BONJEAN:  You know what?  Why don't we

2  take a break, and I'll get those out so he can

3  look at them.

4      MR. HORVAT:  He can answer the question.

5      MS. BONJEAN:  What's that?

6      MR. HORVAT:  There's a question pending.

7  You told him you want the answer, so he should

8  answer first.

9      A  I don't recall that.

10      MS. BONJEAN:  Okay.  Fine.  He doesn't

11  recall.  We can take a break and I'll get those.

12      THE WITNESS:  We are going off the record.

13  The time is 3:52 p.m.

14      (Recess taken, 3:52 p.m. to 4:03 p.m.)

15      THE VIDEOGRAPHER:  We are back on the

16  record.  The time is 4:03 p.m.

17      MS. BONJEAN:  I'm going to ask that you

18  mark that, please.

19      (Dillon Deposition Exhibit 20 marked for

20  identification and attached to the transcript.)

21  BY MS. BONJEAN:

22      Q  Mr. Dillon, why don't you take a minute

23  and look through this.

24      A  Okay.

284

1      Q  And it's double-sided and it's -- I'm

2  going to direct you more to the second page more

3  than anything.  But go ahead.

4      A  Okay.  You said on page 2?

5      Q  Tell me whenever you're ready.

6      A  Page 2 is the second page?

7      Q  Yes -- well, that's the start of the memo.

8  Okay.  Can I direct you?  And then I'll give you

9  an opportunity to review.

10      A  That's fine.

11      Q  You would agree that the date of the -- it

12  says "Team Serrano" memo -- is April 9th, 2004?

13  That's what it reflects?

14      A  That's what it reflects.

15      Q  Okay.  Have you seen this memo before?

16      A  No.

17      Q  Okay.  That's what I was asking earlier.

18  And, again, I'd like to draw your attention

19  specifically to a couple spots.  If you -- if you

20  can, for instance, go to the bottom of -- the

21  Bates stamp is SERRANO 7695.

22      A  Okay.

23      Q  Okay.  And if you could go to the second

24  to the last paragraph, there's a quote there

Transcript of John Dillon
Conducted on November 13, 2018

72 (285 to 288)

---

285

1 that's attributed to Vicente, "You guys would see
2 how many times I was pulled out of my cell at
3 5:00 a.m., almost boastful.  Investigators in
4 suits would see me.  They knew me at the State's
5 Attorney's Office.  I got familiar with Pack Witt."
6 Do you know who Pack Witt is?
7     **A  No idea.**
8     Q  "With Jack O'Malley."  Do you know who
9 Jack O'Malley is?
10     **A  He was the State's Attorney of Cook County.**
11     Q  Right.  "I tried to pick up little
12 conversations.  I heard witnesses come to the
13 State's Attorney.  That's how I got the money,
14 like $1200 plus a few hundred for moving expenses.
15 I had to say that I wasn't receiving special
16 favors."  Do you see that?
17     **A  Yes.**
18     Q  Okay.  Did Mr. Vicente get cash money in
19 the amount of $1200?
20     **A  Not to my knowledge, no.**
21     Q  Okay.  Was he told that he had to say he
22 wasn't receiving special favors by you?
23     **A  No.**
24     Q  Okay.  Did you ever hear anyone tell

---

286

1 Vicente that he could not admit that he was
2 getting special favors from either the State's
3 Attorneys or the detectives in the case?
4     **A  I'm sorry; could you repeat that?**
5     Q  Did you ever hear anyone tell Mr. Vicente
6 that he could not admit that he was getting special
7 privileges, or money, or any types of benefits
8 from either other State's Attorneys, yourself, or
9 other police officers?
10     **A  No, I never heard anyone say that.**
11     Q  Was Mr. Vicente provided with any so-called
12 moving expenses?
13     **A  Not to my recollection.**
14     Q  When an individual or witness is receiving
15 so-called moving expenses or any -- from the Cook
16 County State's Attorney's Office, that's something
17 that you'd have to get approval for; right?
18     **A  Yes.**
19     Q  And that is something that does happen
20 from time to time; right?
21     **A  It would be from the relocation unit of
22 the State's Attorney's Office.**
23     Q  It's happened through the relocation
24 office, and should there be some type of paper

---

287

1 trail memorializing that?
2     **A  Yes.**
3     Q  Okay.  Do you remember approving or
4 recommending that Mr. Vicente receive any moving
5 expenses through the relocation office?
6     **A  No.**
7     Q  On the next page you see -- okay.  I'm
8 going to direct you to the second paragraph there.
9 Quote, "There was one lawyer who got in an
10 argument, a PD in Cook, glasses and a ponytail,
11 lazy eye, shorter guy, I don't remember his name.
12 Sergio seemed to know who Vicente might be talking
13 about and suggested a name, Gary, I didn't catch
14 the last name in time.  He was appointed as
15 Vicente's public defender, so we can look it up in
16 State records.  He apparently told John Dillon
17 that the SA's office was, quote/unquote, 'fucking
18 around' with Vicente.  When you're in SMU, you
19 don't get any court appearances, Vicente said.
20 The public defender closed his deals for him."
21     Do you read that?
22     **A  Yeah.**
23     Q  And is that consistent with your
24 recollection?

---

288

1     **A  I don't know what he's talking about.**
2     Q  Okay.  If you go down to the -- not the
3 next paragraph but the -- no, with the asterisk,
4 it says, "Note, seems that Vicente trusts this guy
5 and also that he might be able to provide
6 corroboration about the coercion that took place
7 in the State's Attorney's Office."  Do you see that?
8     **A  Yes.**
9     Q  Okay.  Did you ever witness any coercion
10 of Mr. Vicente in the State's Attorney's Office?
11     **A  None.**
12     Q  Okay.  In the next paragraph he says,
13 "John Dillon and Matt Coghlan were right up on me.
14 Guevara and Halvorsen would show up.  I was up in
15 the office so many times.  They made sure in
16 Pacheco that I had every word memorized.  Matt was
17 pissed about Pacheco.  That relationship went bad."
18 Do you see that?
19     **A  I see that.**
20     Q  Do you know Pacheco was acquitted?
21     **A  Since the advent of this litigation, yes.**
22     Q  Okay.  At the time you weren't aware that
23 Mr. Pacheco was acquitted?
24     **A  I told you, in April of 1994 I was up on**

---

Transcript of John Dillon
Conducted on November 13, 2018

73 (289 to 292)

289

1  the 14th floor assigned to the felony review unit.
2  I was no longer in the gang unit.
3     Q  Okay.  And at any point did Matt Coghlan
4  express to you any dissatisfaction, or anger, or
5  frustration that Pacheco had been acquitted?
6     A  I didn't talk to Matt Coghlan about this
7  case at all.
8     Q  Okay.  And he reports in the next
9  paragraph that he used to get two free phone calls
10 a day and that, "Coghlan and Dillon would call
11 you," or call him, I guess.  Did you ever call
12 Mr. Vicente on the phone while he was housed at
13 the witness quarters?
14    A  No.  If anything, I tried to avoid his
15 calls to me.
16    Q  Why?
17    A  Because he --
18    Q  Because he was asking --
19    A  Because he would ask for things.  It was
20 an annoyance, like having a child.
21    Q  Okay.  On the next page there's an
22 asterisk -- I'm sorry -- there's italics that
23 says, "Who coached you?"  Do you see that?
24    A  Yes.

290

1     Q  And he says, "John Dillon (Serrano and
2  Bouto) and Matt Coghlan (Iglesias) coached Vicente
3  on what to say."  Do you see that?
4     A  Yes.
5     Q  Again, I understand it's not a sworn
6  statement, but as of whatever this date is, 2004,
7  there's an indication by a student that Vicente
8  told them that.  Do you see that?
9     A  I see that.
10    Q  And is that -- is there any truth to that
11 statement?
12    A  Absolutely none.
13    Q  He wrote, "Matt Coghlan had Halvorsen and
14 Guevara there to craft the statements.  Guevara is
15 more like the boss, really slick when it came to
16 crime scenes.  He got four different IGs in
17 different sections.  It doesn't add up."  Do you
18 see that?
19    A  Yes.
20    Q  Okay.  Did you ever witness Guevara
21 concocting or feeding stories to any witness?
22    A  No.
23    Q  Did you ever witness Guevara or Halvorsen
24 feeding any version of the stories in the Bouto

291

1  case, or the Serrano/Montanez, or the Iglesias
2  case to Mr. Vicente?
3     A  No.
4     Q  Okay.  In the "Bouto Details," this is
5  again as of 2004, it says, "Frankie was in the
6  bullpen at Grand and Central with Bouto, who was
7  also an IG, arrested on the same day as Vicente.
8  Bouto told Frankie what he had been locked up for
9  but did not confess to the crime."  Do you see that?
10    A  Yes.
11    Q  And he alleges that Guevara beat him all
12 over the cell.  Do you see that?  It's in the next
13 paragraph, "Guevara beat me all over the cell."
14    A  I'm sorry; I'm looking for it.
15    Q  Yeah, it's under the "Bouto Details," the
16 second -- it's a one-sentence paragraph.  "When he
17 didn't agree to testify in the case" --
18    A  Yes.
19    Q  Do you see that?
20    A  Started hitting him, huh-huh.
21    Q  Did you have any prior knowledge that
22 Guevara had physically abused Mr. Bouto?
23    A  No.
24    Q  Strike that; I'm sorry.  Did you ever have

292

1  any knowledge that Mr. Guevara physically abused
2  Mr. Vicente?
3     A  No.
4     Q  It says, "Frankie was summoned to the
5  State's Attorney's Office.  John Dillon coached
6  him on what to say at the trial, using ideas
7  generated by Halvorsen and Guevara."  Do you
8  see that?
9     A  Yes.
10    Q  Is that a true statement?
11    A  Absolutely not.
12    Q  You never coached Mr. Vicente?
13    A  No.
14    Q  So I'm not going to go through the whole
15 thing, but the point is that, were you aware that
16 Vicente made statements or at least according
17 to a student at Northwestern had made statements
18 accusing you and Mr. Coghlan of coaching or
19 coercing the -- his testimony back in 2004?
20    A  Not until this litigation, no.
21    Q  Okay.  And you didn't see this until just
22 now; is that fair to say?
23    A  Like I said, I was -- I was given some
24 documents that were generated by Northwestern, but

Transcript of John Dillon
Conducted on November 13, 2018

74 (293 to 296)

293

1 because they're so voluminous, I haven't had the
2 chance to review it.
3     Q   Okay.  So you may have it; you don't have
4 a recollection of it?
5     A   I don't have a recollection of seeing this
6 before, no.
7     Q   Okay.  Were you aware or did you have
8 knowledge of the postconviction proceedings that
9 went forward in the Serrano and Montanez cases
10 when they were occurring?
11     A   No.
12     Q   Were you down at 26th Street in 2014, sir?
13     A   I retired at the end of 2014.  Prior to my
14 retirement I was on the 4th floor of the court
15 building, which is where the grand jury is
16 located.  That's where my offices were located.
17     Q   Okay.  And did you receive any information
18 from any person regarding the postconviction
19 proceedings that were occurring in the
20 Serrano/Montanez case during that period of time?
21     A   The only thing I can remember is I think
22 it was Kurt Smitko coming in and saying to me
23 Chino took the Fifth.
24     Q   Uh-huh.

294

1     A   But I don't understand postconviction law,
2 so that didn't really mean anything to me.
3     Q   But you must have known that there was a
4 hearing, though, going on; correct?
5     A   Well, when he came down and told me that,
6 yeah, I assumed there was.
7     Q   And prior to Vicente taking the Fifth
8 Amendment at the postconviction hearing, had you
9 heard anything about the Serrano/Montanez
10 postconviction proceedings?
11     A   No.
12     Q   Had you had any conversations with
13 Matt Coghlan about those proceedings --
14     A   No.
15     Q   -- at any point?
16     A   Never.
17     Q   Did you ever talk to Judge Boyle about
18 those proceedings?
19     A   Never.
20     Q   Do you know who Judge Boyle is?
21     A   Yes.
22     Q   Have you ever appeared before her?
23     A   Yes.
24     Q   Have you ever worked with her?

295

1     A   I supervised her.
2     Q   And what year did you supervise her?
3     A   It was while I was a deputy supervisor in
4 felony review, and I was up there from '94 to '97.
5 So during that period of time when she was a line
6 assistant going through felony review.
7     Q   And did she -- did you ever speak with
8 Celeste Stack about the postconviction case that
9 was pending before Judge Boyle?
10     A   No.
11     Q   Have you ever had any conversation with
12 Celeste Stack at all?
13     A   About any of these matters?
14     Q   Yes.
15     A   No.
16     Q   You know who she is, though; right?
17     A   Yes.
18     Q   Have you ever had an opportunity to work
19 with her?
20     A   No.
21     Q   Did you ever supervise her?
22     A   No.
23     Q   Have you had conversations with her separate
24 and apart from these Guevara cases?

296

1     A   Just maybe like passing in the hall and
2 saying hello, but that's the extent of it.
3     Q   Okay.  Did she ever ask you about that
4 June 2nd, 1993, meeting?
5     A   She never talked to me about anything
6 involving these cases.
7     Q   And had you talked to Kurt Smitko at all
8 apart from what you just identified?
9     A   No.
10     Q   Do you know why he came up to you and told
11 you that Francisco Vicente took the Fifth?
12     A   Because over the course of the years I,
13 you know, told the story of how a felony review
14 assistant called me in the middle of the night,
15 paged me to tell me that somebody I dealt with in
16 a case was claiming that I was his attorney.  It
17 was kind of a joke.
18     Q   I see.  And Smitko had heard that story,
19 so he just knew your familiarity with Mr. Vicente?
20     A   Maybe some --
21         MR. HORVAT:  Objection to foundation,
22 speculation.
23         You can answer.
24     Q   If you know.

Transcript of John Dillon
Conducted on November 13, 2018

75 (297 to 300)

297

1   A   All I can guess is he thought I may have
2   seen it as humorous.
3       Q   Okay.  And apart from that one comment
4   from Kurt Smitko to you, if I understand you
5   correctly, you had no conversations with anyone
6   regarding the Serrano/Montanez postconviction
7   proceedings?
8       A   I was never involved in the case, so there
9   was no any reason for me to have any conversations
10  with anyone.
11      Q   Okay.  And according -- you haven't had
12  any conversations with anyone about the Bouto
13  postconviction proceedings, either; right?
14      A   No.
15      Q   What about the Iglesias postconviction
16  proceedings?
17      A   No.
18      MS. BONJEAN:  I think I'm good and I will
19  let -- give me one second, if you would.
20      MR. HORVAT:  Do you want to take a break,
21  Counsel, or do you just need a second?
22      MS. BONJEAN:  Why don't we so I don't
23  rush.  If we could just take two minutes.  I think
24  we're fine but if we could.

298

1       THE VIDEOGRAPHER:  We are going off the
2   record.  The time is 4:21 p.m.
3       (Recess taken, 4:21 p.m. to 4:26 p.m.)
4       THE VIDEOGRAPHER:  We are back on the
5   record.  The time is 4:26 p.m.
6   BY MS. BONJEAN:
7       Q   Mr. Dillon, just a couple questions.
8       When you were in the Cook County State's
9   Attorney's Office gang crimes unit with Mr. Vicente
10  and Mr. Halvorsen on June 2nd, 1993, you testified
11  that you were kind of coming in and out of the
12  room; right?
13      A   Yes.
14      Q   Okay.  And when you were coming in and out
15  of the room, and you left the room, you left
16  Mr. Vicente and Mr. Halvorsen in the room together?
17      A   Yes.
18      Q   Okay.  Could you hear what was going on
19  inside the room?
20      A   No.  Because I would have been going to my
21  office, which was maybe 15 or 20 yards away roughly.
22      Q   Okay.  And I know you've testified that
23  you didn't participate in any questioning as it
24  relates to the Serrano/Montanez case, but with

299

1   respect to the Bouto case, I'm not sure I understood
2   your answer to this, but did you discuss with
3   Mr. Vicente the statements that were made to him
4   by Mr. Bouto in one setting, or did you leave and
5   then come back and question him more about that?
6   Do you remember?
7       A   I believe it was in one -- one seating.
8       Q   Okay.  And do you remember coming back and
9   forth one time, or was it multiple times, or it's
10  just a vague recollection at this point?
11      MR. HORVAT:  Objection; speculation.
12      You can answer if you know.
13      A   My recollection is a few times.
14      Q   Okay.  And did you -- and could you see if
15  anyone else came into the conference room when you
16  went back into your office?
17      A   No.
18      Q   Were you able to see inside the conference
19  room or the front of the conference room from your
20  office?
21      A   Well, you see the door you have right
22  there --
23      Q   Sure.
24      A   -- with the glass on the side?

300

1       Q   Uh-huh.
2       A   Probably something similar to that with
3   the exception of the door was open, and when I
4   stepped away, it wasn't like for 20 minutes or
5   half an hour.  It was probably maybe five minutes,
6   something like that.
7       Q   But were you monitoring the front door?
8       A   No, I wasn't monitoring the front door.
9       MS. BONJEAN:  We have nothing further.
10      MR. HIRST:  I have just a handful of
11  questions.
12  EXAMINATION BY COUNSEL FOR DEFENDANT MATTHEW COGHLAN
13  BY MR. HIRST:
14      Q   Mr. Dillon, my name is Morgan Hirst.  I
15  represent Matt Coghlan in this matter.
16      Before today have you and I ever had any
17  communication whatsoever?
18      A   No.
19      Q   And other than introducing myself downstairs,
20  have we ever had any communication whatsoever?
21      A   No.
22      Q   You've testified about the June 2nd meeting
23  at the State's Attorney's Office with Mr. Vicente
24  and the June 9th meeting at the State's Attorney's

Transcript of John Dillon
Conducted on November 13, 2018

301

1  Office with Mr. Vicente.
2       First, on the June 2nd meeting I just want
3  to be clear. I believe you testified Matt Coghlan
4  was not at that meeting.
5     **A  That's correct.**
6     Q  At the June 9th meeting, was Matt Coghlan
7  at that meeting?
8     **A  No.**
9     Q  On or before June 9th of 1993, did
10 Mr. Vicente ever communicate to you in any way
11 that he had met with Matt Coghlan?
12    **A  No.**
13    Q  Or that he had had any contact with
14 Matt Coghlan whatsoever?
15    **A  No, he did not.**
16    Q  On or before June 9th, 1993, did Detective
17 Halvorsen ever communicate to you that he had any
18 contact with Matt Coghlan concerning Francisco
19 Vicente?
20    **A  No.**
21    Q  On or before June 9th, 1993, did Detective
22 Guevara ever communicate to you that he had any
23 contact with Matt Coghlan related in any way to
24 Francisco Vicente?

302

1     A  No.
2     Q  Did you have any contact with Matt Coghlan
3  on or before June 9th, 1993, relating in any way
4  to Francisco Vicente?
5     A  None.
6     Q  Do you have any reason to believe that
7  Matt Coghlan had any contact relating in any way
8  to Francisco Vicente on or before your second
9  meeting on June 9th, 1993?
10    **A  I have no reason to believe that**
11    **Mr. Coghlan had any contact with him until after**
12    **the Serrano/Montanez case was charged.**
13       MR. HIRST: I have no other questions.
14    Thank you.
15       MS. CARNEY: I have no questions.
16       MR. ENGQUIST: I have none.
17       MR. HORVAT: We will reserve.
18       MS. BONJEAN: I just want one quick
19    question.
20    EXAMINATION BY COUNSEL FOR PLAINTIFF ARMANDO SERRANO
21    BY MS. BONJEAN:
22    Q  If Mr. Vicente alleged that he did have
23    contact with both you and Mr. Coghlan as it
24    relates to the Serrano/Montanez prosecution prior

303

1  to June 8th, 1993, it's your testimony that he's
2  not telling the truth about that?
3     **A  That's a bold-faced lie.**
4       MS. BONJEAN: Okay. Thank you. That's it.
5       THE VIDEOGRAPHER: We are going off the
6  record. The time is 4:31 p.m.
7       (Off the record at 4:31 p.m.)

304

1     CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2
3       I, Paula M. Quetsch, Certified Shorthand
4  Reporter No. 084-003733, CSR, RPR, and a Notary
5  Public in and for the County of Kane, State of
6  Illinois, the officer before whom the foregoing
7  deposition was taken, do hereby certify that the
8  foregoing transcript is a true and correct record
9  of the testimony given; that said testimony was
10 taken by me stenographically and thereafter reduced
11 to typewriting under my direction; that reading and
12 signing was requested; and that I am neither
13 counsel for, related to, nor employed by any of
14 the parties to this case and have no interest,
15 financial or otherwise, in its outcome.
16       IN WITNESS WHEREOF, I have hereunto set my
17 hand and affixed my notarial seal this 26th day of
18 November, 2018.
19
20 My commission expires: October 16, 2021
21
22 _____
23 Notary Public in and for the
24 State of Illinois